**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAMILTON RESERVE BANK LTD., | |
| Plaintiff, | |
| v. | No. 22 Civ. 5199 (DLC) |
| THE DEMOCRATIC SOCIALIST REPUBLIC OF SRI LANKA, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

Robert G. Houck
John P. Alexander
Benjamin A. Berringer
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Defendant*
*The Democratic Socialist Republic of*
*Sri Lanka*

Dated: September 21, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ......................................................................................................1

BACKGROUND ........................................................................................................................4

    I.      The Parties. ...................................................................................................4

    II.     The Indenture. ...............................................................................................5

    III.   The Bonds. ....................................................................................................8

    IV.   Sri Lanka's Financial Situation. ...................................................................9

    V.    Sri Lanka's Interim Policy Regarding Foreign Debt Payments. ..............9

    VI.   Plaintiff's Demand and Purported Acceleration. ......................................11

    VII.  The Instant Proceedings. ............................................................................11

    VIII. Post-Filing Events. .....................................................................................12

ARGUMENT ..........................................................................................................................13

    I.      Plaintiff Lacks Standing to Sue Because It Is Not a Registered Holder of the Bonds. ..................................................................................14

    II.     Plaintiff Lacks Standing to Sue Because It Failed to Make the Requisite Demand on the Trustee. .............................................................15

    III.   Plaintiff's Claims Under the Indenture's *Pari Passu* Clause (Second and Third Causes of Action) Are Legally Defective. ...............17

          A.     Plaintiff's "Ratable Payment" Interpretation of the *Pari Passu* Clause Is Incorrect. ...............................................18

          B.     Plaintiff Fails to Allege a Breach of the *Pari Passu* Clause. ...................................................................................21

CONCLUSION .......................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
    314 F. Supp. 3d 497 (S.D.N.Y. 2018) .................................................................. 12

*Ajdler v. Province of Mendoza*,
    No. 17 Civ. 1530, 2017 WL 3635122 (S.D.N.Y. Aug. 2, 2017) ............................ 23

*Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*,
    677 F.3d 1286 (11th Cir. 2012) ............................................................................ 16

*Apotex Inc. v. Acorda Therapeutics*, Inc.
    823 F.3d 51 (2d Cir. 2016).................................................................................... 4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 13

*Beach v. HSBC Bank USA, N.A.*,
    No. 17 Civ. 5153, 2018 WL 3996931 (S.D.N.Y. Aug. 21, 2018) ..................... 23–24

*Bison Bee LLC v. Republic of Argentina*,
    778 F. App'x 72 (2d Cir. 2019).............................................................................. 23

*Bugliotti v. Republic of Argentina*,
    952 F.3d 410 (2d Cir. 2020)......................................................................... 3, 19, 23

*Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*,
    234 F. Supp. 3d 462 (S.D.N.Y. 2017)................................................................... 15

*Cortlandt St. Recovery Corp. v. Bonderman*,
    31 N.Y.3d 30 (2018) ............................................................................................. 16

*DRAW Cap. Partners, LLC v. Republic of Argentina*,
    No. 18 Civ. 548, 2018 WL 5777024 (S.D.N.Y. Nov. 2, 2018) ......................... 16–17

*EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*,
    309 F. Supp. 3d 89 (S.D.N.Y. 2018)..................................................................... 24

*Elite Union Installations, LLC v. Nat'l Fire Ins. Co. of Hartford*,
    559 F. Supp. 3d 211 (S.D.N.Y. 2021)................................................................... 9

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007).................................................................................. 21

*Exp.-Imp. Bank of the Republic of China v. Grenada,*
   No. 13 Civ. 1450, 2013 WL 4414875 (S.D.N.Y. Aug. 19, 2013) ........................................... 23

*Faber v. Metro. Life Ins. Co.,*
   648 F.3d 98 (2d Cir. 2011) ................................................................................................. 13

*Fink v. Time Warner Cable,*
   714 F.3d 739 (2d Cir. 2013) ............................................................................................... 13

*Fleisher v. Phoenix Life Ins. Co.,*
   858 F. Supp. 2d 290 (S.D.N.Y. 2012) ................................................................................ 24

*Hirsch v. Arthur Andersen & Co.,*
   72 F.3d 1085 (2d Cir. 1995) ............................................................................................... 14

*IMH Broadway Tower Senior Lender, LLC v. Hertz,*
   415 F. Supp. 3d 455 (S.D.N.Y. 2019) ................................................................................ 17

*India.Com, Inc. v. Dalal,*
   412 F.3d 315 (2d Cir. 2005) ............................................................................................... 14

*John Gore Org., Inc. v. Fed. Ins. Co.,*
   No. 21 Civ. 2200, 2022 WL 873422 (S.D.N.Y. Mar. 23, 2022) ........................................... 23

*L-7 Designs, Inc. v. Old Navy LLC,*
   647 F.3d 419 (2d Cir. 2011) ............................................................................................. 4, 14

*MacKay Shields LLC, v. Sea Containers, Ltd.,*
   300 A.D.2d 165 (1st Dep't 2002) ....................................................................................... 15

*McMahan & Co. v. Wherehouse Ent., Inc.,*
   65 F.3d 1044 (2d Cir. 1995) ............................................................................................... 16

*NML Cap., Ltd. v. Republic of Argentina,*
   699 F.3d 246 (2d Cir. 2012) ........................................................................ 18, 19, 20, 21, 22

*NML Cap., Ltd. v. Republic of Argentina,*
   727 F.3d 230 (2d Cir. 2013) ..................................................................................... 3, 19–20, 22

*Penades v. Republic of Ecuador,*
   No. 15 Civ. 725, 2016 WL 5793412 (S.D.N.Y. Sept. 30, 2016) ........................................... 17

*Pons v. People's Republic of China,*
   666 F. Supp. 2d 406 (S.D.N.Y. 2009) ................................................................................ 23

*POSCO Energy Co. v. FuelCell Energy, Inc.*,
  560 F. Supp. 3d 747 (S.D.N.Y. 2021)..................................................................... 17

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  244 F. Supp. 2d 289 (S.D.N.Y. 2003)..................................................................... 12

*RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*,
  No. 10 Civ. 25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) ........................... 16, 23

*Wells Fargo Bank, N.A. v. HoldCo Asset Mgmt., L.P.*,
  No. 16 Civ. 6356, 2017 WL 2963501 (S.D.N.Y. July 11, 2017) ............................ 23

*White Hawthorne, LLC v. Republic of Argentina*,
  No. 16 Civ. 1042, 2016 WL 7441699 (S.D.N.Y. Dec. 22, 2016)............................... 20,  22, 23

*Wilson v. Dantas*,
  746 F.3d 530 (2d Cir. 2014)..................................................................................... 14

Defendant The Democratic Socialist Republic of Sri Lanka ("Sri Lanka") submits this Memorandum of Law in support of its Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

The current economic and humanitarian crisis in Sri Lanka that precipitated this dispute has been extensively reported in the press.  In March 2022, the International Monetary Fund ("IMF") released a report finding that Sri Lanka's public debt had become "unsustainable" and that its reserves were "critically low."  In April 2022, Sri Lanka announced an "Interim Policy" that temporarily suspended foreign debt payments while the nation seeks financial assistance from the IMF.  Sri Lanka recently reached a staff-level agreement with the IMF regarding such assistance. This agreement will require, among other things, financing assurances as to the restoration of debt sustainability from official bilateral creditors and good faith efforts to reach a collaborative agreement with private creditors on a general debt restructuring.

