UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HAMILTON RESERVE BANK LTD.,

              Plaintiff,

              v.

THE DEMOCRATIC SOCIALIST
REPUBLIC OF SRI LANKA,

              Defendant.

22 Civ. 5199 (DLC)

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

## INTRODUCTION

The United States of America respectfully submits this Statement of Interest in accordance with federal statutes that authorize the United States Department of Justice "to attend to the interests of the United States" by "argu[ing] any case in a court of the United States in which the United States is interested." 28 U.S.C. §§ 517, 518.[1]

This Statement of Interest is submitted in litigation filed on June 21, 2022, by Hamilton Reserve Bank Ltd. ("Plaintiff" or "Hamilton Bank") against the Democratic Socialist Republic of Sri Lanka ("Defendant" or "Sri Lanka") seeking payment on $250,190,000 of defaulted sovereign bonds. Dkt. No. 23. Hamilton Bank has filed a motion for summary judgment, Dkt. Nos. 44-48, 52, while Sri Lanka has filed a motion to stay the litigation for a period of six months while it conducts sovereign debt restructuring negotiations with sovereign and commercial creditors, Dkt. Nos. 53-55.

The United States submits this Statement of Interest in support of Sri Lanka's motion for a six-month stay. Sri Lanka's sovereign debt restructuring process, described in Section A *infra*, is well advanced and is progressing toward a favorable resolution for Sri Lanka and its creditors in the coming months. As described in Section B *infra*, U.S. policy interests favor an orderly and

---

[1] Under 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." Under 28 U.S.C. § 518, "[w]hen the Attorney General considers it in the interests of the United States, he may personally conduct and argue any case in a court of the United States in which the United States is interested, or he may direct the Solicitor General or any officer of the Department of Justice to do so." These statutes provide a mechanism for the United States to submit its views in cases in which the United States is not a party, *see, e.g.*, *Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 288 n.4 (S.D.N.Y. 2000); *Ren-Guey v. Lake Placid 1980 Olympic Games, Inc.*, 49 N.Y.2d 771, 773 (1980) (per curiam), and are not intended to "subject[] it to the general jurisdiction of this Court," *Flatow v. Islamic Republic of Iran*, 305 F.3d 1249, 1252-53 & n.5 (D.C. Cir. 2002).

consensual sovereign debt restructuring process consistent with the principles of comparability of treatment and enforceability of contractual rights. Under the circumstances of this case, the United States assesses that the stay would facilitate an orderly and consensual sovereign debt restructuring process. The expectation is that the official creditor committee will reach consensus on debt treatment terms—including a term committing Sri Lanka to seek comparable treatment from its commercial creditors and other official bilateral creditors—by the end of the year. A stay would also facilitate negotiations with private creditors, an estimated majority of which have conditioned their participation on the application of comparable treatment. Hamilton Bank's request that this Court order its immediate repayment undermines these ongoing negotiations. Accordingly, as described in Section C *infra*, the public interest and the interests of others not parties to the litigation support the grant of the motion for a stay.

## A.      Background

### 1.      Principles of Sovereign Debt Restructuring

When countries cannot pay their debts, the resolution of sovereign defaults typically centers on cooperation among the debtor and three groups: (1) official bilateral creditors (*i.e.*, sovereigns such as the United States), (2) multilateral organizations (*i.e.*, international financial institutions such as the International Monetary Fund (IMF) and the World Bank), and (3) private creditors (*i.e.*, bondholders, commercial banks, and all other lenders). As there is no formal international bankruptcy process to govern sovereign debt restructurings, creditors seek to coordinate with one another and the debtor in order to maximize their interest and afford the defaulting sovereign a path to recovery consistent with norms and principles that are ordinarily observed.

The restructuring process may be divided into three phases. During the initiation stage, the debtor—typically based on the IMF's technical calculations—determines whether it will be able

to continue to service its obligations, and if not, the relief that is needed to return the debtor to a sustainable financial position. A negotiation stage follows during which the debtor coordinates with its creditors in order to secure the requisite relief. Finally, during the closing stage the debtor attempts to maximize creditor participation. In parallel, the debtor follows through with IMF-supported policies and reforms and ultimately makes revised debt payments to creditors subject to the terms reached through negotiations.[2]

Multilateral organizations play a critical role in providing financial support to sovereigns in financial distress, and because of that role, retain preferred creditor status during restructurings. The IMF plays a particularly prominent and public good role in sovereign debt negotiations because of its oversight and financing roles, which include providing financing in the context of an economic program designed to help the debtor resolve its balance of payments problems and regain external viability.[3] The IMF conducts a debt sustainability analysis for a country in debt distress, which identifies the resources available for restructured debt service payments and informs the negotiation process. IMF financial assistance to a sovereign that has defaulted on its payment obligations to external creditors is provided consistent with the IMF's policies, in particular the IMF's arrears policies. Such assistance is conditioned on the debtor receiving assurances that official bilateral creditors will provide adequate relief to restore debt sustainability and to ensure the debtor's ability to repay the IMF, and on an assessment that the distressed

---

[2] *See generally* Sean Hagan, Working Paper 20-13, *Sovereign Debt Restructuring: The Centrality of the IMF's Role* (July 2020), https://www.piie.com/sites/default/files/documents/wp20-13.pdf.

[3] *See id.* at p. 4.

sovereign is acting in good faith in its interactions with private creditors.[4] If official bilateral creditors fail to provide such assurances, or the debtor does not act in good faith, or the IMF considers creditor assurances inadequate to return the debtor to sustainability, the IMF may withhold financing. A scenario where the IMF withholds financing risks prolonging the debtor's distress and diminishing creditors' repayment.

