# Sri Lanka's Public Debt Restructuring

*Supplementary Note for the presentation made by Secretary to the Treasury Mr. K. M. Mahinda Siriwardana at the Staff Meeting held with the Senior Officials of the General Treasury/ Ministry of Finance, Planning and Economic Development on 01st January 2025*

## 1. Background

Following successive credit rating downgrades and the loss of access to global capital markets in early 2020, Sri Lanka's foreign currency reserves steadily declined until usable reserves declined to near zero levels by April 2022. On 12th April 2022, the government implemented a temporary moratorium on the service of Sri Lanka's official bilateral debt and external commercial debt.

The government commenced discussions with the International Monetary Fund (IMF) in April 2022 with a view to implementing an IMF-supported macroeconomic reform programme to address the root causes of the economic crisis. The IMF's lending rules require that a county's debt sustainability is restored, and therefore Sri Lanka simultaneously commenced the process of restructuring its public debt. In accordance with the norms of the global sovereign debt restructuring architecture, Sri Lanka hired globally renowned financial advisors Lazard Frères and international legal advisors Clifford Chance to support the process of restructuring the debt.

## 2. Process of Debt Restructuring

A key element in the process of debt restructuring is the preparation of the Debt Sustainability Analysis (DSA) by the IMF. The DSA informs the level of debt relief to be obtained through the process of debt restructuring with the goal of restoring debt sustainability. Sri Lanka is among the first countries where debt restructuring was based on the IMF's new DSA framework, the Sovereign Risk and Debt Sustainability Framework for Market Access Countries (MAC SRDSF). According to Sri Lanka's DSA, as per the MAC SRDSF model, the following targets would need to be achieved in order to restore debt sustainability in the country:

i.   Public Debt to GDP should reduce from 128% of GDP in 2022 to less than 95% of GDP by 2032

ii.  Gross Financing Needs (GFN) as a percentage of GDP should reduce from 34.6% in 2022 to less than 13% on average during the period 2027-2032

iii. Foreign currency debt service as a percentage of GDP should reduce from 9.4% of GDP in 2022 to no higher than 4.5% of GDP per annum during the period 2027-2032

Accordingly, in order to restore debt sustainability, Sri Lanka would need to negotiate with its various groups of creditors to obtain debt relief in a manner that would enable the above targets to be met. These targets illustrate the level of debt relief to be obtained by Sri Lanka through the debt restructuring process. It must be kept in mind that creditors are not obliged to offer Sri Lanka such debt relief. The willingness of creditors to provide debt relief is a function of good faith demonstrated by both sides, and the presentation of a credible macroeconomic reform plan that provides a realistic chance of economic sustainability being restored.

It was also necessary for Sri Lanka, in line with the commitment made by Sri Lanka to its creditors at the start of this process, to ensure Comparability of Treatment (CoT) between different groups of external creditors[1]. This was a complex process since different creditors provide debt relief through different adjustments.

Official creditors for instance typically provide debt relief in the form of grace periods, maturity extensions, and interest rate reductions without providing a nominal haircut on principal. Most bondholders on the other hand prefer to include some nominal haircut on principal, whilst typically having shorter maturity periods and a market compatible interest rate structure. The magnitude of debt relief is therefore decided on the collective cashflow relief provided through the combination of grace periods, interest rate

---

[1] https://www.treasury.gov.lk/api/file/9a7403c4-83bd-4c25-b618-ff8e01f4e5fc

reductions, maturity extensions, and nominal haircut, if any. Sri Lanka's debt restructuring had to ensure that the present value of the cashflow relief provided through these different methods of restructuring, is largely comparable between the different external creditors. The Paris Club Secretariat plays a key role in assessing Comparability of Treatment in different debt restructuring scenarios[2].

Sri Lanka's external debt restructuring process includes the following creditor groups, each of which required separate negotiations whilst ensuring comparable treatment amongst them all;

i)   The Official Creditor Committee (OCC) of official bilateral lenders (Co-chaired by France, India, and Japan): USD 5.8 billion

ii)  China Exim Bank: USD 4.2 billion

iii) Other Official Creditors (Kuwait, Saudi Arabia, Iran, Pakistan): USD 0.3 billion

iv)  International Sovereign Bonds: USD 14.2 billion (including past due interest)

   a. International sovereign bondholders: Ad Hoc Group

   b. Domestic sovereign bondholders: Local Consortium of Sri Lanka

iv)  China Development Bank: USD 3.3 billion

v)   Other Commercial Creditors: Under USD 0.2 billion

Any debt restructuring agreement reached by Sri Lanka, including the ISB restructuring, would need to pass two tests:

i)   Ability to meet the debt relief targets as set out in the DSA in order to restore debt sustainability, as assessed by the IMF

ii)  Ensure Comparability of Treatment between different groups of creditors, as assessed by the Paris Club Secretariat

---

[2] https://clubdeparis.org/en/communications/page/comparability-of-treatment

**3. Domestic Debt Optimisation**

Although the External Debt Restructuring (EDR) strategy delivered the significant share of the necessary relief, it was insufficient to meet all the DSA targets. While the EDR significantly improves Sri Lanka's DSA, the envisaged external debt restructuring strategy did not allow Sri Lanka to meet the Gross Financing Needs[3] target set by the IMF. This is because the bulk of Sri Lanka's gross financing needs, particularly in terms of interest cost and annual capital amortization, including Treasury bills, arise out of domestic debt.

Figure 1: Sri Lanka Annual Debt Service Payments Pre-restructuring



Source: CBSL Annual Reports[4]

Accordingly, whilst the EDR provided for a 2.6% of GDP reduction in the GFN towards the targets, domestic debt treatment would need to provide for 1.5% of GDP reduction in the annual GFN.

