# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

HAMILTON RESERVE BANK LTD,

              Plaintiff,

                                           No. 1:22-cv-5199 (DLC)

v.

THE DEMOCRATIC SOCIALIST REPUBLIC

OF SRI LANKA,

              Defendant.

## DECLARATION OF NICHOLAS PEACOCK K.C.

I, Nicholas Peacock K.C. declare as follows pursuant to 28 U.S.C. § 1746:

### A: Introduction

1. I have been retained by counsel to the Democratic Socialist Republic of Sri Lanka ("**Sri Lanka**") to opine on banking confidentiality in Nevis and its effect (if any) on Hamilton Reserve Bank's ("**HRB**") ability to comply with any order for discovery that the New York court might make, as sought in Sri Lanka's document request dated 24 June 2025 ("**the Request**").

1

2. I make this declaration based on my personal knowledge, information, and belief, and my review of the Request. I am being remunerated by Sri Lanka for producing this declaration at an hourly rate of £1,100 subject to an agreed cap of £40,000. My compensation is not contingent on the opinions I express or on the outcome of this matter. I have not given expert evidence in any court or tribunal in any jurisdiction within the last 4 years.

3. I have practiced at the Bar of England & Wales since 1989, and was appointed King's Counsel (at the time, Queen's Counsel) in 2009. I have particularly practiced in the field of financial services and banking regulation for over 30 years and have worked extensively for the Financial Conduct Authority (previously the Financial Services Authority) and prior to that the Securities & Investments Board and the Bank of England in relation to the regulatory (but not prudential) oversight of investment firms, financial institutions and deposit-taking institutions. I attach a copy of my c.v. at <u>Annexe 1</u>.

4. As is well-known, many of the non-US Caribbean islands have adopted (or perhaps more accurately, retained) the English common law as the fundamental basis of their legal systems. St Christopher & Nevis ("**St Kitts & Nevis**") is one such confederation of islands and permits English qualified barristers of sufficient standing to be called to its Bar for the purpose of appearing in court on-island. I was called to the Bar of St Kitts & Nevis in February 2019 and have since then acted both as advocate (in court on-island and in the Eastern Caribbean Court of Appeal, on appeal from the Nevis court) and adviser in relation to a number of multi-jurisdictional commercial disputes.

## B: The Request

5. As I understand it, HRB seeks to enforce certain bonds issued by Sri Lanka with a face value of US$250,490,000, being part of the US$1 Billion 5.875% International Sovereign Bonds issued by Sri Lanka which fell due on 25 July 2022 ("**the Bonds**"). HRB claims to be the legal and beneficial owner of Bonds which it seeks to enforce but that beneficial ownership has been put in issue by Sri Lanka. In furtherance of that dispute concerning the beneficial ownership of the Bonds, Sri Lanka has, in the Request, sought discovery of a number of different categories of documentation and information concerning HRB and its activities.

6. Relevantly for my purposes, the Request seeks the following:

    a. (in para 2) "All Communications concerning the Bonds, the Investment Decision[1], or the Sri Lanka Investment[2], including but not limited to communications between, among, or involving any of the following as a sender or recipient (including any receipt as CC or BCC) with (amongst others) any Depositor[3]"; and

    b. (in para 4) "Documents sufficient to show (a) the identity of each Depositor holding, at any point during the Relevant Period, Deposits of $1 million or more; (b) for each such Depositor, all deposits, withdrawals, or transfers made by that Depositor during the Relevant Period; (c) for each such Depositor, all KYC Information[4] concerning that Depositor; (d) for each such Depositor, all agreements and other on-boarding documentation between that Depositor and HRB, Fintech Bank, or any affiliates thereof; and (e) for each such Depositor, the relationship (whether business, personal, familial or otherwise) between that Depositor and any of HRB or any affiliated persons (including but not limited to Benjamin Wey).

7. In response to these particular requests, counsel to HRB (in a letter to the New York court dated 8 January 2026) has asserted (amongst other things) that "it is prohibited from [giving discovery] by Nevis law. *See* Nevis' Confidential Relationships Act, Chapter 21.02 (prohibiting "any person" from disclosing "confidential information" including as to "the relationship between a bank and a customer of that bank", subject to criminal penalties)".

---

[1] Meaning "HRB's decision or decisions to purchase, sell, or invest in, any interest in the Bonds".

[2] Meaning "any of HRB's claimed purchases of, investments in, holding of, sale of, or any other transaction with respect to any interest in the Bonds".

[3] Meaning "any person who deposited or otherwise contributed a Deposit", namely "any funds classified as deposits of HRB or Fintech Bank in the Financial Statements".

[4] Meaning "all information HRB collects from Depositors in connection with opening a relationship (including but not limited to information collected pursuant to HRB's "Customer Identification Program and Customer Due Diligence procedures reasonably designed to identify and verify all customers and, where applicable, beneficial owners, source of funds, and the nature and intended purpose of the business relationship".

**C: The issues for my opinion**

8. Consequent upon the above, the issues on which I am asked to give my opinion are, as I understand it, as follows:

   a. first, to what extent (if at all) is HRB prevented from giving discovery in answer to the Request by reason of the law of St Kitts & Nevis; and

   b. secondly, to the extent that HRB is so prevented but the New York court nonetheless orders that discovery be given and HRB complies with such an order, what would be the prospect of HRB in fact being prosecuted for any contravention.

**D: First issue: is HRB prevented by law from giving discovery?**

(i) The common law

9. It is, I think, both helpful and necessary to traverse some of the applicable common law background to the Confidential Relationships Act, Chapter 21.02 ("**the CRA**") (Annexe 2) in order to properly understand its scope and effect. The particular common law background is that relating to a banker's duty of confidentiality, which duty is often said to have first been recognised by the English Court of Appeal in ***Tournier v. National and Provincial and Union Bank of England*** **[1924] 1 KB 461** (Annexe 3).

10. In that case, Scrutton LJ expressed the view (page 479) that "It is curious that there is so little authority as to the duty to keep customers' or clients' affairs secret, either by banks, counsel, solicitors or doctors. The absence of authority appears to be greatly to the credit of English professional men, who have given so little excuse for its discussion". Obviously, much has changed since then both in England and in St Kitts & Nevis, but the fundamental principles espoused in ***Tournier*** remain good law in both jurisdictions (subject to any change effected by statute) - see **Toulson & Phipps on Confidentiality 5th edn** para 10.001 ff (Annexe 4). Those principles are as set out below.

4

11. First, the duty is an implied contractual duty of confidence that arises in the relationship of banker and customer. Since the duty arises by way of an implied term, it may be varied by express agreement. I have been provided with a copy of an HRB Customer Account Agreement effective I January 2020 (which I understand has been publicly filed in this case, ECF 93-1), clause 23 of which is headed "Use of information". That clause does not, in my view, affect the implied contractual duty that arises under common law. Rather, it effectively restates the position under the common law. Thus, the clause identifies the obligation of confidence that HRB has (by stating that "All information collected by the Bank is subject to strict confidentiality protections and procedures") but also identifies in general terms the circumstances (which I explore in more detail below) in which that obligation of confidence might not be applicable (by stating that "You hereby authorise the Bank to use and share your information solely as may be necessary to provide services requested by You, conduct due diligence or otherwise maintain a high standard for the Bank's internal legal, operating, and compliance processes (for example as part of the Bank's ongoing Anti Money Laundering procedures), or as necessary to comply with the laws of the Island of Nevis."). I will proceed, therefore, on the basis that there is nothing expressly agreed between HRB and any Depositor that either increases, or decreases, the scope of the common law duty of confidence or of the qualifications to that duty.

12. Secondly, the duty arises at the commencement of the banking relationship and continues even after the customer has closed their account in relation to information gained during the period of the account. Precisely how long after the account has been closed confidentiality continues to exist has not been discussed in any of the case law but the period will be likely to be tied to how long confidentiality continues to have potency in relation to the relevant information.

13. Thirdly, the duty covers information about the customer's affairs gained by virtue of the banking relationship and is not limited to information from or about the account itself.

14. Fourthly, however, the duty is not absolute but, rather, is qualified. Whilst it is possible to indicate the limits of that qualification, it is not possible to definitively define those limits. The result is that it is not possible to frame any exhaustive definition of the duty.

5

15. Fifthly, the qualification of the duty arises under four heads: (a) where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; and (d) where the disclosure is made by the express or implied consent of the customer.

16. Sixthly, the compulsion of law qualification has some notable aspects:

   a. Banker/customer confidentiality does not provide any basis on which a bank might refuse to answer questions in an English Court about the affairs of its customer: see Scrutton LJ in *Tournier* (page 479): "there is no privilege to abstain from answering in a Court of justice questions as to a customer's account".

   b. For the same reason, banker/customer confidentiality does not provide any basis on which a bank (as a party to proceedings before the court) might refuse to provide disclosure in England as required under Part 31 (Disclosure and Inspection of Documents) of the Civil Procedure Rules[5]. Similarly, where the bank which is a party to proceedings before the English court is subject to a foreign law restriction (backed up by a criminal sanction) on disclosure of confidential customer information, the English court will not be deterred from ordering disclosure to be made by the bank, particularly if the bank is the claimant in the proceedings (i.e. where the bank has itself sought to invoke the jurisdiction of the English court, rather than being dragged unwillingly before the English court). Concern as to the risk of prosecution faced by the bank should it comply with the order is trumped by the documents' importance to the fair disposal of the trial, and the English court's ability to conduct its proceedings in accordance with its own law and procedures should not be overridden by foreign law: see *Bank Mellat v HM Treasury* **[2019] EWCA Civ 449** (Annexe 5). The English court might well, however, seek to restrict the dissemination of the confidential material ordered to be disclosed by ordering disclosure to be made only to the members of a "confidentiality club" i.e. a limited group of persons (often restricted to specific identified lawyers acting on the case, perhaps together with one senior person from the client).

---

[5] See https://www.justice.gov.uk/courts/procedure-rules/civil/rules/part31

6

c. The same position would obtain in proceedings before the Nevis court: confidentiality would be no answer to the obligation to provide disclosure under Rule 28 (Disclosure and Inspection of Documents) of the Eastern Caribbean Civil Procedure Rules[6]; and confidentiality backed by a foreign law restriction with an attached criminal sanction would not prevent disclosure being ordered in Nevis.

d. The position would, however, be different both in England and in Nevis if disclosure is sought against a bank that is essentially a mere witness. On the one hand, the English (or Nevis) court will only grant a disclosure order against a non-party foreign bank (or English bank in respect of its foreign branch) in exceptional circumstances[7]; and on the other hand if the English (or Nevis) court is faced with a bank subject to the jurisdiction of the court being assailed by a foreign state's investigatory or criminal evidence gathering procedure, or by an order made by a foreign court, in relation to civil or criminal proceedings to which the bank is not (or will not be) a party, that will not be regarded as being a sufficient basis for disregarding the bank's duty of confidentiality.

17. Seventhly, the scope of the qualification arising in relation to the interests of the bank is particularly unclear. The following points are of note:

a. In **Tournier** Scrutton LJ formulated the qualification in terms of what was "reasonable and proper for its own protection, as in collecting or suing for an overdraft" (see page 481), whereas Atkin LJ formulated the qualification in terms of what was "reasonably necessary for the protection of the bank's own interests either as against its customer or as against third parties in respect of transactions of the bank for or with its customer" (see page 486). The latter appears to be quite wide in scope, whereas the former appears to be rather more limited in that the interests of the bank in contemplation are those as between the bank and the customer whose otherwise confidential information the bank discloses (e.g. that

---

[6] See https://www.eccourts.org/civil-procedure-rules/part-28-disclosure-and-inspection-of-documents/#a28.1

[7] See **Mackinon v Donaldson, Lufkin & Jenrette** [1986] **Ch 482** (Annexe 6) at 493-4 and **Scenna v Persons Unknown** [2023] **EWHC 799 (Ch)** (Annexe 7).

the customer is in fact a customer of the bank and has an account in overdraft in the sum for which the bank is suing).

    b.   In *Sunderland v. Barclays Bank Ltd* **(1938) 5 LDAB 163** (<u>Annexe 8</u>) the bank had refused to honour cheques drawn on it by the claimant married woman. The primary reason for doing so was that there were insufficient funds in the account to meet the cheques issued, but there was also a secondary reason, namely that the bank was aware that the some of the cheques were drawn to meet the claimant's gambling debts. Upon discovering that the cheques had been dishonoured, the claimant asked her husband to make enquiries of the bank, and he was told of both of the bank's reasons. The claimant brought an action against the bank in respect of breach of confidentiality in respect of the disclosure of the second reason. Du Parcq L.J., was unimpressed and found that the disclosure made was necessary as being in the bank's own interests (even though disclosure only of the first reason would have been sufficient to explain why the cheques had been dishonoured), and secondly, in any event, the claimant had impliedly consented to the disclosure through instructing her husband to investigate the issue of the dishonoured cheques.

    c.   This decision would appear to permit disclosure of otherwise confidential information by the bank in circumstances where its own interest is essentially that of protecting its own reputation, or being seen to be acting in a commercially "proper" manner. Some support for this approach can be found in the judgment of Chadwick L.J. in *Christofi v. Barclays Bank* **[1992] 2 All ER (Comm) 417** at 425-6 (<u>Annexe 9</u>).

    d.   But there has been little further guidance provided in relation to this head of qualification since *Tournier* was decided in 1924. It remains the case, therefore, that the key factor is whether or not the disclosure made by the bank is reasonable and proper for its own protection.

18. Eighthly, where a qualification to the duty of confidence applies, there is in fact no duty of confidence binding upon the banker in respect of the information in question at all. In other words, subject to the banker making use of the information in question only within

and for the purposes of the "gateway" permitted by the qualification, then that information has ceased to be confidential. Thus:

a. In ***Barclays Bank plc v. Taylor*** **[1989] 1 WLR 1066** (Annexe 10) Lord Donaldson M.R., stated that, "[I)he duty to maintain confidentiality is not all-embracing, subject to certain exceptions. It does not exist in four exceptional circumstances." Croom_Johnson LJ in that same case disagreed, and characterised the four heads of qualification as providing a justification for a breach of the duty of confidentiality.

b. But that latter analysis has not been accepted. In ***El Jawhary v. Bank of Credit and Commerce International SA100*** **[1993] BCLC 396** (Annexe 11) Sir Donald Nicholls V.C. analysed the banker's duty of confidentiality in terminology consistent with the interpretation offered by Lord Donaldson M.R.: "Where the case is within one of the qualifications to the duty of confidence, the duty, ex hypothesi, does not exist". This approach is mirrored in **Toulson & Phipps on Confidentiality 5ᵗʰ edn** where it is stated that "the true effect of the qualifications is not to excuse a breach of duty, but to identify certain limits of the duty itself."

(ii) The scope of the Confidential Relationships Act

19. It is important to note in relation to my reasoning that appears below that there is, so far as I am aware, no decided case or judicial guidance in St Kitts & Nevis (or in the Eastern Caribbean Court of Appeal) concerning the CRA. We are left, therefore, to approach the process of discerning the intended meaning and effect of the CRA by applying the usual principles of statutory interpretation.

20. Here is probably not the place to consider these principles in any great detail but four of the key principles may be summarised thus: (1) the meaning of a statute is the meaning that, objectively assessed, the legislature acting reasonably would be seeking to convey in using the statutory words in issue; (2) a court will ordinarily adopt a purposive approach to this task, being an approach that emphasises the context of the legislation and that is designed to identify the purpose of a statute and to interpret its language, so far as possible, to give effect to that purpose; (3) statutory provisions should be read in the context of the statute as a whole and in the historical context of the situation which led to its enactment;

and (4) headings and marginal notes may help in cases of ambiguity but are not determinative.

21. Applying those principles to the CRA, the first and most important point to consider, in my view, is whether the CRA was in some way intended to effect a codification of, or perhaps even a change to, the otherwise applicable common law as between banker and customer, or rather whether the CRA sought to build upon (but did not otherwise in any way touch upon) the applicable common law. In my view, the latter is the case for the four reasons set out below.

22. First, the purpose of the CRA is clear. Thus, the title to the CRA states that it is "An act to give sanction to the duty of non-divulgence of information imparted under conditions of business or professional confidence". The title to the Act, therefore, appears clearly to limit its scope to that of giving sanction to (i.e. creating a criminal sanction for any breach of) a duty of confidence that already exists under the common law.

23. Secondly, the historical context for the CRA was the pre-existing common law duty of confidentiality owed by a banker to their customer, and (objectively assessed) the CRA was not intended to change that duty, including not being intended to change the fourfold qualification of that duty. Thus, the existence of a duty of confidence at common law is itself recognised by the section 5 CRA which refers to (and saves) civil liability for "express or implied conditions of confidentiality with regard to business or professional relations or transactions".

24. Thirdly, and importantly, section 5 CRA expressly states that "Nothing in this Act shall be deemed to affect or derogate from any rule or law or the rights of any person with regard to the civil liability of any person for any breach of any express or implied condition of confidentiality". This is as clear a statement as is possible to the effect that both an existing duty of confidence and any liability for breach of that duty are not to be "affected" by the CRA. There is simply no basis for suggesting that the CRA might in some way have altered the scope or effect of those conditions of confidentiality: the statute expressly states to the contrary.

25. Fourthly, the only substantive section of the CRA is section 4 – which is substantive in the sense that it seeks to create new law rather than define the scope of that new law (which is what section 2 seeks to do) or define the application of that new law (which is what section 3 seeks to do) – and it is substantive in just 2 respects. The first substantive effect is to create three new offences, namely in section 4(1)(a) of divulging or attempting or offering or threatening to divulge confidential information, in section 4(1)(b) of obtaining or attempting to obtain confidential information to which the person has no entitlement, and in section 4(2) of making use of confidential information without the consent of the principal, for the benefit of themselves. The second substantive effect is to create a suite of criminal sanctions for the various criminal offences, in varying circumstances: section 4(3)-(5). None of these substantive provisions can, assessed objectively in light of the apparent purpose of the statute, sensibly be said to have in any way altered the existing common law.

26. I ought to mention, if only to explain why I do not consider them to be in any way compelling, possible counter-arguments to the above:

    a. First, it might be suggested that section 1 of the CRA provides a wholly new definition of confidential information which must be applied in all circumstances and for all purposes – in other words the CRA is intended to provide for the wholesale replacement of the *Tournier* principles as between banker and customer. That, so it seems to me, is (in context of the stated purpose of the CRA, as discussed above) an impermissible reading of the statute, particularly in circumstances where the definition of confidential information in section 1 is not expressed to be in any way definitive: thus, confidential information is said to "include" what follows in that provision. This is not the wording upon which the legislature could be thought to have set out to construct the edifice of an entirely new scope of duty of confidence.

    b. Secondly, it might be said that section 3(2) of the CRA is intended to identify the only circumstances in which disclosure of confidential information is to be permitted without there being the commission of an offence under section 4: in other words, that any other disclosure (even if it would have been permitted under the *Tournier* qualifications) is no longer permitted. That, however, to my mind

reads too much into section 3(2) which (being part of section 3) is intended to set out the scope of the application of the substantive provisions of the CRA (namely those in section 4). Rather, so it seems to me, subsections (a) to (d) of section 3(2) are intended to identify "safe harbours" in which there can be no risk of prosecution whatever the nature of the information, and whether or not there is available to the banker a *Tournier* qualification that would mean that no duty of confidence in fact existed in relation to that information in any event. Importantly in this respect, it has to be bore in mind that the CRA applies to professionals as well as bankers and that professionals will not have the benefit of the application of the *Tournier* principles.

c. Thirdly, there is section 4(6) of the CRA which provides: "For the avoidance of doubt, it is hereby declared that, subject to subsection (2) of section 3, a bank which gives credit reference in respect of a customer, without first obtaining the authority of that customer, commits an offence under subsection (1)." This is an extremely odd provision because it is impossible to see how the giving of a credit reference could ever fall within any of the circumstances identified in section 3(2) of the CRA (giving evidence in a criminal trial, giving information to a police offer, the Minister obtaining information, and the Comptroller of Inland Revenue obtaining information) as being permitted circumstances for the disclosure of confidential information. That aside, the apparent intended purpose of the subsection would appear to be to make clear that the giving of a credit reference without express customer consent, is not permitted by a banker – a decision to that effect having been made (within the context of the *Tournier* qualifications) by the Court of Appeal in *Turner v Royal Bank of Scotland* **[1999] 2 All ER (Comm) 664** (Annexe 12). Thus, this subsection would appear to have the limited purpose of clarifying the proper scope of the *Tournier* qualifications and, if anything, provides support for my conclusion above that the underlying assumption to the CRA is that the *Tournier* principles remain applicable.

(iii) The effect of the CRA on a banker's duty of confidentiality

27. The consequence of the above analysis is, in my view, that the applicability of the criminal sanctions in the CRA necessarily assumes the continued confidential nature of the

information. If, applying the *Tournier* qualifications, the bank is permitted to make disclosure, the information is no longer confidential (at least within and for the purposes of the permitted disclosure) and there is nothing on which section 4 of the CRA can bite.

28. The question, therefore, is whether HRB complying with an order for discovery made by the New York court would fall within the scope of one or more of the *Tournier* qualifications. In my view, it is strongly arguable that it would because the compulsion qualification will apply:

   a. As already described above, it is long-established that a duty of banking confidentiality is no answer to the obligation of a bank which is a party to proceedings before the English (or Nevis) court to provide disclosure in accordance with the applicable rules of court. Thus, if the claim before the New York court were being litigated in Nevis, and the Nevis court considered that disclosure ought to be given of the information sought in the Request, that would constitute compulsion of law such that the information ordered to be disclosed would no longer be subject to any duty of confidence on the part of HRB such as to prevent such disclosure. The result would be that the CRA would have no application to HRB and it would not be at risk of committing a criminal offence.

   b. Does it make any difference that the claim is not being litigated in Nevis but is, rather, being litigated in New York? In my view it does not. Notably, this is not a case of HRB being made, unwillingly, subject to a foreign legal or judicial process where it is essentially nothing more than a witness. Rather, HRB has chosen to commence the New York claim and thereby to invoke the jurisdiction of the New York court. If (which is obviously not a question for me to consider) the New York court approaches the question of whether or not to order discovery as sought in the Request on the same (or a similar) basis as under English and Nevis law, namely that confidentiality is no answer to the obligation to provide discovery, then such an order by the New York court ought to constitute relevant compulsion of law just as would an order of the Nevis court. In other words, it cannot lie in the mouth of HRB (which has itself invoked the jurisdiction of the New York court, knowing how that court will approach discovery of otherwise confidential material) to contend that an order for discovery that the New York court might

13

make based on the Request does not operate in the same way as would a similar order made by the Nevis court. Both such orders operate so as to relieve HRB from its duty of confidentiality.

29. I am less confident that the own interests qualification will apply. As set out above, this qualification requires any disclosure of information by the bank to be reasonably necessary for the protection of the bank's own interests either as against its customer or as against third parties in respect of transactions of the bank for or with its customer. Plainly, HRB complying with a discovery order made by the New York court as the price of being able to pursue the valuable claim that it makes against Sri Lanka could be seen to be for the protection of the bank's own interests, as against a third party. But, it would not (so it seems to me) be in respect of a transaction of HRB with its customer, nor (absent the New York court deciding the very issue in dispute, namely whether or not the purchases of the Bonds were made beneficially for Depositors) would it appear to be in respect of a transaction of HRB for its customer. Nonetheless in circumstances where the true scope of the own interests qualification is far from clear, it remains arguable that disclosure as sought in the Request might engage this qualification – for example, if the bank can (in order to protect its own reputation) tell Mrs Sunderland's husband about her gambling, might not HRB also be entitled to protects its interests and reputation by (as it contends) definitively demonstrating through discovery that it was the beneficial purchaser of the Bonds? That is certainly be a respectable argument that it would be open to HRB to make.

(iv) <u>Nevis International Banking Ordinance Cap 7.05 (N) (Annexe 13)</u>

30. It is important to note that HRB is licenced by the Nevis Financial Services Regulatory Commission as an international bank[8] under the Nevis International Banking Ordinance ("**the NIBO**")[9]. International banks that are licenced under and subject to the Nevis regime are entirely separate from domestic banks that are licenced under and subject to

---

[8] Section 3(1) of the NIBO defines international banking as being "(a) receiving foreign funds through (i) the acceptance of foreign money deposits payable upon receipt demand or after a fixed period or after notice; (ii) the sale or placement of foreign bonds, certificates, notes or other debt obligations or other securities; or (iii) any other similar activities involving foreign money or foreign securities; and (b) either in whole or in part using foreign funds so acquired for loans, advances and investments whether in Nevis or elsewhere."

[9] See https://www.nevisfsrc.com/regulated-entities/#hamilton

the regulatory regime set out in the St Kitts & Nevis Banking Act Cap 21.01 ("**the BA**") (Annexe 14), and which are subject to the regulatory oversight of the Eastern Caribbean Central Bank[10]. There are, as I will explain below, some striking differences between the statutory confidentiality regimes that govern international banks subject to the NIBO and that govern domestic banks subject to the BA. But it is first necessary to consider the regime under the NIBO.

31. Although I understand that it has not been relied on by counsel to HRB as a basis for objecting to discovery, I ought to address section 29(1) of the NIBO which provides, under the heading "Insider Information" as follows: "A person who has acquired confidential information concerning a Licensee (a) as a director, officer, employee or auditor of the Licensee; (b) as agent or a custodian of the Licensee; (c) as Regulator or other employee of the Administration; or (d) in any other capacity, shall not disclose that information to any person except as permitted under subsection (2) or use that information for any purpose not related to the duties through which the information was acquired."

32. At first sight, this section would appear to have nothing to do with the discovery sought in the Request, as the section is targeted at "information concerning a Licensee" (i.e. HRB itself) whereas the Request seeks discovery of information concerning Depositors and not HRB. The question is whether or not that initial view is, in fact, correct.

33. The initial view is somewhat reinforced by the heading to the section being "Insider Information", which would appear to tie the restriction on disclosure of information to information concerning the Licensee, which is the entity to which the identified subjects (e.g. directors, officers, agents etc) would be insiders.

34. This is further reinforced by a consideration of the definition of "confidential information" provided for in section 2 of the NIBO, namely: "'Confidential information' includes data, facts and communications concerning the assets, liabilities, transactions and business and affairs of a Licensee which have been revealed in strict privacy or secrecy and which the recipient thereof is not, otherwise than in the normal course of business or professional practice, authorised by the Licensee to divulge". This definition strongly points towards it being information concerning the Licensee that is to subject to the statutory restriction.

---

[10] See https://www.eccb-centralbank.org/member-countries/saint-christopher-st-kitts-and-nevis

35. More importantly, the initial view is extremely strongly reinforced by contrasting section 29(1) of the NIBO with the equivalent section in the BA, namely section 178(1) which provides (under the heading "Secrecy of information") as follows: "No person who has acquired knowledge in his capacity as director, officer, secretary, employee or agent of any licensed financial institution or as its auditor, receiver, official administrator or official liquidator shall disclose to any person or governmental authority the identity, assets, liabilities, transactions or other information in respect of a depositor or customer of a licensed financial institution…".

36. It is immediately apparent that, whereas the NIBO is targeted at information concerning the Licensee, the BA is targeted at secrecy of information in respect of a depositor or customer of a licenced financial institution. Those would appear to be very different, and deliberately chosen, targets for the statutory restriction sought to be imposed by the NIBO and the BA respectively, perhaps driven by a recognition that a Nevis international bank may, as the result of its international business, be made subject to a wide variety of disclosure requirements from non-Nevis jurisdictions that would not apply to domestic banks. Certainly the contrast between the international bank NIBO confidentiality regime and the domestic bank BA confidentiality regime strongly indicates that the former was not intended to have any application to information concerning a Depositor.

37. Were matters to rest there, I might not have felt it necessary to make any reference to section 29(1) of the NIBO. But two points need to be considered. First, even if the statutory restriction in section 29(1) is limited to information concerning HRB, then it might be said that some of the information of which discovery is sought in the Request (for example, the amount of any liability of HRB to a Depositor, or the relationship (if any) between HRB and a Depositor) is information concerning HRB just as much as it is information concerning the Depositor. Without knowing the nature and detail of the information that falls within the scope of the Request (which, obviously, only HRB at present knows) it is extremely difficult to form a view as to whether or not this is a live point, but the New York court should be aware of the possibility.

38. Secondly, and perhaps more fundamentally, section 29(2) of the NIBO potentially has an effect on the analysis set out above. Section 29(2) provides: "Subsection (1) does not apply

to the giving of confidential information when the information (a) is a general credit rating of a person that is supplied by a director, officer or employee of the Licensee following a bona fide business request; (b) is given with the written authorisation of the beneficiary or his legal representative; (c) is lawfully required to be disclosed by an order of the High Court; or (d) is lawfully disclosed pursuant to any other enactment."

39. This disapplication of the restriction in section 29(1) of the NIBO provided for in section 29(2) is in very similar terms to the disapplication of the restriction in section 178(1) of the BA that is effected by subsections (a) to (d) of section 178(1). It might, therefore, be suggested (based on the similarity of the nature and scope of the disapplication of the restrictions) that the intent was that the restrictions themselves would be similar in scope and effect. Whilst I can see the force in that suggestion, the precise wording of the disapplication provided for in in section 29(2) of the NIBO does not to my mind justify such a conclusion:

   a. First, sections 29(c) and 29(d) of the NIBO are entirely neutral, in that they might be equally applicable to information concerning the Licensee as concerning a Depositor.

   b. Secondly, section 29(b) of the NIBO might prompt one to ask why, if "information concerning a Licensee" does not encompass information concerning a Depositor, it was thought necessary to provide for the disapplication of the restriction in the event of "written authorisation" being provided? The wording of subsection (b), however, is problematical in that it refers to the written authorisation of "the beneficiary or his legal representative" and not to a Depositor. "Beneficiary" is nowhere defined in the NIBO and is particularly inapt as a term to use in relation to international banking as provided for in the NIBO, which includes (see section 3(1)(a)) "receiving foreign funds through (i) the acceptance of foreign money deposits payable upon receipt demand or after a fixed period or after notice". In other words, the contemplated relationship is that between international bank and depositor not between international bank and beneficiary. It remains somewhat of a mystery, therefore, to whom subsection (b) intends to refer when it uses the term "beneficiary": it is a term just as apt (or just as inapt) to refer to the Licensee as it

is to refer to a Depositor. The consequence, in my view, is that it cannot provide a substantial counterweight to the initial analysis above.

    c.  Thirdly, whilst section 29(a) of the NIBO (which permits "a general credit rating of a person that is supplied by a director, officer or employee of the Licensee following a bona fide business request") might be thought to relate to information concerning the person (notably, once again, not a Depositor, but also not a beneficiary), in fact a "general credit rating" is likely to consist only of the Licensee's view about the person. In other words, the information disclosed will be information concerning the Licensee (namely the Licensee's general assessment of the credit worthiness of the person in question) and not the particular, underlying information concerning the person upon which the Licensee has formed its view.

40. Drawing the threads together, and acknowledging that the position must be assessed as being uncertain, it does not appear to me that there is anything in section 29(2) of the NIBO which should be considered to displace the initial view of the proper scope of section 29(1), namely that the restriction on disclosure of information bites in relation to information concerning the Licensee (i.e. HRB) and not the Depositors.

## E: Second issue: is there a risk of HRB being prosecuted?

41. The second issue arises on the assumption, contrary to the views I have expressed above, that HRB will, if it complies with an order for discovery made by the New York court based on the Request, be in contravention of the restrictions on disclosure of information provided for in either section 4 of the CRA or section 29(1) of the NIBO, and thereby at risk of criminal prosecution in Nevis. Everything that follows is based on that assumption.

42. Because (as I have explained above) the CRA only purports to create a new set of criminal offences, and expressly disclaims any intention to change the common law, any consideration by a court in St Kitts & Nevis or by the Eastern Caribbean Court of Appeal could only have been in the context of a criminal prosecution. I am not aware of any such

prosecution having been brought[11]. In contrast, section 29(1) of the NIBO might be relevant in both civil proceedings (because its effect would be to displace the *Tournier* qualifications) and criminal proceedings. But again, I am not aware of any consideration of the section by the Nevis court in any civil proceedings, nor am I aware of any prosecution having been brought under its provisions. Once again, therefore, we are left to approach this issue from first principles.

43. Whilst, I assume that it is a matter of New York law as to how one should go about assessing the risk of criminal prosecution in this case, I assume that the approach will be similar to that of the English court, namely to seek to identify whether or not there is a real – in the sense of the actual or more than purely hypothetical – risk of prosecution in the foreign state. To that end, the party must show that the criminal law relied on is not merely a "text, or an empty vessel" and, whilst the past may or may not be a safe guide to future risk, it is for the disclosing party to show that the foreign law is regularly enforced so that the threat to that party is real.

44. In England the Crown Prosecution Service and also the FCA (for the offences in relation to which it is the prosecuting authority) follow the Code for Crown Prosecutors[12], which sets out a two-stage test, namely an evidential test and a public interest test, to be applied in deciding whether or not to commence a prosecution. The evidential test requires a prosecutor to be satisfied that there is sufficient evidence to provide a realistic prospect of conviction against each suspect on each charge. They must consider what the defence case may be, and how it is likely to affect the prospects of conviction. A case which does not pass the evidential stage must not proceed, no matter how serious or sensitive it may be. The public interest test requires prosecutors to consider whether a prosecution is required

---

[11] Notoriously, no prosecution was ever brought in the Cayman Islands of an alleged offence under the similar legislation there, namely The Confidential Relationships (Preservation) Law, originally enacted in 1976 – which appears likely to have been the model for the CRA. This legislation was replaced from 2016 by The Confidential Information Disclosure Law, meaning that some 40 years had passed without there ever having been a prosecution.

[12] For the CPS see: https://www.cps.gov.uk/publication/code-crown-prosecutors. For the FCA see: ENFG 6.1.2G https://handbook.fca.org.uk/handbook/enfg6

in the public interest, taking account of issues such as the seriousness of the offence, the level of culpability, the harm suffered by any victim, and the impact on the community.

45. There appears to be no published guidance by the Director of Public Prosecutions in St Kitts & Nevis ("**DPP**") as to when, and in what circumstances, it might be thought appropriate to commence a criminal prosecution. Nonetheless, it is likely that the DPP will follow a similar approach as applies in England when deciding whether or not to prosecute an alleged offence under the CRA or the NIBO.

46. On that basis, it is far from clear that any prosecution would ever in fact be brought against HRB were it to comply with an order of the New York court for discovery as sought in the Request:

   a. First, there does not appear from my researches ever to have been a prosecution in Nevis alleging a contravention of either section 4 of the CRA or section 29(1) of the NIBO. Moreover, in relation to the equivalent legislation in the Cayman Islands no prosecution was ever brought in the 40 year period it was in place. That might indicate that all bankers and professionals in these Caribbean islands are, and always have been, meticulous in their compliance with the statutory restrictions or, more likely, it might indicate that, whilst there have been breaches of those restrictions, they have either not been discovered or have not been thought sufficiently serious to prosecute. Certainly, there does not appear to be any pattern or practice of enforcement of the restrictions by means of criminal prosecution.

   b. Secondly, that there would be, as a matter of law, any offence committed by HRB under section 4 of the CRA is highly debatable: indeed, my view is that there would not be any offence for the reasons set out above. This ought to militate against any decision to prosecute.

   c. Thirdly, that there would be, as a matter of law, any offence committed by HRB under section 29(1) of the NIBO is also debatable: again, my view is that it is well arguable that there would not be, save to the extent that any of the information answering to the Request is in fact properly to be regarded as being information

concerning HRB rather than a Depositor. This also ought to militate against any decision to prosecute.

d. Fourthly, HRB's culpability for any such breach would be greatly reduced by the fact that (i) it has sought to actively oppose the New York court making such an order, and has thereby sought to maintain the sanctity of whatever restrictions there might be under the law of St Kitts & Nevis, and (ii) it would be subject to compulsion by way of a New York court order in providing any discovery. This would in no way be a voluntary or ill-considered act on the part of HRB.

e. Fifthly, if (as I imagine might ultimately be the case) the choice facing HRB were to be either to comply with the New York court order for discovery or face its claim being dismissed for failure to comply with that order, then HRB's decision to comply with the order (under compulsion) in order to be able to pursue what is on any view a potentially extremely valuable claim would not be regarded as being at a high level of culpability. In essence, HRB will have been put in an impossible position and will have decided to choose the least damaging course of action.

f. Sixthly, such a conclusion would be all the more justified if the decision by HRB to do what is necessary in order to be able to pursue the claim were to be seen to be for the benefit of Depositors as much as for HRB itself. Acknowledging that HRB disputes that the Bonds are beneficially owned by Depositors and also acknowledging that I do not know whether this is in fact the case, the abandonment of HRB's potentially very valuable claim might well impact on Depositors in any event, if the failure to recover some US$250 million impacts upon the balance sheet, liquidity or even solvency of HRB. Thus, indirectly, the Depositors might be seen to benefitting from the pursuit of the claim albeit at the expense of the confidentiality of their information.

g. Seventhly, nonetheless, Depositors could still reasonably be heard to complain about confidential information concerning them and their affairs being disclosed contrary to the applicable statutory restrictions. But the dissemination of that information is already limited by the Stipulated Protective Order made by the New York court on 11 May 2023, which provides that no person subject to that order

may disclose Confidential Discovery Material save as expressly permitted under the Order. Whilst the class of persons who are entitled under the Order to sight of confidential material is somewhat wider than might be provided for under an English law confidentiality club, the scope of any disclosure of restricted information could nonetheless be seen to be relatively narrow and (importantly perhaps) not to include (or permit onward disclosure to) non-Nevis governmental organisations.

h.  Eighthly, whilst there might be some attraction to the DPP to be seen to be enforcing the statutory restrictions on disclosure of information that exist in Nevis in order to bolster the image of the island as a "depositor friendly" jurisdiction, a case such as this where HRB would be being prosecuted for complying with the order of a US court might in fact have a worse countervailing effect. Being seen to punish a Nevis international bank for acting in accordance with US requirements might not encourage the further development of the Nevis international banking sector, where such international banks will almost inevitably have to transact in US dollars, or with US entities, or in US jurisdictions, or subject to US jurisdiction clauses.

