The Weekly Law Reports 19 May 2000

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 1 of 190

947

1 W.L.R.          Christofi v. Barclays Bank Plc. (C.A.)          Chadwick L.J.

A    One answer to this case might have been that the interests of the bank as a chargee of the property required that it should be able to discuss with a claimant against that property whether he is pursuing his claim and, if so, whether he intends to protect that claim by the entry of a caution on the register; in particular to point out to him that there is no caution on the register to protect the claim. I say that the interests of the bank might require that because, although some banks might take the view that their B commercial interests were best served by not telling a claimant that his claim is unprotected, there are other banks who might take a wider view of their commercial reputation and think it improper or unwise to deal with property behind the back of a trustee in bankruptcy, knowing that the trustee in bankruptcy is acting under a mistake. Which view is to be taken in particular circumstances is of course a matter for the commercial C judgment of the bank. But it seems to me hard to criticise a bank which took a view that disclosure was the proper course rather than some dealing behind the back of a trustee in bankruptcy.

However, that is not the basis upon which this case has been argued; and I am persuaded that it would be wrong to decide this appeal on that ground. This case has been argued on the basis that information cannot properly be described as "secret" as between A and B, when B has every D reason to believe that under the statutory scheme A will know of that information. Indeed it is impossible under the statutory scheme for A not to have been made aware of that information. The proposition on which Mr. Serota relies, therefore, comes to this: the law implies a duty on a bank not to disclose to a person assessing a claim against property (over which the bank has security) the fact that that claim is no longer protected by the entry of a caution on the Land Registry.

E    I have failed to find any support in *Tournier's* case for a proposition in those terms. That is not surprising because *Tournier's* case was not concerned with a case in which the person to whom the disclosure was made was the very person who might be expected to have, and indeed must have had, the information already.

Accordingly, it seems to me right to look at the matter in broader F terms. Is it a necessary obligation which must be implied into the relationship of banker and customer in the interests of commercial efficacy?

I cannot persuade myself that it is necessary, as a matter of law, to impose on a bank an obligation not to disclose information to the very person who must be taken to have that information under a statutory scheme. For the law to impose such an obligation would, I think, be to G invite ridicule. There is no sense in it. Of course it would be open to a bank to agree expressly not to remind a claimant of the fact which, although he must once have known, he may have forgotten. But that is an obligation which, to my mind, would need to be imposed expressly. For the reasons which I have sought to give it was not imposed expressly in this case.

H    For those reasons I am satisfied that the claim as pleaded originally was ill-founded and misconceived and was bound to fail. In my view the judge was right to take the view that the action was so plainly misconceived that it should be struck out.

I turn, therefore, to the question whether the action can or should be saved by the proposed amendments put forward for the first time in this court. In this context the relevant amendments begin in paragraph 27. I have already referred to the form in which paragraph 27 appeared in the

A

original pleading. In the form to which it is proposed it should be amended, it now includes 13 sub-paragraphs of which paragraph 1(5) contains the earlier allegation that "the caution registered by the trustee in 1989 against the property had been warned off in 1989."

The other allegations are that the bank disclosed a number of matters relating to its relationship with Mrs. Christofi and her affairs which, on their face at least, would clearly fall within the obligations of confidence recognised in *Tournier's* case. For example at paragraph 1(12) it is said that the bank disclosed the amount of Mrs. Christofi's overdraft with the bank. It is said that the bank disclosed that it had a charge on the lease of La Bella Vista Restaurant. It is said that the bank disclosed that there was a potential remortgage in the offing.

B

Those matters are all derived from a manuscript note which appears to have been written by a Miss Stockley, an employee of the trustee in bankruptcy, at or about the time of the telephone conversation with the bank in May 1991. That manuscript note was disclosed to those advising Mrs. Christofi under cover of a letter dated 3 February 1995 by solicitors advising the trustee. There is no dispute that the matters which Mrs. Christofi now seeks to introduce into paragraph 27 are matters which have been known to her, in so far as they are known now, since at least February 1995. Nor can the conclusion be avoided that, when the statement of claim was originally pleaded and served, towards the end of the six-year limitation period, a decision was taken not to include those allegations within it. The only allegation included in the statement of claim was, as I have said, the allegation as to disclosure of the warning off of the caution.

C

D

It is alleged, by way of amendment in paragraph 28(A) of the proposed amended statement of claim, that the disclosures—that is the disclosures in relation to Mrs. Christofi's financial affairs—were such as to lead Mr. Christofi's trustee in bankruptcy to determine that to place a caution against the property would place pressure on Mrs. Christofi by inhibiting her ability to sell or charge the property so that she might be willing to settle a claim made by the trustee. The thrust of the complaint, therefore, has changed from an allegation that the trustee was reminded that he had not protected his claim by a caution and so decided to do so, to an allegation that a trustee who had decided to abandon his claim was prompted in resurrecting it—and then protecting it by a caution—by the belief that, although it might not have itself any merit, Mrs. Christofi's financial position was such that she would succumb to pressure and compromise it. That is, in my view, a different claim from the claim that was originally pleaded. More to the point, it is a claim which has only been, if I may put it this way, thought up at the last minute in circumstances in which the original claim had already been struck out by the judge.

E

F

G

In those circumstances, is this a claim which ought to be allowed to be introduced by amendment at this stage? Accepting for these purposes that, notwithstanding that the limitation period has long passed, the court has power to allow an amendment of this nature if the facts relied upon in support of the new claim are the same, or substantially the same, as the facts relied upon in relation to the old claim, and also accepting (but without deciding) that that test may be satisfied in the present case, I have no doubt that, as a matter of discretion, this application to amend should be refused.

H

The Weekly Law Reports 19 May 2000

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 3 of 190

949

1 W.L.R.          Christofi v. Barclays Bank Plc. (C.A.)          Chadwick L.J.

A      It is necessary to have in mind that, in exercising a discretion to allow an amendment, the court must pay regard to the overriding objective in C.P.R., Part 1, that is to say the need to deal with cases justly. Dealing with a case justly includes, so far as practicable, saving expense; dealing with a case in a way which is proportionate to the amount of money involved; ensuring that it is dealt with expeditiously and fairly; and, importantly, allotting to it an appropriate share of the court's resources

B   while taking into account the need to allot resources to other cases.

In my view the court would not be acting in accordance with that overriding objective if it were to allow a party, who has known perfectly well for the past four years what information was capable of being adduced in support of a claim for breach of confidence, to take the course which this plaintiff has taken in this case—that is to say to wait until the

C   very end of the limitation period before bringing her claim at all—then to take a deliberate decision not to advance those parts of her claim which depended upon the disclosure of any information other than the warning off of the caution, to abstain from seeking to introduce that information by amendment, either in the face of the application to strike out before the master or on the application to strike out before the judge, and then to bring the claim forward some four years later when this matter comes

D   before the Court of Appeal. That does not seem to me to be a sensible way in which to conduct litigation. I have no doubt that the court should discourage it. In my view that should lead the court in this case to refuse the application to amend.

I should not part with this matter without reference to a letter dated 12 May 1994, written by Mrs. Christofi's son acting as her solicitor, to the solicitors for the trustee in bankruptcy. In the course of that letter the son

E   (Mr. Christopher Christofi) makes two allegations. First, he says:

"From the documentation which we have obtained from [the bank], during the course of the telephone conversation"—and that is a reference to the conversation in April or May 1991—"Bond raised the issue relating to the trustee's unprotected interests."

F   Then a little later he says:

"In fact, we have evidence which suggests that the correct procedures may not have been followed by the Land Registry when the caution was warned off, and we understand from our client's former solicitors that the original caution may well have been removed without your clients, or your firm, receiving any proper notification."

G   Those allegations are made in the context of a letter which seeks to persuade the trustee in bankruptcy through his or her solicitors to co-operate by making available information to Mrs. Christofi. The incentive to co-operate is emphasised by later paragraphs in the letter, in which the trustee is told that Mrs. Christofi has unlimited legal aid to pursue the bank; that settlement with the trustee is a condition precedent to bringing

H   the action against the bank; and that, if the claim against the bank can be established, then there is likelihood of the trustee having accelerated receipt of the moneys due under the compromise.

For a solicitor to make statements in that sort of letter which cannot be supported seems to me to be improper. The two statements to which I have referred are not supported by any documentation that we have been shown; and no explanation has been given for them, notwithstanding that the writer of the letter has been in court during this hearing and has had

Chadwick L.J.          Christofi v. Barclays Bank Plc. (C.A.)          [2000]

the opportunity to give instructions on the matter. It may be that there is      A
an explanation for those statements. If so it ought to be forthcoming.
    For those reasons I would dismiss this appeal.

STUART-SMITH L.J.   I agree.

                                    *Appeal dismissed with costs.*
                                    *Order nisi against legal aid fund with*      B
                                        *nil contribution.*
                                    *Case certified fit for two counsel on*
                                        *defendants' behalf.*

    Solicitors: *Richard West Freeman Christofi; Nicholson Graham & Jones.*

                    [Reported by ISOBEL COLLINS, Barrister]
                                                                                 C

                                ——————

                                                                                 D

                        [COURT OF APPEAL]                          :

        *HARBOUR AND GENERAL WORKS LTD. v. ENVIRONMENT
                            AGENCY

1999   Sept. 16;                                    Waller and Tuckey L.JJ.
       Oct. 12                                                                   E

            *Arbitration—Time bar—Extension of time—Party's late reference*
                *through failure properly to read contract—Whether power to extend*
                *time—Arbitration Act 1996 (c. 23), s. 12(3)*
            *Contract—Construction—Dispute resolution procedure—Engineer to*
                *make decisions on disputes and subsequent referral to arbitration*
                *within time limit—Engineer's decision on claims subject to items to*      F
                *be quantified—Party referring claims to arbitrator out of time—*
                *Whether power to arbitrate claims on arbitration relating to final*
                *payment certificate—Institution of Civil Engineers' Conditions of*
                *Contract (6th ed., 1993 amendment), cl. 66—Institution of Civil*
                *Engineers' Arbitration Procedure (1997), r. 5.2*

                    The applicants were employed by the respondents on the
                Institution of Civil Engineers' Conditions of Contract (6th ed.,      G
                1993 amendment)[1] to construct harbour defences. Clause 66 set
                out the procedure for resolving disputes. Clause 66(2) and
                (3) provided for disputes as to certificates to be settled by the
                engineer. Sub-clause (4) provided that the engineer's decisions
                "shall be final and binding" upon the parties unless and until
                revised by a conciliator or an arbitrator. Sub-clauses (5) and
                (6) respectively provided that where either party was dissatisfied
                with any decision of the engineer given under sub-clause (3) they      H
                might refer the dispute to a conciliator within one month or to an
                arbitrator within three months after receiving notice of the
                decision. Sub-clause (8) stated, inter alia, that the arbitrator "shall
                have full power to open up review and revise any decision opinion
                instruction direction certificate or valuation of the engineer." Rule
                5.2 of the Institution of Civil Engineers' Arbitration Procedure

[1] Institution of Civil Engineers' Conditions of Contract, cl. 66: see post, pp. 954A–955G.

# Annexe 10

[1989]

[COURT OF APPEAL]

A

\*BARCLAYS BANK PLC. (TRADING AS BARCLAYCARD)
v. TAYLOR
TRUSTEE SAVINGS BANK OF WALES AND BORDER
COUNTIES AND ANOTHER v. TAYLOR AND ANOTHER

1989 May 15; 22        Lord Donaldson of Lymington M.R.,
          Croom-Johnson L.J. and Sir Denys Buckley

B

*Banking—Duty to customer—Confidentiality—Implied contractual
term—Bank notified of applications for access orders—Disclosure
in compliance with orders—Whether duty to be implied to inform
client or oppose applications—Police and Criminal Evidence Act
1984 (c. 60), s. 9, Sch. 1, para. 4*

C

Banks with whom the defendants had accounts received
notice from the police of their intention to apply for access
orders in respect of the accounts pursuant to section 9 of and
paragraph 4 of Schedule 1 to the Police and Criminal Evidence
Act 1984[1]. The banks took no action on receipt of the notices
but gave disclosure in compliance with the orders when made.
In proceedings brought by the banks against them the defendants
counterclaimed for damages on the ground that by failing to
challenge the notices or to resist the making of the orders, or to
inform them of the applications the banks were in breach of an
implied contractual obligation arising out of the relationship of
confidentiality existing between banker and client. On the banks'
application the judge struck out the counterclaims as disclosing
no cause of action.

D

On appeal by the defendants:—

*Held,* dismissing the appeals, (1) that, irrespective of whether
the notices were defective, the access orders once made, being
valid on their faces, were fully effective until set aside by due
process; and that since the banker's duty of confidentiality to his
client was qualified by the exception of disclosure under
compulsion of law, the banks were not in breach of their duty
to the defendants in complying with the orders (post, pp.
1070G–H, 1074H, 1075D–E).

E

*Tournier v. National Provincial and Union Bank of England*
[1924] 1 K.B. 461, C.A. applied.

(2) That since such an order could not be made by consent
and the responsibility for deciding whether the access conditions
were satisfied rested with the judge making the order, and since
the public interest in assisting the police investigation of crime
might be frustrated if the account holder knew of the application,
it was not necessary, for the purpose of giving business efficacy
to the banker-client relationship or (*per* Croom-Johnson L.J.)
by reason of anything contained in Schedule 1 to the Act of
1984, to imply an obligation that the bank, in the absence of
special circumstances known only to itself, should either oppose
or probe the application or the supporting evidence, or that it
should inform its client of the application; and that, accordingly,
the defendants' counterclaims disclosed no cause of action and
had properly been struck out (post, pp. 1074E–F, G–H, H—
1075A, 1076H—1077A).

F

G

H

*Reg. v. Manchester Crown Court, Ex parte Taylor* [1988] 1
W.L.R. 705, D.C. approved.

*Per* Lord Donaldson of Lymington M.R. The notification to
the banks was a sufficient compliance with the obligations of the

[1] Police and Criminal Evidence Act 1984, s. 9: see post, p. 1071B–C.
Sch. 1, para. 4: see post, p. 1071H.

1 W.L.R.                    Barclays Bank Plc. v. Taylor (C.A.)

A police to give notice of the applications, and the obligation of the police to specify the material the subject matter of the applications could be met by a specification given orally to officials of the banks (post, pp. 1073G–H, 1075A).

*Per* Croom-Johnson L.J. An order made against one holder of a joint account is nevertheless "compulsion of law" even though it has the effect of destroying in a technical sense the confidentiality of the other account holder's affairs (post, p.

B 1077B–C).

Decisions of Ian Kennedy J. affirmed.

The following cases are referred to in the judgments:

*Moorcock, The* (1889) 14 P.D. 64, C.A.
*Reg. v. Central Criminal Court, Ex parte Adegbesan* [1986] 1 W.L.R. 1292; [1986] 3 All E.R. 113, D.C.

C *Reg. v. Leicester Crown Court, Ex parte Director of Public Prosecutions* [1987] 1 W.L.R. 1371; [1987] 3 All E.R. 654, D.C.
*Reg. v. Manchester Crown Court, Ex parte Taylor* [1988] 1 W.L.R. 705; [1988] 2 All E.R. 769, D.C.
*Shirlaw v. Southern Foundries (1926) Ltd.* [1939] 2 K.B. 206; [1939] 2 All E.R. 113, C.A.; [1940] A.C. 701; [1940] 2 All E.R. 445, H.L.(E.)
*Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B.

D 461, C.A.

The following additional cases were cited in argument:

*Clarke v. Bruce Lance & Co. (A Firm)* [1988] 1 W.L.R. 881; [1988] 1 All E.R. 364, C.A.
*Reg. v. Grossman* (1981) 73 Cr.App.R. 302, C.A.
*Schioler v. Westminster Bank Ltd.* [1970] 2 Q.B. 719; [1970] 3 W.L.R. 68;

E [1970] 3 All E.R. 177
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R. 1555; [1968] 2 All E.R. 1073

BARCLAYS BANK PLC. (TRADING AS BARCLAYCARD) V. TAYLOR

INTERLOCUTORY APPEAL from Ian Kennedy J.

F By a letter dated 28 February 1986 the Greater Manchester Police informed Barclays Bank Plc. that they were making application at Manchester Crown Court for an order of access under section 9 of the Police and Criminal Evidence Act 1984 in respect of accounts maintained at specified branches of the bank, the relevant accounts having already been particularised to the appropriate officer of the bank, and further stating that no contact should be made with the account holder regarding

G the application. On 12 March 1986 Judge Presst, sitting at Manchester Crown Court ordered, pursuant to section 9 of and paragraph 4 of Schedule 1 to the Act of 1984, that the bank should give the police access to the relevant material, being special procedure material in their possession at the specified branches namely: ledger accounts, accounting documents, correspondence, minutes and business records relating to

H Kevin Taylor and a number of companies of which he and his wife, Beryl Honora Taylor were directors. The bank complied with the order.

By an action begun in the Northampton County Court, the plaintiffs, Barclays Bank Plc., (trading as Barclaycard), claimed against the defendant, Kevin Taylor, the sum of £3,586.20 together with costs in respect of a debt arising on his Barclaycard account. The defendant admitted liability but counterclaimed by a defence and counterclaim dated 12 February 1987 for general damages on the grounds that the

plaintiffs as his bankers when served with orders for access under section 9 of the Act of 1984 had (1) failed to resist the order sought either on the ground of its width or depth; (2) failed to satisfy themselves that the conditions for granting the order had been complied with under Schedule 1 to the Act; (3) failed to stipulate that the bank would look to the police for the costs incurred on or about the application; (4) failed to notify the defendant or his solicitors in their improper acquiescence to a request from the police to maintain confidentiality thereby preferring the interests of the police to those of the defendant in circumstances where no court order restraining the bank from so informing their customer existed or was contemplated. Further and in the alternative the defendant counterclaimed for damages on the ground that his contract with the bank had in the events transpiring since 27 February 1986 and 12 February 1987 been frustrated at law.

On 19 March 1987 the plaintiffs applied for an order striking out the defendant's counterclaim on the ground that it disclosed no reasonable cause of action against them and or was frivolous, vexatious and/or an abuse of the process. On 20 March the plaintiffs were awarded judgment for the sum claimed, execution being stayed pending the hearing of the counterclaim. By an order dated 15 May 1987 Mr. Registrar Elliott, sitting at Northampton County Court, continuing the stay, transferred the action to the High Court and dismissed the plaintiffs' application to strike out the counterclaim, directing that any appeal be heard in the High Court.

On 6 November on the hearing of an application made in the High Court to strike out the defendant's counterclaim, his wife, Beryl Honora Taylor, was represented as intervener. The judge, sitting in chambers, struck out the counterclaim and refused leave to appeal. Pursuant to the leave granted by Mustill L.J. on 29 March 1988 both to the defendant and to Mrs. Taylor as proposed second defendant and by a notice of appeal dated 6 April 1988 the defendants appealed on the grounds that (1) it was an implied term of the contract between a bank and its customer that the bank should preserve the confidence with regard to information relating to its customer which was in its possession. Alternatively the bank owed a duty of care to its customer to that effect; (2) it was accepted that the bank was under a duty to make disclosure of confidential information under compulsion of law. A bank was under a duty by virtue of its implied contract, alternatively arising from its duty of care to: (a) examine any notice served on it under the Police and Criminal Evidence Act 1984 to ensure that the notice was valid, (b) notify the customer, the bank's principal, of the notice to enable him to give the bank instructions in respect of it, (c) not to disclose information if the notice were defective, (d) oppose the making of the order by appearing at the inter partes hearing, the customer agreeing to indemnify the bank, (e) not to comply with such parts of the notice as might be unlawful; (3) those were important issues affecting the relationship between a bank and its customer arising from the Act of 1984 which had not been decided by the court, and the judge misdirected himself in holding that it was such a plain and obvious case that the defendants' pleadings should be struck out. The proposed second defendant in addition relied on the further grounds that (4) the judge misdirected himself in law in holding that where the bank received the order in respect of the first defendant only, it was entitled to allow inspection of a joint account held by both defendants to the prejudice of

A   the second defendant; and (5) the bank was in breach of its duty of care to the second defendant in allowing the inspection of the joint account when there was only an order in respect of the first defendant.

The facts are stated in the judgment of Lord Donaldson of Lymington M.R.

B   TRUSTEE SAVINGS BANK OF WALES AND BORDER COUNTIES AND ANOTHER
v. TAYLOR AND ANOTHER

INTERLOCUTORY APPEAL from Ian Kennedy J.

By letters dated 18 and 28 February 1986 the Greater Manchester Police informed the Trustee Savings Bank at their main office in London of their intention to apply for an order of access under section 9 of the

C   Police and Criminal Evidence Act 1984 in respect of accounts maintained at its branch at 60 Lombard Street London, one such account being jointly held by the defendants, Kevin Taylor and Beryl Honora Taylor. On 12 March 1986 Judge Presst sitting at Manchester Crown Court made the order sought pursuant to paragraph 4 of Schedule 1 to the Act of 1984. The bank subsequently complied with the order.

D   By particulars of claim dated 6 June 1986 the Trustee Savings Bank of Wales and Border Counties and the Custodian Trustees for the Trustee Savings Bank of Wales and Border Counties began mortgage possession proceedings in Bury County Court against the defendants. On 18 July 1986 a possession order was made on terms that the defendants made a series of specific payments to the plaintiff banks. On

E   the defendants failing to comply with the order, the banks issued a warrant for possession. On 3 June 1987 the defendants applied to suspend the warrant on the ground that they asserted a counterclaim alleging that the bank wrongfully and in breach of its duty of confidence (i) failed to notify the defendants of the making of the application for the access order and or the matters set out in the letters from the police

F   dated 18 and 28 February 1986, (ii) failed to consider the terms of the application made in the letter of 28 February or to advise on it, (iii) failed to oppose the making of the access order and or (iv) failed to appear to be heard as to the making of the order and its scope, and or (v) failed to make any representation to the police as to the making or scope of the order, (vi) failed to notify the defendants that the orders

G   had been made, (vii) wrongfully supplied the banking information relating to the second defendant who was not the subject of either an intended or actual application or any order under the Act, and they claimed, inter alia, damages for breach of contract and aggravated damages. On 7 June 1987 the defendants' application was dismissed, the counterclaim being transferred to the High Court. On 6 November 1987,

H   on the banks' application the judge hearing the matter with the application of the plaintiff bank in Barclays Bank Plc. v. Taylor struck out the counterclaim and refused leave to appeal. The defendants appealed pursuant to the leave granted by Mustill L.J. on 29 March 1988 and a notice of appeal asserting the same grounds of appeal as those advanced in the first action.

The facts are stated in the judgment of Lord Donaldson of Lymington M.R.

1070

**Barclays Bank Plc. v. Taylor (C.A.)**                    **[1989]**

*Anthony Scrivener Q.C.* and *Ian McCulloch* for Mr. Taylor.                    A
*Anthony Scrivener Q.C.* and *Robin De Wilde* for Mrs. Taylor.
*John Jarvis* Q.C. for the banks.


                                                    *Cur. adv. vult.*


                                                                    B
22 May.   The following judgments were handed down.


LORD DONALDSON OF LYMINGTON M.R. Mr. and Mrs. Taylor are
aggrieved because the banks did not oppose the making of orders under
the Police and Criminal Evidence Act 1984 ("PACE") authorising the
police to inspect Mr. Taylor's accounts, one of which was a joint        C
account with his wife and did not tell them that the police were applying
for such orders. Faced with writs claiming money due to the banks, Mr.
Taylor counterclaimed in the Barclays Bank action and both Mr. and
Mrs. Taylor counterclaimed in the Trustee Savings Bank action. The
basis of the counterclaims was alleged breaches of the duty owed by the
banks to Mr. and Mrs. Taylor as their customers. On the application of
the banks, Ian Kennedy J. struck out the counterclaims as disclosing no    D
cause of action and Mr. and Mrs. Taylor now appeal.

It is common ground that the banks did not oppose the making of
the orders or inform Mr. and Mrs. Taylor that the police were applying
for them. The issue is thus purely one of law: were the banks under any
obligation to do so?

The banker-customer relationship imposes upon a bank a duty of    E
confidentiality in relation to information concerning its customer and his
affairs which it acquires in the character of his banker. But it is not an
absolute duty. It is subject to four well known qualifications. These
entitle the bank to make disclosure where: (a) disclosure is under
compulsion by law; (b) there is a duty to the public to disclose; (c) the
interests of the bank require disclosure; and (d) the disclosure is made
by the express or implied consent of the customer.                    F

Authority for these propositions, and examples of their application,
are to be found in the speech of Bankes L.J. in *Tournier v. National
Provincial and Union Bank of England* [1924] 1 K.B. 461, 473.

In the instant case the banks made disclosure to the police under
compulsion of law, namely in compliance with orders made by a circuit
judge under section 9 of and Schedule 1 to PACE. Mr. Anthony    G
Scrivener appearing for Mr. and Mrs. Taylor, submits that this is too
simple an answer because it assumes that the orders were properly
made. I do not accept this submission. The only assumption which I
make is that they were made by a circuit judge and that they were
orders which fell within his jurisdiction. Whether any or all the conditions
precedent to the making of such an order were satisfied and whether, in
the exercise of his judicial discretion, he should have made them is    H
wholly irrelevant, because a court order which is valid on its face is fully
effective and demands compliance unless and until it is set aside by due
process of law.

It follows that there was no breach of the banks' obligation of
confidence. This is not, however, the end of the appeal because Mr.
Scrivener is entitled to argue, and does argue, that the banks are subject
to an implied contractual obligation to take action in support of the

A    confidentiality of their customers' affairs by resisting the making of such an order and by informing their customer when they learn that such an order will be sought.

In considering this submission it is necessary to look in rather more detail at PACE.

Section 9 of PACE provides:

B    "(1) A constable may obtain access to excluded material or special procedure material for the purposes of a criminal investigation by making an application under Schedule 1 below and in accordance with that Schedule. (2) Any Act (including a local Act) passed before this Act under which a search of premises for the purposes of a criminal investigation could be authorised by the issue of a warrant to a constable shall cease to have effect so far as it relates

C    to the authorisation of searches—(a) for items subject to legal privilege; or (b) for excluded material; or (c) for special procedure material consisting of documents or records other than documents."

"Special procedure material" is defined in section 14 and covers all the information and records which are subject to a banker's obligation of confidence to his customer.

D    Schedule 1, so far as material, provides:

"1. If on an application made by a constable a circuit judge is satisfied that one or other of the sets of access conditions is fulfilled, he may make an order under paragraph 4 below.

"2. The first set of access conditions is fulfilled if—(a) there are reasonable grounds for believing—(i) that a serious arrestable

E    offence has been committed; (ii) that there is material which consists of special procedure material or includes special procedure material and does not also include excluded material on premises specified in the application; (iii) that the material is likely to be of substantial value (whether by itself or together with other material) to the investigation in connection with which the application is made; and (iv) that the material is likely to be relevant evidence; (b) other

F    methods of obtaining the material—(i) have been tried without success; or (ii) have not been tried because it appeared that they were bound to fail; and (c) it is in the public interest, having regard—(i) to the benefit likely to accrue to the investigation if the material is obtained; and (ii) to the circumstances under which the person in possession of the material holds it, that the material

G    should be produced or that access to it should be given.

"3. The second set of access conditions is fulfilled if—(a) there are reasonable grounds for believing that there is material which consists of or includes excluded material or special procedure material on premises specified in the application; (b) but for section 9(2) above a search of the premises for that material could have been authorised by the issue of a warrant to a constable under an

H    enactment other than this Schedule; and (c) the issue of such a warrant would have been appropriate.

"4. An order under this paragraph is an order that the person who appears to the circuit judge to be in possession of the material to which the application relates shall—(a) produce it to a constable for him to take away; or (b) give a constable access to it, not later than the end of the period of seven days from the date of the order or the end of such longer period as the order may specify.

1072

**Lord Donaldson**
**of Lymington M.R.**    Barclays Bank Plc. v. Taylor (C.A.)    **[1989]**

"7. An application for an order under paragraph 4 above shall    A
be made inter partes.

"8. Notice of an application for such an order may be served on
a person either by delivering it to him or by leaving it at his proper
address or by sending it by post to him in a registered letter or by
the recorded delivery service.

"11. Where notice of an application for an order under paragraph
4 above has been served on a person, he shall not conceal, destroy,    B
alter or dispose of the material to which the application relates
except—(a) with the leave of a judge; or (b) with the written
permission of a constable, until—(i) the application is dismissed or
abandoned; or (ii) he has complied with an order under paragraph
4 above made on the application.

"12. If on an application made by a constable a circuit judge—    C
(a) is satisfied—(i) that either set of access conditions is fulfilled;
and (ii) that any of the further conditions set out in paragraph 14
below is also fulfilled; or (b) is satisfied—(i) that the second set of
access conditions is fulfilled; and (ii) that an order under paragraph
4 above relating to the material has not been complied with, he may
issue a warrant authorising a constable to enter and search the
premises.    D

"14. The further conditions mentioned in paragraph 12(a) (ii)
above are—(a) that it is not practicable to communicate with any
person entitled to grant entry to the premises to which the
application relates; (b) that it is practicable to communicate with a
person entitled to grant entry to the premises but it is not practicable
to communicate with any person entitled to grant access to the    E
material; (c) that the material contains information which—(i) is
subject to a restriction or obligation such as is mentioned in section
11(2)(b) above; and (ii) is likely to be disclosed in breach of it if a
warrant is not issued; (d) that service of notice of an application for
an order under paragraph 4 above may seriously prejudice the
investigation.

"15(1) If a person fails to comply with an order under paragraph    F
4 above, a circuit judge may deal with him as if he had committed a
contempt of the Crown Court. (2) Any enactment relating to
contempt of the Crown Court shall have effect in relation to such a
failure as if it were such a contempt."

The police, understandably, did not apply ex parte for a search    G
warrant under paragraph 12, but instead applied for a production and
disclosure order under paragraph 4. Since paragraph 7 requires the
application to be made inter partes someone has to be given notice of
the application. The obvious and necessary respondent to the application
is the person to whom the order will be addressed and who will have to
take action under it if the application is successful, i.e. the banks. I see
no reason why this should be extended to the account holder and in    H
some circumstances doing so would without doubt frustrate the
investigation which a paragraph 4 order is designed to assist. Mr.
Scrivener, on instructions, tells us that, if Mr. and Mrs. Taylor had been
given notice, they would have authorised the banks to give disclosure
and not only would an order have been unnecessary, but it could not
have been made because of the provisions of paragraph 2 (b)(ii) of the
first set of access conditions. The police obviously did not believe this.

**1 W.L.R.**                    Barclays Bank Plc. v. Taylor (C.A.)                    Lord Donaldson
of Lymington M.R.

A    Suffice it to say that, whilst the police are always free to notify the account holder of their intention to make such an application, I can find nothing in the Schedule or in the nature of an order under paragraph 4 to suggest that such notice is required.

The notice given by the police in the case of Barclays Bank took the form of a letter in the following terms:

B        "28 February 1986
"Dear Sir,
"Application under section 9 of the Police and Criminal Evidence Act 1984
"I am writing to advise you in accordance with the requirements of the Police and Criminal Evidence Act 1984, that on the 12 March 1986, a formal application is to be made before a circuit judge at

C        Manchester Crown Court for an order of access under the provisions of section 9 of the above Act, relative to certain bank accounts maintained at your branch offices Strangeways Manchester and 1 Wigan Road, Ashton in Makerfield. The granting of such orders would, apart from the prime objective of authorising access to such records, protect the bank from any breaches of confidentiality in

D        disclosing any necessary information to the police. If you have any objections to the applications being made, please notify my office by telephone within seven days of the date of this letter, so that arrangements can be made for the court to be made aware of the nature of any objections. Mr. Lowry, of the Inspection Department, Manchester Regional Office, Barclays Bank Plc., is aware of the particular accounts subject of this application. May I stress, that out

E        of necessity, at this stage the proposed proceedings are strictly confidential, and no contact should be made with the account holder regarding the pending application. Your assistance in this matter is appreciated.
"Yours faithfully,
        Detective Chief Inspector

F        Secretary,
Barclays Bank Plc.,
54 Lombard Street,
London"

A similar letter, naming a different branch and a different officer as

G    having been informed of the particular accounts which were the subject of the application, was sent to the Trustee Savings Bank.

Mr. Scrivener submits that the letter is plainly defective, because it relies upon extraneous and oral specification of the accounts concerned. This point was raised by way of judicial review in a different case in which Mr. Taylor was involved and was rejected: see *Reg. v. Manchester Crown Court, Ex parte Taylor* [1988] 1 W.L.R. 705. Suffice it to say that

H    I agree with and follow that decision. Paragraphs 7 and 8 read together require the police to give written notice to the person in possession of the material that a section 9 application is to be made and when, where and to whom it will be made. Paragraph 11 by necessary implication requires that the subject matter of the application be identified to the respondent, but not that this be done in the written notice itself. However, Mr. Scrivener is entitled to say that at the time when the letter was received this may have been an open question.

1074

A

Mr. Scrivener also submits that the letter is misleading and defective as a notice under Schedule 1 in that it might imply that the only way in which the bank could voice an objection was by notifying the police and leaving it to them to bring the objection to the attention of the judge. This I do not accept. The bank is to be assumed to be familiar with the relevant parts of PACE and would know that it had a right to be heard by the judge. What was being offered by the letter was an additional facility which the police were not obliged to offer.

B

I have dealt with these objections to the police's letters to the banks, because Mr. Scrivener voiced them. However, I do not think that they are material to the question which we have to consider, namely, did the banks owe a duty to Mr. and Mrs. Taylor to attend the hearing of the application and either object to the making of the order or at least probe the evidence placed before the circuit judge in support of the application. Further or alternatively, did they owe a duty to Mr. and Mrs. Taylor which required them to disregard the request by the police that there should be no contact with the account holder regarding the application.

C

Mr. Scrivener's argument that the banks did owe such a duty was based upon a contention that the banks' duty to maintain confidentiality was all-embracing, subject to the four exceptions set out in *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461. From this it followed, so he submitted, that there was an implied obligation to do everything possible to prevent the application of the exceptions. I do not agree. The duty to maintain confidentiality is not all-embracing, subject to exceptions. It does not exist in the four exceptional circumstances and it is no part of the duty of confidentiality to seek to avoid disclosure under compulsion by law.

D

E

The real question is whether, in order to give business efficacy to the relationship of banker and customer, there must be an implied obligation to contest a section 9 application or to probe it or to inform its customer. Since the responsibility for deciding whether the access conditions are fulfilled is firmly placed upon the circuit judge, and such an order cannot be made by consent of the parties, I can see no reason for implying an obligation to contest the application unless the bank knew something relevant to it which was not likely to be apparent on the face of the application or of the notice relating to it or might not be known to the police. The primary purpose of notice being given to the bank is to enable it to safeguard its own interests by, for example, pointing out it did not hold the accounts to which the application related.

F

G

There is no doubt that the banks were free to ignore the request not to inform Mr. and Mrs. Taylor of the application. However, I should have been surprised and disappointed if they had done so in the context of a criminal investigation unless they were under a legal duty to do so. There is a public interest in assisting the police in the investigation of crime and I can think of no basis for an implied obligation to act in a way which, in some circumstances, would without doubt hinder such inquiries.

H

Accordingly, I conclude that (i) the banks were obliged to comply with the section 9 orders and in so doing were not in breach of their duty to maintain confidentiality; (ii) the banks were under no obligation to oppose or probe the evidence given in support of the section 9 applications; (iii) the banks were not obliged to give Mr. and Mrs.

A    Taylor notice that the section 9 applications were being made in respect of their accounts; (iv) the letters to the banks were a sufficient compliance with the obligations of the police to give notice of the applications; (v) the obligation on the police to specify the material the subject matter of the applications could be met by a specification given orally to officials of the banks.

B    I would accordingly dismiss the appeal.


CROOM-JOHNSON L.J.   The defendants in these two actions appeal from the judgment of Ian Kennedy J. given on 6 November 1987 whereby he ordered that the counterclaim in each action be struck out as disclosing no reasonable cause of action. Each action is brought by a bank, one against Mr. Taylor, and the other against Mr. and Mrs. C    Taylor. In each case the counterclaim alleges that the plaintiff bank is liable in damages to the defendants for breach of the term of confidentiality which is implicit in the contract between bank and customer. The breach of confidence arose in each case because the Greater Manchester Police obtained from a circuit judge an order under section 9 of the Police and Criminal Evidence Act 1984 ("PACE") for D    access to special procedure material as defined in section 14 of that Act. Faced with those orders, the banks complied with them, thereby necessarily breaching the duties of confidence which they owed to Mr. and Mrs. Taylor.

The four circumstances in which a banker is justified in breaking that duty are set out in *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, 473 in the judgment of Bankes L.J. The first E    is "disclosure . . . under compulsion by law." That means that, in complying with the orders under section 9, the banks were not in breach of that implied term in their contracts with Mr. Taylor.

Mr. Scrivener, however, seeks to go behind the orders and submits that they were invalid because they were not obtained in accordance with Schedule 1 to PACE, which governs the procedure by which orders F    may be obtained under section 9. But, since the orders have been obtained, and still stand, the breaches of confidence cannot be attacked, nor can they sound in damages, whether for breach of contract or for an equivalent duty in tort. Accordingly, the defendants have an alternative argument and submit that the damages claimed are not for breach of the banks' duty of confidence, but for breach of a different duty. This is G    pleaded as the breach of a "duty to preserve the . . . confidence."

What is said is that, once the police have served on a bank, in accordance with Schedule 1, paragraph 8, a notice that they intend to make an application for an access order under section 9, there arises a different duty imposed on the bank to take certain steps with a view to preventing the order being made by the circuit judge. If, nevertheless, the judge goes on and makes the order, the confidence is breached and H    it is very difficult to see what damage will have been suffered by the bank's customer.

The hearing before the judge is inter partes: see Schedule 1, paragraph 7. It is now settled that the "partes" are the police and the bank. The customer of the bank does not have a right to be heard: see *Reg. v. Leicester Crown Court, Ex parte Director of Public Prosecutions* [1987] 1 W.L.R. 1371. Indeed, as was pointed out by Watkins L.J. in that case, it is often desirable that the people whose affairs are about to

A

be investigated should be kept in ignorance of the fact. There is nothing in Schedule 1 which forbids people like banks from telling their customers that such an investigation may take place. On the other hand, there is nothing in Schedule 1 which authorises it either. In *Reg. v. Manchester Crown Court, Ex parte Taylor* [1988] 1 W.L.R. 705, 709, *per* Glidewell L.J., the protection which is required to be afforded to people in the position of Mr. Taylor is to come from the circuit judge, who must satisfy himself that the access conditions have been complied with.

B

In order to see whether Mr. Taylor has a reasonable cause of action, which is not susceptible to being struck out, it is necessary to consider whether there is to be implied in the contract between banker and customer a term which goes beyond the ordinary duty of confidentiality. It would have to be generally applicable to the many statutes besides PACE which authorise the inspection of confidential information in the possession of banks. It would have to apply to such statutes as the Bankers' Books Evidence Act 1879, Drug Trafficking Offences Act 1986, Taxes Management Act 1970, Companies Act 1985, to name only some of the statutes at present in force requiring disclosure by banks of the affairs of their customers. The breaches of such an alleged term which are pleaded in Mr. Taylor's counterclaim against the Trustee Savings Bank are (a) failing to notify the Taylors of the making of the application, (b) failing to consider the terms of the application or to obtain advice about it, (c) failing to oppose the application, (d) failing to make representations to the police.

C

D

Those may be summarised by saying that the bank is undertaking by an implied term to use its best endeavours to prevent the confidentiality from being destroyed by legal orders made under a number of statutes on different subjects. It would not be possible to imply a term which was limited in its effect only to the Police and Criminal Evidence Act 1984.

E

In addition, such a term would have to apply in one other set of circumstances mentioned by Bankes L.J. in *Tournier v. National Provincial and Union Bank of England* [1924] 1 K.B. 461, 473 in which the bank is relieved from its obligation of confidentiality. That is, where there is a public duty to disclose.

F

So far as the issues in the present case are concerned, it is submitted for Mr. Taylor that what the banks should have done when they received the notices of applications for orders served on them under Schedule 1, paragraph 8 was to have scrutinised them and seen whether they were good on their faces, and whether they were in order, and complied with what Schedule 1 requires. If a notice is not in order, then any order made consequent on its service may be subject to judicial review: see *Reg. v. Central Criminal Court, Ex parte Adegbesan* [1986] 1 W.L.R. 1292. But the claims for damages with which Mr. Taylor's counterclaims are concerned deal with an earlier stage, the stage between the service of the notice of application and the actual making of the order itself. There is no need to imply such a term in order to give the contract business efficacy: see *The Moorcock* (1889) 14 P.D. 64, nor would the officious bystander say "of course:" see *Shirlaw v. Southern Foundries (1926) Ltd.* [1939] 2 K.B. 206.

G

H

There is another argument against implying such a term, even in the very limited circumstances of an application for an order under section 9. This is that Schedule 1 to the Police and Criminal Evidence Act 1984 places no obligation on people in the position of the banks to do

A anything at all, save to preserve the confidential material once the notice is served: paragraph 11, and obey the order for access once it has been made: paragraph 4. Otherwise, they may choose to do nothing at all, not even to be present and take part in the inter partes hearing. There is nothing in the Schedule which indicates any need to imply the suggested term.

B If the suggested term is not to be implied, as in my view it is not, then the making of the access orders concludes the matter, and the counterclaims should both be struck out.

The complaint made by Mrs. Taylor is that one of the accounts at the Trustee Savings Bank is a joint account and that no order has been made against her. The judge pointed out that an order made against her husband, the other holder of the joint account, is nevertheless

C "compulsion of law," even though it has the effect of destroying in a technical sense the confidentiality of Mrs. Taylor's affairs.

I agree that these appeals should be dismissed.

SIR DENYS BUCKLEY.  I agree.

D
*Appeal dismissed.*
*No order for costs.*
*Legal aid taxation in Manchester.*
*Leave to appeal refused.*

*Solicitors: Edwin Coe, for A. J. Adler, Oldham; Lovell White Durrant; Wilde Sapte.*

E
D. E. C. P.

F

[COURT OF APPEAL]

\*REGINA v. CHIEF CONSTABLE OF THE MERSEYSIDE POLICE,
*Ex parte* MERRILL

G 1989  May 9; 17                          Lord Donaldson of Lymington M.R.,
                                           Woolf L.J. and Sir Denys Buckley

*Police—Disciplinary procedure—Delay—Complaint against police
    officer—Complainant charged with criminal offence—Police officer
    not served with notice of complaint until after complainant's
    trial—Whether notice of complaint served "as soon as . . .*
H *practicable"—Police (Discipline) Regulations 1985 (S.I. 1985 No.
    518), reg. 7*

On 28 August 1984 after a car chase, the applicant and two other police officers arrested E. and two other young men on suspicion of stealing a car. On 31 August solicitors acting for one of the men wrote to the Chief Constable giving details of a complaint against the police. An officer was appointed to investigate the complaint. In June 1985 E. appeared before the

# Annexe 11

# El Jawhary v Bank of Credit and Commerce International SA
# Pharaon and others v Bank of Credit and Commerce International SA
# Adham v Bank of Credit and Commerce International SA

CHANCERY DIVISION
SIR DONALD NICHOLLS V-C
21, 22 JULY 1992

*Winding up – Disclosure of information – Banker-customer obligation of confidentiality – Bank in liquidation – Customer obtaining injunction to prevent disclosure of confidential information – Variation of injunction – Basis on which variation would be granted.*

BCCI, a bank, went into insolvent liquidation and an injunction was granted in favour of some of its customers restraining the bank from disclosing any information relating to the customers in breach of the banker-customer obligation of confidentiality. In the present proceedings the liquidators sought an order varying the injunction to enable the bank to make disclosure as provided for in the third qualification to the banker-customer principle of confidentiality set out in *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, namely where it was in the interests of the bank that disclosure should be made.

**Held** – To prevent the variation to the injunctions sought, the plaintiffs would have to show that there was a real risk that BCCI, which was now under the control of liquidators, may breach the banker-customer privilege of confidentiality. On the facts, it had not been shown that there was a real risk that this would happen. The variation of the injunctions would be granted but the bank through the liquidators would still have to decide whether in a given case not covered by the injunction it was appropriate to make disclosure in the light of the banker-customer principle of confidentiality. The liquidators should err on the side of caution and if there was room for serious doubt obtain the consent of the plaintiffs or apply to the court for directions. Where the bank made disclosure which was wholly proper there was no basis for finding a duty by way of an implied term in a contract or otherwise to inform its customer that disclosure had been made.

Cases referred to in judgment
*Barclays Bank plc v Taylor* [1989] 3 All ER 563, [1989] 1 WLR 1066, CA.
*Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461, [1923] All ER Rep 550, CA.

Case also cited

*Capital Cameras Ltd v Harold Lines Ltd (National Westminster Bank plc intervening)* [1991] BCLC 884, [1991] 3 All ER 389, [1991] 1 WLR 54.

Application

The liquidators of the Bank of Credit and Commerce International SA applied to discharge injunctions obtained by the plaintiffs in three separate actions in May and August 1990, on ex parte applications, restraining the bank from disclosing information concerning the plaintiffs in breach of its bank-customer obligation of confidentiality. The facts are set out in the judgment.

*Charles Purle QC* and *Caroline Lewis* (instructed by *Lovell White Durrant*) for the liquidators.
*Nicholas Underhill QC* (instructed by *Berwin Leighton*) for Adham and El Jawhary.
*Timothy Wormington* (instructed by *Berwin Leighton*) for Pharaon.

**SIR DONALD NICHOLLS V-C.** Before BCCI went into compulsory liquidation or provisional liquidators were appointed, the plaintiffs in these three actions obtained injunctions in May and August 1990, on ex parte applications, restraining the bank from, in short, disclosing information concerning the plaintiffs in breach of its banker-customer obligation of confidentiality. At that time there had, apparently, been breaches by BCCI of that obligation.

The applications before me are a little bedevilled by the fact that discharge of the injunctions in toto is not sought by the notices of motion. What is sought is a variation of the injunctions. In the course of these applications and prompted, I think, by observations from me, the liquidators today applied to amend their notices of motion to seek orders discharging the injunctions entirely. I refused the application to amend because the plaintiffs objected to the amendment. The plaintiffs sought, and in my view were entitled to have, further opportunity to consider their position on this and to adduce evidence. In consequence the scope of the applications before me has remained confined to removing certain types of disclosure from the ambit of the injunctions. This method of proceeding can all too easily be read as carrying with it the implication that if the injunctions are varied as sought, the matters encompassed by the variation have been approved and sanctioned by the court as conduct which will not constitute breach of the banker-customer obligation of confidentiality.

Despite this complication, I consider that in approaching these applications I should have regard to the underlying question of whether the plaintiffs need protection by injunctions at all, at any rate so far as the injunctions bear on disclosure made pursuant to the third of the qualifications enunciated by Bankes LJ in the well-known case of *Tournier v National Provincial and Union Bank of England* [1924] 1 KB 461 at 473, [1923] All ER Rep 550 at 554. That qualification is concerned with disclosure where the interests of the bank require disclosure to be made. That is the qualification relevant to the present applications.

As to that, the affairs of BCCI are now under the control of the liquidators. In my view, the foundation of any claim that the injunctions should still continue has to be a real risk that BCCI, through the liquidators, may breach the banker-

customer obligation of confidentiality. It is only against that risk, if it exists, that the plaintiffs now, since the onset of the liquidation, need the protection of injunctions. *a*

The plaintiffs rely principally on two matters. They contend that the liquidators have misunderstood the scope of the 'interests of the bank' qualification. They have misconstrued the latitude they have. It was submitted that the liquidators seem to think that the duties imposed on them as liquidators extend their powers to make disclosure of confidential information to third parties. *b* The plaintiffs contend, therefore, that the information BCCI has regarding the plaintiffs is not safe in the liquidators' hands.

The two matters relied on are these. First, the terms of the liquidators' notices of motion. The variation sought is very wide. It would permit, in the sense of except from the injunctions, (1) disclosure of information and documents relating to the plaintiffs to any person for the purpose of taking possession of, getting in *c* and realising assets and property of companies in the BCCI group or for the purpose of the BCCI liquidators discharging their duties and taking any steps they consider necessary for winding up the affairs of BCCI and distributing its assets; and (2) disclosure so as to enable the BCCI group companies to plead and prosecute such legal proceedings they consider to be expedient and defend legal proceedings and comply with any obligation as to discovery. The plaintiffs *d* contend, and in my view rightly, that as that variation to the injunctions is drafted, in some circumstances it might well go beyond the bounds of disclosure of confidential information countenanced by the *Tournier* decision. Second, the plaintiffs rely on letters from the liquidators' solicitors preceding these applications. They submit the letters show that the liquidators' views are that *e* they are entitled to make use of the plaintiffs' confidential information and disclose it to others so long as this is necessary to conduct the liquidation of BCCI in accordance with the liquidators' duties as such. That, it is submitted, is too wide.

In my view, these points are not an adequate foundation on which to base a convincing contention that there is a real risk that the liquidators may breach *f* the duty of confidentiality. Mr Purle disclaimed any intention that the variation sought should authorise disclosure which, in the absence of the injunctions, the liquidators could not properly make. The variation was intended to be, and as the notices of motion have been amended it is, apt only to create an exception to the injunctions. As to the solicitors' letters, these contain express recognition that even if the injunctions are varied, the liquidators will continue to owe a *g* duty of confidentiality to the plaintiffs where the banker-customer relationship existed.

The plaintiffs addressed argument on the scope of the 'interests of the bank' qualification. In the *Tournier* case Atkin LJ referred to disclosure 'reasonably necessary for the protection of the bank's interests, either as against their *h* customer or as against third parties in respect of transactions of the bank for or with their customer.' (See [1924] 1 KB 461 at 486, [1923] All ER Rep 550 at 561.) It was submitted, so far as litigation is concerned, that this qualification is much narrower than the liquidators accept. It was submitted that there is here a genuine issue between the parties on the scope of the qualification, and that the so-called balance of convenience favours the grant of an injunction. It is fair *i* and reasonable that the liquidators should come back to the court with specific proposals when they wish to make disclosure. As to disclosure to the liquidators

of other BCCI group companies, it was submitted that those liquidators ought to give undertakings of confidentiality to the English court.

None of these points persuades the plaintiffs need the protection of injunctions against the liquidators. I well understand the plaintiffs' anxieties. The liquidators have a very formidable task. The bank is part of a group, and the affairs of the bank and other companies in the group are intertwined and difficult to disentangle. Realisation of the bank's assets, including its claims against auditors and others, is an exceedingly complex operation. It would be all too easy for the liquidators, in carrying out their work, to take the easier path whenever it exists and disclose confidential information, either to court-appointed office-holders in other jurisdictions, or in the course of litigation, or otherwise, without first giving careful thought to whether such disclosure falls clearly within the circumstances in which the information can properly be disclosed without breaching the bank's duty of confidentiality. Clearly, it is incumbent on the liquidators to take care to see this does not happen. They should err, if at all, on the side of caution. If there is room for serious doubt or argument, the liquidators must raise the matter with the relevant plaintiff and seek consent or apply to the court for directions. The plaintiffs in these actions have shown themselves ready to consent to disclosure in suitable circumstances, and in a proper case there ought not to be difficulty in resolving any doubts by agreement without recourse to the court. In some cases, recourse to the court may nevertheless be needed. If necessary, the liquidators can and should seek directions. The liquidators also must take care that all appropriate steps are taken to ensure that recipients of confidential information will themselves keep confidential the information disclosed to them. Again, if doubt exists on what those steps should be in a particular case, in the absence of agreement the liquidators should seek directions from the court.

One concern of the plaintiffs is that the liquidators, who admittedly do intend to make some disclosure of the plaintiffs' information to others, have not spelled out the proposed disclosure in detail. There is force in this contention. However, in my view, this does not point to the need for an injunction. What it does is to emphasise that these applications are not an appropriate vehicle for trying to mark out the particular safeguards, if any, which may be required in connection with particular types of disclosure or particular recipients of information. Those are matters which need to be considered having regard to the circumstances of particular instances.

I also have in mind that, in the nature of things, the disclosure of information is an irreversible step. If disclosure were made in breach of the duty of confidentiality, damages might well not provide an adequate remedy for the plaintiffs. This is a factor to be taken into account in the balance of convenience, but it does not weigh heavily in this case where, as I have indicated, I am not satisfied there is any real risk that the liquidators will commit a breach of the bank's duty of confidentiality.

Implicit in what I have said so far is something I should state explicitly, so there is no room for misunderstanding for the future. Amendment to the scope of the injunctions will not relieve the liquidators from any obligation of confidentiality resting on BCCI in the absence of the restrictions imposed by the injunctions. Accordingly, variation of the injunctions is not to be read as a decision by the court that the liquidators can properly make disclosures to the persons or for the purposes mentioned in the variation. Whether they can

depends on the nature of the particular information, the person to whom it is proposed to be disclosed and the particular purpose for which disclosure is being made. Likewise with the safeguards, if any, which the liquidators ought to obtain with a view to seeing the information remains confidential to those who receive it.

    The plaintiffs further submitted they have a seriously arguable case that the bank is obliged to tell the plaintiffs of any disclosure the liquidators have made of the plaintiffs' confidential information. I cannot accept this. Where the case is within one of the qualifications to the duty of confidence the duty, ex hypothesi, does not exist. I can see no basis for nevertheless implying an obligation on the bank to tell the customer that the bank has, on this footing wholly properly, passed information to a third party. As far as authority is concerned, the existence of such an implied obligation seems never to have been the subject of decision nor even consideration by the court in any reported case, despite the years which have elapsed since *Tournier* was decided. The nearest one comes to the matter being considered is the decision of the Court of Appeal in *Barclays Bank plc v Taylor* [1989] 3 All ER 563, [1989] 1 WLR 1066, but the point now under consideration did not arise there and was not expressly alluded to.

    Alternatively, it was submitted that the court in its discretion should build into the exception from the injunctions a procedure by which the plaintiffs will be made aware of who else has become possessed of their confidential information, so that they can keep a finger on the pulse and in effect police the liquidators' activities. I do not accept this, even as a general proposition. There may well be circumstances in which it would be undesirable, even self-defeating, for the plaintiffs to be given this knowledge.

    I add one further point of detail concerning the transmission of documents abroad. It really goes without saying, but to remove doubt I will state, that the liquidators should not part with original documents or send them abroad unless this is necessary, and if original documents are parted with, and especially if they are sent abroad, the liquidators must keep copies of all such documents.

    For these reasons, I shall make orders in the terms of the amended notices of motion.

*Order accordingly.*

Celia Fox    Barrister.

# Annexe 12

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 25 of 190

# Neil Owen Turner v Royal Bank of Scotland Plc

**No Substantial Judicial Treatment**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
24 March 1999

No: 1998/0523/2

Court of Appeal (Civil Division)

**1999 WL 477509**

Before: The Vice-Chancellor Lord Justice Thorpe and Lord Justice Judge

Wednesday 24th March 1998

On Appeal from Order of (His Honour Judge Rudd)

**Representation**

Mr A Malek QC (instructed by Panone & Partners , M3 2BU) appeared on behalf of the Appellant.
Mr Turner appeared in Person.

**Judgment**
Wednesday 24th March 1999

The Vice Chancellor:

In 1984 Mr Neil Owen Turner opened a business account with the Royal Bank of Scotland (the bank) at the Bank's London Road, Southampton branch. He later opened a personal account at the same branch.

There was nothing at all special in the circumstances in which the accounts were opened; Mr Turner simply signed a bank mandate and gave the Bank a specimen of his signature. That was all there was to the opening of the accounts.

Between 19th March 1986 and 24th May 1989 the Bank, on eight separate occasions, responded to so-called status enquiries about Mr Turner. The status enquiries were made by the local branch of the National Westminster Bank.

A status enquiry is an enquiry as to the creditworthiness of the individual. The Bank responded to the National Westminster's status enquires in terms unfavourable to Mr Turner. In responding in those terms, the Bank made use of information about the state of Mr Turner's accounts. For example, in responding to the enquiry of 19th March 1986 the Bank said that "from the figures available to us, his resources would appear to be fully committed at present."

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 26 of 190

This was a response which utilised a code devised by banks and understood by banks. A key to the code is contained in a glossary provided by the bank to its staff. According to the glossary "fully committed" means that the individual's accounts are "at limit or overdrawn and most or all assets pledged in security." And "may also suggest a lack of liquid funds".

The response to the status enquiry of 18th March 1987 was "we are not in a position to speak for this enquiry". This response was, according to the glossary code for "extreme caution required."

The responses to the other status enquiries were to much the same effect. It is clear that in giving these responses the Bank was making use of information about the state of Mr Turner's accounts and the manner in which he had conducted those accounts. The terms of these responses to the National Westminster's status enquiries suggest the Bank was finding Mr Turner an unsatisfactory customer. That seems, indeed, to have been the case. On 26th September 1986 the Bank served on Mr Turner statutory notices requiring him to pay his indebtedness on the two accounts. On 20th November 1987 the Bank issued a writ against him for recovery of the money. On 13th November 1992 the Bank obtained judgment against him in the sum of £15,925. The Bank then began bankruptcy proceedings based on the judgment debt.

On 18th September 1995, Mr Turner commenced proceedings against the Bank in the Southampton County Court. He claimed damages from the Bank for, among other things, breach of contract by the Bank in disclosing confidential information in response to the status enquiries. In its amended defence, dated 12th November 1997, the Bank admitted that it owed Mr Turner a duty of confidentiality in respect of his accounts, but contended that the duty did not apply so as to prevent it from supplying information with the consent of Mr Turner.

The kernel of the Bank's case was spelled out in the following three paragraphs of its amended defence:

"10.3 the Defendants admit that they gave references to National Westminster Bank plc in the terms set out in paragraph 10.2 hereof.

10.4 The Defendants will say that the said references constituted an ordinary, everyday activity of banking commerce, and were innocuous and justifiable.

10.5 The Defendant will aver that there was an express or, alternatively, implied consent for the giving of such references by the Defendant in its capacity as such Banker to the plaintiff."

At a pre-trial review conducted by His Honour Judge Rudd directions were given for the trial of the breach of contract issue in advance of any other issues. The hearing of this preliminary issue took place in November 1997 and judgment was handed down by His Honour Judge Rudd on 26th March 1998. The judge held that the Bank's responses to the status enquiries constituted a breach of an implied term of confidentially in the contract between the Bank and Mr Turner. The Bank has appealed against that ruling.

Both before Judge Rudd, and in this Court, Mr Turner has appeared in person.

The case for the Bank has been the same before this Court as it was below. The Bank contends that, at the relevant time, that is to say between 1986 and 1989 when the responses to the status enquiries were given, it was the general practice of banks in the ordinary course of business to respond to status enquiries made by other banks by giving information about the creditworthiness of customers. The Bank contends that every customer opening an account with the Bank must be taken to have agreed to this practice and to have authorised the Bank to give references to third party enquirers based on information that would normally be confidential.

The Bank, notwithstanding paragraph 10.5 of its amended defence, has not contended that Mr Turner expressly authorised it to give references about him. It has accepted that Mr Turner did not know about the general banking practice upon which the Bank relies. But it contends that the existence of the general practice, whether or not known to Mr Turner, binds Mr Turner and that, in opening an account with the Bank, he impliedly authorised the Bank to give information about his creditworthiness to other enquiring banks. The issue on this appeal is whether those contentions are right.

The issue, though important to the parties in this case, has been somewhat overtaken by events. In 1989, Professor Jack presented to Parliament a report on banking services. One of the matters of banking practice dealt with by the report was the giving by bankers of references in response to status enquiries, the banking practice on which the bank relies in this case. As to that, the report recommended as follows:

> "A standard of best practice should require a bank to give all its customers a clear explanation of how the system of bankers' opinions works and to invite them to give or withhold a general express consent for the bank to supply opinions on them, in response to status enquiries."

This recommendation has been adopted by banks and incorporated into the Banking Code , a voluntary code followed by banks and building societies in their relations with personal customers in this country.

Parag of the Code, adopted as I understand it in 1994, provides as follows:

> "We will tell you if we provide a banker's reference. If a banker's reference about you is requested we will require your written consent before it is given."

The Bank now adheres to the code. Since 1994 it has not given references about its customers without their written consent. But this case is dealing with the Bank's practice between 1986 and 1989. The issue is whether its practice at that time was consistent with the duty of confidentiality it owed to customers who, like Mr Turner, knew nothing of the general bankers' practice regarding status enquiries and had not consented or been asked to consent to opinions about their creditworthiness being given in response to status enquiries.

It may be that in some cases a status enquiry could be answered by a bank without any use being made of confidential information. In the present case, however, the Bank's responses to the National Westminster Bank's status enquiries were plainly based on the Bank's knowledge of the state of Mr Turner's accounts and the manner in which Mr Turner had conducted

© 2026 Thomson Reuters.

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 28 of 190

those accounts. The reference in the first of the responses to the overdrawn state of the account. These are matters of an essentially confidential character.

The modern law as to the duty of confidentiality owed by a banker to its customers starts with the *Court of Appeal judgments in Tournier v National Provincial & Union Bank of England [1924] 1 KB 461* . Bankes LJ, at page 471, said this in reference to the duty of confidentiality:

> "At the present day I think it may be asserted with confidence that the duty is a legal one arising out of contract, and that the duty is not absolute but qualified. It is not possible to frame any exhaustive definition of the duty. The most that can be done is to classify the qualification, and to indicate its limits."

And then at the bottom of page 472, he said:

> "In my opinion it is necessary in a case like the present to direct the jury what are the limits, and what are the qualifications of the contractual duty of secrecy implied in the relation of banker and customer. There appears to be no authority on the point. On principle I think that the qualifications can be classified under four heads: (a) Where disclosure is under compulsion by law; (b) where there is a duty to the public to disclose; (c) where the interests of the bank require disclosure; (d) where the disclosure is made by the express or implied consent of the customer."

After giving examples of the first three of these qualifications, Bankes LJ said this, about the fourth:

> "The familiar instance of the last class is where the customer authorises a reference to his banker."

Scrutton LJ, who dissented on a point not material to this appeal, said at page 480:

> "The Court will only imply terms which must necessarily have been in the contemplation of the parties in making the contract. Applying this principle to such knowledge of life as a judge is allowed to have, I have no doubt that it is an implied term of a banker's contract with his customer that the banker shall not disclose the account, or transactions relating thereto, of his customers except in certain circumstances."

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 29 of 190

Then, at the next page, page 481, he said:

> "I doubt whether it is sufficient excuse for disclosure, in the absence of the customer's consent, that it was in the interests of the customer, where the customer can be consulted in reasonable time and his consent or dissent obtained."

Atkin LJ, at page 484, said:

> "The facts in this case as to the course of business of this bank do not appear to be in any degree unusual in general banking business. I come to the conclusion that one of the implied terms of the contract is that the bank enter into a qualified obligation with their customer to abstain from disclosing information as to his affairs without his consent."

At page 486 Atkin LJ went on:

> "I have already stated the obligation as an obligation not to disclose without the customer's consent. It is an implied term, and may, therefore, be varied by express agreement. In any case the consent may be express or implied, and to the extent to which it is given the bank will be justified in acting. A common example of such consent would be where a customer gives a banker's reference. The extent to which he authorises information to be given on such a reference must be a question to be determined on the facts of each case. I do not desire to express any final opinion on the practice of bankers to give one another information as to the affairs of their respective customers, except to say it appears to me that if it is justified it must be upon the basis of an implied consent of the customer."

The principles laid down in these dicta in Tournier regarding a bank's obligation of confidentially to its customer have been confirmed in this Court on a number of occasions. They are not open to doubt (see Lipkin Gorman v Karpnale Ltd [1989] 1 WLR 134O per May LJ at page 1357G.)

So there really is only one issue: does the banking practice on which the Bank relies justify imputing to Mr Turner an implied consent to the bank using information that would otherwise be confidential in order to give other banks references about his creditworthiness?

There are a number of factual findings made by the judge to which I should at this point refer. The judge found:

© 2026 Thomson Reuters.

(1)  that Mr Turner was unaware of the banking practice under which the Bank gave references in response to status enquiries;

(2)  that nothing was said or disclosed to Mr Turner to put him on notice of the existence of this banking practice; and

(3)  that the Bank went to considerable lengths to conceal from its customers the fact that it was giving references about their creditworthiness.

The judge found, also, that at the relevant time there were some banks which did not give these references without the express written consent of their customers. As to this, Mr Malek QC, counsel for the bank, has submitted that the finding was not justified and was based on a misunderstanding of the evidence.

Evidence had been given by Mr Gordon Watson, a senior employee of the Bank. Mr Watson's evidence was that in the period 1986 to 1989 all banks gave references to other banks without first getting the consent of their customers. There was, Mr Watson said, a general bank practice to that effect.

I accept this point of criticism of the judgment. There was no evidence before the judge that contradicted Mr Watson's evidence to which I have referred.

A comment on the judge's finding referred to at (3) above is desirable. Mr Malek was disposed to be critical of this finding. But it was, in my judgment, fully justified by the evidence. The evidence included a memorandum, in loose leaf form, used by the Bank internally for the purpose of providing guidance to its staff as to what they should do when receiving status enquiries about customers. The existence of the memorandum was disclosed by the Bank very late in the day. A number of the pages bear dates later than 1989. It was some of these post 1989 pages that had misled the judge into thinking that in the period 1986 to 1989 there were some banks which did not give references without their customers' express consent. We were told by Mr Malek that the Bank no longer had available the pages that were current between 1986 and 1989. Be that as it may, the memorandum includes the following passage:

> "Enquiries made concerning the standing of customers must be regarded as confidential and the fact that such enquiry has been made should not be revealed to the customer unless exceptional circumstances warrant it. In no case should the name of the enquiring bank or agency be mentioned or admitted at any time."

There is no reason to suppose that this passage was inserted after 1989. Given the Bank's inadequate discharge of its obligations of discovery, of which the judge was rightly critical, it is permissible, in my opinion, to infer that this passage was part of the memorandum in the period 1986 to 1989. The passage seems to show a deliberate policy on the part of the Bank to keep customers in ignorance of the status enquiries being made about them. The proposition that Mr Turner and other customers must be taken to have impliedly consented to the Bank disclosing information about their creditworthiness must, in my view, be considered in the context of this policy of the Bank, revealed by the passage that I have read, of keeping from its customers the fact that enquiries had been made about them and that information about their creditworthiness had been disclosed.

© 2026 Thomson Reuters.

In arguing for a conclusion in favour of implied consent, Mr Malek relied heavily on passages in various text books. He relied in particular on the current addition of Paget on Banking, the 11th edition, in which reference is made to "the long established proposition that a customer impliedly consents to the giving of a banker's reference." (See page 124).

But how long is "long established"? Lord Chorley in the Gilbart lectures, delivered in 1964, referred to the practice of banks in responding to status enquiries without first obtaining the consent of their customers and said at page 24:

> "Paget in the last edition of his great work for which he was personally responsible expressed the view that it is doubtful whether the practice is so common and so well recognised that it can be regarded as implicitly authorised by all customers of the banks. The present editor of Paget's book Mr Megrah considers that this is still true even today. Adding so far as private customers are concerned it is probably fair to say that a large proportion have no knowledge of anything more than that for special purposes, such as tenancies reference to one's banker is often necessary."

Lord Chorley then went on:

> "I doubt if anything has happened during the past 25 years, which enables one to say with confidence the practice has become universally recognised. Tens of thousand of accounts have been opened in the interval but probably an even larger proportion of the new customers are unaware of the alleged usage than was the case with the general run of customers 30 or 40 years ago."

In the 6th edition, the 1974 edition, of Chorley's Law of Banking the view is expressed that "the practice appears to be unjustifiable, according to the doctrine enunciated in Tournier's case" (page 24). There seems, therefore, to be a dispute among the academic commentators as to whether the "long established" proposition is in truth established at all.

In this state of affairs I would return to basic principles. The Bank's case is that the general practice of bankers regarding status enquiries is contractually binding on customers whether or not they know about it, or have any reasonable means of finding out about it.

In Chitty on Contract, 27th edition Vol I. Paragraph 13–014, the circumstances in which usage can become contractually binding are set out:

> "To be binding the usage must be notorious, certain and reasonable and not contrary to law."

How can the bankers' practice on which the Bank relies be regarded as notorious? It is not to the point that all banks may have known of it. The question is whether it was also notorious among the customers, the ordinary members of the public who open accounts with banks. There is no evidence whatever that in that sense this banking practice was notorious. Mr Turner did not know of it. Ordinary banking customers do not read Paget or any other banking text books. There was no evidence of any banking literature, prepared for the purpose of persuading individuals to open accounts with banks, that drew attention to the practice. There was no evidence of any documents put before customers, when opening an account with banks, that drew attention to it. As I have said, the evidence in this case disclosed a policy on the part of the Bank that customers should, if possible, be kept unaware of the practice.

The law holds a person contractually bound by an established usage even if he does not know of it. But it cannot become an established usage unless it is notorious. How can a banking practice be notorious if the existence of the practice is kept from customers?

The proposition that banks can agree among themselves upon a banking practice and put the practice into effect without the knowledge of their customers and then claim that, because the practice is common to all banks, it is binding upon their customers is, in my judgment, unacceptable. There is some authority supporting that reaction.

In Barclay's Bank v Bank of England [1985] All ER 385 Bingham J, as he then was, rejected an argument that because it was the usage of bankers to clear cheques through the clearing house system, the obligation of a presenting banker to present the cheque for collection at the branch of the paying bank where the drawer had his account was discharged by delivery of the cheque to the clearing house (see page 391). He made this comment:

> "The drawer of a cheque has a clear statutory right under section 45 of the 1882 Act (subject to section 46) to be discharged from liability if the cheque is not duly presented to him or his branch of the paying bank for payment. If it is to be said that the drawer loses that right as the result of a private agreement made between the banks for their own convenience, the very strongest proof of his knowledge and assent would be needed."

That comment has, in my judgment, a resonance in the present case. In the present case, the bankers' practice on which the Bank relies seems to me to be no more than a private agreement among banks to respond to status enquires made by other banks by giving opinions based on the state of their customers' accounts. But their customers are entitled, under the Tournier rule, that bankers should treat the state of their accounts as confidential. Customers cannot, in my judgment, be deprived of these rights by bankers establishing among themselves a bankers' practice.

The Banking Code, paragraph 4.5 , that I have read, recognises, in my judgment, the legal obligations of bankers. It does not, in my view, confer on customers rights that they did not previously have. In my judgment, His Honour Judge Rudd was quite right to reject the defence based upon the bankers' practice of giving references. He was, in my judgment, correct in his conclusion that in responding to the status enquiries without Mr Turner's consent, the bank was in breach of contract. I would dismiss this appeal.

Lord Justice Thorpe:

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 33 of 190

I am in complete agreement that the legal issue in this field is an uncertain one. That emerges from the judgment of Lord Atkin, in the leading case of Tournier , at page 486, and that it remained uncertain 40 years later is equally clear from the speech of Lord Morris of Borth-y-gest in Hedley Byrne at page 494. I found Lord Chorley's 1964 Gilbart lecture particularly illuminating. He stressed the uncertain stage of the law, and gave bankers fair warning of the risk of an action by a disgruntled customer, if information concerning his affairs were swapped between bankers without his consent. His textbook of 1974, although less specific, clearly stresses the uncertainty. The contrary view, confidently expressed by other authors subsequently, seems unwarranted since it rests on no secure legal foundation.

The uncertainty should, in my judgment, be settled in favour of Lord Chorley's view for all the reasons given by my Lord. I only add a word of admiration for Mr Malik's very thorough research and the scrupulous fairness with which he presented it in argument.

Lord Justice Judge:

It is a well established principle of banking law that as part of bank customer relationship, a banker owes a qualified contractual obligation to every customer, not to disclose information about the customer's affairs to a third party, without his consent. The duty is not absolute. In *Tournier v The National Provincial & Union Bank of England [1924] 1 KB 461* , four exceptional circumstances qualifying the duty were identified and their existence has not subsequently been doubted. Neither has the principle of confidentiality.

The present appeal is based on the assertion that the disclosure was made with the express or implied consent of the customer; that is within the fourth qualification in Lord Justice Bankes's judgment in Tournier . Express consent presents no problem. If given, the bank's confidentiality obligation is waived for the purpose for which the consent is given. Implied consent too should normally be straightforward. Thus in an example given in Tournier , if a customer gives the name of the bank as an institution which may be approached for a reference, he is plainly consenting to the bank's consequent response. The value generally of a reference system of this kind both to customers and to commerce generally is obvious.

However, the consent in the present case depends on a banking practice said to have been current at the time when Mr Turner's account with the Royal Bank of Scotland was opened. Banks and similar institutions would give opinions or references about individual customers to other bankers, without their customer's consent or knowledge.

Assuming, without deciding, that this practice did indeed exist, it undoubtedly suited the banks and may have suited some of their customers, but it will not have suited all their customers, or even a vast majority of them, and many of those it may have suited would probably have preferred either to be told at the time or at least warned that this disclosure might happen, without any further reference to them.

In reality, many customers, including Mr Turner, were ignorant of the practice, and unaware that information which came into the possession of their banks through the banker/customer relationship was being disclosed to others who were not privy to it. On the face of it, such disclosure constituted a breach of the principle of confidentiality.

Properly analysed the operation of this practice, without the knowledge of customers over many years, means that, in truth, the banks unilaterally dispensed with the need for the customer's consent. The purported justification on the basis of the customer's implied consent, implied that is, not for the purpose of giving efficacy to the contract, but on the basis of the

---

© 2026 Thomson Reuters.

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 34 of 190

practice is itself circular. If the operation of the practice constituted a breach of the principle of confidentiality, its constant representative repetition did not validate it, at any rate, in relation to customers, who like Mr Turner were unaware of and could not be expected to know of it, and from whom it was apparently intended to be concealed. Yet the Royal Bank of Scotland had ample opportunity to inform Mr Turner of the practice and elected not do so, either at the inception of the bank/customer relationship or before making the disclosures and, if he objected, simply to inform the enquiring bank of that fact. To regard Mr Turner's inactivity, when none was sought, or could reasonably be expected of him, as consent, would be entirely unwarranted.

I agree with the Vice-Chancellor and the reasons he has given for dismissing the appeal, and beyond the recording that the current practice of the Royal Bank of Scotland now reflects the views expressed in these judgments, there is nothing further I can usefully add.

*ORDER: The appeal will be dismissed with costs.*

Crown copyright

# Annexe 13

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 36 of 190

LAWS OF SAINT CHRISTOPHER
AND NEVIS
*Nevis International Banking Ordinance*    **CAP. 7.05 (N)**    1
Revision Date: **31 Dec 2017**    [Nevis Ordinances]



# ST. CHRISTOPHER AND NEVIS

## CHAPTER 7.05 (N)

## NEVIS INTERNATIONAL BANKING ORDINANCE
### and Subsidiary Legislation

### Revised Edition
showing the law as at 31 December 2017

This is a revised edition of the law, prepared by the Law Commission under the authority of the Law Commission Act, Cap. 1.03.

This edition contains a consolidation of the following laws—

| | Page |
|---|---|
| **NEVIS INTERNATIONAL BANKING ORDINANCE** | 3 |
| **Ordinance 1 of 2014**  …  in force 1 August 2014 | |
| | |
| **NEVIS INTERNATIONAL BANKING REGULATIONS – Section 84** | 40 |
| S.R.O. 2/2015 | |

Printed under Authority by
The Regional Law Revision Centre Inc.
ANGUILLA

Published in
2019
Consolidated, Revised and Prepared under the Authority of the Law Commission Act,
on behalf of the Government of Saint Christopher and Nevis
by
The Regional Law Revision Centre Inc.,
P.O. Box 1626, 5 Mar Building,
The Valley, AI-2640, Anguilla,
West Indies.


Available for purchase from—

Attorney General's Chambers,
Government Headquarters, P.O. Box 164,
Church Street, Basseterre, St. Kitts,
West Indies


Tel: (869) 465-2521
Ext. 1013
Tel: (869) 465-2127
Fax: (869) 465-5040
Email: attorneygeneral@gov.kn


© Government of Saint Christopher and Nevis
All rights reserved. No part of this publication may be reproduced in any form or by any means
without the written permission of the Government of Saint Christopher and Nevis except as
permitted by the Copyright Act or under the terms of a licence from
the Government of Saint Christopher and Nevis.

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 38 of 190

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*    **CAP. 7.05 (N)**    3

**[Nevis Ordinances]**

# CHAPTER 7.05 (N)

# NEVIS INTERNATIONAL BANKING ORDINANCE

ARRANGEMENT OF SECTIONS

1.   Short title
2.   Interpretation

## PART II

### INTERNATIONAL BANKING

3.   International Banking
4.   Eligible company
5.   Qualified foreign bank

## PART III

### LICENSING REQUIREMENTS

6.   Requirement for licence
7.   Licensee to have place of business
8.   Issue of licence
9.   Application requirements
10.   Tentative applicants
11.   Minimum capital for a Licensee
12.   Maintenance of reserve fund
13.   Examination of applicants
14.   Duty to issue or refuse licence
15.   Conditions for grant and retention of licence
16.   Display of licence
17.   Misleading name
18.   Service on Licensee

## PART IV

### RESTRICTIONS ON BUSINESS

19.   Restriction on distribution of dividends
20.   Restriction on business activities

## PART V

### CORPORATE GOVERNANCE

21.   Person debarred from management
22.   Director
23.   Office of the director
24.   Disqualification of director
25.   Disclosure of interest
26.   Declaration of interest
27.   Recording declaration
28.   Offence

29.    Insider information

## PART VI

### SUPERVISION EXAMINATION AND AUDIT

30.    Regulator of International Banking
31.    Financial statements and Annual Auditing
32.    Confidentiality
33.    Auditor
34.    Annual Auditing
35.    Breaches and sanctions

## PART VII

### RECEIVERSHIP, LIQUIDATION AND REORGANISATION

36.    Voluntary winding up
37.    Commencement of voluntary winding-up
38.    Notice of winding-up
39.    Settlement of Claims
40.    Distribution of remaining assets
41.    Interruption of winding-up
42.    Seizure in other cases
43.    Duty of Minister
44.    Power of High Court
45.    Notice of application
46.    Appointment of custodian
47.    Functions of custodian
48.    Inventory of assets
49.    Reorganization
50.    Content of plan
51.    Application for order by custodian
52.    Compulsory winding-up
53.    Termination of service contracts
54.    Right of lessor
55.    Statements of accounts
56.    Claims
57.    Objections
58.    Distribution of assets
59.    Priority of claims
60.    Distribution to shareholders
61.    Abandoned funds
62.    Completion of winding-up

## PART VIII

### RESIDENCE

63.    Residents of Nevis

## PART IX

### SPECIAL TAX PROVISIONS

64. Exemption from tax
65. Transfer of assets exemption
66. Withholding tax
67. Service fees
68. Customs duty
69. Employee benefits

## PART X

### ABANDONED PROPERTY

70. Abandoned property
71. Disposal of abandoned property
72. Sale of abandoned property
73. Payment to Consolidated Fund
74. Claims against property
75. Notice to claimants
76. Offence in relation to abandoned property

## PART XI

### OFFENCES

77. Unlicenced international banking
78. Misleading advertising
79. False statements and obstruction

## PART XII

### MISCELLANEOUS

80. Minimum criteria for determining fit and proper status
81. Extending time
82. Application of the other legislation
83. Exemptions
84. Regulations
    SCHEDULE:    Nevis International Banking Regulations

## CHAPTER 7.05 (N)

## NEVIS INTERNATIONAL BANKING ORDINANCE

**AN ORDINANCE** TO REPEAL AND REPLACE THE NEVIS OFFSHORE BANKING ORDINANCE CAP. 7.05 WITH THE NEVIS INTERNATIONAL BANKING ORDINANCE, 2014; TO ENABLE INTERNATIONAL BANKING TO BE CARRIED ON BY INTERNATIONAL BANKS FROM WITHIN NEVIS; TO ENCOURAGE THE DEVELOPMENT OF NEVIS AS A RESPONSIBLE INTERNATIONAL FINANCIAL CENTRE; AND TO PROVIDE FOR MATTERS INCIDENTAL THERETO OR CONNECTED THEREWITH.

## PART I

### PRELIMINARY

**Short title.**

1.    This Ordinance may be cited as the Nevis International Banking Ordinance.

**Interpretation.**

2.    In this Ordinance unless the context otherwise requires—

"Administration" means the Nevis Island Administration;

"advertisement" or "advertising" means any form of general notice which is designed to inform the public whether published in St Christopher and Nevis or elsewhere, by any form of media which is now known or hereinafter invented or adopted;

"Attorney" means a person whose name has been entered on the Roll of Attorneys pursuant to the Legal Profession Act, Cap. 3.28;

"Auditor" means an auditor described in section 33 and includes a partnership of auditors;

"Banking Act" means the Banking Act, Cap. 21.01 of the laws of the Federation of St. Christopher and Nevis;

"Capital reserve fund" shall have the meaning given to that expression in section 11;

"Companies Ordinance" means the Companies Ordinance, Cap. 7.06(N) of the Revised Ordinances of Nevis;

"Confidential information" includes data, facts and communications concerning the assets, liabilities, transactions and business and affairs of a Licensee which have been revealed in strict privacy or secrecy and which the recipient thereof is not, otherwise than in the normal course of business or professional practice, authorised by the Licensee to divulge;

"Director" means a director within the meaning of section 22;

"Dollars" means United States Dollars;

"Eligible company" shall have the meaning given to that expression in section 4;

"Financial quarter" means each of the four three month periods which date from 1st January to 31st March, from 1st April to 30th June, from 1st July to 30th September and from 1st October to 31st December of every financial year;

"Financial year" means the period from 1st January to 31st December of every calendar year;

"Foreign currency" means monies other than United States Dollars;

"Group" means—

    (a) in relation to a company, that company and—

        (i) any other company which is its holding company or subsidiary;

        (ii) any other company which is a subsidiary of its holding company;

        (iii) any company which directly or indirectly controls or is controlled by any company referred to in sub-paragraph (i) or (ii);

        (iv) any company which is controlled by a person who directly or indirectly controls a company referred to in sub-paragraph (i), (ii) or (iii);

        (v) any company in which a group of relatives has a controlling interest;

    (b) in relation to a person other than a company—

        (i) a group of relatives where each member of the group is substantially dependent upon the same income source;

        (ii) a group of persons in which one member has power directly or indirectly to control the other members;

        (iii) any other group of persons that may be prescribed by the Minister;

"High Court" means the High Court of the Federation of St. Christopher and Nevis;

"Holding company" means a body corporate which controls another through the ownership of its shares;

"International banking" shall have the meaning given to that expression under section 3;

"Licensee" means a body corporate that holds a licence under this Ordinance to carry on international banking from within Nevis;

"Minister" means the Minister responsible for Finance in the Nevis Island Administration;

"Permanent Secretary" means the Permanent Secretary in the Ministry of Finance in the Nevis Island Administration;

"Qualified foreign bank" shall have the meaning given to that expression in section 5;

"Regulator" means the person appointed by the Minister under section 30 to perform the functions of Regulator of international banking under this Ordinance;

"Senior Management" includes a Chief Executive Officer, Director, Manager or any officer or individual with a similar title who holds a high-ranking position within the Licensee;

Share" in relation to a company includes stock of the company.

## PART II

### INTERNATIONAL BANKING

**International banking.**

3.    (1) International banking is—

(a)  receiving foreign funds through—

(i) the acceptance of foreign money deposits payable upon receipt demand or after a fixed period or after notice;

(ii) the sale or placement of foreign bonds, certificates, notes or other debt obligations or other securities; or

(iii) any other similar activities involving foreign money or foreign securities; and

(b)  either in whole or in part using foreign funds so acquired for loans, advances and investments whether in Nevis or elsewhere.

(2) International banking also includes, for the purposes of this Ordinance, any other activity which the Minister may, by regulations declare to be an activity related to an activity described in subsection (1).

(3) A Licensee carrying on international banking shall not receive or solicit funds from any resident of Nevis, but may receive or solicit funds from any corporation registered under the Nevis Business Corporation Ordinance, Cap. 7.01(N) a limited liability company registered under the Nevis Limited Liability Company Ordinance, Cap. 7.04(N) a trustee of a trust registered under the Nevis International Exempt Trust Ordinance, Cap. 7.03(N), a multiform foundation registered under the Multiform Foundations Ordinance, Cap. 7.08(N).

**Eligible company.**

4.    An Eligible Company includes—

(a)  a body corporate which has been incorporated under the Companies Ordinance which is a wholly owned subsidiary of a bank which is indigenous to St. Christopher and Nevis, regulated by the Eastern Caribbean Central Bank and is licensed under the Banking Act to do banking business in Nevis; or

(b)  a subsidiary of a qualified foreign bank which has been incorporated under the Companies Ordinance; or

(c)  a body corporate which has been incorporated under the Companies Ordinance of which the chief executive officer at the time of its application for a licence, has at least ten years' experience in banking or finance.

**Qualified foreign bank.**

5.    (1) A qualified foreign bank is—

(a)  a bank which was originally incorporated and registered in a jurisdiction other than St. Christopher and Nevis that upon commencement of this Ordinance is licensed under the Banking Act; or

(b) a foreign bank with minimum capitalisation and assets as prescribed by the Minister, that is not licensed under the Banking Act but is licensed to do domestic banking in its jurisdiction of incorporation;

(c) a financial institution approved by the Minister, that is directly or indirectly a wholly owned foreign subsidiary of a bank which is incorporated in a jurisdiction other than St. Christopher and Nevis.

(2) For the purposes of this section domestic banking means the acceptance of deposits from members of the public.

# PART III

## LICENSING REQUIREMENTS

**Requirement for licence.**

**6.**    (1) A person shall not carry on international banking business or hold himself out as carrying on international banking business in Nevis without a licence granted by the Minister.

(2) A person who does international banking from within Nevis during any period in which he does not hold a licence under this Ordinance commits an offence and is liable on conviction to a fine not exceeding five hundred thousand dollars ($500,000.00).

(3) A Licensee which, at the commencement of this Ordinance holds a valid licence to carry on international banking business in Nevis shall be deemed to have been granted a licence under section 14 of this Ordinance.

**Licensee to have place of business.**

**7.**    (1) The Minister shall not grant a licence to a company under this Ordinance unless that company—

(a) has a place of business in Nevis approved by the Regulator which will be its registered office; and

(2) A Licensee shall not—

(a) cease to have a place of business in Nevis; or

(b) change its place of business without the written approval of the Regulator.

**Issue of licence.**

**8.**    (1) The Minister shall not issue a licence under this Ordinance to any person other than an eligible company or qualified foreign bank.

(2) A licence issued under this Ordinance is valid upon payment to the Administration of the prescribed licence fee and shall expire on the 31st day of December of the year in which it is issued and is renewable on or before the 31st day of January in the following year upon payment of the prescribed fee.

**Application requirements.**

**9.**    (1) An Eligible Company must—

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*

**CAP. 7.05 (N)**    11
[Nevis Ordinances]

(a)   be incorporated under the Companies Ordinance as a company limited by shares and have the word bank included as part of its name;

(b)   have objects or business activities restricted to international banking from within Nevis;

(c)   have at least one director who is a citizen of St. Christopher and Nevis and who is resident in Nevis;

(d)   have articles of incorporation and bylaws;

(e)   have authorised paid up capital in accordance with the requirements of section 11.

(2)   An applicant for a licence under this Ordinance must—

(a)   submit an application in the prescribed form to the Minister;

(b)   show that it is an Eligible Company or qualified foreign bank;

(c)   give the names and addresses of its directors;

(d)   give particulars of the international banking it proposes to do from within Nevis;

(e)   give the names of any directors who are residents of Nevis;

(f)   give a statement of the name, address, qualification and experience of its Senior Management;

(g)   provide such other information of a financial or other nature as the Regulator may require in any particular case;

(h)   tender with the application a non-refundable application fee as prescribed by the Minister;

(i)   submit the name and registered office of its appointed auditor as defined under section 33;

(j)   submit the name and registered office of its appointed compliance officer.

(3)   An application for a licence by an Eligible Company must be accompanied by a certified copy of the articles of incorporation and bylaws of the applicant.

(4)   An application for a licence and all documents submitted pursuant to this Ordinance in support of the application must be signed by at least two (2) directors of the company making the application.

(5)   An application for a licence by a qualified foreign bank must be accompanied by—

(a)   copies of the incorporation documents of the bank;

(b)   the names of the directors of the bank;

(c)   the names of the principal shareholders of the bank;

(d)   a certificate showing that the home banking supervisor of the jurisdiction in which it was incorporated, formed or organized has no objection to its application for a licence to do international banking business in Nevis; and

(e)   evidence satisfactory to the Regulator that it is subject to a comprehensive supervision on a consolidated basis by the appropriate authorities in its jurisdiction of incorporation.

(6) The Regulator shall, before giving consideration to any application for a licence, conduct an investigation of the applicant to ascertain—

    (a) the validity of the documents submitted in support of the application;

    (b) the character of the business of the applicant;

    (c) the experience of the person or persons who are to constitute its Senior Management; and

    (d) any other matter as may be required by the Minister.

(7) The applicant shall supply such further information and data as the Regulator may reasonably require for the proper conduct of its investigation under subsection (6).

(8) The Regulator shall submit a report of its findings to the Minister within ten (10) weeks of its receipt of the application.

### Tentative applicants.

**10.**    (1) A person who intends to apply for a licence under this Ordinance may submit a proposal to the Minister for a licence, and the Minister may indicate in a preliminary report on the recommendation of the Regulator whether or not a subsequent application based on the proposal would be favourably received by him.

(2) With every proposal, a non-refundable administrative fee as prescribed shall be paid.

(3) Section 13 of this Ordinance shall apply in relation to every proposal submitted under subsection (1).

(4) Nothing done by the Minister under subsection (1) precludes him from later refusing an application for a licence that was based on a proposal considered by him pursuant to that subsection on grounds that the applicant withheld material information or that the proposed application was made in bad faith.

(5) It is the duty of the Minister to submit a preliminary report within ninety (90) days of the receipt of the proposal from a prospective Licensee.

### Minimum capital for a Licensee.

**11.**    The Minister shall not issue an international banking licence to a company unless that company—

    (a) remains an Eligible Company;

    (b) has a fully paid up capital of not less than two million dollars ($2,000,000.00), or such greater sum as the Minister may reasonably determine in Regulations made hereunder and promulgated by him from time to time; and

    (c) has deposited or invested the sum of two hundred thousand dollars ($200,000.00) in the following manner—

        (i) treasury bills issued by the Government of St. Christopher and Nevis or the Nevis Island Administration;

        (ii) bonds and debentures issued by the Government of St. Christopher and Nevis or the Nevis Island Administration;

        (iii) deposits with a bank licensed under the Banking Act; or

        (iv) deposits with a financial institution approved by the Minister.

(d)  an Eligible Company shall provide an undertaking in writing not to dispose of, pledge, hypothecate, release or otherwise encumber the deposit or investment without prior notification and approval by the Minister.

**Maintenance of reserve fund.**

**12.**    (1) Subject to subsection (2), a Licensee shall maintain a reserve fund and shall out of its net profits of each year and before any dividend is paid, transfer to the fund a sum equal to not less than twenty-five per cent (25%) of those profits whenever the amount of the reserve fund is less than the paid up capital of the Licensee.

(2) Subsection (1) does not apply to a Licensee whom it is shown to the satisfaction of the Minister that the aggregate reserves of the Licensee are adequate in relation to its business.

(3) A Licensee shall maintain its reserve fund at a bank approved by the Regulator other than the Licensee.

**Examination of applicants.**

**13.**    (1) On receipt of an application for a licence under this Ordinance, the Minister shall direct the Regulator to conduct an investigation of the applicant, its financial circumstances and any associates or affiliates of the applicant, as the Minister considers necessary in the public interest.

(2) In particular, the Minister shall require an examination to be made of—

(a)  the financial status and history of the applicant and any of its directors, associates or affiliates;

(b)  the character and experience of the directors;

(c)  the adequacy of its capital for the purpose of the business it intends to carry on;

(d)  the needs of the public or person it intends to serve;

(e)  its earnings prospects and its prospects as an employer; and

(f)  the character of every director and every shareholder having more than five per cent (5%) of the shares to ensure that only fit and proper persons are concerned in the management and control of the company.

(3) For the purposes of this section, "associate" means, when used to indicate a relation with any person—

(a)  a company of which that person beneficially owns or controls directly or indirectly, shares or securities convertible into shares carrying more than ten per cent (10%) of the voting rights under all circumstances or by reason of the occurrence of an event that has occurred and is continuing or a currently exercisable option or right to purchase those shares or convertible securities;

(b)  a partner of that person acting on behalf of the partnership of which they are partners;

(c)  a trust or estate in which that person has a substantial beneficial interest or in respect of which he serves as a trustee or in a similar capacity;

(d) a spouse or a child of that person; or

(e) a relative of that person or of the spouse of that person if the relative has the same residence as that person.

(4) For the purposes of this section—

(a) one company is affiliated with another company if one (1) of them is the subsidiary of the other or both are subsidiaries of the same holding company or each of them is controlled by the same person;

(b) if two (2) companies are affiliated with the same company at the same time, they are affiliated with each other at that time.

(5) A company is the holding company of another if that other company is its subsidiary.

(6) A company is a subsidiary of another company if it is controlled by that other company.

**Duty to issue or refuse licence.**

**14.**    (1) It is the duty of the Minister to issue or refuse a licence under this Ordinance to an applicant—

(a) within three (3) months of the receipt of the application; or

(b) if additional information is required by the Minister, within fourteen (14) days of the receipt by him of the additional information.

(2) Notwithstanding any advice or recommendation given to the Minister by the Regulator, if the Minister is of the opinion that it would be undesirable in the public interest to grant the licence, he may refuse to grant that licence.

(3) Where the Minister refuses to grant a licence in accordance with subsection (2) the Minister is required to give reasons for the refusal and shall inform the applicant of his decision.

**Conditions for grant and retention of licence.**

**15.**    (1) A licence issued under this Ordinance must show the kinds of international banking to be done from within Nevis by the Licensee.

(2) A licence under this Ordinance is subject to such conditions as the Minister, on the recommendation of the Regulator, may specify in respect of the international banking to be done by the Licensee from within Nevis.

(3) A licence issued under this Ordinance is valid until the 31st day of December of the year in which it is issued and renewable on or before the 31st day of January in the following year upon payment of the prescribed fee.

(4) It is a condition of a licence under this Ordinance that the Licensee shall obtain the approval of the Minister before creating a subsidiary company within the meaning of section 13 whenever it opens a place of business outside of Nevis.

(5) Subsection (4) does not apply to a Licensee that is a qualified foreign bank but the Licensee shall not, without notifying the Minister of its intention to do so, create a subsidiary company within the meaning of section 13 to carry on international banking from within Nevis.

(6) It is a condition of a licence under this Ordinance that—

(a) any voting shares of the Licensee's capital will be in registered form;

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 50 of 190

LAWS OF SAINT CHRISTOPHER
AND NEVIS                  *Nevis International Banking Ordinance*      CAP. 7.05 (N)      15
Revision Date: **31 Dec 2017**                                              **[Nevis Ordinances]**

(b)  the Licensee will not, without the approval of the Minister on the recommendation of the Regulator—

   (i)  enter into a merger, amalgamation or consolidation;

   (ii)  transfer otherwise than in the ordinary course of its business, the whole or any substantial part of its assets or liabilities;

   (iii)  change its name from that set out in its licence;

   (iv)  alter its articles of incorporation and bylaws;

   (v)  transfer any of its shares or alter its share structure;

   (vi)  take any action to reduce or impair in any respect its capital; or

   (vii)  repurchase its own shares or take any action which may have a similar effect;

(c)  the Licensee will not knowingly in the course of its business accept any deposit for the account of a resident of Nevis or keep a resident of Nevis as a customer for any of its international banking services; or

(d)  the Licensee that is a foreign qualified bank shall, in the manner and to the extent prescribed, separate international banking activities from its other activities in Nevis and keep separate records of its international banking activities and will permit and assist in an audit of all its undertakings in Nevis by auditors approved by the Regulator.

(7) The Minister shall, before granting approval to any matter mentioned in subsection (6), instruct the Regulator to carry out such investigations as specified in section 13 as he thinks is required.

(8) Paragraphs (a) and (b) of subsection (6) and subsection (7) do not apply to a Licensee that is a qualified foreign bank.

(9) No person or group that is under the control of another person or group shall, without the approval of the Minister on the recommendation of the Regulator and subject to such conditions as the Minister may consider necessary, acquire or hold shares of a value of more than ten per cent (10%) of the stated capital of the Licensee.

(10) Where approval has been obtained to increase the shareholding in accordance with subsection (9), no person or group that is under the control of another person or group shall hold shares the value of which exceeds the amount approved by the Minister on the recommendation of the Regulator.

(11) A person who contravenes this section commits an offence and is liable on conviction to a fine of twenty-five thousand dollars ($25,000.00) or to imprisonment for two (2) years or to both.

**Display of licence.**

**16.**    (1) A Licensee shall display in a conspicuous place at each location where it does business a copy of its current licence issued under this Ordinance.

(2) A Licensee which contravenes this section commits an offence and is liable on summary conviction to a fine of twenty-five thousand dollars ($25,000.00) and a further fine of one thousand dollars ($1,000.00) for each month during which the offence continues after a conviction is obtained.

**Misleading name.**

**17.**    (1) The Minister may refuse to grant a licence or revoke a licence already issued if, in his opinion, the applicant or the Licensee as the case may be is carrying on or intends to carry on international banking business under a name which—

> (a)  can mislead or confuse the persons for whom it intends to provide any or all of its services;

> (b)  is identical with that of a firm or business house whether within Nevis or not or which so nearly resembles that name as to be calculated to deceive;

> (c)  is calculated to suggest falsely, the patronage of or connection with some person or authority whether within Nevis or not; or

> (d)  is calculated to suggest falsely that the applicant or company has a special status in relation to or derived from the Government, has the official backing or acts on behalf of the Government or of any Department, branch, agency or organ of Government or of any officer thereof.

(2) Subject to subsection (3), no person other than a Licensee may, without the approval of the Minister—

> (a)  use the word "bank" or any of its derivatives in any language; or

> (b)  use any other word indicating the doing of international banking from within Nevis,

in the name, description or title under which that person carries on business or intends to carry on business in Nevis or make representation to that effect in any bill head, letter paper, notice or advertisement.

(3) Subsection (2) does not apply—

> (a)  to a bank licensed under the Banking Act; or

> (b)  to a qualified foreign bank or eligible company that is applying for a licence under this Ordinance as a Licensee.

(4) A person who contravenes this section commits an offence and is liable on summary conviction to a fine of twenty-five thousand dollars ($25,000.00) and to imprisonment for twelve (12) months and in the case of a continuing offence to a fine of one thousand dollars ($1,000.00) for each day during which the offence continues.

**Service on Licensee.**

**18.**    All documents in any action arising out of the operations of the Licensee shall be served on the Licensee at its registered office.

## PART IV

### RESTRICTIONS ON BUSINESS

**Restriction on distribution of dividends.**

**19.**    A Licensee shall not declare or pay a dividend if there are reasonable grounds for believing that—

(a) the Licensee is, or would after the payment be unable to pay its liabilities as they become due; or

(b) the realisable value of the Licensee's assets would thereby be less than the aggregate of its liabilities and capital.

**Restriction on business activities.**

20.    (1) Subject to this section, a Licensee shall not—

(a) grant to a person or group that is under the control of another person or group, any advance or credit, or give any financial guarantee or incur any other liability on behalf of such person or group so that—

   (i) the total value of the advances, credit facilities, financial guarantees or other liabilities at any time exceed forty per cent (40%) of the sum of the assets and paid up capital of the Licensee;

   (ii) where a portion of the facilities referred to in sub-paragraph (i) is unsecured, that portion exceeds ten per cent (10%) of the sum of the stated capital and published reserves of the Licensee;

(b) grant unsecured advances or unsecured credit of an aggregate amount in excess of forty thousand dollars ($40,000.00) or of one per cent (1%) of the sum of the stated capital and published reserves of the Licensee, whichever is greater, or give any financial guarantee in excess of such amount without security or incur any other liability in excess of that amount without security—

   (i) to or on behalf of any of its directors whether or not such advances, credits, guarantees or other liabilities are obtained by or on account of the directors jointly or severally;

   (ii) to or on behalf of any person in whom it or any of its directors is interested as a director, partner, manager or agent or as guarantor; or

   (iii) to its holding company, any subsidiary or affiliate or any other director thereof;

(c) grant credit facilities on terms and conditions more favourable than the terms and conditions generally applicable to borrowers to—

   (i) its holding company or any subsidiary or affiliate;

   (ii) any firm in which any director or officer or the relative of such officer or director has an interest or controls twenty per cent (20%) or more of the voting shares;

   (iii) any person if the credit facilities are guaranteed by an officer, director or any relative of the officer or director;

   (iv) any person who controls more than twenty per cent (20%) of the Licensee's shares;

(d) grant to its officers or employees unsecured advances or unsecured credit which exceed in aggregate, for any one officer or employee, one year's emoluments of that officer or employee;

(e) except in so far as may be necessary with respect to the interests or shareholding that a Licensee may acquire in satisfaction of debts due to it—

(i)  engage, whether on its own account or on a commission basis, in the wholesale or retail trade, including the business of import and export, or otherwise have a direct interest in any commercial, agricultural, industrial or other undertaking; or

(ii)  acquire or hold, in an aggregate amount exceeding twenty per cent (20%) of the sum of the stated capital and published reserves of the Licensee, any part of the share capital of any commercial, agricultural, industrial or other undertaking,

but all such interests or shareholding, as the case may be, shall be disposed of within a period not exceeding five (5) years unless permission to extend this period has been given by the Regulator;

(f)  without the approval of the Regulator, invest in the shares of an entity so that the value of the investment at any time exceeds ten per cent (10%) of the sum of the stated capital and published reserves of the Licensee.

(2)  The provision under subsection (1) shall not apply where a loan granted by the Licensee is fully collaterised irrespective of the amount loaned.

(3)  Subject to this section, a Licensee shall not—

(a)  purchase, acquire or lease real estate unless—

(i)  such real estate is necessary for the purpose of conducting its business or providing housing amenities for its staff, having regard to any reasonable requirements for future expansion of its business or staff, and

(ii)  the market value of the real estate does not exceed the stated capital of the Licensee,

except that where the Licensee exercises its legal right in respect of any property which is the security for any debt, the Licensee may acquire such property, but in that case the property shall not be retained for a period in excess of five (5) years without the permission of the Regulator;

(b)  acquire, deal in or underwrite its own shares or the shares of its holding company;

(c)  grant any advance against the security of its own shares, or the shares of its holding company or a subsidiary of the Licensee.

(4)  Subsections (1) and (3) do not apply where the Licensee does not accept third party deposits.

PART V

CORPORATE GOVERNANCE

**Person debarred from management.**

**21.**    (1)  A person who has—

(a)  been found guilty of an offence involving dishonesty by a Court in any country; or

(b)  been or is or becomes bankrupt, suspends payment to or compounds with his creditors,

shall not act or continue to act as a director, manager, secretary or other employee in a managerial position of a Licensee.

(2) The Minister may authorise, in writing, any person who was a director of or directly involved in the management of a Licensee at the time that Licensee had its licence revoked, to act or continue to act as a director, manager, secretary or other employee of a Licensee.

(3) A person who contravenes the provisions of subsection (1) commits an offence and is liable to a fine not exceeding twenty-five thousand dollars ($25,000.00).

**Director.**

**22.**    (1) For the purposes of this Ordinance a "director" means an individual occupying the like position and performing the like functions of a director under the Companies Ordinance, however his position is designated.

(2) A reference to "directors" refers to the board of directors or the body directing the affairs of a company.

(3) A Licensee shall have at least three (3) directors all of whom are natural persons one of whom is a citizen of St. Christopher and Nevis and who is resident in Nevis.

(4) Where a company has appointed a citizen of St. Christopher and Nevis to its board of directors under this Ordinance, that director does not have to subscribe for nor acquire any shares in the company.

(5) A Licensee shall, before the appointment of a director or other senior officer, apply to the Regulator for written approval of the appointment.

**Office of the director.**

**23.**    A director of a Licensee shall cease to hold office as a director if he—

(a)  becomes bankrupt or suspends payment to his creditors;

(b)  is convicted in Nevis of an offence triable on indictment;

(c)  is convicted outside Nevis of an offence that would be triable on indictment had it been committed in Nevis; or

(d)  becomes of unsound mind.

**Disqualification of director.**

**24.**    A person who has been a director of a Licensee whose licence is revoked under this Ordinance shall not, without the prior approval of the Minister, act or continue to act as a director of any other Licensee.

**Disclosure of interest.**

**25.**    (1) A director of a Licensee who is interested directly or indirectly in an advance or loan from the Licensee shall as soon as possible make a declaration as to the nature of his interest to its directors at a board meeting.

(2) Subsection (1) does not apply when the interest of a director in an advance or loan consists only of being a creditor of or having an interest in a firm that is

interested in an advance or loan from the Licensee if, in either case, the interest of the director is not a substantial interest.

(3) A declaration by a director of a Licensee that he is interested directly or indirectly in an advance or loan from the Licensee complies with subsection (1) of this section if—

(a) the declaration specified the nature and extent of the interest; and

(b) the interest of the director is not different in nature from, or greater than, the nature and extent so specified in the declaration at the time any advance or loan is made.

**Declaration of interest.**

**26.**    (1) A director of a Licensee who holds any office or has any interest in any property whereby, directly or indirectly, his functions under this Ordinance are likely to be in conflict with his personal interests shall declare the nature, character and extent of that office or interest to the directors at a meeting.

(2) A declaration required under this section shall be made—

(a) at the first meeting of the directors that is held after the acquisition by the declarant of that relevant office or interest; or

(b) if the declarant was not at that time a director, after he becomes a director.

(3) A director to whom this section or section 25 applies shall in any event notify the secretary of the Licensee of his interest so that the secretary may convene a meeting of the Board of Directors for the purpose of considering the declaration, unless a meeting of the Board of Directors is already scheduled to be held within fourteen (14) days following the receipt of notification by the secretary of the director's declaration.

**Recording declaration.**

**27.**    A director of a Licensee who has declared any interest referred to in section 25 or 26 shall—

(a) cause the declaration made by him thereunder to be brought up and read at the next meeting of the Board of Directors after it was given; and

(b) cause the declaration to be recorded in the minutes of the meeting at which it was made or read or both.

**Offence.**

**28.**    A director of a Licensee who contravenes section 25, 26 or 27 commits an offence and is liable on summary conviction to a fine not exceeding ten thousand dollars ($10,000.00) or to imprisonment for twelve (12) months or to both fine and imprisonment.

**Insider information.**

**29.**    (1) A person who has acquired confidential information concerning a Licensee—

(a) as a director, officer, employee or auditor of the Licensee;

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 56 of 190

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*    **CAP. 7.05 (N)**    21

[Nevis Ordinances]

    (b)  as agent or a custodian of the Licensee;

    (c)  as Regulator or other employee of the Administration; or

    (d)  in any other capacity,

shall not disclose that information to any person except as permitted under subsection (2) or use that information for any purpose not related to the duties through which the information was acquired.

    (2) Subsection (1) does not apply to the giving of confidential information when the information—

    (a)  is a general credit rating of a person that is supplied by a director, officer or employee of the Licensee following a *bona fide* business request;

    (b)  is given with the written authorisation of the beneficiary or his legal representative;

    (c)  is lawfully required to be disclosed by an order of the High Court; or

    (d)  is lawfully disclosed pursuant to any other enactment.

    (3) A person who discloses confidential information contrary to subsection (1) of this section commits an offence and is liable on summary conviction to a fine not exceeding twenty thousand dollars ($20,000.00) or to imprisonment for six (6) months or to both such fine and imprisonment.

## PART VI

### SUPERVISION EXAMINATION AND AUDIT

**Regulator of International Banking.**

**30.**    (1) The Minister shall appoint a public officer to be known as the Regulator of International Banking and another person to be known as the Deputy Regulator of International Banking to assist the Regulator of International Banking, to regulate International Banking under this Ordinance.

    (2) The Regulator shall have the duty to ensure the proper compliance of Licensees with the provisions of this Ordinance and shall use the powers conferred upon him by this Ordinance to fulfill his duties.

    (3) The Regulator shall have power to—

    (a)  supervise the Licensees licensed by the Minister under this Ordinance;

    (b)  examine or cause an examination to be made of each Licensee from time to time in order to ascertain whether or not the Licensee is in a sound financial condition and that the requirements of this Ordinance have been complied with by the Licensee in carrying on international banking business;

    (c)  assist in the investigation of any contravention of this Ordinance that he has reasonable grounds to believe has or may have been committed by a Licensee or any of its directors, officers or senior management;

    (d)  to examine accounts and audited financial statements of a Licensee;

    (e)  to examine and make recommendations to the Minister with respect to applications for licences.

    (4) In the performance of his duties under this Ordinance and to verify compliance with the provisions of this Ordinance by a Licensee, the Regulator is entitled at all reasonable times—

    (a)  to have access at its registered office to such books, records, vouchers, documents, cash, securities and other information on a Licensee as may be specified by the Regulator;

    (b)  to require the directors, officers and auditor of a Licensee to provide information and explanations of the condition and affairs of the Licensee;

    (c)  to request any relevant information, matter or thing from any person who the Regulator has reasonable grounds to believe is carrying on international banking business in Nevis in contravention of section 6;

    (d)  to request any relevant information, return or certificate from Licensee either annually or on a regular basis;

    (e)  to request from any person information or expert advice relevant to the duties of the Regulator and to provide to the person assurances regarding the confidential treatment of the information or any other assurances as the Regulator may reasonably provide.

    (5) The Regulator shall keep abreast of developments in the field of international banking which appear to him to be relevant to the exercise of his powers under this Ordinance.

    (6) The Regulator may, with the written approval of the Minister, authorise another person to assist him in the performance of his duties under this Ordinance.

    (7) The Minister may from time to time give general policy directives to the Regulator which are not inconsistent with the provisions of this Ordinance and the Regulator shall give effect to those directions.

    (8) Notwithstanding the provisions of any other law, no liability shall attach to the Administration, the Regulator or any person acting on behalf of the Administration or the Regulator for anything done in the discharge or purported discharge of any function under this Ordinance unless it is shown that the act or omission was not done in good faith.

### Financial Statements and Annual Auditing.

**31.**    (1) A Licensee shall, not later than three (3) months after the close of its financial year or such longer period as the Regulator may allow, forward to the Regulator and its shareholders, copies of its Annual Audited Financial Statements.

    (2) The annual audited financial statement must bear on its face the certificate of the auditor.

    (3) A Licensee that contravenes any provision of this section commits an offence and is liable on summary conviction to a fine not exceeding twenty five thousand dollars ($25,000.00) and a fine of one thousand dollars ($ 1,000.00) for each month during which the offence continues after a conviction has been obtained.

    (4) The report of the auditor shall be read with the report of the directors to the shareholders at the annual meeting of the Licensee.

(5) A person shall not be appointed an auditor of a Licensee, if he has any proprietary interest in the Licensee, is a director, secretary, officer, employee, agent of the Licensee or a director, secretary, officer, employee of an affiliate or holding company of the Licensee, or is an officer or employee of the Administration.

(6) When a Licensee fails to appoint an auditor pursuant to this section, the Regulator may appoint an auditor who has all the powers of an auditor appointed by the Licensee to conduct an audit of the Licensee.

**Confidentiality.**

**32.**      (1) Save as specifically provided for by this Ordinance, no statement, return or information shall be required by the Regulator or the Minister with respect to the affairs of any particular international banking customer of a Licensee.

(2) Save as is specifically provided for by this Ordinance and for the purposes specified, no statement returns or information furnished or submitted by a Licensee in respect of its business shall be communicated or disclosed.

(3) The Regulator may, without the consent of the Licensee, disclose information to—

> (a) any supervisory or regulatory authority of financial institutions within Nevis; or
>
> (b) the appropriate supervisory or regulatory authority of financial institutions of another country at the request of that authority, where there is a branch, holding company or affiliate of a Licensee operating in that country; or
>
> (c) any international financial institution, foreign banking supervisors and any other local or foreign authority responsible for the supervision or regulation of a financial institution on a reciprocal basis and subject to a confidentiality agreement and a Memorandum of Understanding.

(4) A person who discloses confidential information furnished or submitted by a Licensee contrary to this section commits an offence and is liable on summary conviction to a fine of twenty-five thousand dollars ($25,000.00) or to imprisonment for a term of twelve (12) months or to both fine and imprisonment.

**Auditor.**

**33.**      In this Ordinance unless the context otherwise requires—

"auditor" means a person who—

> (a) is qualified as an accountant by examination of, one (1) of the institutes of Chartered Accountants or Certified Accountants in England and Wales, Ireland, Scotland, the Canadian Institute of Chartered Accountants or the American Institute of Certified Public Accountants and holds a current practicing certificate if required by his institute to do so; or
>
> (b) possesses such other qualification in accountancy, banking or other similar qualification equivalent to the qualification set forth in paragraph (a) as the Minister may, on the recommendation of the Regulator, by order approve and is in good standing with respect to such qualification.

**Annual auditing.**

**34.**    (1) The annual balance sheets and accounts of a Licensee shall be audited at least once in every financial year by an auditor who shall conduct the audit in accordance with the international financial reporting standards.

(2) It is the duty of the auditor appointed pursuant to subsection (1) to submit a report to the shareholders of the Licensee and to the Regulator.

(3) The report of the auditor shall state whether the auditor has obtained all the information and explanations he needed and in addition state whether in his opinion the balance sheet and account presents fairly in all material respects a true and correct view of the assets and liabilities of the Licensee as at the date of the statement and the income and expenditure of the Licensee for the year ended.

(4) It is the duty of the auditor to note in his report any instances where the operations of the Licensee might not in the opinion of the auditor be in compliance with the requirements of this Ordinance or any regulations made thereunder, the conditions of the Licensee's licence or its articles of incorporation or bylaws.

(5) The report of the auditor shall be read with the report of the directors to the shareholders at the annual meeting of the Licensee.

(6) A copy of the report of the auditor shall be displayed by the Licensee in a conspicuous place at its office in Nevis.

**Breaches and sanctions.**

**35.**    (1) Where the Minister is satisfied, on the recommendation of the Regulator that a Licensee—

(a) has not commenced business within six (6) months after the issuance of its licence;

(b) has failed to comply with a condition of its licence;

(c) is in breach of any duty or obligation imposed upon it by this Ordinance or under the Anti-Money Laundering Regulations, the Anti-Terrorism (Prevention of Terrorist Financing) Regulations, or the Financial Services (Implementation of Industry Standards) Regulations;

(d) has ceased to carry on business under its licence;

(e) is carrying on business in an unlawful manner or is in an unsound financial position;

(f) in the opinion of the Minister is carrying on business in a manner that is detrimental to the public interest or to the interest of its depositors;

(g) has provided any false or misleading information in respect of its application under this Ordinance or fails to inform the Minister where there is a material change in respect of the information so supplied;

(h) goes into liquidation;

(i) fails to pay its annual fees; or

(j) has committed an offence under this Ordinance,

the Minister may revoke or suspend the licence of the Licensee.

(2) In addition to the powers conferred on the Minister under subsection (1), the Minister may also—

LAWS OF SAINT CHRISTOPHER
AND NEVIS

*Nevis International Banking Ordinance*

CAP. 7.05 (N)    25

Revision Date: **31 Dec 2017**

[Nevis Ordinances]

(a)  issue a written warning to the Licensee;

(b)  conclude a written agreement with the Licensee providing for a program of remedial action;

(c)  issue a cease and desist order that requires the Licensee or the person responsible for the management of the Licensee to cease or desist from the practice or violations specified in the order; or

(d)  impose new or additional conditions on the Licensee.

(3)  When the Minister intends to revoke a licence under subsection (1), the Minister shall give written notice to the Licensee at its physical place of business in Nevis specifying the grounds upon which he proposes to make the revocation and shall require the Licensee to submit to him within thirty (30) days, a written statement of objections to the revocation.

(4)  Where the Minister decides to revoke the licence of the Licensee the Minister must give written notice to the Licensee and the notice shall include a statement of the reasons for the decision.

(5)  Notice under subsection (4) shall be served at the last known address of the Licensee.

(6)  A Licensee who is aggrieved by any decision of the Minister made under this section, may within thirty (30) days after providing a written statement objecting to the revocation apply to the High Court for redress.

(7)  Where a licence has been revoked, the Minister shall, as soon as possible thereafter publish a notice of the revocation in the *Gazette* and in one newspaper of general circulation in St. Christopher and Nevis.

(8)  Where a licence has been revoked the Licensee shall forthwith surrender the licence in its possession to the Minister and the Minister shall direct the Regulator to appoint a suitably qualified person to carry out the function of a custodian with respect to the business and affairs of the now former Licensee.

(9)  The regulator shall promptly give written notice of the revocation of the licence and of the appointment of the custodian to the former Licensee, clients, creditors, directors, secretary, officers, shareholders, customers and employees of the former Licensee and any other interested persons.

## PART VII

RECEIVERSHIP, LIQUIDATION AND REORGANISATION

**Voluntary winding-up.**

**36.**    (1)  Except with the prior written approval of the Minister no Licensee may be wound-up voluntarily.

(2)  Approval for a voluntary winding-up of a Licensee may be given by the Minister only if he is satisfied that—

(a)  the Licensee is solvent and has sufficient assets to repay its depositors and other creditors without delay; and

(b)  subject to subsection (3), the winding-up has been approved by the holders of at least two-thirds of the outstanding voting shares of the Licensee.

(3) Where the Minister finds in respect of a Licensee that there is imminent danger of its insolvency, the Minister may waive the requirement for shareholder approval of the winding-up of the Licensee voluntarily if—

    (a) the winding-up is to be effected in whole or in part through the sale of any of the assets of the Licensee to another Licensee; and

    (b) the deposit liabilities of the Licensee to be wound-up are to be assumed by that other Licensee.

### Commencement of voluntary winding-up.

**37.**    (1) When a Licensee receives the approval of the Minister to its voluntary winding- up, the Licensee shall—

    (a) cease to do business immediately and retain only such staff as is necessary for an orderly winding-up;

    (b) repay its depositors and other creditors; and

    (c) cease all operations undertaken before the receipt of the approval to wind-up.

### Notice of winding-up.

**38.**    (1) Within thirty days of the receipt of the approval of the Minister to the winding-up a notice of voluntary winding-up which must contain the prescribed information, shall be sent by the Licensee in the prescribed manner or by personal service, to the depositors and creditors of the Licensee and other person having any interest in its funds or other property.

    (2) The notice described in subsection (1) shall also be published in the *Gazette* and in one newspaper of general circulation of St. Christopher and Nevis and placed in a conspicuous place on the premises of each office or branch of the Licensee to be wound-up.

### Settlement of Claims.

**39.**    (1) The approval of the Minister to the voluntary winding-up of a Licensee does not adversely affect the rights of a depositor or other creditor of the Licensee to settlement in full of his claim nor the rights of any person having an interest in the funds or property of the Licensee to settlement of that interest.

    (2) All claims made by persons described in subsection (1) shall be settled by the Licensee concerned within such time as the Minister may determine.

### Distribution of remaining assets.

**40.**    (1) The assets of a Licensee being voluntarily wound-up that remain after settlement of the claims described in section 62 are to be distributed among the shareholders of the Licensee in proportion to their respective rights.

    (2) Notwithstanding subsection (1), no distribution of the remaining assets of a Licensee may be made before—

    (a) all claims of depositors and other creditors have been settled or, in the case of a disputed claim, before the Licensee has deposited with the Administration sufficient funds to meet any liability that could arise under that claim;

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*

**CAP. 7.05 (N)**    27

**[Nevis Ordinances]**

(b) any funds that are payable to a depositor or other creditor who has not made his claim have been deposited with the Administration; or

(c) any funds or property held by the Licensee that could not be returned, in accordance with section 62, to the persons who have an interest therein have been deposited with or transferred to the Administration, together with the relevant records.

**Interruption of winding-up.**

**41.**    (1) If the Regulator determines that the assets of a Licensee that is being voluntarily wound-up are not sufficient for the full discharge of the obligations of the Licensee or that the completion of such a winding-up is being unduly delayed, the Regulator may seize the management and control of the Licensee by posting a notice to that effect on the premises of the Licensee and by placing persons appointed by the Minister into the offices of the Licensee.

(2) When the Regulator seizes the management and control of a Licensee under subsection (1) he shall immediately begin proceedings for compulsory winding-up in accordance with this Ordinance.

**Seizure in other cases.**

**42.**    (1) Notwithstanding section 64, the Regulator may seize the management and control of a Licensee when—

(a) the realizable value of the Licensee's assets is less than the aggregate of its liabilities and capital accounts or the Licensee's financial condition suggests that it will shortly be in that circumstance;

(b) its business is being conducted in an imprudent manner or is not being conducted in accordance with this Ordinance;

(c) the Licensee refuses to submit to inspection of its records or operations by an auditor appointed under section 33 or the Regulator; or

(d) its licence has been revoked or suspended under this Ordinance.

(2) A seizure of the management and control of a Licensee under this section is affected by placing a notice to that effect on the premises of the Licensee and by placing persons appointed by the Minister into the offices of the Licensee.

(3) A Licensee aggrieved by a seizure under this section may institute proceedings in the High Court for recovery of management and control of the institution and the High Court may make such order in respect thereto as to it seems just and consistent with the purposes of this Ordinance.

**Duty of Minister.**

**43.**    Within thirty (30) days after the Regulator has seized the management and control of a Licensee under this Ordinance, the Minister shall begin proceedings in the High Court—

(a) for the compulsory winding-up of the Licensee; or

(b) for the re-organisation of the Licensee.

**Power of High Court.**

**44.**    The High Court may in respect of proceedings by the Minister under section 43 order—

(a)  the compulsory winding-up of the Licensee;

(b)  the reorganisation of the Licensee subject to such terms and conditions as the court may determine; or

(c)  the return of the management and control of the Licensee to its shareholders, directors and officers subject to such safe-guards or conditions, if any, as the court may consider for the purposes of this Ordinance.

### Notice of application.

**45.**    Forthwith after he makes an application to the High Court under section 43 in relation to a Licensee, the Minister shall give notice of the application—

(a)  to the directors and shareholders of the Licensee; and

(b)  to the depositors and other creditors of the Licensee.

### Appointment of custodian.

**46.**    If the High Court orders the compulsory winding-up or reorganisation of a Licensee pursuant to an application under section 43, the High Court shall appoint a custodian to be responsible to the Court and to supervise the winding-up or re-organisation of the Licensee.

### Functions of custodian.

**47.**    (1) In respect of the Licensee for which he has been appointed and subject to the provision of section 52, the custodian has the exclusive power and duty to manage and control the affairs of the Licensee.

(2) Without limiting his powers or duties under subsection (1), the custodian may, in respect of the Licensee for which he has been appointed—

(a)  continue or discontinue its operations;

(b)  stop or limit the payment of its obligations;

(c)  employ staff;

(d)  execute any instrument in its name;

(e)  initiate, defend and conduct in its name any action or proceeding to which the Licensee is or might be a party;

(f)  end the seizure of the Licensee by restoring it to its directors and shareholders;

(g)  re-organise or wind-up the Licensee in accordance with this Ordinance; and

(h)  invite claims by depositors or other persons with interest against the Licensee, giving a date by which any such claims shall be submitted and deal with any such claims in the order in which they are submitted.

### Inventory of assets.

**48.**    (1) Forthwith after assuming management and control of a Licensee, the custodian shall make an inventory of its assets and forward a copy of the inventory to the Registrar of the High Court.

(2) The copy of the inventory forwarded to the Registrar shall be kept available at all reasonable times for the inspection of interested persons.

**Reorganization.**

**49.**    (1) Where the re-organisation of a Licensee has been ordered by the High Court, the custodian shall develop a plan of re-organisation and deliver a copy thereof to each of the depositors and other creditors of the Licensee who under the plan would not receive full restitution or payment of their claims.

(2) The copy of the re-organisation plan must be accompanied by a notice requiring that objections to the plan be delivered to the custodian not later than thirty (30) days after the last of the copies have been delivered under subsection (1).

(3) If within the time limited therefor by subsection (2) the custodian does not receive objections in writing to the reorganisation from persons who in the aggregate hold at least one-third of the total amount of deposits and other liabilities of the Licensee, the custodian may carry out the re-organisation plan referred to in subsection (1).

(4) When an objection to the re-organisation plan is received from one-third or more of the persons described in subsection (3), the custodian shall submit further re-organisation plans in like manner until such time as fewer than one-third of the persons described in subsection (3) object within the time limited therefor or he may refer the matter back at anytime to the High Court for further directions.

(5) The High Court may extend the time limited by subsection (1) and upon cause shown may exempt the custodian from delivering the plan to some or all of the persons mentioned in subsection (1).

**Content of plan.**

**50.**    A re-organisation plan developed by the custodian of a Licensee must, so far as it is practicable to do so—

    (a)  be equitable to all classes of depositors;

    (b)  provide for bringing in new funds to establish adequate ratios between—

        (i) capital and deposits; and

        (ii) liquid assets and deposits; and

    (c)  provide for the removal of any directors or any officer or employee responsible for the circumstances that led to the seizure of the Licensee.

**Application for order by custodian.**

**51.**    If, in the course of the re-organisation of a Licensee, it appears to the custodian that circumstances render the plan or its execution undesirable, he may apply to the High Court for an order—

    (a)  to modify the plan; or

    (b)  to wind-up the Licensee compulsorily.

**Compulsory winding-up.**

**52.**    (1) Where the High Court under section 44 orders the compulsory winding-up of a Licensee, the custodian appointed therefor by the Court may, subject to subsection (2), perform the functions of the Licensee.

(2) A custodian of a Licensee described in subsection (1) may not, without an order of the High Court to do so—

(a)    sell any assets or transfer any property of the Licensee that has a value exceeding one hundred thousand dollars ($100,000.00);

(b)    create a security interest in any asset or property of the Licensee in favour of a creditor who extends a new credit to the Licensee;

(c)    compromise or release any claim the amount of which exceeds one hundred thousand dollars ($ 100,000.00); or

(d)    pay any claim other than one in respect of an obligation incurred by the custodian in the exercise of his winding-up functions before the schedule referred to in section 56(c) has been approved by the High Court.

**Termination of service contracts.**

**53.**    Subject to any other law governing conditions of employment, the custodian of a Licensee that has been ordered by the High Court to be compulsorily wound-up shall terminate not later than nine months after the order of the High Court—

(a)    any employment contract of the Licensee;

(b)    any contract for services to which the Licensee is a party; and

(c)    any obligations of the Licensee as a lessee of property.

**Right of lessor.**

**54.**    A lessor of any property referred to in section 76—

(a)    must be given notice of not less than ninety (90) days of the intended termination of the obligations of a Licensee thereunder;

(b)    has no claim for rent thereunder other than rent accrued on the date of the termination of the obligation of the Licensee; and

(c)    has no right to damages by reason only of any termination of the obligations of the Licensee, notwithstanding any term of the lease to the contrary.

**Statements of accounts.**

**55.**    (1) Within sixty (60) days after an order for the compulsory winding-up of a Licensee, the custodian shall deliver a statement of account to any depositors and other creditors.

(2) The statement of account is a statement of the nature and amount for which a claim of a person described in subsection (1) is shown on the books of the Licensee.

(3) A notice specifying that any objection to the statement of account is to be made on a date specified in the notice, not being later than sixty (60) days after the delivery of the notice, must accompany the statement of account.

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 66 of 190

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**                    *Nevis International Banking Ordinance*    **CAP. 7.05 (N)    31**
[Nevis Ordinances]

(4) The High Court on application of the custodian for cause shown may exempt the custodian from delivering a statement of account to any person mentioned in subsection (1).

**Claims.**

**56.**    Not later than ninety (90) days after the last day specified in the notice for filing claims against a Licensee being compulsorily wound-up, the custodian shall—

>    (a)  reject any claim, of which he doubts the validity;

>    (b)  determine the amount, if any, owing to each known depositor or other creditor and the priority of his claim under this Ordinance;

>    (c)  prepare for filing with the High Court a schedule of the actions proposed to be undertaken for the purpose of the compulsory winding-up of the Licensee;

>    (d)  notify each person whose claim is allowed in full; and

>    (e)  publish, once a week for three (3) consecutive weeks in a newspaper of general circulation in Nevis—

>       (i)  a notice of the date and place where the schedule referred to in paragraph (c) will be available for inspection; and

>       (ii)  the date, not being earlier than thirty (30) days from the date of the publication, on which the custodian will file that schedule with the High Court.

**Objections.**

**57.**    (1) Within twenty (20) days of the filing of a schedule under section 56, a depositor or other creditor or shareholder of the Licensee concerned, or other interested person, may file with the High Court any objection he has to any action proposed in the schedule referred to in section 56(c).

(2) After notice served on the custodian and such interested parties as the High Court may require, the High Court shall hear the objection and make such order thereon as it considers just in the circumstances.

(3) When the High court allows an objection, the order must set out the manner in which the schedule referred to in section 56(c) is to be modified.

**Distribution of assets.**

**58.**    (1) When a schedule has been filed under section 56 in respect of a Licensee, the custodian may make a partial distribution to the claimants against the Licensee whose claims are undisputed or allowed by the High Court, if the custodian establishes an adequate reserve for the payment of disputed claims against the Licensee.

(2) As soon as practicable after all objections against the distribution proposed by the custodian have been heard and determined, final distribution of the assets of the Licensee concerned shall be made by the custodian.

**Priority of claims.**

**59.**    (1) The following claims have priority against the general assets of a Licensee being compulsorily wound-up under this Ordinance—

(a) firstly, the necessary and reasonable expenses incurred by the custodian in carrying out his functions under this Ordinance;

(b) secondly, the wages and salaries of the officers and employees of the Licensee that accrued during the three (3) months immediately preceding the seizure of the Licensee under this Ordinance;

(c) thirdly, any monies owing to the Administration;

(d) fourthly, the Licensee's depositors;

(e) fifthly, all other claims.

(2) After payment of all other claims against the Licensee, of which notice was received by the custodian within the time provided for in section 47(2)(h) together with interest at such rate as the High Court determines, all remaining claims against the Licensee that were not filed within the time limited therefor under this Ordinance may then be paid.

(3) Where the amount available to pay the claims of any class of claimant specified in this section in respect of priorities is not sufficient to provide payment in full to claimants in that class, the amount available shall be distributed by the custodian on a *pro rata* basis among the claimants in that class.

**Distribution to shareholders.**

**60.**    The assets of a Licensee being compulsorily wound-up that remains after the final distribution to claimants pursuant to section 59 shall be distributed by the custodian among the shareholders of the Licensee in proportion to their respective rights.

**Abandoned funds.**

**61.**    (1) Any funds of a Licensee being compulsorily wound-up under this Ordinance that remain unclaimed after the final distribution under section 59 and not subject to distribution under any other provision of this Ordinance shall be deposited with the Administration by the custodian of the Licensee.

(2) Funds deposited with it under subsection (1) must be held by the Administration for ten (10) years unless earlier claimed by a person entitled thereto.

(3) On the expiration of the ten (10) years referred to in subsection (2) in respect of any funds, those funds remaining unclaimed become abandoned property and may be transferred to and used as part of the Nevis Island Consolidated Fund.

**Completion of winding-up.**

**62.**    (1) When all the assets of a Licensee being wound-up have been distributed or dealt with as required by this Ordinance, the custodian shall render an audited statement to the High Court.

(2) If the High Court is satisfied with the audited statement rendered by the custodian in respect of a Licensee being wound-up, it may by order direct the Registrar of Companies to strike the name of the Licensee from the register of companies under the Companies Ordinance and publish notice thereof in the *Gazette*.

(3) When its name is struck off the register of companies pursuant to an order under subsection (2) the Licensee is thereupon dissolved and its licence under this Ordinance is revoked.

LAWS OF SAINT CHRISTOPHER
AND NEVIS

Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*

**CAP. 7.05 (N)**    33

**[Nevis Ordinances]**

## PART VIII

### RESIDENCE

**Residents of Nevis.**

**63.**    For the purposes of this Ordinance, the following are residents of Nevis, namely—

    (a)  an individual ordinarily resident in Nevis;

    (b)  a trust company, partnership, limited partnership or other body incorporated, established, formed or organised in Nevis under the law in force in Nevis, the majority of shares or other ownership of which is legally or beneficially owned, directly or indirectly by the Government or by persons who are residents under the provisions of paragraph (a) or (c);

    (c)  any other trust, corporation, partnership, limited partnership or other entity who or which is a resident of, or ordinarily resident or domiciled in Nevis as under the Income Tax Act, but does not mean a person registered or licensed under any law in force in Nevis relating to international financial services;

    (d)  For the purposes of this Ordinance, a person who has obtained citizenship of St. Christopher and Nevis by way of the citizenship by investment program is not a resident of Nevis.

## PART IX

### SPECIAL TAX PROVISIONS

**Exemption from tax.**

**64.**    Except as provided by this Part, no income tax, capital gains tax or other direct tax shall be levied in Nevis upon the profits or gains of a Licensee in respect of the international banking it does from within Nevis.

**Transfer of assets exemption.**

**65.**    (1) Except as provided by this Part, no tax or duty shall be levied upon a Licensee, its shareholders or transferees in respect of the transfer of all or any part of its securities or other assets to another Licensee.

    (2) Where a Licensee transfers shares of a Licensee that are held by that person or Licensee to another person who is not a resident of Nevis or to another Licensee, the transfer is exempt from the payment of any tax or duty thereon.

    (3) Except as provided by this Part—

    (a)  no income tax or capital gains tax; and

    (b)  no other direct tax,

shall be levied or collected in Nevis in respect of any dividend, interest or other return from any shares, securities, deposits or other borrowing of a Licensee or any assets managed by the Licensee if the dividend, interest or other returns are in respect of shares, securities deposits or other borrowings or assets beneficially owned by a

person who is not a resident of Nevis; but the onus of establishing ownership lies upon the Licensee.

**Withholding tax.**

**66.**    (1) Notwithstanding any provision of the Income Tax Act, but subject to subsection (2), no Licensee need withhold any portion of any dividend, interest or other returns payable to any person in respect of any borrowings of the Licensee or in respect of that person holding shares or securities of the Licensee.

(2) All dividends, interests or other returns attributable to the shares or security of all the management of assets by a Licensee that are payable to a resident of Nevis and known as such by the Licensee shall be reported to the Inland Revenue Department.

**Service fees.**

**67.**    (1) When a tax levied in Nevis is in the nature of a service charge or utility charge for a service provided by the Administration, a Licensee is not exempt from that charge under this Part.

(2) A service or utility charge includes a charge or fee levied or imposed for the issuance of any incorporation, registration or licence required in Nevis.

**Customs duty.**

**68.**    (1) The Minister may by order exempt a Licensee in respect of its business from all or so much of any duty payable under the Customs Act, Cap. 20.04 in respect of any goods imported by the Licensee in respect of its business as the Minister considers expedient.

(2) For the purposes of being considered for exemption under subsection (1), the Licensee has to satisfy the Minister that the goods concerned—

    (a) are not being made or manufactured in Nevis;

    (b) are essential as equipment or fixtures for doing business from within Nevis; and

    (c) are not merely goods that will be used up or expended in the ordinary course of business.

**Employee benefits.**

**69.**    (1) Where the Minister is satisfied that a Licensee must use the services of specially qualified persons in order to do its business effectively from within Nevis and that—

    (a) it is unable to acquire those services in Nevis; and

    (b) it is unable to retain or hire those services from outside Nevis without special tax benefits being made available,

the Minister may authorise an offshore benefit provision for the employment of those specially qualified persons.

(2) An offshore benefit provision is one whereby a prescribed percentage of an employee's or contractor's salary or fees from a Licensee—

    (a) is exempt from any duty or tax in Nevis;

    (b) may be paid in a foreign currency; or

(c) may be paid in some other prescribed manner in another currency or otherwise notwithstanding any other law to the contrary.

## PART X

### ABANDONED PROPERTY

**Abandoned property.**

**70.**    (1) Property of the following kinds held or owing in the course of its business by a Licensee in respect of which no activity has been evidenced for a period of ten (10) years is abandoned property—

(a) any general deposit, that is a demand saving or matured time deposit made with the Licensee together with any interest or dividends but exclusive of legal charges;

(b) funds that were paid towards the purchase of shares or other interests in a Licensee;

(c) any sum payable on cheques or other instruments on which the Licensee is liable,

and in respect of which the Licensee has, by registered mail to the latest known address of the owner, given notice of its intention to deliver the contents into the custody of the Administration and the owner has failed to respond within a period of one (1) year.

(2) Activity is evidenced in respect of the property described in subsection (1) if the owner thereof has—

(a) within ten (10) years of the date of deposit increased or decreased the amount of the deposit or presented a passbook or other record for the crediting of interest in respect of the deposit;

(b) within ten (10) years of paying funds for the purchase of shares or other interest mentioned in subsection (1)(b), increased or decreased the amount of the funds or presented a document or book for crediting of dividends in respect thereof;

(c) within ten (10) years of making the last deposit, inquiry or communication concerning any item mentioned in subsection (1), correspond with the Licensee concerning the items or otherwise indicated an interest in the items as evidenced by a memorandum about them by the Licensee.

**Disposal of abandoned property.**

**71.**    (1) A Licensee shall, once in each financial year, report to the Regulator all its holding of abandoned property within the meaning of this Ordinance and shall, from time to time, deposit with or convey to the Administration in the prescribed manner all abandoned property.

(2) When a Licensee has deposited with or conveyed to the Administration any abandoned property, the Licensee is relieved from any liability to the beneficial owners thereof to the extent of the value of the property deposited or conveyed to the Administration.

(3) Within thirty (30) days after reporting to the Regulator pursuant to subsection (1), the Regulator shall give notice by registered mail to the beneficial owner of the property, at his latest known address; but with the approval of the High Court on application thereto, the Regulator may be exempted from mailing the copy of the notice to the owner.

(4) A Licensee that fails to report to the Regulator any abandoned property in its possession or that fails to deposit with or convey to the Administration any abandoned property as required by this Ordinance commits an offence and is liable on summary conviction to a fine not exceeding two hundred thousand dollars ($200,000.00).

**Sale of abandoned property.**

**72.**    (1) The Administration may sell at public auction any property that has been conveyed to it under section 71 after the expiration of thirty (30) days from the latest date of publication or the notice referred to in section 71(3) and the mailing of the copy of the notice to the owner as the case may be.

(2) The public auction may be held after such reasonable advertising of the sale as the Administration considers suitable.

**Payment to Consolidated Fund.**

**73.**    The Regulator shall pay into the Nevis Island Consolidated Fund all monies received by the Administration as abandoned property and the proceeds to the public auction of any abandoned property less, in each case—

    (a) such amount as the Minister considers necessary to reserve for the payment of claims later made and approved by him; and

    (b) amounts deducted by the Regulator as approved by the Minister for reasonable expenses incurred in connection with the publishing and mailing of notice, service charges, and the sale of abandoned property.

**Claims against property.**

**74.**    (1) A person who claims a beneficial interest in any abandoned property deposited with or conveyed to the Administration may make a claim for the value thereof within the prescribed time and in the prescribed manner.

(2) When the Minster is satisfied that a claimant is entitled to the abandoned property, the Administration shall deliver up the property, or make payment for the value thereof, as the case requires.

**Notice to claimants.**

**75.**    (1) When the Minister admits or refuses a claim under section 74, he shall forthwith notify the claimants of his decision.

(2) A person aggrieved by a refusal of his claim for abandoned property by the Minister may within twenty-one (21) days of receiving notice of the refusal, appeal the decision to a judge of the High Court in chambers who may make such order thereon as he considers equitable.

**Offence in relation to abandoned property.**

**76.**    A Licensee that fails to report to the Regulator any abandoned property in its possession or that fails to deposit with or convey to the Administration any

abandoned property as required by this Ordinance, commits an offence and is liable on conviction to a fine not exceeding twenty-five thousand dollars ($25,000.00).

PART XI

OFFENCES

**Unlicenced international banking.**

**77.**    (1) A Licensee who does international banking from within Nevis during any period in which he does not hold a licence under this Ordinance commits an offence and is liable to a fine not exceeding two hundred and fifty thousand dollars ($250,000.00).

(2) A director or officer of a company that does international banking from within Nevis without a licence under this Ordinance commits an offence and is liable to a fine not exceeding fifty thousand dollars ($50,000.00) or to imprisonment for five (5) years or to both fine and imprisonment.

(3) Subject to subsection (4) a person who holds funds obtained from doing international banking business from within Nevis during any period in which he did not hold a licence under this Ordinance shall repay those funds in accordance with the direction of the Minister.

(4) The High Court may order any profits derived from the conduct of international banking from within Nevis without a licence under this Ordinance to be forfeited to the Administration.

**Misleading advertising.**

**78.**    (1) A Licensee that engages in advertising practices that are likely to mislead concerning—

(a) the relationship of the Licensee with the Administration or any department or office of the Administration;

(b) the true interest rate paid on deposit or charged or credited;

(c) the true returns on the management of investments;

(d) the insured or guaranteed status of deposit or other liabilities or of investments managed by it; or

(e) the financial condition of the designated institution,

commits an offence and is liable on conviction to a fine not exceeding ten thousand dollars ($10,000.00).

(2) A Licensee shall, in respect of its business, furnish the Regulator with copies of all its advertisements.

**False statements and obstruction.**

**79.**    A director, officer, employee or agent of a Licensee who, with intent to deceive—

(a) makes a false or misleading statement or entry in a book, account, record, report or statement of the Licensee or omits a statement or entry that should be made therein; or

(b) obstructs—

    (i) the carrying out by an auditor of his proper function under this Ordinance; or

    (ii) the examination of a Licensee as required pursuant to this Ordinance,

commits an offence and is liable on conviction to a fine not exceeding fifty thousand dollars ($50,000.00) or to imprisonment for five (5) years.


## PART XII

### Miscellaneous

**Minimum criteria for determining fit and proper status.**

**80.**    (1) A person who is, or is likely to be a director, shareholder or manager of a Licensee under this Ordinance shall be a fit and proper person to hold the particular position which he holds or is likely to hold.

    (2) In determining whether a person is a fit and proper person to hold a position as outlined under subsection (1), regards shall be had to—

    (a) that person's probity, competence and soundness of judgment for fulfilling the responsibilities of that position;

    (b) the diligence with which that person is fulfilling or likely to fulfill the responsibilities of that position; and

    (c) whether the interests of depositors or potential depositors of the Licensee are, or are likely to be in any way threatened by that person holding the position.

    (3) Without prejudice to the generality of the foregoing, regard may be had to the previous conduct and activities in business and financial matters of the person in question and, in particular, to any evidence that the person has—

    (a) committed an offence involving fraud, dishonesty or violence;

    (b) contravened any provision made by or under any legislation designed for protecting members of the public against a financial loss due to dishonesty, incompetence or malpractice by persons concerned in the provision of banking or other financial services or the management of companies or against financial loss due to the conduct of a discharged or undischarged bankrupt;

    (c) engaged in any business practices appearing to be deceitful, oppressive or otherwise improper or reflects discredit on that person's method of conducting business;

    (d) an employment record which leads one to believe that the person carried out an act of impropriety in the handling of his employer's business; or

    (e) engaged in or been associated with any other business practices or otherwise conducted himself in such a way as to cast doubt on his competence and soundness of judgment.

**Extending time.**

**81.**    At the request of a Licensee, the Regulator may extend the time within which any documents or information required from the Licensee under this Ordinance must be sent to the Regulator.

**Application of the other legislation.**

**82.**    (1) The provisions of the Companies Ordinance, Cap. 7.06(N) relating to the winding up of a company do not apply to a Licensee.

(2) The Bankruptcy Act, Cap. 5.04 does not apply to a Licensee.

(3) The Banking Act, Cap. 21.01 does not apply to a Licensee in respect of its international banking business.

**Exemptions.**

**83.**    Sections 17 and 19 and PART VII - Receivership, Liquidation and Re-organisation of this Ordinance do not apply to a Licensee that is a qualified foreign bank.

**Regulations.**

**84.**    The Minister may make regulations that are necessary for the carrying into effect of this Ordinance and in respect of acts, matters or things that are required by this Ordinance to be prescribed.

_____

# SCHEDULE

## (Section 84)

## NEVIS INTERNATIONAL BANKING REGULATIONS

**Citation.**

**1.** These Regulations may be cited as the Nevis International Banking Regulations.

**Interpretation.**

**2.** In these Regulations the following words have the following meaning—

"Ordinance" means the Nevis International Banking Ordinance, Cap. 7.05(N).

**Applicable fee.**

**3.** The prescribed fees payable to the Regulator shall be non-refundable and are specified in Schedule 1 to these Regulations.

**Application for Licence.**

**4.** An application for a licence under section 9 of the Ordinance shall be in the form prescribed in Form 1 of Schedule 2.

**Form of Licence.**

**5.** A license to be issued to a Licensee by the Minister shall be in the form as set out in Form 2 of Schedule 2.

**Notice of change of registered address.**

**6.** A notice of change of the registered address of the Licensee under Section 7 of the Ordinance shall be in the form as prescribed in Form 3 of Schedule 2.

**Notice of change of particulars.**

**7.** A notice of change of particulars of the Licensee under Section 9 of the Ordinance shall be in the form as prescribed in Form 4 of Schedule 2.

**Notice of Revocation of license.**

**8.** The notice to be issued by the Minister to a Licensee upon the revocation of that Licensee's license shall be as set out in Form 5 of Schedule 2.

**Tentative applicant proposal.**

**9.** A proposal under Section 10 of the Ordinance shall contain but not be limited to the matters outlined in Schedule 3.

**Late payment of annual fees.**

**10.** (1) In accordance with section 8 of the Ordinance, the annual licence fee shall be paid on or before the 31st day January of each year and shall accompany the prescribed renewal form as set out in Form 6 in Schedule 2.

(2) If the annual fee is paid after 31st January in any year but before the 1st of March in the same year, a late payment fee of 10% of the annual fee is payable in addition to the annual fee.

(3) If the annual fee is paid on 1st March in any year or, on or before 30th June in the same year, a late payment fee of 50% of the annual fee is payable in addition to the annual fee.

(4) If the annual fee and any applicable late payment fees are not paid on or before 30th June in the year in which the annual fee is due and payable, section 35(1) of the Ordinance shall apply.

**Fixed Penalties.**

**11.**    (1) This regulation shall apply to the offences specified in Schedule 4.

(2) Where circumstances giving rise to reasonable belief that a person has committed an offence to which this regulation applies exist, the Regulator may give notice in writing in the form prescribed in Schedule 5 offering that person the opportunity to discharge any liability to conviction for the offence by payment of a fixed penalty.

(3) A person shall not be liable to be convicted of the offence if the fixed penalty is paid in accordance with these Regulations and the requirement in respect of which the offence is committed is complied with before the expiration of 15 days following the date of the notice referred to in sub-regulation (2) or such longer period as may be specified in that notice or before the date on which proceedings are begun, whichever event occurs last.

(4) Where notice is given under this regulation in respect of an offence, the Regulator shall not commence proceedings against that person until the end of the 15 days following the date of the notice or such longer period (if any) as may have been specified in the notice.

(5) Where a person makes a payment of a fixed penalty under this section it shall be made to the Nevis Island Administration and in any proceedings a certificate that payment of a fixed penalty was or was not made to the Nevis Island Administration by a date specified in the certificate shall, if the certificate purports to be signed by the Regulator, be admissible as evidence of the stated facts.

(6) A notice issued under sub-regulation (2) shall—

(a) specify the alleged offence;

(b) give such particulars of the offence as are necessary for giving reasonable information of the allegation; and

(c) state the period during which, by virtue of sub-regulation (4), proceedings will not be taken for the offence.

(7) In any proceedings for an offence to which this section applies, no reference shall be made after the conviction of the accused to the giving of any notice under this section or to the payment or non-payment of a fixed penalty unless in the course of the proceedings or in some document which is before the court in connection with the proceedings, reference has been made by or on behalf of the accused to the giving of such a notice, or, as the case may be, to such payment.

(8) In this regulation, "proceedings" means any criminal proceedings in respect of the act or omission constituting the offence specified in a notice issued and served under sub-regulation (2) and "convicted" shall be construed accordingly.

(9) The Minister upon the recommendation of the Regulator may, by Order published in the *Gazette*, make provision as to any matter incidental to the operation of this regulation, and in particular, any such Order may—

  (a) prescribe the nature of the information to be furnished to the Regulator along with payment;

  (b) prescribe the arrangements for the Regulator to furnish any information with regard to any payment pursuant to a notice under this section.

(10) A fixed penalty levied pursuant to these Regulations may be recovered as a civil debt.

**Submission of information to the Regulator.**

**12.**    (1) Subject to Section 30(4)(d) of the Ordinance, a Licensee shall furnish to the Regulator at such time and in such manner as specified by the Regulator, information and data as the Regulator may require for the proper discharge of his functions and responsibilities.

(2) Without limiting the generality of sub-regulation (1), a Licensee shall, at the request of the Regulator in relation to that Licensee's operations, and in such form as the Regulator may from time to time approve, submit—

  (a) a monthly statement of assets and liabilities not later than 14 days after the last day of the month to which it relates;

  (b) a quarterly return providing an analysis of customers' liabilities to the Licensee in respect of loans, advances and other assets of the Licensee not later than 14 days after the end of the quarter to which it relates;

  (c) within such period as the Regulator may determine, such other returns as the Regulator may require.

(3) All statements and returns produced by a Licensee under sub-regulation (2) and any data or information submitted by a Licensee under sub-regulations (1) or (2), shall be regarded by the Regulator as confidential provided that the Regulator may disclose information in accordance with section 32 of the Ordinance.

(4) A Licensee who contravenes this regulation is liable to a penalty of $5,000.00 and $500.00 for each day in default.

**Extension of time for providing information.**

**13.**    The Regulator may, at the request of the Licensee, extend the time within which that Licensee is obliged to furnish any document or information in accordance with these Regulations.

**Rule for examination and supervision of Licensee.**

**14.**    Subject to section 30(3) of the Ordinance, the Regulator shall observe the rules set out in Schedule 6 for the purpose of examining and supervising Licensees and their operations so as to ensure the preservation of the soundness and efficiency of the international banking system.

———————

## SCHEDULE 1 TO THE REGULATIONS

*(Regulation 3)*

TABLE OF PRESCRIBED FEES

| *The matter in respect of which the prescribed fee is payable* | *Amount of fee in United States Dollars (US$)* | *Enabling sections of the Ordinance* |
|---|---|---|
| Initial License fee | 50,000.00 | Section 8(2) |
| Application fee | 6,000.00 | Section 9(2)(h) |
| Administrative fee | 1,500.00 | Section 10(2) |
| Annual license fee | 50,000.00 | Section 8(2) |

_____

## SCHEDULE 2 TO THE REGULATIONS

FORMS

FORM 1

*(Regulation 4)*

APPLICATION FOR LICENCE TO CARRY OUT INTERNATIONAL BANKING BUSINESS

PLEASE COMPLETE ALL APPLICABLE PARTS OF THE APPLICATION.

## PART 1

## APPLICANT DETAILS

| Name of Applicant: | Registered Office of Applicant |
|---|---|
| Company No. | Business address of Applicant |
| Date of Incorporation | |
| Contact person for this application | Telephone<br>Fax<br>Email |
| **Share Capital**<br><br>Authorised<br><br>Issued<br><br>Paid Up | Method of Raising Share capital<br><br>Amount and nature of loan capital |

Type of International banking business to be carried on by Applicant

LAWS OF SAINT CHRISTOPHER
AND NEVIS
Revision Date: **31 Dec 2017**

*Nevis International Banking Ordinance*

**CAP. 7.05 (N)**     45
[Nevis Ordinances]

## PART 2

## ADDITIONAL INFORMATION

**Please append (where applicable) the following items of information.**

- ➢ Certified evidence of <u>capital</u> requirements.

- ➢ Name, citizenship, bankers' references and addresses of <u>Shareholders</u> (include names of beneficiaries where shareholders are nominees) with statutory declaration. Also amount and type of shares held.

- ➢ <u>Résumés</u> of each Director and Senior Management personnel of Applicant, together with Banker's references. Resumes — shall contain: name, date and place of birth, citizenship details, country of residence and length of residency, private address for past ten years, educational and professional qualifications, employment history, etc.

- ➢ <u>Constitutional documents</u> —

  Certified copies of company incorporation documents including the Articles of Incorporation and Bye-laws, Certificate of Incorporation and Certificate of Good Standing. (It is the applicant's responsibility to ensure that the scope of its Articles of Incorporation is sufficiently wide to carry out its proposed activities.)

- ➢ Particulars of shareholder loan —

  Include details of all loans to and from shareholders.

- ➢ Comparative financial statements — Copy of applicant's and applicant's parent company's latest audited accounts and group accounts where applicable for 3 years prior to year of application and the statements of accounts at the end of the month prior to submission of application (applies to subsidiary or continuing companies)

- ➢ Business plan — encompassing:

  the background, business objectives, proposed operations of the applicant including market plans;

  - corporate governance arrangements; fitness and probity of each director, manager or shareholder having more than 5% of the shares of the applicant;

  - an overview of the investment and lending policies, standard and procedures in respect of the applicant's portfolio of investments and loans;

  - a detailed explanation of the applicant's compliance procedures, AML/CFT policies and its risk management and control processes that identify the applicant's major risk areas i.e. market, credit, technological, operational, liquidity, strategic, legal and regulatory;

  - the source of initial and future capital for expansion, in the form of a capital plan and funding policy, including an estimate of future capital requirements. The capital should meet the business requirements of the applicant's proposed bye-laws;

  - the projected staff complement and organisational chart showing reporting lines for senior positions and key responsibilities and a description of the functions the individual will perform;

- a description of any material outsourcing arrangements in the group, with partners or with third parties, that may be anticipated, including any data processing functions that may be conducted outside Nevis;

- detailed provisioning policies and a description of the general allowances that are anticipated in executing the applicant's business plan;

- the intended financial year end for the applicant;

- where it is intended that an internet platform (e-commerce) would form the key delivery structure of the applicant, the plan must address:

    (a) how customers, employees and vendors will be authenticated and authorised to prevent repudiation and fraud;

    (b) the physical and logical network security, including security of the website and the security of customer information;

    (c) management of systems capacity, encryption of communications and provision of electronic data processing (EDP) audits;

    (d) continuing and contingency costs related to the development and maintenance of IT plans.

- Contingency plans resulting from variations associated with key assumptions used in developing the business plan (provided sensitivity analysis showing the results on the business plan under various scenarios).

➢ <u>Auditors and attorneys-at law confirmation of appointment</u> — Names and address of appointed firms of auditors and attorneys-at-law together with confirmation letters.

➢ List the names and addresses of the correspondent banks in which the applicant has accounts or in which the applicant intends to have accounts.

➢ <u>Restricted list statement</u> — for restricted license, include the names and addresses of persons with which business is to be restricted.

➢ If the applicant is a qualified foreign bank:

    a) a certificate showing that the home banking supervisor of the jurisdiction in which it was incorporated, formed or organised has no objection to its application for a license to do international banking business in Nevis; and

    b) evidence satisfactory to the Regulator that it is subject to a comprehensive supervision on a consolidated basis by the appropriate authorities in its jurisdiction of incorporation.

➢ Undertaking to provide and set apart fully paid-up capital, before and at the time business commences.

   Undertaking must expressly provide that Laws of Nevis are to govern validity, interpretation and effects on the rights and obligations of each of the parties.

➢ Other documents/information which the Regulator deems necessary to allow a full analysis of the application.

## PART 3

## APPLICANT MANAGEMENT

Please list all Directors of the applicant, including non-executive Directors and identify the Chief Executive or Managing Director and any other Directors with specific title. A complete resume for each person should be appended.

| Name and Title | Address | Is resume attached |
|---|---|---|
| | | YES/NO |
| | | YES/NO |
| | | YES/NO |

## PART 4

## DETAILS OF CORPORATE STRUCTURE OF WHICH APPLICANT FORMS PART

Please provide details of group companies of which the applicant forms part and describe the services provided.

| Name of Company | Relationships (Parent, subsidiary, group or related company) | Jurisdiction of domicile | Address | Services provided | Year |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

## PART 5

## APPLICANT ADMINISTRATION EXPERIENCE (WHERE APPLICABLE)

Please provide details of banking business administered by the applicant or group of companies over the past 7 years.

| Name of banking business and jurisdiction of domicile | Number of years administered | Nature of services provided |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

## PART 6

## REGULATORY AUTHORITY

Please provide name and address of All Regulatory Entities to which the Applicant or other group companies report or reported over the past 5 years.

| Name of Company | Name and address of Regulatory Authority |
|---|---|
|  |  |
|  |  |
|  |  |

## PART 7

### STATUTORY DECLARATION - TO BE COMPLETED BY SHAREHOLDERS, DIRECTORS AND SENIOR MANAGEMENT PERSONNEL

I [................................ full name ...........................] Passport Number [......................]
of [please state full address ........................................................................................]
do solemnly and sincerely declare as follows—

1.     That I am a citizen of [......................................................................................]

2.     That *I have never been convicted of an offence under the Laws of any jurisdiction or State (except for minor traffic offences).

3.     That I am of good character.

4.     That I have never been the subject of any refusal in any related application for registration, license, recognition or authorisation by any regulatory authority in any country of jurisdiction.

5.     That I have never been the subject of any suspension, cancellation or revocation of registration license, recognition or authorisation by any regulatory authority in any country or jurisdiction.

6.     That no judgment has been rendered against me nor any suit or proceedings are pending against me in any country or jurisdiction which has been based in whole or in part on fraud, theft, deceit, misrepresentation or similar conduct.

7.     I have never been charged, indicted or convicted in any country or jurisdiction for any offence in any criminal or civil proceedings relating to fraud or theft arising out of operating or dealing in mutual funds, collective investment schemes/funds, securities, banking or insurance business.

8.     I have never been declared bankrupt nor have I been a party to bankruptcy or insolvency proceedings.

9.     I have never been subject to proceeding relating to winding-up, dissolution, creditors' arrangement, creditors' compromise or receivership.

I make this Declaration conscientiously believing the same to be true.

SWORN at ........................................
at
this....................day of .........................................        .........................................
                                                                            *Declarant*

Before me


.........................................


FORM 2

FORM OF LICENCE

*(Section 6(1))*

This is to certify that. ..........................................................................................................
*(Name of Licensee)*

has been granted a licence to carry on international banking business from Nevis.


1.   The Licensee shall not without the written approval of the Minister, carry on any business other than one for which the licence has been obtained.

2.   The licence granted is subject to the following conditions:

(a)  any voting shares of the Licensee's capital will be in registered form;

(b) the Licensee will not, without the approval of the Minister, on the recommendation of the Regulator:

   (i)  enter into a merger, amalgamation or consolidation;

   (ii)  transfer otherwise than in the ordinary course of its business, the whole or any substantial part of its assets or liabilities;

   (iii)  change its name from that set out in its licence;

   (iv)  alter its articles of incorporation and bylaws;

   (v)  transfer any of its shares or alter its share structure;

   (vi)  take any action to reduce or impair in any respect its capital; or

   (vii) repurchase its own shares or take any action which may have a similar effect;

(c)  the Licensee will not knowingly in the course of its business accept any deposit for the account of a resident of Nevis or keep a resident of Nevis as a customer for any of its international banking services; or

(d) the Licensee that is a foreign qualified bank shall, in the manner and to the extent prescribed, separate international banking activities from its other activities in Nevis and keep separate records of its international banking activities and will permit and assist in an audit of all its undertakings in Nevis by auditors approved by the Regulator.


Dated this ............................... day of ..............................., ...............................


.........................................
Minister of Finance

FORM 3

*(Section 7(2)(b))*

NOTICE OF CHANGE OF REGISTERED ADDRESS

Date: .....................................

To: Minister for Finance

Dear Sir:
We hereby notify you that we have changed our registered address and our new registered address is as follows:

......................................................
......................................................
......................................................

FORM 4

*(Sections 15(6) and 35(1 )(g))*

NOTICE OF CHANGE OF PARTICULARS

Date: .........................................

To: Minister for Finance

Dear Sir:

We hereby notify you that we have changed the particulars set out in our application for license as follows:

Approval is requested for the following changes for the reasons outlined:
1 ............................................................................................................................
............................................................................................................................
............................................................................................................................
2. ...........................................................................................................................
............................................................................................................................
............................................................................................................................
3. ...........................................................................................................................
............................................................................................................................
............................................................................................................................

Yours Faithfully,
**Name**: ....................................................
**Signature**: ....................................................
**APPROVED**, except as maybe set forth in an attachment hereto.

..................................................
**Minister of Finance**

**(This form is to be completed in duplicate)**

FORM 5

*(Section 35)*

NOTICE OF REVOCATION

Name of Licensee: ....................................................................................................

License Number: ......................................................................................................

Address: ..................................................................................................................

The Minister of Finance hereby notifies the above holder of an International Banking License, that its license has been revoked by the Minister of Finance as at [................enter date [................] under section 35 of the Nevis International Banking Ordinance for the following reasons:

□ The Licensee appears unable to meet its obligations as they fall due.

□ The Licensee has ceased to carry on business under its license.

□ The Licensee has not commenced business within six (6) months after the issuance of its license.

□ The Licensee is carrying on business in a manner detrimental to the public interest, the interest of its depositors, or other creditors.

□ The Licensee is carrying on business in an unlawful manner or is in an unsound financial position.

□ The Licensee goes into liquidation.

□ The Licensee fails to pay annual fees.

□ The Licensee has committed an offence under the Ordinance.

□ The Licensee has failed to carry on international banking business.

□ A condition exists that would have caused the Minister to refuse to grant the Licensee a license upon application.

□ The Licensee has gone into liquidation, is wound-up or otherwise dissolved.

The Licensee may, under section 35(3) of the Nevis International Banking Ordinance provide a written statement to the Minister objecting to the revocation.

The Licensee may under section 35(6) of the Nevis International Banking Ordinance appeal the decision in relation to revocation by applying to the High Court of St. Christopher and Nevis for redress.

Dated this ................................... day of ..................................., .....................

————————

## SCHEDULE 3 TO THE REGULATIONS

*(Section 10)*

### INFORMATION TO BE INCLUDED IN PROPOSAL

(a)    Overview of the Parent/Group to which the applicant belongs;

(b)    Ownership Structure;

(c)    Applicant's Objectives and Proposed Operations;

(d)    Legal Structure;

(e)    Organisation of the Applicant (including corporate governance arrangements, fitness and probity of key personnel, etc.);

(f)    Reporting Structures;

(g)    Capital, Funding and Solvency Projections; and

(h)    Financial Information and Projections.

_____

## SCHEDULE 4 TO THE REGULATIONS

### OFFENCES IN RESPECT OF WHICH LIABILITY TO CONVICTION MAY BE DISCHARGED BY PAYMENT OF FIXED PENALTY

| Section of Ordinance | Offence | Fixed Penalty |
|---|---|---|
| 6(2) | Carrying on International Banking within Nevis without a license | Not exceeding $500,000.00 and a further penalty of $50,000.00 for each day in default |
| 15(11) | Breach of condition of license | $25,000.00 and a further penalty of $1,000.00 for each day in default |
| 16(2) | Failure to display copy of current license | $25,000.00 and a further penalty of $ 1,000.00 for each month in default |
| 17 | Unauthorised use of the word "bank" in name | $25,000.00 and a further penalty of $1,000.00 for each day in default |

| 21 | Appointment of a person debarred from management | $25,000.00 and a further penalty of $1,000.00 for each day in default |
| --- | --- | --- |
| 25,26,27, 28 | Failure of director to disclose and declare interest | $10,000.00 for each contravention |
| 29 | Disclosure of confidential information | $20,000.00 |
| 31 | Failure to forward to the Regulator and shareholders, copies of Annual Audited Financial Statements by the prescribed date or forwarding returns after the prescribed date | $25,000.00 and a further penalty of $1,000.00 for each month in default |
| 76 | Failure to report to the Regulator any abandoned property in its possession or failure to deposit or convey to the Administration any abandoned property | $25,000.00 and a further penalty of $1,000.00 for each day in default |
| 77(1) and (2) | Conducting international banking from within Nevis during any period in which a Licensee/director/officer does not hold a license | Not exceeding $250,00.00 (Licensee)<br><br>Up to $50,000.00 (director/officer) |
| 78 | Engaging in advertising practices contrary to Ordinance | $10,000.00 and a further penalty of $1,000.00 for each day in default |
| 79 | Making false statements and obstruction | $50,000.00 |
| **Section of Regulation** | **Offence** | **Fixed Penalty** |
| 10(4) | Failure to submit returns as required by the Regulator | $5,000.00 |

_____

## SCHEDULE 5 TO THE REGULATIONS

## NOTICE OF OPPORTUNITY TO DISCHARGE LIABILTY

The Minister of Finance, Nevis Island Administration has reason to believe that

................................................................................ [*insert name of*

*Licensee*] has committed an offence under Section/Regulation* ..........................of the

Nevis International Banking Ordinance/Nevis International Banking Regulations*

having ...........................................................................................................

..........................................................................................................................

.................................................... [state particulars of offence]; and hereby

gives    ...................................................................................    [*insert    name    of*

*Licensee*)

the opportunity to discharge liability for this offence by payment of the sum of
.................................... [*insert fixed penalty listed in Schedule 4 in words and figures*]

to the Nevis Island Administration on or before the ........................................... day of

.......................,20 ...................... and before that date, no proceedings in respect of this

offence will be taken.

................................................................

**Regulator of International Banking**

♦delete as appropriate

_____

## SCHEDULE 6 TO THE REGULATIONS

## RULES OF EXAMINATION AND SUPERVISION OF INTERNATIONAL BANKS

1.    The Regulator shall—

(a) regularly evaluate the condition, solvency and liquidity of all Licensees;

(b) establish appropriate and prudent standards for conducting safe and sound international banking business;

(c) set prudent and appropriate capital adequacy requirements in accordance with the Basel Capital Accord and its Amendments;

(d) evaluate the international banks' policies, practices and procedures related to the granting of loans and making of investments and the on-going management of the loan and investment portfolios;

(e) ensure that international banks have management information systems that enable management to identify portfolio concentration in line with established limits;

(f) ensure that international banks have in place and use systems that accurately measure, monitor and adequately control market and other risks;

(g) ensure that international banks establish and adhere to adequate policies, practices and procedures for evaluating the quality of assets and the adequacy of loan-loss provisions and loan-loss reserves;

(h) ensure that international banks have in place internal controls adequate to the nature and scale of their operations, and adequate policies, practices and procedures, including anti-money laundering and countering the financing of terrorism rules that promote high ethical and professional standards, and so prevent the use of the international bank for criminal purposes;

(i) co-operate with supervisors in other jurisdictions to the extent necessary for the purposes of cross-border supervision and consistent with the policy established by the Basel Committee for cross-border supervision.

*(Inserted by S.R.O. 2/2015)*

_____

# Annexe 14



# St. Christopher and Nevis

# CHAPTER 21.01

# BANKING ACT
## and Subsidiary Legislation

### Revised Edition
showing the law as at 31 December 2020

This is a revised edition of the law, prepared by the Law Commission under the authority of the Law Commission Act, Cap. 1.03.

This edition contains a consolidation of the following laws—

|  | Page |
|---|---|
| **BANKING ACT** | 3 |
| Act 1 of 2015 ... in force 20th May 2016 | |
| **BANK OF NOVA SCOTIA BANKING BUSINESS VESTING ORDER** – Section 175(3) | 97 |
| S.R.O. 30/2019 | |

Printed under Authority by
The Regional Law Revision Centre Inc.
ANGUILLA

Case 1:22-cv-05199-DLC    Document 202-1    Filed 06/24/26    Page 93 of 190

This booklet is published in
2020
Consolidated, Revised and Prepared under the Authority of the Law Commission Act,
on behalf of the Government of Saint Christopher and Nevis
By
The Regional Law Revision Centre Inc.
P.O. Box 1626, 5 Mar Building,
The Valley, AI-2640, Anguilla


Available for purchase from—

Attorney General's Chambers
Government Headquarters, P.O.Box 164,
Church Street, Basseterre, St.Kitts, West Indies


Tel: (869) 465-2521
Ext. 1013
Tel: (869) 465-2127
Fax: (869) 465-5040
Email: attorneygeneral@gov.kn


Printed on the authority and on behalf of the Government of Saint Christopher and Nevis

# CHAPTER 21.01

# BANKING ACT

ARRANGEMENT OF SECTIONS

## PART I

### PRELIMINARY

1. Short title
2. Interpretation

## PART II

### LICENCES

3. Requirement for licence
4. Examination of books of person carrying on banking business without a licence
5. Appointment of receiver for failure to hold licence
6. Repayment of funds obtained without licence
7. Application for licence
8. Grant or denial of licence
9. Licence fees and penalty for default
10. Permissible activities
11. Conditions for licence
12. Variation of conditions for licence
13. Register of licensed financial institutions
14. Revocation of licence
15. Requirement to inform Minister for Finance
16. Restricted words, names, and practices
17. Display of licence certificate
18. Offices and branches deemed one licensed financial institution
19. Authorisation of location and approval of new business premises

## PART III

### OWNERSHIP STRUCTURES

20. Ownership or control of licensed financial institutions
21. Written application for approval
22. Criteria for approval for ownership or control
23. Granting of approval
24. Person with control to be fit and proper
25. Grounds for disapproval of a transfer
26. Prohibition against selling below supervisory threshold
27. Group holdings to be deemed holdings of single member
28. Quarterly reports on ownership and control
29. Report by foreign licensed financial institution on change of control

30.    Sanctions
31.    Prohibition against transfer and acquisition of interest
32.    Non applicability of this Part to government or other persons
33.    Variation of supervisory thresholds
34.    Approval of application for licence by financial holding company

## PART IV

### FINANCIAL HOLDING COMPANIES

35.    Requirement for licensing of financial holding companies
36.    Application for licence by financial holding companies
37.    Considerations to grant licence to financial holding company
38.    Grant or denial of licence to financial holding company
39.    Conditions for licence to financial holding company
40.    Restriction on activities of financial holding companies
41.    Limitation of risk to licensed financial institution
42.    Revocation of licence of financial holding company
43.    Actions of fundamental change requiring approval

## PART V

### FINANCIAL REQUIREMENTS AND LIMITATIONS

44.    Minimum paid-up or assigned capital
45.    Maintenance of reserve fund
46.    Adequacy of capital
47.    Additional capital in respect of special risks
48.    Liquidity requirement
49.    Limit on exposures
50.    Restrictions on exposures to related parties
51.    Restrictions on lending to employees
52.    Prohibition of advances against security of own shares
53.    Prohibition on engaging or investing in trade and outsourcing
54.    Financial subsidiaries permitted
55.    Restrictions on investments in real property
56.    Time limit for compliance with financial requirements
57.    Maintenance of specified assets
58.    Recordkeeping and reporting required

## PART VI

### AUDIT AND INFORMATION

59.    Annual audit, report and publication of financial statements and results
60.    Appointment of external auditor
61.    Duties of external auditor
62.    Remuneration of external auditor
63.    Immediate reports to Central Bank

64.    Resignation or removal of external auditor
65.    Request for copies of reports
66.    External auditor to report to Central Bank
67.    No liability for breach of duty
68.    Failure to comply with request
69.    Audited financial statements

## PART VII

### SUPERVISION

70.    Central Bank examination
71.    Consolidated supervision
72.    Prudential requirements
73.    Reporting of group structures
74.    Disclosure and access to books and records by Central Bank examiner for examination
75.    Central Bank's powers of remedial action
76.    Additional Central Bank remedial actions
77.    Remedial actions against directors, officers, employees or significant shareholders
78.    Additional Central Bank powers of remedial action against directors, officers, employees or significant shareholders
79.    Supplemental powers
80.    Failure to comply with remedial actions
81.    Effective date of order, warning, agreement, direction
82.    Suspension of persons charged with criminal offence, etc.
83.    Dismissal of criminal case not a bar to Central Bank action
84.    Persons convicted may be prohibited from banking business
85.    Appointment of observer
86.    Actions required for adequately capitalised licensed financial institutions or affiliates suffering losses
87.    Actions required for under capitalised licensed financial institutions, or affiliates
88.    Notification of removal of directors and officers
89.    Submission of returns and production of information as required by the Central Bank
90.    Central Bank may request further information
91.    Extension of period for providing information
92.    Disclosure of basis for charges and fees
93.    Restriction on advertising likely to mislead the public
94.    Agreement or arrangement with foreign supervisory authority
95.    Furnishing of statement or return to Participating Governments
96.    Prohibition against providing false, misleading statements

## PART VIII

### CORPORATE GOVERNANCE

97.    Minimum criteria for determining whether a person is fit and proper

98.   Criteria for determining whether a person is fit and proper to be a significant shareholder

99.   Determining whether business carried out in prudent manner

100.  Requirement for fit and proper policy

101.  Notification to Central Bank of appointment of officers and directors

102.  Responsibility of board for corporate governance

103.  Removal and disqualification of director or officer

104.  Right to make representation

105.  Notice of confirmed removal

106.  Person to be removed from office

107.  Effective date of removal

108.  Failure to comply with a direction

109.  Failure to comply with section 103

110.  Declaration and registration of related interest and conflict of interest by director

111.  Responsibility for deceiving statements and obstruction of audit or authorised examination

112.  Management's duty of compliance with the requirements of the laws

113.  Liability of directors, officers and partners

## PART IX

### OFFICIAL ADMINISTRATION

114.  Grounds for appointing an official administrator

115.  Notice of appointment of official administrator

116.  Effective date of appointment

117.  Persons qualified to be official administrator

118.  Period of appointment

119.  Replacement and removal of official administrator

120.  Official administrator to be fit and proper

121.  Declaration of conflict of interest

122.  Transactions to be approved by Central Bank

123.  Failure of official administrator to disclose interest

124.  General powers of the official administrator

125.  Central Bank oversight of official administration

126.  Suspension of dividends

127.  Moratorium and effect of official administration on proceedings

128.  Suspension of contractual early termination rights

129.  Taking control of the licensed financial institution

130.  Inventory and plan of action to resolve the licensed financial institution or licensed financial holding company

131.  Capital increase by existing shareholders

132.  Recapitalisation by new shareholders

133.  Mergers, sales and other restructurings

134.  Mandatory restructuring of liabilities

135.  Misconduct by shareholders, directors, officers or others

136.  Expenses of the official administration

137.    Termination of official administration


## PART X

### RECEIVERSHIP AND COMPULSORY LIQUIDATION

138.    Grounds of receivership
139.    Qualifications and compensation for receiver
140.    Commencement and notice of receivership
141.    Central Bank oversight of receiver
142.    General powers of receiver
143.    Transfer of assets and liabilities
144.    Effects of receivership
145.    Taking control of the licensed financial institution or licensed financial holding company
146.    Repudiation of contracts
147.    Avoidance of pre-receivership transfers
148.    Obligations of lessors of licensed financial institution or licensed financial holding company premises and utility providers
149.    Protection of payment, clearance, and settlement systems
150.    Determination of claims
151.    Authority to disallow claims
152.    Claims relating to eligible financial contracts
153.    Priorities in payment of claims
154.    Unclaimed funds
155.    Safe deposits and unclaimed property
156.    Termination of receivership and final reporting to the Central Bank
157.    Receiver to notify Central Bank of fraudulent activities


## PART XI

### VOLUNTARY LIQUIDATION

158.    Voluntary liquidation
159.    Cessation of business operations
160.    Notice to depositors of voluntary liquidation
161.    Rights of depositors and creditors in voluntary liquidation
162.    Distribution of assets
163.    Insufficiency of assets in discharge of obligations in voluntary liquidation
164.    Audited accounts, and conclusion of liquidation
165.    Review of bank resolutions under Part IX or X
166.    Non-application of Companies Act


## PART XII

### ABANDONED PROPERTY

167.    Abandoned property
168.    Report, publication and disposal of abandoned property

169.    Abandoned property to vest in the Crown
170.    Safe deposit boxes
171.    Sale of contents of a safe deposit box
172.    Handling of proceeds of sale of safe abandoned property
173.    Claims on abandoned property
174.    Failure to file report or to pay property


## PART XIII

### TRANSFER OF BANKING BUSINESS

175.    Banking business vesting order
176.    Supplementary provision as to transfers
177.    Transfers to be subject to stamp duty


## PART XIV

### MISCELLANEOUS PROVISIONS

178.    Secrecy of information
179.    Administrative penalties
180.    Administrative penalties to be placed to the credit of Central Bank
181.    Third Schedule offences
182.    Working days of licensed financial institutions and licensed financial holding companies
183.    Regulations
184.    Prudential standards
185.    Court's powers in legal claims against Central Bank
] 86    Bridge financial institutions and asset management vehicles
187.    Participating Government financing of transfers of deposits
188.    Immunity
189.    Non-application of Aliens Landholding Regulation Act
190.    Provisions applicable to credit institution, class of credit institution and financial group
191.    Amendment of Schedules
192.    Savings
193.    Transitional
        FIRST SCHEDULE:        Fees for Licensed Financial Institution
        SECOND SCHEDULE
        THIRD SCHEDULE:        Offences in respect of which liability to conviction may be discharged by payment of a fixed penalty
        FOURTH SCHEDULE:        Notice of Opportunity to Discharge Liability
        FIFTH SCHEDULE:        Bank of Nova Scotia Banking Business Vesting Order

## CHAPTER 21.01

## BANKING ACT

AN ACT TO PROVIDE FOR THE REGULATION OF BANKING BUSINESS, THE ESTABLISHMENT OF A SINGLE BANKING SPACE IN THE CURRENCY UNION AND FOR INCIDENTAL AND RELATED MATTERS.

## PART I

PRELIMINARY

**Short title.**

**1.**     This Act may be cited as the Banking Act.

**Interpretation.**

**2.**     (1) In this Act—

"affiliate" in relation to a financial institution ("F") means—

    (a) a company which is or has at any relevant time been—

        (i) a holding company or subsidiary of F;

        (ii) a subsidiary of a holding company of F; or

        (iii) a holding company of a holding company or a subsidiary of a subsidiary of F;

    (b) any company over which F has control;

    (c) any company over which F and any person associated with F has control;

    (d) any company which has common ownership with F; or

    (e) any company which has the same beneficial owner and share common management and interlinked businesses with F,

    and "affiliation" shall be construed accordingly;

"Agreement" means the Agreement establishing the Eastern Caribbean Central Bank made on the 5th day of July, 1983, the text of which is set out in the Schedule to the Eastern Caribbean Central Bank Act, Cap. 21.06;

"assigned capital" means the net assets derived from the funds of a foreign financial institution which it is required to keep during the term of its licence in accordance with prudential standards issued by the Central Bank;

"bank" means any licensed financial institution whose operations include the acceptance of deposits subject to a transfer by a depositor by cheque;

"banking business" means—

    (a) the business of receiving funds through—

        (i) the acceptance of monetary deposits which are repayable on demand or after notice or any similar operation;

(ii) the frequent sale or placement of bonds, certificates, notes or other securities,

and the use of such funds either in whole or in part for extensions of credit or investment for the account and at the risk of the person doing such business;

(b) any other activity recognised by the Central Bank as banking practice and which a licensed financial institution may additionally be authorised to do;

"board" means the board of directors responsible for the management of a licensed financial institution;

"borrower group" means—

(a) a family group comprising an individual and that individual's relative where each member of the group is substantially dependent upon the same income sources;

(b) a company in which the family group indicated in paragraph (a) has control;

(c) a group of companies which is under a common control;

(d) a group of persons in which the credit worthiness, ability to generate funds or the future viability of each, depends on one or other member of the group;

(e) a group of persons in which one member has power directly or indirectly to control the other members;

(f) any other group of persons as may be determined by the Central Bank;

"business of a financial nature" means the collection of funds in the form of deposits, shares, loans, premiums, and the investment of such funds in loans, shares and other securities and includes the types of businesses set out in the Second Schedule but does not include banking business;

"capital base" means the total of paid-up share capital, statutory reserve fund, share premium account, retained earnings and any other capital account approved by the Central Bank, in the case of local licensed financial institutions, or such other capital account or similar measure as approved by the Central Bank in the case of a licensed branch of a foreign financial institution, less any amount by which that total has been impaired in either case;

"Central Bank" means the Eastern Caribbean Central Bank established under Article 3 of the Agreement;

"control" means the power of a person, either alone or with an affiliate or relative or connected or other person, directly or indirectly or by an agreement or otherwise to—

(a) exercise more than twenty per cent of the voting rights at any meeting of shareholders of a licensed financial institution, company or unincorporated body;

(b) elect a majority of the directors of a licensed financial institution, company or unincorporated body; or

(c) exert influence over the business and affairs of a licensed financial institution, company or unincorporated body,

and the terms "controlling interest" and "controlling shareholder" shall be construed accordingly;

"corporate group" means a company and its affiliates;

"credit facilities" includes loans, advances, lines of credit, commitment letters, standby facilities, letters of credit, overdrafts, and any other facilities or arrangements, whether on or off-balance sheet;

"credit institution" means any licensed financial institution other than a bank whose business is that of money lending or the granting of credit facilities;

"Currency Union" refers collectively to the member countries and territories of Anguilla, Antigua and Barbuda, The Commonwealth of Dominica, Grenada, Montserrat, Saint Christopher and Nevis, Saint Lucia and Saint Vincent and the Grenadines which use the Eastern Caribbean currency as their official currency;

"director" includes any person occupying the position of director of a licensed financial institution or a company by whatever name called and includes a person in accordance with whose directions or instructions the directors of a company are accustomed to act;

"exposure" means the amount at risk and includes—

(a) credit facilities, investments including equities, participations, guarantees and acceptance;

(b) claims on a counterparty including actual and potential claims that would arise from the drawing down in full of undrawn advised facilities, whether on or off-balance sheet, revocable or irrevocable, conditional or unconditional, that the licensed financial institution has committed itself to provide, arrange, purchase or underwrite;

"external auditor" means an auditor appointed under section 60 that is—

(a) a person who is a member of a professional body of accountants which the Minister has specified by Order published in the *Gazette*; or

(b) any other person approved by the Central Bank;

"financial group" means a corporate group, the members of which conduct banking business or business of a financial nature;

"foreign financial institution" means a financial institution which is incorporated under the laws of a country outside of the Currency Union;

"holding company" means a body corporate that controls another body corporate;

"international financial institutions" refers to the International Monetary Fund, the International Bank for Reconstruction and Development, the Inter- American Development Bank, and the International Finance Corporation;

"large exposure" means an exposure to a person or a borrower group, which amounts to ten per cent or more of the capital base of a licensed financial institution;

"licensed financial holding company" means a holding company of a licensed financial institution licensed under this Act;

"licensed financial institution" means any person or incorporated entity licensed to conduct banking business under this Act;

"local licensed financial institution" means a licensed financial institution formed under the laws of a member country or territory of the Currency Union;

"Minister" means the Minister responsible for Finance;

"Monetary Council" means the Monetary Council established under Article 7 of the Agreement;

"officer" means—

    (a) a chief executive officer, chief operating officer, president, vice president, corporate secretary, treasurer, chief financial officer, chief accountant, chief auditor, chief investment officer, chief compliance officer or chief risk officer;

    (b) any other individual designated as an officer by its articles of incorporation or continuance, by-laws or other constituent document, or resolution of the directors or members; or

    (c) any other individual who performs functions similar to those performed by a person referred to in paragraph (a), whether or not the individual is formally designated as an officer;

"Participating Governments" means the governments of the member countries and territories of the Currency Union;

"person" means an individual, a public body, company, partnership, trust, association or body of persons whether corporate or unincorporated;

"place of business'" means any office including a mobile office of a licensed financial institution, in the Currency Union;

"principal place of business" means, in relation to—

    (a) a local financial institution, its principal office in the Currency Union; and

    (b) a foreign financial institution, the office designated in its licence;

"related party" includes—

    (a) any financial holding company, subsidiary or other affiliate of a licensed financial institution;

    (b) directors, officers, and significant shareholders of a licensed financial institution, financial holding company, subsidiary or other affiliate of a licensed financial institution;

    (c) a relative or other members of the households of persons listed in paragraph (b);

    (d) any entity that is controlled by a person described in paragraphs (a), (b) and (c); or

    (e) any other person or class of persons determined by the Central Bank to be a related party because of its past or present interest in or relationship with the licensed financial institution being such that it can reasonably be expected that this person can influence the decision of the licensed financial institution regarding a transaction;

"relative" means a spouse or former spouse, son, daughter, step-son, step daughter, brother, sister, aunt, uncle or child of aunt or uncle or any person related by marriage, father, mother, any lineal ascendant and descendant of the individual or spouse of the individual;

"significant shareholder" means a person who either alone or with an affiliate or connected person, is entitled to hold more than ten per cent of the shares of the

licensed financial institution or to exercise or control more than ten per cent of the total voting rights at any general meeting of the licensed financial institution or another company of which the licensed financial institution is a subsidiary and the terms "significant", "significant interest" and significant shareholding" shall be construed accordingly;

"subsidiary" means a body corporate that is controlled by another body corporate;

"ultimate beneficial owner" means the individual that ultimately derives the benefits of ownership or control of a body corporate;

"unsecured" in relation to advances or credit facilities, means—

    (a) advances or credit facilities granted without security; or

    (b) in the case of advances or credit facilities against security, any part of the advances or credit facilities which at any given time exceeds the market value of the assets comprising the security given, or which exceeds the valuation approved by the Central Bank whenever it considers that no market value exists for those assets;

(2) For the purposes of this Act, a person is connected to another person—

    (a) where that person is an individual, the person is—

        (i) the relative of that person;

        (ii) the trustee of any settlement under which that person has a life interest in possession;

        (iii) a company of which that person is a director or controlling or significant shareholder;

        (iv) an employee or partner of that person;

    (b) where that person is a company, the person is—

        (i) a director or controlling or significant shareholder of that company;

        (ii) a subsidiary or affiliate of that company;

        (iii) a director or employee of any such subsidiary or affiliate of that company;

    (c) where that person has with any other person an agreement or arrangement with respect to the acquisition, holding or disposal of shares or other interests in a company or under which they undertake to act together in exercising their voting power in relation to the company, that other person.

# PART II

## LICENCES

**Requirement for licence.**

**3.**    (1) A person shall not carry on banking business or hold himself out as carrying on banking business in the Currency Union without a licence granted by the Central Bank.

(2) A financial institution which, at the commencement of this Act, holds a valid licence to carry on banking business in Saint Christopher and Nevis shall be deemed to have been granted a licence under section 8.

(3) Notwithstanding the provisions of subsection (2), the Central Bank shall, within a set period of the commencement of this Act, as the Central Bank may determine, issue to a financial institution a new licence certificate under this Act.

(4) Any person intending to carry on banking business in the Currency Union shall, before commencing such business, apply for a licence under the provisions of section 7.

(5) Any person who contravenes the provisions of subsection (1) commits an offence and is liable on summary conviction—

    (a) in the case of a financial institution, to a fine of one million dollars, and in the case of a continuing offence, to a further penalty of one hundred thousand dollars for each day on which the offence is continued after conviction;

    (b) in the case of a director or an officer, to a fine of five hundred thousand dollars or to imprisonment for a term not exceeding three years or to both such fine and imprisonment and in the case of a continuing offence, to a further penalty of one hundred thousand dollars for each day on which the offence is continued after conviction.

**Examination of books of person carrying on banking business without a licence.**

**4.**    (1) In this section "relevant documents" means any books, accounts, records and other documents, cheques and securities.

(2) Where the Central Bank has reasonable cause to suspect that—

    (a) any person is carrying on banking business without a licence granted under this Act; and

    (b) evidence of contravention of subsection(l) of section 3 is to be found on any premises in Saint Christopher and Nevis,

an application without notice may be made to the High Court by the Central Bank for an order that a named officer or officers of the Central Bank be entitled to enter and search the premises with a police officer and seize the relevant documents and any cash as may be found on the premises relating to the conduct of banking business, to ascertain whether the person is carrying on banking business without a licence.

(3) Any order issued by the High Court under subsection (2) may authorise—

    (a) the Central Bank to detain the relevant documents for a period not exceeding thirty days;

    (b) the officer or officers to make copies of the relevant documents; and

    (c) the Central Bank to retain copies of the relevant documents.

(4) Pursuant to subsection (2), it shall be lawful for any police officer, in the case of resistance, to break open any door, and to force and remove any other impediment or obstruction to such entry, search or seizure.

(5) A person refusing to make available for examination any relevant documents having been so requested by the Central Bank commits an offence and is liable on summary conviction to a fine not exceeding five thousand dollars or

imprisonment for a term not exceeding six months or to both such fine and imprisonment.

**Appointment of receiver for failure to hold licence.**

**5.**    Notwithstanding subsection (5) of section 3, where a person is found under subsection (2) of section 4 to be conducting banking business without a licence, the Central Bank may appoint a receiver for the person under paragraph (k) of section 138.

**Repayment of funds obtained without licence.**

**6.**    A person holding funds which were obtained by doing banking business without being in possession of a licence granted under this Act shall repay such funds in accordance with the directions of the Central Bank.

**Application for licence.**

**7.**    (1) An application for a licence shall be made in writing to the Central Bank, and shall be accompanied by the non-refundable application fee specified in the First Schedule and the following documents and other information—

> (a) authenticated copies of the instrument under which the applicant is organised;
>
> (b) a statement of the address of its head office and the locations of the principal and other places of business where the applicant proposes to do business;
>
> (c) detailed information regarding the persons who will hold or ultimately benefit from significant shareholdings, directly or indirectly, the respective values of the shares and the percentage of ownership;
>
> (d) detailed information regarding the directors and officers, including their qualifications and experience, financial position, business interests and performance of the business concerns under their control or management;
>
> (e) where the applicant will be a member of a financial holding company or other corporate group, a complete diagram of the group, including all direct and indirect affiliates and associates of the financial institution and the nature of their relationship to the group;
>
> (f) documentary evidence of the capital of the applicant seeking to be licensed, including the original sources, and any other sources of funds;
>
> (g) a business plan, including projected statement of financial position, financial performance and capital and full particulars of the business the applicant proposes to operate;
>
> (h) an operating plan and documented internal controls system; and
>
> (i) such other information as the Central Bank may require.

(2) A foreign financial institution that intends to open a branch within the Currency Union shall in addition to submitting the documents and other information required under subsection (1), submit with its application—

> (a) a certificate showing that the home banking supervisor of the jurisdiction in which it was incorporated, formed or organised has no

objection to its application for a licence to do business in the Currency Union; and

(b) evidence satisfactory to the Central Bank that it is subject to a comprehensive supervision on a consolidated basis by the home banking supervisor of the jurisdiction.

(3) The Central Bank may require that information supplied to it be verified, certified or otherwise authenticated in the manner that the Central Bank may consider fit.

**Grant or denial of licence.**

**8.**    (1) In considering an application for a licence the Central Bank shall conduct any investigation it may consider necessary to ascertain that the criteria for approval of a licence are met.

(2) A licence shall not be granted by the Central Bank, unless it is satisfied—

(a) as to the validity of the documents submitted in accordance with section 7;

(b) that the business plan and financial projections are based on sound analysis under reasonable assumptions and the business plan is feasible;

(c) as to the financial condition and history of the applicant;

(d) as to the character of the business of the applicant;

(e) that the proposed directors and officers are fit and proper in accordance with the criteria under section 97;

(f) as to the adequacy of the capital structure and compliance with the minimum capital requirement of section 44;

(g) as to the earning prospects of the applicant;

(h) as to the convenience and needs of the community to be served by the granting of the licence;

(i) as to the suitability of the significant shareholders;

(j) as to the transparency of the ownership structure;

(k) as to the acceptable sources of initial capital;

(l) as to the adequacy of the applicant's arrangements for governance, including but not limited to accounting, risk management, internal control systems and records; and

(m) that the proposed legal and managerial structures will not hinder effective supervision, including supervision on a consolidated basis.

(3) A licence shall not be granted by the Central Bank for a subsidiary or branch of a foreign financial institution unless Central Bank is satisfied that in addition to the satisfaction of the requirements in subsection (2), the following requirements are satisfied—

(a) the foreign financial institution is subject to supervision and regulation that is satisfactory to the Central Bank, including supervision on a consolidated basis within its home country; and

(b) arrangements satisfactory to the Central Bank for cooperation, coordination, and information-sharing with the home country supervisor are in place.

(4) Within six months of its receipt of a completed application for a licence, the Central Bank shall either—

(a) grant the licence and may place any restrictions as the Central Bank considers to be prudent in respect of the licence; or

(b) refuse to grant the licence, if the Central Bank is of the opinion that it would be undesirable in the public interest to grant the licence or the criteria for approving a licence are not met.

(5) Upon payment of the initial licence fee specified in the First Schedule, a licence granted by the Central Bank under this section is valid until revoked.

(6) A licence granted under this section is not transferable or assignable.

**Licence fees and penalty for default.**

**9.**    (1) Every licensed financial institution and licensed financial holding company shall pay an annual licence fee as specified in the First Schedule.

(2) All licence fees paid under this Act shall be payable to the Central Bank not later than the thirty-first day of January in each year or such later date as may be specified by the Central Bank, except that where a licence is issued, or a branch is opened for the first time, after the first quarter in any year, the fee payable shall be calculated on a pro rata basis.

(3) Where a licensed financial institution or a licensed financial holding company fails to pay the annual licence fees under subsection (1), the licensed financial institution or licensed financial holding company is liable to a penalty of ten thousand dollars and a further penalty of one thousand dollars for each day of default.

**Permissible activities.**

**10.**    (1) A licensed financial institution shall not carry on any business except as provided in this section.

(2) A licensed financial institution may conduct one or more of the following activities—

(a) acceptance of deposits and other repayable funds;

(b) lending;

(c) financial leasing;

(d) investment in financial securities;

(e) money transmission services;

(f) issuing and administering means of payment including credit cards, travellers cheques, bankers' drafts, and electronic money;

(g) guarantees and commitments;

(h) the keeping and administration of securities;

(i) credit reference services;

(j) safe custody of valuables;

(k) electronic banking;

(1)  payment and collection services;

(m)  dealing in foreign currency; and

(n)  any other services that the Central Bank may determine as banking practice.

(3) The Central Bank may by prudential standards issued pursuant to section 184 restrict the permissible activities of a licensed financial institution in general, or a class of licensed financial institutions, or remove the restriction so imposed as it considers appropriate.

(4) The conduct of permissible activities by a licensed financial institution shall be in accordance with any conditions imposed in a licence.

**Conditions for licence.**

**11.**    A licence issued under this Act shall be subject to the conditions that the Central Bank may impose, including the activities in which the licensed financial institution is permitted to engage.

**Variation of conditions for licence.**

**12.**    The Central Bank may amend, add to, vary or cancel any condition attached to a licence.

**Register of licensed financial institutions.**

**13.**    (1) A central register shall be kept by the Central Bank that is available to the public which shall record for each licensed financial institution, the name, the head office and branch office addresses, and the class or category of licence held.

(2) The Central Bank shall also maintain a list of licensed financial institutions, the licences of which have been revoked, in the register.

**Revocation of licence.**

**14.**    (1) The Central Bank may revoke any licence to carry on banking business in the Currency Union if the licensed financial institution—

(a)  fails to commence operations within a period of twelve months following the granting of the licence;

(b)  in connection with the application for the licence, provided false, misleading or inaccurate information or suppressed material information;

(c)  fails to comply with the conditions of its licence or the measures required by the Central Bank in accordance with section 11;

(d)  is in breach of any of the provisions of this Act which is applicable;

(e)  ceases to carry on banking business in the Currency Union;

(f)  is conducting its affairs in a manner detrimental to the national and regional interests or to the interest of its depositors;

(g)  fails to maintain sufficient capital or liquidity to meet its liabilities;

(h)  has not fulfilled or is unlikely to fulfil the minimum criteria for licensing under this Act;

> (i) merges or amalgamates with another company or licensed financial institution and the licence is no longer required; or
>
> (j) loses or the parent company of the licensed financial institution loses its authorization to conduct banking business or business of a financial nature in its home jurisdiction or bankruptcy or insolvency proceedings have been or are to be initiated.

(2) Before revoking any licence under subsection (1), the Central Bank shall give the licensed financial institution concerned notice in writing of its intention to do so, specifying the grounds upon which it proposes to make the revocation and shall require the licensed financial institution to submit to the Central Bank within a specified period being not less than thirty days, a written statement of objections to the making of the revocation and thereafter, the Central Bank shall advise the licensed financial institution of its decision.

(3) Where the decision referred to in subsection (2) is to revoke the licence, the notice shall include a statement of the reasons for the decision.

(4) Notice under subsection (2) shall be served at the last known address of the licensed financial institution or shall be published in the *Gazette* or in any local newspaper.

(5) If any licensed financial institution is aggrieved by any decision made under subsection (1), the licensed financial institution may appeal to the High Court within fourteen days of the decision.

(6) Where a licence to carry on banking business in the Currency Union has been revoked, the Central Bank shall, as soon as possible cause a notice of the revocation to be published in the *Gazette* and a newspaper circulating in the relevant member country or territory of the Currency Union and cause such other steps to be taken as it considers necessary to inform the public of the revocation.

**Requirement to inform Minister for Finance.**

**15.** (1) Where the Central Bank receives an application for a licence pursuant to section 7, the Central Bank shall in writing inform the Minister of the application.

(2) Where the Central Bank makes a decision in relation to a licence pursuant to—

> (a) section 8, to grant or deny a licence;
>
> (b) section 12, to vary a condition of a licence; or
>
> (c) section 14, to revoke a licence,

the Central Bank shall in writing inform the Minister of its decision, stating the reasons for the decision.

**Restricted words, names, and practices.**

**16.** (1) No licensed financial institution shall be granted or continue to hold a licence under a name which so closely resembles the name of an existing licensed financial institution in the Currency Union or elsewhere as would be likely, in the opinion of the Central Bank, to mislead the public.

(2) Except with the written consent of the Central Bank, no person other than a licensed financial institution shall—

> (a) use the words "bank", "financial institution", "savings" and "loan", or any of their derivatives or any form in any language, or any other

word indicating the carrying on of banking business, in the name, description or title under which a person is carrying on business in the Currency Union; or

(b) make any representation to the effect in any other manner for the purpose of indicating that a person is carrying on banking business in the Currency Union.

(3) Nothing shall prohibit an association of institutions licensed under this Act formed for the pursuit of common interests from using the words "bank", "financial institution", "savings", or "loan" or any of their derivatives or any form in any language as a part of its name or description of its activities.

(4) No person other than a licensed financial institution shall, except with the written consent of the Central Bank—

(a) make or continue to make representations in any billhead, letter, letterhead, circular, paper, notice, advertisement or in any other manner that the person is carrying on banking business;

(b) in any manner solicit or receive deposits from the public, or any employee of that person.

(5) Any person who contravenes the provisions of this section commits an offence and is liable on summary conviction to a fine not exceeding two hundred and fifty thousand dollars or to imprisonment for a term not exceeding five years or to both such fine and imprisonment and in the case of a continuing offence to a further penalty of two thousand dollars for each day on which the offence is continued after conviction.

**Display of licence certificate.**

**17.** A copy of the certificate of any licence granted under this Act shall be displayed and kept displayed in a conspicuous place in the public part of any place of business of the licensed financial institution and on the public website of the licensed financial institution.

**Offices and branches deemed one licensed financial institution.**

**18.** All offices and branches of a licensed financial institution in the Currency Union shall be deemed to be one licensed financial institution.

**Authorisation of location and approval of new business premises.**

**19.** (1) Any licence granted under this Act shall authorise the licensed financial institution to carry on banking business in the Currency Union at the place of business designated in the licence and at such other place as the Central Bank may in writing authorise.

(2) A licensed financial institution shall not open a new place of business or change the location of an existing place of business in the Currency Union without the prior approval of the Central Bank.

(3) No licensed financial institution shall close an existing place of business in the Currency Union without having given ninety days prior notification to the Central Bank.

(4) No local licensed financial institution shall open a place of business elsewhere than in the Currency Union without the prior approval of the Central Bank.

(5) No local licensed financial institution shall close a place of business outside of the Currency Union without having given twenty-one days prior notification to the Central Bank.

(6) The Central Bank, may direct the closing of a branch or subsidiary of a licensed financial institution operating outside of the Currency Union or impose limitations on the activities of the licensed financial institution or subsidiary if the Central Bank determines that the supervision by the host country supervisor is not adequate compared to the risks that the branch presents to the viability or soundness of the local licensed financial institution.

(7) No licensed financial institution may establish or change the location of an electronic banking system in a place other than a place of business approved under subsection (2), without having given thirty days prior notification to the Central Bank.

(8) Where a licensed financial institution operating under a valid licence has, at the commencement of this Act, established an electronic banking system in a place other than a place of business the licensed financial institution shall notify the Central Bank of the location of all the electronic banking systems within sixty days of the date of the commencement of this Act.

(9) Where a licensed financial institution—

(a) opens a new place of business or changes the location of an existing place of business in the Currency Union without the prior approval of the Central Bank under subsection (2);

(b) closes an existing place of business in the Currency Union without giving notice under subsection (3);

(c) establishes or changes the location of an electronic banking system without giving notice under subsection (7),

it is liable to a penalty of two hundred and fifty thousand dollars.

(10) Where a local licensed financial institution—

(a) opens a place of business elsewhere than in the Currency Union without the prior approval of the Central Bank under subsection (4);

(b) closes a place of business outside of the Currency Union without giving notice under subsection (5),

it is liable to a penalty of two hundred and fifty thousand dollars.

PART III

OWNERSHIP STRUCTURES

**Ownership or control of licensed financial institutions.**

**20.**    Subject to section 32, except with the written approval of the Central Bank, no person, acting directly or indirectly, alone or together with one or more persons, shall hold or acquire—

(a) shares in a local licensed financial institution which, together with any existing direct or indirect holdings of that person, would exceed the

supervisory thresholds of ten, twenty or fifty per cent of the share capital;

(b) in the case of a local licensed financial institution not having a share capital, more than the supervisory thresholds of ten, twenty or fifty per cent of the total voting rights of all the members entitled to vote at a general meeting of the local licensed financial institution.

### Written application for approval.

**21.**    Any person seeking written approval of the Central Bank pursuant to section 20 shall apply in writing and shall submit to the Central Bank the information in a form that the Central Bank may specify.

### Criteria for approval for ownership or control.

**22.**    The Central Bank, in determining whether or not to grant its approval, shall make such investigations and inquiries as it considers necessary, and shall consider—

(a) the terms and conditions of the proposed acquisition;

(b) the financial resources and history of the shareholder or proposed shareholder;

(c) the financial condition and capitalisation of the local licensed financial institution;

(d) any proposed change in the business, corporate structure, or management, including the board of directors, of the local licensed financial institution;

(e) the completeness and truthfulness of the information submitted by the shareholder or proposed shareholder;

(f) whether the shareholder or proposed shareholder is a fit and proper person pursuant to sections 97 and 98;

(g) whether the board of directors of the shareholder or proposed shareholder are fit and proper persons pursuant to section 97;

(h) the identity of the ultimate beneficial owner of the shares and whether such owner is a fit and proper person; and

(i) any other matters that the Central Bank considers appropriate.

### Granting of approval.

**23.**    The Central Bank may grant its approval pursuant to section 20 subject to any terms and conditions as it determines in order to protect the licensed financial institution from the risks of membership in a corporate group or to ensure that the ownership or control structure does not hinder effective supervision on a solo or consolidated basis, and may at any time, add to, vary or revoke any term or condition.

### Person with control to be fit and proper.

**24.**    A person who has received the approval of the Central Bank under section 23 shall at all times during which the person holds the shares or control, continue to be a fit and proper person pursuant to sections 97 and 98.

### Grounds for disapproval of a transfer.

**25.**    The Central Bank may disapprove a proposed transfer of shares in the interest of sound and prudent management of a licensed financial institution by preventing—

> (a) the acquisition of shares by a person who, does not satisfy the fit and proper criteria issued by the Central Bank or may exercise control to the detriment of that licensed financial institution; or

> (b) a transaction in any other situation in which the Central Bank has reason to believe that the transaction will be detrimental to that licensed financial institution.

### Prohibition against selling below supervisory threshold.

**26.**    Except with prior notice to the Central Bank, no person, shall sell or dispose of shares in a licensed financial institution to any other person, if as a result of the transaction the shareholding falls below the supervisory threshold of ten, twenty, or fifty percent of the share capital.

### Group holdings to be deemed holdings of single member.

**27.**    Where the Central Bank determines that the interests of a group of two or more shareholders of a licensed financial institution are connected the total holdings of those shareholders shall be combined and deemed to be the holdings of a single member.

### Quarterly reports on ownership and control.

**28.**    A local licensed financial institution shall submit a quarterly report to the Central Bank on ownership and control of the local licensed financial institution, which shall include—

> (a) the names and addresses of any person who owns five per cent or more of the total voting rights of the local licensed financial institution;

> (b) where a person is a nominee, the name and address of the ultimate beneficial owner for whom a person holds the shares or other ownership interests;

> (c) the name and address of any persons that control the local licensed financial institution, acting directly or indirectly, and acting individually or jointly; and

> (d) any other information as the Central Bank may determine.

### Report by foreign licensed financial institution on change of control.

**29.**    A foreign licensed financial institution shall submit a report to the Central Bank whenever there is a change of control, as determined by the Central Bank.

### Sanctions.

**30.**    (1) In the event that the Central Bank, determines that the provisions of this Part have been violated, the Central Bank may take one or more of the following actions—

> (a) issue an order requiring the divestment of so much of the offending interest as is necessary to secure compliance with the provisions of section 20;

(b) prohibit the payment of dividends in respect of the shares; or

(c) prohibit the issue of 'bonus shares' or 'rights issue' in respect of the shares.

(2) Where the Central Bank has issued an order under paragraph (1) (a), the owner or nominee of the owner of the offending interest shall be prohibited from the exercise of voting rights in respect of the shares.

### Prohibition against transfer and acquisition of interest.

**31.**    (1) A director of a local licensed financial institution who knows or ought reasonably to know of a transfer made in violation of this Part and who fails to disclose it to the Central Bank commits an offence and is liable on summary conviction to a fine not exceeding two thousand dollars or to imprisonment for a term not exceeding three months.

(2) Any person who knowingly acquires an interest in violation of this Part commits an offence and is liable on summary conviction to a fine not exceeding five thousand dollars or to imprisonment for a term not exceeding six months.

### Non applicability of this Part to government or other persons.

**32.**    This Part shall not apply to the Government or to any person who at the commencement of this Act has acquired more than twenty per cent of the total voting rights of all the members of the local licensed financial institution, but no person shall without the consent of the Central Bank, acquire any additional shares which shall have the effect of increasing that person's percentage of the voting rights.

### Variation of supervisory thresholds.

**33.**    The thresholds referred to in sections 20, 26 and 32 may be varied by the Central Bank.

### Approval of application for licence by financial holding company.

**34.**    Where the Central Bank approves an application for licence for a financial holding company as required under section 36 it shall constitute approval for the purposes of section 20.

PART IV

FINANCIAL HOLDING COMPANIES

### Requirement for licensing of financial holding companies.

**35.**    (1) Where a licensed financial institution or proposed licensed financial institution is. or is about to become, a member of a corporate group in which—

(a) one or more members, in addition to the licensed financial institution or proposed licensed financial institution, are limited in their activities to those permitted to a member of a financial group; and

(b) one or more members are not limited in their activities to those permitted to a member of a financial group,

the Central Bank may, in writing, direct the controlling shareholder of the licensed financial institution to engage in restructuring to form a financial holding company, such that—

> (i) the licensed financial institution is directly controlled by the financial holding company; and

> (ii) the other members that are limited in their activities to those permitted to a member of a financial group are either directly or indirectly controlled by the financial holding company or the licensed financial institution referred to in paragraph (a).

(2) In directing a restructuring under subsection (1) the Central Bank may require that the financial holding company be the direct subsidiary of the ultimate parent company of the corporate group.

(3)(a)  Where the Central Bank directs a restructuring under subsection (1) it shall be carried out within twelve months of the date of the direction.

(b)  The Central Bank may, in its discretion, extend this period by notice in writing to the local licensed financial institution to a maximum of two years from the date of the direction.

(4) A holding company that only controls, whether directly or indirectly, members of a financial group, at least one of which is a licensed financial institution, shall be a financial holding company.

(5) Where a financial holding company is required by this section, it shall apply to the Central Bank for a licence pursuant to section 36.

(6) This section shall not apply where a person who controls a licensed financial institution is itself a licensed financial institution under this Act.

(7) No person incorporated or formed under the laws of a jurisdiction outside the Currency Union may be a financial holding company unless that person is a financial institution or a financial holding company subject to authorisation, regulation and supervision in another jurisdiction that is satisfactory to the Central Bank.

(8) The Central Bank may exempt a foreign bank or other foreign company that is subject to regulation and supervision in another jurisdiction from the applicability of one or more of the provisions of this Act applicable to financial holding companies, if a foreign bank or other foreign company is subject to supervision and regulation that is satisfactory to the Central Bank, including supervision on a consolidated basis, in its home jurisdiction or another host jurisdiction in which it has substantial operations.

**Application for licence by financial holding companies.**

**36.**  (1) An application for a licence for a financial holding company shall be made in writing to the Central Bank and shall be accompanied by the non-refundable application fee specified in the First Schedule.

(2) An applicant for a licence under this section shall provide the following information and documents—

> (a) the capital resources, including original sources, and capital structure of the proposed financial holding company;

> (b) the names, addresses, occupations, business and professional history for the past ten years, certified financial positions, and corporate

affiliations of persons who will hold or benefit from shareholdings, directly or indirectly, in the proposed financial holding company, and the respective values of the shares;

(c) organizational and managerial structures, including a complete diagram of the group of companies controlled by the proposed financial holding company, identifying all direct and indirect affiliates and associates and the nature of their relationship to the financial holding company;

(d) the particulars of the directors and officers of the proposed financial holding company, including their qualifications, experience, business and professional history for the past ten years, certified financial position, business interests and performance of the business concerns under their control or management;

(e) the feasibility reports including a business plan and financial projections for the first five years and the areas of intended activities;

(f) audited financial statements for the past three years, if applicable, or for a lesser period as the entity has been in existence if shorter than three years;

(g) the measures and structures the company intends to adopt to ensure that its business is conducted in accordance with sound corporate governance principles;

(h) for each director, officer or significant shareholder of the proposed financial holding company, an affidavit disclosing any convictions for offences by a criminal court, personal bankruptcy filings, disqualifications from practicing a profession, or past or present involvement in a managerial function of a body corporate or other undertaking subject to insolvency proceedings, if any;

(i) a certificate showing that the home banking supervisor of the jurisdiction in which it was incorporated, formed or organised has no objection to its application for a licence to do business in the Currency Union; and

(j) any other particulars that the Central Bank may require.

**Considerations to grant licence to financial holding company.**

**37.**    In determining whether to grant a licence to an applicant under subsection (I) of section 36, the Central Bank shall—

(a) take into account the information referred to in subsection (2) of section 36, and in particular whether the person or persons controlling the proposed financial holding company are fit and proper, or may be persons likely to prejudice the interests of depositors and other customers of the licensed financial institution in question; and

(b) determine whether ownership of shares by the person or persons controlling the proposed financial holding company, given their corporate affiliations or structure, will hinder effective supervision under this Act or would be likely to prejudice the interests of depositors and other customers of the licensed financial institution.

**Grant or denial of licence to financial holding company.**

**38.**    (1) The Central Bank shall not grant a licence under this section, unless the Central Bank is satisfied that—

(a) the feasibility report is based on sound analysis under reasonable assumptions;

(b) the proposed officers are fit and proper, that is, that their integrity is established and their qualifications and experience are appropriate for their positions in light of the proposed financial holding company's business plan and activities, taking into account the size, nature and complexity of the proposed financial holding company;

(c) the proposed significant shareholders are fit and proper and the ownership and managerial structure of the proposed financial holding company will not hinder effective supervision, including supervision on a consolidated basis;

(d) the capital of the applicant is adequate and the original sources of capital are acceptable and do not include borrowed funds;

(e) the applicant's arrangements for corporate governance, including but not limited to accounting, risk management, and internal control systems and records, are adequate;

(f) the applicant is able and willing to comply with the other conditions that the Central Bank may impose; and

(g) where the applicant is an authorised foreign financial institution or financial holding company—

(i) the foreign financial institution or financial holding company is adequately supervised on a consolidated basis by its home country supervisor; and

(ii) arrangements satisfactory to the Central Bank for cooperation, coordination, and information-sharing with the home country supervisor are in place.

(2) Upon payment of the initial licence fee specified in the First Schedule, a licence granted by the Central Bank under this section is valid until revoked.

(3) A licence granted under this section is not transferable or assignable.

**Conditions for licence to financial holding company.**

**39.**    The Central Bank may attach conditions to the licence of a financial holding company under this section, including, without limitation, conditions to ensure that—

(a) the capital available to the financial group is adequate and will not jeopardize the financial position of the licensed financial institutions within the financial group;

(b) no double or multiple gearing or excessive leveraging of capital exists or will take place;

(c) the financial group is structured and managed in such a manner that it may be supervised by the Central Bank:

(d) each member of the financial group maintains adequate control mechanisms enabling it to provide to the Central Bank any data or information relevant to its supervision;

> (e) activities or overseas locations of operations that may be injurious to the licensed financial institutions that are members of the financial group are prevented,

and the Central Bank may from time to time, vary, remove or add further conditions to the licence.

### Restriction on activities of financial holding companies.

**40.**    (1) A licensed financial holding company shall not—

> (a) carry on any activity other than administering its holding of shares in members of its financial group or providing management, advisory, financing, accounting, information processing services to members in the financial group or any other services as approved by the Central Bank;
>
> (b) directly or indirectly exercise control over any member of another financial group, without the prior approval of the Central Bank; or
>
> (c) directly or indirectly, acquire or hold any share or ownership interest in any commercial, agricultural or industrial company or unincorporated entity.

(2) A licensed financial holding company may acquire interest in any company that engages in activities permissible for licensed financial institutions under section 10.

(3) The Central Bank may issue prudential standards under this section, without limitation, relating to—

> (a) the maximum percentage of shares of any class or the maximum value of ownership interests that may be acquired or held; and
>
> (b) the maximum aggregate value of any shares and ownership interest.

### Limitation of risk to licensed financial institution.

**41.**    (1) Where a licensed financial institution or proposed licensed financial institution is or will be a member of a corporate group and no other member of the corporate group is limited in its activities to those permitted to a member of a financial group, in lieu of or in addition to a restructuring under section 35 the Central Bank may require the licensed financial institution to take any measures as, in the opinion of the Central Bank, are appropriate to limit the risks to which the licensed financial institution may be exposed from the other members of the corporate group.

(2) Without limiting the generality of subsection (1), the Central Bank may, by order—

> (a) restrict or prohibit credit exposures by the licensed financial institution to the other members of the corporate group, or to any person that directly or indirectly controls the holding company of the corporate group;
>
> (b) limit or prohibit loans or other transfers of funds by members of the corporate group to the licensed financial institution, other than deposits with the licensed financial institution made in the ordinary course of business;

(c) limit or prohibit loans or other transfers of funds by the licensed financial institution to members of the corporate group;

(d) increase capital and liquidity requirements with respect to the licensed financial institution; or

(e) require that some or all of the directors of the licensed financial institution be independent directors.

**Revocation of licence of financial holding company.**

**42.**    (1) The Central Bank may revoke the licence of a licensed financial holding company where—

(a) the licensed financial holding company persistently fails to comply with the requirements of this Act;

(b) the licensed financial holding company fails to comply with the conditions of its licence;

(c) the licensed financial holding company ceases to meet the requirements for licensing as a financial holding company;

(d) the Central Bank determines that a licence was granted based on false or inaccurate information;

(e) the Central Bank determines that a licensed financial holding company is or is likely to be insolvent;

(f) the parent company of the licensed financial holding company loses its authorisation to conduct banking business in its home jurisdiction; or

(g) proceedings for bankruptcy, insolvency, or an arrangement with creditors is initiated.

(2) Where the Central Bank revokes the licence of a licensed financial holding company, it may—

(a) order the divestiture of the licensed financial institution owned by the licensed financial holding company;

(b) restrict transactions between the licensed financial institution and the licensed financial holding company and other members of the financial group; or

(c) place the licensed financial holding company under official administration or receivership.

**Actions of fundamental change requiring approval.**

**43.**    (1) Unless the approval of the Central Bank is first obtained no licensed financial institution or licensed financial holding company shall—

(a) transfer the whole or any substantial part of its assets or liabilities in the Currency Union other than in the ordinary course of its business;

(b) purchase or acquire the business or undertaking of another financial institution;

(c) effect a reduction of its paid-up capital established under section 44;

(d) alter its name as set out in its licence;

(e) enter into a merger or consolidation in the Currency Union; and

(f) in the case of a local licensed financial institution or licensed financial holding company, amend the instrument or charter under which it was formed in the Currency Union.

(2) Every foreign financial institution shall notify the Central Bank of any amendment to the instrument or charter under which it is formed, within sixty days of such amendment.

(3) Every licensed financial institution or licensed financial holding company shall provide the Central Bank with any bye-law adopted or any amendment to an existing bye-law within thirty days of the adoption or amendment.

(4) In considering approval of any proposed action under subsection (1), the Central Bank shall be guided by the criteria specified in section 8.

## PART V

### FINANCIAL REQUIREMENTS AND LIMITATIONS

**Minimum paid-up or assigned capital.**

**44.**    (1) Every licensed financial institution shall maintain in Saint Christopher and Nevis unimpaired, paid-up or, as the case may be, assigned capital at least equal to the minimum amounts specified in accordance with the following requirements—

(a) if operating as a bank, the minimum required capital shall be not less than twenty million dollars;

(b) if operating as a credit or other financial institution, the minimum required capital shall be not less than five million dollars.

(2) Every licensed financial holding company shall maintain in Saint Christopher and Nevis unimpaired, paid-up capital at least equal to three times the minimum amount applied to the licensed financial institution for which it is the holding company or such other amount as the Central Bank shall determine.

(3) The Central Bank may from time to time by—

(a) written notice to the main office of each licensed credit institution or licensed financial institution in Saint Christopher and Nevis; or

(b)  notice in a newspaper of general circulation in Saint Christopher and Nevis or in the *Gazette*,

increase or vary the minimum amounts of required capital specified in subsection (1) in respect of all or any appropriate class of financial institution or credit institution.

(4) Any licensed financial institution or licensed financial holding company which fails to maintain the minimum capital under subsection (1) or (2) is liable to a penalty of one million dollars and to a further penalty of one hundred thousand dollars for each day of default.

**Maintenance of reserve fund.**

**45.**    (1) Subject to subsection (2) every licensed financial institution shall maintain a reserve fund and shall, out of its net profits of each year transfer to that fund a sum equal to not less than twenty per cent of profits whenever the amount of the reserve fund is less than a hundred per cent of the paid-up or, or as the case may be, assigned capital of the licensed financial institution.

(2) No licensed financial institution or licensed financial holding company shall declare, credit or pay any dividend or make any other transfer from profits whenever the declaration, credit, payment or transfer—

(a) would result in an impairment of the capital required under section 44; or

(b) if the licensed financial institution or licensed financial holding company realises a net loss for that financial year.

**Adequacy of capital.**

**46.**    (1) A licensed financial institution or a licensed financial holding company shall not at any time have a capital adequacy ratio of less than the percentage calculated in the manner, the Central Bank may determine, in respect of all or any appropriate class of licensed financial institution.

(2) Any ratio required under subsection (1) shall be calculated on a consolidated and a solo basis for every licensed financial institution within a financial group.

**Additional capital in respect of special risks.**

**47.**    The Central Bank may require a licensed financial institution or a licensed financial holding company to maintain additional capital as it may consider appropriate to address risks in the licensed financial institution, the licensed financial holding company or in the financial system.

**Liquidity requirement.**

**48.**    (1) The Central Bank shall issue liquidity requirements that require licensed financial institutions and licensed financial holding companies to hold adequate and appropriate forms of liquidity.

(2) Each licensed financial institution and licensed financial holding company shall comply at all times with the liquidity requirements issued by the Central Bank.

**Limit on exposures.**

**49.**    (1) Except with the approval of the Central Bank and subject to such terms and conditions as the Central Bank may determine a licensed financial institution shall not directly or indirectly, incur exposures to—

(a) any person;

(b) any member of a borrower group; or

(c) any borrower group,

so that the total value of the exposures in respect of such person, member or group, is at any time more than twenty-five per cent of the aggregate amount of the licensed financial institution's capital base, unless prior approval is obtained from the Central Bank.

(2) The limitation specified in subsection (1) shall not apply to transactions that represent loans to a Participating Government, or to the boards, agencies, or local government bodies of a Participating Government which are guaranteed by the Participating Government.

(3) In applying subsection (1), where the Central Bank determines that the interests of two or more persons are connected, the total indebtedness of the persons shall be aggregated and deemed to be the indebtedness of a single person.

(4) In making a determination under subsection (3), the Central Bank may take into account whether the financial soundness of any of the persons may affect the financial soundness of the other or others, or the same factors may affect the financial soundness of some or all of them, or if as a result of the structure of their relationship the other person is in fact ultimately responsible for, or benefits from, the exposure outstanding.

(5) A licensed financial institution shall, within fourteen days of exceeding the limit on exposures in subsection (1), report such exposures to the Central Bank and shall provide a written plan for remedying the breach within thirty days.

(6) The aggregate of large exposures of a licensed financial institution shall not exceed four hundred per cent of its capital base, or such other percentage as the Central Bank may determine.

**Restrictions on exposures to related parties.**

**50.**     (1) A licensed financial institution shall not grant or permit to be outstanding an exposure to any of its related parties, unless an exposure is granted on non-preferential terms.

(2) Before an exposure is granted to any related party, an exposure shall be approved by the board of directors and assessed in accordance with any prudential standards issued by the Central Bank.

(3) For the purpose of subsection (1) "non-preferential" means made on substantially the same terms, including interest rates and collateral, as applicable, as those prevailing for comparable transactions with other persons.

(4) A licensed financial institution shall not grant an exposure to a related party where the aggregate of all financial exposures to related parties would exceed fifty per cent of the capital base of the licensed financial institution.

(5) For the purposes of calculating capital adequacy, the amount of exposures that are in excess of the limits under subsection (4) shall be deducted from capital.

**Restrictions on lending to employees.**

**51.**     (1) Except as provided in this section, all lending to employees shall be subject to the general credit policies of the licensed financial institution and subject to section 50.

(2) Lending on preferential terms to employees of a licensed financial institution shall only be permitted where it forms part of a written employment package or employee benefits plan approved by the board or consistent with a written board policy for employee lending that is in compliance with any prudential standards issued by the Central Bank.

(3) A licensed financial institution shall not grant or permit to be outstanding to its employees any unsecured advances or credit facilities which in the aggregate amount for any one employee exceeds fifty per cent of the annual remuneration of such employee.

(4) The aggregate amount of all loans under subsections (1) and (2) shall not exceed twenty per cent of the capital base of the licensed financial institution.

(5) When a licensed financial institution calculates its capital adequacy, any exposures that are in violation of this section shall be deducted from capital.

(6) For purposes of this section, the term "employees" does not include any persons who are considered to be related parties subject to section 50.

**Prohibition of advances against security of own shares.**

**52.** A licensed financial institution shall not grant any advance against the security of its own shares, the shares of an affiliate, or the shares of a company to which the advance is being granted.

**Prohibition on engaging or investing in trade and outsourcing.**

**53.** (1) A licensed financial institution shall not engage in trade, except insofar as may be temporarily necessary in the conduct of its business or in the course of the satisfaction of debts due to it.

(2) No licensed financial institution shall be an affiliate of a company which does not conduct banking business or business of a financial nature, unless the Central Bank grants approval, except that subsidiaries of a licensed financial institution may only engage in activities permitted under section 54.

(3) A licensed financial institution shall not acquire or continue in the acquisition of any ownership interest in any commercial, agricultural, industrial or other non-financial undertaking except such interest as a licensed financial institution may acquire for the satisfaction of debts due to it which shall, be disposed of as soon as possible, but not later than five years after the acquisition.

(4) Upon the approval of and subject to the terms and conditions the Central Bank may determine, subsection (3) shall not prevent the purchase and sale or holding of shares or stocks—

(a) for a trust account or upon the order and for the account of a customer without recourse;

(b) in any company set up for the purpose of promoting the development of a money market or securities market or of improving the financial mechanism for the financing of economic development in the Currency Union;

(c) in another company, the aggregate value of which does not at any time exceed ten per cent of the capital base of that licensed financial institution, and where there is no established market value for such shares the value of such shares shall be established on the basis of a valuation approved by the Central Bank.

(5) The total amount of the holdings of a licensed financial institution under paragraph (c) of subsection (4) may not exceed sixty per cent of the capital base of the licensed financial institution.

(6) An investment in a company under paragraph (c) of subsection (4) may not exceed five per cent of the shares of that company.

(7) A licensed financial institution shall not outsource any of its functions to any other person without the approval of the Central Bank.

**Financial subsidiaries permitted.**

**54.**    (1) A licensed financial institution may acquire or establish a subsidiary company with the prior written approval of the Central Bank, where the subsidiary shall be engaged solely in permissible activities as determined by the Central Bank.

(2) The investment of a licensed financial institution in a permitted subsidiary shall not exceed ten per cent of the capital base.

(3) The aggregate amount of investment which a licensed financial institution may take in respect of its subsidiaries, shall not exceed twenty-five per cent of its capital base.

(4) In considering the granting of approval under this section, the Central Bank shall take into account—

    (a)  whether the acquisition of the shares is likely to prejudice the—

        (i)  financial condition of the licensed financial institution;

        (ii)  capitalisation of the licensed financial institution;

        (iii)  interest of depositors of the licensed financial institution;

    (b)  whether the corporate affiliations and structure of the licensed financial institution exposes the licensed financial institution to undue risks or hinder its effective supervision; and

    (c)  any other criteria as the Central Bank may determine.

**Restrictions on investments in real property.**

**55.**    (1) A licensed financial institution shall not purchase, acquire or lease real or immovable property except as may be necessary for the purpose of conducting its business as a licensed financial institution including provision for future expansion and housing its officers and employees.

(2) Where a licensed financial institution holds any real or immovable property held or leased by it prior to the commencement of this Act for purposes other than those referred to. there shall be a three year period to allow for compliance with this section.

(3) A licensed financial institution may secure a debt on any real or immovable property and in default of repayment may acquire the property for resale as soon as possible, but not later than five years after the acquisition.

**Time limit for compliance with financial requirements.**

**56.**    (1) Any licensed financial institution to which sections 49 to 55 are applicable that, prior to the commencement of this Act, entered into any transactions incompatible with sections 49 to 55 shall, within twelve months after the commencement of this Act, or within any further period as the Central Bank may determine, submit a statement of the transactions to the Central Bank and shall, in respect of the transactions, take action within a reasonable time determined by the Central Bank.

(2) Where a licensed financial institution fails to comply with the provisions of sections 49 to 55 it is liable to a penalty of one hundred thousand dollars for each provision with which it fails to comply.

**Maintenance of specified assets.**

**57.**     (1) Every licensed financial institution may be required to maintain specified assets of an amount not less than that from time to time determined by the Central Bank.

(2) The amount of the specified assets under subsection (1) shall be expressed as a percentage of the aggregate demand, savings, and time deposits and other liabilities of the licensed financial institution and the percentage shall not be more than forty per cent unless the Central Bank so approves.

(3) The Central Bank may approve a period during which surpluses and deficiencies in specified assets may be averaged.

(4) The Central Bank may provide that advances granted to a licensed financial institution by any other financial institution or by an overseas branch or office may be excluded from the computation of the demand, savings and time deposits and other liabilities of the licensed financial institution.

(5) The Central Bank may determine the distribution of amounts required to be held between different classes of specified assets, and may also differentiate between classes of banks, credit institutions and other financial institutions.

(6) Every licensed financial institution which is required to hold specified assets shall be afforded a reasonable time to comply.

(7) In this section "specified assets" means freely transferable assets free from any charge, lien or encumbrance and includes—

    (a)  notes and coins which are legal tender in Saint Christopher and Nevis and such foreign notes and coins as the Central Bank may specify;

    (b)  balances at the Central Bank;

    (c)  net balances at licensed financial institutions in Saint Christopher and Nevis but where the balances are negative they will be subtracted from the specified assets;

    (d)  treasury bills and other securities issued or guaranteed by a Participating Government and securities issued by a statutory corporation wholly owned by a Participating Government and approved by the Central Bank;

    (e)  bills of exchange and promissory notes eligible for rediscount by the Central Bank and warehouse warrants or their equivalent securing possession of goods against which the Central Bank may grant advances, within the limits and in accordance with the evaluation fixed by the Central Bank;

    (f)  net balances at licensed financial institutions in the monetary areas as the Central Bank may approve and the Central Bank may provide for the treatment to be accorded the balance or any portion in respect of the head office of a licensed financial institution organised abroad, and where any balances are negative they will be subtracted from specified assets;

    (g)  money at call in monetary areas approved by the Central Bank under paragraph (f), bills of exchange bearing at least two good signatures drawn on and payable at any place in the approved monetary areas, and treasury bills issued by the government of a country in any

approved monetary areas and maturing within one hundred and eighty days.

(8) Where a licensed financial institution—

(a) fails to furnish promptly any information required by the Central Bank to satisfy itself that the licensed financial institution is observing the requirements of this section; or

(b) allows its holdings of specified assets to be less than the amount which is fixed from time to time; or

(c) during the period of any deficiency of specified assets the licensed financial institution grants or permits increases in its outstanding advances, whether by loans or overdrafts or investment portfolio other than investment in specified assets,

it is liable to pay a penalty at an annual rate of eleven point five per cent on the amount of the deficiency for so long as the failure continues, and the penalty shall be payable to the Central Bank on the date as may be fixed by the Central Bank and may be recovered by deduction from any balance of the licensed financial institution with the Central Bank.

**Recordkeeping and reporting required.**

**58.**    A licensed financial institution shall maintain information systems to identify loan exposures to single borrowers, borrower groups, related parties, and affiliates and shall record the amount of the loans and monitor and report on the loans to the Central Bank at the times and in a form as the Central Bank shall specify.

## PART VI

### AUDIT AND INFORMATION

**Annual audit, report and publication of financial statements and results.**

**59.**    Accounts and financial statements of a licensed financial institution or a licensed financial holding company, including financial statements on a consolidated basis, shall be in accordance with internationally-accepted accounting standards, reflecting additional accounting rules or standards as shall be issued by the Central Bank.

**Appointment of external auditor.**

**60.**    (1) A licensed financial institution or a licensed financial holding company shall appoint annually an external auditor satisfactory to the Central Bank.

(2) An external auditor may not serve for more than six consecutive years, however, the lead and concurring audit partner shall be changed every three years.

(3) A person may not be appointed as the external auditor if that person has previously been appointed as the external auditor for any of the preceding five years.

(4) Prior to appointment, a licensed financial institution or a licensed financial holding company shall give prior notification in writing to the Central Bank of its intention to appoint an external auditor.

(5) The Central Bank shall notify the licensed financial institution or a licensed financial holding company within thirty days if it has an objection to an appointment.

(6) If a licensed financial institution or a licensed financial holding company fails to appoint an external auditor satisfactory to the Central Bank, the Central Bank may appoint an external auditor for the licensed financial institution or licensed financial holding company and the remuneration of the external auditor so appointed shall be determined by the Central Bank and paid by the licensed financial institution or licensed financial holding company.

(7) The Central Bank may at any time appoint an external auditor to conduct an independent audit, a special study, or a diagnostic review of a licensed financial institution or a licensed financial holding company, in accordance with the instructions of the Central Bank, and to report the findings or results to the Central Bank, at the expense of the licensed financial institution or licensed financial holding company.

(8) No director, officer, secretary, employee or agent of a licensed financial institution or a licensed financial holding company, and no person having an interest in any licensed financial institution other than as a depositor, shall be eligible for appointment as an external auditor for a licensed financial institution or a licensed financial holding company.

(9) Any person appointed as an external auditor who shall, after an appointment, acquire any interest in a licensed financial institution or a licensed financial holding company otherwise than as a depositor, or become a director, officer, secretary, employee or agent of a licensed financial institution or a licensed financial holding company shall immediately cease to be an external auditor.

**Duties of external auditor.**

**61.**    (1) The external auditor shall conduct its audit consistent with internationally-accepted auditing standards.

(2) The duties of an external auditor shall include—

    (a) examining the books and records and reporting on the annual financial statements which comprise—

       (i) the statement of financial position, statement of changes in equity, statement of comprehensive income, statement of cash flows; and

       (ii) a summary of significant accounting policies and other explanatory notes,

    on both a solo and consolidated basis if applicable, and in every report the auditor shall state whether in the external auditor's opinion the financial statements present fairly in all material respects the financial position of the licensed financial institution or licensed financial holding company and of its financial performance and its cash flows for the year then ended; and

    (b) all or any of the following duties as may from time to time be required by the Central Bank—

       (i) submission of additional information in relation to the audit of the licensed financial institution or licensed financial holding company as the Central Bank considers necessary;

(ii) to carry out any other examination or establish any procedure in any particular case;

(iii) to submit a report on any of the matters referred to in sub-paragraphs (i) and (ii);

(iv) to submit a report on the financial and accounting systems and risk management controls of the licensed financial institution or licensed financial holding company;

(v) to submit a report on whether prudent credit-granting and investment criteria, policies, practices and procedures are approved and reviewed by the management and board and communicated to all credit officers and whether major credits and investments are decided at a high managerial level;

(vi) to certify whether the systems of loan classification, provisioning and write-offs determined by the Central Bank are being adhered to; and

(vii) to certify whether suitable measures to counter money laundering and to combat the financing of terrorism have been adopted by the licensed financial institution or licensed financial holding company and are being implemented in accordance with the applicable laws.

**Remuneration of external auditor.**

**62.**    A licensed financial institution or a licensed financial holding company shall remunerate the external auditor in respect of the discharge by the external auditor of all or any of the duties set out in section 61.

**Immediate reports to Central Bank.**

**63.**    If in the course of the performance of an external auditor's duties an external auditor is satisfied that—

(a) there has been a material breach of or non-compliance with the provisions of this Act or any Regulations, Notice, or Order made or prudential standards or directions issued under this Act;

(b) there is evidence that a criminal offence involving fraud or other dishonesty may have been committed;

(c) losses have been incurred which reduce the paid-up capital or assigned capital, as the case may be, of the licensed financial institution or licensed financial holding company by twenty-five per cent or more;

(d) material irregularities have occurred, including but not limited to—

(i) any change in accounting policy or the misrepresentation of the financial position of the licensed financial institution or licensed financial holding company;

(ii) evidence that data reported to the Central Bank or data provided to the auditor is not valid;

(iii) transactions that have a serious impact on the financial position of the licensed financial institution or licensed financial holding company;

(iv) transactions giving rise to significant risks that have the potential to jeopardise the viability of the licensed financial institution or licensed financial holding company;

(v) any other transactions or conditions which in the opinion of the external auditor could affect the interest of depositors;

(e) the claims of depositors covered by the assets cannot be confirmed,

the external auditor shall immediately report the matter to the licensed financial institution or licensed financial holding company and the Central Bank.

### Resignation or removal of external auditor.

**64.**    The licensed financial institution or licensed financial holding company and the external auditor shall immediately report to the Central Bank—

(a) the resignation of an external auditor; or

(b) the removal of the external auditor by the licensed financial institution or licensed financial holding company.

### Request for copies of reports.

**65.**    The Central Bank may request copies of reports submitted to the board of a licensed financial institution or a licensed financial holding company by both its internal and external auditors.

### External auditor to report to Central Bank.

**66.**    An external auditor shall report to the Central Bank on any matter it is required to report on any licensed financial institution or licensed financial holding company to any investigative, regulatory or other institution, simultaneously with its report to the licensed financial institution or licensed financial holding company.

### No liability for breach of duty.

**67.**    No external auditor shall be liable for breach of any duty solely by reason of compliance with the provisions of this Part or any other request for information by the Central Bank.

### Failure to comply with request.

**68.**    (1) A licensed financial institution or a licensed financial holding company which fails to comply with a request under paragraph (b) of subsection (2) of section 61 is liable to a penalty of one hundred thousand dollars for each failure.

(2) Any director or officer responsible for a failure to comply with a request under paragraph (b) of subsection (2) of section 61 is liable to a penalty of one hundred thousand dollars for each failure.

### Audited financial statements.

**69.**    (1) The report of the auditor made in accordance with section 61 shall be presented with the report of the board and the financial statements of the licensed financial institution or the licensed financial holding company at the annual meeting of shareholders of each local licensed financial institution or licensed financial holding company and shall be transmitted to the head office of each foreign licensed financial institution.

(2) A copy of the financial statements and reports shall be sent to the Minister and the Central Bank within three months of the end of the financial year.

(3) A licensed financial institution or a licensed financial holding company shall within three months of the end of its financial year—

(a) publish in the *Gazette* or on the company website, and in a local newspaper; and

(b) exhibit in a conspicuous place in each of its offices,

a true and full yearly statement of its accounts and a consolidated balance sheet of all its operations in Saint Christopher and Nevis and abroad as the case may be as certified by its external auditor.

(4) The statement shall be signed by the manager or by an officer of the licensed financial institution or the licensed financial holding company as may from time to time be authorised by the licensed financial institution or the licensed financial holding company to sign the statement on behalf of the licensed financial institution or the licensed financial holding company.

(5) Where any licensed financial institution or any licensed financial holding company fails to comply with the requirements of subsections (1) to (4) within three months of the end of its financial year, it is liable to a penalty of fifty thousand dollars and three thousand dollars for every day of the default except when an extension to the period has been granted by the Central Bank pursuant to section 91.

PART VII

SUPERVISION

**Central Bank examination.**

**70.**    (1) The Central Bank, shall examine or cause an examination to be made of each licensed financial institution from time to time or whenever in its judgment an examination is necessary or expedient in order to determine that the licensed financial institution is in a sound financial condition and that the requirements of this Act have been complied with in the conduct of its business, provided however that each licensed financial institution shall be examined at least once every thirty-six months.

(2) For the purpose of determining compliance with this Act and potential risks to a licensed financial institution from its membership in a corporate group, the Central Bank may at any time examine or cause an examination to be made of any affiliate of the licensed financial institution, in the Currency Union or abroad or any of its overseas offices to the same extent that an examination may be made of the licensed financial institution.

(3) The Central Bank may assess a licensed financial institution for the reasonable expenses of conducting an examination under subsections (1) and (2).

(4) The Central Bank shall forward copies of balance sheets, statements and reports on the results of any examination to the licensed financial institution.

**Consolidated supervision.**

**71.**    (1) The Central Bank shall conduct consolidated supervision of corporate groups to assess and, if necessary, require remedial action as authorised in this Act to

minimise or eliminate, risks to a licensed financial institution from its membership in a corporate group.

(2) For purposes of consolidated supervision, the prudential requirements specified in section 72 shall be applied on a consolidated basis to—

(a) a licensed financial institution and its affiliates; and

(b) a licensed financial holding company of a licensed financial institution and its affiliates.

**Prudential requirements.**

**72.**    (1) The prudential requirements to be applied on a consolidated basis include—

(a) minimum capital adequacy ratio of section 46;

(b) liquidity requirements of section 48;

(c) exposure limits of section 49;

(d) related-party lending limits of section 50;

(e) prohibition on payment of dividends or transfers of profit under section 45; and

(f) other prudential requirements as may be determined by the Central Bank to be necessary or appropriate.

(2) The Central Bank shall determine the manner in which the prudential requirements shall be applied on a consolidated basis, which may include any modifications, adaptations, qualifications and exceptions as may be necessary or appropriate to provide for effective supervision on a consolidated basis.

**Reporting of group structures.**

**73.**    (1) For purposes of consolidated supervision, each licensed financial institution which is a member of a corporate group shall provide to the Central Bank at least twice a year—

(a) a complete diagram, of the group, including all direct and indirect affiliates and associates of the licensed financial institution and the nature of their relationship to the group; and

(b) any other information the Central Bank may require.

(2) Any changes to the structure of the group that are not otherwise subject to approval of the Central Bank under this Act shall be reported by the licensed financial institution to the Central Bank within the time frame determined by the Central Bank.

**Disclosure and access to books and records by Central Bank examiner for examination.**

**74.**    (1) A person who is authorised by the Central Bank to examine, investigate or for any other purpose shall—

(a) have full access to the premises of a licensed financial institution under examination or investigation; and

   (b) have a right to call upon—

     (i) any director, officer or any other employee of a licensed financial institution;

    (ii) an affiliate, any external auditor, or any person to which the licensed financial institution has outsourced any of its functions;

   (iii) or any other person with information regarding the licensed financial institution,

to furnish any information and explanation which that person may consider necessary.

(2) A licensed financial institution or an affiliate shall produce for the inspection of any examiner appointed by the Central Bank at the time the examiner specifies all books, minutes, accounts, cash, securities, documents and vouchers relating to its business as requested by the examiner for the purposes of this Act.

(3) If any books, minutes, accounts, cash, securities, documents and vouchers are not provided, information or explanation is not supplied in accordance with subsection (1), the defaulting person commits an offence and is liable on summary conviction to a fine not exceeding twenty-five thousand dollars and in the case of a continuing offence to a further penalty of one thousand dollars for each day on which the offence is continued after conviction.

(4) If any information supplied or item produced is false in any material particular, the licensed financial institution or affiliate or both commits an offence and shall be liable on summary conviction to a fine not exceeding fifty thousand dollars.

**Central Bank's powers of remedial action.**

**75.**    (1) If in the opinion of the Central Bank a licensed financial institution or any affiliate, director, officer, employee, or significant shareholder of the licensed financial institution—

   (a) engages in unsafe or unsound practices in conducting the business of the licensed financial institution;

   (b) violates any provision of this Act, Regulations or Order made under this Act to which the licensed financial institution, affiliate, or person is subject;

   (c) violates any prudential standard issued by the Central Bank to which the licensed financial institution, affiliate, or person is subject;

   (d) violates any condition attached to a licence issued by the Central Bank;

   (e) incurs losses,

it may be subject to the remedial actions specified in subsection (2).

(2) Where the Central Bank has reasonable cause to believe that the circumstances referred to in paragraphs (a) to (e) of subsection (1) are likely to occur, the Central Bank may take one or more of the following measures—

   (a) issue a written warning as it considers necessary or appropriate;

   (b) conclude a written agreement with the licensed financial institution or the licensed financial holding company providing for a program of remedial action;

(c) issue an order to the licensed financial institution or the licensed financial holding company or their affiliates or the person responsible for the management of the licensed financial institution or the licensed financial holding company;

(d) issue such directions as it considers necessary in relation to the persons comprising the management of the licensed financial institution or the licensed financial holding company.

(3) An agreement, order, or direction under subsection (2) may require any or all of the following—

(a) to cease and desist from the specified practice or violation;

(b) affirmative action to correct the condition resulting from the specified practice or violation; or

(c) any specified remedial action.

**Additional Central Bank remedial actions.**

**76.**    The Central Bank may also take the following remedial actions—

(a) restrict the licensed financial institution or affiliate from further lending or taking further financial exposures, including off-balance sheet transactions, investments, or capital expenditure;

(b) require the licensed financial institution or affiliate to suspend for a specified period of time, alter, reduce, or terminate any activity that in the opinion of the Central Bank has caused material losses to the licensed financial institution or affiliate, is detrimental to the interest of depositors, or presents excessive risk to the licensed financial institution or affiliate;

(c) require the licensed financial institution or affiliate to sell, liquidate, or otherwise dispose of an affiliate or part of its business;

(d) prohibit payment of bonuses or incentive compensation to any director or officer;

(e) prohibit the licensed financial institution or affiliate from paying a dividend or making a distribution on its share capital or issue rights, shares or bonus shares to shareholders or to any person claiming under their authority;

(f) require shareholders to contribute additional capital;

(g) suspend or remove any officer of the licensed financial institution or affiliate or restrict the officer's powers;

(h) remove any or all of the directors on the board of the licensed financial institution or affiliate or restrict their powers;

(i) restrict or vary any restriction of a licence;

(j) any other action necessary or appropriate to eliminate the basis for requiring remedial action; or

(k) revoke the licence issued to the licensed financial institution to do banking business pursuant to section 14.

**Remedial actions against directors, officers, employees or significant shareholders.**

**77.**    (1) In sections 77 and 78 "relevant person" means director, officer, employee or significant shareholder.

(2) The Central Bank pursuant to section 75 with respect to any relevant person of a licensed financial institution or affiliate may take the following remedial actions—

   (a) require the relevant person to reimburse the licensed financial institution for losses caused by any violations;

   (b) prohibit the relevant person from direct or indirect exercise of voting rights attached to shares of the licensed financial institution;

   (c) suspend the relevant person from his position with the licensed financial institution or declare him to no longer be fit and proper; and

   (d) prohibit the payment of capital distributions or dividends to a relevant person.

(3) If the Central Bank has reasonable cause to believe that a financial institution or its shareholders, directors, officers, employees, attorneys, accountants or other professionals have engaged or are engaging in criminal or fraudulent activities, it shall immediately refer the matter to the authorities responsible for investigating and prosecuting the activities.

**Additional Central Bank powers of remedial action against directors, officers, employees or significant shareholders.**

**78.**    (1) If in the opinion of the Central Bank any relevant person of a licensed financial institution or affiliate—

   (a) wilfully or repeatedly has caused violation of any provision of this Act, Regulations or Order issued under this Act or prudential standard issued by the Central Bank to which the institution or person is subject following a written warning or an order from the Central Bank under section 75;

   (b) has been engaging in an unsafe or unsound practice that has resulted in a material loss to the licensed financial institution or financial gain to a person; or

   (c) has been conducting his affairs in a manner detrimental to the interests of the depositors,

that person shall be subject to the remedial actions specified in subsection (2).

(2) In addition to the actions in section 77, the Central Bank may take one or more of the following actions—

   (a) dismiss the relevant person from his position in the licensed financial institution or affiliate;

   (b) prohibit the relevant person from serving in or engaging in banking business permanently or for a stated period; and

   (c) require the relevant person to dispose of all or any part of his direct or indirect ownership interest in the licensed financial institution or affiliate or cease to hold a significant interest in it.

### Supplemental powers.

**79.**     The powers of the Central Bank under sections 75 to 78 are in addition to any other provisions authorizing or requiring the Central Bank to take action or impose penalties under other sections of this Act.

### Failure to comply with remedial actions.

**80.**     A licensed financial institution, its affiliate, or any director, officer, employee or significant shareholder of a licensed financial institution who fails to comply with any requirement or contravenes any prohibition imposed on the licensed financial institution under this Part commits an offence and is liable on summary conviction—

    (a) in the case of the licensed financial institution or its affiliate, to a fine of one hundred thousand dollars, and in the case of a continuing offence, to a further penalty of ten thousand dollars for each day on which the offence is continued after conviction;

    (b) in the case of any individual specified in this section, to a fine of fifty thousand dollars and in the case of a continuing offence, to a further penalty of five thousand dollars for each day on which the offence is continued after conviction.

### Effective date of order, warning, agreement, direction.

**81.**     Any order, warning, agreement, or direction issued by the Central Bank under subsection (2) of section 75 shall be deemed to take effect from the date specified.

### Suspension of persons charged with criminal offence, etc.

**82.**     If any person referred to in sections 77 and 78 is charged with a criminal offence involving dishonesty or breach of trust and his continued service or participation in the licensed financial institution or affiliate—

    (a) poses, or may pose a threat to the interests of the depositors; or

    (b) threatens, or may threaten to impair public confidence in the licensed financial institution or affiliate,

the Central Bank may issue an order temporarily suspending the person from his position in the licensed financial institution or affiliate and, if applicable, suspending the exercise of voting rights of shares in the licensed financial institution or affiliate by the person pending the determination of the criminal case.

### Dismissal of criminal case not a bar to Central Bank action.

**83.**     A dismissal of the criminal case or decision of not guilty on the merits of the case against the person referred to in section 82 shall not preclude the Central Bank from taking any action with respect to a person authorised by this Act.

### Persons convicted may be prohibited from banking business.

**84.**     Where a person is convicted of a criminal offence, the Central Bank may permanently prohibit the person from serving in or engaging in banking business.

**Appointment of observer.**

**85.**    (1) Where any of the grounds for remedial action under section 75 exists and—

(a) the Central Bank considers it necessary to stabilise the licensed financial institution or affiliate; or

(b) a licensed financial institution or affiliate fails to comply with a measure under section 75,

the Central Bank may by order appoint a competent person as observer of the licensed financial institution or affiliate at the expense of the licensed financial institution or affiliate.

(2) The Central Bank shall give the licensed financial institution, or affiliate—

(a) notice in writing of its intention to appoint an observer; and

(b) the opportunity to submit to it, within a specified period being not less than fourteen days, a written statement of objections to the appointment,

unless, the Central Bank determines that time to object would be detrimental to the interests of the licensed financial institution, the affiliate, or depositors.

(3) A licensed financial institution or affiliate which is served with an order appointing an observer shall comply with the order.

(4) An observer appointed under this section is entitled to attend the meetings of the board of the licensed financial institution or affiliate or its committees.

(5) The observer's views shall be recorded in the minutes of the meetings, but the observer shall not have the right to vote on any matter.

(6) An observer appointed under this section—

(a) shall hold office for a period determined by the Central Bank; and

(b) shall furnish the Central Bank with status reports on the licensed financial institution or affiliate as the Central Bank may determine.

(7) An observer appointed under this section shall have full access to the premises of the licensed financial institution or affiliate and shall have a right to call upon any director, officer, external auditor, or other person to which any function is outsourced or any other person with information regarding the licensed financial institution or affiliate to furnish the observer any information and explanation which the observer may consider necessary and that person shall comply.

**Actions required for adequately capitalised licensed financial institutions or affiliates suffering losses.**

**86.**    (1) Where a licensed financial institution or affiliate which complies with the capital requirements under this Act or prudential standards issued by the Central Bank has incurred or is likely to incur losses within any financial year, the Central Bank shall by order or direction take any of the following actions—

(a) prohibit the licensed financial institution or affiliate from declaring and distributing any dividends which are, in the opinion of the Central Bank, likely to cause it not to comply with the capital requirements under this Act or prudential standards issued by the Central Bank or

otherwise would be detrimental to the financial soundness of the licensed financial institution;

(b) undertake more frequent inspection of the licensed financial institution or affiliate;

(c) require additional or more frequent reporting;

(d) require the directors or officers of the licensed financial institution or affiliate to provide a written explanation detailing the causes of those losses and the measures to be taken by the licensed financial institution or affiliate to rectify the position and prevent future losses.

(2) This section shall not be construed so as to preclude the Central Bank from taking action under any other section of this Act.

**Actions required for under capitalised licensed financial institutions, or affiliates.**

**87.**    (1) Where a licensed financial institution or affiliate fails to comply with any or all of the capital requirements under this Act or prudential standards issued by the Central Bank, the Central Bank shall take any of the following actions—

(a) the actions specified in section 86;

(b) require the licensed financial institution, or affiliate to present a plan that is satisfactory to the Central Bank to reconstitute its capital adequacy ratio within thirty days or a longer period as may be determined by the Central Bank;

(c) prohibit the licensed financial institution, or affiliate from awarding any bonuses, or increments in the salary, emoluments and other benefits of all directors and officers.

(2) Where a licensed financial institution or affiliate is required by the Central Bank to submit a capital restoration plan under subsection (1), and it fails, refuses or neglects to comply or to implement the capital restoration plan, the Central Bank shall take any of the following measures—

(a) prohibit the licensed financial institution or affiliate from opening new branches or acquiring or establishing new subsidiaries;

(b) restrict the licensed financial institution or affiliate from engaging in new business;

(c) impose restrictions on growth of assets or liabilities of the licensed financial institution or affiliate as it shall consider fit;

(d) restrict the rate of interest on savings and time deposits payable by the licensed financial institution to the rates as the Central Bank shall determine;

(e) remove officers of the licensed financial institution or affiliate responsible for the noncompliance.

(3) If at any time—

(a) after the period specified, the licensed financial institution or affiliate failed to raise its capital to the levels necessary to rectify its undercapitalisation; or

(b) before the end of the period specified, the financial position of the licensed financial institution or affiliate continues to deteriorate,

the Central Bank may without having to wait for the expiry of that period place the licensed financial institution into official administration in accordance with Part IX of this Act or revoke its licence and initiate receivership and liquidation in accordance with Part X.

(4) This section shall not be construed so as to preclude the Central Bank from taking action under any other section of this Act.

**Notification of removal of directors and officers.**

**88.**     (1) Where an action under this Part requires the removal of a director or officer of a licensed financial institution the Central Bank shall serve on the licensed financial institution and on the director or officer concerned written notice of the intended removal.

(2) The licensed financial institution and the director or officer served with a notice under subsection (1) may, within the period of fourteen days commencing from the day after which the notice is given, make written representations to the Central Bank and the Central Bank shall take the representations into account in deciding whether to remove the director or officer.

(3) Where the Central Bank is of the opinion that the public interest may be prejudiced by the director or officer continuing to exercise the powers or carry out the duties and functions of that office during the period for making representations specified in subsection (2), the Central Bank may make an order suspending the director or officer, and the suspension shall not extend beyond the period for making written representation.

(4) Where the Central Bank decides to remove the director or officer the Central Bank shall, without delay, notify the director or officer and the licensed financial institution of the removal order or suspension order made under this section.

(5) The director or officer, as the case may be, ceases to hold office as of the date, the removal order is made, or any later date specified in the order.

**Submission of returns and production of information as required by the Central Bank.**

**89.**     (1) Every licensed financial institution shall furnish to the Central Bank at the time and in the manner the Central Bank may determine, information and data, on a solo or consolidated basis, as the Central Bank may require for the proper discharge of its functions and responsibilities.

(2) For the purposes of determining compliance with this Act and any potential risks to a licensed financial institution from its membership in a corporate group, the Central Bank may require any affiliate of a licensed financial institution to furnish to the Central Bank information and data in the time and in the manner the Central Bank may determine.

(3) Without limiting the generality of subsection (1) every licensed financial institution shall, at the request of the Central Bank submit to the Central Bank in a form as the Central Bank determines—

      (a) not later than fourteen days after the last day of the month to which it relates, a monthly statement of assets and liabilities at the end of each month;

      (b) not later than fourteen days after the end of the quarter to which it relates, a quarterly return providing an analysis of customers'

liabilities to the licensed financial institution in respect of loans, advances and other assets of the licensed financial institution at the end of each quarter;

(c) not later than fourteen days after the end of the quarter to which it relates, a quarterly return providing information on all exposures that equal to or are in excess of ten per cent of the capital base of the licensed financial institution;

(d) within such period as the Central Bank may determine that other returns may be required.

(4) All statements and returns submitted by a licensed financial institution under subsection (3), any data or information submitted by a licensed financial institution or affiliate under subsection (1) or (2), and any other information obtained under this Act regarding the identity, assets, liabilities, transactions or other information in respect of a depositor or customer of a licensed financial institution shall be regarded by the Central Bank as secret.

(5) Notwithstanding subsection (4)—

(a) the Central Bank may—

(i) provide international financial institutions, foreign banking supervisors and any other local or foreign authorities responsible for the supervision or regulation of a licensed financial institution, or for maintaining the integrity of the financial system with such statements, returns, data and information; and

(ii) provide access, to any officer of a foreign authority responsible for the supervision or regulation of a foreign financial institutions in order to assess the safety and soundness of a foreign financial institution,

on a reciprocal basis and subject to an agreement for confidentiality and a Memorandum of Understanding;

(b) the Central Bank may publish statements on the assets and liabilities of each licensed financial institution furnished under paragraph (a) of subsection (3) but no information in respect of the affairs of a particular customer of a licensed financial institution shall be so published.

**Central Bank may request further information.**

**90.**    The Central Bank may require a licensed financial institution to submit any further information and data relating to the matters described in subsection (3) of section 89, and may from time to time call for any other information which it may require for the purposes of this Act from any licensed financial institution about its operations and those of its affiliates in the Currency Union or from a local licensed financial institution about its operations and those of its affiliates abroad and any further information and data shall be submitted within the period and in the manner as the Central Bank may require.

**Extension of period for providing information.**

**91.**    At the request of a licensed financial institution or an affiliate, the Central Bank may extend, any period within which a licensed financial institution or affiliate is, in accordance with the provisions of this Act, obliged to furnish any document or information.

**Disclosure of basis for charges and fees.**

**92.**    The Central Bank may require a licensed financial institution to disclose the basis for any of its charges and fees and the disclosure shall be made within the period and in the manner as the Central Bank may require.

**Restriction on advertising likely to mislead the public.**

**93.**    (1) No licensed financial institution shall engage in advertising practices which are likely to mislead the public concerning—

    (a)  the relationship of the licensed financial institution to the Central Bank or any department or official of the Central Bank;

    (b)  the interest rate paid on deposits or charged on credit;

    (c)  the insured or guaranteed status of deposits or other liabilities of the licensed financial institution;

    (d)  the financial condition of the licensed financial institution.

    (2) Any licensed financial institution which contravenes subsection (1) commits an offence and is liable on summary conviction to a fine not exceeding fifty thousand dollars for each contravention.

**Agreement or arrangement with foreign supervisory authority.**

**94.**    The Central Bank may enter into an agreement or arrangement for coordination, cooperation, and the exchange of information with a foreign supervisory authority with responsibility to supervise financial institutions, financial holding companies, or other similar institutions, and with a foreign resolution authority or other government agency with direct responsibility for matters relating to the resolution of failing or failed financial institutions, if different from the supervisory authority, where the Central Bank is satisfied that the foreign authority has the obligation to protect the confidentiality of the information imparted.

**Furnishing of statement or return to Participating Governments.**

**95.**    At the request of a Participating Government, the Central Bank shall arrange for that Participating Government to be supplied with a copy of any statement or return furnished by a licensed financial institution under subsection (3) of section 89 in relation to its operation in the territory of that Government and all statements and returns so supplied shall be regarded by the Government as secret.

**Prohibition against providing false, misleading statements.**

**96.**    (1) Where a licensed financial institution or an affiliate fails—

    (a)  to submit returns or to produce information and data required by the Central Bank in accordance with section 89;

    (b)  to provide further information and data to the Central Bank pursuant to section 90;

    (c)  to provide the information and data requested under sections 89 and 90 to the Central Bank in accordance with the extension granted under section 91,

it is liable to a penalty of twenty-five thousand dollars for each failure.

(2) Where a licensed financial institution supplies any statement, return, information or data knowing it to be false or misleading in any material particular it is liable to a penalty of twenty-five thousand dollars.

PART VIII

CORPORATE GOVERNANCE

**Minimum criteria for determining whether a person is fit and proper.**

**97.**    (1) Every person who is, or is likely to be a director, significant shareholder, or officer of a licensed financial institution or licensed financial holding company must be a fit and proper person to hold the particular position which he holds or is likely to hold.

(2) In determining whether a person is a fit and proper person to hold any particular position, regard shall be had to—

(a) the person's probity, competence and soundness of judgment for fulfilling the responsibilities of that position;

(b) the academic or professional qualifications or effective experience in banking, finance, business or administration or any other relevant discipline of the person concerned;

(c) the diligence with which the person is fulfilling or likely to fulfill the responsibilities of the position;

(d) whether the interests of depositors or potential depositors of the licensed financial institution are, or are likely to be, in any way threatened by the person holding the position;

(e) whether the person is a significant shareholder, director or officer or holds any position of authority in any licensed financial institution locally or elsewhere whose licence has been suspended, or revoked otherwise than as a result of an amalgamation or voluntary liquidation or which has been or is being wound up or compulsorily liquidated;

(f) whether the person has failed to satisfy any judgment or order of a court locally or abroad including the repayment of a debt;

(g) whether the person is an undischarged bankrupt or has been declared a bankrupt locally or abroad; and

(h) whether the person has been removed or suspended by a regulatory authority from serving as a director or officer in a licensed financial institution or any body corporate locally or abroad.

(3) Without prejudice to the generality of the foregoing provisions, regard may be had to the previous conduct and activities in business or financial matters of the person in question and, in particular, to any evidence that the person has—

(a) committed an offence involving fraud or other dishonesty or violence;

(b) contravened any provision made by or under an enactment designed for protecting members of the public against financial loss due to dishonesty, incompetence or malpractice by persons concerned in the provision of banking, insurance, investment or other financial services

or the management of companies or against financial loss due to the conduct of a discharged or undischarged bankrupt;

(c) engaged in any business practices appearing to the board to be deceitful or oppressive or otherwise improper (whether unlawful or not) or which otherwise reflect discredit on the person's method of conducting business;

(d) an employment record which leads the board to believe that the person carried out an act of impropriety in the handling of his employer's business; or

(e) engaged in or been associated with any other business practices or otherwise conducted himself in a manner as to cast doubt on his competence and soundness of judgment.

**Criteria for determining whether a person is fit and proper to be a significant shareholder.**

**98.**    In determining whether a company or person is a fit and proper person to be a significant shareholder, regard shall be had to, but not limited by, the following criteria—

(a) whether the directors of the company or person have satisfied the fit and proper criteria set out in this Part;

(b) whether the company or person has been found guilty of insider trading or fraud involving trading in securities by local or foreign authorities;

(c) whether the company or person has been convicted of an offence under this Act;

(d) whether in the opinion of the Central Bank the company or person has failed to carry on its business or business affairs in a prudent manner;

(e) whether in the opinion of the Central Bank the company is insolvent or is likely to become insolvent;

(f) whether the company or person has suspended or is about to suspend payment in respect of, or is unable to meet their obligations, as they fall due;

(g) whether in the opinion of the Central Bank the affairs of the company or person are being conducted in a manner prejudicial to the soundness of the licensed financial institution in question or the financial system of the Currency Union;

(h) any other matter which the Central Bank may determine.

**Determining whether business carried out in prudent manner.**

**99.**    In determining whether a company has carried on its business in a prudent manner under paragraph (d) of section 98 the Central Bank shall take into consideration—

(a) the capital of the company in relation to the size and nature of the business or proposed business of the licensed financial institution;

(b) loan concentration or proposed loan concentration and risk exposures or proposed risk exposures in the company and the licensed financial institution;

(c) separation of the business or proposed business of the company and the licensed financial institution or licensed financial holding company from other business and from other interests of any significant shareholder of the company;

(d) internal controls and accounting systems or proposed internal controls and accounting systems of the company;

(e) risk management systems and policies or proposed risk management systems and policies of the company and the licensed financial institution or licensed financial holding company;

(f) arrangements for any business, or functions relating to any business of the company or the licensed financial institution or licensed financial holding company to be carried on by any person other than the company, the licensed financial institution or licensed financial holding company; and

(g) such other matters as the Central Bank may determine.

**Requirement for fit and proper policy.**

**100.** All licensed financial institutions shall have a fit and proper policy in accordance with this Act, or prudential standards issued by the Central Bank and shall apply such fit and proper policy in assessing directors and officers.

**Notification to Central Bank of appointment of officers and directors.**

**101.** (1) A licensed financial institution or licensed financial holding company shall give written notice to the Central Bank of the appointment or election of a director or officer within thirty days of the election or appointment of the director or officer.

(2) (a) Where the Central Bank receives a notice under subsection (1) and is not satisfied that a director or officer is a fit and proper person in accordance with the criteria in section 97, it shall direct the removal of the director or officer.

(b) The Central Bank may notify in writing the person whose removal is required with a copy of the direction.

**Responsibility of board for corporate governance.**

**102.** (1) The board of a licensed financial institution or a licensed financial holding company shall establish policies over the entire operations of the licensed financial institution and the licensed financial holding company, including without limitation—

(a) adequate policies and procedures for risk management;

(b) corporate governance;

(c) internal controls;

(d) internal audit and compliance;

(e) external audit; and

(f) executive compensation.

(2) The board of a licensed financial institution or a licensed financial holding company shall ensure that the risk management policies and procedures under paragraph (a) of subsection (1) include appropriate risk strategies and risk management frameworks to address the following risks—

    (a) credit;

    (b) country and transfer;

    (c) market;

    (d) interest rate risk in the banking book;

    (e) legal and reputational risk; and

    (f) operational risks on a bank-wide basis.

(3) Where the board of a licensed financial institution or licensed financial holding company fails to comply with this section, the Central Bank may take any action against the licensed financial institution or licensed financial holding company and the directors under sections 75 to 78.

**Removal and disqualification of director or officer.**

**103.** (1) Any person who is a director or officer of a licensed financial institution or licensed financial holding company shall cease to hold office—

    (a) upon notification by the board of a finding by two-thirds of its members—

        (i) of that person's permanent incapacity or serious neglect of, or misconduct in, office; or

        (ii) that the person is not a fit and proper person in accordance with this Act or prudential standards issued by the Central Bank;

    (b) if that person—

        (i) is or was convicted of an offence under this Act;

        (ii) has been declared bankrupt or is compounding with, or suspending payment to, the person's creditors; or

        (iii) has been convicted in a court of law of any offence involving fraud, dishonesty, or violence.

(2) Any person who—

    (a) has been sentenced for an offence involving a term of imprisonment exceeding six months or in default of the payment of a fine;

    (b) has been a director or officer of a company which has been wound-up by a court or has been placed in receivership; or

    (c) has been a director or officer of, or directly or indirectly concerned in the management of a former licensed financial institution, the licence of which has been revoked, unless such revocation was due to—

        (i) its amalgamation with another licensed financial institution or licensed financial holding company or other company; or

        (ii) its voluntary winding up,

shall not without the prior approval of the Central Bank act or continue to act as a director or officer of, or be directly or indirectly concerned in any way in the

management of any licensed financial institution or licensed financial holding company.

(3) A licensed financial institution or licensed financial holding company shall within fifteen days of becoming aware that any of its directors or officers is ineligible to hold the office, cause the removal of the ineligible director or officer and notify the Central Bank accordingly.

(4) Where the Central Bank is satisfied that any of the directors or officers of a licensed financial institution or licensed financial holding company who is ineligible under subsection (1), continues to hold office, the Central Bank may—

(a) direct the licensed financial institution or licensed financial holding company in writing to remove the person from the office within the period specified in the direction; and

(b) notify in writing the person whose removal is required with a copy of the direction.

**Right to make representation.**

**104.** A licensed financial institution or licensed financial holding company to which a direction is given and a person who is served a copy of it under subsection (2) of section 101 or subsection (4) of section 103 may, within the period of fourteen days commencing from the day after which the direction is given, make written representations to the Central Bank and the Central Bank shall take the representations into account in deciding whether to confirm the direction.

**Notice of confirmed removal.**

**105.** Where the Central Bank decides to confirm the direction it shall serve written notice of the confirmation on the licensed financial institution or licensed financial holding company and the person whose removal is required.

**Person to be removed from office.**

**106.** The licensed financial institution or licensed financial holding company shall within the period specified in the direction, remove the person identified from the office and notify the person in writing of his removal from office and shall take any other steps as are necessary to inform the shareholders of the licensed financial institution or licensed financial holding company and the Registrar of Companies of the removal.

**Effective date of removal.**

**107.** The removal of the director or officer in accordance with the directions given under subsection (2) of section 101 or subsection (4) of section 103 shall take effect from the date of receipt by the director or officer of the notification of removal given by the Central Bank or any later date specified in the notice notwithstanding the provisions of any other law or the constituent documents of the licensed financial institution or licensed financial holding company.

**Failure to comply with a direction.**

**108.** If a licensed financial institution or licensed financial holding company fails to comply with a direction under subsection (2) of section 101 or subsection (4) of section 103 the Central Bank may take any action against the licensed financial

institution or licensed financial holding company and the director or officer under sections 75 to 78.

**Failure to comply with section 103.**

**109.**    A person who contravenes section 103 commits an offence and is liable on summary conviction to a fine not exceeding ten thousand dollars or to imprisonment for a term not exceeding one year or to both such fine and imprisonment and in the case of a continuing offence to a further penalty of five hundred dollars for each day on which the offence is continued after conviction.

**Declaration and registration of related interest and conflict of interest by director.**

**110.**    (1) Every director of a licensed financial institution or licensed financial holding company who is in any manner, directly or indirectly interested in loans, advances, contracts or transactions from the licensed financial institution or licensed financial holding company shall as soon as possible declare the nature of his interest to the board or other body responsible for the management of the licensed financial institution or licensed financial holding company and shall cause the declaration to be circulated immediately to all of the members of the board.

(2) For the purpose of subsection (1) a declaration by a director of a licensed financial institution or licensed financial holding company to the effect that the director is to be regarded as interested in any loan, advance, contract or other transaction, which may, after the date of the notice, be made by the licensed financial institution or licensed financial holding company shall be deemed to be a sufficient declaration of interest in relation to any loan, advance, contract or other transaction so made if—

(a)  it specifies the nature and extent of the interest of the director; and

(b)  the interest of the director is not different in nature from, or greater in extent than, the nature and extent so specified in the notice at the time any advance is made.

(3) Every director of a licensed financial institution or licensed financial holding company who holds any office or possesses any property where directly or indirectly, duties or interests might be created in conflict with his duties or interests as a director in the Currency Union shall declare the fact, nature, character and extent of the conflict at the first meeting of the board held—

(a)  after assuming office as a director of the licensed financial institution or licensed financial holding company; or

(b)  if already a director, after the date of commencement in office or possession of the property.

(4) Every director of a licensed financial institution or licensed financial holding company who qualifies as an interested director under the provisions of this section shall cause to be brought up and read any declaration made under subsections (1) or (3) at the next meeting of the board after it is given, and shall cause to be recorded any declaration made under this section in the minutes of the meeting at which it was made or at which it was brought up or read.

(5) A director who contravenes subsection (1) or subsection (3) commits an offence and is liable on summary conviction to a fine not exceeding ten thousand dollars or to imprisonment for a term not exceeding one year or to both such fine and imprisonment.

**Responsibility for deceiving statements and obstruction of audit or authorised examination.**

**111.**    Any director, officer, secretary, employee or agent of a licensed financial institution or licensed financial holding company who—

> (a)  with intent to deceive—
>
>> (i)  makes any false or misleading statement or entry;
>>
>> (ii)  omits any statement or entry that should be made in any book, account, report or statement of the licensed financial institution or licensed financial holding company; or
>
> (b)  obstructs or endeavours to obstruct—
>
>> (i)  the proper performance by an auditor of his duties in accordance with the provisions of this Act; or
>>
>> (ii)  a lawful examination of the licensed financial institution or licensed financial holding company by a duly authorised examiner appointed by the Central Bank,

commits an offence and is liable on summary conviction to a fine not exceeding fifteen thousand dollars or to imprisonment for a term not exceeding two years or to both such fine and imprisonment.

**Management's duty of compliance with the requirements of the laws.**

**112.**    Any director, officer, secretary or other officer concerned in the management of a licensed financial institution or licensed financial holding company who—

> (a)  fails to take all reasonable steps to secure compliance by the licensed financial institution or the licensed financial holding company with the requirements of this Act; or
>
> (b)  is implicated in an offence committed under section 93,

commits an offence and is liable on summary conviction to a fine not exceeding fifteen thousand dollars or to imprisonment for a term not exceeding two years or to both such fine and imprisonment, unless a different penalty is specified by another section of this Act.

**Liability of directors, officers and partners.**

**113.**    (1) Where an offence under this Act has been committed by a body of persons which is—

> (a)  a body corporate, society or other body of persons, every person who at the time of the commission of the offence was a director, secretary or other officer of the body corporate, society or other body of persons as well as that body corporate, society or other body of persons commits the offence;
>
> (b)  a partnership or firm, every partner of the partnership or firm as well as that partnership or firm commits the offence,

and shall be liable to be prosecuted.

(2) No person referred to in subsection (1) shall be found guilty of an offence where he proves, that—

    (a) the act constituting the offence took place without his knowledge or consent; or

    (b) he exercised all due diligence to prevent the commission of the offence.


## PART IX

### OFFICIAL ADMINISTRATION

**Grounds for appointing an official administrator.**

**114.** (1) The Central Bank may appoint an official administrator for a licensed financial institution or licensed financial holding company where—

    (a) the Central Bank determines that the licensed financial institution or licensed financial holding company has—

        (i) violated any provision of this Act or Regulations made under this Act or prudential standards issued by the Central Bank; or

        (ii) engaged in any unsafe and unsound practices, in such a manner as to weaken the licensed financial institution's or licensed financial holding company's condition, threaten depositors' interests, or dissipate the licensed financial institution's or licensed financial holding company's assets;

    (b) the licensed financial institution's or licensed financial holding company regulatory capital level falls below the minimum regulatory capital required pursuant to section 44 and related prudential standards issued by the Central Bank;

    (c) the Central Bank has reasonable cause to believe that the licensed financial institution or the licensed financial holding company or its directors, officers, or significant shareholders has engaged or is engaging in illegal activities in a manner as to jeopardize depositors' interests;

    (d) the Central Bank determines that the licensed financial institution or licensed financial holding company is in an unsafe or unsound condition to transact business and the licensed financial institution or licensed financial holding company or its directors or officers are unable to promptly improve such condition;

    (e) the licensed financial institution or the licensed financial holding company fails in any manner to cooperate with the Central Bank or its examiners to enable the Central Bank to perform its supervisory responsibilities, including through concealment or failure to submit for inspection any of the licensed financial institution's or licensed financial holding company's books, papers or records;

    (f) the licensed financial institution or licensed financial holding company fails in any manner to cooperate with its external auditors;

    (g) the licensed financial institution or licensed financial holding company or its directors, officers, employees, or significant shareholders

wilfully violate or fail to comply with an order or direction of the Central Bank under sections 75 to 87; or

(h) the licensed financial institution or licensed financial holding company, by resolution of its directors or shareholders, requests the appointment of an official administrator.

**Notice of appointment of official administrator.**

**115.** A licensed financial institution or a licensed financial holding company shall be promptly notified of the appointment of an official administrator and the notification shall specify the grounds for the appointment.

**Effective date of appointment.**

**116.** The appointment of an official administrator shall be effective from the time specified by the Central Bank.

**Persons qualified to be official administrator.**

**117.** The official administrator may be a person from the private sector or an official of the Central Bank who meets the qualifications determined by the Central Bank.

**Period of appointment.**

**118.** (1) An official administrator may be appointed for a period not exceeding twelve months.

(2) An official administrator may be appointed for a further period not exceeding twelve months if it appears to the Central Bank that additional time is required to ensure an orderly restructuring of the licensed financial institution or licensed financial holding company under this Act.

**Replacement and removal of official administrator.**

**119.** (1) The official administrator may at any time be replaced by the Central Bank.

(2) The official administrator may be removed prior to the end of the period specified.

**Official administrator to be fit and proper.**

**120.** An official administrator shall be subject to the fit and proper provisions of this Act and any prudential standards issued by the Central Bank.

**Declaration of conflict of interest.**

**121.** Section 110 shall apply to an official administrator except that any obligation to report to the board shall represent an obligation to report to the Central Bank, and any decision to be made by the board of a licensed financial institution or licensed financial holding company shall refer to a decision of the Central Bank.

**Transactions to be approved by Central Bank.**

**122.** Any transaction involving the licensed financial institution or licensed financial holding company in official administration in which the official

administrator has a material interest or relationship in the matter may be engaged in only with the prior approval of the Central Bank.

### Failure of official administrator to disclose interest.

**123.**   If an official administrator fails to disclose an interest or relationship as required, the contract may be set aside and the Central Bank shall remove the official administrator.

### General powers of the official administrator.

**124.**   (1) Upon the appointment of an official administrator, all powers, functions and responsibilities of the licensed financial institution's or licensed financial holding company's shareholders, directors, and officers shall vest in the official administrator, except where the official administrator requests the shareholders or directors or officers to carry out any activity provided under this Act.

(2) The official administrator shall have full and exclusive powers to manage and operate the licensed financial institution or licensed financial holding company, including taking any action—

(a) necessary or appropriate to carry on the business of the licensed financial institution or licensed financial holding company in accordance with this Act, Regulations made under section 183, Orders or prudential standards issued by the Central Bank;

(b) to preserve and safeguard its assets and property; or

(c) to implement a plan of action with respect to the licensed financial institution or licensed financial holding company approved by the Central Bank.

(3) The official administrator may, with the approval of the Central Bank, and notwithstanding any other law or the constituent documents of the licensed financial institution or licensed financial holding company—

(a) remove any or all directors and officers, and appoint their replacements subject to the criteria in section 97;

(b) issue shares, or rights to acquire shares, in the licensed financial institution or licensed financial holding company;

(c) cancel shares, or rights to acquire shares, in the licensed financial institution or licensed financial holding company;

(d) reduce the share capital by cancelling any paid-up share capital that is not represented by available assets; or

(e) sell shares, or rights to acquire shares, in the licensed financial institution or licensed financial holding company.

(4) The official administrator may employ, at the expense of the licensed financial institution or licensed financial holding company in official administration—

(a) legal counsel;

(b) accountants;

(c) valuators;

(d) appraisers;

(e) and other independent professionals or consultants,

to assist the official administrator, on terms the Central Bank shall approve.

### Central Bank oversight of official administration.

**125.** (1) In the exercise of his powers under this Part, the official administrator shall act in accordance with Regulations made pursuant to section 183, directions and prudential standards issued by the Central Bank, at any given time in the course of the official administration, and shall be accountable only to the Central Bank for the performance of his duties and the exercise of his powers as official administrator.

(2) The official administrator may delegate any of his powers or duties to other persons, in accordance with the instructions issued by the Central Bank.

### Suspension of dividends.

**126.** The official administrator shall immediately suspend the payment of capital distributions in general and payment of any kind to directors, officers, and significant shareholders however base compensation may be paid to directors or officers for services rendered in their capacity as directors or officers of the licensed financial institution or licensed financial holding company.

### Moratorium and effect of official administration on proceedings.

**127.** (1) The Central Bank may impose a moratorium suspending some or all payments by a licensed financial institution or licensed financial holding company in official administration, except payments to central clearing counterparties and to payment, settlement and clearing systems.

(2) On and during the appointment of an official administrator, no creditor, shareholder, depositor or any other person shall have any remedy against the licensed financial institution or licensed financial holding company in respect of any claim.

(3) Without prejudice to die generality of subsection (2), no creditor, shareholder, depositor or any other person shall—

(a) commence or continue any action, execution or other proceedings; or

(b) seek to enforce in any way any judgment or order obtained against the licensed financial institution or licensed financial holding company or its successor or the transferee of the whole or any part of any property, assets or undertaking of the licensed financial institution or licensed financial holding company for the recovery of any claim or in respect of any other liability,

until the termination of official administration in relation to the licensed financial institution or licensed financial holding company or without the prior leave of the court, unless the court directs otherwise.

(4) Where official administration has not yet been terminated, the Central Bank may, where it is of the opinion that it is no longer necessary to impose a stay, publish in the *Gazette* and in such newspapers as it thinks appropriate in the member countries or territories where it has assumed control of the licensed financial institution or licensed financial holding company, a notification to lift the stay imposed under this section.

(5) Where a stay has been lifted under subsection (4), no person shall take any steps to institute winding up, receivership, administration or any other related proceedings in relation to that licensed financial institution or licensed financial

holding company without the prior leave of the court unless the court directs otherwise.

(6) No creditor, shareholder, depositor or any other person shall—

(a) commence or continue any claim, action, execution or other proceedings; or

(b) seek to enforce in any way any judgment or order obtained against the official administrator,

in respect of any act, commission, claim, fact or matter connected with or arising out of the acts or omissions of the official administrator in respect of the licensed financial institution or licensed financial holding company, until the termination of official administration in relation to the licensed financial institution or licensed financial holding company without the prior leave of the court unless the court directs otherwise.

(7) No provision of a security agreement, lease or licence between the licensed financial institution or licensed financial holding company and a secured or other creditor that provides, in substance, that on—

(a) the winding up of the licensed financial institution or licensed financial holding company or any related entity or any insolvency restructuring or reorganization proceedings being commenced, continued or ordered in respect of the licensed financial institution or licensed financial holding company or any related entity; or

(b) the default by the licensed financial institution or licensed financial holding company of an obligation under the security agreement, lease or licence,

the licensed financial institution or licensed financial holding company ceases to have such rights to use or deal with assets secured or dealt with under the agreement, lease or licence as the licensed financial institution or licensed financial holding company would otherwise have, or is given lesser rights or priorities in respect of any assets or property as the licensed financial institution or licensed financial holding company would otherwise have, shall have any force or effect, until the termination of official administration in relation to the licensed financial institution or licensed financial holding company or without the prior leave of the court, unless the court directs otherwise.

(8) No provision in any contract or agreement or any other document which gives any party a right to acquire any property or assets of the licensed financial institution or licensed financial holding company on the grounds of any change of control or on any analogous ground or on the grounds of insolvency shall have any effect, until the termination of official administration in relation to the licensed financial institution or licensed financial holding company or without the prior leave of the court unless the court directs otherwise.

(9) For the purposes of this section—

(a) the rights, property and assets referred to in this provision are taken to be the rights, property and assets where ever located; and

(b) the agreement, lease or licence referred to in this provision are taken to be an agreement, lease or licence governed by any law.

(10) A stay pursuant to subsection (2) shall only operate as a temporary stay of a claim, against the licensed financial institution or licensed financial holding

company and shall not have or be taken to have the effect of extinguishing such a claim.

(11) Where a claim is stayed pursuant to this section, for the purposes of the computation of time limits under any applicable law on limitation of actions, the period of time commencing with the date of appointment of the official administrator and ending with the date of termination of appointment of the official administrator shall be excluded.

(12) For the purposes of this section, "claim" means any claim whatsoever, including claims which are secured or unsecured, present or future, actual, prospective or contingent, or arising out of contract, tort, bailment, restitution, breach of trust or any other cause of action and whether or not made by a creditor, shareholder, depositor or any other person.

**Suspension of contractual early termination rights.**

**128.**    No right or obligation of a third party under any contract to which the licensed financial institution or licensed financial holding company in official administration is a party, may be terminated, accelerated, or modified solely because of the appointment of the official administrator or any action taken by the official administrator.

**Taking control of the licensed financial institution.**

**129.**    (1) Immediately upon appointment, the official administrator shall secure the properties, offices, assets, books and records of the licensed financial institution or licensed financial holding company, and may take all necessary or appropriate steps aimed at such purpose, including without limitation—

(a) cancelling authorisations of persons to engage the financial responsibility of the licensed financial institution or licensed financial holding company and issuing new authorisations, as appropriate, and notifying third parties;

(b) informing correspondent financial institutions, registrars and transfer agents of securities, and external asset managers of the licensed financial institution's or licensed financial holding company's assets that persons who previously had authorization to give instructions on behalf of the licensed financial institution or licensed financial holding company with respect to dealing in the licensed financial institution's or licensed financial holding company's assets or assets held in trust by the licensed financial institution or licensed financial holding company are no longer so authorised and that only the official administrator, and persons authorised by the official administrator have such authority.

(2) In the course of the official administration, the official administrator shall have unrestricted access to, and control over, the properties, offices, assets and the books of account and other records of the licensed financial institution or licensed financial holding company.

(3) The official administrator may request the assistance of law enforcement officials, who shall, if necessary, use force to assist the official administrator to gain access to any premises of the licensed financial institution or licensed financial holding company, to gain control over and to secure such properties, offices, assets, books and records of the licensed financial institution or licensed financial, holding company.

(4) The licensed financial institution or licensed financial holding company, its affiliated institutions and their directors, officers and agents other than its auditors shall give every assistance to the official administrator including the supply of information or explanation in any form as may be required, the production of books, documents, minutes, cash, securities and vouchers, and generally the provision of all necessary facilities required for the performance of any function of the official administrator save that in the case of its auditors they shall only be required to supply any information which is in their possession or knowledge other than their internally generated working papers.

(5) A person who does not comply with subsection (4) or otherwise obstructs the Central Bank or an official administrator in the performance of functions under this section commits an offence and is liable on summary conviction to a fine of fifteen thousand dollars or to a term of imprisonment not exceeding two years.

### Inventory and plan of action to resolve the licensed financial institution or licensed financial holding company.

**130.**   (1) Not later than thirty days after the appointment, the official administrator shall prepare and deliver to the Central Bank an inventory of the licensed financial institution's or licensed financial holding company's assets and liabilities.

(2) The official administrator in his report shall classify the assets in accordance with applicable asset classification criteria.

(3) Not later than ninety days after the appointment, the official administrator shall prepare and deliver to the Central Bank a report on the financial condition and future prospects of the licensed financial institution or licensed financial holding company.

(4) The official administrator shall include in the report an assessment of the amount of assets likely to be realized in a liquidation of the licensed financial institution or licensed financial holding company.

(5) In the report referred to under subsection (3), the official administrator shall propose a plan of action which, as appropriate, may recommend—

   (a) returning the licensed financial institution or licensed financial holding company to compliance with the provisions of this Act by carrying out a plan of corrective actions that may include a capital increase;

   (b) compulsory liquidation of the licensed financial institution or licensed financial holding company if there is no reasonable prospect for the return of the licensed financial institution or licensed financial holding company to financial soundness through reorganization or otherwise; or

   (c) any other course of action designed to resolve the licensed financial institution or licensed financial holding company in a manner that minimizes disruption to depositors and preserves the stability of the financial system.

(6) The official administrator shall promptly provide any additional report or information requested by the Central Bank.

(7) The Central Bank may—

   (a) approve the report or additional report mentioned in subsection (3) or (6) without modification;

(b) approve the report or additional report mentioned in subsection (3) or (6) subject to such conditions as it considers necessary; or

(c) refuse to approve the report.

(8) On the basis of the report and with the approval of the Central Bank, the official administrator shall implement the plan of action.

(9) In carrying out any resolution pursuant to this Part, the Central Bank shall take into account the order of priorities of claims that would be applicable in liquidation, as set out in section 153 and ensure that similarly situated creditors are treated in a similar manner.

(10) The Central Bank may take any action otherwise authorised by this Part that does not comply with subsection (9) if it determines that the category of claims that are benefited by an action are of strategic importance to the economy or that the action is necessary to contain potential systemic impact in connection with the resolution of the licensed financial institution or to maximise the value for the benefit of all creditors as a whole.

(11) The official administrator and the Central Bank shall have no liability to depositors, creditors, and shareholders of the licensed financial institution or licensed financial holding company as a result of actions taken in accordance with this Part, except to the extent that the amount received by a depositor, creditor, or shareholder as a result of the completion of the plan of action is less than the amount that would have been received if the licensed financial institution or licensed financial holding company had been liquidated and wound up under Part X.

(12) In assessing any liability under subsection (11), actual or potential financial assistance provided by the Central Bank or any Participating Government to the licensed financial institution or licensed financial holding company, disregarding ordinary assistance offered by the Central Bank on its usual terms, or to a third party to facilitate the resolution must be disregarded.

**Capital increase by existing shareholders.**

**131.** (1) On the basis of the report under section 130 and with the approval of the Central Bank the official administrator may take the following actions to increase the licensed financial institution's or licensed financial holding company's capital through the issuance of new shares—

(a) determine the extent of losses and prepare the licensed financial institution's or licensed financial holding company's balance sheet covering the amount of such losses through the licensed financial institution's or licensed financial holding company's profits, reserves and. if necessary, capital; and

(b) notify existing shareholders of the amount of additional capital needed to bring the licensed financial institution's or licensed financial holding company capital into compliance with all capital requirements and allow the shareholders to subscribe and purchase additional shares, by submitting binding commitments equal to the full amount of additional capital needed within three business days of such notification.

(2) Existing shareholders of a licensed financial institution or licensed financial holding company in official administration shall have no pre-emptive or other rights to purchase additional shares issued except as provided in this section.

**Recapitalisation by new shareholders.**

**132.**    (1) On the basis of the report produced under section 130 and with the approval of the Central Bank, the official administrator may take the following actions to increase the licensed financial institution's or licensed financial holding company's capital through the issuance of shares to new shareholders in the following circumstances—

(a)  in the event that binding commitments are not submitted in an amount equal to the full amount of additional capital needed by existing shareholders; or

(b)  without offering shares to existing shareholders, where the Central Bank determines that—

(i)  an expedited resolution of the licensed financial institution or licensed financial holding company to maintain financial stability is necessary;

(ii)  the existing shareholders are no longer fit and proper to maintain a significant capital position in the licensed financial institution or licensed financial holding company; or

(iii)  there has been a failure to comply with a remedial measure under this Act requiring an increase in the capital of the licensed financial institution or licensed financial holding company.

(2) To carry out a recapitalisation by new shareholders, the official administrator shall—

(a)  if not already carried out in accordance with section 130, determine the extent of losses and prepare the licensed financial institution's or licensed financial holding company's balance sheet covering the amount of losses through the licensed financial institution's or licensed financial holding company's profits, reserves and, if necessary, capital;

(b)  if necessary to reflect losses, reduce the par value of outstanding shares, notwithstanding any other provision of law;

(c)  determine the amount and type of funding needed to bring the licensed financial institution or licensed financial holding company into compliance with all capital requirements;

(d)  cause the licensed financial institution or licensed financial holding company to issue additional shares in the amount necessary and carry out the sale of shares by the licensed financial institution or licensed financial holding company and purchase of such shares by new investors.

(3) Any new significant shareholders may acquire interests pursuant to this provision only if the Central Bank is satisfied that they are fit and proper.

**Mergers, sales and other restructurings.**

**133.**    (1) On the basis of the report produced under section 130 and with the approval of the Central Bank, the official administrator may carry out a merger of the licensed financial institution or licensed financial holding company or a transfer, in whole or in part, of the licensed financial institution's or licensed financial holding company's assets and liabilities, without obtaining any approval, assignment, or consent with respect to such transfer or assumption.

(2) A transfer of the licensed financial institution's assets and liabilities may include a transfer to a bridge financial institution or an asset management vehicle established by one or more Participating Governments for the purpose of resolving the licensed financial institution.

(3) The transferee may be required to continue operating at the premises of the transferor for a specified period of time, including safe deposit box and safekeeping activities.

(4) The transferee of assets of the licensed financial institution or licensed financial holding company shall have no liability to depositors, creditors, or shareholders of the licensed financial institution or licensed financial holding company except to the extent liabilities are explicitly assumed.

(5) In accordance with the instructions given by the Central Bank, the official administrator may approve a restructuring of the licensed financial institution's or licensed financial holding company's liabilities through arrangements with the creditors, including a reduction, modification, rescheduling and novation of their claims.

(6) In carrying out a transfer of assets and liabilities, where a depositor whose deposit is to be transferred owes the licensed financial institution an amount for a matured or past-due loans, that amount may be set-off against the deposit amount in accordance with prudential standards issued by the Central Bank.

**Mandatory restructuring of liabilities.**

**134.**   (1) On the basis of the report produced under section 130 and with the approval of the Central Bank, the official administrator may restructure the liabilities of the licensed financial institution or licensed financial holding company in accordance with this section without the approval of depositors, creditors or shareholders.

(2) The Central Bank may approve mandatory restructuring of liabilities if the Central Bank determines that the restructuring, either alone or combined with recapitalisation or other resolution measures, will restore the licensed financial institution or licensed financial holding company to viability.

(3) The official administrator shall not apply mandatory restructuring to secured debt.

(4) The official administrator may restructure liabilities directly or may convert the liabilities to shares.

(5) In the exercise of his powers under this section the official administrator shall act in accordance with Regulations made pursuant to section 183 and prudential standards issued by the Central Bank.

**Misconduct by shareholders, directors, officers or others.**

**135.**   If the official administrator has reasonable cause to believe that significant shareholders, directors, officers, attorneys, accountants or other professionals have engaged or are engaging in illegal activities punishable by imprisonment or in fraudulent activities, it shall immediately notify—

(a) the Central Bank and shall pursue civil actions seeking damages and restitution; and

(b) the authorities responsible for investigating and prosecuting the activities.

**Expenses of the official administration.**

**136.** (1) The official administrator shall receive a remuneration determined by the Central Bank.

(2) All costs and expenses incurred on account of the official administration shall be borne by and charged to the licensed financial institution or licensed financial holding company subject to any proceedings.

**Termination of official administration.**

**137.** (1) The official administration shall terminate at the expiry of the term specified in the decision appointing the official administrator or any extension of the term of appointment by the Central Bank.

(2) An official administration may be terminated prior to the expiry of the term identified in subsection (I) if the Central Bank determines that—

    (a) official administration is no longer necessary because the grounds for appointment of the official administrator have been remedied; or

    (b) the licensed financial institution or licensed financial holding company cannot be rehabilitated and the Central Bank issues a decision to revoke the licensed financial institution's or licensed financial holding company's license under section 14 and to commence liquidation proceedings under Part X.

(3) In the case of a termination of official administration that does not involve a closure of the licensed financial institution or licensed financial holding company the official administrator shall carry out the duties of the licensed financial institution's or licensed financial holding company's directors and officers, until nomination or election of new directors and appointment of officers, at which time all powers of control over the affairs of the licensed financial institution or licensed financial holding company and its properties, offices, assets, books and records that were vested in the official administrator shall vest in the licensed financial institution or licensed financial holding company.

(4) The decision of the Central Bank to terminate an official administration shall be accompanied by a recommendation by the official administrator and a detailed report prepared by the official administrator supporting the recommendation.

(5) Within thirty days of the termination of the appointment, the official administrator shall prepare and submit to the Central Bank a final report and accounting of the official administration.

## PART X

### RECEIVERSHIP AND COMPULSORY LIQUIDATION

**Grounds of receivership.**

**138.** (1) The Central Bank may appoint a receiver for a licensed financial institution or licensed financial holding company where—

    (a) it is insolvent;

    (b) it is not viable;

    (c) its capital is impaired or its condition is otherwise unsound;

(d) it has experienced substantial dissipation of assets or earnings due to any of the grounds for action by the Central Bank under subsection (1) of section 75;

(e) it or its directors, officers, employees, or significant shareholders wilfully violate or fail to comply with an order or direction of the Central Bank under sections 75 to 87;

(f) its business is being conducted in an unlawful or imprudent manner;

(g) the continuation of its activities is detrimental to the interests of its depositors;

(h) it conceals or refuses to submit any of its records or its operations for examination as provided for in section 74, or has otherwise obstructed such examination;

(i) its licence has been revoked in accordance with section 14 or section 76;

(j) official administration is terminated pursuant to paragraph (b) of subsection (2) of section 137; or

(k) it is carrying on banking business without a licence.

(2) A receiver appointed under this Part shall liquidate the licensed financial institution or licensed financial holding company for which it has been appointed receiver and wind up its affairs in an orderly manner that minimizes any risk to financial stability, minimizes disruption to depositors, and, consistent with the preceding goals, maximizes the value of the assets of the licensed financial institution or licensed financial holding company.

(3) For purposes of this section, "insolvent" means the licensed financial institution or licensed financial holding company is not paying or is unable to pay its obligations as they fall due or the value of its liabilities exceeds the value of its assets.

(4) The value of a licensed financial institution's or licensed financial holding company's assets, liabilities and capital shall be determined in accordance with valuation standards and procedures issued by the Central Bank.

**Qualifications and compensation for receiver.**

**139.** (1) A receiver may be—

(a) a person from the private sector or an official of the Central Bank who meets the qualifications determined by the Central Bank; or

(b) any institution established by Participating Governments whose mandate includes that of receivership.

(2) The Central Bank may dismiss a receiver and replace the receiver with another qualified person.

(3) The terms of the receiver's compensation shall be set by the Central Bank.

(4) The Central Bank may on a current basis pay—

(a) compensation to the receiver;

(b) compensation to the experts engaged by the receiver;

(c) reimbursement to both the receiver and the experts for their expenses.

(5) Any amounts paid by the Central Bank under this section and any remaining costs of the receivership at the end of the term of receivership shall be paid from the proceeds of the sales of the licensed financial institution's or licensed financial holding company assets with the priority described in section 153.

**Commencement and notice of receivership.**

**140.** (1) The Central Bank shall provide immediate notice regarding the appointment of a receiver and revocation of licence to the chairman of the board of directors of a licensed financial institution or licensed financial holding company.

(2) The appointment of a receiver of a licensed financial institution or licensed financial holding company shall be effective from the date of issuance of the notice, unless the notice states otherwise.

(3) The receiver shall, immediately post in each office of the licensed financial institution or licensed financial holding company and publish in the *Gazette* and at least one local newspaper a notice announcing the revocation of the licence and appointment by the Central Bank, specifying the effective date and time and the procedures and time frame for depositors and other creditors and stakeholders to present their claims against the licensed financial institution or licensed financial holding company to the receiver.

(4) The notice shall also specify that—

   (a) authorisations of persons to engage the financial responsibility of the licensed financial institution or licensed financial holding company have been cancelled;

   (b) persons who previously had authorisation to give instructions on behalf of the licensed financial institution or licensed financial holding company with respect to payment or transfer of the licensed financial institution's or licensed financial holding company's assets or assets managed by the licensed financial institution or licensed financial holding company are no longer so authorised; and

   (c) the licensed financial institution or licensed financial holding company licence has been revoked.

(5) The receiver shall mail a notice to any depositor or other creditor shown on the books of the licensed financial institution or licensed financial holding company at the address as shown on the books or, if not shown, upon discovery of the name and address.

**Central Bank oversight of receiver.**

**141.** (1) The receiver shall act in accordance with Regulations made pursuant to section 183, directions, and prudential standards issued by the Central Bank at any time in the course of the liquidation, and shall be accountable only to the Central Bank for the performance of its duties and the exercise of its powers as receiver.

(2) The receiver shall report to the Central Bank at least once a month, or more frequently if the Central Bank so requires, on the progress of the receivership in a form determined by the Central Bank and provide any other information upon the request of the Central Bank.

**General powers of receiver.**

**142.**    (1) Upon appointment the receiver shall become the sole legal representative of the licensed financial institution or licensed financial holding company, and shall succeed to all the rights, titles, powers and privileges of the licensed financial institution or licensed financial holding company and its shareholders, directors and officers.

(2) Notwithstanding subsection (1), shareholders, directors and officers may be instructed by the receiver to exercise specified functions for the licensed financial institution or licensed financial holding company.

(3) The receiver may—

(a) hold title to the books, records, and assets of the licensed financial institution or licensed financial holding company;

(b) manage, operate and represent the licensed financial institution or licensed financial holding company with all of the powers of the shareholders, directors and officers;

(c) marshal assets and claims;

(d) transfer or dispose of assets and liabilities;

(e) take any other action necessary for the efficient liquidation of the licensed financial institution or licensed financial holding company;

(f) continue or discontinue any operation of the licensed financial institution or licensed financial holding company;

(g) borrow money on a secured or unsecured basis;

(h) hire any necessary staff, specialists, experts or professional consultants and terminate their employment;

(i) administer the licensed financial institution's or licensed financial holding company's accounts;

(j) collect the debts due to the licensed financial institution or licensed financial holding company and recover goods owed by third parties;

(k) execute any instrument in the name of the licensed financial institution or licensed financial holding company;

(1) initiate, defend and conduct in its name any action or proceeding to which the licensed financial institution or licensed financial holding company may be party.

(4) A receiver shall not take any deposits and shall make no loans except to extend funds for the protection of collateral assets where necessary.

(5) The receiver may, in its sole discretion, make partial or complete payment on proven claims at any time, and no liability shall attach to the receiver, by reason of any payment or for failure to pay dividends to a claimant whose claim is not proved at the time of any payment.

**Transfer of assets and liabilities.**

**143.**    (1) The receiver may transfer any asset, or liability of the licensed financial institution or licensed financial holding company without obtaining any approval, assignment, or consent with respect to the transfer or assumption.

(2) The receiver may, upon the prior written approval of the Central Bank and according to its directions, pursue the following activities—

    (a) dispose of part or all of a licensed financial institution's or licensed financial holding company's assets and liabilities through a purchase and assumption transaction with an acquiring licensed financial institution or licensed financial holding company; or

    (b) transfer part or all of a licensed financial institution's or licensed financial holding company's assets and liabilities to a bridge financial institution by one or more Participating Governments.

(3) The arrangements for a transfer of assets and liabilities shall provide for the removal of any director, secretary, officer or employee responsible for the circumstances which led to the appointment of a receiver for the licensed financial institution or licensed financial holding company.

**Effects of receivership.**

**144.** Upon and after appointment of a receiver—

    (a) any term, statutory, contractual or otherwise, on the expiration of which a claim or right of the licensed financial institution or licensed financial holding company would expire or be extinguished shall be extended by six months;

    (b) the calculation of interests and penalties against the licensed financial institution's or licensed financial holding company's obligations shall be suspended and no other charge or liability shall accrue on the obligations of the licensed financial institution or licensed financial holding company;

    (c) all legal proceedings against the licensed financial institution or licensed financial holding company are stayed and a third party shall not exercise any right against the licensed financial institution's or licensed financial holding company's assets without the prior leave of the court unless the court directs otherwise;

    (d) no depositor or other creditor may sell or take possession of any assets of the licensed financial institution or licensed financial holding company as a means of enforcing a claim or initiate or continue any legal proceeding to recover the debt or perfect security interests in the licensed financial institution's or licensed financial holding company's assets;

    (e) no attachment or lien, except a lien created by the receiver in the application of the provisions of this Part, shall attach to any of the property or assets of the licensed financial institution or licensed financial holding company;

    (f) No execution shall be returned against the assets of a licensed financial institution or licensed financial holding company for which a receiver has been appointed, except an execution effected pursuant to a judgment rendered prior to the date of the appointment of the receiver for an amount not exceeding one thousand dollars.

**Taking control of the licensed financial institution or licensed financial holding company.**

**145.**    (1) The receiver shall have unrestricted access to and control over the offices, books of account and other records, and assets of the licensed financial institution or licensed financial holding company and its subsidiaries.

(2) The receiver may request the assistance of police officers to gain access to the premises of the licensed financial institution or licensed financial holding company or control over the records of the licensed financial institution or licensed financial holding company.

(3) The receiver shall secure the property, offices, books, records, and assets of the licensed financial institution or licensed financial holding company to seek to prevent their dissipation by theft or other improper action.

(4) Any person who wilfully interferes with a receiver's access to or control over the offices, books of account and other records, and other assets of a licensed financial institution or licensed financial holding company commits an offence and is liable on summary conviction to a fine not exceeding fifteen thousand dollars or imprisonment for a period not exceeding one year.

**Repudiation of contracts.**

**146.**    (1) Within ninety days from the date of appointment, the receiver may repudiate any contract to the extent that the fulfilment of the contract is determined to be burdensome for the licensed financial institution or licensed financial holding company and the repudiation would promote the orderly administration of the licensed financial institution's or licensed financial holding company's affairs and protect depositors' interest.

(2) Any liability arising from the repudiation shall be determined as of the date of repudiation and shall be limited to actual direct damages incurred and shall not include any damage for lost profits or opportunity or non-monetary damages.

(3) In case of repudiation of a lease agreement of immovable and movable property, the receiver shall give the owner thirty days' notice.

(4) This section shall not apply to contracts entered into by an official administrator appointed in accordance with Part IX, except with the prior approval of the Central Bank.

**Avoidance of pre-receivership transfers.**

**147.**    (1) The receiver may set aside the following transactions affecting the assets of the licensed financial institution or licensed financial holding company and recover the assets from the transferee or other beneficiary of the transaction—

(a) gratuitous transfers to directors, officers, and significant shareholders of the licensed financial institution or licensed financial holding company or their relatives made within three years prior to the effective date of the receivership;

(b) transactions with related parties or affiliates conducted within three years prior to the effective date of the receivership, if detrimental to the interest of depositors and other creditors;

(c) gratuitous transfers to third parties made within three years prior to the effective date of the receivership;

(d) transactions in which the consideration given by the licensed financial institution or licensed financial holding company considerably exceeded the received consideration, made within three years prior to the effective date of the receivership;

(e) a transaction based on a forged or fraudulent document that the licensed financial institution or licensed financial holding company has executed to the detriment of creditors;

(f) any act done with the intention of all parties involved to withhold assets from a licensed financial institution's or licensed financial holding company's depositor and creditors, or otherwise impair their rights, within five years prior to the effective date of the receivership; and

(g) transfers of property of the licensed financial institution or licensed financial holding company to, or for the benefit of a depositor or creditor on account of a debt incurred within one year prior to the effective date of the receivership which has the effect of increasing the amount that the depositor or creditor would receive in a liquidation of the licensed financial institution or licensed financial holding company but payment of deposits in an amount equal to or less than one hundred thousand dollars per depositor shall not be subject to this provision;

(h) any attachment or security interest, except one existing six months prior to the effective date of the receivership.

(2) Any action to set aside a transfer under this section shall be taken by the receiver within one year following the effective date of the receivership.

(3) Notwithstanding subsections (1) and (2), the receiver may not set aside a payment or transfer by the licensed financial institution or licensed financial holding company if it was made in the ordinary course of business, or if it was part of a contemporaneous exchange for reasonably equivalent value, or to the extent that following the transfer the recipient extended new unsecured credit to the licensed financial institution or licensed financial holding company which had not been satisfied by the licensed financial institution or licensed financial holding company as of the effective date of the receivership.

(4) The receiver may recover property or the value of property transferred by the licensed financial institution or licensed financial holding company from a transferee of an initial transferee only if the second transferee did not give fair value for the property and knew or reasonably should have known that the initial transfer could be set aside under the provisions of this Act.

(5) The receiver may order that notice of an action to set aside a transfer be recorded in the public records for real estate ownership and any other rights in property and a person taking title to or acquiring any security interest or other interest in the property after the filing of a notice takes his title or interest subject to the rights of the receiver to recover the property.

(6) This section shall not apply to transfers to an asset management company established by the Participating Governments or transfers by the official administrator.

**Obligations of lessors of licensed financial institution or licensed financial holding company premises and utility providers.**

**148.**    A lessor of a licensed financial institution's or licensed financial holding company's premises or a utility company or other provider of utility services including, without limitation, a company that supplies electricity, water or telecommunication services (including internet), may not alter, refuse or discontinue the services to a licensed financial institution or licensed financial holding company because of its receivership or because the licensed financial institution or licensed financial holding company has failed to pay for the services prior to its receivership.

**Protection of payment, clearance, and settlement systems.**

**149.**    (1) Irrevocable money and securities transfer orders entered by a licensed financial institution or licensed financial holding company into a payment or securities settlement system recognized as such by the Central Bank shall be legally enforceable and binding on third parties, even upon a decision revoking the licence and appointing a receiver, but only if the transfer orders become irrevocable before the decision takes effect.

(2) Where a licensed financial institution or licensed financial holding company enters irrevocable money or securities transfer orders into a payment or securities settlement system after the decision revoking the licence and appointing a receiver takes effect and the transfer orders are carried out on the day of the decision, the transfer orders shall be legally enforceable and binding on third parties, unless the receiver proves that the system operator was aware of the decision before the transfer orders became irrevocable.

(3) No provision authorizing the setting aside of contracts and transactions entered into before the appointment of a receiver takes effect shall be applied in a way as to require the unwinding of netting by a payment or securities settlement system recognized by the Central Bank, but the preservation of the netting shall not prevent the ability of the receiver to recover assets directly from the transferee or beneficiary.

(4) For the purposes of subsections (1), (2) and (3)—

(a) a transfer order entered into a money or securities settlement system becomes irrevocable at the time defined by the rules of that system;

(b) "netting" means the conversion into one net claim or one net obligation of claims and obligations resulting from transfer orders which a participant or participants in a settlement system either issue to, or receive from, one or more other participants in that system with the result that only a net claim or a net obligation remains.

**Determination of claims.**

**150.**    (1) The procedures for determinations of the validity and priority of claims and for liquidation of assets and return of the licensed financial institution or licensed financial holding company customers' property shall be determined by the Central Bank.

(2) Any sale of the licensed financial institution or licensed financial holding company assets shall be accomplished in a transparent and reasonable manner.

(3) Any right of a creditor other than a depositor to set off a debt owed by the creditor to the licensed financial institution or licensed financial holding company against a claim of a creditor may be asserted if it would be enforceable under

applicable non-insolvency law, except to the extent that the claim of the creditor is disallowed or the set-off is based on a transaction that has been avoided under section 147.

(4) If a depositor owes the licensed financial institution an amount for a matured or past-due loan, that amount shall be set-off against the deposit amount owed by the licensed financial institution.

(5) If a depositor owes the licensed financial institution an amount for a loan and the loan is not matured or past-due, then, at the sole option of the depositor, the amount owed may be set-off against the deposit amount owed by the licensed financial institution.

**Authority to disallow claims.**

**151.** (1) The receiver may disallow any claim or portion of a claim against the licensed financial institution or licensed financial holding company, including a claim based on a security interest, preference, set-off, or priority which is not proved to the satisfaction of the receiver.

(2) In the case of a claim that is secured by any property or other asset of the licensed financial institution or licensed financial holding company, the portion of the claim which exceeds the fair market value of the property or assets shall be treated as an unsecured claim.

(3) This section shall not apply to an extension of credit from the Central Bank to the licensed financial institution.

**Claims relating to eligible financial contracts.**

**152.** (1) In determining the rights and obligations between the licensed financial institution or licensed financial holding company and its contractual counterparties, effect shall be given to the termination provisions of eligible financial contracts between them, except during the period of any temporary stay on the exercise of the right that the Central Bank may determine.

(2) The temporary stay of termination provisions shall be subject to any safeguard standards as the Central Bank shall issue to facilitate liquidation of the licensed financial institution or licensed financial holding company while at the same time minimizing disruption to the markets for eligible financial contracts.

(3) The net termination value determined in accordance with an eligible financial contract between them shall be a claim of the licensed financial institution or licensed financial holding company on the counterparty or shall be admitted after its validation as a claim of the counterparty on the licensed financial institution or licensed financial holding company.

(4) For the purposes of this section—

    (a) "eligible financial contracts" includes securities contracts, commodities contracts, swaps, repurchase agreements, and similar financial contracts, determined by the Central Bank, and may include a master agreement covering more than one type of contract; and

    (b) "net termination value" means the net amount obtained after setting off the mutual obligations between the parties to an eligible financial contract in accordance with its provisions.

**Priorities in payment of claims.**

**153.**    (1) In any liquidation of a licensed financial institution's or licensed financial holding company's assets, allowed secured claims shall be paid to the extent of the realization of the security or the security shall be delivered to the secured creditor.

(2) Other allowed claims shall be paid in relation to all other debts, in the order described below—

(a) necessary and reasonable expenses of official administration and the receivership, including those paid by the Central Bank in accordance with section 136;

(b) wages and salaries of employees of the licensed financial institution or licensed financial holding company in liquidation for the six-month period preceding the appointment of the receiver for the licensed financial institution or licensed financial holding company except for wages and salary earned by a director or officer;

(c) the net amount due to any depositor of the licensed financial institution up to two hundred thousand dollars, except to a depositor identified in paragraph (e);

(d) the net amount due to any depositor of the licensed financial institution in excess of the amount due under paragraph (c), if any, except to a depositor identified in paragraph (e);

(e) the net amount of deposits due to directors, officers and significant shareholders of the licensed financial institution;

(f) national insurance contributions for officers and employees due but not paid;

(g) taxes, rates and deposits owed to Saint Christopher and Nevis and local authorities concerned;

(h) unsecured credits extended to the licensed financial institution or licensed financial holding company prior to the appointment of the receiver;

(i) subordinated debt;

(j) fees and assessments due to the Central Bank.

(3) After payment of all other claims filed, with interest at a rate to be fixed by the Central Bank, any remaining claims which were not filed within the prescribed time shall be paid.

(4) After payment of all claims filed, any remaining allowable claims that were not filed within the time specified by rule for the filing shall be paid.

(5) Any proceeds remaining after all claims of depositors and other creditors have been paid shall be distributed among the shareholders of the licensed financial institution or licensed financial holding company in accordance with their rights.

(6) Notwithstanding subsection (2), the Central Bank may take actions that would treat similarly situated creditors differently, but only if the Central Bank determines that—

(a) the category of claims that are benefitted by the action are of strategic importance to the economy or the action is necessary to contain potential systemic impact or to maximise the value for the benefit of all creditors as a whole; and

(b) no creditor will receive less in the liquidation than it would have without the disparate treatment.

(7) For the purpose of determining the net amount due to any depositor under subsections (2)(c), (d) and (e), the Central Bank shall aggregate the amounts of all deposits in the licensed financial institution which are maintained by a depositor in the same capacity.

**Unclaimed funds.**

**154.** Unclaimed funds remaining after the final distribution made by the receiver which are not subject to other provisions of this Act shall be deposited by the receiver in the Central Bank for fifteen years, unless claimed by the owner before the expiration of that period, and on the expiration of that period the funds remaining unclaimed shall be presumed to be abandoned property for the purposes of section 167.

**Safe deposits and unclaimed property.**

**155.** (1) Any safe deposit box, the contents of which have not been withdrawn before a date specified by the receiver, shall be opened by the receiver and their contents inventoried and the contents and the inventory shall be deposited by the receiver in the Central Bank.

(2) Any unclaimed property held by the licensed financial institution or licensed financial holding company as bailee, together with inventories, shall be deposited by the receiver in the Central Bank.

(3) Any contents of a safe deposit box or unclaimed property deposited not claimed within a period of fifteen years following its deposit in the Central Bank shall be presumed to be abandoned property for the purposes of section 167.

**Termination of receivership and final reporting to the Central Bank.**

**156.** (1) Once the proceeds for the sale of assets of a licensed financial institution or licensed financial holding company have been distributed, the receiver shall provide a report to the Central Bank that includes a statement of income and expense and sources and uses of funds during the period of receivership.

(2) Upon approval by the Central Bank of the report, the receivership shall be terminated and the Central Bank shall notify the Registrar of Companies which shall proceed to terminate the legal existence of the licensed financial institution or licensed financial holding company as a company and the Central Bank and the receiver shall be relieved of any further responsibility in connection with the receivership of the licensed financial institution or licensed financial holding company.

(3) A receivership shall be terminated within five years of its initiation or as soon as is practicable.

**Receiver to notify Central Bank of fraudulent activities.**

**157.**   If the receiver has reasonable cause to believe that a licensed financial institution or licensed financial holding company or its shareholders, directors, officers, attorneys, accountants or other professionals have engaged or are engaging in fraudulent activities or other criminal activities, the receiver shall immediately notify—

> (a)   the Central Bank and shall pursue civil actions seeking damages and restitution; and
>
> (b)   the authorities responsible for investigating and prosecuting the activities.


# PART XI

## VOLUNTARY LIQUIDATION

**Voluntary liquidation.**

**158.**   A voluntary liquidation of a licensed financial institution or licensed financial holding company shall be subject to authorisation by the Central Bank when—

> (a)   the licensed financial institution or licensed financial holding company is solvent and has sufficient liquid assets to repay its depositors and other creditors within three days; and
>
> (b)   the liquidation has been properly approved by the members or shareholders of the licensed financial institution or licensed financial holding company.

**Cessation of business operations.**

**159.**   When it has received the authorisation of the Central Bank the licensed financial institution or licensed financial holding company shall—

> (a)   immediately cease to carry on business, retaining only the powers necessary to effect an orderly liquidation;
>
> (b)   repay its depositors and other creditors; and
>
> (c)   wind up all operations undertaken prior to the receipt of the authorisation.

**Notice to depositors of voluntary liquidation.**

**160.**   (1) Within thirty days from the receipt of authorisation referred to in section 158 a notice of voluntary liquidation, setting out any information as the Central Bank may determine, shall be sent by mail to all depositors, other creditors and persons otherwise entitled to the funds or property held by the licensed financial institution or licensed financial holding company as a trustee, lessor of a safe deposit box or bailee.

(2) The notice shall be posted conspicuously on the premises of each office and branch of the licensed financial institution or licensed financial holding company and shall be published as the Central Bank, shall direct.

(3) The Central Bank may exempt the mailing of such notice to specified persons upon a showing of cause by the licensed financial institution or licensed financial holding company.

**Rights of depositors and creditors in voluntary liquidation.**

**161.**    (1) The authorisation to go into voluntary liquidation shall not prejudice the rights of a depositor or other creditor to payment in full of his claim nor the right of an owner of funds or other property held by the licensed financial institution or licensed financial holding company to the return.

(2) All deposits shall be paid within three days, all other lawful claims shall be paid promptly, and all funds and other property held by the licensed financial institution or licensed financial holding company shall be returned to their owners within such maximum period as the Central Bank shall determine.

**Distribution of assets.**

**162.**    (1)  When the Central Bank, is satisfied that the licensed financial institution or licensed financial holding company has discharged all the obligations referred to in section 161, it shall be struck from the list of licensed financial institutions and the remainder of its assets shall be distributed among its shareholders in proportion to their respective rights, but no such distribution shall be made before—

(a)  all claims of depositors and other creditors have been paid or, in the case of a disputed claim, before the licensed financial institution or licensed financial holding company has turned over to the Central Bank sufficient funds to meet any liability that may be determined by a court of competent jurisdiction;

(b)  any funds payable to a depositor or other creditor who has not claimed them have been turned over to the Central Bank;

(c)  any other funds and property held by the licensed financial institution or licensed financial holding company that could not be returned to the owners in accordance with the provisions of section 161 have been transferred to the Central Bank, together with the inventories.

(2) Any funds or property not claimed within a period of fifteen years following a transfer to the Central Bank shall be presumed to be abandoned property for the purposes of section 167.

**Insufficiency of assets in discharge of obligations in voluntary liquidation.**

**163.**    If the assets of a licensed financial institution or licensed financial holding company, whose voluntary liquidation has been authorised will not be sufficient for the full discharge of all its obligations or completion of the liquidation is unduly delayed, the Central Bank may cause the commencement of proceedings leading to its compulsory liquidation or resolution in conformity with the procedures set out in Part X.

**Audited accounts, and conclusion of liquidation.**

**164.**    (1) When all assets have been distributed in accordance with the provisions of this Act, the licensed financial institution or licensed financial holding company shall render an audited account to the Central Bank.

(2) Upon approval of this account the Central Bank shall notify the Registrar of Companies which shall proceed to terminate the legal existence of the licensed financial institution or licensed financial holding company as a company.

**Review of bank resolutions under Part IX or X.**

**165.**    (1) After completion of an official administration under Part IX or a receivership under Part X (a resolution action), the Central Bank shall conduct a review to ascertain why the licensed financial institution's or licensed financial holding company's problems required a resolution action under either of those Parts.

(2) The Central Bank shall prepare a written report that describes in detail the circumstances leading to the resolution action, the actions taken by the Central Bank prior to action under Part IX or Part X to address any problems, the reasons why those actions did not succeed in preventing the need for resolution.

(3) The Central Bank shall lay a copy of the report before the Monetary Council.

**Non-application of Companies Act.**

**166.**    The provisions of the Companies Act or any law on or relating to company bankruptcy, reorganization, insolvency or liquidation shall not apply to the liquidation of a licensed financial institution under this Act.

PART XII

ABANDONED PROPERTY

**Abandoned property.**

**167.**    (1) Subject to subsection (2) the items in paragraphs (a), (b) and (c) which are held or owing by a licensed financial institution for fifteen years shall be presumed to be abandoned—

(a) any general deposit (demand, savings or matured time deposit), and funds prepaid on credit cards and other electronic funds made in Saint Christopher and Nevis with a licensed financial institution, together with any interest or dividend, but excluding any lawful charges;

(b) any funds paid in Saint Christopher and Nevis toward the purchase of shares or other interests in a licensed financial institution or licensed financial holding company, together with any interest or dividend, but excluding any lawful charges;

(c) any sum payable on cheques certified in Saint Christopher and Nevis or on written instruments issued in Saint Christopher and Nevis on which a licensed financial institution or licensed financial holding company is directly liable.

(2) The items enumerated in paragraphs (a), (b) and (c) of subsection (1) shall not be presumed to be abandoned if the owner has, within fifteen years of the date of deposit, payment of funds or issuance of instruments, as the case may be—

(a) increased or decreased the amount of the deposit or funds or presented the passbook or other record for the crediting of interest or dividends in respect of the items enumerated in paragraphs (a) or (b) of subsection (1);

(b) corresponded in writing with the licensed financial institution or licensed financial holding company concerning the items; or

(c) otherwise indicated an interest in the items enumerated in paragraphs (a), (b)and (c) of subsection (1) as evidenced by a memorandum concerning them written by a licensed financial institution or licensed financial holding company.

**Report, publication and disposal of abandoned property.**

**168.** (1) Every licensed financial institution or licensed financial holding company holding any of the items enumerated in paragraphs (a), (b) and (c) of subsection (1) of section 167 shall within ninety days after the end of its financial year report such holdings to the Central Bank, and pay to the Central Bank all property presumed to be abandoned listed in the report in accordance with Regulations made by the Minister upon the recommendation of the Central Bank.

(2) Upon paying the items enumerated in paragraphs (a), (b) and (c) of subsection (1) of section 167 into the custody of the Central Bank a licensed financial institution or licensed financial holding company shall be relieved of all liability to the extent of the value of the property for any claim.

(3) Except with the approval of the Central Bank, on the terms and conditions as it may determine, no reduction in the amount of interest or dividends payable and no charges in excess of those made in respect of comparable active accounts shall be made by a licensed financial institution or licensed financial holding company either during the period of inactivity of the items set out in subsection (1) of section 167 or at the time payment and delivery of them under subsection (1) is required.

(4) Within thirty days after the end of its financial year but before the filing of the report to the Central Bank required by subsection (1) and the report to the Minister under subsection (2) of section 170 , a licensed financial institution or licensed financial holding company shall publish in the *Gazette*, a newspaper of general circulation and on its website the name of the owner and particulars concerning the property and shall mail a notice to the owner at his last known address containing particulars concerning the property.

**Abandoned property to vest in the Crown.**

**169.** Any abandoned property paid into the custody of the Central Bank under subsection (1) of section 168 shall vest in the Crown fifteen years from the date on which it was paid into the custody of the Central Bank.

**Safe deposit boxes.**

**170.** (1) The contents of a safe deposit box at a licensed financial institution shall be presumed to be abandoned where—

(a) the lease or rental has expired; and

(b) five years has elapsed from the expiration of the lease or rental.

(2) Every licensed financial institution holding any contents of a safe deposit box presumed abandoned shall—

(a) within ninety days after the end of its financial year report the holdings to the Minister; and

(b) deliver to the Minister the contents of the safe deposit boxes reported under paragraph (a).

(3) Upon delivering the property into the custody of the Minister a licensed financial institution shall be relieved of all liability to the extent of the value of the property for any claim.

**Sale of contents of a safe deposit box.**

**171.** (1) The contents of a safe deposit box delivered to the Minister under subsection (2) of section 170 may be sold at public auction by the Minister after the expiration of sixty days from the later date of publication or mailing required by subsection (4) of section 168 following such advertisement of the sale as the Minister on the recommendation of the Central Bank, may prescribe.

(2) Any purchaser shall receive title to the property free from all claims of the owner or prior holder and from all persons claiming through or under him.

**Handling of proceeds of sale of safe abandoned property.**

**172.** (1) There is hereby established an Abandoned Property Fund under the administration and control of the Minister.

(2) The Minister shall deposit the proceeds of the sale of property into the Abandoned Property Fund less all reasonable costs incurred by it in connection with the sale, mailing of notices, and service as it may consider appropriate to assure the prompt payment of claims which may subsequently be made and approved by the Minister.

(3) Any property remaining unsold shall be disposed of by the Minister in such manner as the Minister on the recommendation of the Central Bank may prescribe.

(4) The proceeds of sale of any property under subsection (2) shall be held in the Abandoned Property Fund for a period of ten years, after which the amount shall vest in the Crown.

**Claims on abandoned property.**

**173.** (1) Any person claiming an interest—

    (a) in any property which has been paid into the custody of the Central Bank;

    (b) in any property delivered into the custody of the Minister; or

    (c) in the proceeds from the sale of the property by public auction,

may, prior to the expiration of the periods under section 169 and subsection (4) of section 172 file a claim for that interest by a claim form supported by affidavit evidence.

(2) The Minister on the recommendation of the Central Bank shall by Regulations prescribe the—

    (a) claim form;

    (b) persons to whom a claim form may be issued;

    (c) required documentation to accompany each claim;

    (d) procedures for filing the claim form;

    (e) process for the approval of claims;

    (f) procedures for the payment of claims and for reimbursements.

(3) Upon the expiration of the periods under section 169 and subsection (4) of section 172 no person may make any claim against the Central Bank or the Crown in respect of the property.

(4) Any person aggrieved by a decision of the Central Bank or the Minister may commence an action in the High Court to establish his claim within thirty days following the decision of the Central Bank or the Minister.

**Failure to file report or to pay property.**

**174.** Any licensed financial institution or licensed financial holding company which wilfully—

      (a) fails to file the report or to pay property presumed to be abandoned into the custody of the Central Bank in accordance with subsections (1) and (4) of section 168; or

      (b) fails to file the report or to deliver the property presumed to be abandoned into the custody of the Minister in accordance with subsection (2) of section 170,

is liable to a penalty of five thousand dollars and for a further penalty of one thousand dollars for each day of the default.

## PART XIII

### TRANSFER OF BANKING BUSINESS

**Banking business vesting order.**

**175.** (1) Where an agreement has been entered into for the acquisition by a licensed financial institution or licensed financial holding company (herein referred to as the "transferee financial institution") of the undertaking of another financial institution or financial holding company, whether or not a financial institution or financial holding company to which the provisions of this Act apply (herein referred to as the "transferor financial institution) the transferor financial institution may, for the purpose of effecting the transfer to, and the vesting in, the transferee financial institution of the undertaking, make a written application to the Central Bank, notice of which shall be published in the *Gazette* in any case where the Central Bank so directs.

(2) Upon the making of an application under subsection (1), the Central Bank shall investigate the application including in particular the circumstances leading to the proposed transfer, the ability of the transferee to discharge its obligations under the transfer and the effect, which the transfer is likely to have on the banking services available to the public.

(3) On completion of the investigation, the Central Bank may, if it thinks fit, make a recommendation to the Minister to make a Banking Business Vesting Order transferring to and vesting in the transferee financial institution the undertaking, as from the date specified therein, and on the making of such an order, all such existing property, rights, liabilities and obligations as are intended by the agreement to be transferred and vested shall, by virtue of this Act, and without further assurance be transferred to, and shall vest in, the transferee financial institution to the intent that the licensed financial institution shall succeed to the whole or such part of the

undertaking of the transferor financial institution as is contemplated by the agreement.

(4) No transfer or vesting effected by a Banking Business Vesting Order shall—

(a) operate as a breach of covenant or condition against alienation;

(b) give rise to a forfeiture; or

(c) invalidate or discharge a contract or security.

(5) Notwithstanding anything contained in any enactment to the contrary, the Minister may issue a Banking Business Vesting Order which, for the purposes of corporation tax, contain provisions respecting—

(a) the carry forward; and

(b) the set off,

by the transferee financial institution of such of the losses of the transferor financial institution as may be specified in the Banking Business Vesting Order as if the undertaking of the transferor financial institution had not been permanently discontinued on the date specified in the Banking Business Vesting Order and a new banking business had been then set up and commenced by the transferee financial institution.

**Supplementary provision as to transfers.**

**176.** (1) Without prejudice to the generality of section 175, the effect of a Banking Business Vesting Order as regards the banking business transferred is that on and from the date of transfer—

(a) every existing contract to which the transferor financial institution was a party, whether in writing or not, has effect as if—

(i) the transferee licensed financial institution had been a party thereto instead of the transferor financial institution;

(ii) for any reference (however worded and whether expressed or implied) to the transferor financial institution there were substituted as respects anything falling to be done on or after the date of the transfer, a reference to the transferee financial institution; and

(iii) any reference (however worded and whether express or implied) to the directors or to any director, officer, clerk or servant of the transferor financial institution were, as respect anything falling to be done on or after the date of transfer, a reference (as the case may require) to the directors of the transferee financial institution may appoint, or in default of appointment, to the director, officer, clerk or servant of the transferee financial institution who corresponds as ready as may be to the first mentioned director, officer, clerk or servant;

(b) any account between the transferor financial institution and a customer shall become an account between the transferee financial institution and that customer;

(c) any existing instruction, direction, mandate, power of attorney or consent given to the transferor financial institution shall have effect as if given to the transferee financial institution;

(d) any negotiable instrument or order for payment of money which is expressed to be drawn on, or given to, or accepted or endorsed by the transferor financial institution, or payable at any of its places of business, shall have effect as if it had been drawn on, or given to or accepted or endorsed by the transferee financial institution, or payable at the same place of business of the transferee financial institution;

(e) any security transferred to the transferee financial institution by a Banking Business Vesting Order that immediately before the date of the transfer was held by the transferor financial institution as security for the payment or discharge of any debt or liability or obligation (whether present or future, actual or contingent) shall be held by, and be available to, the transferee financial institution as security for the payment or discharge of such debt or liability or obligation; and any such security which extends to future advances or liabilities shall, from the date of the transfer, be held by, and be available to, the transferee financial institution as security for future advances by, and future liabilities to, the transferee financial institution, in the same manner and in all respects as future advances by, or liabilities to, the transferor financial institution were secured immediately before the date of the transfer;

(f) any judgment or award obtained by or against the transferor financial institution and not fully satisfied before the date of the transfer shall be enforceable by or against the transferee financial institution;

(g) unless the agreement by the parties to the transfer provides to the contrary, any officer, clerk, or servant employed by the transferor financial institution immediately before the date of the transfer shall become an officer, clerk or servant, as the case may be, of the transferee financial institution on terms and conditions no less favourable than those on which he was so employed immediately before the date of the transfer, and such employment with the transferor, and transferee financial institution respectively shall be deemed, for all purposes, to be a single continuing employment, save that no director, secretary or auditor of the transferor financial institution shall by virtue only of a Banking Business Vesting Order become a director, secretary or auditor, as the case may be, of the transferee financial institution.

(2) The provisions of subparagraphs (l)(a)(ii) and (l)(a)(iii) shall apply to—

(a) any statutory provision;

(b) any provision of any existing contract to which the transferor financial institution was not a party; and

(c) any provision of any other existing document (not being a contract but including in particular a will),

as they apply in relation to a contract to which paragraph (l)(a) applies.

(3) Any property or rights transferred to, and vested in, the transferee financial institution which immediately before the date of the transfer were held by the transferor financial institution, whether alone or jointly with any other person—

(a) as trustee or custodian trustee of any trust, deed, settlement, covenant, agreement or will, and whether originally so appointed or not, and whether appointed under hand or seal or by order of any court;

(b)  as executor of the will of a deceased person;

(c)  as administrator of the estate of a deceased person;

(d)  as judicial trustee appointed by order of any court; or

(e)  in any other fiduciary capacity whatsoever,

shall, from the date of the transfer, be held by the transferee financial institution whether alone or jointly with such other person, in the same capacity upon the trusts, and with, and subject to, the powers, provisions, liabilities and obligations, applicable thereto respectively.

**Transfers to be subject to stamp duty.**

**177.**  The transfer of, and vesting in, the transferee financial institution of an undertaking by a Banking Business Vesting Order shall, unless exempted (either generally or in some particular case) by the Banking Business Vesting Order, be subject to the provisions of the Stamps Act, Cap. 20.40 as if the Banking Business Vesting Order was, in each of the cases in which the duty is imposed on the several instruments specified in the Schedule to the (Act/ Ordinance), an instrument between party and party within the contemplation of the (Act/ Ordinance).

## PART XIV

### MISCELLANEOUS PROVISIONS

**Secrecy of information.**

**178.**  (1) No person who has acquired knowledge in his capacity as director, officer, secretary, employee or agent of any licensed financial institution or as its auditor, receiver, official administrator or official liquidator shall disclose to any person or governmental authority the identity, assets, liabilities, transactions or other information in respect of a depositor or customer of a licensed financial institution except—

(a)  with the written authorisation of the depositor or customer or of his heirs or legal personal representatives; or

(b)  when required in conformity with the provisions of this Act; or

(c)  when lawfully required to make disclosure by any court of competent jurisdiction within Saint Christopher and Nevis; or

(d)  under the provisions of any law of Saint Christopher and Nevis or agreement among the Participating Governments.

(2) Except that nothing shall prevent—

(a)  a licensed financial institution or any individual referred to above, from providing to a person, upon a legitimate business request, a general credit rating, a summary of which will be provided to the depositor or customer upon request; or

(b)  a licensed financial institution for which a receiver or official administrator has been appointed, or any individual referred to above with respect to that licensed financial institution, from providing access to confidential information of the licensed financial institution that is necessary to conduct due diligence in connection with a

potential acquisition of part or all of the assets and liabilities for the licensed financial institution, whether through direct transfer or through a merger or similar corporate transaction.

**Administrative penalties.**

**179.**    An administrative penalty levied pursuant to this Act may be recovered as a civil debt.

**Administrative penalties to be placed to the credit of Central Bank.**

**180.**    (1) The penalties imposed under sections 9(3), 19(9), 19(10), 44(4), 56(2), 57(8), 68, 69(5), 96 and 174 shall be paid to the Central Bank.

(2) The Central Bank may, without prejudice to any other remedies available to it under the law recover such penalties by deduction from any deposit maintained by a licensed financial institution with the Central Bank.

**Third Schedule offences.**

**181.**    (1) This section applies to an offence specified in the Third Schedule.

(2) Where circumstances give rise to a reasonable belief that a person has committed an offence specified in the Third Schedule, the Central Bank may give notice in the form prescribed in the Fourth Schedule offering that person the opportunity to discharge any liability to conviction of that offence by payment of a fixed penalty under this section.

(3) No person shall be liable to be convicted of the offence if the fixed penalty is paid in accordance with this section and the requirement in respect of which the offence was committed is complied with before the expiration of fifteen days following the date of the notice referred to in subsection (2) or a longer period (if any) as may be specified in that notice or before the date on which proceedings are begun, whichever event last occurs.

(4) Where a person is given notice under this section in respect of an offence, proceedings shall not be taken against the person for that offence until the end of the fifteen days following the date of the notice or a longer period (if any) as may have been specified in the notice.

(5) Where a person makes a payment of a fixed penalty under this section it shall be made to the Central Bank and in any proceedings a certificate that payment of a fixed penalty was or was not made to the Central Bank by a date specified in the certificate shall, if the certificate purports to be signed by the Governor of the Central Bank, be admissible as evidence of the stated facts.

(6) A notice under subsection (2) shall—

(a)    specify the offence alleged;

(b)    give such particulars of the offence as are necessary for giving reasonable information of the allegation; and

(c)    state the period (whether fifteen days or a longer period) during which, by virtue of subsection (4) of this section proceedings will not be taken for the offence.

(7) In any proceedings for an offence to which this section applies, no reference shall be made after the conviction of the accused to the giving of any notice under this section or to the payment or non-payment of a fixed penalty unless in the

course of the proceedings or in some document which is before the court in connection with the proceedings, reference has been made by or on behalf of the accused to the giving of such a notice, or, as the case may be, to such payment.

(8) In this section "proceedings" means any criminal proceedings in respect of the act or omission constituting the offence specified in the notice under subsection (2) of this section and "convicted" shall be construed in like manner.

(9) The Minister upon the recommendation of Central Bank may, by Order make provision as to any matter incidental to the operation of this section, and in particular, any such Order may—

(a) prescribe the nature of the information to be furnished to the Central Bank along with payment;

(b) prescribe the arrangements for the Central Bank to furnish any information with regard to any payment pursuant to a notice under this section.

**Working days of licensed financial institutions and licensed financial holding companies.**

**182.**  (1) All licensed financial institutions in the Currency Union shall remain open for business during the hours and days, except public holidays, as may be agreed to by the Central Bank.

(2) Any obligation which can only be fulfilled at a licensed financial institution which would fall due on any day or at any particular hour on which a licensed financial institution is not open for business under subsection (1) shall be deemed to fall due on the first working day thereafter.

(3) The Central Bank may, by notice in the *Gazette*, declare any day on which no financial institution may be open for business, without regard to whether or not the day is or is not also a public holiday.

**Regulations.**

**183.**  The Minister upon the recommendation of the Central Bank may make Regulations as may be required from time to time for giving effect to the provisions of this Act, and without limiting the generality of the foregoing, may make Regulations respecting—

(a) reports or other information to be supplied by persons to whom licences have been granted and any other matter associated with their use;

(b) records to be kept, returns and reports to be made to the Central Bank by persons who are appointed as auditors under the Act;

(c) character of the records to be kept by any licensed financial institution or licensed financial holding company and the form of the report and returns to be made by the licensed financial institution or licensed financial holding company and fixing the times when such reports and returns shall be made;

(d) forms necessary for the administration of this Act;

(e) the better implementation of Part IX;

(f) penalties that may be imposed for violations of Orders and Regulations made under this Act and may also prescribe the penalties

to be imposed on summary conviction, but no such penalty shall exceed a fine of fifty thousand dollars or imprisonment of a term exceeding twelve months.

**Prudential standards.**

**184.**    The Central Bank may issue such prudential standards as may be required from time to time for giving effect to the provisions of this Act, and without limiting the generality of the foregoing, may issue prudential standards respecting—

    (a) policies, practices and procedures for evaluating—

        (i) the quality of assets, including off-balance sheet items;

        (ii) the adequacy of asset loss provisions; and

        (iii) asset loss reserves;

    (b) a system of asset classification, provisioning and write-offs;

    (c) the method of valuation of collateral;

    (d) rules for non-accrual of income on non-performing or impaired assets;

    (e) the suspension and reversal of accrued interest;

    (f) policies, procedures and systems for identifying, monitoring and controlling country risk, transfer risk, market risk, liquidity risk, interest rate risk, operational risk, and such other risks as the Central Bank shall specify;

    (g) liquidity requirements and ratios;

    (h) treatment of assets and investments;

    (i) treatment of loans and other credit facilities;

    (j) related party transactions;

    (k) accounting policies;

    (l) auditors;

    (m) disclosure;

    (n) anti money laundering and combating the financing of terrorism matters;

    (o) corporate governance matters of a licensed financial institution and a licensed financial holding company to ensure prudent operations, including without limitation matters relating to the scope and nature of the duties of directors; executive compensation; requirements for audit and other specific committees of the board; responsibilities of key management personnel; risk management; internal audit; internal controls, and compliance;

    (p) capital adequacy requirements and capital ratios to be maintained by a licensed financial institution or licensed financial holding company;

    (q) consolidated supervision.

**Court's powers in legal claims against Central Bank.**

**185.**    (1) In any court proceedings under this Act, the Court shall take into consideration the public interest.

(2) In considering the public interest, the Court shall have regard to—

    (a) the critical importance of financial stability to the public interest;

    (b) the importance of permitting the Central Bank to discharge its functions in an expeditious and efficient manner in the interest of maintaining financial stability.

(3) Any action under this Act by the Central Bank, official administrator or receiver that is the subject of any court proceedings shall be allowed to continue unrestricted notwithstanding the challenge or review before the Court.

(4) Where the Court is satisfied in any proceedings under this Act that—

    (a) a remedy in damages is available to the person who seeks relief; and

    (b) it would be just in all the circumstances, having regard to the public interest, to limit relief to an award of damages,

the Court shall limit relief in such proceedings to an award of damages.

### Bridge financial institutions and asset management vehicles.

**186.** (1) A Participating Government may establish a bridge financial institution for the purpose of acquiring and managing the assets and liabilities of a licensed financial institution that is subject to official administration or receivership under Part IX or Part X for a period of up to twelve months or any further period pursuant to paragraph (2).

(2) The Central Bank may extend the operation of the bridge financial institution under subsection (1) for up to two consecutive periods of twelve months each and upon the expiration of the latter period the bridge financial institution shall be placed into receivership and liquidated.

(3) The Central Bank may initiate receivership at an earlier time, in accordance with Part X.

(4) A bridge financial institution established under subsection (1) shall be licensed under this Act and shall be subject to all of the provisions of this Act, except the capital requirements of sections 44 and 46 for a period of twelve months.

(5) A Participating Government may establish an asset management company for the purpose of acquiring, managing, and disposing of problem assets of a financial institution pursuant to Part IX or Part X.

### Participating Government financing of transfers of deposits.

**187.** (1) (a) In the event that the Central Bank initiates official administration or receivership of a licensed financial institution, a Participating Government may, if appropriate, provide financing in the amount necessary to facilitate the transfer of deposits held by the licensed financial institution.

    (b) A Participating Government in providing financing under paragraph (a) may take into consideration—

        (i) its fiscal and debt profile; and

        (ii) the costs that would have been incurred in paying out depositors in a liquidation.

(2) Where a Participating Government provides such financing, the Participating Government shall assume the rights of depositors against the licensed

financial institution and shall enjoy the priority conferred on depositors over other unsecured creditors in section 153 of this Act.

### Immunity.

**188.**   The official administrator appointed under Part IX of this Act and the receiver appointed under Part X shall be immune from legal process with respect to acts performed or omissions made by them in their official capacity in good faith except where such acts or omissions are as a consequence of fraud, gross negligence or wilful recklessness on the part of the official administrator and the receiver.

### Non-application of Aliens Landholding Regulation Act.

**189.**   The provisions of the Aliens Landholding Regulation Act, Cap. 10.01, do not apply to the licensed financial institutions under this Act.

### Provisions applicable to credit institution, class of credit institution and financial group.

**190.**   The Minister, on the recommendation of the Central Bank may by Order prescribe that any provision of this Act, which at the date of the commencement of this Act does not apply to a credit institution, class of credit institution or financial group, shall apply with modifications, adaptations, qualifications and exceptions as may be specified in the Order to any credit institution, class of credit institution or financial group.

### Amendment of Schedules.

**191.**   The Minister, on the recommendation of the Central Bank, may by Order published in the *Gazette* amend the Schedules.

### Savings.

**192.**   Notwithstanding the repeal of the Banking Act, 2004—

(a) any regulation, rule, notice or other subsidiary legislation or guideline made pursuant to the Banking Act, 2004, shall, if in force at the commencement of this Act, continue in force until replaced by any regulation, rule, order, notice or other subsidiary legislation made under this Act; and

(b) any act, decision or other matter carried out pursuant to the Banking Act, 2004, shall be deemed to have been carried out under this Act.

### Transitional.

**193.**   The following provisions shall not apply to an existing licensed financial institution, in respect of—

(a) section 20, for a period of three hundred and sixty days;

(b) section 44, for a period of four hundred and fifty days;

(c) section 46, for a period of three hundred and sixty days; and

(d) section 100, for a period of three hundred and sixty days,

from the coming into force of this Act.

_____

## FIRST SCHEDULE

*(Sections 7(1), 8(5), 9(1), 36(1) and 38(2))*

### FEES FOR LICENSED FINANCIAL INSTITUTION

| Description | Non Refundable Application Fee | Initial Licence Fee | Annual Licence Fee |
|---|---|---|---|
| Foreign Financial Institution | $20,000 | $120,000 | $120,000 |
| Local Licensed Financial Institution | $20,000 | $ 80,000 | $ 80,000 |
| Licensed Financial Holding Company - Foreign | $20,000 | $ 60,000 | $ 60,000 |
| Licensed Financial Holding Company - Local | $20,000 | $ 40,000 | $ 40,000 |
| Establishment of Branch - Local Licensed Financial Institution | - | - | $ 20,000 |
| Establishment of Additional Branch -Foreign Financial Institution | - | - | $ 30,000 |

_____

## SECOND SCHEDULE

*(Section 2)*

Business of a financial nature includes the following types of business:

| Class | Activities |
|---|---|
| 1. Finance House or Finance Company | Hire purchase and installment credit |
| 2. Credit Unions | Provision of basic savings (share accounts) for members and making loans to members. |
| 3. Merchant Bank | Floating and underwriting, stocks, Shares, and bonds, Loans syndication, Dealing in gold, Providing consultancy and investment, management services and corporate, advisory services, Acceptance credit, Project Development, Lease financing, Foreign exchange dealing, Interbank financing. |
| 4. Mortgage Institutions | Mortgage lending |
| 5. Trust Company | Managing Trust Funds, Performing duties of trustees, Executor or administrator and attorney Administration of Pension Funds, Mortgage lending. |

| Class | | Activities |
|---|---|---|
| 6. | Unit Trust | Providing facilities for the participation by persons as beneficiaries under a trust or other scheme, in profits or income arising from the acquisition, holding, management or disposal of securities or any other property whatever |
| 7. | Credit card business | Issuing payment, credit or charge cards and in co-operation with others including other financial institutions, operating a payment, credit or charge card plan. |
| 8. | Financial Services | Providing financial services relating to future and contingent liabilities in relation to foreign exchange and commodities. |
| 9. | Securities business | carrying on, within the meaning of the Securities Act, Cap. 21.16, the business of securities exchange, clearing agency, securities depository, securities registry, underwriting, broker-dealer, limited service broker, custodian, an investment adviser, or a management company or trustee or custodian of a collective investment scheme. |
| 10. | Insurance business | Carrying on the business of receiving proposals for or the issuing of policies of any class of insurance, or the collection or receipt of premiums on policies and the making of payments due under such policies, reinsurance, insurance underwriting, insurance brokerage, the issuing and carrying out of contracts to pay annuities, the effecting and carrying out of tontines. |

_____

## THIRD SCHEDULE

*(Section 181)*

### OFFENCES IN RESPECT OF WHICH LIABILITY TO CONVICTION MAY BE DISCHARGED BY PAYMENT OF A FIXED PENALTY

| Offence | Section | Fixed penalty |
|---|---|---|
| Failure to have licence | 3(5) | $250,000 |
| Refusal to make relevant documents available for examination | 4(5) | $2,500 |
| Use of restricted words, names and practices | 16(5) | $125,000 |
| Failure to disclose transfer | 31(1) | $1,000 |
| Failure to disclose acquisition of interest | 31(2) | $2,500 |
| Failure to disclose and allow access to books and records | 74(3) | $25,000 |
| Providing information that is false in any material particular | 74(4) | $25,000 |
| Failure to comply with remedial actions(licensed financial institution) | 80(a) | $50,000 |
| Failure to comply with remedial actions(individual) | 80(b) | $25,000 |
| Failure to comply with section 103 | 109 | $5,000 |
| Failure to declare related interest | 110 | $5,000 |
| Deceiving statements and obstruction of audit or authorised examination | 111 | $15,000 |
| Failure of management to comply with the law | 112 | $7,500 |
| Failure to assist the official administrator | 129(5) | $7,500 |
| Interference with receivers access to or control over office, books of accounts and other records | 145(4) | $7,500 |

_____

## FOURTH SCHEDULE

*(Section 181(2))*

NOTICE OF OPPORTUNITY TO DISCHARGE LIABILITY

**The Eastern Caribbean Central Bank has reason to believe that**          *[name of bank]* **has committed an offence under section**          **of the Banking Act having**

                                                            *[particulars of offence     ]*; **and hereby gives the**          *[name of bank]* **the opportunity to discharge liability for this offence by payment of the sum of**          *[insert fixed penalty listed in the Third Schedule in*

*words and figures]* **to the Central Bank on or before the**          **day of**

         **, 20      and before that date no proceedings in respect of this offence will be taken.**

..............................
*Governor*
*Eastern Caribbean Central Bank*

_____

## FIFTH SCHEDULE

*(Section 175(3))*

### BANK OF NOVA SCOTIA BANKING BUSINESS VESTING ORDER

**Citation.**

**1.**    This Order may be cited as the Bank of Nova Scotia Banking Business Vesting Order.

**Interpretation.**

**2.**    In this Order—

"Act" means the Banking Act, No. 1 of 2015;

"Agreements" means—

(a) the Purchase and Sale Agreement made on the 27th day of November 2018 as amended by the Amended and Restated Purchase and Sale Agreement made on the 24th day of September 2019 between the Transferor Financial Institution and Republic Financial Holdings Limited; and

(b) the Local Purchase Agreement made on 20th September 2019 between the Transferor Financial Institution and the Transferee Financial Institution relating to the transfer of the branch business of the Transferor Financial Institution;

"branch business" means the banking business carried on by the Transferor Financial Institution in Saint Christopher and Nevis comprising all the local purchased assets, local purchased property, rights, liabilities and obligations of the Transferor Financial Institution in Saint Christopher and Nevis as are more particularly described in the Local Purchase Agreement as being the subject of the sale;

"Transferee Financial Institution" means Republic Bank (EC) Limited, a corporation incorporated under the laws of Saint Lucia and registered and licensed under the laws of Saint Christopher and Nevis;

"Transferor Financial Institution" means The Bank of Nova Scotia, a Schedule I bank existing under the laws of Canada and registered and licensed under the laws of Saint Christopher and Nevis.

**Vesting of Banking Business.**

**3.**    Pursuant to the provisions of sections 175 and 176 of the Act, the branch business is, on the recommendation of the Eastern Caribbean Central Bank and by virtue of this Order, without further assurance, hereby transferred to and vested in the Transferee Financial Institution from the appointed day, to the intent that the Transferee Financial Institution shall succeed to the branch business as is contemplated by the Agreements.

**Assets in Schedule.**

**4.**    Pursuant to the provisions of the Local Purchase Agreement, the assets of the branch business of the Transferor Financial Institution referred to in subsection (3) are more particularly described in the Schedule to this Order.

_____

**SCHEDULE**

LOCAL PURCHASED ASSETS

Local Purchased Assets means the following assets of the Branch Business in the Local Jurisdiction—

(a)  the Cash Items;

(b)  the Loans;

(c)  the Branch Real Property Leases;

(d)  the Branch Real Property;

(e)  the Receivables;

(f)  the Fixed Assets;

(g)  the Branch Contracts;

(h)  the Branch Books and Records; and

(i)  the Customer Books and Recorders.
*(Inserted by S.R.O. 30/2019)*

_____