Plaintiff claims to be the beneficial owner of certain international sovereign bonds issued by Sri Lanka (the "Bonds") pursuant to a July 2012 Indenture (the "Indenture").  Instead of participating in the restructuring process to achieve the debt sustainability that is necessary for IMF financing (or even waiting for it to take place), Plaintiff commenced this litigation.  The Complaint seeks over $250 million in damages and drastic injunctive relief that would bar Sri Lanka from paying any other creditor.  The Court should reject Plaintiff's apparent attempt to gain leverage over a nation in crisis and jump ahead of other foreign creditors (none of whom have sued).

As an initial matter, Plaintiff lacks standing in this action.  The Indenture and Bonds are clear that only "Holders"—the Bonds' registered owners—have any rights thereunder.  Plaintiff is not a Holder, but is merely a purported beneficial owner.  Thus, Plaintiff lacks any rights under the governing documents and may not proceed with any of its claims.

Moreover, even if Plaintiff were a Holder, Plaintiff's rush to the courthouse fails to comply with the Indenture's "no-action" clause.  Specifically, Section 5.7 of the Indenture provides that Holders of at least 25% of the outstanding amount of the Bonds may sue only if they first make a written demand on the Indenture trustee to bring suit, offer a reasonable indemnity to the trustee, and then give the trustee 30 days to act (during which time the majority Holders may object to any action).  Plaintiff's purported notice of default, attached to the Complaint, makes no such demand on the trustee, and there is no allegation that Plaintiff has otherwise done so.  Plaintiff should not be allowed to circumvent these requirements.  Indeed, the whole point of a no-action clause is to deter suits brought by a single bondholder that are unpopular with their fellow bondholders. Plaintiff disingenuously trumpets that the Bonds are "broadly held by U.S. retirement systems including Fidelity Investments, BlackRock, T. Rowe Price, Lord Abbett, JP Morgan, PIMCO, Neuberger Berman and other U.S. investors."  (Compl. ¶ 8.)  But neither these retirement systems nor their advisers have sued or joined this matter.  Nor has the trustee or any other bondholder. Indeed, Plaintiff—a private limited company based in St. Kitt's and Nevis—is the only bondholder to sue, suggesting that other bondholders may disagree with Plaintiff's view of the matter.

Apart from these threshold obstacles, Plaintiff's Second and Third Causes of Action relating to the Indenture's *pari passu* clause also should be dismissed for failure to state a claim. The Indenture provides that the Bonds must "rank at least equally" with other foreign currency debt.  Plaintiff argues that this means that whenever Sri Lanka pays any such debt, it also must make a "ratable payment" to Plaintiff.  On this theory, Plaintiff asserts that Sri Lanka will violate the *pari passu* clause if (as announced) it makes payments on certain U.S. dollar denominated debts held predominantly by domestic banks (the "Sri Lanka Development Bonds").   This argument fails.

***First***, Plaintiff's interpretation of the *pari passu* clause is wrong as a matter of law.  It is well-settled that "***mere selectivity in payment***" is "***not enough to give rise to a pari passu violation[.]***"  *Bugliotti v. Republic of Argentina*, 952 F.3d 410, 415 (2d Cir. 2020) (internal quotation marks omitted) (emphasis added); *see also NML Cap., Ltd. v. Republic of Argentina*, 727 F.3d 230, 247 (2d Cir. 2013) (hereinafter "*NML II*") ("[W]e have not held that a sovereign debtor breaches its *pari passu* clause every time it pays one creditor and not another, or even every time it enacts a law disparately affecting a creditor's rights.").  Rather, courts have found a *pari passu* violation only when confronted with an "extraordinary" course of conduct by a "uniquely recalcitrant debtor"—*i.e.*, when Argentina, for several years, disavowed its debt obligations and passed legislation barring payment of the debt and recognition of related judgments, among other things.

***Second***, Plaintiff comes nowhere close to alleging the requisite extreme conduct by Sri Lanka that would amount to a *pari passu* violation.  Sri Lanka has not disavowed its debt, nor has it passed any legislation prohibiting debt repayment.  Instead, Sri Lanka is only alleged to have defaulted on its debt in the past few months and—in the midst of a humanitarian and economic crisis—is working towards the approval of an IMF program that contemplates a proposed consensual debt restructuring with creditors.  As described more fully in the Interim Policy, Sri Lanka has *temporarily* suspended repayment but has explicitly acknowledged that interest will run thereon during the payment suspension.  On this motion to dismiss record, the mere allegation

that Sri Lanka intends to pay certain domestic debt obligations—but for the time being, not foreign

debt holders—is woefully insufficient to state a claim.

For the foregoing reasons, and those set forth below, the Complaint should be dismissed.

## BACKGROUND[1]

### I.     The Parties.

Defendant Sri Lanka is a foreign state.  (Compl. ¶ 11.)[2]  The U.S. State Department notes

that U.S.-Sri Lanka relations are "based on shared democratic values and a rules-based regional

and international order."  (Houck Ex. 12.)  Sri Lanka and the U.S. belong to a number of the same

international organizations, including the United Nations, The World Bank, and the IMF.

(Compl. ¶ 39.)

Plaintiff Hamilton Reserve Bank Ltd. ("Plaintiff") is a private limited company based in

St. Kitt's and Nevis.  (Compl. ¶ 10; Houck Ex. 3.)  Plaintiff purports to be the beneficial owner of

US$250,190,000 in principal amount of Bonds issued by Sri Lanka.  (Compl. ¶ 10; Compl. Ex. B.)

Plaintiff claims that this amount represents more than 25% of the aggregate principal amount of

the Bonds.  (*Id*.)