The Paris Club is an informal group of twenty-two states, including the United States, that assists in coordinating negotiations between official bilateral creditors and sovereigns suffering repayment difficulties.[5] Paris Club members, in conjunction with non-Paris Club sovereigns, often form an official creditor committee (OCC) that leads negotiations with the debtor country regarding the terms of a restructuring of bilateral debts. One of the Paris Club's key principles for negotiation is that the debtor seek "comparability of treatment," meaning that the debtor commit to seeking relief from other official bilateral creditors and private creditors on terms at least as favorable as those provided by OCC creditors.

---

[4] *See, e.g.*, IMF Policy Paper, *Reviews of the Fund's Sovereign Arrears Policies and Perimeter* (May 18, 2022), https://www.imf.org/en/Publications/Policy-Papers/Issues/2022/05/18/Reviews-of-the-Fund-s-Sovereign-ARREARS-Policies-and-Perimeter-517997.

[5] The Paris Club has 22 permanent members: Australia, Austria, Belgium, Brazil, Canada, Denmark, Finland, France, Germany, Ireland, Israel, Italy, Japan, Republic of Korea, Netherlands, Norway, Russia, Spain, Sweden, Switzerland, United Kingdom, and the United States, with other creditors participating in negotiations on a case-by-case basis. France serves as the Paris Club Chair and the French Treasury acts as the Secretariat. According to the Paris Club's website, the Paris Club's "role is to find coordinated and sustainable solutions to the payment difficulties experienced by debtor countries." Paris Club, https://clubdeparis.org/ (last visited Sept. 30, 2023). While it has no formal charter or rules, the Paris Club works on the basis of consensus and consistent with six key principles: solidarity, consensus, information sharing, case-by-case basis, conditionality, and comparability of treatment. *The Six Principles*, Paris Club, https://clubdeparis.org/en/communications/page/the-six-principles (last visited Sept. 30, 2023).

Private creditors holding substantial portions of the defaulting sovereign's debt will also typically form a committee to facilitate negotiations.[6] From what was once a small group of prominent banks, the universe of private creditors has become increasingly heterogenous in recent decades.[7] This has made coordination more difficult, both among private creditors and between private creditors and the debtor's official bilateral creditors.

In a successful restructuring, the sovereign is able to secure debt relief that will return it to a sustainable financial position while balancing the interests of its creditors. There are several ways in which a restructuring can fail, including: inability to reach an agreement in a reasonable timeframe; the debtor receiving too little relief; too few creditors participating, often accompanied by lengthy and expensive litigation in domestic courts; and the debtor demanding excessive relief from its creditors, undermining its ability to borrow at affordable rates in the future.[8]

2.    **Sri Lanka's Debt Crisis and Restructuring Efforts**

In recent years, Sri Lanka has faced an economic, humanitarian, and political crisis. In the spring of 2022, Sri Lanka defaulted on its external debt. As described by the IMF in its March 20, 2023 Staff Report:

---

[6] *See, e.g.*, *Sri Lanka Bondholders Announce Formation of Group*, PR Newswire (June 21, 2022), https://www.prnewswire.com/news-releases/sri-lanka-bondholders-announce-formation-of-group-301571937.html;   *Sri Lanka Bondholder Group Letter to the IMF*, PR Newswire (Feb. 3, 2023), https://www.prnewswire.com/news-releases/sri-lanka-bondholder-group-letter-to-the-imf-301738096.html.

[7] *See, e.g.*, IMF Policy Paper at 68, *Reviews of the Fund's Sovereign ARREARS Policies and Perimeter* (May 23, 2022), https://www.imf.org/en/Publications/Policy-Papers/Issues/2022/05/18/Reviews-of-the-Fund-s-Sovereign-ARREARS-Policies-and-Perimeter-517997.

[8] *See* Lee Buchheit, Guillaume Chabert, Chanda DeLong and Jeromin Zettelmeyer, *The Sovereign Debt Restructuring Process* (Sept. 4, 2018), https://www.imf.org/-/media/Files/News/Seminars/2018/091318SovDebt-conference/chapter-8-the-debt-restructuring-process.ashx.

Sri Lanka fell into an unprecedented crisis as a result of a series of shocks and policy missteps. Debt rose to unsustainable levels resulting from large fiscal imbalances, and access to international capital markets was lost soon after large tax cuts and the onset of the COVID-19. Reserves were depleted, leading to a sharp exchange rate depreciation, and debt service was suspended in the spring of 2022. Sizable monetary financing to meet fiscal obligations contributed to a surge in inflation. Sri Lanka's economy is in deep recession and financial stability is at risk given the tight financial-sovereign nexus. People are suffering from food and energy shortages, exacerbating deep-rooted public dissatisfaction and creating a vulnerable political and social environment.[9]

On April 12, 2022, Sri Lanka's Ministry of Finance issued an "Interim Policy Regarding the Servicing of Sri Lanka's External Public Debt" (Interim Policy), announcing the suspension of external debt service.[10] Noting the effects of COVID-19 and Russia's war against Ukraine, the Interim Policy suspended "normal debt servicing of all Affected Debts . . . pending an orderly and consensual restructuring of those obligations in a manner consistent with an economic adjustment program supported by the IMF."[11] The Interim Policy defined "Affected Debts" as various