---

[3] Annual Gross Financing Needs is the sum of annual interest cost (domestic and foreign), annual capital amortisation (domestic and foreign) which includes Treasury bills maturing during the year, and the primary budget balance.
[4] See page 213 -
https://www.cbsl.gov.lk/sites/default/files/cbslweb_documents/publications/annual_report/2022/en/10_Chapter_06.pdf

Figure 2: Necessity for Domestic Debt Treatment





Against this backdrop, while the envisaged external debt restructuring strategy was continued with the planned creditor engagements, Domestic Debt Optimisation (DDO) was initiated under two main pillars.

*Local Law Foreign Currency (LLFC) Debt*

LLFC held in Sri Lanka Development Bonds (largely held by banks) and FX bank loans of the government were restructured to achieve substantial debt flow relief. Sri Lanka Development Bonds and Foreign Currency Banking Units were treated with three options (including an option with conversion to LKR) available to holders (excluding individuals).

The restructuring strategy of LLFC was executed in two phases. First, requests for proposals were obtained from eligible Sri Lanka Development Bond holders and the issuance of new instruments was affected in a few stages based on the type of instrument by retiring identified debt stocks. Having scrutinized the proposals received under the DDO Programme, a total outstanding stock of Sri Lanka Development Bonds amounting to USD 837.59 million was settled by issuing Sri Lanka rupee-denominated Treasury

Bonds under the Registered Stocks and Securities Ordinance. A few investors who did not opt for DDO were settled in USD subsequently with a reasonable haircut.

Second, a Memorandum of Understanding was signed with the two state banks i.e. Bank of Ceylon and People's Bank, to convert Foreign Currency Banking Units loans held by both Banks into longer-term Treasury Bonds denominated in LKR. Both Banks were allowed a reasonable period to purchase the equivalent USD to match the Net-Opening Position (NOP) of USD against the settlement of the same in LKR-denominated instruments, before issuing Treasury Bonds.

### *Local Law Local Currency (LLLC) Debt*

Local Law Local Currency (LLLC) debt comprised primarily Treasury bills and Treasury bonds. The majority of Treasury bills were held by the Central Bank of Sri Lanka and the Treasury bonds were largely held by superannuation funds (including the EPF 36.5%) and the state owned banks (32.5%).

Figure 3: Local Currency Debt Universe



Note: (1) The category "Others" includes: for (i) T-Bills: insurance companies, corporations, Local Individual, foreign investors and Treasury securities used for repurchase transaction allocations, and for (ii) T-Bonds: ETF, insurance companies, corporations, Individual, Gov't Institutions and SOEs, Treasury securities used for repurchase transaction allocations

LLLC considered for restructuring consisted of the Treasury Bonds held by Superannuation Funds, the Treasury Bills held by the Central Bank of Sri Lanka and provisional advances issued by the Central Bank of Sri Lanka to the government. The different options and their associated legal procedures were evaluated to optimize the

design of an LLLC debt treatment while preserving financial sector stability. Accordingly, it was proposed to convert the Treasury bond holdings of Superannuation Funds into long-maturity instruments, with a tax incentive mechanism, and a step-down coupon structure with no principal haircut. Treasury Bills and Provisional Advance holdings of the Central Bank were converted into longer-term Treasury Bonds (along with the relevant legislation being enacted).

The restructuring of LLLC was also executed in two phases. First, an Exchange Memorandum published by the Ministry of Finance, Economic Stabilization, and National Policies on 04th July 2023 requesting proposals seeking consent to convert a part of Treasury Bonds held by Superannuation Funds. A few rounds of extensions were given for the bondholders and there were simultaneous statutory amendments to support the restructuring program and Treasury Bonds worth Rs. 3,204 billion were converted to new Treasury Bonds on 14.09.2023. Treasury Bills held by the CBSL worth Rs. 2,368.4 billion and Central Bank Provisional Advance of Rs. 344.7 billion were converted to new Treasury Bonds worth Rs. 2,492 billion and new Treasury Bills worth Rs. 220.8 billion under the DDO Programme during the year.

### Selection of Perimeter of the DDO

The selection of the perimeter of the DDO took into account the necessity to maintain financial sector stability. Accordingly, for short term instruments (Treasury bills) only the Treasury bills held by the CBSL were included for treatment given the necessity to maintain liquidity in short term debt instruments for the government. Accordingly, out of the 1.5% GDP required reduction in the GFN, the effort of the banking sector (CBSL and other banks) accounted for a 1% GDP reduction of the GFN.

With regard to Treasury Bonds, 32.5% of outstanding bonds were held by state banks, 11.9% were held by other banks, 36.5% by the Employees Provident Fund (EPF), and 19.2% held by others including insurance companies, the Employees Trust Fund, SOEs, among others. Accordingly, other than the superannuation funds including the EPF, the

other major holder was the state banks. State banks had already been subject to significant restructuring relating to FCBUs, SLDBs, and would also be subject to restructuring of SOE loans (such as CPC loans) transferred to the government. Therefore, state banks would already require significant capital enhancement and the government allocated Rs. 450 billion of tax payer funds in the 2024 budget for this purpose.

As a result, including state bank held Treasury Bonds in the perimeter would have resulted in a very large additional recapitalization requirement which would have had to be funded by tax payers. It was therefore evident that other than Treasury Bonds held by the EPF and state banks, the potential cash flow relief and impact on the GFN from a treatment of other Treasury Bonds would be limited.

The other key risk was that under the Registered Stocks and Securities Ordinance 1937, the law under which Treasury Bonds are issued, there is no legal mechanism for mandatory restructuring. Any such measure would have to be on a voluntary basis by the holders of such Bonds. Given the fact that other Treasury bond ownership is highly fragmented, imposing a mandatory restructuring procedure would not be legally viable and any attempt to do so would expose the entire debt restructuring process to significant litigation risk. Such a legal risk would have delayed the entire process, including the progress of the IMF supported reform programme, undermining the interest of all stakeholders.