47. These eight factors together provide, in my view, a reasonably compelling basis for concluding that the risk of prosecution of HRB is more theoretical than real: certainly I do not think it could be concluded that a prosecution is more probable than not.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct .

Executed in England on this 22 day of June, 2026, by:

Nicholas Peacock K.C.

# Annexe 1

# MAITLAND



## NICHOLAS PEACOCK KC

**CALL:** 1989   **KC:** 2009
npeacock@maitlandchambers.com Email Clerks

## OVERVIEW

Nicholas's practice centers on advice and litigation concerning financial services - in particular, collective investment schemes, client money and client assets regimes, e-money, payment services, pensions and, more recently, cryptoassets. His practice also includes advice and litigation on banking issues, insolvency issues and fraud claims, quite often arising out of the operations of financial services companies.

He is an experienced advocate in both trials and interim applications in the High Court, and has extensive experience of appellate advocacy, in the Court of Appeal, the Supreme Court and the Privy Council. He also has experience of advocacy before a wide range of disciplinary and regulatory tribunals, as well as in offshore jurisdictions.

Recent work has included:

- Advising as to the scope of regulated arranging activities and the Article 33B RAO exclusion in relation to an insurance intermediary
- Advising in relation to application of, and the holding company exclusion from, the AIFMD
- Advising as to whether a proposed fractionalised bond investment product would constitute a collective investment scheme
- Advising an FCA authorised payments firm in relation to an application to be authoised as an EMI
- Advising various EMIs as to the lawfulness of SD20 issued by the Payments Systems Regulator in relation to APP scams

## EXPERTISE

## BANKING & FINANCIAL SERVICES

Nicholas has been involved in financial services advice and litigation since before the creation of the FSA, at a time when regulation was undertaken by the SIB and the various SROs. He has particular experience in relation to collective investment schemes, covering investments as wide ranging as land banking schemes, airport car parking spaces, storage units, student accommodation, gambling, hotel rooms, peer-to-peer lending, and crowdfunding. He has advised in relation to the scope and application of the client money and client asset regimes in CASS, regulation of insurance and pensions, sale and rentback agreements, OEICs, insider dealing and market abuse and spot forex trading.

Nicholas also has extensive banking litigation experience in areas such as mis-selling (of interest rate hedging products, card protection insurance, derivatives and pensions), breaches of COB and COBS, and negligent discretionary portfolio management.

Recent work has included:

- Advising a global cryptocurrency exchange platform in relation to application of section 235 FSMA 2000 (collective investment schemes) to staking as a service
- Advising in relation to an FX services provider and the potential engagement of the regulated activity of operating an MTF/OTF
- Advising various entities in relation to the extension of the financial promotions regime to cryptoassets
- Advising the FCA in relation to application of section 235 FSMA 2000 (collective investment schemes) to cryptoasset staking
- Advising a global cryptocurrency B2B exchange and services provider as to the permitted scope of brand advertising under the financial promotions regime
- Advising the FCA in relation to the activities within the UK of a global cryptoasset exchange
- Acting for the FCA in a claim arising from advice given to numerous consumers to transfer out of their defined benefit pension schemes
- Acting for the promoter of an airport car park investment scheme in relation to claims made by the FCA that it constituted a collective investment scheme
- Advising on online EV car subscription service in relation to consumer regulated hire agreement issues
- Advising an online creator content subscription service concerning the applicability of the Electronic Money Regs and the Payment Services Regs
- Advising the FCA in relation to the administration of a major SIPP operator
- Advising a payments infrastructure provider in relation to the collapse of Wirecard
- Advising as to whether a limited partnership structure being used as a venture capital vehicle would constitute a collective investment scheme
- Advising as to whether a collective investment scheme was created by arrangements made in the context of a commercial transaction for the acquisition of an international sports and media entertainment group
- Acting for a respondent to regulatory proceedings brought by the Guernsey Financial Services Commission
- Advising in relation to the impact of Brexit on the operation of the Lloyd's insurance market

## INSOLVENCY & ASSET RECOVERY

Insolvency work, particularly relating to financial institutions and solicitors' firms, is an important part of Nicholas' practice.

Recent work has included:

- Advising clearing banks in relation to their insolvency recovery processes for COVID Bounce Back Loans
- Acting for the appointors of joint administrators of a company developing a mass security and privacy programme in opposing an application for the discharge of the administration
- Acting for the directors of a UK group which provided vital cloud-based services to health and defence institutions in seeking an immediate winding up order, with the Official Receiver being appointed as liquidator
- Advising the FCA in relation to the administration of a major SIPP operator
- Advising in relation to CVA proposals arising out of the operation of an airport car park investment scheme
- Acting for the respondents to a public interest winding up petition concerning companies operating a storage unit investment scheme
- Advising the SRA in relation to the insolvency of 3 major firms of solicitors

Notable cases include:

- Chandrasekaran v Fisher [2023] EWHC 522 (Ch)
- Virtual Infrastructure Group Limited and UK Cloud Limited (2022)
- Rayford Homes Ltd v Bank of Scotland Plc & Barclays Wealth Trustees Ltd (2011)
- Lehman Brothers Int (Europe)(In Admin) ( 2010)
- Lehman Brothers International (Europe) (December2009)
- Lehman Brothers International (Europe)(In Administration) (October2009)
- Global Trader Europe Ltd (In Liquidation) v City Facilities Management Ltd
- Kier Regional Ltd v City & General (Holborn) Ltd & Others (2008)

## COMMERCIAL LITIGATION & ARBITRATION

Nicholas has extensive experience of large-scale, multi-party litigation involving international parties, entailing long-running trials with numerous witnesses (both factual and expert) and evidence being given via interpreters.

Recent work has included:

- Acting for a very high net worth US investor in relation to a UK listed special purpose acquisition company
- Acting for a UK property investment fund in relation to a dispute concerning the practical completion of

a development
- Arbitration in relation to competing claims to ownership of an investment vehicle with extensive Russian oil & gas assets

**Cases:**

- *Libyan Investment Authority -Dr Ali Mahmoud Hassan -v- Hassan Bouhadi & ors (authority dispute)* (2019)
- *StateBankofIndia&12OrsvVijayMallya&Ors*(2018)
- *UBSAG v Kommunale Wasserwerke Leipzig GMBH*(2017)
- *Virgin Radio v Christopher Evans*(2003)

---

## CRYPTOASSETS

Nicholas is advising the FCA in relation to the activities within the UK of a global cryptoasset exchange

## DIRECTORY QUOTES

---

*"He has a very cool, calm head and does an excellent job in the line of fire."*

**Chambers UK Financial Services Regulation (2017)**

*"Experienced in handling cases arising from the insolvency of financial institutions."*

**Legal 500 UK Insolvency (2016)**

## NOTABLE CASES

---

- *Chandrasekaran v Fisher [2023] EWHC 522 (Ch)*
- *State Bank of India & 12 Ors v (1) Vijay Mallya (2) Ladywalk Llp (3) Rose Capital Ventures Ltd (4) Orange India Holdings Sarl (2018)*
- *UBS AG v Kommunale Wasserwerke Leipzig GMBH (2017)*
- *Asset Land Investment PLC v Financial Conduct Authority (2016)*
- *AB International (HK) Holdings PLC Ltd & AB (Australia) Pty Ltd v AB Clearing Corp Ltd (2015)*
- *UBS AG (London Branch) & Ors v Landesbank Baden-Wurttemberg & Ors (2014)*
- *John Green & Paul Rowley v Royal Bank of Scotland Plc (2013)*
- *Financial Services Authority v European Property Investments (UK) Ltd (2012)*
- *In the Matter of Rayford Homes Ltd v Bank of Scotland Plc & Barclays Wealth Trustees Ltd (2011)*

- *In The Matter Of Lehman Brothers International (Europe) (In Administration) (October 2009)*
- *In the matter of Global Trader Europe Ltd (In Liquidation) v City Facilities Management Ltd & Ors*
- *Kier Regional Ltd v City & General (Holborn) Ltd & Others (2008)*
- *Finlan v Eyton Morris Winfield (a firm) (2007)*
- *In The Matter Of The Inertia Partnership LLP (2007)*
- *Nearfield Ltd v (1) Lincoln Nominees Ltd (2) Lincoln Trust Co (Jersey) Ltd (2006)*
- *Financial Services Authority (A Company Limited by Guarantee) v John Martin & Adrian Sam & Co (2005)*
- *Velmore Estates Ltd & Ors v Roseberry Homes Ltd (2005)*
- *Murugesu Kanapathipillai Sritharan v Law Society (2005)*
- *In The Matter Of Crystal Palace Football Club (1986) Ltd (2005)*
- *Christopher Evans v SMG Television Ltd & Ors (2003)*

# Annexe 2



# ST. CHRISTOPHER AND NEVIS

# CHAPTER 21.02

# CONFIDENTIAL RELATIONSHIPS ACT

### Revised Edition
showing the law as at 31 December 2017

This is a revised edition of the law, prepared by the Law Commission under the authority of the Law Commission Act, Cap. 1.03.

This edition contains a consolidation of the following laws—

|  | Page |
|---|---|
| **CONFIDENTIAL RELATIONSHIPS ACT** | 3 |
| **Act 2 of 1985** … in force 11th February 1985 | |
| Amended by:   Act 34 of 2012 | |

Printed under Authority by
The Regional Law Revision Centre Inc.
ANGUILLA

Published in
2019
Consolidated, Revised and Prepared under the Authority of the Law Commission Act,
on behalf of the Government of Saint Christopher and Nevis
by
The Regional Law Revision Centre Inc.,
P.O. Box 1626, 5 Mar Building,
The Valley, AI-2640, Anguilla,
West Indies.


Available for purchase from—

Attorney General's Chambers,
Government Headquarters, P.O. Box 164,
Church Street, Basseterre, St. Kitts,
West Indies


Tel: (869) 465-2521
Ext. 1013
Tel: (869) 465-2127
Fax: (869) 465-5040
Email: attorneygeneral@gov.kn

© Government of Saint Christopher and Nevis
All rights reserved. No part of this publication may be reproduced in any form or by any means
without the written permission of the Government of Saint Christopher and Nevis except as
permitted by the Copyright Act or under the terms of a licence from
the Government of Saint Christopher and Nevis.

## CHAPTER 21.02

## CONFIDENTIAL RELATIONSHIPS ACT

ARRANGEMENT OF SECTIONS

1.    Short title
2.    Interpretation
3.    Application of Act
4.    Offences against the Act
5.    Saving
6.    The Regulations
7.    Notification to Attorney-General before prosecution

## CHAPTER 21.02

## CONFIDENTIAL RELATIONSHIPS ACT

AN ACT TO GIVE SANCTION TO THE DUTY OF NON-DIVULGENCE OF INFORMATION IMPARTED UNDER CONDITIONS OF BUSINESS OR PROFESSIONAL CONFIDENCE; AND TO PROVIDE FOR RELATED OR INCIDENTAL MATTERS.

**Short title.**

**1.**     This Act may be cited as the Confidential Relationships Act.

**Interpretation.**

**2.**     In this Act, unless the context otherwise requires—

"bank" means any bank or other financial institution to which the provisions of the Banking Act, Cap. 21.01 apply;

"business of a professional nature" includes the relationship between a professional person and his or her principal, by whatever term the latter may be described, and also the relationship between a bank and a customer of that bank;

"confidential information" includes information concerning any property, or relating to any business of a professional nature or commercial transaction which has taken place, or which any party concerned contemplates may take place, which the recipient thereof is not, otherwise than in the normal course of business or professional practice authorised by the principal to divulge;

"entitled to possession of confidential information" means so entitled, in the normal course of business or professional practice or by the specific consent of the party who, but for the giving of such consent, would be entitled to require the preservation of the confidentiality of that information;

"Minister" means the person charged for the time being with responsibility for finance;

"principal" means a person who has imparted to another person confidential information in the course of his or her business or professional relationship with that other person, and includes a customer or a bank in relation to his or her business transactions with that bank;

"professional person" includes an accountant, or barrister-at-law, solicitor or attorney (or other legal practitioner by whatever name called), a broker or other kind of commercial agent or adviser, a bank or other financial institution, any public officer or other government official or employee, and such other persons as may be prescribed as being professional persons for the purposes of this Act and whether or not any such person was licenced or authorised, under any law for the time being in force, to act in that capacity; and also includes any person subordinate to or in the employment or under the control of any such person for the purpose of his or her professional activities;

"property" includes every present, contingent or future interest or claim, direct or indirect, legal or equitable, positive or negative, in any money or money's worth, real personal, movable or immovable, rights, charges and securities thereover and all documents and things evidencing or relating thereto.

**Application of Act.**

**3.**    (1) Subject to the provisions of subsection (2), this Act shall apply to all confidential information with respect to business of a professional nature which arises in or is brought into Saint Christopher and Nevis and to all persons who come into possession of such information at any time thereafter, whether within or without Saint Christopher and Nevis.

(2) This Act shall not apply to confidential information given to or received by—

(a) any person in the course of the taking or giving of evidence whether within or without Saint Christopher and Nevis, for the purpose of or in the course of the trial of any person in respect of an alleged criminal offence triable within Saint Christopher and Nevis or which would have been triable if it had been committed within Saint Christopher and Nevis;

(b) a police officer in the execution of his or her duties whether within or without Saint Christopher and Nevis, investigating any criminal offence committed within Saint Christopher and Nevis or which, if it had been committed within Saint Christopher and Nevis, would have been a criminal offence under the law of Saint Christopher and Nevis;

(c) the Minister or a person exercising powers of examination or investigation under any of the provisions of the Banking Act, Cap. 21.01 or any law repealing or replacing that Act;

(d) the Comptroller of Inland Revenue or an officer authorised by him or her for the purposes of collection of taxes or investigation of non-payment of taxes and for related matters pursuant to the Tax Administration and Procedures Act, Cap. 20.52.
*(Inserted by Act 34 of 2012)*

**Offences against the Act.**

**4.**    (1) Subject to the provisions of subsection (2) of section 3, any person who—

(a) being in possession of confidential information, however obtained—

(i) divulges it to any person not entitled to possession thereof; or

(ii) attempts, offers or threatens to divulge it to any person not entitled to possession thereof;

(b) obtains or attempts to obtain confidential information to which he or she is not entitled,

commits an offence:

Provided that it shall be a defence for a person charged with an offence under this subsection if he or she proves to the satisfaction of the court that, at the time when he or she divulged, attempted, offered or threatened to divulge or obtained or attempted to obtain (as the case may be), the confidential information in question, he or she did not know and did not have reasonable grounds to suspect that doing so would be a breach of an express or implied duty to preserve confidentiality or would be contrary to the provisions of this Act.

(2) Any person who, being in possession of information which he or she knows or has reason to suppose is confidential information, makes use thereof, without the consent of the principal, for the benefit of himself or herself or any other person, commits an offence.

(3) Any person who commits an offence under this section shall be liable, on summary conviction—

    (a) in the case of an individual, to a fine of five thousand dollars or to imprisonment for twelve months or to both such fine and imprisonment; or

    (b) in the case of a body corporate, to a fine of twenty-five thousand dollars:

Provided that where an offence under this section is committed by a professional person, that person shall be liable, on conviction—

    (i) in the case of an individual, to a fine of ten thousand dollars or to imprisonment for twelve months or to both such fine and imprisonment; or

    (ii) in the case of a body corporate, to a fine of fifty thousand dollars.

(4) Any person who is convicted of an offence under subsection (1) and is proved to have solicited, received or offered (as the case may be), on behalf of himself or herself or any other person, any reward for doing the act which constituted the offence, shall be liable, in addition to any penalty imposed under subsection (3), to a further fine equivalent to the amount or value of the reward solicited, received or offered and to forfeit the amount or value of any reward actually received by him or her.

(5) Where an offence under this section is committed by a body corporate and is proved to the satisfaction of the court to have been committed with the consent or connivance of, or to have been attributable to any neglect on the part of any director, manager, secretary or similar officer (by whatever name called) of that body corporate, or by any person purporting to act in any such capacity, he or she as well as the body corporate commits an offence and shall be liable to be proceeded against and punished accordingly.

(6) For the avoidance of doubt, it is hereby declared that, subject to subsection (2) of section 3, a bank which gives credit reference in respect of a customer, without first obtaining the authority of that customer, commits an offence under subsection (1).

### Saving.

**5.**    Nothing in this Act shall be deemed to affect or derogate from any rule or law or the rights of any person with regard to the civil liability of any person for any breach of any express or implied condition of confidentiality with regard to any business or professional relations or transactions between them.

### The Regulations.

**6.**    The Minister may make regulations for carrying into effect the provisions of this Act and for prescribing anything which is required to be prescribed under any such provisions.

### Notification to Attorney-General before prosecution.

**7.**    Before any prosecution is instituted under this Act the Director of Public Prosecutions shall advise the Attorney-General in writing.

————————

# Annexe 3

Case 1:22-cv-05199-DLC    Document 202    Filed 06/24/26    Page 38 of 133

# *461 Tournier v National Provincial and Union Bank of England.

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal

**Judgment Date**
17 December 1923

**Report Citation**
[1924] 1 K.B. 461



In the Court of Appeal.

Bankes , Scrutton , and Atkin L.JJ.

1923 Nov. 9, 12; Dec. 17.

*Banking—Banker and Customer—Implied Contract between—Obligation of Secrecy—Limitations of.*

It is an implied term of the contract between a banker and his customer that the banker will not divulge to third persons, without the consent of the customer express or implied, either the state of the customer's account, or any of his transactions with the bank, or any information relating to the customer acquired through the keeping of his account, unless the banker is compelled to do so by order of a Court, or the circumstances give rise to a public duty of disclosure, or the protection of the banker's own interests requires it.

The plaintiff was a customer of the defendant bank. A cheque was drawn by another customer of the defendants in favour of the plaintiff, who instead of paying it in to his own account indorsed it to a third person who had an account at another bank. On the return of the cheque to the defendants their manager inquired of the last named bank who the person was to whom it had been paid, and was told it was a bookmaker. That information the defendants disclosed to third persons:-

Held, (by Bankes and Atkin L.JJ.), that that disclosure constituted a breach of the defendants' duty to the plaintiff, for though the information was acquired not through the plaintiff's account but through that of the drawer of the cheque, it was acquired by the defendants during the currency of the plaintiff's account and in their character as bankers.

By Scrutton L.J., contra, that although the disclosure was a breach of the defendants' duty to the drawer, it was not a breach of their duty to the plaintiff.

APPEAL of the plaintiff from a verdict and judgment in favour of the defendants at the trial before Avory J. and a jury.

The plaintiff was a customer of the Moorgate Street branch of the defendants' bank, and in March, 1922, his account was overdrawn to the amount of 9*l*. 8s. 6d. The defendants pressed him to pay off the overdraft, and in April, 1922, he entered into an arrangement with them to pay off 1l. a week commencing on April 17. He paid three instalments, and then ceased to make any further payments. On June 8, 1922, he entered the service of a company called Kenyon & Co. under an agreement for a three months' employment as traveller and  *462*  salesman. Shortly afterwards a cheque for 45l. was drawn in his favour by a company called Woldingham Traders, Ld., who were also customers of the same branch of the defendants' bank, but the plaintiff did not pay that cheque into his account. The cheque was eventually returned to the defendants for payment by the London City and Midland Bank. The manager of the defendants' Moorgate Street branch, a Mr. Fennell, then inquired of the London City and Midland Bank who their customer was for whom payment of the cheque had been collected, and was told he was a bookmaker of the name of Lloyd. Mr. Fennell then rang up Kenyon & Co. on the telephone and had a conversation with two directors of that company, a Mr. Wells and a Mr. Kenyon. He asked for the plaintiff's private address, and told them that the plaintiff was indebted to the bank, and that though several letters had been written to him he had not replied. Mr. Fennell, according to his own evidence, added: "Tournier must be getting money from somewhere or other; I have seen a cheque coming through the bank payable to Tournier and have been informed that one cheque has gone to the credit of a bookmaker's account, and if that is the case he ought to pay the bank off some of his debt." In consequence of that communication Kenyon & Co. refused to renew the plaintiff's employment when the three months' agreement expired.

The plaintiff brought this action (1.) for slander, and (2.) for breach of an implied contract that the defendants would not disclose to third persons the state of the plaintiff's account or any transactions relating thereto. The slander alleged was twofold: it was alleged in para. 2 that Mr. Fennell said over the telephone to Mr. Wells, "I am afraid that Mr. Tournier is engaged with bookmakers, as we have been able to trace a cheque or cheques passing from Mr. Tournier's account to bookmakers"; and in para. 3 that he said to the other director, Mr. Kenyon, "Tournier's account is overdrawn, and various promises made by him to give the matter his attention have not been fulfilled, cheques passed through Tournier's account were for betting men, and we think that  *463*  Tournier is betting heavily"; the innuendo being that the plaintiff was an undesirable person to be employed by Kenyon & Co. and a person not fit to conduct their business or to be entrusted with money. At the trial the actual words proved in evidence were slightly different from those above set out in the statement of claim, and also from the evidence of Mr. Fennell. According to Mr. Wells' evidence the words spoken to him were, "As we have been able to trace a cheque or cheques to a bookmaker we are afraid he is mixed up with bookmakers." Mr. Kenyon said that the words spoken to him were, "He has made various promises to look into the matter and has not done so, and various cheques going through Tournier's account were going to betting men." On the second head of claim, that for breach of an implied contract of secrecy, the obligation claimed was alleged to be an absolute obligation unqualified by any exceptions. It appeared that in the pass books issued by the defendants to their customers, including the pass book of the plaintiff, there was on the first page a statement that "The officers of the Bank are bound to secrecy as regards the transactions of its customers."

Avory J. left the following questions to the jury:-

1. Were the words complained of in para. 2 or para 3 of the statement of claim spoken by Mr. Fennell? Answer No. The plaintiff's counsel had asked the judge to add to the question the words, "or words to the like effect," but the judge had refused.

2. If so, were such words defamatory of the plaintiff, that is, were they calculated to expose him to hatred, ridicule, or contempt in the mind of a reasonable man? Answer No.

3. Has the plaintiff suffered actual damage by the speaking of such words? Answer No. On this head the evidence was that business was not brisk and that Kenyon & Co. would probably have declined to renew the plaintiff's employment in any case.

4. Was Mr. Fennell actuated by malice in speaking the words, that is, was he acting from any indirect motive other than a desire to do his duty? Answer No.  *464*

5. Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion? Answer Yes.

6. What damages? None.

Judgment was thereupon entered for the defendants.

The plaintiffs appealed.

© 2026 Thomson Reuters.

*Sir H. Smith K.C.* and *Pitt* for the appellant. The summing up of the learned judge was defective on both heads of the claim. On the claim for slander he omitted to ask the jury whether the words proved to have been spoken by Fennell were the same in substance as those pleaded in paras. 2 and 3 of the statement of claim, and though in actions for slander it was formerly essential to prove the actual words pleaded, that strict rule has been relaxed, and "for a long time it has been held to be enough to prove the substance of the words alleged in the declaration": per Lord Coleridge C.J. in *Harris v. Warre.* [1] He refused to ask the jury whether "words to the like effect" had been spoken by Fennell, although in *Dalgleish v. Lowther* [2] an interrogatory administered to the defendant in an action of slander asking whether he had spoken the words set out in the statement of claim "or words to that effect" was held by the Court of Appeal to be a proper interrogatory. On the claim for breach of the implied contract of secrecy also the summing up was defective, as the learned judge asked the jury the question whether the communication with regard to the plaintiff's account was made "on a reasonable and proper occasion," without giving them any direction as to the circumstances in which the occasion would be reasonable or proper. In *Hardy v. Veasey* [3] where the plaintiff, a customer of the defendants' bank, alleged in his amended declaration that the defendants had communicated the state of his account to a third person in breach of their implied promise not to disclose it "except on a reasonable and proper occasion," it is true that no direction was given by the trial judge as to *\*465* what constituted a reasonable and proper occasion, and no objection was taken by the Court to that omission. But it was not necessary to do so. The plaintiff had overdrawn his account, and the third person to whom the defendants mentioned the fact was a moneylender from whom they tried to obtain assistance for the plaintiff, and the only question left to the jury was whether the communication to the moneylender was officious and unjustifiable, the judge telling them that if it was made with an honest intention of getting such assistance he doubted whether the action was maintainable. The jury having found for the defendants, the only objection taken to the summing up was that the latter statement was a misdirection. The Court held that it was not.

*J. G. Hurst K.C.* and *Morle* for the respondents. On the claim for slander the judge was right in refusing to add to the question left to the jury the words "or words to the like effect." "In libel and slander the very words complained of are the facts on which the action is grounded. It is not the fact of the defendant having used defamatory expressions, but the fact of his having used *those* defamatory expressions alleged, which is the fact on which the case depends": per Lord Coleridge C.J. in *Harris v. Warre.* [4] In that case a statement of claim, which alleged that the defendant had written letters to the chief constable charging the plaintiff with having been concerned in a murder, without setting out the actual contents of the letters, was held bad on demurrer. That case is quite consistent with *Dalgleish v. Lowther.* [5] In exhibiting interrogatories a plaintiff may ask: "Did you use [specific words] or words to that effect?" But a very different and much more strict standard is to be applied when it is a matter of correspondence between pleadings and proof. If the plaintiff's counsel intended to treat the words proved to have been spoken by Fennell as material he ought to have asked for an amendment of the claim, but he did not. In *Ecklin v. Little* [6] the words alleged in the statement of claim were: "I hear the plaintiff is a divorced man; you *\*466* had better inquire." The words proved in evidence were such that the jury might infer that the defendant was asserting as a fact that the plaintiff had been divorced, and not merely that she had heard a rumour to that effect from third persons. Under those circumstances the Court held that the plaintiff could not rely on the words proved without an amendment.

With regard to the second head of the plaintiff's claim that there was a breach of the implied contract of secrecy it is to be observed that it has never yet been decided that the duty not to disclose the state of the customer's account is anything more than a moral one. In *Hardy v. Veasey* [7] the Court expressly said that it was not necessary for them to decide whether there was a contract or legal duty not to disclose; their decision was nothing more than that, if there was such a duty except on a reasonable and proper occasion, the circumstances of the case brought it within the exception. It is clear that a banker is compellable to disclose the state of the customer's account if ordered to do so by a judge: *Loyd v. Freshfield.* [8] It also seems clear that there are other exceptions than compulsion of law. In *Tassell v. Cooper* [9] , a count which alleged that the plaintiff was a customer of the defendant bank and that it became the duty of the defendants not to disclose the particulars of the plaintiff's account without his authority except to persons presenting for payment cheques or bills drawn or accepted by the plaintiff, "unless compellable by due course of law so to do," was held bad. In *Foster v. Bank of London* [10] the holder of a bill of exchange for 532*l.* accepted by the plaintiff payable at the defendants' bank on presenting it for payment was told that the plaintiff's balance was not sufficient to meet it by 104*l.*, whereupon the holder paid in 104*l.* to the plaintiff's account and obtained payment of the bill. In an action against the bank for disclosing the state of the plaintiff's account Erle C.J. left it as a question of fact to the jury whether there was such a duty, and the *\*467* jury, having found that there was, gave the plaintiff a verdict for the amount at which his balance stood before the 104*l.* was paid in, apparently upon the ground that the act of the banker was in fraud of the plaintiff's other creditors: see per Martin B. in *Hardy v. Veasey.* [11] In the present case the plaintiff alleged the banker's duty of non-disclosure to

© 2026 Thomson Reuters.

be not merely a legal duty, but an absolute one without exceptions. All that Avory J. was called upon to do was to rule whether the duty as pleaded existed, and he was right in ruling that it did not. But even if the duty of non-disclosure is a legal duty, it is subject to the exception that the banker may do what is necessary for the protection of his own interests. Here the defendants were in the position of creditors trying to recover the balance of an overdraft. The state of the plaintiff's account was a matter in which they were interested. Their communication of it was on a privileged occasion, and there was no evidence of malice. The intimation that the plaintiff had been dealing with bookmakers was not a breach of the duty of non-disclosure at all, for it was based on facts which had no connection with his account, but which they had learnt from another source.

*Cur. adv. vult.*

**Dec. 17. The following written judgments were delivered:-**
BANKES L.J.

In this appeal the plaintiff asks for a new trial on the ground of misdirection by the learned judge. The action was founded on statements alleged to have been made by an acting manager of a branch of the defendant bank. The plaintiff complained that the statements were slanderous, and further that they constituted a breach of the duty owed by the bank to him. The short facts leading up to the action were as follows: The plaintiff was a customer of the Finsbury Pavement branch of the defendant bank. In April, 1922, his account was overdrawn to a small amount, and on April 8 the plaintiff signed a document agreeing to pay off the debt by weekly instalments of 1*l.*  *468*  At the time this document was signed the plaintiff was about to enter the employ of a firm of Kenyon & Co., and on the document containing the agreement the plaintiff wrote their name and address. The plaintiff did not pay the weekly instalments as agreed. In July the acting manager of the branch, by name Fennell, got into telephonic communication with Kenyon & Co. for the purpose of ascertaining the plaintiff's private address. The inquiry led to further conversation with two directors of the company, one of the name of Wells, and the other of the name of Kenyon. The plaintiff's complaint in the action was that in the course of that conversation on the telephone Fennell had told Kenyon that the plaintiff's account was overdrawn, that various promises made by him to give the matter his attention had not been fulfilled, that cheques which passed through his account were for betting men, and that the bank thought that he was betting heavily. To Wells Fennell was alleged to have said that he was afraid that the plaintiff was engaged with bookmakers, as the bank had been able to trace a cheque or cheques passing from the plaintiff's account to bookmakers. The innuendo pleaded was that the words complained of meant and were understood to mean that the plaintiff was an undesirable person to be employed by Messrs. Kenyon & Co., and a person not fit to conduct their business or to be entrusted with money. Wells and Kenyon were called as witnesses for the plaintiff, and they deposed to a conversation with Fennell in the terms alleged in the statement of claim. So far therefore as the plaintiff's evidence was concerned there was no necessity for the judge to ask the jury any question other than the one which he did ask them, namely - whether the words complained of were spoken by Fennell. In order to contradict the plaintiff's version of the conversation Fennell was called for the defendants. His account of the conversation was that he rang up Messrs. Kenyon in order to ascertain what the plaintiff's private address was, and whether he was working on salary or commission. He was asked why he made the inquiry, and he then explained that the  *469*  plaintiff was indebted to the bank in a small amount, and that he had not replied to letters. He then went on to say that the plaintiff must be getting money from some source or other, that he had seen cheques coming through the bank payable to the plaintiff, and that he had made it his business to find out where one cheque had gone to, and that he had been informed that it had gone to the credit of a bookmaker's account, and that if that was the case he thought that the plaintiff ought to have paid off some of his debt to the bank. It was after and in consequence of this evidence by Fennell that the plaintiff's counsel pressed the learned judge to ask the jury whether the words complained of or words to a like effect had been proved, his object being obviously to obtain a verdict on Fennell's evidence if the jury accepted his version of the conversation in preference to that of Wells and Kenyon. The learned judge refused to adopt this course. The question on this part of the case is whether he was right in so deciding. The strictness of the old rule in reference to variance between proof and pleading in actions of libel and slander has long ago disappeared. It is still necessary to plead the exact language complained of, but proof of language substantially the same as that pleaded is admissible and should be submitted to the jury. Lord Coleridge C.J. states the present rule in *Harris v. Warre* [12] as follows:

> "In libel and slander everything may turn on the form of words, and in olden days plaintiffs constantly failed from small and even unimportant variance between the words of the libel or slander set out in the declaration and the proof of them. For a long time it has been held to be enough to prove the substance of the words alleged in the declaration, but if there was difference between both the form and substance of the words alleged, and of the words proved, the defendant was entitled to succeed. In libel and slander the very words complained of are the facts on which the action is grounded. It is

© 2026 Thomson Reuters.

Case 1:22-cv-05199-DLC    Document 202    Filed 06/24/26    Page 42 of 133

not the fact of the defendant having used defamatory expressions, but the fact of his having used *those* defamatory  *470*  expressions alleged, which is the fact on which the case depends."

There can be no question as to the difference in form between the rival accounts of the conversation. Do they differ in substance? Every case must depend upon its own circumstances, and no rule can be laid down as to what constitutes a substantial difference. In my opinion there was such a substantial difference between the rival accounts of the conversation that Fennell's version ought not to have been submitted to the jury as proof of the plaintiff's pleaded case without an amendment. Even if that view is not correct I do not think that the learned judge was wrong in refusing to add to his question "or words to the like effect." If Fennell's evidence was to be submitted to the jury at all in proof of the plaintiff's case it should have been done by a series of questions which would have made it quite clear to the jury that when they had to consider whether the words were defamatory they must consider that question in reference only to the version of the conversation which they accepted. I do not take the view that there was any material misdirection by the learned judge on this part of the case; though had the question depended upon whether the ancient definition of what constitutes a slander is sufficiently wide for a case like the present I should have hesitated before saying that it is. As the other members of the Court think that the order for a new trial should include both branches of the claim I do not differ from them, though I do adhere to my view that an amendment is necessary to enable the plaintiff to do what he attempted unsuccessfully to do at the trial.

The case with regard to the claim for damages for breach of duty raises a very important question, and one on which the learned judge did not, in my opinion, sufficiently direct the jury. The case for the plaintiff as alleged in the statement of claim was that the bank were absolutely pledged to secrecy in regard to the plaintiff's account and business, and all matters incidental thereto, and that it was an implied term of the contract between the plaintiff and the bank that they would not disclose to any one any of the plaintiff's business with the bank or matters arising therefrom, or the nature  *471*  or state of his account, or any transactions relating thereto. The learned judge very properly, in my opinion, ruled against the existence of any such absolute contract. The matter might have rested there. It did not do so, however, because in his summing up the learned judge did give a direction to the jury on the law on the point, and asked them a question with regard to it. The question was this: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" and his direction on this point was as follows:

> "Fifthly, I shall have to ask, in view of the other claim for breach of contract, whether the communication of the state of the plaintiff's account at the bank, which was made to his employers, was, under the circumstances, made on a reasonable and proper occasion; that is to say, whether there was a reasonable justification for his making that communication? I shall hold, as a matter of law, that there is no such absolute contract as Sir Harold Smith has contended for between a banker and his customer. He has contended that there is an absolute contract that the banker shall not under any circumstances disclose the state of a customer's account to another person. I hold, as a matter of law, that there is no such absolute contract. But, if the banker has made that disclosure justifiably, that is to say, if, under the circumstances of the particular case, it was reasonable and proper that he should make the communication, then there is no breach of contract on his part."