---

[1]  The following background is based on the allegations of the Complaint that are assumed to be true solely for the purposes of this Motion.  Reference is also made herein to the documents attached as exhibits to the Declaration of Robert G. Houck dated September 21, 2022 ("Houck Ex.").  The Court may consider these documents because they are "incorporated in [the complaint] by reference," "integral to the complaint," and/or are information subject to judicial notice because it is "publicly available and its accuracy cannot reasonably be questioned." *See Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); *L-7 Designs, Inc. v. Old Navy LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks omitted).

[2]  Sri Lanka has waived sovereign immunity in this matter solely to the extent expressed in Section 1.17 of the Indenture.  (*See* Compl. Ex. A.)

## II.    The Indenture.

Sri Lanka, as issuer, and HSBC Bank USA, National Association, as trustee and other roles (the "Trustee"), entered into an Indenture as of July 25, 2012 (the "Indenture," *see* Compl. Ex. A). The Indenture governs Sri Lanka's issuance of US$1,000,000,000 in aggregate principal amount of bonds with a "Stated Maturity" of July 25, 2022 (the "Bonds") (Indenture § 3.1).[3]   As relevant here, several provisions of the Indenture are summarized below:

*First*, the Indenture provides rights only to Sri Lanka, the Trustee, and the "Holders." Specifically, Section 1.12 provides:

> Nothing in this Indenture or in the Securities, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder and **the Holders** of Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

(Indenture § 1.12 (emphasis added).)  "Holder" is defined as the person "in whose name a Security is registered in the Security Register."   (Indenture § 1.1, at p 3; *see also* § 1.5 (providing that ownership of the Bonds "shall be proved by the Security Register").)

*Second*, the initial Holder of all of the Bonds is The Depositary Trust Company ("DTC"). (*See* Indenture, Definitions at pp. 2–3; §§ 2.1, 3.4(d)(i).)[4]   The Bonds can be exchanged or transferred to other persons, including beneficial owners, but only under certain circumstances and involving the issuance of a new security in the new Holder's name.  (*See* Indenture § 3.4.)[5] Absent

---

[3]    The Indenture also refers to the Bonds as the "Securities."  (*See* Indenture, Recitals.)

[4]    Specifically, the Bonds are initially issued as "Global Securities," meaning they are registered in the name of the "Depositaries"—*e.g.*, DTC—or their nominees.  (Indenture, Definitions at p. 2–3; §§ 2.1, 3.4(d)(i).)  Therefore, "DTC, as registered Holder of such Global Bond, will be considered the sole owner or Holder of the Bonds represented by such Global Bond for all purposes under such Bonds and the Indenture," absent a transfer.  (Houck Ex. 2, at 135.)

[5]    In particular, the Bonds may be exchanged or transferred to "Non-Global Securities"—*i.e.*, held in the name of someone other than DTC or its nominee—only in certain circumstances. (Indenture, §§ 3.4(b)(iv), (d)(ii)–(iii); *see also* Houck Ex. 2, at 134–39.)  Effecting such an

a registered transfer, Sri Lanka and the Trustee may treat the person "in whose name such Security is registered" as the owner for purposes of paying principal and interest "and for all other purposes whatsoever, whether or not such Security be overdue, and neither the Issuer, the Trustee nor any agent of the Issuer or the Trustee shall be affected by notice to the contrary."  (Indenture § 3.8.)

*Third*, the Indenture contains a "*pari passu*" clause providing as follows:

> The Securities constitute direct, unconditional, unsubordinated and unsecured general obligations of the Issuer and will at all times rank *pari passu* among themselves in all respects, without any preference of one over the other by reason of priority of date of issue or otherwise, and will at all times rank at least equally with all other present and future unsecured and unsubordinated External Indebtedness.

(Indenture § 3.1.)  "External Indebtedness" refers to "unsecured, unsubordinated obligations" of Sri Lanka that are "expressed or denominated or payable, or which, at the option of the relevant creditor, may be payable in or by reference to any currency other than the lawful currency of Sri Lanka."  (Indenture § 9.3(c).)

*Fourth*, the Indenture identifies various "Events of Default."  These include Sri Lanka's non-payment of principal or interest when due, breach of "the other covenants or agreements contained in the Securities or in this Indenture," cross-default in connection with other External Indebtedness, and declaration of a general moratorium respecting External Indebtedness (all as described in more detail in the Indenture, § 5.1.)  If an Event of Default occurs, the "Holders of not less than 25%" of the principal amount of the Bonds may declare the Bonds "immediately due and payable," subject to other terms of the Indenture.  (Indenture § 5.1.)

*Fifth*, the Trustee has primary responsibility for enforcing the Indenture and bringing claims related thereto.  For instance, the Trustee may bring suit for the collection of unpaid

---

exchange or transfer requires the issuance and authentication of a new security pursuant to the procedures specified in the Indenture.  (Indenture §§ 3.4(a)–(b).)

amounts and to "protect and enforce its rights and the rights of the Holders . . . ."  (Indenture § 5.3.)

Any recovery by the Trustee must be for the "ratable benefit of the Holders" (subject to

reimbursement of expenses).  (Indenture § 5.5; *see also* § 5.6.)

       **Sixth**, the Holders may not bring suit on their own except in certain circumstances.

Section 5.7 ("Limitation on Suits") specifies:

> ***No Holder of any Security shall have any right to institute any suit,*** action
> or proceeding, judicial or otherwise, in equity or at law, or otherwise, with
> respect to this Indenture, or for the appointment of a receiver or trustee, or
> for any other remedy hereunder, ***unless***:
>
> (a) such Holder has previously given written notice to the Trustee of a
> continuing Event of Default;
>
> (b) the Holders of not less than 25% in aggregate principal amount of the
> Outstanding Securities shall have made written request to the Trustee to
> institute proceedings in respect of such Event of Default in its own name as
> Trustee hereunder;
>
> (c) such Holder or Holders have offered to the Trustee reasonable indemnity
> against the costs, expenses and liabilities to be incurred in compliance with
> such request;
>
> (d) the Trustee for 30 days after its receipt of such notice, request and offer
> of indemnity has failed to institute any such proceeding; ***and***
>
> (e) no direction inconsistent with such written request has been given to the
> Trustee during such 30-day period by the Holders of a majority in principal
> amount of the Outstanding Securities;
>
> it being understood and intended that no one or more Holders shall have any
> right in any manner whatever by virtue of, or by availing of, any provision of
> this Indenture to affect, disturb or prejudice the rights of any other Holders,
> or to obtain or to seek to obtain priority or preference over any other Holders
> or to enforce any right under this Indenture, except in the manner herein
> provided and for the equal and ratable benefit of all the Holders.