---

[9] IMF, *Sri Lanka: Request for an Extended Arrangement Under the Extended Fund Facility-Press Release; Staff Report; and Statement by the Executive Director for Sri Lanka*, IMF Staff Country Report No. 23/116 (Mar. 2023) [hereinafter "IMF Staff Report"], Executive Summary at 1, https://www.imf.org/en/Publications/CR/Issues/2023/03/20/Sri-Lanka-Request-for-an-Extended-Arrangement-Under-the-Extended-Fund-Facility-Press-531191. Secretary of State Blinken similarly noted during an August 2022 meeting with the Sri Lankan Foreign Minister that "Sri Lanka is in a moment of challenge and crisis." U.S. Dep't of State, *Secretary Antony J. Blinken and Sri Lankan Foreign Minister Ali Sabry Before Their Meeting* (Aug. 4, 2022) [hereinafter "Blinken Statement"], *available at* https://www.state.gov/secretary-antony-j-blinken-and-sri-lankan-foreign-minister-ali-sabry-before-their-meeting/.

[10] Ministry of Fin., *Interim Policy Regarding the Servicing of Sri Lanka's External Public Debt* (2022), *available at* https://www.treasury.gov.lk/api/file/54a19fda-b219-4dd4-91a7-b3e74b9cd683. For purposes of the policy, "external debt" is defined as "obligations for borrowed money or the deferred purchase price of goods or services (i) denominated in a currency other than Sri Lankan Rupees and (ii) governed by a law other than the law of Sri Lanka." *Id.* at 1.

[11] *Id.* at 1-2.

"categories of external public debts of [Sri Lanka] and its public sector borrowers," including "(i) [a]ll outstanding series of bonds issued in the international capital markets."[12]

The Interim Policy noted that holders of "Affected Debts" were requested to capitalize (*i.e.*, add to the outstanding principal) any amounts falling due during the interim suspension, and "such amounts shall bear interest during the interim period at the normal contractual rate applicable to that credit."[13] The Interim Policy also noted that the Sri Lankan government intended, *inter alia*:

> to engage in good faith discussions with representatives of both bilateral and commercial creditors regarding the features of a comprehensive external debt restructuring program consistent with the parameters of the IMF-endorsed economic adjustment program and to invite the views of those parties on the elements of such an external debt restructuring program[.]"[14]

---

[12] *Id.* at 3-4. The definition of "Affected Debts" also included:

> (ii) All bilateral (government-to-government) credits, excluding swap lines between the Central Bank of Sri Lanka and a foreign central bank;
>
> (iii) All foreign currency-denominated loan agreements or credit facilities with commercial banks or institutional investors (including such institutions owned/controlled by foreign governments) for which [Sri Lanka] or a public sector entity is the obligor or guarantor; and
>
> (iv) All amounts payable by [Sri Lanka] or a public sector entity following a call during the interim period upon a guarantee (or equivalent financial undertaking) issued in respect of the debt of a third party. *Id.*

[13] *Id.* at 2. According to the policy, promptly after the scheduled due date of an affected principal or interest payment, the Ministry would send to the creditor, relevant trustee, or fiscal agent written confirmation of the new principal amount of the Affected Debt as shown on Ministry records. *Id.* at 2-3. The policy also indicated that the holder of an Affected Debt could request the Sri Lankan Rupee equivalent of an amount falling due during the interim period in lieu of capitalization and that the Ministry would attempt to accommodate that request, "provided that doing so (i) is consistent with the Central Bank's monetary policy and (ii) is feasible under the relevant credit documentation." *Id.* at 3.

[14] *Id.* at 4-5. After announcing its intention to seek external debt restructuring and suspending payment on Affected Debts, Sri Lanka formally defaulted on its international sovereign bonds

Following Sri Lanka's request for an IMF arrangement in April 2022, IMF staff and Sri Lankan authorities reached a staff-level agreement (SLA) on a roughly $2.9 billion, 48-month arrangement under the Extended Fund Facility (EFF) on September 1, 2022.[15] The IMF EFF "provides financial assistance to countries facing serious medium-term balance of payments problems because of structural weaknesses that require time to address."[16] The SLA was subject to approval by the IMF Executive Board, contingent on Sri Lanka's implementation of prior actions and receipt of financing assurances from official bilateral creditors, as well as good faith efforts by Sri Lanka to reach a collaborative agreement with private creditors.[17]

---

(ISBs) on May 18, 2022. IMF Staff Report at 5 (noting that, "[w]ith the lapse of a grace period, Sri Lanka has defaulted on its ISBs on May 18, 2022").

[15] IMF, Press Release No. 22/295, *IMF Staff Reaches Staff-Level Agreement on an Extended Fund Facility Arrangement with Sri Lanka* (Sept. 1, 2022), https://www.imf.org/en/News/Articles/2022/09/01/pr22295-imf-reaches-staff-level-agreement-on-an-extended-fund-facility-arrangement-with-sri-lanka.

[16] IMF, *The Extended Fund Facility (EFF)*, https://www.imf.org/en/About/Factsheets/Sheets/2023/Extended-Fund-Facility-EFF.

[17] IMF Press Release, *supra* note 15 ("The new EFF arrangement will support Sri Lanka's program to restore macroeconomic stability and debt sustainability, while safeguarding financial stability, reducing corruption vulnerabilities and unlocking Sri Lanka's growth potential. The agreement is subject to the approval by IMF management and the Executive Board in the period ahead, contingent on the implementation by the authorities of prior actions, and on receiving financing assurances from Sri Lanka's official creditors and making a good faith effort to reach a collaborative agreement with private creditors. Debt relief from Sri Lanka's creditors and additional financing from multilateral partners will be required to help ensure debt sustainability and close financing gaps.").