*Treatment of Superannuation Funds Including EPF*

Hence, the Treasury bond restructuring was restricted to superannuation funds with a limited debt treatment comprising a maturity extension, no capital haircut, and a step-down coupon structure with a ceiling on coupons in line with historical averages. Until end 2025, the restructured Treasury Bonds held by superannuation funds would have a coupon rate of 12% per annum (which was higher than the average coupon rate of superannuation funds' portfolios at the time). At present all Treasury Bonds have a yield

below 12% in the secondary market[5], and in the most recent primary auction[6], indicating that present superannuation fund yields under the DDO exceed present market rates. However, what is more important than the nominal return is the real return – that is the return adjusted for inflation. A nominal coupon rate of 20% is of limited value if the inflation rate is 30% and the resultant real return is -10%.

At present, inflation is at a negative -1.7% (December 2024), therefore in effect, the real return received by restructured Treasury Bonds at present is well over 12% - which is significantly higher than the historical average real returns of, for example, the EPF. From 2026 onwards, the nominal coupon rate on restructured Treasury Bonds held by superannuation funds would step down to 9% in line with the projected decline in market interest rates. However, unlike in the past, the Central Bank by law must keep inflation rates at 5% or below. Therefore, the real return of the restructured Treasury Bonds held by superannuation funds will be at or above 4% - which is again largely in line with the historical real returns of entities such as the EPF. There remains a risk of some opportunity loss for the provident funds if interest rates increase significantly in the medium term. However, if the government continues to adhere to the ongoing reform programme including the inflation targeting mandate of the Central Bank, the risk of interest rates increasing is limited, and inflation will be managed at 5% or below, enabling the members of superannuation funds including the EPF to enjoy positive real returns in line with or above historical averages.

In the final outcome, the DDO resulted in a 1% of GDP contribution to the reduction of the GFN by the banking sector (Central Bank and commercial banks). Over and above this, the state banks provided further relief by the restructuring of CPC loans transferred from the government amounting to USD 2.43 billion. A 0.5% of GDP contribution to the

---

[5] See table 3.3 page 10 -
https://www.cbsl.gov.lk/sites/default/files/cbslweb_documents/statistics/wei/WEI_20241127_e_r.pdf
[6] See
https://www.cbsl.gov.lk/sites/default/files/cbslweb_documents/press/pr/press_20241230_treasury_bond_issuance_held_on_30_december_2024_e.pdf

GFN reduction was provided by the Treasury Bonds held by superannuation funds. The data makes it evident that the burden of the DDO was largely absorbed by the banking sector, and not the superannuation funds (including EPF) as incorrectly stated by certain groups.

The DDO made a major contribution towards the progress of the IMF supported reform programme and the debt restructuring process, which has enabled the stabilization of the economy including reduction in inflation, reduction in interest rates, currency appreciation, and a return to economic growth.

The DDO process is an illustration of the difficult choices that must be made at a national economic policy level. There is no perfect option that is cost-free, but policy decisions have to be made in a manner that provides an optimal outcome for the citizenry as a whole. The government could have chosen to leave superannuation funds out of the restructuring perimeter and instead restructured Treasury Bonds held by the state banks, however this would have required additional tax measures on the entire citizenry to fund the resultant large recapitalization requirement. A failure to adequately capitalize the banks could have led to a collapse in confidence of depositors, leading to a bank run which would have had catastrophic implications for the entire country for many years to come. The government could have left out superannuation funds and state banks from the restructuring perimeter and instead restructured other smaller fragmented holders of bonds, but that would have been legally challenging and even so would have left a large gap in the GFN target which would have derailed the restructuring process and the IMF supported programme. That outcome would have kept interest rates (which were around 30% at the time) elevated, inflation in double digits, and prevented economic stabilization and recovery.

Considering these factors, the government chose the most pragmatic options for the DDO in a way that enabled the GFN targets to be met, whilst also ensuring the stability of the financial sector and the security of bank deposits. This in turn has contributed to the stabilization of the economy and has created a foundation that enabled the economy to recover and grow in an inclusive and sustainable manner.

## 4  Official Sector Debt Restructuring

Sri Lanka's official sector creditors organised into the Official Creditor Committee, a group of 17 countries co-chaired by Japan, India, and France. The Exim Bank of China remained outside of the OCC and therefore, Sri Lanka had to negotiate debt treatment terms with both groups in parallel, whilst ensuring Comparability of Treatment between the two groups.

In the case of official creditors, such as the OCC and Exim Bank of China, debt relief is typically provided not through a haircut on the principal value of the debt but through an extension of the payment period (maturity extension), capital grace period, and reduction of interest rates. This reduces the payment burden for the debtor country in the near term until the economy has recovered and its payment capacity has improved in the future. To quantify this, the OCC and Exim Bank of China restructuring agreements provide debt relief of up to 92% of their respective debt service falling due during the IMF programme period. Sri Lanka received capital grace periods until 2028, reduced interest rates, and progressive amortization with final repayments in 2043.

This cash flow relief frees up financial resources for Sri Lanka to spend on priority public services and essential development needs instead of spending it on debt service in the near term. By discounting the value of the cash flow relief provided through the restructuring period, the net present value effort (NPV effort) incurred by the creditor can be ascertained. In the case of official creditors, this NPV effort is incurred by the taxpayers of their respective countries in support of Sri Lanka's economic recovery.

Sri Lanka had to navigate significant geopolitical challenges during this process, along with certain disagreements as to elements of the existing sovereign debt restructuring architecture affecting discussions on Sri Lanka's restructuring process. For instance, at a global level, Chinese creditors raised concerns regarding the lack of a requirement to restructure multilateral debt when a country is restructuring its debt. There was also a lack of clarity at the global sovereign debt restructuring architecture level regarding cut-

off dates, treatment of emergency credit lines and so on, which added to complications in Sri Lanka's restructuring process. Nonetheless, Sri Lanka successfully navigated these various challenges and ensured that both the OCC MoU and the Exim Bank of China Amendment Agreements were signed simultaneously, with comparable treatment, on 26th June 2024.