With all respect to the learned judge this is not a sufficient explanation of what is a difficult and hitherto only very partially investigated branch of the law. The judge no doubt took the form of the question from the case of *Hardy v. Veasey* [13] , in which the judges raised, without deciding them, a number of questions in relation to the duty of banker towards customer not to disclose his affairs, and amongst others the question whether the duty was a legal or only a moral one, and if legal whether it arose out of contract or out of tort. At the present day I think it may be asserted with confidence that the duty is a  *472*  legal one arising out of contract, and that the duty is not absolute but qualified. It is not possible to frame any exhaustive definition of the duty. The most that can be done is to classify the qualification, and to indicate its limits. For this purpose the case of *Hardy v. Veasey* [14] is of no assistance. The plaintiff in his amended declaration in that case set out a promise on the part of the bank not to disclose the state of his banking account except "on a reasonable and proper occasion." To this the defendants pleaded a denial, and leave and licence. The disclosure complained of was made to a moneylender, to whom the defendant's manager applied with a view of obtaining assistance for the plaintiff. The learned judge who tried the action stated that the question for the jury would be "Whether the communication to the moneylender of the state of the plaintiff's account was an officious and

unjustifiable one?" and he added: "If it was made with reasonable hope and an honest intention of getting assistance for the plaintiff I should doubt whether the action is maintainable." The jury found for the defendants. The discussion in the Court of Exchequer took place upon an application for a new trial, and no decision was given except that there had been no misdirection and no wrong verdict. The plaintiff by his pleading had confined his complaint to a disclosure on some occasion other than a reasonable and proper occasion, and the Chief Baron in his judgment is only referring to the plaintiff's complaint when he uses those words. The question was never raised, whether it was a proper way of ascertaining what the defendants' duty was to ask a question of the jury in that form. Had that question been discussed, I cannot think that the Court would have approved of such a question, partly because it is leaving to the jury a question which is primarily a question for the judge, and partly because it leaves the jury entirely without instruction as to what the circumstances are which they are entitled to take into consideration in arriving at a conclusion as to what is reasonable and what is propel. In my opinion it is necessary in a case like the present to direct the jury what  *473  are the limits, and what are the qualifications of the contractual duty of secrecy implied in the relation of banker and customer. There appears to be no authority on the point. On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer. An instance of the first class is the duty to obey an order under the Bankers' Books Evidence Act . Many instances of the second class might be given. They may be summed up in the language of Lord Finlay in *Weld-Blundell v. Stephens* [15] , where he speaks of cases where a higher duty than the private duty is involved, as where "danger to the State or public duty may supersede the duty of the agent to his principal." A simple instance of the third class is where a bank issues a writ claiming payment of an overdraft stating on the face of the writ the amount of the overdraft. The familiar instance of the last class is where the customer authorizes a reference to his banker. It is more difficult to state what the limits of the duty are, either as to time or as to the nature of the disclosure. I certainly think that the duty does not cease the moment a customer closes his account. Information gained during the currency of the account remains confidential unless released under circumstances bringing the case within one of the classes of qualification I have already referred to. Again the confidence is not confined to the actual state of the customer's account. It extends to information derived from the account itself. A more doubtful question, but one vital to this case, is whether the confidence extends to information in reference to the customer and his affairs derived not from the customer's account but from other sources, as, for instance, from the account of another customer of the customer's bank.

It is very necessary to speak with caution on this question upon which there is no authority. I desire therefore to confine my observations to the facts of this particular case.  *474  The information which the branch manager is said to have disclosed, and which disclosure is said to have constituted a breach of duty, came to the bank in the following manner. A cheque was drawn by a customer of the bank on their Moorgate Street branch in favour of the plaintiff. The cheque was paid in to the account of a customer at the London City and Midland Bank. When the cheque came back to the Moorgate Street branch Mr. Fennell's attention was called to the fact that the plaintiff had not paid the cheque in to his account, and Mr. Fennell then made inquiries of the London City and Midland Bank, the reply to which he is said to have committed a breach of his duty in disclosing. The privilege of non-disclosure to which a client or a customer is entitled may vary according to the exact nature of the relationship between the client or the customer and the person on whom the duty rests. It need not be the same in the case of the counsel, the solicitor, the doctor, and the banker, though the underlying principle may be the same. The case of the banker and his customer appears to me to be one in which the confidential relationship between the parties is very marked. The credit of the customer depends very largely upon the strict observance of that confidence. I cannot think that the duty of non-disclosure is confined to information derived from the customer himself or from his account. To take a simple illustration. A police officer goes to a banker to make an inquiry about a customer of the bank. He goes to the bank, because he knows that the person about whom he wants information is a customer of the bank. The police officer is asked why he wants the information. He replies, because the customer is charged with a series of frauds. Is the banker entitled to publish that information? Surely not. He acquired the information in his character of banker. So in the present case Mr. Fennell was put upon inquiry by a cheque drawn in the plaintiff's favour upon a customer's account. He acquired the information which he is said to have divulged in his character as the plaintiff's banker. I use the expression "in the character of banker," because I find that expression  *475  used by Gurney B. in the case of *Davies v. Waters* [16] , in which the question was raised whether a solicitor had acquired certain information as attorney for a client or as his trustee. In his judgment Gurney B. says this:

> "But the objection here goes further; for just an hour before the trial, being possessed of the deed, and possessed of it in the character of trustee, he takes it to the consultation, and there, in the character of attorney for the defendant, and for the express purpose of informing the minds of the counsel for the defendants, he reads the deed, and by that means acquires his knowledge of its contents. Can it be

© 2026 Thomson Reuters.

> doubted that this is a knowledge acquired in the character of professional adviser of the party? If so, it is fit and proper that knowledge so acquired should be held sacred."

Rolfe B. did not agree with this view of the facts, but I cite the passage because it introduces what is, I think, a convenient indication of the limits of professional or commercial privilege in relation to non-disclosure. In *Taylor v. Blacklow* [17] Vaughan J., in speaking of a violation by a solicitor of the professional privilege, speaks of it as a breach of a great moral duty, and he adds that "the law is never better employed than in enforcing the observance of moral duties." In the present case I think that the information obtained by Mr. Fennell as the result of his inquiry of the London City and Midland Bank was covered by the privilege of the customer, and that the bank are liable for any disclosure of that information which may have caused damage to the plaintiff unless the bank can bring the disclosure of the information so derived under one of the classified qualifications I have already referred to.

It follows from what I have said that in my opinion a direction to the jury in a case such as the present must inform the jury of the nature and limits and qualifications of the duty of the bank as a matter of law, leaving to them only questions for the purpose of ascertaining their view whether the communication complained of was or was not made, and whether it did or did not come within any of the protected occasions to which I have called attention. For these reasons *476 I consider that the appeal must be allowed with costs, the judgment entered for the defendants set aside, and a new trial ordered. The costs of the first trial to abide the event of the new trial.

SCRUTTON L.J.

This application for a new trial raises questions of some general importance, though I can understand the jury who answered all questions against the plaintiff not taking a favourable view of his case. He had an account with the defendant bank which, in October, 1921, was overdrawn about 8*l*. He paid nothing in to this account until April, 1922, when, being pressed to pay his debt, he agreed to do so by weekly instalments of a pound. He paid three of these, but not punctually, and in July, 1922, had not paid for some time, his overdraft then being 6l. or so. Under these circumstances the bank manager found that cheques made payable to him were being paid to strangers at another bank, instead of being used to discharge his overdraft. He also found that one of these cheques came to the bank from the account of a betting man. He was naturally annoyed, and in endeavouring to obtain the private address of the plaintiff from his employers, he made statements, the exact terms of which were in dispute, about the state of the plaintiff's account, and the cheque coming from a bookmaker's account. On hearing of this the plaintiff brought an action against the bank (1.) for slander, alleging as special damage the loss of his situation, (2.) for breach of contract to keep his account secret. The two causes of action have different histories and arguments relating to them, and I deal with them separately.

As to slander, the plaintiff alleged two conversations, one with Wells, to whom Fennell is alleged to have said: "I am afraid that Mr. Tournier is engaged with bookmakers, as we have been able to trace a cheque or cheques passing from Mr. Tournier's account to bookmakers"; the other with Mr. Kenyon, to whom he is alleged to have said: "Tournier's account is overdrawn, and various promises made by him to give the matter his attention have not been fulfilled, cheques *477 passed through Tournier's account were for betting men, and we think that Tournier is betting heavily." The witnesses gave evidence substantially as pleaded. The bank manager said he asked the plaintiff's employers for his private address, and whether he was paid by salary or commission, and on being asked why he wanted to know said that the plaintiff was slightly overdrawn, and had not answered the bank's letters, and as the manager had seen cheques payable to the plaintiff coming through another bank account, and found they came from a bookmaker's account, he thought the plaintiff ought to pay up. It will be seen he alleges that he said nothing about cheques passing from Tournier's account to bookmakers, or that Tournier was betting heavily; he did mention the overdraft, and that one cheque payable to Tournier had passed through a bookmaker's account. No application was made by the plaintiff to amend by relying on the words proved by the defendants, but when the judge proposed to ask the jury the question: "Were the words complained of in paragraph 2, or paragraph 3 of the claim, spoken by Mr. Fennell?" counsel asked him to add "or words to the like effect," which the judge refused. The jury found that the words alleged in the claim were not spoken. They went on to find that they, presumably the words alleged, were not defamatory. On this the judge had directed them that defamatory words were words tending to expose the plaintiff to "hatred, ridicule, and contempt" in the mind of a reasonable man. I do not myself think this ancient formula is sufficient in all cases, for words may damage the reputation of a man as a business man, which no one would connect with hatred, ridicule, or contempt. This misdirection is, however, not raised by the notice of appeal. The jury appear to have thought that to say that a man's account was overdrawn, and that he betted, was no reasonable cause for "hatred, ridicule, and contempt"; whether they would have thought such words damaging to the reputation of a business man I do not know. The more substantial matter is the refusal of the judge to add the words "to the like effect," and his failure to direct the jury that they should *478 consider whether the words alleged, or a material and defamatory part

© 2026 Thomson Reuters.

of them, were in substance uttered. There is no doubt that precise words must be alleged in the statement of claim, and only a century ago the most minute variation in proof was ground for non-suiting the plaintiff. One who complained of the words: "This is my umbrella, and he stole it from my back door," and proved: "It is my umbrella, and he stole it from my back door" was nonsuited in 1819 by the full Court: *Walters v. Mace* [18], it being proved that the umbrella was not in the presence of the speaker, so that "This" referred to a present umbrella, and "It" to an absent one, a different thing. But I think modern practice is, as stated by Lord Coleridge in *Harris v. Warre* [19], that it is enough to prove the substance of the words alleged, or I would add, of a material and defamatory part of them. In the case of interrogatories the Court has decided that the defendant may be asked whether he spoke the words "or words to that effect," meaning, according to Sir Francis Jeune, "anything in substance like them," "words which, though not exactly the same, are to that effect." [20] So far as the words proved make a materially different allegation, amendment is necessary if that allegation is to be relied on; but in my view the jury should be directed that if they think the defendant used, in substance, the words, or a material and defamatory part of the words complained of, they should say so, and he is liable. I have no doubt that in this case part of the words alleged are materially different from the defendant's admission, but I think the jury should have been directed to consider whether or not part of the defendant's admission was a material and defamatory part of the words complained of. It is obvious, however, that if the claim for slander stood alone the statement about overdraft was justified, and the jury obviously did not think, and might reasonably not think, the statement about one cheque from a bookmaker's account defamatory. On this part of the case, if it stood alone, I should not be disposed *479* to order a new trial, though I think the summing up was defective.

The other cause of action is of far more public interest. The plaintiff alleged an absolute contract to be implied that the bank should not disclose the plaintiff's account or matters arising therefrom, or any transactions relating thereto, to anybody. The judge directed the jury there was no such absolute contract, and I think he was right. There is clearly no privilege to abstain from answering in a Court of justice questions as to a customer's account: *Loyd v. Freshfield* [21], per Abbott C.J.; and the bank can disclose the state of the account by bringing an action to recover overdraft.

The learned judge left to the jury the question: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" I think he took these words from the judgments of Kelly C.B. and Martin B. in *Hardy v. Veasey* [22], though in that case the actual question left to the jury was: Was the communication "an officious and unjustifiable one?" But having read them the questions, the learned judge, by some unfortunate oversight, omitted to give the jury any direction as to the standard by which reasonableness and propriety were to be considered; indeed, as the jury had found that the words alleged by the plaintiff were not uttered, it is not clear to what communication the question and answer related.

It is curious that there is so little authority as to the duty to keep customers' or clients' affairs secret, either by banks, counsel, solicitors or doctors. The absence of authority appears to be greatly to the credit of English professional men, who have given so little excuse for its discussion. As to bankers, there is the ruling of Abbott C.J., already referred to, as to the duty to disclose in the law Courts; there is the opinion of two judges on demurrer in *Tassell v. Cooper* [23] in 1850, that a count that a bank had a duty not to disclose the state of a customer's account showed no cause of action; but here counsel, who was winning on another count, *480* abandoned the count attacked [24]; there is the fact that in 1862, in *Foster v. Bank of London* [25], Erle C.J. asked the jury whether it was the duty of the bank not to disclose to a person presenting a bill or cheque the exact state of a customer's account as contrasted with a statement of "not sufficient assets," and on their replying that the duty was as stated said "he knew of no law against that"; and lastly, the judgment in 1868 in *Hardy v. Veasey* [26] of the Court of Exchequer, that if there was a duty not to disclose the state of a customer's account it was subject to an exception in favour of disclosure reasonable and proper in the interests of the customer himself. It is to be noticed that in the last case the Court were under the impression that there was no reported case in which an action had been brought against a solicitor for disclosure of his client's affairs; they had not been referred to *Taylor v. Blacklow* [27], an action for such disclosure, where all the judges recognized such a duty, tracing it back to a passage in Comyn's Digest, tit. "Action on the Case for Deceit," A.5. [28] It might be possible to rest the duty on the express words in the bank's pass book: "The officers of the bank are bound to secrecy as regards the affairs of its customers," though even then exceptions must be introduced by implication. The contract is alleged in the claim as "implied," and according to the decision of this Court in *In re Comptoir Commercial Anversois and Power* [29], implied terms are a question of law for the Court, the jury finding such facts as are necessary or material to enable the Court to judge of the implication. The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the banker shall not disclose the account, or transactions relating thereto, of his customer except in certain circumstances. This duty *481* equally applies in certain other confidential relations, such as counsel or solicitor and

© 2026 Thomson Reuters.

client, or doctor and patient. The circumstances in which disclosure is allowed are sometimes difficult to state, especially in the case of a medical man; and I do not propose to do more than indicate the exceptions material to the present case. I think it is clear that the bank may disclose the customer's account and affairs to an extent reasonable and proper for its own protection, as in collecting or suing for an overdraft; or to an extent reasonable and proper for carrying on the business of the account, as in giving a reason for declining to honour cheques drawn or bills accepted by the customer, when there are insufficient assets; or when ordered to answer questions in the law Courts; or to prevent frauds or crimes. I doubt whether it is sufficient excuse for disclosure, in the absence of the customer's consent, that it was in the interests of the customer, where the customer can be consulted in reasonable time and his consent or dissent obtained. I think also, in accordance with well-known authorities on the duties and privileges of legal advisers, that the implied legal duty towards the customer to keep secret his affairs does not apply to knowledge which the bank acquires before the relation of banker and customer was in contemplation, or after it ceased; or to knowledge derived from other sources during the continuance of the relation. For instance, the banker hears from an entirely independent source that one of its customers has speculative dealings in oil, may it disclose that fact to another of its customers also interested in oil? As we have only to imply terms which the parties must necessarily have contemplated, how can it be said that it is a necessary term that the bank shall not talk about the customer at all, though the subject matter of its conversation is not derived from its dealings with the customer? This position would be the same as prevails in the case of legal advisers, as stated in Taylor on Evidence [30], and supported by the cases of *Brown v. Foster* [31] ; *Griffith v. Davies* [32], as to which see per Alderson B.  *482 in *Davies v. Waters* [33] ; *Lewis v. Pennington.* [34] It appears to me, therefore, that we cannot imply an obligation to keep secret information about a customer derived not from that customer or his account, but from the account of another customer. The second customer may complain, but not the first. It is not possible to apply this rule to the facts of the present case so as to avoid a new trial, for we do not know what words were spoken, or how any statement about cheques for betting was mixed up with statements about overdraft. I hold therefore that if the bank knows something about customer A., through customer B.'s account, his duty not to disclose is one owing to customer B. and not to customer A.

None of these matters, or standards by which the propriety of disclosure should be judged, were explained to the jury, and it is obvious that some of them were very material to the facts of this case. What, if anything, was known or suspected about betting was known through the account of another customer, but the suggestion, if made, that the overdraft was due to betting, might be considered by the jury as the disclosure of the plaintiff's account, or might not. I think a new trial should be ordered of this issue, which is an important one; and as the treatment of the issue as to slander was not very satisfactory, I think the new trial should extend to the whole action, and I therefore do not comment further on the facts of the case. The plaintiff must have the costs of the appeal, and those of the first hearing should abide the event of the second hearing. The plaintiff must consider whether he should apply to amend.

ATKIN L.J.

This is an action brought by the plaintiff against the defendant bank in respect of words spoken by the manager of a branch of the bank. The plaintiff alleges as causes of action: (A) slander; (B) breach of an implied contract not to divulge information concerning the plaintiff's transactions with the bank. The second point involves a question of considerable public importance, and I propose to consider it first.  *483

In *Joachimson v. Swiss Bank Corporation* [35] this Court had to consider what were the terms of the contract made between banker and customer in the ordinary course of business when a current account is opened by the bank. All the members of the Court were of opinion that the contract included several implied terms, some of which were then stated, so far as was necessary for the determination of that case, which turned upon the necessity of a demand before the customer could sue the bank for the amount of his credit balance. It is now necessary to consider whether there is any, and if so what, implied term as to an obligation of secrecy on the part of the bank. The question of what terms are to be implied in a contract is a question of law: *In re Comptoir Commercial Anversois and Power* [36] ; and the rules by which the Court should be guided are contained in passages from the judgments of Lord Esher in *Hamlyn v. Wood* [37], and of Lord Watson in *Dahl v. Nelson, Donkin & Co.* [38], cited by Bankes L.J. [39] The principle is stated by Scrutton L.J. in words substantially to the same effect [40] : "The Court," he says, "and not the jury, are the tribunal to find such a term; they ought not to imply a term merely because it would be a reasonable term to include if the parties had thought about the matter, or because one party, if he had thought about the matter, would not have made the contract unless the term was included; it must be such a necessary term that both parties must have intended that it should be a term of the contract, and have only not expressed it because its necessity was so obvious that it was taken for granted." Is there any term as to secrecy to be implied from the relation of banker and customer? I have myself no doubt that there is. Assuming that the test is rather stricter than Lord Watson would require, and is not merely what the parties, as fair and reasonable men, would presumably have agreed upon, but what the Court considers they must necessarily  *484 have

agreed upon, it appears to me that some term as to secrecy must be implied. The bank find it necessary to bind their servants to secrecy; they communicate this fact to all their customers in their pass-book, and I am satisfied that if they had been asked whether they were under an obligation as to secrecy by a prospective customer, without hesitation they would say yes. The facts in this case as to the course of business of this bank do not appear to be in any degree unusual in general banking business. I come to the conclusion that one of the implied terms of the contract is that the bank enter into a qualified obligation with their customer to abstain from disclosing information as to his affairs without his consent. I am confirmed in this conclusion by the admission of counsel for the bank that they do, in fact, consider themselves under a legal obligation to maintain secrecy. Such an obligation could only arise under a contractual term.

The important point, and one which presents difficulties, is as to the extent of the obligation. The plaintiff's pleading alleged the obligation in wide terms as absolute and unconditional. The learned judge, as I think quite rightly, ruled that there was no such absolute duty, and the trial then proceeded without further amendment of the pleadings on the footing that the plaintiff relied on a breach of the true contract, whatever it was. The learned judge directed the jury: "If the banker has made the disclosure justifiably, that is to say, if, under the circumstances of the particular case, it was reasonable and proper that he should make the communication, then there is no breach of contract on his part." Without any further direction he left to the jury the question: "Was the communication with regard to the plaintiff's account at the bank made on a reasonable and proper occasion?" The direction and question appear to follow the direction to the jury given by Byles J. in *Hardy v. Veasey* [41] , affirmed by the Court of Exchequer. I think that the decision in that case was based on the fact that the formula approved was that adopted by the plaintiff's counsel  *485  in his pleading, and accepted by him as representing the true issue to be left to the jury. In fact, however, to leave to the jury what is "justifiable" or "proper" is merely to tell them that the bank may not divulge information except on occasions when they may divulge it, and that of what those occasions are the jury are the judges. This appears to me to treat as fact what is matter of law, and to afford no guidance to the jury, leaving the rights and duties as between customer and banker to vary with the individual views of juries in each case.

The first question is: To what information does the obligation of secrecy extend? It clearly goes beyond the state of the account, that is, whether there is a debit or a credit balance, and the amount of the balance. It must extend at least to all the transactions that go through the account, and to the securities, if any, given in respect of the account; and in respect of such matters it must, I think, extend beyond the period when the account is closed, or ceases to be an active account. It seems to me inconceivable that either party would contemplate that once the customer had closed his account the bank was to be at liberty to divulge as it pleased the particular transactions which it had conducted for the customer while he was such. I further think that the obligation extends to information obtained from other sources than the customer's actual account, if the occasion upon which the information was obtained arose out of the banking relations of the bank and its customers - for example, with a view to assisting the bank in conducting the customer's business, or in coming to decisions as to its treatment of its customers. Here, again, counsel for the bank admitted that the bank treated themselves as under such an obligation, and this, I think, would be in accordance with ordinary banking practice. In this case, however, I should not extend the obligation to information as to the customer obtained after he had ceased to be customer. Speaking for myself, I find little assistance from considering the implications that have been found by the Courts to arise from contracts in other occupations and  *486  professions, such as those of solicitors or doctors. The limitation of the implied term must vary with the special circumstances peculiar to each class of occupation. On the other hand, it seems to me clear that there must be important limitations upon the obligation of the bank not to divulge such information as I have mentioned. It is plain that there is no privilege from disclosure enforced in the course of legal proceedings. But the bank is entitled to secure itself in respect of liabilities it incurs to the customer, or the customer to it, and in respect of liabilities to third parties in respect of the transactions it conducts for or with the customer. It is difficult to hit upon a formula which will define the maximum of the obligation which must necessarily be implied. But I think it safe to say that the obligation not to disclose information such as I have mentioned is subject to the qualification that the bank have the right to disclose such information when, and to the extent to which it is reasonably necessary for the protection of the bank's interests, either as against their customer or as against third parties in respect of transactions of the bank for or with their customer, or for protecting the bank, or persons interested, or the public, against fraud or crime. I have already stated the obligation as an obligation not to disclose without the customer's consent. It is an implied term, and may, therefore, be varied by express agreement. In any case the consent may be express or implied, and to the extent to which it is given the bank will be justified in acting. A common example of such consent would be where a customer gives a banker's reference. The extent to which he authorizes information to be given on such a reference must be a question to be determined on the facts of each case. I do not desire to express any final opinion on the practice of bankers to give one another information as to the affairs of their respective customers, except to say it appears to me that if it is justified it must be upon the basis of an implied consent of the customer.

As to the rest of the case based on slander, I think that this issue must also be submitted for a new trial. I do not  *487  think that it is a sufficient direction to a jury on what is meant by "defamatory" to say, without more, that it means: Were the words

© 2026 Thomson Reuters.

calculated to expose the plaintiff to hatred, ridicule, or contempt, in the mind of a reasonable man? The formula is well known to lawyers, but it is obvious that suggestions might be made very injurious to a man's character in business which would not, in the ordinary sense, excite either hate, ridicule, or contempt - for example, an imputation of a clever fraud which, however much to be condemned morally and legally, might yet not excite what a member of a jury might understand as hatred, or contempt. Speaking for myself, I also think that it is undesirable where an issue of privilege is raised to leave a question of express malice to be decided by the jury before the judge has ruled whether the occasion is privileged. The judge has to determine, not only whether the occasion is privileged, but whether the defendant has gone beyond the privilege which the occasion creates: *Adam v. Ward.* [42] In the words of Lord Loreburn: "All this is for the judge alone, and the question of malice, which is for the jury, cannot arise till the judge has ruled on the whole question of privilege." In many cases, and I think this is one, the jury cannot form a correct opinion as to what is express malice until the judge has ruled whether the circumstances exist, as to legal or social duty and so forth, on which the legal privilege depends; and if the occasion is not privileged, or has been, in fact, exceeded, the question of express malice is irrelevant; and I think it is a disadvantage to the administration of justice that questions should be asked of the jury unnecessarily when the final decision may appear to conflict with their answers. It is also, I think, clear that the plaintiff was entitled to put before the jury his case that the words proved, though not the very words pleaded, were words substantially to the same effect. Whether this be done by amending the pleading, by framing the question to the jury so as to raise the point, or by directing the jury that the words pleaded would be proved by proof of words substantially to the same *488* effect, seems to me immaterial. No slander of any complexity could ever be proved if the ipsissima verba of the pleading had to be established. There appears to me to be ample authority in well established every day practice, and in the decisions upon the form of interrogatories in such cases, to support the view that I am expressing.

For the above reasons, without expressing an opinion upon the points raised between the parties at the trial, I come to the opinion that this appeal must be allowed, and a new trial ordered.

### Representation

Solicitor for the appellant: J. R. Cort Bathurst .
Solicitors for the respondents: Wilde, Wigston & Sapte .

*Appeal allowed. (J. F. C. )*

---

### Footnotes

| | |
|---|---|
| 1 | *(1879) 4 C. P. D. 125 , 128.* |
| 2 | *[1899] 2 Q. B. 590 .* |
| 3 | *(1868) L. R. 3 Ex. 107 .* |
| 4 | *4 C. P. D. 125 , 128.* |
| 5 | *[1899] 2 Q. B. 590 .* |
| 6 | *(1890) 6 Times L. R. 366 .* |
| 7 | *L. R. 3 Ex. 107 .* |
| 8 | *(1826) 2 C. & P. 325 .* |
| 9 | *(1850) 9 C. B. 509 .* |
| 10 | *(1862) 3 F. & F. 214 .* |
| 11 | *L. R. 3 Ex. 107 .* |
| 12 | *4 C. P. D. 125 , 128.* |
| 13 | *L. R. 3 Ex. 107 .* |
| 14 | *L. R. 3 Ex. 107 .* |
| 15 | *[1920] A. C. 956 , 965.* |
| 16 | *(1842) 9 M. & W. 608 , 613.* |
| 17 | *(1836) 3 Bing. N. C. 235 , 249.* |
| 18 | (1819) 2 B. & Al. 756. |
| 19 | *4 C. P. D. 125 .* |
| 20 | Dalgleish v. Lowther *[1899] 2 Q. B. 590 .* |
| 21 | *2 C. & P. 325 , 329.* |

*L. R. 3 Ex. 107* .

*9 C. B. 509* .

*9 C. B. 532* .

*3 F. & F. 214* .

*L. R. 3 Ex. 107* .

*3 Bing. N. C. 235* .

*3 Bing. N. C. 248* , 249.

*[1920] 1 K. B. 868* .

11th ed., § 930, heads 2 to 5.

*(1857) 26 L. J. (Ex.) 249* .

*(1833) 5 B. & Ad. 502* .

*9 M. & W. 608* , 611.

*(1860) 29 L. J. (Ch.) 670* .

*[1921] 3 K. B. 110* .

*[1920] 1 K. B. 868* .

*[1891] 2 Q. B. 488* .

*(1881) 6 App. Cas. 38* .

*[1920] 1 K. B.* at pp. 886-7.

Ibid. at pp. 899-900.

*L. R. 3 Ex. 107* .

*[1917] A. C. 309* , 321.

(c) Incorporated Council of Law Reporting for England & Wales

# Annexe 4

# CHAPTER 10

# Bankers

## INTRODUCTION

*Tournier v National Provincial and Union Bank of England* is the leading authority on the duty of confidence owed by a bank to its customer.[1] The Court of Appeal held that a bank owes its customer an implied contractual duty to keep their affairs secret, but the duty is qualified such that disclosure may be permitted when (a) there is compulsion by law, (b) there is a duty to the public to make the disclosure, (c) the bank's own interests require disclosure, or (d) disclosure is permitted by the express or implied consent of the customer. This chapter begins by considering the general principle before examining each of the qualifications in turn.

**10-001**

## THE TOURNIER DUTY

The *Tournier* duty is an implied contractual duty of confidence that arises in the relationship of banker and customer.[2] The existence of an express confidentiality clause with exceptions to confidentiality does not preclude the *Tournier* duty and its exceptions from arising in a given case.[3] Further, as the *Tournier* duty is a contractual one, a concurrent equitable obligation of confidence may arise out of the same facts.[4]

**10-002**

As for the duration and scope of the *Tournier* duty, it arises at the commencement of the banking relationship and continues after the customer has closed their account in relation to information gained during the period of the account. It covers information about the customer's affairs gained by virtue of the banking relationship and is not limited to information from or about the account itself.[5] Indeed, the range of modern banking relationships means that the duty often arises

**10-003**

---

1   [1924] 1 K.B. 461.
2   [1924] 1 K.B. 461 at 473. Where there is no concluded contractual relationship, a customer's confidential information may still be protected in equity, see *Primary Group (UK) Ltd v Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] 2 All E.R. (Comm) 1121 at [246].
3   [1924] 1 K.B. 461 at 480. See also *Ajayi v Ebury Partners Ltd* [2020] EWHC 166 (Comm) at [131].
4   See generally *CF Partners (UK) LLP v Barclays Bank Plc* [2014] EWHC 3049 (Ch); [2014] Pens. L.R. 681 at [130]–[134] and *Dixon v North Bristol NHS Trust* [2022] EWHC 3127 (KB) at [41] and [43] (this was not a banking case, but the *Tournier* principle was applied to an employment relationship, at [98]). The equitable obligation arises independently, but it may be (although is not necessarily) co-extensive with the *Tournier* duty.
5   See also *Barclays Bank Plc v Taylor* [1989] 1 W.L.R. 1066 at 1070 per Lord Donaldson MR: "The banker-customer relationship imposes upon the bank a duty of confidentiality in relation to information concerning its customer and his affairs which it acquires in the character of his banker". One

where no bank account exists.[6] The duty may prevent a bank from communicating information to other companies in the same group, including its own direct subsidiaries.[7]

**10-004**    In *Brighton v Australia and New Zealand Banking Group Ltd*, the New South Wales Court of Appeal declined to find an implied obligation of confidentiality in the contractual relationship between a bank and individuals who had provided the bank with personal guarantees but accepted that:[8]

> "It might possibly be the case that if a guarantor were to supply to a bank information concerning his or her own financial circumstances (as could fairly readily happen if the bank needed assurance that the guarantor had the wherewithal to meet the guarantee) there would be either an implied contractual obligation of confidentiality, or an equitable obligation of confidentiality concerning that information. It is not necessary to decide whether that is so, for the purpose of deciding the present case."

**10-005**    The appeal in *Tournier* arose from a jury trial, in which the judge had directed the jury that disclosure of the state of a customer's account by a banker to a third party was not a breach of contract if made "justifiably, that is to say, if, under the circumstances of the particular case, it was reasonable and proper that he should make the communication". This was held to be an inadequate explanation of a difficult area of law. Atkin LJ commented that:[9]

> "… to leave to the jury what is 'justifiable' or 'proper' is merely to tell them that the bank may not divulge information except on occasions when they may divulge it, and that of what those occasions are the jury are the judges. This appears to me to treat as fact what is matter of law …".

**10-006**    The fullest judgment on the qualifications to the implied obligation of secrecy is that of Bankes LJ who said:[10]

> "At the present day I think it may be asserted with confidence that the duty is a legal one arising out of contract, and that the duty is not absolute but qualified. It is not possible to frame any exhaustive definition of the duty. The most that can be done is to classify the qualification, and to indicate its limits. …
>
>     On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer".

These four qualifications were reaffirmed by the Court of Appeal in *Barclays Bank Plc v Taylor*.[11]

**10-007**    The true effect of the qualifications is not to excuse a breach of duty, but to

clear example of confidential information obtained during the course of the banking relationship is bank statements: *Obaid v Al-Hezaimi* [2019] EWHC 1953 (Ch) at [24].

6    In *CF Partners (UK) LLP v Barclays Bank Plc* [2014] EWHC 3049 (Ch); [2014] Pens. L.R. 681, the duty of confidence arose in the context of the bank's provision of advisory services relating to mergers and acquisitions. When considering "non-traditional" banking services it is particularly important to examine the express contractual provisions governing the banking relationship in addition to the case law discussed in this chapter.

7    *Bank of Tokyo Ltd v Karoon*: (Note) [1987] A.C. 45, *Primary Group (UK) Ltd v Royal Bank of Scotland Plc* [2014] EWHC 1082 (Ch); [2014] 2 All E.R. (Comm) 1121, especially at [188].

8    [2011] NSWCA 152 at [56]. See also [53]–[60].

9    *Tournier v National Provincial and Union Bank of England* [1924] 1 K.B. 461 at 485.

10   *Tournier v National Provincial and Union Bank of England* [1924] 1 K.B. 461 at 471–472 and 473.

11   [1989] 1 W.L.R. 1066 at 1070, per Lord Donaldson MR.

identify certain limits to the duty itself. Thus, where a qualification is present, the appropriate analysis is that by disclosing the customer's information, the bank has not acted in breach of duty at all because the duty simply does not extend to prevent such disclosure. The existence of a qualification therefore operates as a denial of the elements of the claimant's cause of action, there being no duty to maintain confidentiality in the circumstances.[12] In this regard the judgment of Lord Donaldson MR in *Barclays Bank Plc v Taylor* is preferable to that of Croom-Johnson LJ. Lord Donaldson MR said:[13]

> "The duty to maintain confidentiality is not all-embracing, subject to exceptions. It does not exist in four exceptional circumstances …".

In contrast, Croom-Johnson LJ said:[14]

> "Faced with those orders [under s.9 of the Police and Criminal Evidence Act 1984], the banks complied with them, thereby necessarily breaching the duties of confidence which they owed to Mr and Mrs Taylor.
>     The four circumstances in which a banker is justified in breaking that duty are set out in *Tournier v National Provincial and Union Bank of England* [1924] 1 K.B. 461, 473 in the judgment of Bankes, L.J. The first is 'disclosure … under compulsion by law'. That means that, in complying with the orders under section 9, the banks were not in breach of that implied term in their contracts with Mr Taylor."

Yet it is contradictory to speak of the banks "necessarily breaching the duties of confidence" owed to the customer, while at the same time saying that "the banks were not in breach of that implied term of their contracts". For that reason, the analysis of Lord Donaldson MR is preferred.

In *El Jawhary v BCCI*, Sir Donald Nicholls VC followed the approach taken by Lord Donaldson MR, saying:[15]     **10-008**

> "Where the case is within one of the qualifications to the duty of confidence, the duty, ex hypothesi, does not exist …".

In *Barclays Bank Plc v Taylor*, it was argued by the customer that a bank served     **10-009** with notice of an application for an order under the Police and Criminal Evidence Act 1984, requiring disclosure of documents relating to his affairs, owed him a duty to resist the application and to inform him.[16] The court held that the contract between banker and customer did not contain any such implied duty on the part of the bank; and that, once an order valid on its face was made, the bank was obliged to comply with it.[17]

The same principle applies after disclosure as before it. In *El Jawhary v BCCI*,     **10-010** Sir Donald Nicholls VC held that, where a bank disclosed information to a third party in circumstances within one of the qualifications to the duty of confidence, there was no basis for implying an obligation on the bank to tell the customer what it had done.[18]

In *Robertson v Canadian Imperial Bank of Commerce*, a subpoena was served     **10-011**

---

[12] On the distinction between denials and defences proper, see generally J. Goudkamp, *Tort Law Defences*, 1st edn (Hart Publishing 2013), and especially at para.1.2.2.
[13] [1989] 1 W.L.R. 1066 at 1074.
[14] [1989] 1 W.L.R. 1066 at 1075.
[15] [1993] B.C.L.C. 396 at 400.
[16] [1989] 1 W.L.R. 1066.
[17] [1989] 1 W.L.R. 1066 at 1074.
[18] [1993] B.C.L.C. 396.

on a bank requiring it to give evidence and produce bank statements in an action to which the customer was not a party.[19] The bank manager, having tried unsuccessfully to contact the customer before complying with the subpoena, produced the bank statements and gave evidence as required, without protest and without informing the court that he had been unable to contact the customer. The customer sued the bank, alleging breach of confidence in disclosing the information without having first consulted the client or voiced objection. At first instance the judge found that the defendant had breached its duty, but that the action failed because the bank manager's evidence, including the production of the information, was covered by absolute privilege.