(Indenture § 5.7 (emphasis added).)  Notwithstanding these restrictions, "the Holder of any

Security" has the right to "receive payment" of principal and interest "on the respective Stated

Maturities" and "to institute suit for the enforcement of any such payment . . ." (Indenture § 5.8.)

### III.    The Bonds.

The Bonds themselves incorporate the Indenture and its terms, explaining that they are

"issued and to be issued" under the Indenture, and:

> to which Indenture and all indentures supplemental thereto reference is
> hereby made for a statement of the respective rights, limitations of rights,
> duties and immunities thereunder of the Issuer, the Trustee and the Holders
> of the Securities and of the terms upon which the Securities are, and are to
> be, authenticated and delivered.

(Indenture § 2.3.)[6]  Among other things, the Bonds recite their payment terms.  (Indenture § 2.2.)

The face of the Bonds also makes clear that they are registered in the name of DTC or Cede

& Co. and can be transferred only on the terms specified in the Indenture:

> THIS SECURITY IS A GLOBAL SECURITY WITHIN THE MEANING
> OF THE INDENTURE HEREINAFTER REFERRED TO AND IS
> REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE
> THEREOF.  THIS SECURITY MAY NOT BE EXCHANGED IN WHOLE
> OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER
> OF THIS SECURITY IN WHOLE OR IN PART MAY BE REGISTERED,
> IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITARY
> OR A NOMINEE THEREOF, EXCEPT IN THE LIMITED
> CIRCUMSTANCES DESCRIBED IN THE INDENTURE. . . .

(*Id.*)  In addition, unless the Bond is provided to Sri Lanka by DTC or Cede & Co. for a registered

transfer, "ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR

OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED

OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."  (*Id.*)  The Bonds further

state that, absent a registered transfer, Sri Lanka and the Trustee "may treat the Person in whose

name this Security is registered as the owner hereof for all purposes, whether or not this Security

---

[6]    Plaintiff does not provide a copy of any Bonds, but the Indenture specifies the form of the
Bonds.  (*See* Indenture § 2.)

be overdue, and neither the Issuer, the Trustee nor any such agent shall be affected by notice to the contrary."  (Indenture § 2.3.)

## IV.  Sri Lanka's Financial Situation.

Sri Lanka's ongoing economic and humanitarian crisis is a matter of public record.  In March 2022, the IMF released a report on Sri Lankan economic matters, noting that "***public debt has become unsustainable, and gross reserves are critically low and insufficient to cover near-term debt service needs.***"  (Houck Ex. 4, at 1 (emphasis added).)[7]  According to the IMF report, Sri Lanka has an annual US$7-8 billion in foreign currency debt service costs (with US$7 billion in 2022) and "[n]et international reserves have become negative since November 2021."  (Houck Ex. 4, at 9, 13, 37, 50, 60–61.)  The report further notes that Sri Lanka's government interest bill is "among the highest in the world," its debt-to-GDP ratio has "sharply increased," and "all three international ratings agencies have downgraded Sri Lanka to CCC and lower" (*Id.* at 47).[8]

## V.  Sri Lanka's Interim Policy Regarding Foreign Debt Payments.

In April 2022, Sri Lanka began seeking to restructure its external debt.  (Compl. ¶ 35.)

On April 12, 2022, Sri Lanka announced the "Interim Policy Regarding the Servicing of Sri Lanka's External Public Debt" (the "Interim Policy").  (Compl. ¶ 35; Houck Ex. 5.)  The policy

---

[7]  The IMF report was issued pursuant to the IMF's "surveillance" function of each member state, set forth in Article IV of the IMF Articles of Agreement.  The Court may take judicial notice of this document.  *See, e.g.*, *Elite Union Installations, LLC v. Nat'l Fire Ins. Co. of Hartford*, 559 F. Supp. 3d 211, 218 (S.D.N.Y. 2021) (on motion to dismiss, courts may "take judicial notice of certain matters of public record," including "letter decisions of government agencies, published reports, records of administrative agencies" (internal quotation marks omitted)).

[8]  Sri Lanka's foreign currency issuer rating was subsequently downgraded to SD by S&P on April 25, 2022 (reaffirmed on August 15), downgraded to Ca by Moody's on April 18, and to RD by Fitch on May 19.  (*See* Houck Exs. 7, 9, 11, 15.)  Fitch may upgrade the rating upon completion of restructuring that "normalise[s] the relationship with the international financial community."  (Houck Ex. 18.)

explains that the difficult economic situation has made normal debt servicing impossible, that Sri Lanka will seek a comprehensive debt restructuring, and that Sri Lanka has approached the IMF for financial assistance. (Houck Ex. 5.) Therefore, pending an "orderly and consensual" debt restructuring, Sri Lanka adopted certain "emergency measures as temporary expedients" in order to "preserve the financial *status quo*," including:

- The Interim Policy will apply only "until, with the assistance of the IMF and Sri Lanka's other official sector partners, a full economic recovery program can be prepared";

- Sri Lanka will "suspend normal debt servicing" of "Affected Debts"—*i.e.*, external obligations (including "[a]ll outstanding series of bonds issued in the international capital markets") that are denominated in foreign currency and governed by foreign law;

- Affected debtholders are "requested to capitalize any amounts of principal or interest falling due during this interim period," and "such amounts shall bear interest during the interim period at the normal contractual rate applicable to that credit," "until a restructuring proposal can be presented to the creditors for their consideration"; and

- Sri Lanka expects and intends to, among other things, "engage in good faith discussions" with and "invite the views of" its creditors regarding the proposed restructuring, which will be consistent with "the parameters of the IMF-endorsed economic adjustment program" and "the principles of inter-creditor equity (both as between different creditor groups and among individual members of each creditor group)."

(Houck Ex. 5.)

Sri Lanka has clarified that the Interim Policy does not apply to certain obligations known as "Sri Lanka Development Bonds" or "SLDBs." (Compl. ¶¶ 35–36.) SLDBs are governed by Sri Lankan law and therefore are not "Affected Debts" under the Interim Policy. (Houck Ex. 6.) The Complaint quotes a press report explaining that the SLDBs are "dollar denominated bonds" held mainly by "domestic banks." (Compl. ¶¶ 35–36.)[9]

---

[9]   The same article explains Sri Lanka's reasoning that "the government may have had to inject capital into banks if they are given hair cuts, cancelling the effect of any hair cuts." (Houck Ex. 8.) Another article cited in the Complaint explains the concern that "if local debt restructuring is carried out in any way, it could have a severe impact on the asset bases of local pension funds, banks, and insurance companies." (Houck Ex. 10.)