With respect to financing assurances,[18] the Paris Club announced the day after the SLA was reached that it was "ready to start the debt treatment process."[19] The Paris Club "reiterate[d] its willingness to coordinate with non-Paris Club official bilateral creditors to provide the necessary financing assurances in a timely manner and ensure fair burden sharing[.]"[20] Following the announcement, the Paris Club engaged with Sri Lankan authorities, the IMF, and Sri Lanka's other official bilateral creditors.

Despite efforts by the United States and other Paris Club members, Sri Lanka's discussions with official bilateral creditors regarding financing assurances became protracted. Other official creditors, in particular the People's Republic of China (PRC), were reluctant to commit to debt relief in line with IMF program parameters and the debt sustainability analysis.[21] On February 7,

---

[18] As a general matter, SLAs are the result of technical negotiations between IMF staff and the authorities and can be reached prior to provision of financing assurances (*i.e.*, commitments by official bilateral creditors to negotiate a restructuring in line with the IMF's debt sustainability analysis and program targets), but approval of SLAs (which unlocks disbursement of funds) by the IMF Executive Board is contingent on the receipt of such assurances.

[19] *Paris Club Statement on Sri Lanka*, Paris Club (Sept. 2, 2023), https://clubdeparis.org/en/communications/press-release/paris-club-statement-on-sri-lanka-02-09-2022.

[20] *Id.*

[21] Jorgelina Do Rosario, *Analysis: Cash-strapped countries face IMF bailout delays as debt talks drag on*, Reuters (Mar. 2, 2023), https://www.reuters.com/business/finance/cash-strapped-countries-face-imf-bailout-delays-debt-talks-drag-2023-03-02/ (reporting that delays in IMF approval of SLAs "have been caused by a number of reasons, but debt experts mainly point to the fact that China is still reluctant to offer debt relief in comparable terms with other external creditors."); *see also* Benjamin Parkin and Mahendra Ratnaweera, *Sri Lanka commits to $42bn domestic debt restructuring*, Financial Times (Jun. 28, 2023), https://www.ft.com/content/c0c47c1d-b86b-43d4-8b51-5fe3bd902a23 ("Beijing, Sri Lanka's largest bilateral creditor with about $7bn in debts, had for months resisted agreeing to restructure along the IMF's terms. It has also not joined a committee of creditors designed to accelerate the restructuring process.").

2023, the Paris Club announced that it had provided financing assurances to support the IMF Executive Board's approval of the SLA and "urged other official bilateral creditors, including China, to do the same in line with IMF program parameters as soon as possible."[22] The announcement also noted that Sri Lanka committed:

> to seek from all its commercial creditors and other official bilateral creditors a debt treatment on terms at least as favorable, and to hold all creditors in arrears until a comparable debt treatment is provided.[23]

The Export-Import Bank of China, which holds more than 90% of the PRC official bilateral claims subject to restructuring,[24] ultimately provided financing assurances on March 6, 2023.[25]

The IMF Executive Board approved the EFF arrangement with Sri Lanka on March 20, 2023. IMF staff assessed that Sri Lankan authorities were making good faith efforts toward achieving a debt restructuring with private creditors.[26] The Staff Report noted that:

> The authorities, through their financial and legal advisors, are making good faith efforts to reach a collaborative agreement with these private creditors. In particular, they have engaged in early dialogue with them since June 2022, and shared relevant information through an investor presentation held in September 2022 (followed by a detailed document addressing investors' questions) and the publication of detailed debt statistics in November 2022. The authorities' advisors have also shared, under non-disclosure agreements with the advisors to [International Sovereign Bond (ISB)] holder committees and [China Development Bank (CDB)], key information

---

[22] *Paris Club Creditors Provide Financing Assurances to Support the IMF's Approval of an EFF for Sri Lanka*, Paris Club, https://clubdeparis.org/en/communications/press-release/paris-club-creditors-provide-financing-assurances-to-support-the-imf-s (last visited Sept. 30, 2023).

[23] *Id.*

[24] IMF Staff Report at 28.

[25] Uditha Jayasinghe and Andrea Shalal, *Sri Lanka closes in on $2.9 bln IMF deal after China support*, Reuters (Mar. 8, 2023), https://www.reuters.com/markets/asia/sri-lanka-says-positive-news-coming-imf-29-bln-package-2023-03-07/.

[26] IMF Staff Report at 28-29.

presented to official bilateral creditors so that private creditors have an early opportunity to provide input on the design of restructuring strategies.[27]

The Staff report further noted that an ad hoc group of ISB holders (the "Ad Hoc Bondholders Group") had sent a letter to the IMF in February 2023,[28] in which the group confirmed that it was prepared to engage with the Sri Lankan authorities in restructuring negotiations consistent with the parameters of an IMF program.[29] Sri Lanka estimates that the Ad Hoc Bondholders Group represents roughly 55% of ISB holders.[30]

On May 9, 2023, the Paris Club, India, and Hungary had the first meeting of a committee of participating official creditor countries.[31] The Official Creditor Committee (OCC) has thus far

---

[27] *Id.*

[28] *Id.* at 29 ("The ad hoc group of ISB holders (holding about half of outstanding ISBs) issued an open letter to the IMF in February 2023 expressing its readiness to negotiate a debt relief with Sri Lanka that restores debt sustainability consistent with program parameters. Staff assesses that the good faith efforts made by the authorities, along with the assessment that prompt Fund support is considered essential for the successful implementation of the member's adjustment program, satisfy the Fund's Lending into Arrears (LIA) policy.").