## 5. ISB Restructuring

International Sovereign Bonds (ISBs) accounted for USD 12.55 billion of face amount of debt, out of total central government external face amount of debt of USD 37 billion as of end 2023. Accordingly, these bonds were included in the perimeter of the debt restructuring. The holders of ISBs organised themselves into two groups to negotiate the restructuring of the ISBs. The larger group, controlling approximately 40% of the aggregate outstanding amount, comprised some of the largest international holders of ISBs, which formed the Ad-Hoc Group, represented by a steering committee advised by financial advisors Rothschild & Co, and legal advisors White & Case. The second group comprised Sri Lankan domestic financial market holders of ISBs, controlling approximately 12% of the aggregate outstanding amount. The local consortium was advised by Newstate Partners and Baker McKenzie.

Technical negotiations on debt restructuring began once the IMF's DSA was published with the IMF Executive Board's approval of the Program in March 2023. Subsequently, Sri Lanka through its debt advisors, shared indicative restructuring treatments with each of the external creditor groups, through their advisors, as appropriate. These indicative restructuring terms proposed a basis for restructuring debt in a manner that would reach the DSA targets and also address any concerns regarding Comparability of Treatment.

The Ad-Hoc Group (AHG) responded to Sri Lanka's indicative treatment with a counter-proposal that was subsequently published in the public domain in October 2023[7]. This proposal introduced for the first time the concept of Macro-Linked Bonds (MLB). The AHG took the view that the IMF's macroeconomic framework, including the GDP estimations that underpin the DSA targets, were overly pessimistic.

The AHG position remains that Sri Lanka will outperform the IMF framework, primarily through a less depreciated FX rate trajectory, and such outperformance will create additional debt service payment capacity, which should be shared between the creditor(s) and the debtor. The MLB is designed as an instrument that enables such sharing of upside without compromising debt sustainability, whilst also sharing the downside risk.

The AHG's view is that in reality, Sri Lanka's USD GDP will be higher than projected by the IMF, and thereby the DSA targets to restore debt sustainability could in their opinion be reached with a lower level of debt relief. For example, with a higher than anticipated USD GDP figure, the denominator in the public debt/GDP would be higher, thereby enabling the DSA target to be reached with a smaller downward adjustment to outstanding debt (the numerator).

Thus far, Sri Lanka has over-performed IMF expectations both in terms of currency appreciation and real GDP growth. For example, for 2023, the IMF baseline GDP was USD 75.3 billion in the March 2023 IMF staff report, based on which the debt targets were set. The actual nominal GDP in 2023 was USD 84.4 billion. An even more pronounced divergence is expected in 2024 where the IMF baseline expectation in the March 2023 staff report was USD 76 billion and the actual outcome is expected to be over USD 90 billion.

---

[7] https://www.prnewswire.com/news-releases/ad-hoc-group-of-sri-lanka-bondholders-submits-restructuring-proposal-301956251.html

Table 1: IMF Macro Baseline (March 2023) Compared to Actual Outcomes in 2023

| 2023 Indicator | IMF Baseline | Actual |
| --- | --- | --- |
| Nominal GDP (USD) | 75.3 billion | 84.4 billion |
| Inflation (annual average) | 28.5% | 17.4% |
| Implied FX* (annual average) | LKR 396/USD | LKR 327.5/USD |

Note: Implied FX derived based on nominal GDP in USD terms and nominal GDP in Sri Lanka Rupee (LKR) terms as set out in the IMF baseline.

Accordingly, the data made it evident that the IMF baseline estimations were overly pessimistic, which provided significant negotiating leverage to the bondholders.

A well-designed MLB with appropriate thresholds and adjustments would provide a mechanism for sharing of upside whilst ensuring the country's long term debt sustainability is maintained. However, as in many cases, it is the details of such thresholds and adjustments that matter. Sri Lanka rejected the AHG's October 2023 proposal[8] due to concerns regarding the ability of the proposal to meet the DSA targets, concerns regarding asymmetry of sharing of upside but not downside, and concerns regarding the nature of the test which determines any adjustment.

Subsequently, Sri Lanka, through its advisors, shared further counter-proposals with the advisors of the AHG. Sri Lanka continued to maintain its preference for a plain vanilla option without a state contingent element (macro linked bonds in this case) that met DSA and CoT compliance requirements. However, the AHG was unwilling to engage on such a vanilla option due to their contentions regarding the IMF's macroeconomic assumptions underpinning the DSA. In January 2024, Sri Lanka provided a counter-proposal of a more standard detachable Value Recovery Instrument (VRI) where debt relief was linked to nominal USD GDP subject to a "test" in each year which reduces risk to Sri Lanka. However, this too was not accepted by the bondholders since such a detachable VRI would not be index eligible – which was a key requirement for

---

[8] https://www.treasury.gov.lk/api/file/8b9cf8b4-e22d-4e9a-9008-3a0065469692

bondholders. A lack of index eligibility for the bonds issued as part of the ISBs restructuring would also adversely affect participation in the restructuring since index eligibility was important for institutional investors. Therefore, index eligibility was important for the success of the future bond exchange implementing the ISBs restructuring. Progress in the negotiations stalled at this stage.

Sri Lanka's major constraint was that it was not possible to make progress with the IMF programme reviews if negotiations with bondholders remained at a standstill. A significant delay in programme reviews would undermine access to finance and reverse confidence in the economy which was crucial for maintaining economic stability. Other creditors, including official creditors, would also not have accepted a situation where they make commitments to restructure debt whilst negotiations to secure similar treatment from bondholders have made no progress. Sri Lanka was also constrained by the ongoing litigation instituted by Hamilton Reserve Bank (HRB), for which Sri Lanka had sought a number of stays in relation to the proceedings.