**10-012**   The Privy Council held that the first of the *Tournier* qualifications applied (disclosure under compulsion by law), so that there was no duty, and expressed no opinion whether the bank, if it had been in breach of duty, would have been protected by the absolute immunity which attaches to the testimony of witnesses.

**10-013**   In concluding that the first of the *Tournier* qualifications applied, the Board left unanswered a number of questions. Lord Nolan said that the Board had much sympathy with the argument by the customer that he should have been notified of the issue of the subpoena. He added:[20]

> "In the ordinary way a customer in good standing could reasonably expect, *if only as a matter of courtesy and good business practice*, to be told by his bank that a subpoena had been received … Their Lordships accept that the bank was compelled by law to produce the bank statement to the court, but it was under no compulsion to withhold knowledge of the subpoena from the customer." (Emphasis added).

Although observing that there was no compulsion to withhold knowledge, the Board refrained from holding that there was a duty to inform. Lord Nolan recognised that it would be difficult to formulate the terms of any duty to be implied, and that it could not go beyond a duty to use best endeavours, in which case on the judge's findings there had been no breach.

**10-014**   On the question of the bank's failure to object to production, Lord Nolan said that there was no head of privilege which the customer, or the bank, could have claimed, and that it would be difficult to formulate the terms of any contractual duty to inform the court that the bank was producing the bank statement without the customer's consent. In any event, the customer had not established that the bank's omission to do so had caused him any loss, but Lord Nolan added:[21]

> "Their Lordships would not exclude the possibility that a particular banker/customer relationship would include some such implied term or duty of care as that for which the customer has contended, and that damages might be recoverable as a result of its breach by the bank concerned, but this is not such a case."

There is no reason to differentiate between a bank given notice of an intention to apply for an order for discovery and a bank served with a witness summons.[22] *Barclays Bank Plc v Taylor* was cited in argument in *Robertson* but regrettably is not referred to in the judgment. The judgment of the Privy Council leaves open the question whether a bank served with notice requiring production of documents owes any, and if so what, duty to try to inform the customer, or to object to the order (if

---

[19]   [1994] 1 W.L.R. 1493.
[20]   [1994] 1 W.L.R. 1493 at 1498.
[21]   [1994] 1 W.L.R. 1493 at 1500.
[22]   *Barclays Bank Plc v Taylor* [1989] 1 W.L.R. 1066.

there are potential grounds for objection), or to inform the court of the absence of the customer's consent.

In *Tournier*, Atkin LJ emphasised that it would not be right to imply an obligation of secrecy into the contract between a bank and its customer merely because it would be a reasonable term to include, but only if it was a necessary term; and that, whilst it was necessary to imply some term, there must be "important limitations" to the term required to be implied, one being that it was "plain that there is no privilege from disclosure enforced in the course of legal proceedings".[23]

That limitation plainly applies to documents produced pursuant to a witness summons or other compulsory process. That being so, as Lord Donaldson MR said in *Barclays Bank Plc v Taylor*:[24]

> "The real question is whether, in order to give business efficacy to the relationship of banker and customer, there must be an implied obligation to contest a section 9 application or to probe it or to inform its customer."

It may be that a customer in good standing would reasonably expect, "as a matter of courtesy and good business practice", to be informed by the bank of any notice requiring it to produce documents regarding the customer's affairs. Courtesy and good business practice are no doubt the basis on which many commercial relationships are expected to be conducted, and in fact are conducted, but they are not the basis for the imposition of an implied term. Although a customer might be displeased at his bank complying with an order for discovery without informing him or seeking to oppose the order, it is difficult to see how a term requiring the bank to do so could be said to be necessary. Moreover the difficulty which the Privy Council recognised about any attempt to formulate such an implied contractual term is argument against it.

## COMPULSION BY LAW

Compulsion arises when a bank is required by law to disclose the relevant information. The compulsion must arise as a matter of local law or by a local court order; thus a foreign law or foreign court order which is not recognisable or enforceable in England and Wales does not satisfy the compulsion by law limb.[25] Apart from the obligations of disclosure which are of general application (for example, in the course of litigation to which the bank is a party, or to answer questions in the witness box),[26] compulsion may arise in various ways particularly relevant to banks. A non-exhaustive list includes the following:[27]

(1) *Bankers' Books Evidence Act 1879:* under this Act orders for inspection may be made in civil or criminal proceedings.
(2) *Finance Act 2011:* Banks may be compelled to disclose certain information to Revenue and Customs (for example, in relation to interest payments) under Sch.23 to the Finance Act 2011 and the Data-gathering Pow-

---

[23] [1924] 1 K.B. 461 at 483 and 486.
[24] [1989] 1 W.L.R. 1066 at 1074.
[25] *Scenna v Persons Unknown* [2023] EWHC 799 (Ch) at [29]–[30].
[26] See generally CPR 31. In the context of answering questions in the witness box, see *Loyd v Freshfield* (1826) 2 Car. & P. 325 at 329; *Parry-Jones v Law Society* [1969] 1 Ch. 1 at 9, and *Robertson v Canadian Imperial Bank of Commerce* [1994] 1 W.L.R. 1493.
[27] See also Paget, *Law of Banking*, 16th edn (LexisNexis 2023), Ch. 33.

ers (Relevant Data) Regulations 2012.

(3) *The Proceeds of Crime Act 2002:* s.328 creates an offence of entering into or becoming concerned in defined arrangements relating to criminal property.[28] Section 330 creates an offence for bankers and others in the regulated sector of failing to disclose their knowledge or suspicions of money laundering activities. Section 333A creates (subject to ss.333B to 333E) a "tipping off" offence of making a disclosure prejudicial to money laundering investigations.

(4) *Insolvency Act 1986:* a bank may be compelled to disclose information about the affairs of insolvent customers under ss.236 (companies) and 366 (individuals).

(5) *Financial Services and Markets Act 2000:* Part 11 of the Act contains a number of provisions in relation to the Financial Conduct Authority's information gathering powers (see especially s.175(5)).

(6) *Companies Act 1985:* inspectors appointed under the Act may require a bank to disclose information or produce documents relating to the affairs of a customer where the customer is the company under investigation, or where the requirement is authorised by the Secretary of State, or where the bank is itself under investigation: ss.452(1A), (1B).

(7) *Competition Act 1998:* the Competition and Markets Authority may require a bank to produce documents relating to its investigation: ss.25 to 27.

(8) *Police and Criminal Evidence Act 1984:* under s.9 and Sch.1, a bank may be ordered to produce documents for the purposes of a criminal investigation, as illustrated by *Barclays Bank Plc v Taylor*.[29] The Terrorism Act 2000, the Serious Organised Crime and Police Act 2005 and the Money Laundering, Terrorist Financing and Transfer of Funds (Information on the Payer) Regulations 2017 also contain disclosure provisions relating to their subject-matter.

(9) Disclosure orders may be made in support of a tracing claim in equity, or in support of a freezing injunction, requiring a bank to disclose information relating to its customer.[30] In *KOO Golden East Mongolia v Bank of Nova Scotia*, Sir Anthony Clarke MR said "A court should be very reluctant to make a *Norwich Pharmacal* order which involves a breach of confidence as between a bank and its customer."[31] Although it might be said that, strictly speaking, a bank's compliance with an order of the court could not amount

---

28 The risk to bank customers of an injustice caused by the operation of s.328 was identified by Laddie J in *Squirrell Ltd v National Westminster Bank Plc* [2005] EWHC 664; [2006] 1 W.L.R. 637 at [7]. See also the discussion of the draconian effects of the relevant provisions in *K Ltd v National Westminster Bank Plc* [2006] EWCA Civ 1039; [2007] 1 W.L.R. 311, *R. (on the application of UMBS Online Ltd) v Serious Organised Crime Agency* [2007] EWCA Civ 406; [2008] 1 All E.R. 465, *Shah v HSBC Private Bank (UK) Ltd* (both the Court of Appeal's decision on the defendant's summary judgment application—[2010] EWCA Civ 31;[2010] 3 All E.R. 477, especially per Longmore LJ at [32], and Supperstone J's final judgment after trial—[2012] EWHC 1283 (QB); [2013] 1 All E.R. (Comm) 72, especially at [38]), and *N v Royal Bank of Scotland Plc* [2017] EWCA Civ 253; [2017] 1 W.L.R. 3938 per Hamblen LJ at [56]–[58].

29 [1989] 1 W.L.R. 1066.

30 See generally, *A v C (Note)* [1981] Q.B. 956, *Bankers Trust Co v Shapira* [1980] 1 W.L.R. 1274, *AJ Bekhor & Co Ltd v Bilton* [1981] Q.B. 923, *Santander UK Plc v National Westminster Bank Plc* [2014] EWHC 2626 (Ch), *Miles Smith Broking Ltd v Barclays Bank Plc* [2017] EWHC 3338, and *Cancrie Investments Ltd Sarl v Haider* [2024] EWHC 3087 (Comm) at [66].

31 [2007] EWCA Civ 1443; [2008] Q.B. 717 at [49]. This sentiment applies equally to Bankers Trust relief, see *Bankers Trust Co v Shapira* [1980] 1 W.L.R. 1274 at 1282. See more recently, *Stanford Asset Holdings Ltd v AfrAsia Bank Ltd* [2023] UKPC 35; [2024] 1 W.L.R. 1118 at [13] and [34].

in law to a breach of confidence, the Master of the Rolls's dictum serves to illustrate the importance that is attached by the courts to obligations of banking confidentiality.[32]

The compulsion of law exception to banking confidentiality came under the spotlight of the Court of Justice of the European Union in *Coty Germany GmbH v Stadtsparkasse Magdeburg*.[33] In that case, it was held that a German national provision which gave a banking institution unlimited and unconditional authorisation to withhold information requested in the context of civil proceedings by invoking banking secrecy was inconsistent with art.8(3)(e) of the European Parliament and Council Directive 2004/48/EC which provides that certain disclosure obligations relating to alleged intellectual property infringement shall apply without prejudice to national statutory provisions governing the protection of confidentiality.[34]    **10-018**

## DUTY TO THE PUBLIC

A duty owed to the public may also limit the scope of any *Tournier* duty. In *Tournier* itself, Banks LJ said:[35]    **10-019**

"Many instances … might be given. They may be summed up in the language of Lord Finlay in *Weld-Blundell v Stephens*,[36] where he speaks of cases where a higher duty than the private duty is involved, as where 'danger to the State or public duty may supercede the duty of the agent to his principal'."

Scrutton LJ thought it clear that the bank might disclose the customer's account and affairs to prevent fraud or crimes.[37]

Atkin LJ also thought it safe to say that the bank's obligation was subject to the qualification that it had the right to disclose information relating to its customer's affairs when and to the extent to which it was reasonably necessary for protecting the bank, or other interested persons, or the public, against fraud or crime.[38]    **10-020**

The scope of the public interest exception to banking confidentiality is uncertain although its practical relevance may be limited owing to the wide array of statutory inroads on a bank's obligation of confidence, discussed earlier. Staughton J adopted a broad approach in *Libyan Arab Foreign Bank v Bankers Trust Co*, in which the defendant bank's branch in London had informed the New York Federal Reserve Board of fund movements which were being effected by its Libyan clients.[39] Staughton J said obiter:[40]    **10-021**

---

[32] In *Durrani v The Secretary of State for the Home Department* [2014] UKUT 295 (IAC); [2014] Imm. A.R. 1019, the Upper Tier Immigration Tribunal suggested obiter at [13] that a compulsion of law "could also conceivably" arise by virtue of paras 41-SD(i) and (ii) of the Immigration Rules. However, the paragraphs in question set out the banking documents which an applicant for entrepreneurial migrant status will require in order to prove access to the level of funds demanded by the Immigration Rules (the burden being on the applicant). It is suggested that nothing in paras 41-SD(i) and (ii) compels banks to disclose otherwise confidential documents in the absence of consent and/or a court order.

[33] (C-580/13) EU:C:2015:485; [2015] 1 W.L.R. 4283.

[34] Directive 2004/48/EC of the European Parliament and of the Council on the enforcement of intellectual property rights [2004] O.J. L157/45.

[35] [1924] 1 K.B. 461 at 473.

[36] [1920] A.C. 956 at 965.

[37] *Tournier v National Provincial and Union Bank of England* [1924] 1 K.B. 461 at 481.

[38] *Tournier v National Provincial and Union Bank of England* [1924] 1 K.B. 461 at 486.

[39] [1989] Q.B. 728.

"… presuming (as I must) that New York law on this point is the same as English law, it seems to me that the Federal Reserve Board, as the central banking system in the United States, may have a public duty to perform in obtaining information from banks. I accept the argument that higher public duty is one of the exceptions to a banker's duty of confidence, and I am prepared to reach a tentative conclusion that the exception applied in this case."

**10-022**    In *Price Waterhouse v BCCI*, Millett J had to consider banking confidence at one remove.[41] The issue was whether Price Waterhouse was at liberty to disclose information, obtained in the course of acting for BCCI as auditors and professional advisers, to an inquiry set up by the Government and the Bank of England, under the chairmanship of Bingham LJ, to investigate the supervision of BCCI under the Banking Act and to make recommendations.

**10-023**    On the subject of banking confidentiality and public duty of disclosure, Millett J said that:[42]

"… there seems no reason to doubt the general correctness of the statement in Paget's *Law of Banking* (10th edn, 1989) p.256, based on a remark of Bankes LJ in the *Tournier* case [1924] 1 K.B. 461 at 474 … that

'The giving of information to the police, for instance in regard to a customer suspected of a crime would be unwarranted.'"

What Bankes LJ said in *Tournier* was:[43]

"I cannot think that the duty of non-disclosure is confined to information derived from the customer himself or from his account. To take a simple illustration. A police officer goes to a banker to make an inquiry about a customer of the bank. He goes to the bank, because he knows that the person about whom he wants information is a customer of the bank. The police officer is asked why he wants the information. He replies, because the customer is charged with a series of frauds. Is the banker entitled to publish *that* information? Surely not. He acquired the information in his character of banker." (Emphasis added).

The point which Bankes LJ was making was that in his simple illustration the banker would not be entitled to publish to the world the information which he gained about his customer *from* the police that the customer was charged with a number of frauds, because he acquired that information "in his character of banker" (albeit not from the customer himself). Bankes LJ was not there addressing the scope of the public duty qualification and whether the banker would be entitled to assist the police.

**10-024**    An express undertaking by a bank to a customer to keep secret the fact that the customer was presently engaged, or intending to engage, in a criminal or fraudulent course of conduct would be unenforceable as contrary to public policy; and a bank would not be under an implied obligation to keep such information secret (see the judgments of Scrutton and Atkin LJJ in *Tournier* referred to above).[44] The situation may be different where a customer discloses the commission of a past offence.

---

[40]   [1989] Q.B. 728 at 771.
[41]   [1992] B.C.L.C. 583. For a fuller discussion, see paras 5-124–5-131.
[42]   [1992] B.C.L.C. 583 at 598.
[43]   [1924] 1 K.B. 461 at 474.
[44]   [1924] 1 K.B. 461 at 481 and 486. See also *Gartside v Outram* [1857] 26 L.J.Ch. (N.S.) 113, *Initial Services Ltd v Putterill* [1968] 1 Q.B. 396, *Canadian Imperial Bank of Commerce v Sayani* (1993) 83 B.C.L.R. (2d) 167, Court of Appeal of British Columbia, *Philipp v Barclays Bank UK Plc* [2023] UKSC 25; [2024] A.C. 346 at [33], and *Cavallari v Mercedes-Benz Group AG* [2024] EWHC 190 (KB) at [37]–[49].

In *Weld-Blundell v Stephens*, the Court of Appeal drew a strong distinction between confiding in a professional adviser an intention to commit a crime and confessing a past crime, and between voluntary disclosure and disclosure under process of law.[45] However, statutory interventions, such as the Proceeds of Crime Act 2002,[46] have significantly eroded this distinction—certainly in cases where previous criminal conduct has not yet come to the attention of the proper authorities.

The subject of public interest is considered further in Ch.5.                    **10-025**

## INTEREST OF THE BANK

A bank's own interests may be a sufficient reason to justify disclosure of a client's   **10-026**
confidential information. In *Tournier*, Bankes and Scrutton LJJ instanced disclosure in collecting or suing for an overdraft.[47] Atkin LJ referred to the bank having the right to disclose information when, and to the extent to which, it is reasonably necessary for the protection of the bank's interests, either as against its customer or as against third parties in respect of transactions of the bank for or with its customer.[48]

In *Sunderland v Barclays Bank Ltd*, the defendants dishonoured a cheque drawn   **10-027**
by the plaintiff in favour of her dressmaker at a time when her account was overdrawn.[49] The bank manager's real reason was not the fact of the account being overdrawn, but that most of the cheques drawn on it had been to bookmakers. The plaintiff complained about the return of the cheque to her husband, who spoke to the bank manager. He told the plaintiff's husband about the cheques to the bookmakers. The plaintiff sued for breach of duty of confidence. Du Parcq LJ dismissed her claim, holding that when the bank received an implied demand for an explanation of its apparent discourtesy in dishonouring the cheque, it was entitled in its own interests to explain the circumstances.[50]

In *Primary Group (UK) Ltd v Royal Bank of Scotland Plc*, a group of insurance   **10-028**
companies disclosed confidential information to their bank for lending purposes.[51] The bank then passed the information to a competitor of the group for assistance in assessing the sector risks. In its defence to a claim by the group for breach of confidence, the bank alleged that it was entitled in its own interests to consult a third-party industry specialist when assessing the lending risk. But Arnold J concluded on the facts that the disclosure had not been reasonably necessary in circumstances where, among other things, the third party could have provided industry-specific insight without receiving the information at issue and the bank already had access to all the insurance restructuring and valuation expertise it reasonably needed from accountants engaged at great expense by the claimants.[52]

---

[45] [1919] 1 K.B. 520 at 527 (Bankes LJ) and 544–545 (Scrutton LJ). See also the Australian decision of *Bodnar v Townsend* [2003] TASSC 148 at [8].

[46] See paras 10-017 and 14-044–14-050.

[47] [1924] 1 K.B. 461 at 473 (Bankes LJ) and 481 (Scrutton LJ).

[48] [1924] 1 K.B. 461 at 486.

[49] (1938) 5 LDAB 163; The Times, 24 November 1938.

[50] See also *Christofi v Barclays Bank Plc* [2000] 1 W.L.R. 937.

[51] [2014] EWHC 1082 (Ch); 2 All E.R. (Comm) 1121.

[52] [2014] EWHC 1082 (Ch); 2 All E.R. (Comm) 1121 at [192].

## CONSENT

**10-029**    A client's express or implied consent to disclosure will permit a bank to disclose the client's confidential information. In *Sunderland v Barclays Bank Ltd* Du Parcq LJ held that there was implied consent to disclosure in that when the plaintiff's husband took over the conduct of the matter of the dishonoured cheque, the plaintiff impliedly consented to the bank giving him the explanation.[53]

**10-030**    *Lee Gleeson Pty Ltd v Sterling Estates Pty Ltd* provides another example of implied consent.[54] A builder entered into a contract with a site owner for the development of a site. The owner ran into financial difficulties and the builder stopped work for non-payment. Negotiations took place involving the builder, owner and owner's bank. The builder and the owner came to an arrangement for the builder to complete the work and for the owner to pay by staged instalments. At the owner's request, the bank wrote to the builder confirming that the owner had authorised the bank to make payments in accordance with the arrangement. The owner subsequently countermanded the bank's instructions. The bank did not inform the builder. The builder sued the bank under an Australian statutory provision relating to misleading or deceptive conduct in trade or commerce.

**10-031**    The bank contended that it could not have informed the builder of the revocation of the owner's instructions without placing itself in breach of confidence to its customer. Brownie J rejected the bank's argument, holding that by authorising the bank to write to the builder, making a statement as to its authority to make payments to the builder, the customer impliedly authorised the bank to inform the builder of the change to those instructions.

**10-032**    In *Turner v Royal Bank of Scotland Plc*, the defendant bank answered third party status enquiries in relation to its customer, without informing its customer that it was doing so.[55] The bank argued that its approach had been in accordance with universal banking practice and that its customer had impliedly consented to such disclosures being made. The Court of Appeal rejected the bank's argument, observing that the evidence suggested that the bank had deliberately withheld knowledge of its practice from its customers.

---

[53]   (1938) 5 LDAB 163; The Times, 24 November 1938.
[54]   [1992] 1 Bank L.R. 342 (New South Wales Supreme Court).
[55]   [1999] 2 All E.R. (Comm) 664.

# Annexe 5



Neutral Citation Number: [2019] EWCA Civ 449

Case No: A4/2018/2445

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM BUSINESS AND PROPERTY COURTS**
**COMMERCIAL COURT**
**Mrs Justice Cockerill DBE**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 15/03/2019

Before :

**LORD JUSTICE GROSS**
**LORD JUSTICE PETER JACKSON**
and
**LORD JUSTICE COULSON**

- - - - - - - - - - - - - - - - - - - -

Between :

| | |
|---|---|
| **Bank Mellat** | **Appellant** |
| - and - | |
| **Her Majesty's Treasury** | **Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Timothy Young QC, Amy Rogers** and **Rupert Paines** (instructed by **Zaiwalla & Co LLP**) for the Appellant
**David Foxton QC, Philippa Hopkins QC** and **Helen Morton** (instructed by **Government Legal Department**) for the **Respondent**

Hearing dates : 19 and 20 February 2019
- - - - - - - - - - - - - - - - - - - -
# Approved Judgment

Double-click to enter the short title

**LORD JUSTICE GROSS :**

INTRODUCTION

1.      The English Court welcomes litigants from all parts of the world.  Gratifyingly, it enjoys a much prized reputation for fairness.  There is no "home ground" advantage; it matters not whether the litigants are domestic, foreign, governmental or private.  All are treated the same.

2.      For all litigants, the procedure in this Court is governed by the *lex fori* – English law. That is the norm internationally, as a matter of the conflict of laws.  Disclosure and the inspection of documents form a part of the law of procedure governed by the *lex fori*. On occasions, a tension can arise between the English law requirement for the inspection of documents and the provisions of foreign law in the home country of the litigant.

3.      Where such a tension arises, it is for the Court to balance the conflicting considerations: the constraints of foreign law on the one hand, and the need for the documents in question to ensure a fair disposal of the action in this jurisdiction, on the other.  That balance is struck by a Judge sitting at first instance, making discretionary, case management decisions.  As is well-established, this Court will only interfere if the Judge has erred in law or principle or has (in effect) reached a wholly untenable factual conclusion.

4.      This is an appeal by the Iranian Appellant ("the Bank") against the judgment and order of Cockerill J, made on 19 September 2018 ("the judgment" and the "order" respectively), on the application of the Respondent ("HMT") under CPR Part 31.19(5), requiring the production of documents in unredacted form but subject to various confidentiality provisions.  As will be seen, it is common ground that production of the Iranian documents covered by the order and with which this appeal is solely concerned, would constitute a breach of Iranian law.

5.      The background concerns a claim by the Bank for damages under the *Human Rights Act 1998* ("the HRA 1998") against HMT, in respect of loss it allegedly suffered as the result of a "financial restriction", the *Financial Restrictions Iran Order 2009* ("the 2009 Order"), made by HMT in October 2009 and held unlawful by the Supreme Court, by a majority, in 2013:  *Bank Mellat v HM Treasury (No. 2)* [2013] UKSC 38; [2013] UKSC 39; [2014] AC 700.

6.      In overview, the issue at the trial, fixed for June 2019, is whether the Bank can prove that the losses it allegedly suffered were caused by the 2009 Order.   The pleaded quantum of the Bank's claim has been some US$4 billion; a recent amendment suggests a reduction to some US$1.7 billion, plus interest.  In very broad terms, the Bank's claim divides into two parts.  The first part is now put at some US$31.7 million plus, relating to specific transactions (letters of credit ("L/Cs"), bank guarantees and penalties) said to have failed in consequence of the 2009 Order.  The second – and far larger part – does not turn on existing, specific transactions and includes as its most sizeable component a claim for over US$800 million relating to the Bank's share of the Iranian foreign currency L/C market; the allegation is that the Bank's existing share of that market in October 2009 was approximately 25%;  but for the 2009 Order, that share would have been maintained and increased to about 35%.

7. The litigation is massive and complex. Though loosely described as a quantum trial, major issues of causation are live. For example, the trial is intended to determine challenges as to the lawfulness of further United Kingdom ("UK") financial restrictions orders made in 2011 and 2012 ("the follow-on measures"). The knock-on effect on causation in respect of the Bank's claim is readily apparent. So too, questions of causation will arise with regard to measures taken elsewhere (including by the European Union ("EU"), the United Arab Emirates ("UAE") and South Korea), allegedly attributable to HMT encouragement ("the copycat orders"). Further, insofar as it is claimed that the Bank lost business due to the 2009 Order, we are told that there will be an issue as to the extent to which other international measures (not challenged in these proceedings, such as US sanctions) had the effect of reducing Iranian trade more generally. Still further, there may be "cut-off points" as to the second part of the Bank's claim (not linked to specific transactions), turning on the meaning to be given to "possessions" within Article 1 Protocol 1 to the European Convention on Human Rights ("A1P1" and the "ECHR", respectively).

8. As we understand it, some 33,000 documents have been disclosed by the Bank since 2016. Of those documents, around one third (roughly 12,500 documents) are said to contain confidential banking data in relation to identifiable customers, said to be protected under Iranian, Turkish and South Korean law – the Bank having overseas branches in Turkey and South Korea.

9. In a nutshell, the documents in question had hitherto been produced in redacted form. Pursuant to CPR Part 31.19(3), the Bank contended that it had a "right or a duty to withhold" inspection of the documents in question on the grounds that they contained confidential information, such that production of the documents in unredacted form would expose the Bank to the risk of criminal prosecution in Turkey, Iran and South Korea.

10. It is unnecessary to trace the history of the parties' respective positions. Suffice to say that by the time the matter reached this Court, the Bank's case was that customer identities were to be redacted and the needs of the trial could be catered for by way of ciphers representing those identities. For its part, HMT contended for the production of unredacted documents but only to members of a "confidentiality ring" ("the confidentiality club") and in ciphered form, with a master list of cipher codes being available to members of the confidentiality club – and not for use in open court.

11. Cockerill J ruled that the risk of prosecution under Turkish law was such that no master list should be provided to HMT in respect of documents in Turkey. The Turkish aspect of the case is now academic as the Bank has recently indicated that it will not be pursuing its claim in respect of losses allegedly suffered by its Turkish branch.

12. With regard to the South Korean documents, the Judge ruled in favour of HMT and the Bank has not appealed.

13. As already noted, this appeal is solely concerned with the Iranian documents where the Judge ruled in favour of HMT – the parties essentially dividing on the production of a master list accessible to members of the Confidentiality Club.

14. It is to be underlined that the Bank resists the order (made by Cockerill J) root and branch. The Bank has not sought to engage with the constitution of the Confidentiality Club, for example by seeking to confine its membership. Nor has the Bank adopted any intermediate position on the documents covered by the order; there is no fall-back contention that even if some documents must be produced unredacted others must not. The Bank's position is all or nothing.

## THE JUDGMENT AND THE ORDER

15. After recounting the history of the proceedings, Cockerill J helpfully outlined their scope as follows (at [12]):

> "A number of interesting legal issues arise, including questions as to causation, whether the interference in the Bank's enjoyment and control of its possessions has been caused by the 2009 order, the extent to which it can prove its loss, whether an award of damages is necessary to afford just satisfaction to the Bank and, if so, in what sum. In this respect it is relevant to note that there has been a recent amendment to the defence in April 2018 to plead that by reason of the Bank's own conduct and/or its ownership and/or control by the Government of Iran no order for damages is appropriate. Alternatively, there should be a significant reduction in any damages awarded."

16. The Judge then went on to deal with the topic of sampling (which does not arise at least directly on this appeal) before turning to the question of redactions. After noting the parties' positions (as they then were), Cockerill J observed (at [47]) that the "relevant legal principles were not very much in issue":

> "It is agreed that obligations of confidentiality arising under some other legal system do not provide an automatic entitlement on a party litigating in this forum to withhold documents from disclosure and it is a matter for the court's discretion whether production should be ordered."

After citing authority (to which I shall return), the Judge (at [50]) noted the HMT submission that it was relevant to the Court's discretion "how real any risk of prosecution in the foreign state is found to be". Ultimately (at [51]), it was agreed between the parties that:

> "….the question is a discretionary one. The issue….is to what extent the fact that risk is invoked by the claimant affects the principle and to what extent the interest of the litigant trumps those of the party claiming that it is not legitimate to comply."

17. Coming to her conclusions, the Judge (at [79]) did not accept that there was "exactly the same presumption in favour of disclosure" where, as here, the disclosure of confidential information was said to be contrary to foreign law, as where the issue was "simply 'business confidential' information". After some reference to authority, the Judge observed (at [82]) that each case needed to be evaluated on its own facts "…and the utility of the information sought and the prejudice caused by its absence

weighed against the evidence as to the actual risk caused to the party subject to the order".

18.  The Judge acknowledged that the expert evidence on Iranian law came only from the Bank, in the event through a Dr Kakhki (discussed further below). HMT had not been able to put forward evidence on its own behalf. Nonetheless, it was for the Judge to evaluate that evidence (at [84]), rather than simply take it at face value. The Bank was advancing an extremely large claim and seeking the Court's "sanction to provide less than full disclosure by reason of redactions". In particular, the Judge was required to consider what the evidence was telling her as to risk.

19.  The Judge continued as follows, in a passage much debated on the appeal:

> "85. I accept Dr Kakhi's expertise which was not in issue. I also accept the evidence indicates that there would be a breach of the law in Iran in providing the documents unredacted. The real question is as to the risks of sanction. In this area, while I see and I have read a few times now what Dr Kakhi says, which is that there are such risks from breach which he describes as even '*real*' and '*probable*' and '*likely*', I am not entirely happy with his evidence. In particular it seems to me that there is a failure to address head on the critical question; that is, what is the risk of sanction in the face of the breach being as a result of compliance with an order of a competent court elsewhere.
>
> 86. Despite Mr McLaren's submissions [i.e., Mr McLaren QC, then representing the Bank], I do not read the report's allusion to deliberate/knowing wrongdoing as engaging with that question. It engages rather with the question of compliance voluntarily. That appears to be the basis on which the questions as to confidentiality in ciphering were posed to him [i.e., Dr Kakhi] for the purposes of preparing his second report…. He was not asked and he does not appear to be telling me what the situation would be if the court imposed a confidentiality ring. Similarly, in his earlier report where there is a section….dealing with the question of the impact of this court's order, it seems to me that he is not dealing with it in relation to the question of risk of sanction in the face of compliance with a court order, but only in relation to the question of enforcement.
>
> 87. The question of risk is…plainly in play on the authorities. I would have expected it to be actively and specifically engaged with on that basis…..It is…still more surprising in that (i) Dr Kakhi does say that legal compulsion provides an excuse and (ii) that question of legal compulsion providing an excuse (when it is an order of the Iranian court) provides the very obvious jumping off point for engaging with the concept of what qualifies as legal compulsion. And yet he does not do so. He does deal…with the effect of the English court's order; but there he does so only as regards the separate question of enforcement, without dealing at all with the question of the

Iranian Courts' attitude to complying with such an order. Nor does he specifically deal with the question of legal compulsion and comity. The result is that in performing the weighing exercise I lack evidence on this key point from the Bank."

20.    The inference which the Judge drew (at [88]) from Dr Kakhki's evidence, particularly given that "it is conceded that compulsion may be taken into account" was that the answer to the question of risk "if grappled with head on, is not one which is entirely coherent with the answers of '*real risk*' and '*probability*'" which Dr Kakhki had given in relation to voluntary disclosure.   The Judge (at [89]) was not "entirely happy" with Dr Kakhki's evidence in other respects; his evidence as to the bases for claiming illegality appeared to her to have shifted between his two reports, without explanation.

21.    Other materials had been adduced as to risk but the Judge was not persuaded (at [90]) that she could extrapolate from them to infer "such a real risk" were she to make the order.   The fact that HMT could not obtain an expert involved an "apples and oranges" comparison; such an expert would be assisting resistance to a claim brought by the Bank in which the Government of Iran through its substantial shareholding had a financial interest; by contrast, compliance by the Bank with a Court order would take place in the context of the Bank doing its best to prosecute "the same claim in the indirect interests of the Government".   Similarly (at [91]), media items as to detentions in Iran were not valid comparisons at all.  On the contrary:

> "92. …it seems to me fair to conclude that the position of the Iranian Government *vis a vis* the Bank does suggest that it would be well placed to offer support in any legal challenge and that, given that non-compliance with the order could only harm the chances of success of the Bank in this important claim which it brings, the Government support would be likely to render the chances of sanction very much less than they would be even in a normal case of compelled production.….
>
> 94. I therefore conclude that the evidence demonstrates the production would be a breach of Iranian law but the factors which I have considered indicate that the risk of prosecution and sanction are not as serious as Dr Kakhi's indications in relation to what might be called voluntary disclosure. I do not accept that Dr Kakhi's evidence, which does on reading appear to address voluntary production, should be read as extending without nuance to the facts of this case. I conclude that there is no real evidence evaluating any risk as a result of complying with the order. I do, however, accept his evidence as to extraterritoriality."

22.     Turning (at [97] and following) to the need for the documents in an unredacted form, the Judge underlined that though not impressed with the evidence of risk, she would not make an order "unless…persuaded that the material contained in the redactions had a relevance". In this regard, the Judge's view was that the material would not just be relevant "but may have a probative influence on some issues".   The Judge did not propose to go through all the heads of argument and (at [98]):

> "…while not emulating Flaux J [who had conducted an earlier hearing] and being able to think of a '*multitude of reasons*' off the top of my head, I can even looking at the question fairly critically, see the following."

23. First (at [99]), "factors such as reasons for a transaction not completing may well be customer related". Insolvency was a "prime example". The Judge disagreed with the Bank's contention that this was *de minimis*. Similar issues arose "as regards ascertaining which transactions were affected by which measures: original, Follow-on or Copycat, although to a lesser extent…".

24. Secondly (at [100]), "alternative routes or replacement transactions" would be client specific. The Judge was not persuaded by the Bank's argument that this was overstated. Though ciphering and specific transaction numbers ("UTNs") had been suggested as the solution to this concern, the Judge regarded this as a dubious assumption. The Judge (at [101]) accepted the submission of Mr Foxton QC (for HMT) that information could be missed if fields were redacted, all the more so where it was sought to extrapolate from a sample.

25. Thirdly (at [102]), whether a client was "a long-term customer" could be relevant to show how much business had been lost.

26. The Judge was satisfied (at [103]) the (unredacted) material would be relevant "on numerous fronts". Primarily (but not exclusively), this related to the first part of the Bank's claim relating to specific transactions. As to the submission (in effect) that the Bank bore the burden of proof and thus the risk of failing to prove its claim, the Judge regarded it as "undesirable to create a risk of arguments having to depend on burden of proof if that is avoidable". Moreover, the materials might go to "wider points" and the Judge saw "real problems with the argument that the material can be adequately assessed absent full disclosure and that anonymous ciphering or UTNs could enable a full picture to be seen". Such practical objections as had been raised (at [105]) could not stand in the way of the order sought by HMT.

27. The Judge's overall conclusion was as follows:

> "106. When I balance these various factors, the one against the other, I am satisfied that the appropriate answer is that an order along the lines sought by HMT should be made.
>
> 107. As to that order, I have been troubled as to whether any form of confidentiality club should be ordered at all since that is contrary to the default position and the Bank does not itself seek a confidentiality club. However, I note HMT's own willingness to contemplate this. Thus…..in the interests of those whose details might otherwise come into the open, as well as in the interests of offering as much respect as possible to the legal position in the foreign jurisdiction – because I am aware and I should make plain that I do understand their concern for confidentiality of material such as this – I am prepared to order a confidentiality club. There should be limitation to named individuals and provision of a list of those

> authorised, the usual kinds of measures which should be taken to ensure that a confidentiality club does not get out of hand.
>
> 108. So far as ciphering is concerned….ciphering generally may well be a good idea with a view to ensuring that there is a possibility to protect client identities during trial."