## VI.    Plaintiff's Demand and Purported Acceleration.

On June 21, 2022, Plaintiff sent a letter to the Trustee as a purported "Beneficial Owner" of certain of the Bonds.  (Compl. ¶ 27; Compl. Ex. B.)  In particular, Plaintiff stated that it "currently holds Bonds as indicated below":

| ISIN | *Beneficial Owner* | Principal Amount Held |
|------|--------------------|-----------------------|
| USY2029SAH77 | Hamilton Reserve Bank Ltd. | US$250,190,000 |

(Compl. Ex. B (emphasis added).)  Plaintiff claimed that there had been two alleged events of default under the Indenture: (1) Sri Lanka's non-payment in May 2022 of certain interest in connection with other sovereign debt (an alleged "cross-default" under Section 5.1(c)); and (2) Sri Lanka's April 2022 suspension on debt servicing as described in the Interim Policy (an alleged "moratorium" default under Section 5.1(d)).  (Compl. Ex. B.)  As a result, Plaintiff purported to accelerate the Bonds, and demanded immediate payment of all principal and interest.

The letter did not make any demand that the Trustee bring suit or offer any indemnity in connection therewith, nor did it refer to the Indenture's *pari passu* clause.  (*See* Compl. Ex. B.)

## VII.    The Instant Proceedings.

On June 21, 2022—***the very same day*** as its purported acceleration notice—Plaintiff commenced the instant action alleging that Sri Lanka had failed to make immediate payment. Plaintiff brings three claims for relief:

***First***, Plaintiff seeks damages based on Sri Lanka's alleged breach of contract (First Cause of Action).  The theory is that Sri Lanka did not make immediate payment of all principal and interest in response to Plaintiff's June 21 acceleration letter.  (Compl. ¶¶ 25, 26, 41–46.)

***Second***, Plaintiff seeks declaratory relief (Second Cause of Action) regarding its purported rights under the Indenture's *pari passu* clause.  In particular, Plaintiff asserts that any payment of

the SLDBs or other External Indebtedness "without also making a ratable payment at the same time to Plaintiff" would violate the clause.  (Compl. ¶¶ 49–50.)

*Third*, Plaintiff seeks specific performance (Third Cause of Action) of the *pari passu* clause.  Plaintiff argues that payment of the SLDBs "without ratable payments at the same time" to Plaintiff, or "other discriminatory actions," "will violate" the *pari passu* clause.  (Compl. ¶ 52.) Plaintiff asks for a "mandatory injunction requiring Sri Lanka to pay Plaintiff ratably whenever it makes any payment to the holders of External Indebtedness . . . ."  (Compl. ¶ 53.)

## VIII.   Post-Filing Events.

Following the filing of the Complaint, the political and economic crisis in Sri Lanka intensified.  The former President resigned on or about July 14, 2022, and the new and current President, Ranil Wickremesinghe, was elected by members of Parliament on July 20, 2022.[10]  The U.S. State Department has a travel advisory in effect noting that visitors should "[r]econsider travel" to Sri Lanka because of the "ongoing economic situation" (including fuel, medicine, and food shortages).[11]

After extensive discussions between the IMF and Sri Lankan authorities, on September 1, 2022, the IMF announced a staff-level agreement on a 48-month extended fund facility arrangement of about US$2.9 billion.  (*See* Houck Ex. 17.)  The IMF press release notes the "acute crisis" facing Sri Lanka, including that:

---

[10]   (*See* Houck Ex. 16.) On a motion to dismiss, the Court may take judicial notice of "indisputable historical events," including from sources such as government websites. *See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 314 F. Supp. 3d 497, 515 n.3 (S.D.N.Y. 2018) (taking judicial notice of the 2008 financial crisis); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 296 n.4, 297 n.6 (S.D.N.Y 2003) (for background, taking judicial notice of the CIA World Factbook and a State Department note regarding conditions in Sudan).

[11]   (*See* Houck Ex. 13.)  The World Bank has also issued a statement that it is "deeply concerned about the dire economic situation and its impact on the people of Sri Lanka." (Houck Ex. 14.)

[A] critically low level of foreign reserves has hampered the import of essential goods, including fuel, further impeding economic activity. The economy is expected to contract by 8.7 percent in 2022 and inflation recently exceeded 60 percent. The impact has been disproportionately borne by the poor and vulnerable.

Against this backdrop, the authorities' program, supported by the Fund, would aim to stabilize the economy, protect the livelihoods of the Sri Lankan people, and prepare the ground for economic recovery and promoting sustainable and inclusive growth.

(*Id.*)  According to the IMF press release, the agreement is still subject to approval by IMF management and is contingent on, among other things, "receiving financing assurances from Sri Lanka's official creditors and making a good faith effort to reach a collaborative agreement with private creditors.  Debt relief from Sri Lanka's creditors and additional financing from multilateral partners will be required to help ensure debt sustainability and close financing gaps."  (*Id.*)

## ARGUMENT

To survive a motion to dismiss, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "Plausibility depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."  *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (internal alterations and quotation marks omitted).

A pleading is insufficient when it contains only "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]"  *Iqbal*, 556 U.S. at 678; *see also Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (noting that court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions" (internal quotation marks omitted)).  Moreover, "[g]eneral, conclusory allegations need not be

credited . . . when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995); *see also L-7 Designs,* 647 F.3d at 422 (noting that factual allegations are "assume[d] to be true unless contradicted by more specific allegations or documentary evidence").

## I.    Plaintiff Lacks Standing to Sue Because It Is Not a Registered Holder of the Bonds.

Plaintiff lacks standing to sue on any of its claims because it is not a "Holder"—*i.e.*, it is not the registered owner of—any of the Bonds.

The Indenture provides that only Sri Lanka, the Trustee, and "***the Holders***"—*i.e.*, the registered owners of the Bonds—are entitled to "any benefit or any legal or equitable right, remedy or claim under this Indenture."   (Indenture § 1.12 (emphasis added); *see also* Indenture § 1.1 (defining Holder as "a Person in whose name a Security is registered in the Security Register").)[12] It is well-established that such clauses—sometimes called "negating clauses" because they negate the ability of unnamed third parties to sue—are enforceable.  As the Second Circuit has explained:

> Under New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: where a provision exists in an agreement expressly negating an intent to permit enforcement by third parties, that provision is decisive.

*India.Com, Inc. v. Dalal*, 412 F.3d 315, 321 (2d Cir. 2005) (internal quotation marks and alterations omitted); *see also Wilson v. Dantas*, 746 F.3d 530, 537 (2d Cir. 2014) (holding that negating clause precludes suit by third parties "even where a contract expressly sets forth obligations to specific individuals or categories of individuals" (internal quotation marks omitted)).