[29] *Sri Lanka Bondholder Group Letter to the IMF*, PR Newswire (Feb. 3, 2023), https://www.prnewswire.com/news-releases/sri-lanka-bondholder-group-letter-to-the-imf-301738096.html (noting that "finalization of an agreement" would be also subject to satisfaction of three conditions: (1) reorganization of the Sri Lankan government's domestic debt in a way that ensures debt sustainability and safeguards financial stability; (2) the opportunity for the Ad Hoc Bondholder Group to express its views on the economic assumptions underpinning IMF program targets and the adequacy and feasibility of the adjustment efforts under the program; and (3) application of the principle of comparable treatment).

[30] Dkt. No. 53, Def.'s Mem. of Law in Supp. of Its Mot. to Stay Proceedings at 12; *see also* IMF Staff Report at 29 (noting that the Ad Hoc Bondholders Group holds "about half of outstanding ISBs").

[31] *First meeting of the Creditor Committee for Sri Lanka*, Paris Club (May 9, 2023), https://clubdeparis.org/en/communications/press-release/first-meeting-of-the-creditor-committee-for-sri-lanka-09-05-2023. The Committee is co-chaired by India, Japan, and France and includes 17 participating creditor countries: 15 Paris Club creditors (Australia, Austria,

met four times—in May, June, July, and September—and aims to reach consensus on debt treatment terms to restructure Sri Lanka's debt in line with IMF program targets for debt sustainability.[32]

Once consensus on debt treatment terms is reached, those terms will be reflected in a legally non-binding instrument, known as an Agreed Minute or Memorandum of Understanding (MOU). All participating creditors and Sri Lanka will sign the instrument, which is then to be implemented via legally binding bilateral agreements between each respective creditor country and Sri Lanka. The OCC is making progress and expects to reach consensus on debt treatment terms, alongside an agreement between Sri Lanka and other official bilateral creditors on comparable debt treatment terms, by the end of the year.

Consistent with the "comparability of treatment" principle, the debt treatment terms are expected to include a commitment by Sri Lanka to seek from all its commercial creditors and other official bilateral creditors a debt treatment on comparable terms.[33] Comparability of treatment is one of the key principles of the Paris Club and is intended to achieve fair sharing of the burden among official bilateral and private creditors. The comparability of treatment terms in an MOU or

---

Belgium, Canada, Denmark, France, Germany, Japan, Republic of Korea, the Netherlands, Russia, Spain, Sweden, the United Kingdom, and the United States of America), as well as India and Hungary. Saudi Arabia, Iran, and the PRC are observers, and IMF and World Bank representatives may attend as well.

[32] The targets are, according to the IMF Staff Report at 56: $17 billion in debt service reduction during 2023-27 is needed, including the arrears accumulated in 2022, to close the external financing gap; the stock of total public debt should not exceed 95% of GDP by 2032; average annual gross financing needs of the central government in 2027-32 should not exceed 13% of GDP; and foreign exchange debt service should not exceed 4.5 % of GDP on an annual basis between 2027-32.

[33] *See supra* note 23 and accompanying text.

Agreed Minute—and subsequently incorporated into the bilateral agreement between the debtor country and the respective participating creditor country—specify that the debtor country is to seek from other official bilateral creditors and private creditors a treatment on comparable terms (*i.e.*, on terms at least as favorable as those provided by OCC members). The comparability of treatment terms are designed to facilitate fair burden-sharing and ensure that Paris Club countries' claims are not subordinated to those of other official bilateral or private creditors and that the financial interests of the Paris Club member countries and their respective taxpayers are preserved. It is also designed to ensure that the debt treatment achieves its intended goal of putting the debtor country back on the path of debt sustainability.[34]

The IMF is in the process of conducting its first review of Sri Lanka's IMF program. IMF staff completed a visit to Sri Lanka on September 27, 2023, in support of this review and discussions are ongoing.[35] A successful review by IMF staff and approval by the Executive Board would enable the IMF to provide the next disbursement under the program to Sri Lanka, which would amount to roughly $330 million.[36] In addition, Sri Lanka is taking steps to implement a

---

[34] *See also* 22 U.S.C. § 286e-8 ("The Secretary of the Treasury shall instruct the United States executive director to seek to assure that no decision by the International Monetary Fund undermines or departs from United States policy regarding the comparability of treatment of public and private creditors in cases of debt rescheduling where official United States credits are involved.").

[35] IMF, *IMF Staff Concludes Visit to Sri Lanka* (Sept. 27, 2023), https://www.imf.org/en/News/Articles/2023/09/27/pr23326-imf-staff-concludes-visit-to-sri-lanka (noting, *inter alia*, that "[t]he people of Sri Lanka have shown remarkable resilience and the authorities have made significant progress on important reforms. Discussions will continue towards reaching a staff-level agreement in the near term that will maintain the reform momentum needed to allow Sri Lanka to emerge from its deep economic crisis.").