Considering these constraints, Sri Lanka had to engage with the AHG on the basis of a restructuring framework that included macro-linked bonds. Sri Lanka's strategy was to commence such negotiations, but to extract certain concessions from the AHG such that risks to Sri Lanka from an MLB option would be reduced to the lowest possible extent.

*Restricted Discussions in March 2024*

On the 27th-28th March 2024, the Government of Sri Lanka and the Steering Committee members of the AHG held restricted discussions in London on the restructuring of the ISBs[9]. At these meetings, the parties discussed a fresh proposal submitted by the AHG in March 2024 and a counter-proposal submitted by Sri Lanka, which also included GDP-linked instruments. Sri Lanka's March proposal was found to be compliant with the DSA as assessed by the IMF, whilst the AHG proposal was not.

---

[9] https://www.treasury.gov.lk/api/file/bdfd5073-3639-4c0b-bcda-a52d85e33daa

Whilst the London negotiations failed to reach a consensus, it was possible to distil four outstanding areas that required resolution:

i.   *The choice of baseline parameter*: Sri Lanka insisted on using the IMF macro baseline as the baseline whereas the AHG used its more optimistic "alternative baseline"

ii.  *Inclusion of downside risk:* Whilst the AHG only included one downside scenario (where there would be a larger debt relief in case Sri Lanka's actual macroeconomic performance was below the baseline), Sri Lanka proposed to include additional downside scenarios to ensure appropriate balance of risks

iii. *Choice of trigger:* The AHG insisted on a single trigger (nominal GDP in USD terms), Sri Lanka preferred to have a dual test which would give Sri Lanka protection in case GDP growth was purely due to currency over-valuation. The AHG did however agree to Sri Lanka's request to increase the period of the trigger from 2 years to 3 years, giving Sri Lanka more protection

iv.  *Share of upside:* The AHG proposal saw most of any potential upside being allocated to bondholders, whereas Sri Lanka suggested a more even share of upside.

*Joint Working Framework in July 2024*

Immediately following the finalisation of a memorandum of understanding (MoU) with the Official Creditor Committee and debt treatment agreements with EXIM Bank of China on 26th June 2024, the AHG and Sri Lanka resumed restricted negotiations on the 27th – 28th of June in Paris. The AHG had submitted a new proposal which made further adjustments to address Sri Lanka's concerns on the four outstanding points. During the negotiations in Paris, further adjustments were agreed in a Joint Working Framework, as follows:

16

i. *Choice of baseline parameter:* The IMF baseline from the June 2024 second review of the IMF-supported Program would be applied.

ii. *Inclusion of downside risk:* Additional downside scenarios were included, providing Sri Lanka with further debt relief in case of an adverse macroeconomic outcome.

iii. *Choice of trigger:* Sri Lanka had concerns regarding the AHG's preference for a single trigger due to a perceived risk of nominal USD GDP increasing only based on currency appreciation as opposed to real GDP growth. In the absence of real GDP growth, there could be a risk of higher payouts being triggered without concomitant increase in government payment capacity. Therefore, a "control variable" which captures real GDP growth as well was agreed.

iv. *Share of upside:* The upside thresholds and payouts were adjusted to ensure a more balanced share of upside between creditor and debtor.

In line with Sri Lanka's strategy, Sri Lanka won concessions on all 4 of the key outstanding areas of discussion from the March negotiations. Sri Lanka agreed on the JWF in order to demonstrate good faith in negotiations to the AHG, even though Sri Lanka was concerned that the JWF would likely fall short of the DSA and CoT requirements. Sri Lanka's strategy beyond July was then, to reach agreement on further concessions from the bondholders based on DSA and CoT requirements in order to arrive at a final agreement in principle (AIP).

### Agreement in Principle of September 2024

Between July and September, Sri Lanka continued to engage with the Ad Hoc Group through their financial advisors (Rothschild), whilst in parallel engaging with the IMF to informally assess the compatibility of various scenarios with the DSA. Eventually, by mid-September, a final round of negotiations with bondholders took place, where Sri

17

Lanka was able to obtain the required additional concessions to make the final agreement in principle compatible with the DSA and compliant with the OCC's CoT requirements. Key concessions include;

i)  A further increase in the USD nominal GDP levels at which higher payout thresholds are triggered (e.g. the highest payout threshold was USD 100 billion which is increased to USD 107 billion).

ii)  Coupons were reduced providing lower interest costs to Sri Lanka.

iii)  The cumulative real GDP trigger is also increased from 11.1% of GDP between 2024 and 2027 to 11.5% of GDP which is higher than the IMF forecast.

iv)  Nominal reinstatement of two MLBs (maturing in 2030 and 2033) were reduced in the two highest states.

Under the agreements, holders of the ISBs have consented to a present value concession of 40% in the baseline scenario, calculated with a discount factor of 11%. In respect of the highest state (resulting from the most significant economic outperformance), bondholders' present value concession relative to the JWF has increased from 27% to 33%. Compared to July's JWF, coupon adjustments for the highest state were reduced by roughly 160 basis points. Similarly, the coupon adjustments for the second highest state were reduced by roughly 60 basis points.

To illustrate the evolution of the MLBs between October 2023 when they were first proposed by the AHG and the recent AIP; considering a hypothetical average GDP of USD 93 billion (average 2025-2027), the principal haircut would have been 2% as per the October 2023 proposal, whereas in the AIP, the principal haircut for an average GDP of USD 93 billion would be 27%. This is just one illustration of the increased debt relief and risk reduction obtained by Sri Lanka during a year of negotiations.