28.     Pausing there, the Bank's skeleton argument on appeal (pre-dating the involvement of Mr Young QC who did not appear below) appeared to criticise the Judge for producing an *ex tempore* judgment.   That criticism was misconceived and, very properly, Mr Young expressly disassociated himself from it.   This impressive judgment was delivered after overnight reflection so that, in any event, it was not, strictly, *ex tempore*. More importantly, however, Judges are not to be criticised for *ex tempore* judgments, which have the beneficial result that the outcome is known promptly after the hearing.   If there are proper grounds for differing from the judgment under appeal, they do not arise from its delivery "*ex tempore*".

29.     In respect of the Iranian (and South Korean) documents, the order provided for the establishment of a "Confidentiality Ring" (i.e., the confidentiality club) and a cipher code for each document disclosed which included redacted information.   A "Master List" of the cipher codes was to be maintained by the Bank, which would itself be a confidentiality club document.   Schedule 1 to the order dealt, *inter alia*, with the membership of the confidentiality club. Thus, with the exception of the Court and individuals permitted by the Bank, the Master List was only to be made available to confidentiality club members.   "Confidentiality Ring" Members were strictly limited to:

> "…Ministers, employees or contractors of HM Government, the Government Legal Department, the Defendant's expert accountants and counsel instructed in these proceedings."

That is, it may be observed, a broad membership – but, as already highlighted, the Bank has not sought to advance any proposals or submissions for narrowing the membership.   At all events, a "Confidentiality Ring Register" is to be maintained by HMT's solicitors.   A copy of or detail from the Confidentiality Ring Register is to be provided to the Bank "…if agreed by the parties or so ordered by the court".

## THE PRINCIPAL ISSUES ON THE APPEAL

30.     The principal issues on the appeal fall conveniently under the following headings:

i)      The actual risk of prosecution faced by the Bank (or its employees) in Iran should it comply with the order; ("Issue I: Risk")

ii)     The importance of production of the documents in unredacted form to the fair disposal of the trial;  ("Issue II: Need")

iii)     The discretionary balancing exercise for the Court: weighing Risk under Issue I against Need under Issue II ("Issue III: Striking the right balance").

Double-click to enter the short title

THE RIVAL CASES

31.     For the *Bank*, Mr Young QC submitted that the question was whether the Iranian documents should be produced (1) with customers represented by a cipher system or (2) with customers represented by a cipher system *plus* a master list – the master list being accessible to the wide membership of the confidentiality club. The background was to be kept in mind: the 2009 Order had been imposed to exclude the Bank from London based international business; the Supreme Court had held the 2009 Order to be unlawful; the Bank sought to vindicate its rights and could only do so before this Court.

32.     The Judge had conducted a balancing exercise but not a legally valid balancing exercise.  As to risk, she had misunderstood the evidence and drawn her own inferences straying outside the permissible bounds of the uncontradicted expert evidence.  With regard to the question of need, the criterion was the need for the documents in unredacted form (i.e., with a master list) for a fair trial but the Judge had made no mention of that criterion.  The Judge's balancing exercise had thus failed to reflect the components on both Issues I and II.

33.     The relevant risk (Issue I), was the risk of prosecution – not the risk of sanction *if* prosecuted and convicted.   The Judge was obliged to follow the uncontradicted expert evidence of Iranian law and practice but she had, wrongly, imposed her own thinking.  At [84] and following, the Judge had simply gone wrong.  Her assessment of risk had no foundation in the evidence. Dr Kakhki had "head-on" addressed the treatment in Iranian law and practice of production being made in consequence of compliance with an English court order.   Under Iranian law, such production remained a criminal offence, violating the Sharia tenets of privacy in the Iranian constitution. The Judge's criticisms of the expert had been unfair and unfounded. Unlike the position in some of the authorities, there would be here a real crime with a real risk of prosecution. On the advice received by the Bank, an application to the Iranian court for an order permitting production of the documents in unredacted form would be pointless.  Though the English Court had jurisdiction to do so, it would not lightly order a party to do something which constituted a criminal offence abroad.

34.     As to need (Issue II), the HMT submissions did not survive scrutiny; they could all be addressed by production of the documents with a cipher code and in unredacted form. The suggested needs were speculative, "Micawberish lite" and hypothetical.   The Bank would in any event not have information relating to the underlying transactions. Further and in any event, the risk was on the Bank, which bore the burden of proof of making good its claim.

35.     On the facts of this case, the exercise of the Court's discretion (Issue III) permitted only one right decision.  The order was contrary to comity.  The Bank should not be put in a position where it could only have its rights fairly determined by committing a crime in Iran.  With regret but on instructions, Mr Young said in terms that "if push came to shove", the Bank would not comply with the order. Accordingly, the order as it stood would generate a contempt of court. In this last regard it is also right to record that, through Mr Young, Mr Zaiwalla of the Bank's solicitors, told the Court that his firm would strongly advise the Bank to comply with the Court's order.

Double-click to enter the short title

36.    For *HMT*, Mr Foxton QC underlined, as to Issue III, that the Judge had made a case management decision after a balancing exercise conducted in the exercise of her discretion; this Court should not readily interfere. The fact that the burden of proof rested on the Bank was neither here nor there; as Mr Foxton put it, HMT was entitled to attack as well as defend.

37.    As to Issue I, the focus was on the actual risk of prosecution. That was a question fundamentally different from the content or interpretation of foreign law. On that question, Dr Kakhki did not have relevant expertise. No evidence had been produced by the Bank of any Iranian prosecution of any person who had given disclosure pursuant to an order of the foreign court. The Judge was aware of the real issue – the actual risk of prosecution. She had not fallen into error. It was further to be remembered that many of the Bank's customers could be expected not to be Iranian – by way of examples, suppliers under a performance bond or buyers under a L/C. In any event, even if there was a real risk of prosecution, that factor fed into the discretionary balancing exercise; it did not dictate the permissible outcome of the exercise.

38.    As to Issue II, the Bank's case was driven by its (alleged) loss of customers. Mr Foxton submitted that the dispute could not fairly be tried without knowing who they were, together with when and why business had been lost. Further questions included whether transactions had really not completed or whether other routes had been used and whether the Bank had been involved in an attempt to evade *lawful* sanctions, before or after 2009. Without a master list, ciphers would not be satisfactory and would be vulnerable to minor variations, front companies, group companies and so on. HMT was entitled to test the very sizeable claim brought against it. Insofar as extrapolation from a sample was involved, the need for customer identities was heightened. As the Judge had observed, citing an observation of Flaux J (as he then was, at an early Case Management Conference ("CMC") in this case), there were "a multitude of reasons" why customer identities needed to be provided to ensure a fair disposal of the trial.

39.    We were most grateful to both Mr Young and Mr Foxton, together with their respective teams, for their excellent submissions.

THE EXPERT EVIDENCE

40.    I come next to the expert evidence of Iranian law, given by Dr Mohammad M. Hedayati-Kakhki ("Dr Kakhki"), the subject of much debate under Issue I. Dr Kakhki practised law as a member of the Iranian Bar for a number of years. He holds Bachelor's and Master's degrees in law from Iranian universities. He has a PhD in Middle Eastern Politics and Law (with a focus on Iran) from Durham University, obtained in 2008. It does not appear that he has practised at the Iranian Bar since the early 2000s; however, as Mr Young underlined, he has given expert evidence here in Immigration and Asylum cases, including as to the structure of the Iranian legal system. He has assisted the Home Office with commentary and research for its Country of Origin Report on Iran. There is no doubt that Dr Kakhki has the relevant expertise to give expert evidence on Iranian law.

41.    Dr Kakhki's evidence was uncontradicted. HMT was unable to instruct an expert on Iranian law. A permissible inference from what we were told is that those approached

Double-click to enter the short title

feared repercussions from Iran if they assisted HMT – and the English Court – in this matter.    That is most unfortunate, but we can only proceed on the basis of the evidence that was before Cockerill J and we do so.

42.    Dr Kakhki's first report was dated 29 September 2017 ("the first report").    He explained the Sharia law nature of the system, a matter of importance as the Iranian Constitution – with its Sharia foundations – protects the right to privacy of Iranian citizens.    Dr Kakhki drew attention to criminal penalties contained in the Iranian Criminal Code for professionals and officials who disclose confidential information, where not permitted by law.    Against this backdrop, the Bank owed a duty of confidentiality to its customers under the Iranian Constitution. According to Dr Kakhki, the location of the customer (whether within or outside Iran) would make no difference to the duty owed by the Bank. That duty could be overridden under Iranian law but only "…by a domestic court as Iran does not recognise and enforce foreign court orders within the Iranian jurisdiction automatically".

43.    Dr Kakhki was asked this question:

> "Does it make any difference…that Bank Mellat is required to give disclosure and inspection of such documents by an Order of the English Court in litigation which Bank Mellat has brought in England?"

He gave the following extended answer:

> "44. As explained above, the order of a foreign court is not capable of being enforced automatically, and would have to be taken through the domestic judicial process to be first recognised, and then enforced where appropriate….
>
> 45. In principle, there is no bar on the 'recognition' of foreign court orders/judgments in Iran but their 'enforceability' is contingent on their approval at the discretion of the domestic court through the issuance of an 'enforcement order'.
>
> …..
>
> 47. According to Article 1295 of the Civil Code, a foreign judgment/document will only be considered as legal if the following conditions are met:
>
> …
>
> · *Their content is not in contradiction with public policy or good morals in Iran.*
>
> 49. ….privacy and confidentiality are key principles of Sharia law, and therefore Iranian law. In my opinion, an order issued by a foreign court for disclosure of client information and/or documents is likely to be found contrary to public order/ morality, per Article 1295, due to the emphasis on the

preservation of individual privacy within Islamic doctrine. In my view, a disclosure order, such as that of Flaux J, would not be directly enforceable by the courts in Iran; and as noted, additional scrutiny by the Iranian courts in the context of Iranian principles and policies would likely find such disclosure incompatible with preservation of good morals and public policy and not recognise the order as valid under Article 1295."

44.    Turning to the question of sanction, Dr Kakhki stated that if the Bank disclosed customer information to HMT without the requisite Iranian court order, "…they will be held liable for criminal and civil law penalties…".  The parties affected, as well as the Public Prosecutor, could initiate court proceedings.   The risk of criminal prosecution applied equally to the Bank's branches, subsidiaries, officers and employees outside Iran.

45.    The question of an English Court order was raised again, as follows:

"Does it make any difference to this question that Bank Mellat is required to give disclosure and inspection of such documents by an Order of the English Court in litigation which Bank Mellat has brought in England?"

Dr Kakhki answered in these terms:

"61. The applicable provisions relating to disclosure are part of Iranian law, and are regarded as public policy by a sovereign state. In the absence of a bi-lateral treaty between the two countries any disclosure based on an English court order would not negate the overriding duty of the bank to preserve confidentiality under domestic Iranian law. Therefore, in my opinion, if Bank Mellat disclosed information based on an English court order they would be held responsible for the breach of their duty."

46.    The first report concluded with the following paragraph:

"64. To summarise…Bank Mellat is bound across its branches and subsidiaries to act in accordance with Iranian law, which protects customer privacy in accordance with Sharia principles. …..these provisions are enshrined within the Iranian Constitution…. Therefore Bank Mellat has a duty to protect the confidentiality of its customers' details which extends to redacting identifiable information. Even if the court order for disclosure of the information were taken through the court system in Iran it is likely that this information would similarly be ordered to be redacted/concealed considering the fundamental importance and emphasis within Sharia on the privacy, dignity and respect of the individual and their associated rights. I would like to reiterate that the banking system in Iran is fully Sharia compliant and it is…highly likely that an order for full disclosure would be found to be against

> public order in a country where there is no separation between religion and the state and all laws and regulations are based on fundamental principle of Sharia including the right to privacy."

47.    Dr Kakhki's second report was dated 16 May 2018 ("the supplementary report"). By this stage, the question of the confidentiality club had emerged.  In that regard, he was asked this question:

> "Does Bank Mellat have a right or duty under Iranian law not to provide customer information to HMT through a confidentiality ring, in the manner proposed by HMT in its application? Please identify the relevant right or duty."

He answered as follows:

> "5. …the liability explained in my First Report would still apply despite disclosure being limited to a confidentiality ring. As mentioned previously, Bank Mellat has both a right not to reveal customer information and a duty not to disclose confidential information, and would be at risk of criminal investigation and liability were it to do so. It is not difficult to find examples of arrest and prosecution of Iranian bank employees for privacy law offences. For example, one account from 26th July 2016 details the arrest of 4 employees for disseminating information regarding over 200,000 bank customers (including names and addresses) without authorisation.…."

The source of the example appears to be a BBC website.

48.    Reiterating what had been said in the first report, Dr Kakhki said that the Bank's duties under Iranian law and the consequences of non-compliance would continue to apply "even in the event that an order for disclosure of confidential information is made by the English Court".  Additional complications arose from the confidentiality club in circumstances where the proposed disclosure of confidential information would be by electronic transmission to servers located outside Iran.

49.    Dr Kakhki went on to express further concern as to whether any of the (proposed) disclosure material might be regarded by the Iranian authorities as "secret data". The relevant legislation was vaguely worded:

> "9. …it is not difficult or unlikely that the Iranian authorities would define 'state security' or 'national interest' so as to cover many types of information, including the customer information being considered in the present case. It is….probable that the Iranian authorities would conclude that the disclosure of banking customer information on this scale could potentially lead to widespread distrust of the domestic banking system of which customers would previously have trusted the secrecy and privacy, which could undermine the national interest.  These

Double-click to enter the short title

considerations would make prosecution and a significant penalty more likely in my view."

50.     In relation to the confidentiality club, Dr Kakhki's conclusions were these:

> "21. ….revelation to a confidentiality ring as proposed would not eliminate liability and is unlikely to reduce the punishment if investigated. Disclosure of confidential customer information by Bank Mellat to a confidentiality ring in the manner proposed would carry a very real risk of prosecution and potential persecution of the offenders by the Iranian authorities, in addition to the risks to the Bank's reputation and future business. ….. In summary, under Articles 604 and 648 of the Iranian Penal Code offenders face three months to one year's imprisonment in addition to payment of a fine and compensation for damages caused. Moreover, as well as payment of damages to affected customers or third parties, the Bank would be likely to lose its licence to operate…..
>
> 22. This opinion is supported by my understanding as to the sensitivity of the Iranian authorities in relation to the materials under consideration…..Further, and to the extent Iranian authorities perceive this to be an issue of national importance (which…seems likely), such investigations would be conducted by the Iranian Revolutionary Courts and Ministry of Information and Intelligence (Ettela'at) which are known for use of aggressive investigative techniques…..
>
> 23. In this context, it is entirely understandable that employees of Bank Mellat would be extremely wary of contravening Iranian criminal law….. Unfortunately, within Iran the consequences of criminal conduct can be felt within the personal sphere as well as affecting the corporate entity.
>
> 24. For the avoidance of doubt I do not consider that the Bank could remove this risk by applying for an Iranian court order…..it is unlikely the Iranian courts would order the disclosure of personal information (even to a limited number of recipients….), as to do so would override fundamental Islamic and Iranian principles of privacy and confidentiality. In addition, the Iranian courts would be likely to be wary of legitimising disclosure of confidential information to third parties abroad (and particularly a foreign state). As such, and based upon my experience of Iranian courts and practising in Iran as well as my research….including discussions with practising professionals in Iran, any application would have very low prospects of being successful before the Iranian courts."

Double-click to enter the short title

51.     Finally, the use of ciphers representing customers – *without* a master list giving HMT access to customer identities – would meet the requirements of Iranian confidentiality law.

## THE LEGAL FRAMEWORK

52.     There was no significant dispute before us as to the legal framework, covering two broad areas which it is convenient to outline here.  The first concerns the approach of this Court to evidence of foreign law.  The second goes to the position of this Court where it is admitted or established that an order for production and inspection of documents will involve the party subject to the order in a breach of foreign criminal law.

53.     *(1) Evidence of foreign law:*  The propositions which follow are well-established and emerge clearly from the judgment of Scott LJ, in *A/S Tallina Laevauhisus v Estonian State S.S. Line* (1947) 80 Ll. L. Rep. 99, at pp. 107-108, together with *Dicey, Morris and Collins On The Conflict of Laws* (15th ed.), at paras. 9-015 – 9-016:

i)      In English private international law, foreign law is a question of fact, to be proved by a duly qualified expert in the law of that foreign country.  The function of such an expert extends to both the interpretation and application of the foreign law.

ii)     The burden of proof rests on the party seeking to establish the proposition of foreign law in question.

iii)    Although the English Court will scrutinise the evidence adduced, it will not undertake its own researches into questions of foreign law, any more than it will into other questions of evidence.

iv)     When scrutinising evidence of foreign law, as on any other question of evidence, the Court is not inhibited from using its own intelligence and common sense.

v)      Where expert evidence on foreign law is uncontradicted, the Court "should be reluctant" to reject it and is not entitled to do so on the basis of its own research; however, as explained in *Dicey, Morris and Collins* (at para. 9-016):

"….while the court will normally accept such evidence it will not do so if it is 'obviously false', 'obscure', 'extravagant', lacking in obvious 'objectivity and impartiality' or 'patently absurd' or if 'he never applied his mind to the real point of law' or if 'the matters stated by [the expert] did not support his conclusion according to any stated or implied process of reasoning'….Or, in other words, 'using its own intelligence as on any other question of evidence'…. "

54.     *(2) Production, inspection and contravening foreign criminal law:* For present purposes, we are concerned with a species of confidentiality, namely, where a party to litigation in England asserts a right or a duty to withhold inspection of documents because a failure to do so would give rise to a contravention of foreign criminal law.

55. In general terms, the right to inspect documents, under CPR Part 31.14 and following, is not unqualified: *National Crime Agency v Abacha* [2016] EWCA Civ 760; [2016] 1 WLR 4375, at [30]. In that case, I went on to say (at [31]):

> "….while disclosure and inspection cannot be refused by reason of the confidentiality of the documents in question alone, confidentiality (where it is asserted) is a relevant factor to be taken into account by the court in determining whether or not to order inspection. The court's task is to strike a just balance between the competing interests involved – those of the party asserting an entitlement to inspect the documents and those of the party claiming confidentiality in the documents. In striking that balance in the exercise of its discretion, the court may properly have regard to the question of whether inspection of the documents is necessary for disposing fairly of the proceedings in question….."

56. Coming closer to the present context, in *Mackinnon v Donaldson, Lufkin and Jenrette* [1986] 1 Ch 482, the Court discharged an *ex parte* order and subpoena requiring an American bank, <u>not</u> a party to the action, to produce books and other papers held at its head office in New York. In necessarily *obiter* observations, Hoffmann J (as he then was) said this (at pp. 494-495):

> "…I am not concerned with the discovery required by RSC Ord. 24 from ordinary parties to English litigation who happen to be foreigners. If you join the game you must play according to the local rules. This applies not only to plaintiffs but also to defendants who give notice of intention to defend…..Of course a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept…..But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are."

57. In *Ventouris v Mountain* [1991] 1 WLR 607, Bingham LJ (as he then was) underlined (at p.622) that under the (old) RSC Ord. 24 regime, production and inspection were not automatic once relevance and the absence of entitlement to privilege were established. He added this (*ibid*):

> "While the court's ultimate concern must always be to ensure the fair disposal of the cause or matter, it need not be unmindful of other legitimate concerns nor is it powerless to control the terms upon which production and inspection may be ordered. I would not wish it thought that because, as I conclude, production and inspection may be ordered therefore they must at once be ordered unconditionally."

58. *Brannigan v Davison* [1997] AC 238, a decision of the Privy Council on appeal from the Court of Appeal of New Zealand, concerned a commission of inquiry summoning witnesses to give evidence in circumstances where their testimony was likely to render them criminally liable under foreign law. While the issue related to the

privilege against self-incrimination, rather than the inspection of documents, the considerations articulated by Lord Nicholls, giving the judgment of the Board, are nonetheless of interest for the present debate. The "chief strand of reasoning" discernible in the common law privilege against self-incrimination was (at p.249) the "…undesirability of the state compelling a person to convict himself out of his own mouth. There is an instinctive recoil from the use of coercive power to this end." However, where prosecution under a foreign law was involved, the privilege (if applicable) "…would have the effect of according primacy to foreign law in all cases". Lord Nicholls continued (*ibid*):

> "Another country's decision on what conduct does or does not attract criminal or penal sanctions would rebound on the domestic court. The foreign law would override the domestic court's ability to conduct its proceedings in accordance with its own procedures and law. If an answer would tend to expose the witness to a real risk of prosecution under a foreign law then, whatever the nature of the activity proscribed by the foreign law, the witness would have an absolute right to refuse to answer the question, however important that answer might be for the purposes of the domestic court's litigation."

The "opposite extreme" (at p.251) involved the proposition that the prospect of prosecution under foreign law was neither here nor there; the witness would always be required to answer a relevant question in the domestic proceedings, regardless of the likely practical consequences for the witness under foreign law. This, Lord Nicholls stated, "would be a harsh attitude". He went on:

> "It would be a reproach to any legal system. One would expect that a trial judge would have a measure of discretion…."

59.    *Morris v Banque Arabe et Internationale d'Investissement SA* [2001] IL Pr. 37 concerned a dispute arising out of the BCCI saga. The claimant liquidators commenced proceedings against the defendant French bank, seeking (*inter alia*) the disclosure and inspection of documents held in France. The defendant bank resisted inspection on the basis that under a French "Blocking Statute", the production of such documents for use as evidence in foreign legal proceedings was prohibited. The bank argued that the claimants should instead seek the evidence via a letter or request under the *1970 Hague Convention on Obtaining Evidence Abroad*.

60.    Neuberger J (as he then was) held (at [50]) that the Court had jurisdiction to order inspection of the documents. Under the CPR, the Court had a discretion whether or not to order a person resident and domiciled in another country to do something which would be a breach of the criminal law of that country (at [59] and following). On that footing, putting aside considerations relating to the Hague Convention (which ultimately did not dissuade him), he had little hesitation in exercising his discretion to do so; the absence of the documents in question (at [68]) would "….very substantially interfere with the liquidators' ability to pursue the case and would clearly hamper the Court's ability to try the case fairly". Although (at [71]), by affording inspection, the bank would be committing an offence under the Blocking Statute:

> "and could, at least in theory, suffer the imposition of a penalty, it appears to me that this risk, on the evidence I have heard, is little more, and indeed is probably no more, than purely hypothetical."

Neuberger J (at [74]) added these observations:

> "…in connection with litigation of this sort, involving a substantial sum of money, alleged wrongdoing and in the context of a massive and notorious international financial scandal….[it]…would be highly unusual if the French criminal authorities were to prosecute a party to an action such as this in England, in circumstances where he was required to comply with an order of the Court for production of documents for the purposes of that action. The enforcement of a law such as the Blocking Statute in a case such as this would not correspond with generally accepted notions of comity."

61.  In *Secretary of State for Health v Servier Laboratories Ltd* [2013] EWCA Civ 1234; [2014] 1 WLR 4383, proceedings for breach of EU competition law were brought in England.  French defendants were ordered to provide further information and specific disclosure; compliance potentially exposed those defendants to criminal prosecution in France under the Blocking Statute.  Their appeals to this Court were dismissed. For present purposes, it suffices to refer to the following passage from the judgment of Beatson LJ (at [117]):

> "Whether or not compliance with the orders of the English court…is illegal under French law, the English court has jurisdiction to make them as part of the ordinary process of disclosure in civil proceedings because such matters are governed by English law as the *lex fori*.  In the exercise of its jurisdiction, it is legitimate for the court to take account of the real risk of prosecution. On the information available to Henderson and Roth JJ when they made their orders, it cannot be said that their exercise of discretion was flawed in law. First, there is no evidence of any prosecutions under the French blocking statute….apart from that in Christopher X (unreported) 12 December 2007.  That was a case in which…the facts were exceptional, involving as they did the use of deception by a French lawyer without the protection of a court order."

62.  The question of compliance with foreign legal obligations is specifically dealt with in *Matthews and Malek, Disclosure* (5th ed.), at para. 8.26, as follows:

> "The court may take into account, in deciding whether to order disclosure, the fact that compliance with the order would or might entail a breach of foreign law……. It will…need to be shown that the foreign law contains no exception for legal proceedings, and that it is not just a text, or an empty vessel, but is regularly enforced, so that the threat to the party is real.

> Even so, the court has a discretion and, on the basis that English litigation is to be played according to English and not foreign rules, it will rarely be persuaded not to make a disclosure order on this ground. More often than not where foreign law is raised as an objection, any threat of a sanction abroad against the disclosing party is found to be more illusory than real."

63. Pulling the threads together for present purposes:

i) In respect of litigation in this jurisdiction, this Court (i.e., the English Court) has jurisdiction to order production and inspection of documents, regardless of the fact that compliance with the order would or might entail a breach of foreign criminal law in the "home" country of the party the subject of the order.

ii) Orders for production and inspection are matters of procedural law, governed by the *lex fori*, here English law. Local rules apply; foreign law cannot be permitted to override this Court's ability to conduct proceedings here in accordance with English procedures and law.

iii) Whether or not to make such an order is a matter for the discretion of this Court. An order will not lightly be made where compliance would entail a party to English litigation breaching its own (i.e., foreign) criminal law, not least with considerations of comity in mind (discussed in *Dicey, Morris and Collins, op cit,* at paras. 1-008 and following). This Court is not, however, in any sense precluded from doing so.

iv) When exercising its discretion, this Court will take account of the real – in the sense of the actual – risk of prosecution in the foreign state. A balancing exercise must be conducted, on the one hand weighing the actual risk of prosecution in the foreign state and, on the other hand, the importance of the documents of which inspection is ordered to the fair disposal of the English proceedings. The existence of an actual risk of prosecution in the foreign state is not determinative of the balancing exercise but is a factor of which this Court would be very mindful.

v) Should inspection be ordered, this Court can fashion the order to reduce or minimise the concerns under the foreign law, for example, by imposing confidentiality restrictions in respect of the documents inspected.

vi) Where an order for inspection is made by this Court in such circumstances, considerations of comity may not unreasonably be expected to influence the foreign state in deciding whether or not to prosecute the foreign national for compliance with the order of this Court. Comity cuts both ways.

DISCUSSION AND CONCLUSIONS

ISSUE I: RISK

64.    *(1) Nature of the Issue:*  As already foreshadowed, this Issue goes to the actual risk of prosecution of the Bank and/or its employees in Iran.  It is important to highlight what this entails.  First, it is concerned with the risk of *prosecution*, rather than the risk of subsequent sanction, if prosecuted and convicted.   Secondly, however, the question focuses on the *actual* risk of prosecution – not on whether the conduct in question discloses a breach of Iranian criminal law, without more.

65.    *(2) The Judge's conclusion:*  The Judge's conclusion on this Issue appears from [94] of the judgment: although production of the Iranian documents unredacted would constitute a breach of Iranian law, the risk of prosecution (and sanction) was "not as serious" as suggested by Dr Kakhki in relation to "voluntary disclosure".

66.    *(3) Overview:*  For my part, I think that the Judge addressed the right ultimate question – the actual risk of prosecution – and came to the right answer.  *En route*, however, there appears to have been a mis-step.  My reasons follow.

67.    *(4) Dr Kakhki's evidence:* Dr Kakhki's expertise as to matters of Iranian law was undisputed before the Judge and before us.  Properly assessed, Dr Kakhki's evidence yields the following conclusions:

   i)    As to the impact in Iran of the production of the Iranian documents unredacted (i.e., utilising ciphers but with a master list accessible to HMT), in compliance with an order of the English Court, Dr Kakhki's first report dealt at some length (at paras. 44 and following) with the enforceability in Iran of the English Court order.  Dr Kakhki's conclusion was clear: the order of a foreign court would only be enforced if recognised and then enforced by an order of the domestic Iranian Court.  Paras. 49 and 64 of the first report suggest that, at the least, it would be unlikely that an order would be obtained from the Iranian Court permitting unredacted production – a matter forcefully reiterated at para. 24 of Dr Kakhki's supplementary report.   The question of enforcement of an English Court order in Iran was not, however, the question with which this Issue was (at least directly) concerned and the Judge's observations in this regard (at [87]) were, with respect, justified.

   ii)    That said, matters do not end there. The first report, at para. 61, does, in my judgment, address squarely – or "head-on" – the consideration that compliance with an order of the English Court would <u>not</u> excuse the Bank from a breach of its duty of confidentiality under Iranian law.  Para. 61 is, however, the high point of the first report for the Bank's case.  Yet, on a fair reading it does not go beyond the view that unredacted production, absent a permissive order from the Iranian Court, would give rise to a breach of Iranian criminal law.  It does not deal with the actual risk of prosecution in Iran.

   iii)    It is fair to say, as the Judge did, that Dr Kakhki's supplementary report expanded somewhat the grounds upon which the Bank sought to base its case on Issue I – and, for my part, I can understand the Judge's concern (at [89]) in this regard.  Thus, questions of electronic transmission of the materials and

"state security" were ventilated or principally ventilated in the supplementary report rather than the first report.

iv)     Dr Kakhki's supplementary report expressed the opinion that production of the Iranian documents unredacted, to a confidentiality club, would not absolve the Bank from its liability for breach of Iranian criminal law – all the more so, where one of the members of the club was a foreign State (para. 24). Dr Kakhi commented (at para. 21) that production of the Iranian documents unredacted to the confidentiality club would carry "a very real risk of prosecution", aside from other consequences. The *only* example given, however, of the arrest and prosecution of Iranian bank employees for breach of their duty of confidentiality is that found at para. 5 of the supplementary report – an example self-evidently far removed from the facts of the present case.

68.    *(5) The judgment:*  I turn next to the judgment.  First, I am satisfied that the Judge addressed the right ultimate question – namely, that going to the actual (or real) risk of prosecution in Iran, as clearly emerges from both [50] and [82] of the judgment – and gave her answer at [94] of the judgment.

69.    Secondly, I would reject the criticism of the Judge that she had misunderstood the relevant risk. Thus, the Judge made express reference to the risk of prosecution (at [94]). Though there and elsewhere (at [85]), she referred to the risk of "sanction", the most relevant authorities (*Morris* and *Servier*, together with *Brannigan*) were before her and were carefully considered (at [48] – [50] and [80] – [82]).  It is noteworthy that, at [50], the Judge referred in terms to the question relevant to the Court's discretion being "how real any risk of prosecution in the foreign state is found to be". I am accordingly satisfied that the Judge had well in mind that the risk with which she was concerned was the risk of *prosecution*, rather than subsequent sanction. Certainly, a fair reading of the judgment does not suggest that she regarded the risk of prosecution as insufficient to weigh in the Court's discretion, unless accompanied by the risk of subsequent sanction.

70.    Thirdly, I am unable to accept the Bank's submission that the Judge strayed outside her remit and impermissibly imposed her own thinking in the face of Dr Kakhki's uncontradicted expert evidence. To my mind, Dr Kakhi's evidence, uncontradicted though it was, did not preclude the Judge from reaching the conclusion to which she came:

i)      In my view, the *actual risk* of prosecution in Iran involves an inquiry clearly distinct from one going to Iranian law or even the interpretation and application of Iranian law.  I am therefore unable to agree that Dr Kakhki's expert evidence (without more) was determinative on this question.  The mischief of this Court conducting its own research on questions of foreign law is far removed from the inquiry here as to the actual risk of prosecution in Iran – an altogether more mundane and, essentially, factual question.

ii)     It is, next, important to distinguish between (a) the question whether production of the Iranian documents unredacted to the confidentiality club would, absent a permissive Iranian Court order, give rise to a breach of Iranian criminal law and (b) the actual risk of prosecution in Iran. The Judge accepted (at [94]) that such conduct would constitute a breach of Iranian (criminal) law.

As already suggested, it is not at all clear that question (b) did fall within Dr Kakhki's expertise; if so, the Judge was plainly not constrained by his evidence as to the conclusions open to her. However, even insofar as the actual risk of prosecution involved a question of Iranian law and falls within Dr Kakhki's area of expertise, it is to be recollected that the burden rests on the Bank to establish the relevant risk and that the Court is entitled to use its own intelligence in scrutinising that evidence. In this regard, with respect, Dr Kakhki's evidence was anything but compelling. To reiterate, despite Dr Kakhki's assertion as to the "very real" risk of prosecution, the only example of prosecution was contained in para. 5 of the supplementary report and far removed from the facts of the present case. The Judge was not obliged to accept that - somewhat exiguous - evidence as persuasive on the degree of risk involved, still less to extrapolate from the facts of that example to those now before the Court. For my own part, that example falls well short of making good Dr Kakhki's view as to the "very real" risk of prosecution. Even if, as Mr Young suggested, there is a lack of data on Iranian prosecutions, it is noteworthy that Dr Kakhki had discussed this matter with fellow professionals (supplementary report, para. 24) and it must be inferred that those discussions yielded nothing more.

iii) It is probably unnecessary and somewhat speculative to go further but it cannot be overlooked that compliance with the (Judge's) order as to production of the Iranian documents, would assist in the prosecution of the Bank's very substantial claim against HMT – not an irrelevant consideration for the Iranian Government, with (as is common ground) its substantial shareholding in the Bank. Nor does it require any assumptions as to the rule of law or separation of powers in Iran, for a consideration of this nature to weigh with the Iranian prosecution authorities; any rational evaluation of a decision to prosecute would do so. Furthermore, if it is said that the present state of international relations might point the other way, the proposition would be distinctly double-edged. On any view, it would not be an attractive stance when coming to the balancing exercise - pitting reliance on a foreign State's worldview, particularly if held regardless of comity, against the domestic court's ability to conduct its proceedings in accordance with its own procedures and law (*Brannigan*, *supra*).

iv) The Bank subjected the Judge's conclusion, that the risk of prosecution was "not as serious" as Dr Kakhki had indicated, to particular criticism. For my part, this criticism was unwarranted; to the contrary, the Judge's conclusion was one she was amply entitled to reach and entirely fair. The Judge was not prepared to treat the risk of prosecution as purely hypothetical (unlike the authorities as to the French Blocking Statute (*Morris* and *Servier*); that was a conclusion she was entitled to reach, given the sensitivity of the issue and the importance attributed to confidentiality in the evidence of Iranian law. On the other hand, for the reasons already given, the Judge was entitled to subject Dr Kakhi's assessment of the actual risk of prosecution to critical scrutiny and to differ from it.

v) For completeness, though much was made by the Bank of the "fundamental" nature of confidentiality and privacy in Iranian law, perspective must not be

Double-click to enter the short title

lost; it is to be noted that such considerations can be overridden by a domestic Iranian Court order.  Unsurprisingly, it appears that in Iranian law, as in other legal systems, such issues do not involve absolutes but a balance of competing considerations.

71.    Fourthly, I part company with the Judge in one respect only.  At [85] – [87] and [94] of the judgment, the Judge appears to have concluded that Dr Kakhki did not consider the risk to the Bank flowing from a breach of Iranian law consequent upon compliance with an order of a competent Court elsewhere. With respect, this conclusion appears to conflate two separate questions.  As to the actual risk of prosecution faced by the Bank, for the reasons already given, I think Dr Kakhki's evidence was of very limited assistance and the Judge was entitled to reach the conclusion she did. However, also as already explained, I think that Dr Kakhki did indeed address the question of whether the Bank's breach of Iranian law would be excused by reason of the breach being a consequence of an English Court order.  On that question, his evidence was clear: the fact that production of the Iranian documents unredacted was attributable to compliance with a foreign Court order would be neither here nor there in assessing whether or not the conduct in question gave rise to a breach of Iranian law.

72.    *(6) Overall conclusion on Issue I:*  In my judgment, the Judge addressed the right ultimate question (the actual risk of prosecution under Iranian law) and gave the right ultimate answer (more than a purely hypothetical risk but less serious than that suggested by Dr Kakhki).  I am not persuaded that the Judge's mis-step *en route* – insofar as she thought Dr Kakhki's evidence was confined to what she termed "voluntary disclosure" – invalidates her decision.  Be that as it may, if it did, I would in any event and emphatically reach the same conclusion as the Judge, for the reasons set out above.