---

[12]   The Bonds themselves also make clear that they are registered in the name of DTC or Cede & Co. and that only registered owners have any rights.  (*See* Indenture § 2.3.)

Here, it is clear from Plaintiff's purported acceleration letter attached to the Complaint that it is at most a "Beneficial Owner" of the Bonds.  (*See* Compl. Ex. B.)[13]  That Plaintiff is not a "Holder" is further confirmed by the terms of the Indenture, which strictly limit the circumstances in which ownership of the Bonds may be transferred to a person other than DTC or its nominee (and which Plaintiff does not allege has taken place here).  (*See* Indenture, §§ 2.1, 3.4.)

The fact that Plaintiff may be a beneficial owner of the Bonds is irrelevant.  As the First Department has explained:

> Standing to sue upon the indentures which plaintiffs seek to enforce is, pursuant to the indentures, expressly reserved to "holders."  The indentures define a "holder" as one in whose name a senior note is registered.  Inasmuch as it is undisputed that plaintiffs are not registered holders, they are without standing to sue, regardless of whether they are beneficial holders.

*MacKay Shields LLC*, *v. Sea Containers, Ltd.*, 300 A.D.2d 165, 166, (1st Dep't 2002); *see also Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 476 (S.D.N.Y. 2017) ("Because of the negating clauses, [plaintiff], as a beneficial but not registered owner of the Certificates, lacks standing to bring its breach of contract claims.").

## II.    Plaintiff Lacks Standing to Sue Because It Failed to Make the Requisite Demand on the Trustee.

Plaintiff also lacks standing to sue because (even if it were a Holder) it has not made the requisite demand on the Trustee to bring suit.  In particular, Section 5.7 of the Indenture imposes various restrictions on when Holders may bring suit.  Among other things, the Holders of at least 25% in aggregate principal amount of the Bonds must first make a written demand on the Trustee

---

[13]    Plaintiff alleges that it "*h*olds Bonds" (*see, e.g.*, Compl. ¶ 1 (emphasis added)), but does not claim to be a "*H*older."  In any event, any conclusory reference in the Complaint to "holding" is belied by the clear language of Plaintiff's June 21 letter.  (*See* Compl. Ex. B.)

to bring suit, offer to provide a reasonable indemnity, and wait 30 days for the Trustee to act (during which time Holders representing a majority may object to any action).  (Indenture § 5.7.)

> This type of clause is often called a "no-action" clause.  Its primary purpose is:

>> to protect issuers from the expense involved in defending individual lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors.  The inclusion of such a clause in an indenture makes it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders.

*Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 43 (2018) (internal citations and quotation marks omitted); *see also Akanthos Cap. Mgmt., LLC v. CompuCredit Holdings Corp.*, 677 F.3d 1286, 1295 (11th Cir. 2012) (under New York law, "[a]n important purpose of no-action clauses is to protect against the exercise of poor judgment by a single bondholder or a small group of bondholders") (internal quotation marks omitted).  Though "strictly construed," such clauses "frequently are included in indentures" and "have been enforced in a variety of contexts in both federal and state courts."  *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1050–51 (2d Cir. 1995) (internal quotation marks omitted); *see also RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*, No. 10 Civ. 25, 2011 WL 3251554, at \*6 (S.D.N.Y. July 28, 2011) ("It is well established that 'no action' clauses bar claims by individual bondholders who fail to comply with the conditions precedent recited therein.").

Here, Plaintiff does not allege compliance with Section 5.7 of the Indenture.  While Plaintiff purported to provide the Trustee with an alleged notice of default, that letter contains no demand that the Trustee bring suit, nor any offer of indemnity, as required.  (*See* Compl. ¶ 27; Compl. Ex. B.)  Plaintiff makes no other allegation concerning any demand on the Trustee that complies with Section 5.7.  Therefore, all claims should be dismissed.  *See, e.g., DRAW Cap. Partners, LLC v. Republic of Argentina*, No. 18 Civ. 548, 2018 WL 5777024, at \*2 (S.D.N.Y. Nov. 2, 2018) (dismissing claim where plaintiff failed to plead compliance with no-

action clause); *Penades v. Republic of Ecuador*, No. 15 Civ. 725, 2016 WL 5793412, at *3 (S.D.N.Y. Sept. 30, 2016) (same).[14]

Moreover, Plaintiff's aggressive approach here is exactly the sort of unilateral action that no-action clauses are meant to deter. Sri Lanka is only alleged to have defaulted in the past few months and is still seeking approval from the IMF board of its program. Such approval is conditional on Sri Lanka achieving debt sustainability—which will require debt restructuring. Plaintiff asserts that the Bonds are "broadly held by U.S. retirement systems including Fidelity Investments, BlackRock, T. Rowe Price, Lord Abbett, JP Morgan, PIMCO, Neuberger Berman and other U.S. investors." (Compl. ¶ 8.) However, neither the Trustee, nor any of these investors, nor anyone else has brought suit, and Plaintiff does not purport to be proceeding on behalf of all bondholders. Especially in these circumstances—where Plaintiff is seeking to jump ahead of other creditors—Plaintiff should not be allowed to circumvent the Indenture's requirements.

## III. Plaintiff's Claims Under the Indenture's *Pari Passu* Clause (Second and Third Causes of Action) Are Legally Defective.

Plaintiff asserts that (1) the Indenture's *pari passu* clause mandates ratable payments, and (2) any payments of External Indebtedness—*e.g.*, paying the SLDBs—without a corresponding ratable payment to Plaintiff violates the clause. Plaintiff is wrong on both counts, and its Second and Third Causes of Action should be dismissed.

---

[14] *See also POSCO Energy Co. v. FuelCell Energy, Inc.*, 560 F. Supp. 3d 747, 754 (S.D.N.Y. 2021) ("Because it has not plausibly alleged satisfaction of the condition precedent, [plaintiff] has failed to state a claim for breach of contract[.]"); *IMH Broadway Tower Senior Lender, LLC v. Hertz*, 415 F. Supp. 3d 455, 463 (S.D.N.Y. 2019) (where guarantor's liability was subject to condition precedent, "plaintiffs must plead accordingly in order to state a claim against defendants").

### A.    Plaintiff's "Ratable Payment" Interpretation of the *Pari Passu* Clause Is Incorrect.

Throughout the Complaint, Plaintiff refers to the *pari passu* clause as the "Equal Treatment Provision" (though this language appears nowhere in the Indenture).  Plaintiff claims that under this provision, Sri Lanka may not pay "any other External Indebtedness (*i.e.*, debt issued in any currency other than Sri Lanka's)—without also making a ratable payment at the same time to Plaintiff."  (Compl. ¶ 33.)  This "ratable payment" interpretation is incorrect as a matter of law.