[36] *IMF staff to visit Sri Lanka in Sept for first programme review*, Reuters (Aug. 15, 2023), https://www.reuters.com/markets/asia/imf-staff-visit-sri-lanka-sept-first-programme-review-2023-08-15/.

domestic debt restructuring,[37] which is both necessary to reach the debt sustainability targets of the IMF program[38] and a condition cited by the Ad Hoc Bondholders Group with respect to finalization of a restructuring agreement.[39]

Throughout this process, the United States has played a key role in Sri Lanka's debt restructuring as the two countries continue to expand bilateral relations. The United States considers Sri Lanka a partner in the Indo-Pacific and supports Sri Lanka's efforts to restore economic stability within the country. The timely completion of the IMF program will help promote a strong and durable economic recovery, thereby increasing the stability and security of the country and advancing the U.S. Government's Indo-Pacific Strategy. The United States provided over $270 million in new financing and emergency assistance to Sri Lanka during the height of the crisis in 2022 and 2023. U.S. assistance and other diplomatic efforts are now focused on helping Sri Lanka make long-term economic and governance reforms to put the country on a more sustainable path forward, as well as supporting Sri Lanka in efforts to "create a more inclusive, representative, democratic, responsive government." Blinken Statement, *supra* note 9. The United States is "very supportive of Sri Lanka and the IMF working out an arrangement that

---

[37] Benjamin Parkin and Mahendra Ratnaweera, *Sri Lanka commits to $42bn domestic debt restructuring*, Financial Times (June 28, 2023), https://www.ft.com/content/c0c47c1d-b86b-43d4-8b51-5fe3bd902a23; Bharatha Mallawarachi, *Sri Lanka's Parliament approves a debt restructuring plan in an attempt to overcome economic crisis*, Associated Press (July 1, 2023), https://apnews.com/article/sri-lanka-crisis-imf-restructuring-debt-9137189b08befe71ab1ce0ade9af26ad; Ronojoy Mazumdar, *Sri Lanka Set to Pass Law to Finalize Domestic Debt Restructure*, Bloomberg (Aug. 11, 2023), https://www.bloomberg.com/news/articles/2023-08-11/sri-lanka-set-to-pass-law-to-finalize-domestic-debt-restructure.

[38] IMF Staff Report at 56.

[39] *See supra* note 29 (describing the Ad Hoc Bondholders Group's three conditions to which finalization of a restructuring agreement is subject).

also requires appropriate debt restructuring that has to be done on an equitable basis with all of the creditors doing what's necessary to support Sri Lanka at this time." *Id.*; *see also* U.S. Dep't of the Treasury, *Joint Statement by Secretary of The Treasury Janet L. Yellen and Japan Finance Minister Suzuki Shunichi* (July 12, 2022) [hereinafter "Yellen Statement"] ("We emphasize the critical role of creditor coordination to ensure fair burden sharing among all creditors in a debt treatment for vulnerable middle-income countries, notably Sri Lanka."), https://home.treasury.gov/news/press-releases/jy0858.

**B.     U.S. Policy Favors Orderly and Consensual Restructurings When a Sovereign Cannot Meet Its External Obligations**

Foreign sovereign debt plays an important role in the global economy. It allows countries to meet their short-term economic obligations, while also making critical investments in physical and human infrastructure necessary to best position those countries for the future.[40] But when those countries cannot pay their obligations, the ensuing debt crises can rapidly spiral—creating or aggravating financial crises and causing geopolitical dislocation that can have significant humanitarian and foreign policy consequences.[41] It has long been U.S. policy to avoid or minimize this possibility. *See, e.g.*, 22 U.S.C. § 5322(1) ("The Congress finds that – the international debt problem threatens the safety and soundness of the international financial system, the stability of the international trading system, and the economic development of debtor countries.").

As a result, the United States has had for decades a significant interest in the orderly and cooperative resolution of sovereign debt defaults, which is crucial to the stability and future growth

---

[40] *See generally* S.M. Ali Abbas & Alex Pienkowski, *What Is Sovereign Debt*, IMF (Dec. 2022), https://www.imf.org/en/Publications/fandd/issues/ 2022/12/basics-what-is-sovereign-debt.

[41] *See generally* Mark de Broeck, *The Debt Web*, IMF (Mar. 2018), https://www.imf.org/en/Publications/fandd/issues/2018/03/debroeck.

of the world and U.S. economy. *See*, *e.g.*, 22 U.S.C. § 5324(2) ("It is the policy of the United States that . . . it is necessary to broaden the range of options in dealing with the debt problem to include improved mechanisms to restructure existing debt[.]"). The United States recognizes the serious difficulties that sovereign debt crises present for both sovereign borrowers and the international financial system. The United States has therefore adopted as a cornerstone of its foreign economic policy the position that governments should embrace strong macroeconomic policies that support sustainable economic growth, allowing them to fully satisfy their external debt obligations. In those instances where a sovereign cannot meet its external obligations, however, the policy of the United States has long been that the orderly and consensual restructuring of sovereign debt, in conjunction with needed macroeconomic adjustments, is the most appropriate response.

In its capacity as a sovereign debtholder, the United States, joined by countries in efforts including the Paris Club and the G20 Common Framework for Debt Treatments Beyond the Debt Service Suspension Initiative, supports efforts "to find coordinated and sustained solutions to payment difficulties experienced by debtor countries," including "appropriate debt treatment."[42] And with respect to private debt, "the United States encourages participation in, and advocates the success of, . . . foreign debt restructuring procedures" under the auspices of the IMF or other mechanisms. *Pravin Bankers Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 855 (2d Cir. 1997) ("*Pravin IV*").

There are good reasons for this long-established policy. First, orderly and consensual restructuring reduces the risk of prolonged delay to sufficient debt relief and, with it, the concomitant spillover effects within and outside the defaulting sovereign's borders. Second, consensual restructuring can secure more effective relief for the sovereign, and in doing so,

---

[42] *See e.g.*, Paris Club, https://clubdeparis.org/ (last visited Sept. 30, 2023).

enhance the likelihood of repayment to creditors. Third, voluntary restructuring avoids a "rush-to-the-courthouse" or other attempts to secure priority in a manner that complicates restructuring while ultimately undermining the debtor's ability to make whole its creditors in a fair and comparable manner.