Table 2: Improvement in MLB Debt Relief Through Negotiations

| | October MLB Proposal (NGDP USD Bn) | Principal Hairuct | March/April Negotiations (NGDP USD Bn) | Principal Haircut | June Joint Working Framework (NGDP USD Bn) | Principal Haircut | September Agreement in Principal (NGDP USD Bn) | Principal Haircut |
|---|---|---|---|---|---|---|---|---|
| Upside Scenario | 98.9 | 2% | 96.3 | 7% | N/A | N/A | N/A | |
| Threshold 1 | 93 | 2% | 93.9 | 10% | 100 | 15% | 107 | 16% |
| Threshold 2 | 89.5 | 5% | 90.1 | 13% | 96 | 15% | 99 | 16% |
| Threshold 3 | 86.1 | 16% | 86.3 | 22% | 92 | 20% | 94 | 19% |
| IMF Baseline | 83.1 | 26% | 84.2 | 28% | 88.6 | 28% | 88.6 | 27% |
| Threshold -1 | N/A | N/A | 80.5 | 42% | 86.7 | 35% | 86.7 | 30% |
| Threshold -2 | N/A | N/A | 77.6 | 55% | 84.7 | 40% | 84.7 | 39% |

*Note: NGDP Refers to average Nominal GDP in USD terms during the period 2025-2027*

Figure 4: Annual Debt Service Under the Agreement in Principle with the AHG*

| Debt service under the Joint Working Framework | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| US$m | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 |
| GDP threshold #1 (avg. GDP 2025-2027: $107.0bn) | 534 | 708 | 695 | 681 | 1,131 | 1,309 | 1,274 | 1,465 | 1,414 | 1,620 | 1,403 | 1,324 | 1,812 | 1,672 | 1,530 |
| GDP threshold #2 (avg. GDP 2025-2027: $99.0bn) | 534 | 708 | 695 | 681 | 1,075 | 1,255 | 1,224 | 1,420 | 1,374 | 1,620 | 1,403 | 1,324 | 1,812 | 1,672 | 1,530 |
| GDP threshold #3 (avg. GDP 2025-2027: $94.0bn) | 534 | 708 | 695 | 681 | 1,010 | 1,167 | 1,140 | 1,333 | 1,294 | 1,554 | 1,372 | 1,292 | 1,678 | 1,548 | 1,417 |
| IMF baseline (avg. GDP 2025-2027: $88.6bn) | 534 | 708 | 695 | 681 | 926 | 1,000 | 979 | 1,152 | 1,122 | 1,393 | 1,327 | 1,247 | 1,485 | 1,370 | 1,254 |
| Below IMF baseline #1 (avg. GDP 2025-2027: $86.7bn) | 534 | 708 | 695 | 681 | 912 | 955 | 934 | 1,099 | 1,070 | 1,331 | 1,310 | 1,230 | 1,411 | 1,302 | 1,191 |
| Below IMF baseline #2 (avg. GDP 2025-2027: $84.7bn) | 534 | 708 | 695 | 681 | 869 | 809 | 792 | 929 | 905 | 1,134 | 1,254 | 1,175 | 1,173 | 1,083 | 990 |

Note: Assuming 100% of the Existing bonds (USD 12.55bn) exchanged under the AIP

*Agreement with Local Holders of ISBs*

Following the achievement of the July's Joint Working Framework, the LCSL in turn expressed their preference for instruments which do not include a state contingent feature, and which include a portion of outstanding ISBs exchanged for LKR instruments. This was primarily driven by the need to minimize losses incurred upfront by domestic financial institutions and therefore preserve stability in the domestic financial markets.

Accordingly, agreement in principle on a Local Option for members of the LCSL was also agreed on September 19th 2024 after negotiations over more than a year, contemplating the exchange of ISBs held by local holders for a mix of new plain vanilla USD and LKR denominated instruments with a reduced aggregate principal amount ("haircut"). It was

further agreed that the Local Option would be offered to all bondholders, subject to a cap set at 25% of the aggregate outstanding amount of the ISBs, with priority given to local bondholders, and pro-rata allocation of the balance between consenting international bondholders who have opted for the Local Option. The agreement reached with the local consortium is comparable in terms of the debt relief provided by agreements reached with other creditors as per the Comparability of Treatment criteria.

*Participation Risks in the ISB Restructuring*

The ISBs being restructured comprise 11 series of bonds with a total face value (excluding interest) of USD 12,550 million. The restructuring would be implemented through a bond exchange where new restructured bonds would be offered in exchange for the existing bonds through a consent solicitation.

The new restructured bonds would have new economic and legal terms, where the bondholders of the existing bonds would need to vote in favour or against changing the economic and legal terms of the existing bonds to enable the exchange. A super-majority of votes would be needed to ensure a successful exchange, where the relevant percentages required to change the terms of the bonds vary for the different bond series.

Of the 11 series, 7 series that were issued in 2017 and after have aggregated Collective Action Clauses (CACs) which allow multiple series aggregation for voting purposes whereas 4 series have older single series Collective Action Clauses which allow only voting within each individual series of ISBs.

   i.   Single series collective action clauses: Applies to 4 bond series issued in 2016 or before.

        Any change of terms of reserved matters (relevant for changes in payment terms, early redemption etc) requires approval by at least 75% of bondholders in that series. Changes to terms of non-reserved matters require 66.67% for these 4 bond series.

ii.    Aggregated CACs: Included in 7 series issued since 2017.

Two limbed aggregation: 66.67% (in aggregate voting) across all securities being aggregated <u>and</u> 50% (per series voting) for each of the securities being aggregated to change reserved matters. Non-reserved matters require 50% approval.

It was clear that the single series collective actions clauses applicable to the bonds issued prior to 2017 require a more challenging threshold to complete the restructuring of these ISBs. This was particularly the case for the ISBs maturing in 2022 (issued in 2012) where Hamilton Reserve Bank (HRB) claims to have 25% beneficial ownership of the bonds, which was expected to form a blocking stake of that bond series.

Considering the above, it was clear that strong participation in the exchange was necessary for a successful restructuring.