## ISSUE II: NEED

73.    *(1) Overview:* Issue II goes to the other side of the equation, forming part of the discretionary balancing exercise: namely, as the Judge put it (at [82]), "…the utility of the information sought and the prejudice caused by its absence…".  As the Judge made clear (at [97]), there would be no order for production of the Iranian documents unredacted, unless "…the material contained in the redactions had a relevance"; in her judgment (*ibid*), there was a "very real prospect" that the material would not just be relevant "but may have a probative influence on some issues".

74.    One of the Bank's criticisms may be disposed of at the outset; although the Judge may not have referred expressly to the need for the unredacted materials to ensure a fair trial, to my mind it is clear beyond peradventure that this was the criterion she had in mind.  Realistically, I am wholly unpersuaded that, when balancing the risk of ordering unredacted production of the Iranian documents against the utility of their production, she had in mind any other criterion.

75.    Before proceeding further, some idea of the scale of the trial should be underlined.  We were told that some 2361 transactions were involved.  Disclosure has been given in respect of about 635 of those (156 L/Cs, 21 bank guarantees and 458 penalties).  Leaving customer identities to one side, disclosure has thus been given in respect of 156 L/C transactions.  Information is more sparse in respect of a further 211 L/Cs and

virtually no information is available on the balance of 1217 L/Cs.   In respect of L/C transactions, the contemplated mode of proceeding entails extrapolating from a 10% sample – albeit that the parties will remain in dispute as to the efficacy or reliability of the extrapolation exercise.

76.     Based on experience and instinct, my initial reaction, I readily confess, is that the fair disposal of this trial cries out for production of the Iranian documents unredacted.   I am in complete sympathy with Flaux J's observation that there were a "multitude of reasons" for the unredacted production of the relevant customer identities to the confidentiality club.

77.     Mr Young retorted with force that the need for the documents must be analysed and could not be considered in the abstract; a speculative need and a fishing expedition would not do.  That may well be right as far as it goes. But it may not go very far.

78.     First, in assessing the need for the unredacted documents, it is necessary to keep in mind the dynamics of a trial and the developments which may take place as preparation becomes more advanced and even in the trial itself.  A decision now to proceed by way of ciphers alone, without a master list, would (in practice) be irremediable should it later transpire that customer identities were needed.  Secondly, this will be a trial of very considerable complexity involving a massive claim, even after the amendment to which reference has already been made.   Thirdly, that complexity will increase insofar as it is necessary (as appears likely at least in part) to extrapolate from sample transactions. When each transaction is to be taken as representative of (say) ten others, it is all the more necessary to minimise the risks of unfairness, in one direction or the other – and the master list would assist in doing so. An extrapolation exercise, with the trial confined to ciphers and without a master list, strikes me as over-ambitious and fraught with risk. Fourthly, while catering for purely (or essentially) speculative needs would count for little weight in the balancing exercise, I would find it troubling to dismiss the need for unredacted Iranian documents as speculative, on no more than the Bank's say-so. Moreover, it is important to appreciate that the parties are not here concerned with a fishing expedition in the context of *disclosure*; the issue goes to the mode of *production* of documents which already satisfy the disclosure criteria. Fifthly, a healthy dose of realism and practicality is called for.  Anonymisation almost invariably makes the trial process more difficult and cumbersome.  Here, the claim brought by the Bank alleges loss of custom; as a practical matter, whatever the theoretical attractions of proceeding by way of ciphers only, I would be deeply concerned as to the prospect of proceeding without the production of customer identities.   There is an element of unreality in attempting to try a claim for loss of custom without knowing who the customers are or were, together with when and why the business was lost.

79.     Overall, there can be no gainsaying HMT's right to test the very substantial claim advanced against it. Nor can the matter be resolved by leaving it to the burden of proof resting upon the Bank. Quite apart from the inherent undesirability, as the Judge observed (at [103]), of leaving matters to be resolved by the burden of proof if an alternative solution is available, HMT must be entitled to attack as well as defend – as Mr Foxton tellingly put it.

Double-click to enter the short title

80.    *(2) Particular reasons:*  As it seems to me, the (non-exhaustive) reasons which follow suffice, individually and cumulatively, to demonstrate the need for production of the Iranian documents unredacted, in the interests of the fair disposal of the trial.

81.    First, as the Judge concluded (at [99]), the reasons for a specific transaction not completing might not be attributable to the 2009 Order but instead be customer related – insolvency comprising an obvious example. *Prima facie*, that conclusion has obvious force.  That the matter might turn out to be *de minimis* (as the Bank contended before the Judge) or that the information might not be of any use (as Mr Young submitted to us, on the ground that there was no register of insolvent Iranian companies), cannot justify preventing HMT from investigating and pursuing this topic – on, necessarily, no more than the Bank's assertion that it would be *de minimis* or pointless.  For the same reasons, time will tell whether the information sought by HMT is lacking, given that the Bank's interest must be expected to lie with the documentation rather than the underlying transactions.

82.    Secondly, as Mr Foxton submitted, HMT must be entitled to explore whether transactions did not complete in consequence of the 2009 Order (as alleged by the Bank) or whether they were in fact completed by other routes, with the Bank obtaining a share of the commission or profits. To my mind, this submission is unanswerable.  Plainly, any such instances would reduce the Bank's claimed loss.  It is not at all apparent that any such (obviously relevant) inquiry could be conducted by way of ciphers only and without customer identities. As is plain from the Bank's disclosure to date (to which we were taken in argument) and as is to be expected, the Bank was actively exploring ways of mitigating the impact of the 2009 Order.

83.    Thirdly, given the complexity of the causation issues (flagged much earlier), it will be of obvious relevance to explore which transactions were affected by the 2009 Order and which by other measures, such as the follow-on measures or copycat orders. So too, it will be relevant to explore the impact of different cut-off points, having regard to A1P1 considerations, flagged above.  Once again, the difficulties of conducting such an exercise with ciphers alone – and without a master list – are readily apparent.

84.    Fourthly, given that the Bank's claim is for "just satisfaction" pursuant to the HRA 1998, HMT must be entitled to probe whether any transactions were linked to attempts to evade lawful sanctions – a matter which would or might impact on any sums payable to the Bank. It is unrealistic to suppose that this exercise could be conducted without customer identities, as demonstrated by the gaps in the sample disclosure to which we were referred in this context.  Given, which must be anticipated, determined efforts to circumvent sanctions, a master list will be needed and ciphers alone will not suffice. Further, I am unable to accept Mr Young's submission in this regard, that without a confidential UK list of "suspect entities", any such information could not be evaluated; I simply do not see why that should be the case.  Still further even if production of such a UK list was a realistic possibility (which I am satisfied it is not), any linkages would require customer identities not ciphers alone.

85.    Fifthly, there is the obvious risk that if the proceedings are confined to ciphers, the use of front companies or group companies, together with minor variations in names would be missed.

86. Sixthly, although it can be said that the need for customer identities is more readily apparent in respect of the first and smaller part of the Bank's claim relating to specific transactions (itself now put at US$31.7 million plus) rather than the second larger part of the claim based on loss of market share (put, in respect of L/C's at over US$800 million), it cannot be gainsaid that the availability of customer identities might demonstrate links between the two. As the Judge observed (at [104]) the fact that no links had been made so far was not a powerful point; the entire complaint was that "this information is needed to …make such links meaningfully".

87. It follows that the Judge was entitled to reach the conclusion she did under Issue II; in any event, I agree with that conclusion.

ISSUE III: STRIKING THE RIGHT BALANCE

88. It is now time to consider the balance struck by the Judge between the conclusions as to Risk (Issue I) and Need (Issue II). For my part, I am amply satisfied that the Judge exercised her case management discretion lawfully and appropriately (at [106]) in concluding that an order should be made for production of the Iranian documents, unredacted but safeguarded by the confidentiality club provisions, along the lines sought by HMT. If, however, as Mr Young submitted, it is necessary for this Court to exercise the discretion afresh, then I would exercise it in the same manner as did the Judge, on the fact specific conclusions as to Risk and Need outlined above. My conclusion is not reached lightly; it takes comity very much into account; it neither intends nor entails any disrespect for the relevant principles of Iranian law – and it reiterates a suggestion (hitherto apparently disregarded by the Bank) as to mitigating a possible area of concern. I elaborate in the paragraphs which follow.

89. First, the order was not made lightly by the Judge and is not lightly upheld in this Court. It must be recognised that the 2009 Order, as with any provision for Orders, was designed to affect the Bank's ability to do business. The Supreme Court then held that Order to be unlawful. Even if it is too simplistic to say, as Mr Young did, that the (Judge's) order compels the Bank to commit a crime in Iran, it is apparent that if the Bank wishes to pursue its claim against HMT, it must do so in this Court. It is therefore necessary to be mindful of the Bank's concern that compliance with the order will involve the commission of a criminal offence in Iran. Comity requires no less. There is no doubt that Cockerill J had the Bank's predicament well in mind and so do I. It is, however, to be underlined (as already discussed) that an actual risk of prosecution of the Bank is not, *ipso facto*, determinative of the balancing exercise but is to be taken into account as part of it.

90. Secondly, in assessing the degree of actual risk of prosecution, it is both appropriate and necessary to take into account the limitations of Dr Kakhki's evidence (set out above and which need not be repeated here). If necessary to go further, there are attractively rational reasons for taking a guarded view as to the actual risk of prosecution under Iranian law. So:

i) As is clear from Dr Kakhki's evidence, customer confidentiality is not an "absolute" under Iranian law and can be overridden by a domestic court order. Accordingly, an application could be made in Iran for the production of the documents in accordance with the requirements of the English Court order. Such compliance could only assist the Bank in the pursuit of its claim in this

jurisdiction – a claim which, if successful, would yield benefit to the Iranian State, by way of the Iranian Government's shareholding in the Bank. Notwithstanding the view expressed by Dr Kakhki as to the likelihood of failure of any such application, it is difficult, with respect, to see why an Iranian Court would not wish to take account of such considerations.

ii)     Even if compliance with the order would involve a crime in Iran and no "protecting" Iranian court order can be obtained, there is no reason to suppose that the Iranian prosecuting authorities lack all discretion as to any decision to prosecute. By way of comparative example, under English law, prosecuting authorities have a discretion whether to prosecute in the light of the public interest – even if there is otherwise sufficient evidence for a prosecution. No evidence has been adduced to demonstrate that the Iranian prosecuting authorities lack any such discretion. For reasons already canvassed, a decision not to prosecute the Bank for compliance with the order would, rationally, have clear attractions in the (Iranian) public interest. Against this background, it is not unreasonable to invite the Iranian Court and prosecuting authorities themselves to have regard to considerations of comity.

91.     Thirdly, the English Court order for the production of the Iranian documents already makes provision for the confidentiality club. To repeat, the Iranian documents will not be ventilated, unredacted, in open Court. That is not the issue; the parties divide on the different question as to the provision of the master list to the confidentiality club. If it is the Bank's view that the safeguarding provisions of the confidentiality club are inadequate, there is no reason why – even now and even though, hitherto, the Bank has declined to engage in this regard - its legitimate concerns as to the breadth of the membership of the confidentiality club could not be further considered. While any such debate cannot be pre-judged, there is apparent scope for an argument that membership of the confidentiality club could be restricted (for example) to those directly involved in the litigation. It will be recollected that the master list (containing the key to the ciphers) is only available to members of the confidentiality club and that in open court ciphers only would be used.

92.     Fourthly, the need for production of the Iranian documents in the manner set out in the order, intends and entails no disrespect for the relevant principles of Iranian law as to customer confidentiality. Instead, the need flows from the procedural requirements of the *lex fori*, to ensure a fair disposal of the trial. In accordance with English law and international norms, that is, necessarily, a matter for the *lex fori*. The Judge proceeded in just this fashion and her approach cannot be impugned. The scale of the redaction sought by the Bank must be emphasised. It does not go to an isolated document or even to a small number of documents; it relates to (it would seem) thousands of Iranian documents, notwithstanding the confidentiality club provisions - and the absence of a master list would dramatically impact upon the entire conduct of the trial. There is no reason to suppose that an Iranian Court or the Iranian prosecuting authorities, on the basis of mutual respect, would not appreciate the need for the production of the Iranian documents as contemplated by the order.

93.     Fifthly, having regard to the degree of risk (the actual risk of prosecution in Iran) on the one hand and the scale of redaction sought on the other, and should all overtures to mitigate any legitimate concerns as to the safeguarding provisions of the confidentiality club be rebuffed, then I am in no doubt that the needs of the litigants -

Double-click to enter the short title

and the litigation - for the production of the Iranian documents unredacted, should trump the concerns as to Iranian law. Certainly on the facts of this case, this Court's ability to conduct its proceedings in accordance with its own law and procedures should not be overridden by foreign law. The Judge had unquestioned jurisdiction to make the order; as a matter of discretion, she was amply entitled to reach the conclusion she did. If and insofar as it is for this Court to exercise its own discretion, I agree with the Judge.

94. Sixthly, notwithstanding the courtesy with which Mr Young indicated, upon instructions, that ("if push came to shove") the Bank would not comply with the order (if upheld), any such statement contains an inherent element of threat. It is thus, despite Mr Young's best efforts, deeply unattractive. This Court does not contemplate that its orders would not be obeyed and is unmoved by this indication on behalf of the Bank. How the matter would be dealt with if the order is disobeyed will be resolved if or when necessary. But, as already emphasised, there is no need for it to come to that.

95. For the reasons given, I would uphold the order made by Cockerill J and dismiss the appeal.

## POSTSCRIPT: CASE MANAGEMENT

96. In the course of argument, the Court expressed its concern as to the case management of this immensely complex trial, with the trial date now rapidly approaching. We were told that no Judge had yet been designated and that the next CMC is scheduled for 9 May. Case management of the Commercial Court proceedings is not for us, but we draw the attention of both the Judge in Charge of the Commercial Court and the President of the Queen's Bench Division to our concern. We express and imply no criticism but, on the face of it, designation of a Judge to grip these proceedings from now up to and including the trial is overdue and a 9 May date for the next CMC strikes us as worryingly late.

## LORD JUSTICE PETER JACKSON

97. I agree.

## LORD JUSTICE COULSON

98. I also agree.

# Annexe 6

482

[1986]

A

MACKINNON v. DONALDSON, LUFKIN AND JENRETTE
SECURITIES CORPORATION and Others

1985   Oct. 31;                                              Hoffmann J.
       Nov. 1; 5

B

> Evidence—Documentary—Bankers' books—Right to inspect and take
> copies as evidence—Books relating to account with American
> bank in New York—Ex parte order and subpoena requiring bank
> to produce books—Whether infringements of sovereignty of United
> States—Whether justified—Whether ex parte order appropriate—
> Bankers' Books Evidence Act 1879 (42 & 43 Vict. c. 11), s. 7

In an action brought by the plaintiff against certain company   C
and individual defendants alleging fraud, the plaintiff obtained
an order ex parte under section 7 of the Bankers' Books
Evidence Act 1879[1] against an American bank which was not a
party to the action. The order required the bank to produce
books and other papers, held at its head office in New York,
which related to an account of one of the defendants, a
Bahamian company, which, having been struck off the Bahamian   D
register of companies since the issue of the writ, had ceased to
exist. The plaintiff then issued a subpoena duces tecum against
an officer of the bank at its London office.

On a motion by the bank to discharge the order and the
subpoena on the grounds that they exceeded the jurisdiction of
the court and infringed the sovereignty of the United States:—

*Held*, discharging the order and the subpoena, that, save in   E
exceptional circumstances, the court should not require a
foreigner who was not a party to an action, and in particular a
foreign bank which would owe a duty of confidence to its
customers regulated by the law of the country where the
customer's account was kept, to produce documents outside
the jurisdiction concerning business transacted outside the
jurisdiction; that the order and the subpoena, taking effect in
New York, were infringements of the sovereignty of the United   F
States; and that, in all the circumstances and particularly as
legitimate alternative procedures were available to the plaintiff,
such infringements were not justified (post, pp. 493F–G, G—
494A, C–G, 500A–C).

*Reg. v. Grossman* (1981) 73 Cr.App.R. 302, C.A. applied.

*British South Africa Co. v. De Beers Consolidated Mines
Ltd.* [1910] 2 Ch. 502, C.A. and *Acrow (Automation) Ltd. v.
Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676, C.A. distinguished.   G

*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, C.A.
and *X A.G. v. A Bank* [1983] 2 All E.R. 464 considered.

*Per curiam.* Orders under the Bankers' Books Evidence Act
1879 concerned with documents outside the jurisdiction are so
unusual that they should ordinarily be made on notice to the
bank (post, p. 497D–E).

H

[1] Bankers' Books Evidence Act 1879, s. 7: "On the application of any party to a legal
proceeding a court or judge may order that such party be at liberty to inspect and take
copies of any entries in a banker's book for any of the purposes of such proceedings. An
order under this section may be made either with or without summoning the bank or any
other party . . ."

A

The following cases are referred to in the judgment:

*Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; [1971] 3 All E.R. 1175, C.A.

*Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274; [1980] 3 All E.R. 353, C.A.

*Bonalumi v. Secretary of State for the Home Department* [1985] Q.B. 675; [1985] 2 W.L.R. 722; [1985] 1 All E.R. 797, C.A.

B
*British South Africa Co. v. De Beers Consolidated Mines Ltd.* [1910] 2 Ch. 502, C.A.

*Laker Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324

*London & Counties Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978, Templeman J.

*Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C.

C
133; [1973] 3 W.L.R. 164; [1973] 2 All E.R. 943, H.L.(E.)

*Reg. v. Grossman* (1981) 73 Cr.App.R. 302, C.A.

*Société Internationale pour Participations Industrielles et Commerciales S.A. v. Rogers* (1958) 357 U.S. 197, U.S. Supreme Court

*South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046, C.A.

D
*Waterhouse v. Barker* [1924] 2 K.B. 759, C.A.

*WEA Records Ltd. v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721; [1983] 2 All E.R. 589, C.A.

*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (No. 1 and No. 2), In re* [1978] A.C. 547; [1978] 2 W.L.R. 81; [1978] 1 All E.R. 434, H.L.(E.)

*X A.G. v. A Bank* [1983] 2 All E.R. 464

E

The following additional cases were cited in argument:

*Becker v. Noel (Practice Note)* [1971] 1 W.L.R. 803; [1971] 2 All E.R. 1248, C.A.

*Boyle v. Sacker* (1888) 39 Ch.D. 249, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3 W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

F
*Compagnie Générale Transatlantique v. Thomas Law & Co.* [1899] A.C. 431, H.L.(E.)

*Consolidated Rendering Co., In re* (1907) 66 Atl. 790

*Cook Industries Inc. v. Galliher* [1979] Ch. 439; [1978] 3 W.L.R. 637; [1978] 3 All E.R. 945

*Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd.* [1927] A.C. 95, H.L.(E.)

*Farquharson v. Balfour* (1823) T. & R. 184

G
*Archer, H.M.S.* [1919] P. 1

*Haggin v. Comptoir D'Escompte de Paris* (1889) 23 Q.B.D. 519, C.A.

*Lhoneux, Limon & Co. v. Hong Kong and Shanghai Banking Corporation* (1886) 33 Ch.D. 446

*Newby v. Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293

*United States v. First National City Bank ('Citibank')* (1968) 396 F. 2d 897

H
MOTION

By a writ dated 22 December 1983, the plaintiff, Kenneth Thomas Mackinnon, sought against the defendants, Donaldson, Lufkin and Jenrette Securities Corporation, Donaldson, Lufkin and Jenrette (Asia)

Ltd., Investment Advisory Services (1979) Ltd., Alan David Shepherd, **A**
G. Raymond Lanciault and the Martini Foundation inter alia, (1)
damages for breach of an agreement made in October 1980 between the
plaintiff and the fourth defendant as managing director of the second
defendant whereby it was agreed that the first and/or second defendants
would provide or procure finance for plaintiff; (2) damages for deceit in
respect of false representations deliberately made by the fourth defendant
to the plaintiff on behalf of the first and/or second defendants; (3)    **B**
damages for breach of an agreement made in October 1980 between the
plaintiff and the fifth defendant whereby it was agreed that the sixth
defendant would provide finance for the plaintiff; (4) damages for deceit
in respect of false representation deliberately made by the fifth defendant
to the plaintiff on behalf of the sixth defendant; (5) damages for
conspiracy to defraud the plaintiff; and (6) the return of U.S. $250,000    **C**
paid by the plaintiff to the third defendant for a consideration which had
wholly failed as money had and received by the defendant to the use of
the plaintiff. The plaintiff obtained an order ex parte from Master
Gowers on 2 October 1985 under the Bankers' Books Evidence Act
1879 allowing the plaintiff to inspect and take copies of entries in the
books of Bank of America, Chase Manhattan Bank and Citibank N.A.

By a notice of motion dated 25 October 1985, Citibank N.A. and    **D**
Barry Robinson applied to the court for orders that (1) Citibank N.A.
be joined as seventh defendant to the action, pursuant to R.S.C., Ord.
15, r. 2(6); (2) the order of 2 October 1985 be set aside or varied so as
to exclude all books outside the jurisdiction of the court, or alternatively,
Citibank N.A. be given leave to appeal to the Court of Appeal against
that order; and (3) a subpoena dated 4 October 1985 addressed to Barry    **E**
Robinson of Citibank N.A. be set aside on the grounds that it was
procured for the purpose of securing the production of documents in the
possession of Citibank N.A.'s head office in New York, United States of
America, and was thus an abuse of the powers of the court, and/or
ought not to have been issued, in that the proper means of securing
production of such documents was by the procedure contained in
R.S.C., Ord. 39, or, alternatively, the subpoena be varied so as to    **F**
exclude from production all documents out of the court's jurisdiction.

The facts are stated in the judgment.


*Jonathan Hirst* for the bank. There are grave objections of principle
to the master's order. Its purpose is clearly to procure production of the
bank's documents in New York. The plaintiff is seeking to obtain    **G**
discovery from a non-party of bank documents outside the jurisdiction.
The order short-circuits the internationally agreed procedure under the
Hague Convention on the Taking of Evidence Abroad in Civil or
Commercial Matters in a way which our courts have deprecated when
United States Courts have tried it in the past. The bank is unlikely to be
unco-operative or difficult if the plaintiff applies to the court in New
York; but the bank objects in principle to an application here. It further    **H**
objects to the fact that the master's order was made ex parte.

It is clear from *Reg. v. Grossman* (1981) 73 Cr.App.R. 302 that a
bank should never (or only in the most exceptional circumstances) be

A ordered to produce a document which it holds abroad. Although it has been held in *Bonalumi v. Secretary of State for the Home Department* [1985] Q.B. 675 that the *Grossman* case was decided per curiam, the judgments are correct insofar as they suggest that the bank cannot apply to set aside an order made ex parte without being joined as a defendant before doing so: see *Boyle v. Sacker* (1888) 39 Ch.D. 249; *H.M.S. Archer* [1919] P. 1; *WEA Records Ltd v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721 and *Becker v. Noel (Practice Note)* [1971] 1 W.L.R. 803.

B There was a stronger case for making an exception in *Reg. v. Grossman,* 73 Cr.App.R. 302 than in the present case because (a) in that case the bank had its head office within the jurisdiction and (b) the revenue had already tried unsuccessfully to obtain the documents in the Isle of Man. The "fortuitous" aspect is even more striking here where the plaintiff has taken advantage of the presence of a branch within the jurisdiction;

C also no attempt has been made to obtain the documents in New York.

The court should not undermine the system which preserves United Kingdom sovereignty when parties to foreign proceedings seek to obtain evidence in this jurisdiction; compare the Evidence (Proceedings in Other Jurisdictions) Act 1975, section 3. The converse procedure when parties to English proceedings wish to obtain evidence abroad is provided

D by R.S.C., Ord. 39 which is a complete code. The system combines court procedures and diplomacy in a way which preserves the interests of both jurisdictions concerned. Alternatively the plaintiff could apply to the court for leave to make a direct application to the New York court for discovery: *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1986] Q.B. 348. The English courts have

E objected to the assertion by New York courts of the "long arm of jurisdiction"; compare *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 608D et seq. *per* Lord Wilberforce and *per* Lord Diplock at pp. 639F et seq. So has Parliament: see the Protection of Trading Institute Act 1980. This order and subpoena are invasions of the

F jurisdiction and sovereignty of the U.S.A., and they also deny the bank the opportunity of seeking any protection to which it may be entitled in New York.

*X A.G. v. A Bank* [1983] 2 All E.R. 464 was this case in reverse except that there the bank had its head office in New York. Leggatt J. clearly disapproved of the powers exercised by the United States court which he described as "excessive"; see at p. 480B, and as placing the

G bank in a "dilemma"; see at p. 480F. The English court should not grant the order and subpoena and wait to see if they result in an injunction in New York.

As to the dissolution of the bank's customer, (a) that does not destroy the right of confidentiality and the court cannot be sure that the bank will not be in breach if it complies and (b) the fact that the

H plaintiff would have a strong case if he used the right procedure is no excuse for trying to short-circuit it.

The New York court's recent decision in *Laker Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324 indicates a welcome

change of attitude on the part of some United States judges which we should encourage by maintaining the same attitude ourselves.

*John McDonnell Q.C.* for the plaintiff. The English court asserts jurisdiction over foreign corporations who carry on business here because they are regarded as "English residents," even though they may also be resident in other jurisdictions: see *Newby v. Colt's Patent Firearms Manufacturing Co.* (1872) L.R. 7 Q.B. 293 and *Compagnie Générale Transatlantique v. Thomas Law & Co.* [1899] A.C. 431. For the application of this principle to banks see *Lhoneux, Limon & Co. v. Hong Kong and Shanghai Banking Corporation* (1886) 33 Ch.D. 446 and *Haggin v. Comptoir D'Escompte de Paris* (1889) 23 Q.B.D. 519. The bank has submitted to the jurisdiction of the English court by (a) taking up residence here, (b) by registering under Part X of the Companies Act 1948 which enables it to be served with process and (c) by securing recognition under the Banking Act 1979, which makes it a "bank" within the meaning of the Bankers' Books Evidence Act 1879, section 9, as amended: see *Employers' Liability Assurance Corporation Ltd. v. Sedgwick, Collins & Co. Ltd.* [1927] A.C. 95. The bank is thus liable to be sued or compelled to give discovery as a defendant or to give evidence or produce documents under subpoena which may assist to do justice between other litigants just like any other resident subject to the jurisdiction.

If, as is plainly the case, an English resident with no second residence can be compelled to produce on discovery, as a defendant, or under subpoena, as a witness, documents which are in his possession or overseas—subject to any excuses justified by applicable foreign law (see *Farquharson v. Balfour* (1823) T. & R. 184), why should a resident who has a second residence be in a different position? The real underlying problems where banks are concerned is that the production of documents by way of discovery or under subpoena may affect the rights of third party customers. Even without a foreign element, a subpoena against a bank to produce documents relating to a third party's account without reference to the third party may well not be enforced; and in that situation the court is always very cautious about orders made under the Bankers' Books Evidence Act 1879. It is a fortiori if the customer is outside the jurisdiction, even if the documents are here and no foreign branch is involved, though in such a case it can be argued that the customer has submitted the documents to the jurisdiction by keeping his accounts here.

The case for non-intervention is even stronger where a customer who is not subject to the English jurisdiction has his account with an overseas branch of a bank which is subject to the jurisdiction; it is accepted that in such a case the court should not use its power in personam over the bank save in exceptional circumstances. But where, as here, both the bank and its customer are, in one way or another, subject to the jurisdiction, the fact that the account is kept at a foreign branch should be irrelevant, unless some actual conflict of law arises.

There is nothing "fortuitous" about the bank having a branch here; that is a choice which the bank has made in its own commercial

A   interests. What is "fortuitous" is that the customer who is the real target of the subpoena has chosen to keep its overseas account with a bank which has chosen to submit itself to the English jurisdiction. It would certainly be objectionable to take advantage of the bank's presence here in order to compel it to produce overseas documents where the real target was a customer against whom the court's process would not lie; but it is not objectionable to compel the bank to produce overseas

B   documents if (a) the bank is itself the real target, or defendant, or (b) the real target is a customer who *is* amenable to the court's process, but from whom for some reason the document cannot be obtained. A parallel distinction might be drawn if the bank were subpoenaed to produce documents within the jurisdiction relating to a third party customer. That is what Leggatt J. meant by "excessive" in the *X A.G.*

C   case [1983] 2 All E.R. 464, 480B. This is also the true explanation of the *Grossman* case, 73 Cr.App.R. 302, where the documents related to the account of a customer who was not amenable to the jurisdiction. When the Court of Appeal referred to the Isle of Man branch as a separate entity, they merely had in mind that the customer had not submitted to the jurisdiction in the sense in which it would have done by keeping its account with the bank's head office in London.

D       In the present case, the customer, International Advisory Services (1979) Ltd. (I.A.S.) had submitted to the jurisdiction by having its place of business in London, or at all events the court was prepared to assert it, having given leave to effect service in the Bahamas under R.S.C., Ord. 11. Thus if it had not been dissolved before service it would have had to give discovery.

E       The exercise of jurisdiction in personam over a foreigner resident here or over any defendant in respect of property outside the jurisdiction does not usually infringe foreign sovereignty or jurisdiction. It cannot do so where the personal remedy granted does not affect the rights of third parties who are not subject to the jurisdiction. What would be objectionable would be for the court to make an order in personam against a person subject to the jurisdiction which affected the rights of

F   another person who was not subject to the jurisdiction; but that is not the present case.

        No objection to the order or subpoena can be founded on any rights of I.A.S. because (1) it is not only dissolved but has no assets or liabilities and, even if the right to confidentiality could vest in the Treasurer of the Bahamas as adjunct to some credit balance or other asset, it cannot be "property" in vacuo where there are no assets for the

G   confidentiality to protect. (2) I.A.S. would have to disclose the information sought and counterpart documents as a defendant if it had not brought about its own dissolution so any vestigial duty of confidence cannot relieve the bank from producing the documents. (3) The bank has not suggested that it is in fact under any conflicting legal obligation in New York.

H       The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters as cutting down the remedies open to litigants: all it sets out to do is to provide an orderly and mutual system for obtaining documents from persons not subject to the jurisdiction of the

488
Case 1:22-cv-05199-DLC    Document 202    Filed 06/24/26    Page 97 of 133
Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.    [1986]

applicant state but subject to the jurisdiction of the respondent state. It
would be highly inconvenient to treat it as substituting its own procedure
for existing powers to obtain documents from persons subject to the
jurisdiction of both the states in question.

The bank's reasoning has in fact been adopted in the United States
of America and taken to extreme lengths. Discovery against foreign
parties to litigation is now apparently limited to documents within the
jurisdiction and documents abroad can only be obtained under the
Convention. This development may explain the difference between the
attitudes of the New York courts in *United States v. First National City
Bank* (1968) 396 F. 2d 897 and the *Laker* case, 607 F.Supp. 324. That
reasoning has not yet been adopted here. Foreign defendants are
regularly compelled to give discovery of their overseas documents, for
example, orders have been made against the first two defendants in the
present case, and according to the relevant department of the court no
letters of request for documents only have yet been issued.

The court should regard the Hague Convention as providing a
procedure for cases where discovery and subpoena are not available and
should not refrain from granting those forms of relief against persons
who are subject to the jurisdiction unless (a) there is a real risk of a
clash with foreign sovereignty or jurisdiction or (b) third parties outside
the jurisdiction may be materially affected. That would be consistent
with *South Carolina Insurance Co. v. Assurantie Maatschappij "De
Zeven Provincien" N.V.* [1986] Q.B. 348 which is relied on for (a) the
explanation of the rule that procedure is governed by the lex fori (see at
pp. 355H, and 358B), (b) the indication that the court should use its
control of proceedings to assist in keeping down costs and in particular
minimising the need for recourse to other tribunals (see at pp. 358B–D)
and (c) the assumption that production of the documents in question
would have been compellable by subpoena if the possessors—not the
documents—had been within the jurisdiction (see at pp. 354H–355A).

Lord Wilberforce's comment in the *Westinghouse* case [1978] A.C.
547 about the Act of 1975 being more restrictive than the previous law
was only referring to the procedure for obtaining evidence from persons
not subject to the jurisdiction. He was not referring to the remedies
available against persons subject to the jurisdiction.

Our "mere witness" rule makes American subpoenas for pre-trial
discovery against non-parties objectionable not because they purport to
operate extra-territorially but because they represent relief not available
in English proceedings. That was a major factor in the *Westinghouse*
case: see the comments of Lord Diplock in *British Airways Board v.
Laker Airways Ltd.* [1985] A.C. 58, 78D. Hostility of the English courts
to that procedure has no bearing on the present problem, for here
Citibank is trying to resist a subpoena which would clearly lie against an
English bank for the production of English documents. In effect they say
that the duty of persons subject to the jurisdiction to assist the court as
witnesses does not apply to corporations with a domicile or second
residence outside the jurisdiction, or at any rate the duty does not
extend to information or documents of such a corporation outside the

A    jurisdiction. But the plaintiff has a positive right to extract the information and documents in question from anyone subject to the court's jurisdiction under the principle of *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R., 1274 which is an exception to the "mere witness" rule. In these circumstances there is a cause of action for discovery: see *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133; *Bankers Trust Co. v Shapira* [1980] 1 W.L.R. 1274 and

B    *London & Counties Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978, Templeman J. Compare *Cook Industries Inc. v. Galliher* [1979] Ch. 439 where the court made an order under this jurisdiction for the inspection of property in France. In these circumstances it goes without saying that the customer cannot object; the right to discovery is founded on the prima facie case of fraud against

C    the customer.

There is no objection on grounds of comity in the present case. Compare *In re Consolidated Rendering Co.* (1907) 66 Atl. 790; *United States v. First National City Bank,* 396 F. 2d 897 and the expert evidence as to New York law summarised in *X A.G. v. A Bank* [1983] 2 All E.R. 464, 472D–474F. Contrast *Reg. v. Grossman*, 73 Cr.App.R. 302 where the order was as objectionable as it could possibly be because it

D    was obtained after the Manx court had refused relief and it had been followed by a Manx injunction.

In fact the plaintiff is not seeking to obtain discovery from a non-party; the subpoena is part of the court's normal procedure and the order merely relieves the bank from bringing its original books to court. It is normal for the order to be obtained ex parte so far as the bank is

E    concerned; the remarks in the *Grossman* case were directed at the failure to notify the customer which does not arise in the present case since the customer has been dissolved. The procedure adopted does not deny Citibank the opportunity of claiming any protection which would be available to it in New York; it could have raised any such point on this application but has not done so.

There is no great constitutional issue raised of the kind suggested by

F    the bank. When the remedy sought is in personam the English court's writ does run abroad: compare *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676. The true principle at stake is the plaintiff's right to require any person subject to the jurisdiction to produce at the trial of his action any evidence which may assist the court to do justice between the parties. That principle should only be cut

G    down by a conflicting right and there is no such right asserted here but merely a nebulous and unfounded point of diplomatic principle or alleged conflict between the English and New York courts.

*Hirst,* in reply. The bank does not dispute that the court has jurisdiction over it as a result of its presence within the jurisdiction. The issue is whether the court should exercise the jurisdiction. In international law the United Kingdom has no jurisdiction over the bank in respect of

H    what it has or does outside the United Kingdom. This principle would be modified if the bank had duly been made a party to the litigation; but that is not the case, The English courts have been increasingly cautious about exercising jurisdiction of this kind. The *Norwich Pharmacal* case

[1974] A.C. 133 involving documents within the jurisdiction was an exceptional case. The *Bankers Trust* case [1980] 1 W.L.R. 1274 and the *London & Counties Securities* case (unreported), 26 May 1978, Templeman J. involved hot pursuit of missing funds. That did not arise in this case where the trail was cold.

*Cur. adv. vult.*

5 November. HOFFMANN J. read the following judgment. This motion raises a point of some importance to banks, especially foreign banks with branches in London. A plaintiff in an action before this court has served a subpoena and an order obtained ex parte under the Bankers' Books Evidence Act 1879 upon Citibank at its branch office in London. Citibank is a New York bank with its head office in Manhattan and with branches all over the world. It is not a party to the proceedings. The subpoena and the order require Citibank to produce books and other papers held at its head office in New York, relating to transactions which took place in New York on an account maintained there by a Bahamian company. Citibank has moved to set aside the subpoena and to discharge the ex parte order on the grounds that in principle it exceeds the international jurisdiction of this court and infringes the sovereignty of the United States.