The Indenture's *pari passu* clause provides:

> The Securities constitute direct, unconditional, unsubordinated and unsecured general obligations of the Issuer and will at all times rank *pari passu* among themselves in all respects, without any preference of one over the other by reason of priority of date of issue or otherwise, and will at all times rank at least equally with all other present and future unsecured and unsubordinated External Indebtedness.

(Indenture § 3.1.)  Nothing in the clause says that Sri Lanka must ***pay*** all External Indebtedness at the same time or that, if it does not, it must make ratable payments.  If the parties had wanted to require "ratable payments" in a default scenario, they could have said so.[15]

Plaintiff evidently seeks to rely on the Second Circuit's interpretation of a *pari passu* clause in connection with Argentina's long-running sovereign debt litigation.  (*See* Compl. ¶ 37.)  In that case, the relevant Fiscal Agency Agreement ("FAA") provided: "***The payment obligations*** of the Republic under the Securities shall at all times rank at least equally . . . ."  *NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 251 (2d Cir. 2012) (hereinafter "*NML I*") (emphasis added).  The court found that this specific language in the *pari passu* clause prevented Argentina from

---

[15]   For instance, the Indenture elsewhere provides that when Holders bring suit, they must do so "for the equal and ***ratable*** benefit of all the Holders."  (§5.7 (emphasis added).)

giving "priority to other payment obligations" by "discriminating against FAA Bonds in favor of other unsubordinated foreign bonds." *Id.* at 259.

However, the Second Circuit was careful to emphasize the limited scope of its interpretation and to stress that its interpretation of the FAA *pari passu* clause did not necessarily apply to any future sovereign default.

***First***, the Court noted that its decision was driven by the "particular language of the FAA's *pari passu* clause," which "dictated a certain result in this case." *NML II*, 727 F.3d at 248. More specifically, according to the Second Circuit, the FAA's *pari passu* clause meant that Argentina was prohibited "as bond *payor,* from paying on other bonds without paying on the FAA Bonds." *NML I*, 699 F.3d at 259 (emphasis in original). The Court explained, however, that a different *pari passu* clause could lead to a different result. *See NML II*, 727 F.3d at 248 ("If, in the future, parties intend to bar preferential payment, they may adopt language like that included in the FAA. If they mean only that subsequently issued securities may not explicitly declare subordination of the earlier bonds, they are free to say so."). Because the Indenture's *pari passu* clause does not contain language addressing payment obligations, they fall into the latter category.

***Second***, the Court also has explained that only "extraordinary" conduct would violate a *pari passu* clause. Indeed, "***mere selectivity in payment among FAA bondholders is not enough to give rise to a pari passu violation[.]***" *Bugliotti*, 952 F.3d at 415 (internal quotation marks omitted; emphasis added); *see also NML II*, 727 F.3d at 247 ("[W]e have not held that a sovereign debtor breaches its *pari passu* clause every time it pays one creditor and not another, or even every time it enacts a law disparately affecting a creditor's rights."). Rather, finding a violation of the *pari passu* clause "required us to conclude that Argentina was a 'uniquely recalcitrant debtor'" engaged in "extraordinary behavior." *Bugliotti*, 952 F.3d at 415; *NML II*, 727

F.3d at 247.  This extreme course of conduct included years of refusing to pay holdout creditors (while paying restructured debt), disavowing payment obligations, and passing legislation (a so-called "Lock Law") that banned payment or recognition of judgments.  *See NML I*, 699 F.3d at 259–60.

\*        \*        \*

The Second Circuit's holding that only extreme conduct violates a *pari passu* clause makes sense.  There is of course no bankruptcy regime for foreign sovereigns—instead, "in the event of a debt crisis, sovereigns wishing to honor some portion of their defaulted debt must negotiate with individual creditors or groups of creditors to effectuate restructurings." *Id.* at 251 n.2.  If a foreign sovereign in default could be subject to a specific performance claim any time it pays some creditors but not others, the prospects of a consensual debt resolution process would be severely undermined.  Recognizing this, the U.S. government has expressly disavowed a "ratable payment" interpretation, arguing:

> The ratable payment interpretation of the *pari passu* clause presents a classic collective action problem: no creditor will be willing to accept the reductions in debt necessary for a consensual restructuring plan if creditors are contractually guaranteed to receive the full amount of their outstanding loan obligation at some point in the future, when the sovereign inevitably makes payment on other external indebtedness.

(*See* Houck Ex. 1, at 17–18); *see also id.* at 5 (arguing that such an interpretation could "enable a single creditor to thwart the implementation of an internationally supported restructuring plan").)

*See also White Hawthorne, LLC    v.    Republic    of    Argentina*, No. 16    Civ.    1042, 2016 WL 7441699, at \*3 (S.D.N.Y. Dec. 22, 2016) ("The U.S. Government, too, has maintained the position that simply paying some creditors and not others does not constitute breach.").  The Second Circuit's ruling that a *pari passu* violation requires extraordinary circumstances is consistent with this economic and political reality.

- 20 -

### B.    Plaintiff Fails to Allege a Breach of the *Pari Passu* Clause.

Plaintiff fails to allege anything remotely close to the extreme circumstances necessary to find a violation of a *pari passu* clause.  The Complaint asserts that Sri Lanka's plan to temporarily suspend foreign debt payments, while at the same time planning to pay the SLDBs, is "discriminatory" and thus violates the *pari passu* clause.  (Compl. ¶¶ 8–9, 35, 37, 52.)  These allegations are insufficient because they do not plausibly set forth an "extraordinary" course of conduct.  Among other reasons:

***First***, Sri Lanka is not alleged to be a "uniquely recalcitrant debtor" with long-running defaults.  Indeed, the Complaint alleges that Sri Lanka defaulted only in April or May 2022 for "the first time in its history."  (Compl. ¶¶ 25–26.)  By contrast, Argentina defaulted in 2001 and began to restructure its debt in 2005, and then made full payments on the restructured debt but made "no payments for six years" on plaintiffs' bonds.  *See NML I*, 699 F.3d at 259-60; *see also EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007) ("Argentina has made many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations, as well as through what we might term a diplomacy of default.").