Accordingly, U.S. policy is to afford sovereigns who are negotiating in good faith—as here—a limited opportunity to achieve a consensual resolution before judgments are entered or enforced against their debts. *See, e.g.*, *Pravin Bankers Assocs., Ltd v. Banco Popular Del Peru*, 165 B.R. 379, 389 (S.D.N.Y. 1994) ("*Pravin I*") (granting six-month stay of plaintiff-creditor's motion for summary judgment when restructuring efforts are ongoing). Such an opportunity provides the best chance for a solution that supports U.S. interests and those of other sovereigns.

These aims are consistent with creditors' rights to pursue relief under the terms of their contract. Indeed, contractual certainty is a precondition to achieving those efforts. The United States' position has long been that "while parties may agree to renegotiate conditions of payment, the underlying obligations to pay nevertheless remain valid and enforceable," such that "unilateral restructuring of private obligations . . . [is] inconsistent with this system of international cooperation and negotiation and thus inconsistent with United States policy." *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 519 (2d Cir. 1985) (summarizing U.S. policy). But a stay of proceedings that allows for voluntary restructuring—and indeed, a U.S. policy that encourages such restructuring—does not vitiate those pre-existing contractual rights. Indeed, the existence of those rights is what makes renegotiation possible in the first place. The policy articulated here is thus consistent with decades-long U.S. policy.[43]

---

[43] *See, e.g.*, U.S. Gov't Br. as *Amicus Curiae* in Supp. of Reversal at 6-10, *NML Capital v. Argentina*, 12-105 (2d Cir. Apr. 4, 2012); U.S. Gov't Statement of Interest at 2 *et seq.*, *Macrotechnic Int'l Corp. / EM Ltd. v. Argentina*, 02 Civ. 5932 (S.D.N.Y. Jan, 12, 2004); Brief for

**C.      The Six-Month Stay Sought by Sri Lanka Is Reasonable and in Accordance with U.S. Policy**

Under the circumstances of this case, the United States supports Sri Lanka's motion for a six-month stay. A grant of the motion for a stay would be consistent with the U.S. policy interests as described in Section B *supra*. The United States assesses that the stay would facilitate an orderly and consensual sovereign debt restructuring process, as the expectation is that the OCC and other bilateral creditors will reach consensus on debt treatment terms—including a term committing Sri Lanka to seek comparable treatment from its commercial creditors and other official bilateral creditors—by the end of the year, with the process for implementing those terms via bilateral agreements between the respective creditor countries and Sri Lanka underway.[44] A stay would also facilitate negotiations with private creditors, an estimated majority of which, through the Ad Hoc Bondholders Group, have conditioned their participation on the application of comparable treatment.[45] The United States has further articulated the importance of this principle. *See* Blinken Statement; Yellen Statement.

Courts in this District have identified five factors governing the exercise of the court's inherent authority to stay an action:

(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed;

(2) the private interests of and burden on the defendants;

(3) the interests of the courts;

---

the United States as *Amicus Curiae* at 9-10, *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, No. 83-7714 (2d Cir. July 30, 1984).

[44] *See supra* notes 31-32 and accompanying text regarding the OCC and the expected timeline.

[45] *See supra* notes 28-29 and accompanying text regarding the Ad Hoc Bondholders Group.

(4) the interests of persons not parties to the civil litigation; and

(5) the public interest.

*Jiminez v. Credit One Bank*, 377 F.Supp.3d 324, 336 (S.D.N.Y. 2019); *accord, e.g.*, *Arden Way Assocs. v. Boesky*, 660 F. Supp. 1494, 1497 (S.D.N.Y. 1987). As the parties have already thoroughly briefed these factors, the United States addresses only the fourth and fifth factors. The public interest and the interests of bilateral creditors, including the United States and other Paris Club members, support the grant of a stay in this case.

As discussed *supra* at Section B, U.S. policy supports affording sovereigns who are negotiating in good faith a limited opportunity to achieve a consensual resolution in debt restructuring talks with creditors. *See generally Allied Bank*, 757 F.2d at 519 (summarizing U.S. policy). This is such an instance. Sri Lanka is engaged in good faith negotiations intended to achieve a consensual resolution. The limited stay of six months sought here affords it an opportunity to carry out such a consensual resolution.

As a general matter, securing the broadest possible participation of official bilateral creditors and private creditors is key to a successful debt restructuring consistent with the comparability of treatment principle and to reaching the debt sustainability targets in Sri Lanka's IMF program. In this case, granting a temporary stay would allow time for Sri Lanka and its creditors to finalize the restructuring so that all creditors, including Hamilton Bank, are incentivized to accept repayment on comparable terms. Denial of a stay, followed by a judgment against Sri Lanka, before broader external debt restructuring talks further advance, could complicate those talks and potentially cause them to fail. Such a judgment, moreover, could encourage other private creditors to try to "jump the queue" like Hamilton Bank and seek repayment separately on the terms achieved by Hamilton Bank through litigation, rather than as part of an orderly debt restructuring process. This could have significant consequences, both for

19

Sri Lanka's efforts to seek economic and humanitarian improvements during its current economic crisis and more generally for the ability of future emerging market debt restructurings to achieve broad consensual participation. For these reasons, the United States (through this Statement of Interest), as well as France and the United Kingdom "as long standing and active members of the Paris Club," have indicated their support for a stay in aid of the consensual debt restructuring process.[46]