Participation risk was compounded by the fact that two of the three major rating agencies (Fitch and S&P) did not express willingness to rate the MLBs since they provide downside capital adjustment. The lack of a rating could have made the transaction less attractive for larger institutional investors who have mandatory rating requirements in their investment criteria. Sri Lanka engaged with the rating agencies with a view to facilitate a rating being provided at a later stage.

Considering all of the above, Sri Lanka's implementation strategy was as follows;

- Use of aggregated CACs in the context of a mandatory exchange for the series with aggregated CACs (upon reaching the two separate voting thresholds)

- Use of series-by-series CACs for the series with single series CACs (except the 2022 series) to include a mandatory exchange provision and at the same time, launch a mandatory exchange (requiring 75% bondholder consent individually for each of the series)

- Pure voluntary exchange for the 2022 series

In the event the relevant super-majorities would be reached, Sri Lanka would be in a position to implement a mandatory exchange for the remaining non-consenting minority bondholders of the relevant series as well. Other mechanisms to incentivize participation such as differentiated consent fees were also used as part of Sri Lanka's exchange offer. Sri Lanka also left open the possibility of de-listing bonds that were not exchanged.

The above approach was considered with a view to optimising participation. Even so, it was expected that there would inevitably be some non-participants or holdouts. Ideally, this would be limited to HRB.

The inherent non-participation risk in the bond exchange provided further reason for why it was important for Sri Lanka to agree pragmatic restructuring terms that accommodated the interests of the majority of bondholders as represented by the Ad-Hoc Group of bondholders. If Sri Lanka had ignored their preferences, such as the inclusion of MLBs, non-participation risks would have been far higher, and the likelihood of a successful restructuring would have been more limited.

The final outcome was indeed very positive, as Sri Lanka received 96% participation allowing for 98% of the ISBs to be exchanged under the strategy described above. The only significant holdout was HRB, as Sri Lanka's restructuring strategy was successful in ensuring a successful execution of a very complex transaction.

### Critiques of the MLBs and DSA

There have been various critiques of the IMF's DSA targets itself. This includes the view that the debt to GDP target of 95% of GDP by 2032 is too high. However, 95% is just the target, there is nothing to prevent the government from achieving a debt to GDP well below that target. In fact, already debt to GDP has declined below the level anticipated by the IMF at the time of programme review. Any over-performance in terms of GDP growth and currency will help the country drive the debt to GDP ratio below the 95% target. The negotiations with the bondholders have ensured that even at the highest state of growth over-performance, a nominal haircut of 16% is obtained, and a Net Present Value (NPV) haircut of 33% (at 11% discount rate) is achieved.

22

Another critique is that the DSA does not include a limit of NPV of external debt stock (a target typically included in DSAs of low-income countries). However, there is a limit on the forex debt flow, which is the 4.5% of GDP upper ceiling on foreign currency debt service. This creates an implicit limit on the stock of foreign currency debt with which Sri Lanka's debt can remain sustainable. The 4.5% of GDP ceiling on forex debt service is a significant reduction from the unsustainable level of forex debt service in 2022 which was more than double the target level at 9.4% of GDP, indicating the significant debt relief materializing through the debt restructuring process. The outcome of the debt restructuring was far better than the target level, where forex debt service is limited to below 4% of GDP during the period 2027-2032.

In general, for a middle-income country like Sri Lanka, the stock of debt matters less than the cost of debt (debt flow). To consider an example, from the far end of the spectrum, Japan (a high-income country) has a debt stock of over 260% of GDP. However, Japan's debt is sustainable since the cost of debt is low and gross financing needs are limited.

Finally, there is a critique that the DSA's debt targets do not make specific reference to foreign exchange reserves and government revenue and therefore are not directly linked to debt service capacity – and that therefore, the MLBs endanger Sri Lanka's capacity to pay its external debt. However, this fails to consider the fact that both foreign exchange reserves (net international reserves) and government revenue (tax revenue to GDP) are implicit targets within the IMF programme itself, and that the MLB has inbuilt protection should Sri Lanka's ability to pay its external debt be diminished. For instance, by the end of the IMF programme period, Sri Lanka is expected to reach a government revenue to GDP of 15.4% of GDP and foreign exchange reserves of USD 15.1 billion by end 2028. At present, Sri Lanka is on track regarding both the revenue target and the net international reserves target. However, if the process of accumulating reserves becomes challenging due to an unforeseen shock causing weaker than expected forex inflows, it will trigger a depreciation of the currency, which in turn will prevent Sri Lanka from reaching the higher GDP thresholds in the MLB (measured in USD nominal GDP, as well as real GDP growth).

If Sri Lanka continues to adhere to the macroeconomic reform path, as it is expected to do, there will be sufficient fiscal capacity and reserve buffers to meet the debt service obligations – even if the higher thresholds of the MLBs are triggered. The entire IMF programme design is structured to achieve this objective. However, in case there is some adverse shock which triggers a recession or a major currency depreciation, Sri Lanka has additional protection through the MLB's inbuilt trigger mechanism.

The table below illustrates the fact that even in the event of the highest payout (the yellow line named Post-Restructuring Max), where Sri Lanka's economic over-performance is 21% higher than the IMF baseline level (green line), the increase in debt service obligations is far lower than the pre-restructuring scenario. Such payouts would only occur if Sri Lanka's capacity to pay is far greater than it was in the past. The critical factor is that Sri Lanka must maintain discipline in its fiscal and monetary management in order to maintain this capacity to pay.

<u>Figure 5: Sri Lanka External Debt Service Outflows</u> *(Excluding Multilateral Debt; i.e. IMF, World Bank and ADB etc.)*



Note: This includes Sri Lanka's total external debt service (capital and interest) from official bilateral debt and all external commercial debt (ISBs, CDB, other) and assumes no refinancing.

Sri Lanka's ISB restructuring ensures the country's debt remains sustainable even under the highest threshold of MLB related payouts. Figure 6 below indicates how the debt targets are met under the IMF baseline scenario.