The background to the motion is international fraud. Mr. Mackinnon, the plaintiff in the action, alleges that he has been swindled out of U.S. $250,000 by the two personal defendants, Mr. Alan Shepherd and Mr. Raymond Lanciault. He says that they pretended that through certain American and Hong Kong companies and a Liechtenstein foundation, they would procure for him a loan of U.S. $360 million to enable him to buy a property in Hong Kong. At their request he paid an advance fee of U.S. $250,000 into an account of International Advisory Services (1979) Ltd. ("I.A.S."), a Bahamian company represented by Mr. Lanciault, at Citibank, New York. In truth, says the plaintiff, there was never any intention or ability to procure a loan. The transaction was simply a scheme to defraud. His action is to recover the U.S. $250,000 and for damages. The trial is due to begin on the 25th of this month.

I.A.S. is named as a defendant in the writ and ordinarily would have had to disclose on discovery the documents or copy documents concerning the operation of its account with Citibank. This would have shown, for example, on whose authority the account was operated and what happened to the U.S. $250,000. Unfortunately, however, I.A.S. has ceased to exist. When an attempt was made in March 1985 to serve it with notice of the writ pursuant to leave granted under R.S.C., Ord. 11, it was found that on 26 January 1985 it had been struck off the Bahamian companies register under the Removal of Defunct Companies Act [c. 185 of the 1965 consolidation] and the Removal of Defunct Companies (Amendment) Act 1975. The file disclosed that this had been done at the request of the company's Bahamian directors on the ground that it had no assets or liabilities and was no longer operating.

The plaintiff therefore wishes to obtain the books and documents from Citibank itself. If Citibank did not have a branch in England, there

would be only two ways in which this could be done. The first and more orthodox route would be to apply to a master under R.S.C., Ord. 39 for the issue of letters of request to the courts of New York specifying the documents required to be produced. The United States and the United Kingdom are both parties to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters and, subject to any questions of privilege or public policy under New York law (compare section 3 of the Evidence (Proceedings in Other Jurisdictions) Act 1975) this court is entitled under the Convention to the assistance of the New York courts in obtaining evidence for the purposes of the pending action.

The second route is for the plaintiff to apply directly to a court in New York under provisions of United States or New York legislation. To adopt this course, the plaintiff would first have to obtain the leave of this court: see *South Carolina Insurance Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1986] Q.B. 348 and the defendants, who are not party to this motion, would be entitled to be heard on an application for leave. At the moment, however, I cannot see why, subject to any question of costs, the plaintiff should not obtain such leave if a direct application is likely to be more expeditious than letters of request. Citibank concede that the plaintiff has made out a strong case for the relevance of the documents and would be happy to produce them under the protection of an order of the New York court, whatever method may be used to obtain such an order.

It appears that in September 1985 the plaintiff's legal advisers surveyed the fruits of discovery from the various defendants and decided that they needed to obtain the documents in question from Citibank and also other American and Hong Kong documents relevant to the alleged fraud in the possession of the Chase Manhattan Bank and the Bank of America. With the trial two months away, an application for letters of request was thought to be too dilatory. Application was therefore made ex parte to the master for orders upon all three banks under section 7 of the Bankers' Books Evidence Act 1879 requiring, in the case of Citibank, that the plaintiff and his solicitors

"be at liberty to inspect and take copies of any entries in the books . . . relating to the sum of U.S. $250,000 paid on 24 October 1980 . . . to Citibank's [New York] office for the account of Investment Advisory Services (1979) Ltd. number 10776363 including any entries showing what has become of the said sum of $250,000."

The master made an order in those terms on 2 October 1985. Two days later, the plaintiff caused subpoenas ad testificandum and duces tecum to be issued to the three banks. In the case of Citibank the subpoena, as now amended, requires it to attend by its proper officer to give evidence on the part of the plaintiff and to produce by its proper officer

"all correspondence, drafts, cheques, vouchers, internal memoranda and any other documents or records or copies thereof relating to account number 10776363 with your head office in New York . . ."

Both the order and subpoena were directed to Citibank at its office at   A
336, The Strand, London, and served upon it there.

I conclude this recital of the facts by mentioning two matters. First,
so far as the subpoena ad testificandum is concerned, I was told that
there is an officer of Citibank now resident in England who may have
some knowledge of transactions on the account in question, though
probably not those in issue. There is no objection to his attendance
pursuant to the subpoena. The only objection is to production of the   B
documents in New York. Secondly, I was told that Chase Manhattan
Bank and Bank of America have complied with the orders and do not
object to compliance with the subpoenas.

Before turning to the matters in controversy, I should note two
points on which counsel were agreed. The first is that Citibank has locus
standi to bring this motion without being joined as a party to the action.   C
In the case of a subpoena there is no doubt that the person served may
apply to have it set aside, in this division by summons to the master or
motion to the judge. The Bankers' Books Evidence Act 1879 was, as
Bankes L.J. said in *Waterhouse v. Barker* [1924] 2 K.B.759, 763:

> "passed in the interest of bankers in order to prevent interference
> with their business, and needless expense and trouble, and to   D
> facilitate the giving in evidence of relevant material contained in
> their books."

An order under section 7 of the Act therefore has strong analogies with
a subpoena, tailored to meet the convenience of banks. It would be
illogical if the bank had no locus standi to apply to discharge it. In *Reg.*   E
*v. Grossman* (1981) 73 Cr.App.R. 302 a customer who wished to
discharge an ex parte order made upon its bank went to the lengths of
applying to be joined as a party and then appealing to the Court of
Appeal (Civil Division). Quite apart from the fact that the proceedings
in that case were criminal and that the Court of Appeal, therefore, had
no jurisdiction (see *Bonalumi v. Secretary of State for the Home*
*Department* [1985] Q.B. 675), the procedure there adopted seems to   F
offend against the rule that no appeal may be brought against an order
made ex parte until an application to discharge it has been made under
R.S.C., Ord. 32, r. 6 to the judge who granted the order: see *WEA*
*Records Ltd. v. Visions Channel 4 Ltd.* [1983] 1 W.L.R. 721. It is true
that the applicant in *Grossman's* case, 73 Cr.App.R. 302 was the
customer rather than the bank itself. Nevertheless, if any person affected   G
may apply to discharge an injunction (see *Halsbury's Laws of England,*
4th ed., vol. 24 (1979), para. 1111), I do not see why the same should
not be true of an order under the Bankers' Books Evidence Act 1879.

The analogy between an order under the Act and a subpoena leads
to the other point on which counsel were agreed, namely, that for the
purposes of the jurisdictional point I have to consider no distinction can
be drawn between the order and the subpoena. If it would be improper   H
to require production of the New York documents by subpoena, it could
not be proper to require their inspection and copying by order under the
Act.

A          The argument in support of the subpoena and order by Mr. McDonnell, for the plaintiff, is simple. Citibank carries on business in London. It has complied with the provisions of section 691 of the Companies Act 1985 by registering, inter alia, the names and addresses of persons resident within the jurisdiction authorised to accept service of process on the bank's behalf. It has applied for and obtained the privileges of recognition as a bank by the Bank of England under the

B    Banking Act 1979. Citibank has therefore submitted itself to the jurisdiction of the English court. It follows that it can be required to comply with a subpoena in the same way as an English company. Unless there is some good reason for non-production, for example, that production would be unlawful by the law of the place where the documents are kept, the fact that the documents in question happen to

C    be out of the jurisdiction is no reason for discharging the subpoena.
          I think that this argument confuses personal jurisdiction, i.e., who can be brought before the court, with subject matter jurisdiction, i.e., to what extent the court can claim to regulate the conduct of those persons. It does not follow from the fact that a person is within the jurisdiction and liable to be served with process that there is no territorial limit to the matters upon which the court may properly apply its own rules or

D    the things which it can order such a person to do. As Dr. Mann observed in a leading article, "The Doctrine of Jurisdiction in International Law," (1964) 111 Recueil des cours 146:

          "The mere fact that a state's judicial or administrative agencies are internationally entitled to subject a person to their personal or 'curial' jurisdiction does not by any means permit them to regulate

E          by their orders such person's conduct abroad. This they may do only if the state of the forum also has substantive jurisdiction to regulate conduct in the manner defined in the order. In other words, for the purpose of justifying, even in the territory of the forum, the international validity of an order, not only its making, but also its content must be authorised by substantive rules of

F          legislative jurisdiction."

See also by the same author "The Doctrine of International Jurisdiction Revisited after Twenty Years," (1984) 196 Recueil des cours 9, 19.
          The content of the subpoena and order is to require the production by a non-party of documents outside the jurisdiction concerning business which it has transacted outside the jurisdiction. In principle and on

G    authority it seems to me that the court should not, save in exceptional circumstances, impose such a requirement upon a foreigner, and, in particular, upon a foreign bank. The principle is that a state should refrain from demanding obedience to its sovereign authority by foreigners in respect of their conduct outside the jurisdiction. It is perhaps ironic that the most frequent insistence upon this principle by Her Majesty's Government has been as a result of its violation by the courts and

H    government agencies of the United States. In particular, Her Majesty's Government has on several occasions objected to the application by United States courts and agencies of the United States antitrust laws to British companies in respect of their conduct outside the United States.

It has also objected to demands made upon such companies for the production of documents situated outside the United States and concerned with transactions taking place abroad: see the submissions for the Crown in *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (No. 1 and No. 2)* [1978] A.C. 547, 589.

Similarly in *X A.G. v. A Bank* [1983] 2 All E.R. 464, the United States department of justice issued a subpoena to a New York bank requiring it to produce to a New York grand jury the documents relating to the accounts maintained at its London branch by two Swiss companies, one having a major branch in New York, and a Panamanian corporation resident in Switzerland. An order for the enforcement of this subpoena was made by a New York court. Leggatt J. described the order, at p. 480, as "the exercise by the United States court in London of powers which, by English standards, would be regarded as excessive . . ." Conversely, it seems to me that the subpoena and order in this case, taking effect in New York, are an infringement of the sovereignty of the United States. The need to exercise the court's jurisdiction with due regard to the sovereignty of others is particularly important in the case of banks. Banks are in a special position because their documents are concerned not only with their own business but with that of their customers. They will owe their customers a duty of confidence regulated by the law of the country where the account is kept. That duty is in some countries reinforced by criminal sanctions and sometimes by "blocking statutes" which specifically forbid the bank to provide information for the purpose of foreign legal proceedings: compare section 2 of our Protection of Trading Interests Act 1980. If every country where a bank happened to carry on business asserted a right to require that bank to produce documents relating to accounts kept in any other such country, banks would be in the unhappy position of being forced to submit to whichever sovereign was able to apply the greatest pressure.

I have stated the principle as being a self-imposed limitation upon a state's sovereign authority and I must clarify this concept by distinguishing certain other cases relied on by Mr. McDonnell. First, I am not concerned with the enforcement of private rights arising out of matters properly subject to the jurisdiction of the court. For example, a foreigner may have agreed by a contract over which the court has jurisdiction to perform various acts abroad. There can be no objection in principle to the enforcement of those rights by injunction or specific performance, even though this requires the performance of acts abroad: see *British South Africa Co. v. De Beers Consolidated Mines Ltd.* [1910] 2 Ch. 502; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676. But a subpoena does not involve the enforcement of a private right. It is an exercise of sovereign authority to require citizens and foreigners within the jurisdiction to assist in the administration of justice.

Secondly, I am not concerned with the discovery required by R.S.C., Ord. 24 from ordinary parties to English litigation who happen to be foreigners. If you join the game you must play according to the local rules. This applies not only to plaintiffs but also to defendants who give

Case 1:22-cv-05199-DLC    Document 202    Filed 06/24/26    Page 104 of 133

1 Ch.              Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.        Hoffmann J.

notice of intention to defend. The recent decision of the Court of Appeal in the *South Carolina Insurance Co.* case [1986] Q.B. 348 shows that adherence to local rules requires also forbearance from taking advantage of more advantageous rules available elsewhere. Of course, a party may be excused from having to produce a document on the grounds that this would violate the law of the place where the document is kept: compare *Société Internationale pour Participations Industrielles et Commerciales S.A. v. Rogers* (1958) 357 U.S. 197. But, in principle, there is no reason why he should not have to produce all discoverable documents wherever they are.

The authority most in point and upon which Mr. Hirst for the bank mainly relied is the decision of the Court of Appeal (Civil Division) in *Reg. v. Grossman*, 73 Cr.App.R. 302. The fact that this decision was given per incuriam without jurisdiction does not detract from its authority on the matters now in issue. It concerned the propriety of an order made ex parte under section 7 of the Bankers' Books Evidence Act 1879 on Barclays Bank Ltd. at its head office in London requiring it to allow the Inland Revenue to inspect and take copies of an account maintained by Savings and Investment Bank Ltd., an Isle of Man company, with Barclays Bank's branch in the Isle of Man. The evidence was required for the purpose of a prosecution for tax evasion pending against Mr. Grossman before a criminal court in Wales. It appears that an application for a similar order had previously been made to the court in the Isle of Man and had been refused. Lord Denning M.R. held that the order should not have been made. He said, at pp. 307–308:

> "I think that the branch of Barclays Bank in Douglas, Isle of Man, should be considered in the same way as a branch of the Bank of Ireland or an American bank, or any other bank in the Isle of Man which is not subject to our jurisdiction. The branch of Barclays Bank in Douglas, Isle of Man, should be considered as a different entity separate from the head office in London. It is subject to the laws and regulations of the Isle of Man. It is licensed by the Isle of Man government. It has its customers there who are subject to the Manx laws. It seems to me that the court here ought not in its discretion to make an order against the head office here in respect of the books of the branch in the Isle of Man in regard to the customers of that branch. It would not be right to compel the branch—or its customers—to open their books or to reveal their confidences in support of legal proceedings in Wales. Any order in respect of the production of the books ought to be made by the courts of the Isle of Man—if they will make such an order. It ought not to be made by these courts. Otherwise there would be danger of a conflict of jurisdictions between the High Court here and the courts of the Isle of Man. That is a conflict which we must always avoid. . . . It seems to me that, although this court has jurisdiction to order the head office here to produce the books, in our discretion it should not be done."

Shaw L.J. agreed with Lord Denning M.R. and mentioned, as Lord Denning M.R. had done before the passage I have cited, that since the ex

parte order the court in the Isle of Man had actually granted an injunction restraining Barclays Bank from disclosing the books. Oliver L.J. said that an order to inspect the account of a foreign customer maintained with a foreign branch of an English bank was "a very strong thing to seek." He went on, at p. 309:

A

"The English court is asked to order, because of the fortuitous fact that the head office of Barclays Bank is situated in this country, the disclosure of a foreign banker's account maintained at a foreign branch of Barclays Bank. That is sought in the face of a subsisting injunction of a court of competent jurisdiction in the Isle of Man . . . I do not say that an order in such unusual circumstances can never be made, but it would I think be one which ought to be made only on a case very much stronger than that which the Inland Revenue have been able to deploy . . ."

B

C

Mr. Hirst rightly points out that in two respects this is an a fortiori case. Barclays was at least an English bank whereas Citibank is foreign. International law generally recognises the right of a state to regulate the conduct of its own nationals even outside its jurisdiction, provided that this does not involve disobedience to the local law. But banks, as I have already said, are in a special position. The nature of banking business is such that if an English court invokes its jurisdiction even over an English bank in respect of an account at a branch abroad, there is a strong likelihood of conflict with the bank's duties to its customer under the local law. It is therefore not surprising that any bank, whether English or foreign, should as a general rule be entitled to the protection of an order of the foreign court before it is required to disclose documents kept at a branch or head office abroad.

D

E

Secondly, Mr. Hirst says that in *Reg. v. Grossman*, 73 Cr.App.R. 302 there was no other way to obtain the documents. The court of the Isle of Man had refused to order production. In this case there are, as I have mentioned, two methods by which the documents could be obtained without infringing United States sovereignty and without depriving Citibank of the protection of a New York order. Mr. Hirst submits that as between states which are party to the Hague Convention or similar bilateral treaties, evidence should ordinarily be obtained only by the methods prescribed or permitted in the convention. He referred me to a recent decision of the New York Federal District Court in *Laker Airways Ltd. v. Pan American World Airways* (1985) 607 F.Supp. 324 in which Brieant J. quashed a subpoena served on two English banks at their New York offices requiring them to produce documents held in England relating to transactions which took place in England. Brieant J., held that this was in principle "inappropriate" and also constituted "an end run . . . around the Hague Convention." This decision shows a welcome revival in a United States court of sensitivity to foreign sovereign interests and I accept Mr. Hirst's submission that its reasoning applies equally to this case.

F

G

H

Mr. McDonnell argued that *Reg. v. Grossman*, 73 Cr.App.R. 302 was distinguishable on two grounds. First, compliance with the order would have been unlawful by the law of the Isle of Man whereas in this

497
Case 1:22-cv-05199-DLC   v.   Document 202   Filed 06/24/26   Page 106 of 133
1 Ch.        Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.        Hoffmann J.

case there is no suggestion that disclosure would violate any law of New York. Likewise, in *Laker Airways Ltd. v. Pan American World Airways,* 607 F.Supp. 324 Brieant J. said that failure to use the Hague Convention was "more than a mere technicality" because production of the documents had been made unlawful in English law by orders made under the Protection of Trading Interests Act 1980. Secondly, the customer in *Grossman's* case, 73 Cr.App.R. 302 was a foreign company not party to the proceedings whereas in this case the customer, though Bahamian by incorporation, appears at some stage to have carried on business in London and would, if it had not ceased to exist, be a party to the action.

It seems to me that *Grossman's* case decides that an order in respect of documents held at a bank's foreign branch or head office should not be made save in very exceptional circumstances. Matters of the kind mentioned by Mr. McDonnell may be relevant in deciding whether or not to make an order in exceptional circumstances but do not affect the general principle. In *Grossman's* case Shaw and Oliver L.JJ. also said that although the Bankers' Books Evidence Act 1879 allowed an application to be made ex parte, where the accounts of third parties were affected the application should ordinarily be made upon notice to the customer. In this case, notice could not be given to the customer and application was therefore made ex parte. Mr. McDonnell said that there could be no prejudice to the bank if it was served with the order and left to apply to discharge it if it objected to compliance. But I think that orders concerned with documents outside the jurisdiction are so unusual that they should ordinarily be made on notice to the bank so as to give the bank full opportunity to investigate the position in the foreign jurisdiction.

Before turning to the question of whether such exceptional circumstances exist in this case, I must address another argument advanced by Mr. McDonnell. On the particular facts of this case, he says, the order and subpoena seeking information about the I.A.S. account should be equated to ordinary discovery against a defendant. It follows that in accordance with the general rules of discovery, production should be ordered unless there are grounds on which it should be excused. The basis of this submission is that under the rule in *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] A.C. 133, as extended by the Court of Appeal in *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, the plaintiff would be entitled to join Citibank as a defendant and demand discovery of the documents in question in order to be able to trace the proceeds of his U.S. $250,000. Mr. Hirst agreed that for the purpose of deciding this point I should deal with the matter as if there was a motion before me to join Citibank as a defendant and require production of the documents by way of *Bankers Trust Co.* discovery. The *Bankers Trust Co.* case establishes the jurisdiction of the court to order a bank to give discovery of documents relating to a customer's account when there is, in the words of Lord Denning M.R., at p. 1282:

> "a good ground for thinking the money in the bank is the plaintiff's money—as, for instance, when the customer has got the money by

fraud—or other wrongdoing—and paid it into his account at the    A
bank."

The purpose of the discovery is to trace the money and find out what
has happened to it. This jurisdiction is in turn founded on the principle
disinterred by the House of Lords in the *Norwich Pharmacal* case [1974]
A.C. 133 and formulated as follows by Lord Reid, at p. 175:

"if through no fault of his own a person gets mixed up in the    B
tortious acts of others so as to facilitate their wrong-doing he may
incur no personal liability but he comes under a duty to assist the
person who has been wronged by giving him full information and
disclosing the identity of wrongdoers."

The *Norwich Pharmacal* case is therefore an exceptional case in which a
bank can be named as a defendant solely for the purpose of obtaining    C
discovery and without there being any cause of action against it.

It seems to me that for the purposes of the jurisdictional rules now
under consideration, the *Norwich Pharmacal* case is much more akin to
the subpoena directed to a witness than the discovery required of an
ordinary defendant. It is a general duty imposed upon persons who
become "mixed up" in tortious acts to produce evidence and documents    D
*before trial* comparable with the general duty upon all persons who have
relevant knowledge or documents to give evidence *at the trial*. It is,
therefore, also an exercise of sovereign authority and not merely a
condition of being allowed to take part as plaintiff or defendant in an
English trial. In the United States there is a general right to discovery
from third parties but the fact that this process is characterised as
discovery does not alter its nature for the purposes of international    E
jurisdiction. In addition, the policy grounds for the restraint enjoined in
*Reg. v. Grossman*, 73 Cr.App.R. 302 apply with equal force to discovery
under *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274.

In *Bankers Trust Co. v. Shapira* the order was made against an
English bank in respect of an account maintained in London. The
question of international jurisdiction was not considered. However, in    F
one of the cases cited by the Court of Appeal, *London and County
Securities Ltd. (In Liquidation) v. Caplan* (unreported), 26 May 1978,
Templeman J. had ordered an English bank to procure from its foreign
banking subsidiaries documents relating to accounts connected with the
defendant in order to trace assets which he was said to have embezzled.
Templeman J. described the relief which he was granting as "onerous
and . . . to be granted only in the most exceptional circumstances." The    G
exceptional circumstances were that the case was one of crime and fraud
where "unless effective relief is granted, justice may well become
impossible because the evidence and the fruits of crime and fraud may
disappear." The foreign subsidiary banks were indemnified against
liability in damages under the local law by the cross-undertaking in
damages and the infringement of sovereignty was excused by a    H
commercial equivalent of hot pursuit.

In my judgment, the authorities on *Bankers Trust Co. v. Shapira*
[1980] 1 W.L.R. 1274 discovery against a bank are consistent with what
seems to me to be correct in principle, namely, that its international

Case 1:22-cv-05199-DLC   Document 202   Filed 06/24/26   Page 108 of 133
499
1 Ch.       Mackinnon v. Donaldson, Lufkin and Jenrette Corpn.    Hoffmann J.

A    jurisdictional limits are the same as those of a subpoena duces tecum or an order under the Bankers' Books Evidence Act 1879.

I therefore come finally to the question of whether this can be regarded as an exceptional case justifying the making of an exorbitant order. It does have at least one very unusual feature, namely, that the customer to whom any duty of confidence is likely to be owed under New York law has ceased to exist. It is true that under the Bahamian
B    Removal of Defunct Companies Act the assets of a dissolved company vest in the treasurer of the Bahamas. But the company had no other assets or liabilities and the possibility that the treasurer may assert a right of confidence in gross in the courts of New York is somewhat improbable. Compliance with the order is therefore highly unlikely to involve Citibank in any civil liability in New York and the plaintiff
C    through Mr. McDonnell has offered to indemnify Citibank by way of undertaking in damages against any which may arise. There is no suggestion that compliance would in any other respect be unlawful by New York law and, as I have noted, Chase Manhattan and Bank of America have felt able to comply with similar orders. It is accepted that documents are needed for the purposes of the trial which will shortly take place.
D    On the other hand, I think that it would be wrong to undertake a process of weighing the interests of this country in the administration of justice and the interests of litigants before its courts against those of the United States. As appears from the evidence before Leggatt J. in *X A.G. v. A Bank* [1983] 2 All E.R. 464 this is an exercise which has frequently been undertaken by the courts of the United States. It is extremely difficult to perform in a way which carries conviction outside
E    the forum. Distinguished American commentators as well as foreign observers have not failed to notice that the balance invariably comes down in favour of the interests of the United States. It is equally hard for a court in this country, with a duty to administer justice here, to put objectively into the scales the interests of a foreign country in the integrity of its sovereignty over persons or transactions within its
F    jurisdiction. It is likewise inappropriate to decide the matter on a balance of convenience between the plaintiff and the bank. It seems to me that in a case like this, where alternative legitimate procedures are available, an infringement of sovereignty can seldom be justified except perhaps on the grounds of urgent necessity relied upon by Templeman J. in the *London and County Securities Ltd. v. Caplan* (unreported).
G    If this matter had come before me in September 1985, I would have had no hesitation in saying that the subpoena and order should be discharged and that the plaintiff should make application, directly or indirectly, to the courts of New York. There is no question here of hot pursuit. The money has almost certainly been long ago spirited away. But I have anxiously considered whether to make an exceptional order on the grounds that there is now little time before trial. The difficulty is
H    that the plaintiff has no satisfactory explanation for why he has left it so late. The relevance and importance of the documents concerning the Citibank account must have been known from the commencement of the proceedings. The plaintiff has known since March 1985 that I.A.S. has

been struck off. I am told that the file relating to the striking off was
mislaid by the Bahamian authorities and was not recovered until
recently, but the affidavit of the plaintiff's solicitor in support of his ex
parte application says unequivocally that he learned in March that
I.A.S. had been struck off. It must have been obvious that the prospects
of getting these documents by ordinary discovery were not high.

Equally, I am not satisfied that even now it will not be possible to
obtain the documents before trial from the New York court. A motion
for leave to apply directly under United States or New York legislation
can be brought on two clear days' notice. I would be willing, if asked, to
abridge even this period. Citibank have said that they are willing to co-
operate in obtaining an appropriate New York order as quickly as
possible. In those circumstances, I think that I should exercise my
discretion by following the principle stated in *Reg. v. Grossman,* 73
Cr.App.R. 302 and discharge the order and subpoena.

*Order accordingly.*

Solicitors: *Coward Chance; Compton Carr.*

T. C. C. B.

---

## LUCAS INDUSTRIES PLC. v. WELSH DEVELOPMENT AGENCY

[1986 W. No. 800]

1986   March 4; 21                            Sir Nicolas Browne-Wilkinson V.-C.

> *Arbitration—Award—Appeal—Application for leave to appeal—Rent
> review arbitration—Principles applicable to grant of leave—
> Whether leave to be granted—Arbitration Act 1979 (c. 42),
> s. 1(4)*[1]
> *Landlord and Tenant—Rent—Review—Arbitration to determine review
> rent—No terms specified for letting to hypothetical tenant—
> Arbitrator's award based on new form of lease—Less restrictive
> than tenant's existing lease—Tenant's application for leave to
> appeal—Whether to be granted—Arbitration Act 1979 (c. 42),
> s. 1(4)*

> In deciding whether to grant leave to appeal against an
> arbitrator's decision on a rent review clause in a lease, the
> guidelines for granting leave to appeal against the decision of a

---

[1] Arbitration Act 1979, s. 1(4): see post, p. 503c.

# Annexe 7



[2023] EWHC 2173 (Ch)

**IN THE HIGH COURT OF JUSTICE**                    **Claim No. BL-2022-001711**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**
**B E T W E E N :**

Date: 30 August 2023

**Before** :

**James Pickering KC**
**(sitting as a Deputy High Court Judge)**
- - - - - - - - - - - - - - - - - - - -
**Between :**

**(1) DANIEL CARLOS SCENNA**

**(2) HOST GROWTH INC (a company registered in Ontario)**        **Claimants**

**And**

**(1) PERSONS UNKNOWN USING THE IDENTITY "NANCY CHEN"**

**(2) PERSONS UNKNOWN USING THE IDENTITY "VERA"**

**(3) PION MARKET LTD (a company incorporated in England)**

**(4) QS TRADING LTD (a company incorporated in Hong Kong)**

**(5) WIN FY PTY LTD (a company incorporated in Australia)**

**(6) TECO INDUSTRIAL PTY LTD (a company incorporated in Australia)**

**(7) AUSTRALIA AND NEW ZEALAND BANKING GROUP LTD**

**(a company incorporated in Australia)**

**(8) WESTPAC BANKING CORPORATION (a company incorporated in Australia)**

**(9) DAH SING BANK LTD (a company incorporated in Hong Kong)**        **Defendants**

1

- - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - -

**Celso De Azevedo** (instructed by **Giambrone & Partners LLP)** for the **Claimants**
**Edward Harrison** (instructed by **Farrer & Co LLP)** for the **Seventh Defendant**
**Edward Levey KC (**instructed by **Herbert Smith Freehills LLP**) for the **Eighth Defendant**

**Hearing date:** 9 June 2023

- - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

.............................

**James Pickering KC (sitting as a Deputy High Court Judge):**

## Introduction

1. On 5 April 2023, I delivered my substantive judgment in the above matter. That judgment was essentially in favour of the Seventh and Eighth Defendant Banks ("**the Banks**").

2. On 9 June 2023, the consequentials hearing took place. At that consequentials hearing, amongst other things, I decided that the Claimants should pay the Banks' costs of the Disclosure Applications on the indemnity basis and of all other matters, including the Jurisdiction Applications, on the standard basis.

3. I further decided that, rather than make an order for detailed assessment together with a payment on account, the above costs should be summarily assessed. Unfortunately, however, there was insufficient time for that summary assessment to take place there and then as a result of which I gave directions for brief written submissions. In due course, I received those written submissions for which I am grateful.

2

**The relevant principles**

4.    A number of principles were outlined to me in argument. None was controversial but they are worth briefly re-stating here.

**(a) The difference between assessment on the standard and indemnity bases**

5.    Whether the costs are to be assessed on the standard basis or an indemnity basis, the court will not allow costs which have been unreasonably incurred or are unreasonable in amount: CPR 44.3(1).

6.    When such assessment is to take place on the standard basis, the court will (a) only allow costs which are proportionate to the matters in issue; and (b) resolve any doubt which it may have as to whether costs were reasonably and proportionately incurred or were reasonable and proportionate in amount in favour of the paying party: CPR 44.3(2).

7.    By contrast, when assessing costs on the indemnity basis, (a) any doubt as to whether any costs were reasonably incurred or were reasonable in amount is to be decided in the receiving party's favour, and (b) proportionality is not a relevant consideration: CPR r. 44.3(3)[1].

**(b) The difference between summary assessment and detailed assessment**

8.    A detailed assessment will generally involve a line by line billing exercise.

9.    By contrast, where a summary assessment is to take place, a broad brush approach is to be adopted: ***Brake v Guy*** [2022] EWHC 2907 (Ch) at [26-27]; ***Football Association Premier League v The Lord Chancellor*** [2021] EWHC 1001 (QB) at [20].

**(c) The relevance of the paying party's costs**

---

[1] See also *Guide to the Summary Assessment of Costs* (2021 edition) at paragraph 13.

10.    I also take on board that when summarily assessing the costs that a receiving party is to receive, the costs incurred by the paying party may be relevant (albeit not determinative) when considering the reasonableness and proportionality of the receiving party's costs: *Malmsten v Bohinc* [2019] EWHC 1386 (Ch) at [69(3)].

**The amount of costs sought**

11.    The starting point when summarily assessing costs is to consider the amount of costs being claimed by the receiving party as set out in the relevant costs schedules (and as verified by the relevant solicitors in each case).

12.    In the present case, the costs claimed by the (receiving) Banks can be summarised as follows:

**The Seventh Defendant:**

| Application | Amount Claimed |
|---|---|
| Disclosure Order Application | £160,835.78 |
| Jurisdiction Application | £58,647.53 |
| Costs Application | £7,371.75 |
| Post-hearing Costs | £15,826.00 |
| **Total** | **£242,681.06** |

**The Eighth Defendant:**

| Application | Amount Claimed |
|---|---|
| Disclosure Order Application | £103,929.06 |
| Jurisdiction Application | £35,803.09 |
| Costs Application | £3,946.08 |
| Post-hearing Costs | £16,710.01 |
| **Total** | **£160,388.24** |

4

13. Given their potential relevance, I note here that the costs incurred by the (paying) Claimants can be summarised (with similar but not identical categorisation) as follows:

| Application | Amount Claimed |
| --- | --- |
| Disclosure Order Application | £28,025.00 |
| Jurisdiction + Injunction Applications | £23,225.00 |
| **Total** | **£51,250** |

**The Claimants' complaints**

14. The Claimants' challenge the above level of costs sought on a number of broad bases. In short, so the Claimants say:

(1) The **hourly rates** charged by the solicitors in each case are too high. In particular, the Banks should be restricted to claiming solicitors' costs on the London Band 2 rate (as opposed to at a figure in excess of the London Band 1).

(2) There has been unnecessary **duplication** of work between Grade A and Grade B fee earners for the same tasks.

(3) The **length of time** spent on each task was unnecessary.

(4) **Counsel's fees** are "exceedingly high".

15. I will consider each of these complaints in turn.

**Discussion**

**(a) Hourly rates**

16. The *Guide to the Summary Assessment of Costs (2021 Edition)* provides guideline hourly rates which are described as being "broad approximations"[2] and "a starting point

---

[2] Paragraph 27

for those faced with summary assessment"[3]. For Grade A solicitors, the hourly rate given is £373 for London 2 rising to £512 for London 1. For Grade B solicitors, it is £289 for London 2 rising to £348 for London 1. In this context, London 2 relates to certain central London postcodes, while London 1 relates to "very heavy commercial and corporate work by centrally based London firms"[4].

17.   In the present case, the Seventh Defendant Bank's most senior fee earners have been charged out at £550 (Grade A) and £395 (Grade B) per hour, while the Eighth Defendant Bank's most senior fee earners have charged out at £668 (Grade A) and £550 (Grade B) per hour. In short, therefore, the hourly rates for the above senior fee earners are in each case higher than London 1 rated cases and quite significantly higher than London 2 rated cases.

18.   The present case undoubtedly involved a degree of complexity, a degree of urgency and, of course, an international element. Having said that, the various applications were all dealt with within a single day. Overall, while I fully understand why the Banks' solicitors charged (and the Banks were prepared to pay) at the above charge out rates, I am not persuaded that the present matter is the sort of matter which should be considered to be London 1. It seems to me that the appropriate starting point (for that is all the guideline rates are) are the London 2 rates and that the fees claimed by the Banks are accordingly significantly higher than that starting point.

**(b) Duplication/Length of time**

19.   The next two complaints raised by the Claimants relate to what is suggested to be duplication as a result of different fee earners carrying out the same tasks and the length of time spent on each task. It seems to me that they can be conveniently considered together.

20.   It is right to say (as the Banks have done) that the above complaints have not been particularised let alone targeted in respect of any particular item but instead are made

---

[3] Paragraph 28
[4] Appendix 2

as against all items contained in the costs schedules as a whole. Nothing turns on this, however, as I have of course been provided with the costs schedules and have been able to consider the relevant breakdowns in each case.

21.    Again, while I can fully understand why work was carried out by various senior fee earners – and why that work was carried out thoroughly and extensively - it does seem to me that there is something in the Claimants' points and that, adopting a broad brush approach, some of the costs incurred by the Banks cannot be said – for the purposes of the current exercise - to have been reasonably incurred.

**(c) Counsel's fees**

22.    The final complaint by the Claimants is directed at counsel's fees. The Banks' respective counsel were outstanding throughout and no doubt – as between themselves and the Banks – were worth every penny. I do have to bear in mind, however, that there was overlap between the various applications and while therefore individually each brief fee may seem reasonable, when considered together for the purposes of a single one day hearing, again I agree with the Claimants that the same were on the high side.

**(d) The relevance of the Claimants' own costs schedules**

23.    As observed above, the Claimants' own costs schedules total was significantly less than those of the Banks (some £242,681.06 and £160,388.24 for the Banks compared to £51,250 for the Claimants). While the above comparison is of some use, ultimately the relevance of the Claimants' own costs schedules is somewhat limited since it is not comparing like with like: the Claimants' costs schedules quite properly excluded the not insubstantial work undertaken prior to the ex parte hearing; by contrast, the Banks each had somewhat of a standing start.