***Second***, as described in the Interim Policy, Sri Lanka's suspension of foreign debt payments is expressly "temporary" and provides that it will last only so long as it takes Sri Lanka to obtain financial assistance from the IMF and engage in good faith efforts with private creditors to reach a collaborative agreement that the IMF envisages.  (Compl. ¶ 35; Houck Ex. 5.)  This is nothing like Argentina's Lock Law, which for several years had the effect of "precluding its officials from paying defaulted bondholders and barring its courts from recognizing plaintiffs' judgments." *See NML I*, 699 F.3d at 260.

***Third***, Sri Lanka has acknowledged its payment obligations and is proposing a consensual restructuring discussion as part of the process of achieving IMF financial support.  (Houck Ex. 5.)

Indeed, the Interim Policy expressly states that interest will run on payment obligations that are deferred during the temporary suspension. Argentina's officials, on the other hand, repeatedly disavowed the nation's debts with "incendiary statements"—*e.g.*, they denigrated holdout creditors as "vulture funds" and "publicly and repeatedly announced their intention to defy any rulings of this Court and the district court with which they disagree." *See NML II*, 727 F.3d at 238, 238 n.4; *NML I*, 699 F.3d at 252–53, 259–60; *White Hawthorne*, 2016 WL 7441699, at *2.

*Fourth*, there is no plausible allegation that Sri Lanka has the "financial wherewithal" to pay its sovereign debt (unlike Argentina which refused to pay creditors for years after its economic crisis had passed). *See NML II*, 727 F.3d at 246. The Complaint alleges that Sri Lanka has US$2 billion in foreign currency reserves and suggests that this is sufficient to pay the Bonds. (Compl. ¶39.) However, even accepting this US$2 billion figure as accurate, the notion that Sri Lanka can pay the more than US$1 billion outstanding on the Bonds in the face of US$7-8 billion in annual foreign debt servicing costs is fanciful.[16]

In these circumstances, the allegation that Sri Lanka plans to pay some domestic creditors (holders of the SLDBs) but not pay all its foreign debt at the same time is woefully insufficient to make out a *pari passu* claim. Notably, courts in this Circuit have repeatedly granted motions to dismiss *pari passu* claims on this basis. For instance, when the Argentine government changed its extreme policy toward holdout creditors, the mere allegation that Argentina was paying some but

---

[16] The Complaint makes the conclusory assertion that "Sri Lanka's default is a matter of choice, as Sri Lanka is capable of paying Plaintiff's Bonds in full." (Compl. ¶ 5.) This allegation is implausible on its face. As support, the Complaint cites statements from Sri Lankan officials in January and February 2022—*i.e.*, *before* the IMF deemed Sri Lanka's foreign reserves "critically low and insufficient to cover near-term debt service needs." (Houck Ex. 4.) In any event, even assuming *arguendo* Sri Lanka could somehow pay the Bonds in full, the Complaint still fails to allege the "extraordinary" conduct necessary to state a claim for the reasons discussed above.

not others was insufficient for a claim.  *See, e.g., Bugliotti*, 952 F.3d at 415 (affirming dismissal because "Plaintiffs have not alleged facts sufficient to disturb our more recent conclusion that Argentina is uniquely recalcitrant no more" (internal quotation marks omitted)); *Bison Bee LLC v. Republic of Argentina*, 778 F. App'x 72, 73 (2d Cir. 2019) (same).  As one court put it:

> [T]he amended complaints boil down to a simple but inadequate allegation: that mere payment to other creditors, including payment encouraged by this court to settle claims on other defaulted debt, constitutes a violation of the *pari passu* clause.  In short, plaintiffs allege breach due to the Republic's decision to pay *other* creditors while plaintiffs hold out for a better deal.

*White Hawthorne*, 2016 WL 7441699, at *3 (granting motion to dismiss).[17]

*      *      *

For the reasons discussed above, the claim for specific performance (Third Cause of Action) should be dismissed.[18]  The declaratory judgment claim (Second Cause of Action) should be dismissed as well for the same reasons.  *See, e.g., John Gore Org., Inc. v. Fed. Ins. Co.*, No. 21 Civ. 2200, 2022 WL 873422, at *13 (S.D.N.Y. Mar. 23, 2022) ("Having ruled that Plaintiff's breach of contract claim fails, Plaintiff's declaratory judgment claim will be dismissed for the same reasons."); *Beach v. HSBC Bank USA, N.A.*, No. 17 Civ. 5153,

---

[17]  *See also Ajdler v. Province of Mendoza*, No. 17 Civ. 1530, 2017 WL 3635122, at *10 (S.D.N.Y. Aug. 2, 2017) ("[Plaintiff] alleges primarily that the Province has paid principal and interest on other bonds, including the New Bonds and 2024 Bonds. This fact, without more, is insufficient to state a claim of breach of *pari passu*."); *Exp.-Imp. Bank of the Republic of China v. Grenada*, No. 13 Civ. 1450, 2013 WL 4414875, at *4 (S.D.N.Y. Aug. 19, 2013) (allegations that Grenada "may have made payments to other external bond holders" and stated it would not pay certain claims "unless resources become available to do so" were insufficient).

[18]  The Third Cause of Action can also be dismissed because specific performance is "not a viable cause of action under New York law"; it is "an equitable remedy for a breach of contract rather than a separate cause of action."  *Wells Fargo Bank, N.A. v. HoldCo Asset Mgmt., L.P.*, No. 16 Civ. 6356, 2017 WL 2963501, at *15, *15 n.11 (S.D.N.Y. July 11, 2017); *RJ Cap.*, 2011 WL 3251554, at *16 (internal quotation marks omitted); *see also Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 414–15 (S.D.N.Y. 2009) ("despite their invocations of a purported *pari passu* clause, plaintiffs have but one cause of action: a right to payment on the salt bonds that was breached in 1960 when the PRC defaulted on the bonds").

2018 WL 3996931, at *7 (S.D.N.Y. Aug. 21, 2018) (same).   In addition, the claim should be dismissed as duplicative and unnecessary because the Third Cause of Action "will resolve the same issues."  *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (dismissing claim for declaratory relief as duplicative); *see also Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 302 (S.D.N.Y. 2012) ("The fact that a lawsuit has been filed that will necessarily settle the issues for which declaratory judgment is sought suggests that the declaratory judgment will serve no useful purpose." (internal quotation marks omitted)).

## CONCLUSION

For the reasons set forth above, Sri Lanka's Motion to Dismiss should be granted.

Dated: September 21, 2022                     Respectfully submitted,
     New York, New York

    s/ Robert G. Houck
    Robert G. Houck
    John P. Alexander
    Benjamin A. Berringer
    CLIFFORD CHANCE US LLP
    31 West 52nd Street
    New York, New York 10019

    *Attorneys for The Democratic Socialist Republic of Sri Lanka*