As discussed above, Hamilton Bank is incorrect to state that a stay would violate "clear U.S. policy." Dkt. No. 62 at 21-23. In part, Hamilton Bank's arguments rest upon the fact that the United States had not previously articulated its interest in this litigation. *Id.* at 19-20, 22. But Hamilton Bank also misconstrues the past position of the United States in the *Pravin* and other litigation. *See id.* at 21-22 (citing, *inter alia*, *Pravin IV*, 109 F.3d at 854-55). The *Pravin* court noted the United States' two interests in foreign debt resolution proceedings:

> First, the United States encourages participation in, and advocates the success of, IMF foreign debt resolution procedures under the Brady Plan. Second, the United States has a strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders. This second interest limits the first so that, although the United States advocates negotiations to effect debt reduction and continued lending to defaulting foreign sovereigns, it maintains that creditor participation in such negotiations should be on a strictly voluntary basis. It also requires that debts remain enforceable throughout the negotiations.

*Pravin IV*, 109 F.3d at 855 (citations omitted).

---

[46] *See* Dkt. No. 69, Letter re: Leave to File Amicus Br. in *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* (including proposed brief). Consistent with the position expressed here by the United States, France and the United Kingdom emphasized that (1) the sovereign debt restructuring process necessary for Sri Lanka to return to a sustainable path is ongoing and relies on creditor coordination and (2) an early judgment could disrupt the debt restructuring process by running the risk of deterring other private creditors' restructuring endeavors.

Hamilton Bank suggests that because the second interest "limits" the first it essentially occludes the first interest whenever a private creditor declines to participate in voluntary negotiations. Dkt. No. 62 at 22. That is incorrect. The Second Circuit affirmed the district court's grant of summary judgment in *Pravin III*, after a cumulative eight months of stays in *Pravin I* and *Pravin II*. The Second Circuit explicitly "agree[d] with the [district] court's conclusion in" granting the six-month stay in *Pravin I* and noted that a further stay of proceedings or stay of execution of judgment might have been warranted had the question been presented on appeal, while declining to find that the district court had abused its discretion in denying a further stay. *Pravin IV*, 109 F.3d 855-56. The motion presented here is analogous to the stay presented in *Pravin I*, and the public interest similarly favors the grant of stay. Moreover, Hamilton Bank misstates the effect of the *Allied Bank* doctrine. That case—and the U.S. position articulated in its amicus briefs—articulated a concern over actions by the debtor country to involuntarily *impair* the existing contract through a unilateral change in the governing terms. But here, Sri Lanka is not trying to unilaterally change the terms of the contract, but to seek time and space to conduct a restructuring that is necessary to allow it to equitably pay its debts.

Hamilton Bank also cites prior decisions involving Jamaica, Congo, Argentina, and Venezuela. Dkt. No. 62 at 10-13. These instances are all distinguishable, as none of these cases involved a motion for a stay of determinate length while debt restructuring negotiations proceeded with substantial prospects for near-term success. *A.I. Credit Corp. v. Government of Jamaica*, 666 F.3d 62 (S.D.N.Y. 1987), concerned only whether judgment should be entered and did not involve any request for a stay by Jamaica. *Id.* at 623 (also noting the absence of U.S. intervention). *National Union Fire Ins. Co. of Pittsburgh v. People's Republic of Congo*, 729 F.Supp. 936 (S.D.N.Y. 1989), involved a stay request, but the request was only for a stay pending Congo's application for an English court to set aside the default judgment at issue; once the English court dismissed the

application, the request for a stay was mooted. *Id.* at 938 n.1. Otherwise, as in *A.I. Credit*, the question was simply whether judgment should be entered. *Id.* at 944-45. In *Lightwater Corp. Ltd. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003), Argentina's request for a stay was open-ended (with a suggestion of six months made only at oral argument), and the prospects for success of restructuring negotiations much dimmer given Argentina's repeated past defaults. *Id.* at *5 ("The debt restructuring situation is uncertain as to possible success and timing."). And *Casa Express Corp. v. Bolivarian Republic of Venezuela*, 492 F. Supp. 3d 222 (S.D.N.Y. 2020), involved a request for an "open-ended" stay "that would last until the Guaidó government takes power in Venezuela, stabilizes the country, and negotiates a debt restructuring process." *Id.* at 227.

Here, by contrast, Sri Lanka has made significant progress in negotiating a debt restructuring and seeks a defined stay that generally aligns with the expected timetable for resolution of negotiations. Moreover, it does so in the unusual circumstances where one creditor, Hamilton Bank, is pursuing its claim and demanding immediate payment at an early stage in collective and ongoing negotiations. Under these circumstances, the public interest and the interests of persons not parties to this litigation support granting Sri Lanka's motion for a stay.

For the reasons stated herein, the United States supports the grant of Sri Lanka's motion for a six-month stay of the litigation. The United States takes no position on Hamilton Bank's motion for summary judgment.

Dated:  New York, New York
         October 2, 2023

                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


                               By:      /s/ *Lucas Issacharoff*
                                        LUCAS ISSACHAROFF
                                        Assistant United States Attorney
                                        Southern District of New York
                                        (212) 637-2737

Cc:          Counsel of record via ECF

             BRIAN M. BOYNTON
             Principal Deputy Assistant Attorney General

             ALEXANDER K. HAAS
             Director, Federal Programs Branch

             DIANE KELLEHER
             Assistant Director

             JOSEPH E. BORSON
             Senior Trial Counsel
             Civil Division, Federal Programs Branch
             United States Department of Justice