Figure 6: DSA Targets Under the IMF Baseline Scenario



Figure 7: DSA Targets Under the MLB's Highest Payout Scenario





Figure 7 above indicates how the DSA targets are met even under the highest MLB payout scenario. This is due to the fact that the increase in GDP in the highest scenario exceeds the increase in debt service under that scenario. The critical factor here is to ensure that Sri Lanka maintains the required fiscal discipline and external sector buffers as envisaged under the IMF supported reform programme.

Table 3: DSA Targets in 2022 and 2032 Under ISB Restructuring Scenarios

| DSA Target | Actual Performance in 2022 | Outcome under IMF Baseline Scenario in 2032 | Illustrative outcome under Highest Payout Threshold in 2032* |
|---|---|---|---|
| Public Debt to GDP Ratio | 128% | 93% | 86% |
| Gross Financing Needs to GDP ratio | 34.6% | 13% | 12% |
| Foreign Debt Service to GDP Ratio | 9.4% | 4.2% | 3.7% |

*Illustrative projection: see Figure 7 above for assumptions

*Governance Linked Bond*

The bondholders proposed an additional instrument which provides Sri Lanka with a lower coupon (interest payment) if agreed criteria related to governance are met by Sri Lanka.

According to this proposal, the Governance Linked Bond (GLB) would have a 50 basis point coupon reduction from the time of measurement (H2 2028) until maturity in 2035 if the selected governance linked triggers are fulfilled. Both vanilla bonds were proposed to be structured as GLBs as proposed by the AHG.

The proposed indicators by the AHG were as follows;

1. Quantitative indicator: Total revenue to GDP at 15.3% in 2026 and 15.4% in 2027
2. Qualitative indicator: Publication of tax holidays and details of procurement contracts, as assessed by the IMF.

Both of these indicators would need to be met for the GLB coupon reduction to be triggered from 2028.

However, there was a flaw in this design as the IMF does not allow triggers linked to approvals required by the IMF Executive Board and alternatively, an external certification body would be required at Sri Lanka's cost. Therefore, both the IMF and Sri Lanka rejected this proposal. The bondholders' counterproposal was that the second trigger would be that Sri Lanka's score on the Transparency International Corruption Perception Index must reach 40 in 2027 from 34 in 2023.

Sri Lanka rejected this proposal due to the fact that Sri Lankan authorities are not able to control perceptions even if all actionable measures are in fact implemented. Sri Lanka's counterproposal was a qualitative indicator which is anchored to a domestic policy instrument. Specifically, the qualitative trigger would require that the Fiscal Strategy Statement (FSS) as required in the Public Financial Management Act is published in 2026 and 2027. The FSS was the most appropriate trigger since fiscal mismanagement was the primary driver of Sri Lanka's economic crisis. Sri Lanka also negotiated a 75 basis point coupon reduction. This was accepted by the bondholders.

| Bond | Capital (USD mn) | Coupon 2024-2027 | Coupon 2028-2032 | Coupon 2032-2035 | Final Maturity |
|------|------------------|------------------|------------------|------------------|----------------|
| Vanilla Bond | 1,422 | 3.60% | 5.1% | 9.25% | 2035 |
| Vanilla bond when structured as a GLB | 1,422 | 3.60% | 4.35% | 8.50% | 2035 |

## 6. **Conclusion**

The Agreements in Principle negotiated with the AHG and LCSL provide a fair balance of risk sharing and sufficiently address Sri Lanka's concerns and the requirements set by bondholders. The MLB structure, following the adjustments made through the evolution of the proposed instrument, enables the appropriate sharing of upside between creditors and the debtor, whilst ensuring that in this process, Sri Lanka's debt sustainability is not compromised, as confirmed by IMF assessment of DSA compatibility. Debt relief from the restructuring is calculated by the combined cash flow relief provided through maturity extension, coupon (interest) reduction, principal haircut, and capital grace period.

The ISB restructuring provides Sri Lanka with:

- Upfront debt stock reduction of USD 3.0 bn which can increase to USD 4.3 bn in case of economic downturn or reduce to USD 1.8 bn in case of economic over-performance (compared to IMB baseline)

- USD 9.6 billion debt service payments reduction during the 4-year IMF program period

- 33% reduction in the coupon rate of Sri Lanka's Bonds to 4.3%

- Extension of the average maturity profile of around 6 years

- In sum, as of the settlement date of the ISBs exchange, bondholders would be consenting to a Net Present Value (NPV) concession of 40% in the IMF baseline scenario and in the highest MLB threshold, the NPV concession would be 33% when the standard commercial market discount factor of 11% is applied.

On 20th December 2024, Sri Lanka concluded the successful settlement of the ISB restructuring and immediately Fitch Ratings upgraded Sri Lanka's credit rating from Restricted Default to CCC+. It is useful to note that both Zambia and Ghana which have also gone through debt restructuring in 2024, remain at RD for issuer level long term foreign currency ratings as per Fitch. On the 23rd of December 2024, Moody's also upgraded Sri Lanka from Ca to Caa1, the highest rating notch increase when comparing with Zambia and Ghana this year.

29

On the 24th of December 2024, Sri Lanka successfully concluded the restructuring settlements with China Development Bank, bringing to a close all the major debt restructuring obligations. The small pending commercial restructuring (HSBC, ICBC) are in advanced stages of finalisation, as are the pending small official creditors outside the OCC (Kuwait, Pakistan, Saudi Arabia, Iran).

Overall, the restructuring provides Sri Lanka with significant debt relief, which is sufficient to restore debt sustainability as confirmed by the IMF's assessment. Sri Lanka must use the cash flow relief and fiscal space provided to rebuild its fiscal and external sector buffers, as envisaged in the IMF supported reform programme, to ensure that future debt service can be met without any difficulties.