**Determination**

24.    Overall, therefore, adopting a broad brush approach, it seems to me that the fair assessment of costs taking into account all of the above matters is as follows:

**The Seventh Defendant:**

| Application | Amount Claimed | Basis | Determination |
|---|---|---|---|
| Disclosure Order Application | £160,835.78 | Indemnity | £110,000 |
| Jurisdiction Application | £58,647.53 | Standard | £30,000 |
| Costs Application | £7,371.75 | Standard | £5,000 |
| Post-hearing Costs | £15,826.00 | Standard | £12,000 |
| **Total** | **£242,681.06** | | **£157,000** |

**The Eighth Defendant:**

| Application | Amount Claimed | Basis | Determination |
|---|---|---|---|
| Disclosure Order Application | £103,929.06 | Indemnity | £74,000 |
| Jurisdiction Application | £35,803.09 | Standard | £21,000 |
| Costs Application | £3,946.08 | Standard | £3,000 |
| Post-hearing Costs | £16,710.01 | Standard | £12,000 |
| **Total** | **£160,388.24** | | **£110,000** |

### **Timing**

26. By CPR 44.7, summarily assessed costs are to be paid within 14 days unless the court orders otherwise. Where a party wishes the court to make an order for such costs to be paid other than within the above 14 day period (either longer or shorter), it is of course for that party to persuade the court why it should depart from the above general rule.

27. In the present case, the Claimants invite me to allow them 35 days to pay the above costs – a departure from the general rule which the Banks both resist.

28. If it had been possible to deal with costs at the consequentials hearing, I would no doubt have explored with the Claimants why the above additional time was required. As stated above, however, it was not possible to so deal with costs and, as a result, more than 35 days have passed since that hearing. In those circumstances, the Claimants have already

had (more than) the time requested to make the necessary payment (the order of which, if not the precise sums, has been known to the Claimants for some time).

29.  In the above circumstances, I decline to depart from the general rule and order the costs which I have just summarily assessed to be paid within 14 days of the making of this order.

**Conclusion**

30.  In conclusion, therefore, I order the Claimants to pay the Seventh Defendant Bank the sum of £157,000 and the Eighth Defendant Bank the sum of £110,000, in each case within 14 days of the making of this order.

**JPKC**

**August 2023**

# Annexe 8



Sunderland v Barclays Bank Limited

Overview (1938)  |  **5 LDAB 163,**  |  (1938) Times, 25 November

# SUNDERLAND v BARCLAYS BANK LIMITED 5 LDAB 163

IN THE KING'S BENCH DIVISION

Reported: The Times, November 25, 1938

(DU PARCQ, L.J.)

(November 24, 1938)

**Banker and customer — contract — obligation of secrecy — breach.**

THE plaintiff had drawn a cheque, in favour of her dressmaker, which was dishonoured by the defendants. Although there were not sufficient funds on the account to meet the cheque, the real reason for the dishonour was that Mrs. Sunderland had indulged in betting operations and, presumably, the manager felt that it would be unwise to grant her an overdraft for the purpose of meeting the cheque. The plaintiff complained to her husband of the return of the cheque, and in the course of a telephonic conversation between the husband and the bank, the manager informed him that most of the cheques which had passed through his wife's account were drawn to bookmakers. This statement Mrs. Sunderland regarded as a breach of the bank's duty to maintain secrecy concerning her affairs. The bank pleaded, in defence, that the telephonic conversation with the husband resulted from, and was a continuation of, one with the wife, and that it was at the latter's request that an explanation was given to the husband for the return of the cheque; that, consequently, the bank had implied authority for the statement concerning the nature of the operations on the account.

Du PARCQ, L.J., giving judgment, said that Mrs. Sunderland had drawn a small cheque in favour of her dressmaker, having overlooked the fact that she had not enough money in the bank to meet it.

There was enough guidance for the present decision to be obtained from *Tournier v National Provincial and Union Bank of England* ([1924] 1 KB 461).

He was anxious not to say one word more than was necessary for the decision of the present case, as each case must depend on its own facts. Here a bank manager was talking to the husband of a customer when he had just been talking to the customer herself. She had relinquished the telephone in favour of her husband, who then took over the conversation.

It would be ridiculous to say that no importance attached to the fact that the relationship of husband and wife subsisted here. It was no doubt true that to say that husband and wife were one was, as Maule, J. said in 1853 in *Wenman v Ash* (13 CB 836, 844), "a strong figurative expression" which could not be so dealt with as that all the consequences must follow which would result from its being literally true. But there was no other relationship like that of husband and wife living together in amity. They might say things to each other which no court would compel either of them to disclose as being statements about the other.

SUNDERLAND v BARCLAYS BANK LIMITED 5 LDAB 163

Society still expected a husband to act as his wife's adviser and protector, but there were things about which any bank or professional person bound by professional confidence would know must not be said to one spouse about the other. On the other hand, there were many things which a doctor, for example, would not repeat to anyone else, but would not hesitate to repeat to a husband about his wife or *vice versa*.

The bank's manager having impliedly received a demand for an explanation of what seemed to Dr. Sunderland to be discourteous conduct on the part of the bank, he (his Lordship) could not think that the manager was not entitled in such circumstances to give the information which explained what the bank, rightly or wrongly, had done. He (his Lordship) thought that in the present case the interests of the bank required disclosure, and that it might be said that the disclosure was made with the implied consent of the customer. He did not wish to be understood to mean by that that the plaintiff intended to authorize the bank to tell her husband that, but he thought that, the husband having taken over the conduct of the matter, the manager was justified in thinking that the wife did not object to his offering to the husband the explanation which might satisfy the husband that the complaint made was unjustified. Accordingly there must be judgment for the defendants. If his judgment had been for the plaintiff he would have awarded her 40s. nominal damages.

## Note.

In the course of his judgment in *Tournier v National Provincial and Union Bank of England Ltd.* ([1924] 1 KB 461) Bankes, L.J. laid down that the qualifications of the contractual duty of secrecy implied in the relation of banker and customer were

(a) where disclosure is under compulsion by law;

(b) where there is a duty to the public to disclose;

(c) where the interests of the bank require disclosure;

(d) where the disclosure is made by the express or implied consent of the customer.

In this present case Du Parcq, L.J. thought that the interests of the bank required disclosure and, moreover, that disclosure might be said to have been made with the implied consent of the customer, inasmuch as she had handed the telephone to her husband who took over the conversation with the bank which she had begun. It is interesting that the judge would have awarded the plaintiff only 40s. nominal damages if his judgment had been in her favour. The damage that she had suffered through the bank's disclosure to her husband was clearly small.

---

End of Document

# Annexe 9

937

1 W.L.R.

[COURT OF APPEAL]

## *CHRISTOFI v. BARCLAYS BANK PLC.

1999   June 28                          Stuart-Smith and Chadwick L.JJ.

*Banking—Duty to customer—Confidentiality—Wife of bankrupt obtaining loan from bank secured on matrimonial home—Caution against dealings in favour of husband's trustee in bankruptcy—Wife instructing bank not to provide information to trustee—Bank informing trustee that caution warned off—Trustee reregistering caution—Whether disclosure in breach of duty of confidentiality*

The plaintiff's husband, who had transferred the matrimonial home into the plaintiff's sole name, was adjudicated bankrupt. The plaintiff borrowed £30,000 from the defendant bank on the security of a second charge over the matrimonial home. The husband's trustee in bankruptcy registered a caution against dealings in respect of the property but the caution was subsequently warned off. The plaintiff's husband, acting on behalf of the plaintiff, twice instructed the bank not to give the trustee any information whatsoever, in particular concerning the fact that the caution had been warned off. Following a request for information by the trustee the bank disclosed that the caution had been warned off. The trustee reregistered the caution. The plaintiff brought an action against the bank for damages for alleged breach of contract and breach of the bank's implied duty of confidentiality. The bank applied to strike out the writ and statement of claim as disclosing no reasonable cause of action. The master dismissed the application but the judge allowed the bank's appeal and struck out the claim.

On the plaintiff's appeal:—

*Held*, dismissing the appeal, that the information that the caution had been cancelled was a matter of record on the title of the property over which the bank had a registered charge and the bank was under no obligation to accept or act upon instructions which might fetter its discretion as to the way in which it dealt with claims or potential claims to that property unless either those instructions were given in furtherance of some right to instruct which the customer already had or the bank agreed to act upon them as a term of continuing the banking relationship; that it was not alleged that the bank had agreed or undertaken to act upon the plaintiff's instructions and, in the absence of such an undertaking or agreement at the time when the instructions were conveyed, the instructions added nothing to the obligations of confidentiality to be implied under the general law as between banker and customer; that the information that the caution had been warned off was not secret information giving rise to a duty of confidentiality since, under the relevant statutory scheme, the trustee in bankruptcy had to be taken to have received notice of the warning off; that neither was it necessary in the interests of business efficacy to impose on a bank an obligation not to disclose information to the very person who was to be taken to have that information under a statutory scheme; and that, accordingly, the pleaded claim was ill-founded and misconceived and the judge had been right to strike it out (post, pp. 944G–945B, 946D–E, 947C–H, 950A).

*Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, C.A. considered.

Decision of Lawrence Collins Q.C. sitting as a deputy judge of the Chancery Division [1998] 1 W.L.R. 1245; [1998] 2 All E.R. 484 affirmed.

938

Christofi v. Barclays Bank Plc. (C.A.)                    [2000]

The following cases are referred to in the judgment of Chadwick L.J.:

*Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, C.A.

*Turner v. Royal Bank of Scotland* [1999] Lloyd's Rep. Bank. 231, C.A.

The following additional cases were cited in argument or referred to in the skeleton arguments:

*Abrahams v. Herbert Reiach Ltd.* [1922] 1 K.B. 477, C.A.

*Banque Bruxelles Lambert S.A. v. Eagle Star Insurance Co. Ltd.* [1997] A.C. 191; [1996] 3 W.L.R. 87; [1996] 3 All E.R. 365, H.L.(E.)

*Barclays Bank Ltd. v. Taylor* [1974] Ch. 137; [1973] 2 W.L.R. 293; [1973] 1 All E.R. 752, C.A.

*Barclays Bank Plc. (trading as Barclaycard) v. Taylor* [1989] 1 W.L.R. 1066; [1989] 3 All E.R. 563, C.A.

*British & Commonwealth Holdings Plc. (Nos. 1 and 2), In re* [1993] A.C. 426; [1992] 3 W.L.R. 853; [1992] 4 All E.R. 876, H.L.(E.)

*Circle Thirty Three Housing Trust Ltd. v. Fairview Estates (Housing) Ltd.* (1984) 8 Con.L.R. 1, C.A.

*Cranleigh Precision Engineering Ltd. v. Bryant* [1965] 1 W.L.R. 1293; [1964] 3 All E.R. 289

*Darlington Building Society v. O'Rourke James Scourfield & McCarthy* [1999] P.N.L.R. 365, C.A.

*Galoo Ltd. v. Bright Grahame Murray* [1994] 1 W.L.R. 1360; [1995] 1 All E.R. 16, C.A.

*Hancock Shipping Co. Ltd. v. Kawasaki Heavy Industries Ltd.* [1992] 1 W.L.R. 1025; [1992] 3 All E.R. 132, C.A.

*Idyll Ltd. v. Dinerman Davison & Hillman* (1971) 1 Const.L.J. 294, C.A.

*Initial Services Ltd. v. Putterill* [1968] 1 Q.B. 396; [1967] 3 W.L.R. 1032; [1967] 3 All E.R. 145, C.A.

*Lavarack v. Woods of Colchester Ltd.* [1967] 1 Q.B. 278; [1966] 3 W.L.R. 706; [1966] 3 All E.R. 683, C.A.

*Libyan Arab Foreign Bank v. Bankers Trust Co.* [1989] Q.B. 728; [1989] 3 W.L.R. 314; [1989] 3 All E.R. 252

*Lipkin Gorman v. Karpnale Ltd.* [1989] 1 W.L.R. 1340; [1992] 4 All E.R. 409, C.A.

*Liverpool City Council v. Irwin* [1977] A.C. 239; [1976] 2 W.L.R. 562; [1976] 2 All E.R. 39, H.L.(E.)

*Lonhro Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1; [1991] 4 All E.R. 961

*Marles v. Philip Trant & Sons Ltd.* [1954] 1 Q.B. 29; [1953] 2 W.L.R. 564; [1953] 1 All E.R. 651, C.A.

*Mihalis Angelos, The* [1971] 1 Q.B. 164; [1970] 2 W.L.R. 907; [1970] 1 All E.R. 673; [1971] 1 Q.B. 164; [1970] 3 W.L.R. 601; [1970] 3 All E.R. 125, C.A.

*Paragon Finance Plc. v. D. B. Thakerar & Co.* [1999] 1 All E.R. 400, C.A.

*Sorata Ltd. v. Gardex Ltd.* [1984] R.P.C. 317, C.A.

*Steamship Mutual Underwriting Association Ltd. v. Trollope & Colls (City) Ltd.* (1986) 33 B.L.R. 81, C.A.

*Sterman v. E. W. & W. J. Moore* [1970] 1 Q.B. 596; [1970] 2 W.L.R. 386; [1970] 1 All E.R. 581, C.A.

*Weld-Blundell v. Stephens* [1920] A.C. 956, H.L.(E.)

*Welsh Development Agency v. Redpath Dorman Long Ltd.* [1994] 1 W.L.R. 1409; [1994] 4 All E.R. 10, C.A.

*X (Minors) v. Bedfordshire County Council* [1995] 2 A.C. 633; [1995] 3 W.L.R. 152; [1995] 3 All E.R. 353, H.L.(E.)

1 W.L.R.          Christofi v. Barclays Bank Plc. (C.A.)

A    INTERLOCUTORY APPEAL from Lawrence Collins Q.C. sitting as a deputy judge of the Chancery Division.

By writ and statement of claim dated 13 January 1997, the plaintiff, Mrs. Elli Christofi, claimed against the defendants, Barclays Bank Plc., damages for breach of contract, or alternatively breach of confidence, by reason of the disclosure of certain information by the bank to the plaintiff's husband's trustee in bankruptcy contrary to the express

B    instructions of the plaintiff. By a summons dated 15 July 1997 the bank applied under R.S.C., Ord. 18, r. 19(1) and the inherent jurisdiction of the court for the statement of claim to be struck out on the ground that the writ and statement of claim disclosed no reasonable cause of action and/or was frivolous, vexatious and an abuse of the process of the court. On 28 October 1997 Master Dyson dismissed the application and ordered that

C    the application be transferred to the Central London County Court. The bank appealed by notice dated 31 October 1997 and on 19 January 1998 Lawrence Collins Q.C., sitting as a deputy judge of the Chancery Division, allowed the appeal and ordered, inter alia, that the plaintiff's writ and statement of claim be struck out.

By a notice of appeal dated 27 November 1998 and pursuant to leave granted by Morritt and Waller L.JJ. on 19 November 1998, the plaintiff

D    appealed on the grounds, inter alia, that the judge erred in law (i) in finding that there was no duty on the bank not to disclose to the trustee the fact that his caution had been warned off by the Land Registry and in finding that the information that the caution had been warned off was no secret as regards the trustee and was information already in his possession; (ii) in failing to treat as the appropriate test that, if the information in

E    question had been imparted as part of the relationship of banker and customer, a duty of confidentiality arose on the part of the banker and that the banker would be in breach of that duty if he disclosed that information to a third party save where one of the established exceptions in *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461 applied; and (iii) in finding that the plaintiff's claim had no

F    chance of success.

At the hearing of the appeal the plaintiff applied for permission to amend the statement of claim.

The facts are stated in the judgment of Chadwick L.J.

*Daniel Serota Q.C.* and *Jeffrey Bacon* for the plaintiff.
*Richard Salter Q.C.* and *John Odgers* for the defendants.

G

CHADWICK L.J.   This is an appeal from the order made on 19 January 1998 by Mr. Lawrence Collins Q.C., sitting as a deputy judge of the Chancery Division, in proceedings brought by Mrs. Elli Christofi against Barclays Bank Plc. for damages said to flow from an alleged breach of confidence. The deputy judge ordered that the writ and statement of claim

H    of the action be struck out on the grounds that they disclose no cause of action. Mrs. Christofi appeals to this court with the permission of this court (Morritt and Waller L.JJ.) granted on 19 November 1998.

The appeal is coupled with an application for permission to amend the statement of claim. The application is opposed on the ground that the amendments introduce new claims to which there would be a limitation defence. That makes it necessary to consider whether the new claims, if any, arise out of the same facts, or substantially the same facts, as claims

Chadwick L.J.          **Christofi v. Barclays Bank Plc. (C.A.)**          [2000]

in respect of which the plaintiff, Mrs. Christofi, has already sought a    A
remedy in the proceedings: see C.P.R., r. 17.4(2).

In those circumstances it is, I think, convenient to approach this
appeal, first, on the basis that Mrs. Christofi's claim is as set out in the
statement of claim endorsed on the writ and before amendment.

The principal facts, as they are alleged in the statement of claim
endorsed on the writ, or as they appear from documents which are not
controversial, may be summarised as follows.                              B

(1) Until 18 February 1982 the freehold property, known as 139,
Whitehall Road, Woodford Green, Essex, was registered in the joint names
of Mrs. Christofi and her husband, Mr. Andreas Christofi, under title
NGL 150835. On 18 February 1982 that property was transferred into the
sole name of Mrs. Christofi. At all material times thereafter, until the sale
of the property in January 1995, 139, Whitehall Road was registered in her    C
name alone.

(2) On 6 August 1984 Mr. Christofi was adjudged bankrupt.
Thereafter the joint account which Mr. and Mrs. Christofi had maintained
with the bank at its Woodford Green branch was closed, but Mrs. Christofi
remained a customer of the bank with an account in her sole name. She
had opened that account on 20 July 1984, that is between the date of her
husband's receiving order and the date of his bankruptcy.                 D

(3) On or about 17 December 1987 the bank lent Mrs. Christofi
£30,000 to assist her in the purchase of a leasehold interest in a property
known as La Bella Vista Restaurant in Theydon Bois, Essex. That loan
was secured by a second charge on the property at 139, Whitehall Road.
The bank registered its charge at the district land registry. The charge was
in the standard form used by the bank to secure all moneys from time to    E
time owing.

(4) On 27 June 1988 Mr. Nigel Halls, an insolvency practitioner and
then a partner in the firm Deloittes Haskins & Sells, was appointed to be
the trustee in bankruptcy of Mr. Christofi. In February 1989 Mr. Halls, as
trustee in bankruptcy, caused a caution against dealings to be entered on
the register against title NGL150835 in respect of 139, Whitehall Road.
The nature of the interest said to be protected by the caution was that of    F
the trustee of a bankrupt who was alleged to have transferred his interest
in the property to his wife in circumstances in which the transfer could be
attacked or avoided under the provisions of section 42 of the Bankruptcy
Act 1914. On 28 February 1989 the Chief Land Registrar gave notice to
the bank, as the holder of a registered charge, that the caution had been
entered.                                                                  G

(5) In or about September 1989 solicitors acting for Mrs. Christofi
applied for the caution to be warned off pursuant to section 55 of the
Land Registration Act 1925. Notice of that application was sent to the
trustee in bankruptcy as cautioner on 18 September 1989. In the absence
of response the caution was cancelled on 18 October 1989. Shortly
thereafter Mrs. Christofi informed the bank that the caution had been
cancelled and by letter dated 3 November 1989 the bank sought           H
confirmation of that from the district land registry. Confirmation that the
caution had indeed been cancelled was provided by the Land Registry to
the bank by a letter dated 11 December 1989.

(6) Paragraph 20 of the statement of claim is in these terms:

"In or about October or November 1989 Mr. Christofi gave
instructions on behalf of [Mrs. Christofi] to have no contact with the

The Weekly Law Reports 19 May 2000

Case 1:22-cv-05199-DLC    Document 202    Filed 06/24/26    Page 128 of 133

941

1 W.L.R.        Christofi v. Barclays Bank Plc. (C.A.)        Chadwick L.J.

said trustee and not to give the said trustee any information whatsoever including information concerning the fact that the caution had been warned off as aforesaid."

It must, of course, be kept in mind that the caution could not have been warned off or cancelled without notice to the trustee in bankruptcy having been given by the Land Registry: see rules 218 and 219 of the Land Registration Rules 1925 (S.R. & O. 1925 No. 1093 (L.28)). At first sight, therefore, the instruction which Mr. Christofi is said to have given in relation to the caution was an instruction that the bank should not tell the trustee something which the trustee would necessarily already know. It is not without significance that the instruction was given at the time that the period of warning off was either still running or had only just expired.

(7) It is said that the instruction was repeated in the following year. Paragraph 23 of the statement of claim is in these terms:

"In or about October or November 1990 Mr. Christofi on behalf of [Mrs. Christofi] again instructed Mr. Bond of the plaintiff"—that is clearly a mistake for "the bank"—"not to divulge any information to the trustee in particular concerning the fact that the caution had been warned off."

(8) By letter dated 10 April 1991 the trustee sought information from the bank relating to the joint account formerly held by Mr. and Mrs. Christofi at its Woodford Green branch. The letter indicated that the information was required "in order to assess whether legal action should be taken against the bankrupt's wife." The bank replied to that letter on 22 April 1991. The written reply makes no reference to the property at 139, Whitehall Road, to the caution entered in February 1989 or to the fact that the caution had been cancelled in October 1989.

(9) Paragraphs 27 and 28 of the statement of claim are in these terms:

"27. On a date between 10 April and 7 May 1991 a conversation was held between an employee of Messrs. Cork Gully acting on behalf of the trustee and the [bank] in which the [bank] disclosed inter alia to the trustee the fact that the caution registered by the trustee in 1989 against the property had been warned off in 1989.

"28. The said disclosure was in breach of and contrary to the express instructions of [Mrs. Christofi] and in breach of the [bank's] implied duty of confidentiality."

I pause to note that there appears to have been a change in the identity of the trustee, or it may be that Mr. Halls had moved from Deloittes to Cork Gully in the interim.

(10) Whatever may have been said by the bank to the trustee's representative in a telephone conversation in April or May 1991, the trustee plainly became aware that the caution which had been entered in February 1989 was no longer in force. On or about 10 May 1991 solicitors acting for the trustee in bankruptcy reapplied for registration of the caution and this was effected by entry at the Land Registry on or about 15 May 1991. The allegation in the statement of claim is that the trustee's decision to apply for reregistration of the caution was a direct result of the disclosure in the course of the telephone conversation with the bank.

(11) On 17 June 1991 the bank gave notice to Mrs. Christofi determining her accounts and the facilities on them. The letter is in these terms, so far as material:

Chadwick L.J.       **Christofi v. Barclays Bank Plc. (C.A.)**       [2000]

"It is with some regret that the bank must protect its position in   A
view of the trustee in bankruptcy's attitude towards your property
and issue the enclosed termination and default notices upon your
accounts. Obviously in issuing these documents we appreciate that
there is a dispute between yourselves and the trustee, which
regrettably due to their action crystallises our debt and prevents us
from allowing you to run your usual overdraft."

It is clear that by the date of that letter the bank was aware that the   B
caution had been reregistered. In principle it could have become so aware
either (i) because it had been informed by the trustee or (ii) because, as the
holder of the second charge over the property, it had received notice from
the Land Registry. In fairness to the bank it is appropriate to note its
explanation of the position in a letter dated 1 July 1991 to Mrs. Christofi's
solicitors:   C

"Lastly, we would point out that no breach of confidence has been
made by the bank in any discussions with the trustees. In fact upon
receipt of the trustee's inquiry on Mr. Andreas Christofi we replied
simply stating that we could provide no information as we held no
account in this name. It was this that prompted the trustee's
telephone conversation to ourselves where we were threatened with   D
the issue of an order for the production of information on any
accounts in the name of Andreas Christofi or Elli Christofi. During
this conversation, which we would add was somewhat one sided, the
trustee advised us that it was her intention to reissue the caution, thus
putting us on notice of a detrimental aspect to our security."

It is, of course, impossible for us to form any view as to what actually did   E
happen in the course of a telephone conversation in or about May 1991.
For the purpose of this application we must proceed upon the basis that
the allegation in paragraph 27 of the statement of claim could be
established on the facts. But, as I say, in fairness to the bank it is right to
observe that that is disputed.

(12) The problem for the bank, of course, was that the existence of the   F
caution would or might prevent it from relying on its existing second
charge over the property in respect of any further advances made to
Mrs. Christofi, including further advances on her current or running
account.

(13) On 2 March 1992 the trustee in bankruptcy commenced
proceedings against Mrs. Christofi to set aside the transfer of 18 February
1982. Mrs. Christofi compromised that claim in, I think, 1993 by agreeing   G
to pay to the trustee £10,000 by instalments.

(14) The property at 139, Whitehall Road was eventually sold in
January 1995. The bank was repaid out of the proceeds of sale.

It is in those circumstances that Mrs. Christofi alleges: (i) that, by
making disclosure to the trustee in April or May 1991 of the fact that the
caution, which had been first entered in February 1989, had been cancelled   H
in October of that year, the bank acted in breach of its duty of confidence;
and (ii) that by reason of that breach of duty she has suffered loss and
damage. The loss alleged is set out under four heads: (a) interest on
Mrs. Christofi's overdrawn account (£10,610) and on the £30,000 loan
(£7,478) from September 1991 (when, as she alleges, she would have sold
139, Whitehall Road but for the registration of the new caution) and bank
charges or costs (£1,500), a total of £19,600 or thereabouts; (b) the

1 W.L.R.                Christofi v. Barclays Bank Plc. (C.A.)              Chadwick L.J.

A    difference between the price for which 139, Whitehall Road was sold in January 1995 (£160,000) and the price for which it is said that it would have been sold in 1991. That is said to be a figure between £190,000 and £200,000; alternatively, £172,000, which was the amount of an offer made in September 1991; (c) legal fees which she is said to have incurred in relation to the abortive sale in September 1991 and in relation to the repayment moneys due to the bank; (d) the £10,000 paid to the trustee in
B    compromise of his claims against the property.

These proceedings were commenced by the issue of a writ on 13 January 1997. The bank served a defence on 10 June 1997. By a summons issued a few weeks later, on 15 July 1997, the bank sought an order that the written statement of claim be struck out and the action dismissed under R.S.C., Ord. 18, r. 19(1) on the grounds that they disclose
C    no reasonable cause of action; alternatively, under the inherent jurisdiction of the court. That summons was heard by Master Dyson on 28 October 1997. He dismissed the application, directed that the proceedings be transferred to the Central London County Court and gave directions for discovery and the exchange of witness statements. The bank appealed to the judge. It was that appeal which came before Mr. Lawrence Collins Q.C. in January 1998. He set aside the master's order and struck out the
D    statement of claim and the writ. It is from that order that Mrs. Christofi appeals to this court.

The judge [1998] 1 W.L.R. 1245 took the view that the action was so plainly misconceived that it should be struck out. He held, first, that Mrs. Christofi could not rely on the express instructions said to have been given to the bank by her husband in late 1989 and repeated in late 1990, as pleaded in paragraphs 20 and 23 of the statement of claim to which I have
E    referred. He reached that conclusion, at p. 1250H, on the basis that: "This instruction, if given, would have been the plainest possible breach of the obligation under section 22 [of the Bankruptcy Act 1914], and cannot give rise to actionable rights."

Secondly, as regards the allegation of an implied duty of confidentiality arising from the relationship of banker and customer, he held that whether an obligation was to be implied was a matter of law; and that as a matter
F    of law no duty was to be implied in relation to information which the bank had every reason to think that the trustee already had. He expressed his conclusion, at p. 1251:

"Second, as regards the allegation of the implied duty of confidentiality, I accept the submission for Mrs. Christofi that the
G    duty extends beyond information which is secret. It is clear from the judgment in *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461 that the duty extends to information gained during the currency of the account and that it goes beyond the state of the account, and extends to information derived from the account itself. But the obligation depends on a term implied by law: 'the duty
H    is a legal one arising out of contract' (pp. 471–472); 'the limits and qualifications of the duty of the bank [are] a matter of law' (p. 475). The limits of the duty must be ascertained in accordance with common sense. In modern times, banks have a variety of dealings with persons other than account holders, and it is entirely contrary to the rationale of the rule in *Tournier*, the privacy of the customer-banker relationship, that a bank should be bound not to inform a trustee in bankruptcy, making legitimate inquiries of the bank about

Chadwick L.J.          Christofi v. Barclays Bank Plc. (C.A.)          [2000]

A

an account in which the bankrupt had a joint interest with his wife, of a fact which any bank would have had every reason to suppose the trustee already knew, namely that the caution on the matrimonial home had been warned off."

Thirdly, the judge held that the allegations of loss and damage were flawed by the fact that they were founded on a pleaded case that the principal cause of that loss was the bank's decision to call in the loans rather than the alleged breach of the duty of confidence: see p. 1251D–E. He concluded his judgment with this observation, at p. 1251F: "In my judgment, Mrs. Christofi's real complaint is that she and her husband failed to take advantage of the trustee's error or inactivity, and her effort to make the bank liable for it is bound to fail."

B

The reference there to the trustee's error or inactivity must, in the context of the facts to which I have referred, be a reference to the trustee's failure to respond to the notice given under section 55 of the Land Registration Act 1925 in or about September 1989 within the period limited by that notice, and the failure to take any other steps to reinstate the caution which protected his claim between the end of 1989 and May 1991. The judge is pointing out, as it seems to me, that during that period there was an opportunity to sell 139, Whitehall Road in circumstances in which a purchaser or a mortgagee would take free from the trustee's claim.

C

Mr. Serota, who appears for Mrs. Christofi on this appeal, challenges each of those findings. He submits, first, that the judge was wrong to take the view that Mr. Christofi had acted unlawfully in giving the instructions to the bank in 1989 or 1990, which he is said to have given. He contends that, if Mr. Christofi had an honest belief that the trustee in bankruptcy's claim under section 42 of the Bankruptcy Act 1914 was ill-founded, he was under no obligation to assist the trustee in any steps which he might wish to take in pursuit of that claim. Whether or not that is a correct view of the scope of section 22 of the Bankruptcy Act 1914, it seems to me that it could not have been proper for Mr. Christofi to give instructions that the bank was to disclose no information whatsoever about any dealing with a property which had been formerly in his name. Be that as it may, it seems to me that Mr. Serota is on stronger ground when he points out that Mrs. Christofi would have committed no bankruptcy offence if she had instructed the bank to disclose no information about her affairs other than information which the bank could be compelled to disclose to a trustee in bankruptcy by law; and that she should be in no worse position if she conveyed that instruction to the bank through the agency of her husband than she would be if she had instructed the bank direct.

D

E

F

The true answer to the submission that the bank was under a duty not to disclose information to the trustee in relation to the caution by reason of an express instruction given in 1989 or 1990 by Mr. Christofi is, as it seems to me, that the bank was under no duty to comply with that instruction unless it agreed to do so as a term of continuing the banking relationship with Mrs. Christofi, provided, of course, that the instruction went beyond the obligations which the bank had already assumed by virtue of the existing banking relationship.

G

H

The information that the caution which had been entered in February 1989 had been cancelled in October 1989 was a matter of record on the title to property over which the bank had a registered charge. In my view the bank was under no obligation to accept or to act upon instructions which might fetter its discretion as to the way in which it dealt with or

A   responded to claims or potential claims to that property which were adverse to its interests under that charge unless either: (i) those instructions were given in furtherance of some right to instruct, which the customer already had under the existing banking relationship; or (ii) the bank agreed to act upon them.

It is not alleged that the bank did agree or undertake to act upon the instructions alleged in paragraphs 20 and 23 of the statement of claim. In
B   the absence of some undertaking or agreement given by the bank at the time when the instructions were conveyed to it—which, as I have said, is not alleged—the express instructions, as it seems to me, add nothing to the obligations of confidentiality to be implied under the general law as between banker and customer.

Before turning to those obligations I can refer shortly to the question
C   of damage. The judge, understandably, thought that it was Mrs. Christofi's case that the losses which she had suffered stemmed from the fact that the bank had called in its loans. He would have been led to that conclusion by the pleading in paragraph 30(2)(c) of the statement of claim endorsed on the writ, where it is alleged that, "were it not for the fact that the [bank] had called in its loans . . .[Mrs. Christofi] would have achieved a sale" of the property, 139, Whitehall Road, at a price of around £190,000.
D   The true nature of Mrs. Christofi's case—as the proposed amended pleading makes clear and as it was, I understand, explained to this court when seeking permission to appeal—is that the loss flowed from her inability to sell the property, 139, Whitehall Road, while the caution against dealings remained on the title. Properly understood, the claim is for the damages which flow from the loss of opportunity to sell the
E   property during the period that the trustee allowed his claim against the property to remain unprotected by the entry of a caution against dealings on the register. That period had, of course, run from October 1989 until May 1991. The complaint is that, due to the bank's action, the opportunity to sell free from the trustee's claim did not continue to run for a further indefinite period while the trustee remained in ignorance of the
F   fact that his claim was not protected.

Seen in that light it is understandable, first, that there is a claim for damages in relation to the £10,000 which Mrs. Christofi was obliged to pay to settle the trustee's claim, and, secondly, that there is a claim for the interest which she incurred, because she was unable to pay off the bank lending out of the proceeds of an early sale of the property. For my part I have considerable doubt as to whether a claim based on the fall in the
G   property market between September 1991 and January 1994 is a claim which could be recovered by reason of the alleged breach of duty. But in any event those claims for damages are, it seems to me, properly to be discounted by reason of the fact that what Mrs. Christofi lost, if anything, was the chance to sell.

I turn, therefore, to the principal question, namely whether the bank
H·  owed to Mrs. Christofi a duty of confidence not to disclose the information that the caution had been warned off. It is relevant to have in mind the scheme of the statutory provisions in relation to cautions. Section 54 of the Land Registration Act 1925 enables any person interested in any land to lodge a caution to the effect that no dealing with the land on the part of the proprietor is to be registered until notice has been served on the cautioner. There can be no doubt that a trustee in bankruptcy who seeks to assert a claim under section 42 of the Bankruptcy

Chadwick L.J.          Christofi v. Barclays Bank Plc. (C.A.)          [2000]

A

Act 1914 is a person interested in the land to which that claim relates, and so no doubt that he is a person who is entitled to lodge a caution.

It is to be noted that the effect of a caution is not to establish the cautioner's claim. All that a caution does is to ensure that the cautioner has notice of any proposed dealing with the land so that he can take steps to assert his claim. Section 55 of the Land Registration Act 1925 provides that, once a "caution against dealings has been lodged . . . the registrar shall not, without the consent of the cautioner, register any dealing . . . until he has served notice on the cautioner, warning him that his caution will cease to have any effect after the expiration of the prescribed number of days." The service of a notice requires the cautioner to take some action. If he wishes to dispute or restrain the proposed dealing, he must apply to the registrar for an order that the dealing should not take place for such period as the registrar thinks just, thereby giving the cautioner an opportunity to establish his right in the courts. If, on the other hand, he does not wish to pursue his claim, or if he has no objection to the proposed dealing, he need do nothing; in which case the dealing simply takes place and the purchaser takes free from the interest which the caution was intended to protect.

B

C

Notice to be served on the cautioner is served under rule 218 of the Land Registration Rules 1925. The cautioner has the opportunity to object within the prescribed period of time. If he does, then there is a hearing in front of the registrar (see rule 220) and the registrar may refer the matter to the court. If he does not object and appear, then the caution is cancelled (see rule 221).

D

I refer to those provisions because the statutory scheme is intended to ensure that, once a cautioner has lodged a caution which has been entered on the register, the caution will not be removed or cancelled without notice to the cautioner; so that the one person that would be expected to know that there had been an application to warn off or cancel the caution would be the cautioner himself. It is in that context that it is necessary to ask whether the law implies a duty on a bank who itself has security over the property not to inform the cautioner that his caution has been cancelled; in other words, a duty on the bank not to inform the very person whom it would expect to have that information already.

E

F

In support of the proposition that such a duty exists we were referred to *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461 for principles which have been approved and applied subsequently in this court, most recently in *Turner v. Royal Bank of Scotland* [1999] Lloyd's Rep. Bank. 231. As Sir Richard Scott V.-C. said in *Turner's* case, the principles in *Tournier's* case are not open to dispute, at least in this court. The principles are to be found in the judgment of Bankes L.J., at p. 473. He refers to the contractual duty which arises between a banker and its customer to respect the customer's secrets and goes on, at pp. 472–473:

G

"it is necessary in a case like the present to direct the jury what are the limits, and what are the qualifications of the contractual duty of secrecy implied in the relation of banker and customer. There appears to be no authority on the point. On principle I think that the qualifications can be classified under four heads: (*a*) Where disclosure is under compulsion by law; (*b*) where there is a duty to the public to disclose; (*c*) where the interests of the bank require disclosure; (*d*) where the disclosure is made by the express or implied consent of the customer."

H