# Exhibit A

Confidential

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAMILTON RESERVE BANK LTD,<br><br>      Plaintiff,<br><br>v.<br><br><br>THE DEMOCRATIC SOCIALIST REPUBLIC OF SRI LANKA,<br><br>      Defendant. | No. 1:22-cv-5199 (DLC) |

# EXPERT REPORT OF AVINASH PERSAUD

Confidential

# I.    Introduction and Summary of Opinions

1. I have been retained by counsel to the Democratic Socialist Republic of Sri Lanka ("**Sri Lanka**") to opine on the principles of bank regulation, bank capital requirements, and in the context of Hamilton Reserve Bank's ("**HRB**") holdings of a bond issued by Sri Lanka. The bond in question was due on July 25, 2022, paid a coupon rate of 5.875%, and was denominated in US dollars (the "**2022 Bond**"). This expert report is based on my personal knowledge, information, and belief and my review of relevant documents.

2. I previously submitted declarations in this matter.[1] Those declarations addressed, among other things, HRB's accumulation of a highly concentrated exposure to Sri Lanka sovereign bonds, the implications of that concentration for capital and liquidity, and the degree to which the Bank's balance sheet was inconsistent with ordinary banking practice.

3. This report builds on those prior declarations. It incorporates additional discovery materials that provide more direct evidence concerning the construction of HRB's balance sheet, the composition of its deposit base, the concentration of customer and transaction activity, the treatment of the 2022 Bond, external pressures from auditors and regulators, updated financial statements, HRB's internal Risk Assessment, and a shareholder standby purchase agreement relating to Sri Lanka sovereign bonds.

4. The central question addressed in this report is not simply whether HRB made an imprudent investment decision. A bank can make a poor investment without ceasing to operate as a bank. ████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████

5. In addressing that question, I consider what HRB did, what a prudently managed bank would ordinarily be expected to do, including a bank with the services HRB

---

[1] I incorporate by reference my analyses and conclusions from the Declaration of Avinash Persaud, July 17, 2023, and the Declaration of Avinash Persaud, July 1, 2025. These are attached as Appendix III and Appendix IV, respectively.

Confidential

offered to its customers, and the significance of the differences between the two. █

████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████

6. Simply put, liquidity risk for a bank is the risk that depositors, especially those offered no interest, demand their deposits back or to use them in a transaction. To respond to that demand and limit liquidity risk, the bank needs to carry sufficient cash or assets that are easy to sell quickly for cash without losing much value. Prudent banks carry a high liquidity ratio - the ratio of cash or highly liquid assets to deposits - so that they can cover extreme occurrences of heavy depositor withdrawal.

7. Simply put, credit risk for a bank is the risk that the assets in which it has invested depositors' cash, fail, for instance through a default on bond interest payments, so the bank cannot repay its depositors in full when they need their cash. Prudent banks reduce the credit risk of their assets by limiting exposures to a single asset or like assets, and diversifying their assets very broadly with a high proportion of assets of the highest safety. For a bank operating in US dollars and offering such high liquidity and safety that it does not need to pay depositors any interest, typical assets would include US Government Bonds or other bonds that one of the large credit rating agencies classifies as being of high credit quality, in the parlance of credit ratings, 'AAA' or 'AA' or close. The better the credit rating of an asset the lower the interest, but that is the trade-off expected of a bank paying no interest to its depositors in return for safety and liquidity; the characteristics of a bank's assets are meant to reflect the obligations of its liabilities. One of the other principal ways a bank reduces the credit risk to its depositors is not to fund their purchase of assets entirely with depositor money, but a high proportion of shareholders' money, so that depositors

3

Confidential

have an ample cushion of safety to protect them from partial failures. This is referred to as capital adequacy.



8. ███████████████████████████████████

9. ███████████████████████████████████

10. ███████████████████████████████████ HRB increased its exposure to the 2022 Bond over time, including after the sovereign credit had deteriorated further and the bond had matured without payment.

11. ███████████████████████████████████

Confidential

████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████
████████████████████████████████

12.  ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
██████████████████████████████████████
██████████████████████████████████
████████████████████████████████████
████████████████████████████████████

13.  ██████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████

---



Confidential



14. █████████████████████████

15. █████████████████████████

16. █████████████████████████

Confidential



17. I reserve the right to revise or supplement my conclusions in light of any evidence, testimony, or other information which becomes known to me after the date of this declaration.

## A.    Qualifications

18. Through my work on bank risks, liquidity, and insolvency, I was one of the intellectual architects of Basel III, the global framework governing capital adequacy, liquidity, and risk management for internationally active banks. Much of my work across my career has focused on the relationship between capital, liquidity, market prices, risk concentration, and the behaviour of financial institutions under stress.

19. I currently serve as Special Advisor to the President of the Inter-American Development Bank. I previously served as Special Envoy to the Prime Minister of Barbados on matters involving debt, investment, and finance, including the Barbados sovereign debt restructuring of 2018-2020, which had similarities with the Sri Lankan restructuring.

20. I am a former Chair of the Financial Services Commission of Barbados (2018-2021), the integrated regulator responsible for supervising including savings, investment, insurance, and other financial institutions operating in an international financial centre. That role required attention to institutions whose business models, funding profiles, and risk exposures often differed from conventional domestic commercial banks but were nonetheless subject to prudential expectations and rules.

21. I also served as an expert member of HM Treasury's Audit and Risk Committee in the United Kingdom (U.K.) during the global financial crisis, when troubled financial assets and financial institutions were acquired or supported by the U.K. Government. That work involved consideration of risk, valuation, audit, and governance issues arising from distressed financial assets and institutions.

Confidential

22. My professional experience includes London-based senior executive roles in major international banks engaged in the trading, analysis, and risk management of sovereign debt instruments, including emerging market sovereign bonds of the type relevant to this case. I have worked in senior positions at institutions active in sovereign debt markets such as Union Bank of Switzerland and J. P. Morgan. I have experience assessing how sovereign bonds behave under distress, how they are valued, and how such positions should be managed within financial institutions.

23. I have also served as a director and chairman of financial institutions operating in the Caribbean in local and international financial centres. This includes experience with institutions whose externally presented business model is closer to a safekeeping, transaction, correspondent and FX services model like the one HRB purported to be. A successful example of such a model is the Bank of St. Lucia International Limited (BOSLIL), which operated in a manner that required close attention to liquidity, asset quality, and depositor confidence and where I was a board director.

24. Prior to 2018 when I took on regulatory roles, I served as a member of the Audit and Risk Committee of RBC Caribbean and chair of the audit committee of Beacon Insurance, a Caribbean insurer, and of RBC Barbados, a subsidiary of RBC. (RBC or Royal Bank of Canada is a large international bank headquartered in Toronto, Canada.) Those positions involved oversight of risk, audit, internal controls, capital, liquidity, and governance. They are directly relevant to the issues in this report, including what one would expect to see in the governance record of a bank facing rising credit risks.

25. I have served as an expert witness in several matters involving banks, their actions, and their distressed assets, including matters relating to Lloyds Bank PLC and HBOS in the United Kingdom, Exotix, a broker in emerging market debt, Laiki Bank in Greece, and Bank of Cyprus in Cyprus. These matters have involved issues of bank solvency, liquidity, distressed sovereign assets, depositor treatment, valuation, and prudential conduct.

8

Confidential

26. My Curriculum Vita including my list of publications and past testimony is attached as Appendix I.

27. The opinions expressed in this report are based on my experience, my review of the materials identified, and the application of prudential banking principles to the facts as I understand them.[10]

### B.    Materials Relied Upon

28. The list of materials considered in the preparation of this report is attached as Appendix II.

### C.    Remuneration

29. I have been retained at my standard hourly rate of $1,050 per hour. My fee is not contingent on the outcome of this matter. I have been assisted in this matter by employees of NERA Economic Consulting who have worked under my direction.

## II.    HRB and Banking

### A.    Function of a Bank

30. It is useful to begin with the economic function of a bank. Not any firm can call itself a bank. A bank is a regulated deposit-taking institution. In the conventional banking model, a bank takes deposits from a broad base of customers and uses those deposits to make loans or buy interest earning assets like bonds. It typically attracts deposits by paying interest. It earns income to pay that interest either by lending the cash and charging borrowers more interest than it pays to depositors or by buying assets that pay interest. A critical function of a bank is to manage the credit, liquidity, and maturity risks that arise from the assets a bank may own. Whether a bank lends money for interest directly, or purchases assets, like sovereign bonds, that pay

---

[10] An elaboration on prudential banking principles is laid out in Section III of the Declaration of Avinash Persaud, July 17, 2023, and incorporated here by reference, where I discuss the capital requirements of banks under the risk-weighted asset framework as outlined in the Basel Core Principles and Basel Capital Standards.

Confidential

interest, is not conceptually different; many banks do both and some specialise in one or the other.

31. A fundamental way in which a bank manages risk is through diversification of both sides of its balance sheet, customer deposits (or liabilities) on one side and assets, like bonds or loans, on the other. It does not ordinarily take a sudden increase in customer deposits and invest almost all of it in a single-name exposure. It diversifies its assets across types of assets, like loans and bonds; across maturities - the time that these assets mature and repay what was invested; and across different country or industry sectors. Because the future is uncertain, the protection of depositors depends at the very least on the ability of the bank's portfolio of assets to withstand the deterioration or default of any one asset.

32. Some banks do not primarily engage in lending. These institutions provide safekeeping, transaction, correspondent and FX services. They may pay no interest on balances in customer accounts because the value they provide for that deposit is not yield, but safety, immediate access to funds and international transaction services.

33. The zero-interest feature of such a model is not separate from the liquidity and safety feature. It is intrinsic to it. If depositors do not receive interest for depositing their cash into an account at the bank and letting the bank use it, then they are receiving something else: immediate liquidity, payment functionality, and safety. Yet, to provide those services the bank is constrained in what it can do with customer deposits. It must hold assets that are highly liquid – that can be sold quickly without loss – and of high credit quality. High credit quality  - the low likelihood that the asset would stop paying interest or repay the amount invested  - is normally illustrated by the assets being rated highly by one of the large credit rating agencies like Standard & Poors, Moody's and Fitch, such as a "AAA" or "AA" or even "A" rating using the nomenclature of Standard and Poor's, but not for instance a "BB" rating or weaker

34. A payments or safekeeping institution therefore has little room for credit risk. If it pays its customers little or no interest on their accounts in return for safe-keeping and immediate access to funds for transactions and withdrawal, it cannot seek high-yield

10

Confidential

by placing almost all of its customers' cash into an illiquid or distressed asset. Doing so would undermine the premise on which the depositors placed their funds without earning interest with the institution and with banking prudence.

### B.    HRB's Banking Profile

35. HRB presented itself in its Risk Assessment as a bank providing global retail and commercial payment, depository, custodial, and trust services. The Risk Assessment states that the Bank had a "no lending" policy and served customer savings accounts and wire payment services.[11] HRB presented itself as a payments, deposit, and safekeeping institution.

36. Against that presented model, the asset choice is especially striking. A bank that pays no interest and offers immediate liquidity for transactions should hold high-quality, liquid assets like short-term loans to the US Government or other 'AAA/AA/A-rated' bond issuers. HRB instead built a balance sheet dominated by a single Sri Lankan sovereign bond that was distressed at the outset, rated at the time the position began to grow at just CCC+, matured unpaid, and depended for recovery on litigation. That is inconsistent not only with conventional banking but also with the type of liquid, safe-keeping model HRB appeared to present externally.

## III.   Overview of the 2022 Bond

37. The 2022 Bond was issued in 2012, with a total issue size of $1 billion.[12] My understanding is that it was one of the older-style bonds with non-aggregated collective action clauses. In bonds with aggregated collective action clauses, a holdout or vulture investor would have to purchase 25% or more of all of the bonds in default issued by the issuer. My understanding is that the Sri Lankan Government's default covered international bonds with a face value of more than $12 billion.[13] However, in bonds with the non-aggregated clauses, a holdout would only need to

---

[11] HRB-VOL5-000435-REPROD at 000438.

[12] Amended Complaint, filed October 13, 2022, ¶19.

[13] HRB_206 at 207.

Confidential

own 25% of a single issue of the bond to be able to block a restructuring, which in the case of the 2022 Bond was a face value of $250 million. This feature of the 2022 Bond is considered the "main reason" why in 2021 and 2022 this bond was trading at a higher proportion of face value than other Sri Lankan Government Bonds.[14] See Exhibit 1 below.

---

[14] For a discussion of these issues, see Mark Weidemaier and Mitu Gulati, "Raise a Glass to Freedom … From Debt Restructurings," *FT Alphaville*, April 27, 2023.

Confidential

*Exhibit 1: Sri Lankan Government Bond Prices*



Notes and Sources:
Data are from Bloomberg L.P.

# IV.  HRB's Financial Statements

## A.  HRB's Assets and Liabilities

38. HRB's statement of assets and liabilities for 2020 to 2024 is reproduced below in Exhibit 2.

[15]



Confidential

*Exhibit 2: HRB's Assets and Liabilities (in USD) from 2020 to 2024 – As Reported*



**Notes and Sources:**
Data are from HRB's Financial Statements for the year ended December 31, 2020 (*see* HRB-VOL2-000285 et seq.), HRB's Financial Statements

## B.   Discussion of HRB's Balance Sheet

39.

Confidential



[REDACTED] [17]

40. [REDACTED]

41. [REDACTED] Banks specialising in payment, transactions, correspondent and foreign exchange transactions, and custody services—without engaging in interest-bearing deposits or lending—are a well-established category of which HRB was not a particularly compelling part. The Bank of Saint Lucia International Limited is just one Caribbean example, I am familiar with, but globally this banking model includes many licensed payment-focused banks across multiple jurisdictions. [REDACTED]

42. [REDACTED]

---

[17] [REDACTED] and [REDACTED]

[18] [REDACTED]

[19] Deposition of Antonio Kenyatta, April 16, 2026, 410:14-412:5.

Confidential



43. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████  Again, the additional deposits were

ultimately used to fund the purchase of the 2022 Bond.

44. By 2023, HRB's holdings of the 2022 Bond had increased to slightly above $250 million of face value, more than one quarter of the total issue size of the bond.[23] That level of ownership is significant not only in balance sheet terms but also in restructuring terms, because the 2022 Bond had older-style non-aggregated collective action clauses. Ownership of approximately one quarter of a single issue could have significant implications for the ability to block a restructuring of that issue.

45. The following table summarizes the balance sheet pattern that I consider central to this report.

---

[20] ████████████████████████████████████████████████████████
████████████████████████████

[21] ███████████████████████████████████

[22] ████████████████████████████████████████████████████

[23] ██████████████████████

Confidential

*Exhibit 3: HRB's Balance Sheet Patterns*

| Metric | Fiscal Year | | | | Significance |
|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | |
| (1) | (2) | (3) | (4) | (5) | (6) |
| Deposits | ███ | ███ | ███ | ███ | ████ |
| ███ | ███ | ███ | ███ | ███ | ███ |
| ███ | █ | ███ | ███ | ███ | ███ |
| ███ | █ | ███ | ███ | ███ | ███ |

**Notes and Sources:**

███████████████████████████████████

███████████████████████████████████

46. ████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████

47. ████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

█████████████████████████

17

Confidential



48.

Confidential



50. The persistence of the concentration in assets is also important. The exposure to a CCC+ rated bond was dominant from the start, with exposure only continuing to increase and remain dominant as the sovereign credit deteriorated, after Sri Lanka suspended debt service, and after the bond matured without payment. In a prudently managed bank, those events would ordinarily lead to reassessment, risk reduction, impairment analysis, asset write-downs, capital planning, and liquidity contingency planning. ████████████████████████████████ ████

51. ████████████████████████████████



Confidential



Confidential



[29] HRB-VOL7-000631.

[30] HRB-VOL7-001408.

[31] ███████████ (Def. Ex. 11 to Deposition of Antonio Kenyatta).

21

Confidential



61. HRB's Risk Assessment also shows concentration of depositors by business category.

[32] HRB-VOL5-000435-REPROD at 000446.

[33] HRB-VOL5-000435-REPROD at 000447.

22

Confidential



[35] HRB-VOL5-000435-REPROD at 000452.

[36] HRB-VOL5-000435-REPROD at 000453.

[37] HRB-VOL5-000435-REPROD at 000459.

[38] HRB-VOL5-000435-REPROD at 000463.

Confidential

66.

*Exhibit 5: HRB's Liability Concentration*



**Notes and Sources:**

"Risk Assessment, Financial Crime Customer Risk Rating Methodology, Risk Appetite Framework", *Hamilton Reserve Bank*, May 31, 2022 (HRB-VOL5-000435-REPROD et seq.)

67.

Confidential



70. International prudential standards reinforce this point. The Basel Committee's large exposures framework is designed to protect banks from losses caused by the sudden default of a single counterparty or group of connected counterparties. Under that framework, the general large exposure limit is 25% of a bank's Tier 1 capital.[39] For Bank Supervisors, accountants, and internal risk managers, exposure to a counter-party would include, for instance, holdings in all of the bonds and other instruments of the same issuer, in this case the Republic of Sri Lanka. The point of such a limit is that the capital and liquidity buffers that Bank Supervisors, accountants, and internal risk managers use assume a broad diversity of exposures so that the likelihood of a collection of defaults or withdrawals occurring at the same time and of a scale that puts the bank's liquidity or solvency at risk are small. If, for an extreme example,

---

[39] "Supervisory framework for measuring and controlling large exposures," *Basel Committee on Banking Supervision*, April 2014.

Confidential

there was only one poorly-rated exposure, then the risk of something happening in the future that could cause the bank to be insolvent would be greater; thus, the capital and liquidity buffers a bank would have against future risks should be greater than standard buffers to better protect depositors. Note, that this is 25% of *capital* or shareholder funds not the larger amount of total deposits.

71.

[41]

[40]

[41]

Confidential

*Exhibit 6: Basel Guidance Limits vs. HRB's 2022 Bond Position*



| Year (1) | Reported Equity (2) | Illustrative 25% of Equity (3) | Sri Lanka 2022 Bond Position (4) | Scale of Bond Position Relative to 25% Benchmark (5) |
|---|---|---|---|---|
| 2021 | ██████ | ██████ | Approx. $143.96 million face value | ██████ |
| 2022 | ██████ | ██████ | Approx. $240.79 face value | ██████ |
| 2023 | ██████ | ██████ | Approx. $250.49 face value | ██████ |

**Notes and Sources:**

████████████████████████████████████████
████████████████ "Supervisory framework for measuring and controlling large exposures", *Basel Committee on Banking Supervision*, April 2014, and Basel Framework LEX standard.

72.
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████

73. The prudential concern is even greater because the asset was distressed and then defaulted. As discussed in my previous declaration, by the time HRB started to purchase the 2022 Bond in August 2021, Sri Lanka's credit rating was CCC at Fitch, CCC+ at S&P, and Caa1 at Moody's.[42] At no point subsequent to HRB's initial purchase of the 2022 Bond in August 2021 did Sri Lanka's Foreign Currency Long-Term Debt Rating achieve an investment grade level. Prudential frameworks require that distressed or defaulted assets be reassessed, impaired where appropriate with write-downs lowering reported capital, actively monitored, and considered in capital

---

[42] Declaration of Avinash Persaud, July 17, 2023, ¶19.

Confidential

and liquidity planning. A bank is not expected to continue treating a matured and unpaid asset as if expected repayment at maturity remains the operative assumption.

74. In a prudentially managed institution, investment in a below-investment-grade sovereign credit would typically trigger documented consideration of the investment thesis; further deterioration and nonpayment at maturity of the asset would additionally involve reconsideration of the investment thesis, impairment analysis, liquidity contingency planning, capital write-downs, and board or committee escalation. If the bank nevertheless decided to maintain the position, one would expect extensive documentation explaining why the position remained consistent with the bank's risk appetite, bank solvency and depositor protection, and key liquidity ratios.

75.

76.

Confidential



77. Moreover, this reasoning does not hold when one considers the significant difference in magnitude between the prior Sri Lanka investments and the 2022 Bond investment. The earlier July 2021 investment was approximately $31.8 million in face value.[47] The exposure of the 2022 Bond on the other hand was far greater, rising to almost ten times this earlier amount. Using the previous, smaller Sri Lanka investment as valid precedent to invest at almost ten times the amount in what had become a more distressed and poorly rated 2022 Bond does not make sense.[48]

78.

---

[45] Deposition of Antonio Kenyatta, April 16, 2026, 123:1-15.

[46] Deposition of Antonio Kenyatta, April 16, 2026, 155:5-157:18

[47] HRB-VOL7-000674 (Def. Ex. 14 to Deposition of Antonio Kenyatta).

[48] When HRB began investing in the Sri Lanka July 2021 bond series in September 2020 (*see* HRB-VOL7-000674 (Def. Ex. 14 to Deposition of Antonio Kenyatta)), Sri Lanka's foreign currency long term debt was rated B- by S&P. When HRB began investing in the Sri Lanka July 2022 Bond in August 2021, the rating had dropped to CCC+ (ratings data from Bloomberg L.P).

[49] HBR-VOL9-000015 at 000016.

Confidential



79. Mr. Kenyatta says that they had no reason to believe that Sri Lanka would not pay out on the 2022 Bond.[51] To say that there was *no* reason, especially in light of the 2022 Bond's CCC+ rating by S&P in 2021 and CCC in early 2022 and equivalent ratings by other leading credit rating agencies, is inexplicable. According to S&P, a CCC sovereign rating means that the obligor is "currently vulnerable and is dependent upon favourable business, financial, and economic conditions to meet its financial commitments."[52]

80. In late 2021, S&P cut its credit outlook on bonds issued by the Republic of Sri Lanka to negative and Moody's and Fitch downgraded them below the equivalent of CCC, so that for months before the April 2022 suspension of debt payments by the Republic of Sri Lanka, the credit rating agencies were collectively broadcasting that Sri Lanka's bonds were extremely fragile and close to default.

81.

---

[50]

[51] Deposition of Antonio Kenyatta, April 16, 2026, 195:24-25.

[52] "S&P Global Ratings Definitions," *S&P Global*, December 16, 2025, available at
https://www.spglobal.com/ratings/en/regulatory/article/190705-s-p-global-ratings-definitions-s504352.

Confidential



The lawsuit against Sri Lanka was publicly filed in July of 2022. This point is reiterated by Mr. Kenyatta in his recent deposition; "The case is public. Everybody in the world knows about it. Everybody knows that there's some little bank in Nevis suing Sri Lanka. That is – as I've said before, you have to be hiding under a rock."[54]

[55]

82. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

83. HRB's stated or presented model implied liquid, safe assets. ▮▮▮

---

[53] Deposition of Antonio Kenyatta, April 16, 2026, 426:3-4 and HRB-VOL2-000433 at 000435.

[54] Deposition of Antonio Kenyatta, April 16, 2026, 372:11-18

[55] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I also note that there exists an outstanding lawsuit against HRB whereby one depositor, Jesse Guzman, is seeking recovery of deposits with a claim of about $50 million, however Mr. Kenyatta has characterized this as a compliance issue (*see* Deposition of Antonio Kenyatta, April 16, 2026, 413:8-21).

Confidential

## VIII. Treatment of the Asset and Litigation Dependence

84.

85.

86.

87.

88.

Confidential



## IX.  Final Synthesis

---

[56] Declaration of Avinash Persaud, July 1, 2025, ¶¶23-27.

[57]

Confidential

92.

93.

94.

95.

## X.    Opinion

96. My opinions from my previous declarations remain the same.

Confidential

97. In my opinion, HRB's structure and conduct are inconsistent with prudential banking principles.

98. This is not a case of poor risk management alone. ██████████████████ ██████████████████████████████

99. A conventional bank reduces risk by taking deposits from many depositors and investing them across a diversified set of assets. A payments or safekeeping bank reduces risk by investing deposits in highly liquid, low-risk assets that preserve depositor liquidity. ████████████████████████ ████████████████████████

100.

101. 

102. 

103.

Confidential

$\mathcal{ADP1}$
_____

Avinash Persaud

May 6th, 2026

# Appendix I
**AVINASH D. PERSAUD**
apersaud@me.com
Born, Barbados 22 June 1966
British and Barbadian citizen

Avinash Persaud's career unusually spans finance, public policy and academia.

## *CURRENT POSITIONS*

**Special Advisor to the President of the Inter-American Development Bank,** Washington, January 2024 -

**Member of the Consultative Group, Sovereign Debt Forum,** Den Haag, 2026 -

**Member of the Wise Persons Group, Green Guarantee Group, Berlin, 2025-**

**Member of the Inter-Governmental Taskforce for Debt, Nature and Climate, sponsored by Colombia, France, Germany and Kenya, 2024-**

## *PAST POSITIONS IN PUBLIC POLICY*

**Special Envoy to the Prime Minister of Barbados for Investment and Financial Services, Government of Barbados, Bridgetown 2018-2022**

**Expert Member of the Transition Committee of the UNFCCC Loss and Damage Fund and Funding Arrangements, 2023, Dubai**

**Chair, Caribbean Commission on the Economy,** CARICOM**, 2019-2021, Georgetown.**

**Non-Executive Chair, Financial Services Commission of Barbados, 2018-2021, Bridgetown.**

**World Economic Forum ("Davos"), Member, Council on International Monetary System**, 2012 – 2018, Davos

**Expert Member, HM Treasury Audit & Risk Committee,** UK Government, 2008–2011, London.

**Member of the Pew Task Force to the US Senate Banking Committee,** 2009-2010, Washington.

**Honorary Advisor, National Financial Sector Legislative Reform Commission of India**, 2010-2013, Delhi.

**Commissioner, UN Commission on Financial Reform ("Stiglitz Commission"),** 2009–2010, New York. (Chair of the Regulation Sub-Committee)

**Co-Chair, Emerging Market Network, OECD,** 2005–2010, Paris

(Bringing together OECD officials with CEOs of 50 of the largest companies operating in the "South".)

**Chairman, Warwick Commission on International Financial Reform**, 2009, Warwick University, UK. (The Commission's report had forwards from Adair Turner, Mark Carney and Andrew Sheng.)

**Visiting Researcher, European Central Bank,** 2005–2006, Frankfurt
(Focus on financial market liquidity. This work was published in ECB Occasional Papers No. 50.)

**Visiting Scholar,  International Monetary Fund**, 2000–2001, Washington.
Developing my earlier work on measuring shifts in investor risk appetite. This work was referenced in subsequent World Economic Outlooks and published in International Finance, Vol. 5, No. 3, 2002.

**Deputy Chairman, Overseas Development Institute**, 2002–2010, London.
The world's largest and oldest think tank on the eradication of poverty. It supports 140 researchers.


*FORMER EXECUTIVE POSITIONS IN FINANCE*


**Investment Director, Global Asset Management**, 2003–2005, London, UK
One of the oldest and largest, alternative asset managers, focused on sovereign bonds and currencies.

**Managing Director, State Street Bank,** 1999–2003, London, UK
One of the world's largest holders of assets under management, custody and accounting.

**Global Head, FX and Commodity Research & Member of the FX Management Committee
J.P. Morgan**, 1993–1999, London, UK
(Member of the nine-person Management Committee that oversaw the $1bn currency and commodity business. Developed analytical tools regularly published in the Financial Times and Wall Street Journal.)

**Director, Fixed Income Research, Union Bank of Switzerland,** 1988–1993, London, U


*NON-EXECUTIVE POSITIONS IN FINANCE*


**Non-Executive Chairman, Royal Bank of Canada, Barbados Limited**, 2017–2018,
The Barbados subsidiary of RBC. Previously Chair of the Audit Committee.

**Non-Executive Director and Chairman, Audit Committee, The Beacon Insurance Company Ltd**. 2012–2018, Trinidad and Tobago
(The operations are primarily non-life insurance with gross premiums)

**Non-Executive Chairman and Director of Elara's Luxembourg funds**
Elara Capital. 2005-2019, London, UK
Non-Executive Chairman of a boutique emerging market bank

**Non-Executive Director, Royal Bank of Canada (Financial)**. 2010–2018, Trinidad and Tobago
The Caribbean subsidiary of RBC.

**Non-Executive Director (and previously Member of the Investment Committee), Proven Investments Limited,** and Non-Executive Director of BOSLIL a wholly owned subsidiary, 2016 – 2024, An international investment trust primarily invested in fixed-income assets

*ACADEMIC & RESEARCH POSITIONS, HONOURS & EDUCATION*

**(Google Scholar: 4,700 citations, h-index, 26, i10-index, 50)**

**Nonresident Senior Fellow, Peterson Institute for International Economics**, 2014- 2016, Washington D.C.
(Writing policy briefs on exchange rates, international monetary system, international finance, financial regulation, systemic risk, investor behaviour, liquidity.)

*2024 Perry World House Fellow, University of Pennsylvania, 2024*

**Executive Fellow, London Business School**, 2011 – 2014
(Teaching International Economics and Finance for the MBA and Executive MBA.)

**Mercer Memorial Professor of Commerce (now Emeritus Professor), Gresham College, UK** 2003 – 2006, UK.
(The College and seven professorships were established in 1597 by Sir Thomas Gresham. The Royal Society was formed at Gresham. Former Chairs include Sir Christopher Wren and Robert Hooke.)

**Governor, London School of Economics, and Member of the Management Council**, 2005 – 2011, London, UK.

**President, British Science Association (BA), Section F (Economics)**, 2009 – 2010, London, UK
The BA (founded 1831) is a learned society with the object of promoting the wider understanding of science. Proceedings are recorded in the Economic Journal.

**Trustee (elected) Royal Economic Society,** 2007 – 2010, London, UK
The objective of the RES (founded in 1890) is to promote the study of economics. It publishes two leading journals: The Economic Journal and The Econometrics Journal.

**Chairman of the Board of Trustees, Errol and Nita Barrow Educational Trust**, 2012 – 2024
A 21 year old education trust that awards post-graduate exhibitions and scholarships

**Non-Executive Director & Trustee (elected), Global Association of Risk Professionals,** 2002 – 2009, New York, USA
(120,000-strong professional organization delivering the Fellow of Risk Management (FRM)).

**Distinguished Visitor to the Republic of Singapore**
(A designation conferred by the Singapore International Association in 2001 involving a series of lectures and discussions with policy makers)

**First Prize, Jacques de Larosiere Award in Global Finance, IIF, Washington**, 2000

**Bronze Award, Amex Bank Awards in Finance and the International Economy**, 1994

**London School of Economics and Political Science**
BSc, (Hons.) International Monetary Economics. 1984 – 1987

*RECENT EXPERT TESTIMONY*

Laiki Bank versus Greek Central Bank, a case involving a bank's insolvency and illiquidity because of its holdings of defaulted government securities. ICSID hearings in Zurich, 2015

Lloyds HBOS versus shareholders, a case involving disclosures around the asset quality of the bank. UK High Court hearings in 2018.

Lehman Brothers In Receivership versus Exotix, a case involving trading and valuing of emerging market government securities. UK High Court hearings in 2019.

Laiki Bank depositors versus Central Bank of Cyprus, a case involving the treatment of depositors in a bank wind-up because of its holdings of defaulted government securities. ICSID hearings in London in 2023.


*PUBLICATIONS*


*De-risking Macro-finance and Unblocking the Green Transition in Emerging Economies*, Policy-Driven Climate and Development Finance, Chapter 12, 2025.

*Unlocking the green transition in developing countries with a partial foreign exchange guarantee.* A. Persaud, CPI, June 2023

*Avinash Persaud on how to boost investment in climate protection*, By Invitation, The Economist, https://www.economist.com/by-invitation/2022/12/07/avinash-persaud-on-how-to-boost-investment-in-climate-protection. December 7th, 2022.

*Breaking the deadlock on Climate: The Bridgetown Initiative,* La Geopolitique Reseau, Energie, Environment, Nature, November 2022.

*Barbados offers lessons for debt relief in future crises,* Opinion, The Financial Times, June 27, 2021

*Adam Tooze's Crashed: How a Decade of Financial Crises Changed the World,* Contributions to Political Economy, Volume 38, Issue 1, 2019, Pages 74–81, https://doi.org/10.1093/cpe/bzz015

*The future of traditional banking*, Feature Address, Annual Conference, Finance Watch, June 2016.

*Breaking the Link between Housing Cycles, Banking Crises and Recession*, Policy Brief 16-3, Peterson Institute for International Economics, April 2016.

*Reinventing Financial Regulation,* Springer, 2015.

*How Not to Regulate Insurance Markets: The Risks and Dangers of Solvency II*, Policy Brief, 15-5, Peterson Institute for International Economics, April 2015.

*Why Bail-In Securities Are Fool's Gold*, Policy Brief, 14-23, Peterson Institute for International Economics, November 2014.

*Will the new regulatory regime for OTC markets impede financial innovation?* Financial Stability Review, Banque de France, pp 223-238, April 2013.

*Vive la difference,* The Economist (Guest Article), January 26, 2013.

*Micro and Macro Prudential Regulation* in Handbook of Safeguarding Global Financial Stability, Elsevier, November 2012.

*The nature of modern credit markets, banking and financial innovation*, co-authored with K. Alexander and J Eatwell, in Research Handbook on International Financial Regulation, Edward Elgar, 2012.

*Fostering Growth and Development in Small States through Disruptive Change.* Centre for International Governance Innovation, (CIGI) Waterloo, Canada, 2011.

*Where Europe and America differ on global banking regulation*, Europe's World, June 2010.

*The Locus Of Financial Regulation: home versus host.* International Affairs, Volume 86, Number 3, May 2010.

*A critique of current proposals to reform bank regulation*, Butterworths Journal of International Banking and Financial Law 25 (3), pp 147-148. 2010.

*In Praise of an Unlevel Playing Field*, editor and chair, The Warwick Commission on International Financial Reform, The University of Warwick, 2009.

*Macro-Prudential Regulation*, The World Bank Group, Crisis Response, Note Number 6. July 2009.

*The Fundamental Principles of Financial Regulation*, co-authored with, M. Brunnermeier, A. Crockett, C. Goodhart and H. Shin, Geneva Report on the World Economy Series, 11, ICMB/CEPR/NBER, May 2009.

*Report of the Commission of Experts of the President of the United Nations General Assemby on Reforms of the International Monetary and Financial System*, Co-authored with J. Stiglitz, Y Boutros-Ghali, JP Fitoussi, CA Goodhart. UN Conference on the World Financial and Economic Crisis, 2009.

*Valuation, Regulation And Systemic Liquidity,* Financial Stability Review, Banque de France, No. 12, p.75, October 2008.

*How well-meaning accounting and legal principles contributed to the financial crisis and what to do about it.* Butterworths Journal of International Banking and Financial Law 24 (1) pp 3-4, 2009.

*Point of View, Will Basle II Help Prevent Crises or Worsen Them?* Finance and

Development, IMF, 2008.

*Financial Supervision and Crisis Management in the EU*, co-authored with K Alexander, J. Eatwell and R Reoch. Economic and Scientific Policy Committee of the European Parliament, 2007.

*All you need to know about ethics and finance: Finding a moral compass in business today*, coauthored with J. Plender. Longtail, 2007.

*Implications for Liquidity From Transparency in European Bond Markets,* co-authored with Marco Lagana, Martin Perina and Isabel Von Koppen-Mertes. European Central Bank, Occasional Papers, No. 50. August 2006.

*Redesigning Regulation Of Pensions And Other Financial Products,* co-authored with J. Nugee. Oxford Review of Economic Policy, Pensions, Vol. 22, No. 1, pp 66-77; January 2006.

*Improving efficiency in the European government bond market*, Intelligence Capital and SSRN, 2006.

*Official Reserves and Currency Management in Asia, Myth, Reality and the Future,* co-authored with H. Genberg, R. McCauley, Y.C Park, Centre for Economic Policy Research, 2005.

*Seven rules of foreign exchange,* Central Banking, May 2004

*Credit Derivatives, Insurance Companies and Liquidity Black Holes,* Geneva Papers on Risk and Insurance, Issues and Practice, Vol. 29. No. 2 April 2004.

*Liquidity black holes: Understanding, quantifying and managing financial liquidity risk*, editor. Risk Books, 2003.

*Economic Policy forum explaining and forecasting exchange rates with order flows*, Economie Internationale, pp135-138, 2003.

*Pure Contagion and Investors' Shifting Risk Appetite,* co-authored with Manmohan S. Kumar. International Finance, Vol. 5, No. 3, Winter 2002.

*International Capital Flows in the 1990s: The Role of Institutional Investors,* in Short-Term Capital Flows and Economics Crises, edited by S-Griffith-Jones, Manuael F Montes and Anwar Nasution, Oxford University Press, 2001.

*The Knowledge Gap,* Foreign Affairs, 107-117, 2001.

*Sending the herd off the cliff edge: the disturbing interaction between herding and market sensitive risk management practices,* BIS Papers Number 2 *and* Journal of Risk Finance, 2 (1), 59-65, 2000.

Confidential

# Appendix II

## Materials Considered

| Number | Item |
|:---:|:---|
| (1) | (2) |
|  | **Produced Materials** |
| 1 | Amended Complaint, *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* , No. 1:22-cv-5199 (DLC), filed October 13, 2022. |
| 2 | Declaration of Antonio Kenyatta in Further Support of Plaintiff Hamilton Reserve Bank Ltd.'s Motion for Summary Judgement, *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* , July 7, 2023. |
| 3 | Declaration of Antonio Kenyatta in Support of Plaintiff Hamilton Reserve Bank Ltd.'s Motion for Summary Judgement, *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* , June 26, 2023. |
| 4 | Deposition of Antonio Kenyatta, *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* , April 16, 2026. |
| 5 | ECF 140-4 (Pl.'s Exhibit 3 to Deposition of Antonio Kenyatta). |
| 6 | ECF 46-7. |
| 7 | ECF 46-8. |
| 8 | ECF 46-9. |
| 9 | ECF 59-10 (Def.'s Exhibit 7 to Deposition of Antonio Kenyatta). |
| 10 | ECF 59-9 (Def.'s Exhibit 6 to Deposition of Antonio Kenyatta). |
| 11 | ECF 93-1 (Pl.'s Exhibit 2 to Deposition of Antonio Kenyatta). |
| 12 | "Hamilton Reserve Bank Completes US$ 35 Million Oversubscribed Equity Financing at USD 2 Billion Valuation, Aims for a Multi-Billion IPO," *Hamilton Reserve Bank* , screenshot of website (Def.'s Exhibit 4 to Deposition of Antonio Kenyatta). |
| 13 | Historical Bond Ratings 5.875 7-25-22. |
| 14 | HRB_024 – HRB_027 (Pl.'s Exhibit 4 to Deposition of Antonio Kenyatta). |
| 15 | HRB_028. |
| 16 | HRB_144 - HRB_165 (Def.'s Exhibit 42 to Deposition of Antonio Kenyatta). |
| 17 | HRB_166 - HRB_183. |
| 18 | HRB_184 - HRB_193 (Def.'s Exhibit 30 to Deposition of Antonio Kenyatta). |
| 19 | HRB_194 - HRB_195. |
| 20 | HRB_196 - HRB_200. |
| 21 | HRB_201 - HRB_202. |
| 22 | HRB_203 - HRB_205 (Def.'s Exhibit 27 to Deposition of Antonio Kenyatta). |
| 23 | HRB_206 - HRB_213. |
| 24 | HRB_214 - HRB_216. |
| 25 | HRB_217 - HRB_219. |
| 26 | HRB_220 - HRB_222. |
| 27 | HRB_223 - HRB_226 |
| 28 | HRB_226. |
| 29 | HRB_227 - HRB_229. |
| 30 | HRB_230. |
| 31 | HRB_231. |
| 32 | HRB's Amended Objections and Responses to Interrogatory Nos. 5, 14 & 15, *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka* , April 14, 2026 (Def.'s Exhibit 13 to Deposition of Antonio Kenyatta). |
| 33 | HRB-VOL1-000002-REPROD – HRB-VOL1-000006-REPROD. |
| 34 | HRB-VOL1-000033-REPROD – HRB-VOL1-000037-REPROD. |
| 35 | HRB-VOL1-000038-REPROD – HRB-VOL1-000043-REPROD. |
| 36 | HRB-VOL1-000090-REPROD – HRB-VOL1-000096-REPROD. |
| 37 | HRB-VOL1-000106-REPROD – HRB-VOL1-000108-REPROD. |
| 38 | HRB-VOL2-000001 – HRB-VOL2-000103. |
| 39 | HRB-VOL2-000105 (Def.'s Exhibit 11 to Deposition of Antonio Kenyatta). |
| 40 | HRB-VOL2-000137 – HRB-VOL2-000168 (Def.'s Exhibit 2 to Deposition of Antonio Kenyatta). |
| 41 | HRB-VOL2-000174 – HRB-VOL2-000177 (Def.'s Exhibit 8 to Deposition of Antonio Kenyatta). |
| 42 | HRB-VOL2-000178 – HRB-VOL2-000284. |
| 43 | HRB-VOL2-000285 – HRB-VOL2-000323 (Def.'s Exhibit 10 to Deposition of Antonio Kenyatta). |
| 44 | HRB-VOL2-000324 – HRB-VOL2-000430. |
| 45 | HRB-VOL2-000432. |
| 46 | HRB-VOL2-000433 – HRB-VOL2-000447 (Def.'s Exhibit 43 to Deposition of Antonio Kenyatta). |

Confidential

# Appendix II

### Materials Considered

| Number (1) | Item (2) |
| --- | --- |
| 47 | HRB-VOL2-000433 – HRB-VOL2-000447. |
| 48 | HRB-VOL2-000448 – HRB-VOL2-000461. (Def.'s Exhibit 44 to Deposition of Antonio Kenyatta). |
| 49 | HRB-VOL3-000136 – HRB-VOL3-000150 (Def.'s Exhibit 38 to Deposition of Antonio Kenyatta). |
| 50 | HRB-VOL3-000303 – HRB-VOL3-000307. |
| 51 | HRB-VOL3-000521 – HRB-VOL3-000533. |
| 52 | HRB-VOL3-000587 – HRB-VOL3-000599. |
| 53 | HRB-VOL3-000607 – HRB-VOL3-000617. |
| 54 | HRB-VOL3-000618 – HRB-VOL3-000622. |
| 55 | HRB-VOL3-000625 – HRB-VOL3-000627. |
| 56 | HRB-VOL3-000628 – HRB-VOL3-000629. |
| 57 | HRB-VOL3-000630. |
| 58 | HRB-VOL4-000018 – HRB-VOL4-000028. |
| 59 | HRB-VOL4-000204 – HRB-VOL4-000205. |
| 60 | HRB-VOL4-000278 – HRB-VOL4-000279 (Def.'s Exhibit 41 to Deposition of Antonio Kenyatta). |
| 61 | HRB-VOL4-000390 – HRB-VOL4-000409 (Def.'s Exhibit 33 to Deposition of Antonio Kenyatta). |
| 62 | HRB-VOL4-000810 – HRB-VOL4-000811. |
| 63 | HRB-VOL4-000933 (Def.'s Exhibit 40 to Deposition of Antonio Kenyatta). |
| 64 | HRB-VOL4-000937 – HRB-VOL4-000940. |
| 65 | HRB-VOL4-000968 – HRB-VOL4-000978. |
| 66 | HRB-VOL4-000979 – HRB-VOL4-000980 (Def.'s Exhibit 32 to Deposition of Antonio Kenyatta). |
| 67 | HRB-VOL4-000981 – HRB-VOL4-000982 (Def.'s Exhibit 32 to Deposition of Antonio Kenyatta). |
| 68 | HRB-VOL4-000983 – HRB-VOL4-000984 (Def.'s Exhibit 32 to Deposition of Antonio Kenyatta). |
| 69 | HRB-VOL4-000985 – HRB-VOL4-000988 (Def.'s Exhibit 32 to Deposition of Antonio Kenyatta). |
| 70 | HRB-VOL4-000989 (Def.'s Exhibit 32 to Deposition of Antonio Kenyatta). |
| 71 | HRB-VOL4-000992 – HRB-VOL4-000995 (Def.'s Exhibit 28 to Deposition of Antonio Kenyatta). |
| 72 | HRB-VOL4-001151 – HRB-VOL4-001159 (Def.'s Exhibit 23 to Deposition of Antonio Kenyatta). |
| 73 | HRB-VOL4-001229 – HRB-VOL4-001239. |
| 74 | HRB-VOL4-001284 – HRB-VOL4-001300. |
| 75 | HRB-VOL4-001301 – HRB-VOL4-001322. |
| 76 | HRB-VOL4-001368 – HRB-VOL4-001369. |
| 77 | HRB-VOL4-001370. |
| 78 | HRB-VOL4-001379 – HRB-VOL4-001383. |
| 79 | HRB-VOL5-000005-REPROD – HRB-VOL5-000009-REPROD. |
| 80 | HRB-VOL5-000103-REPROD – HRB-VOL5-000108-REPROD. |
| 81 | HRB-VOL5-000202-REPROD – HRB-VOL5-000206 (Def.'s Exhibit 5 to Deposition of Antonio Kenyatta). |
| 82 | HRB-VOL5-000435-REPROD – HRB-VOL5-000581-REPROD. |
| 83 | HRB-VOL6-000002 (Def.'s Exhibit 45 to Deposition of Antonio Kenyatta). |
| 84 | HRB-VOL6-000005. |
| 85 | HRB-VOL6-000008. |
| 86 | HRB-VOL6-000009. |
| 87 | HRB-VOL6-000010. |
| 88 | HRB-VOL6-000011. |
| 89 | HRB-VOL6-000012. |
| 90 | HRB-VOL6-000013. |
| 91 | HRB-VOL6-000014. |
| 92 | HRB-VOL6-000015. |
| 93 | HRB-VOL6-000016. |
| 94 | HRB-VOL6-000017. |
| 95 | HRB-VOL6-000018. |
| 96 | HRB-VOL6-000019. |
| 97 | HRB-VOL6-000020. |
| 98 | HRB-VOL6-000021. |
| 99 | HRB-VOL6-000022. |
| 100 | HRB-VOL6-000023. |

Confidential

# Appendix II

## Materials Considered

| Number | Item |
|---|---|
| (1) | (2) |
| 101 | HRB-VOL6-000024. |
| 102 | HRB-VOL6-000025. |
| 103 | HRB-VOL6-000026. |
| 104 | HRB-VOL6-000027. |
| 105 | HRB-VOL6-000028. |
| 106 | HRB-VOL7-000012 – HRB-VOL7-000013. |
| 107 | HRB-VOL7-000014. |
| 108 | HRB-VOL7-000015 – HRB-VOL7-000019 (Def.'s Exhibit 16 to Deposition of Antonio Kenyatta). |
| 109 | HRB-VOL7-000048 – HRB-VOL7-000069. |
| 110 | HRB-VOL7-000079 – HRB-VOL7-000089. |
| 111 | HRB-VOL7-000090 – HRB-VOL7-000194 (Def.'s Exhibit 22 to Deposition of Antonio Kenyatta). |
| 112 | HRB-VOL7-000202 – HRB-VOL7-000206. |
| 113 | HRB-VOL7-000213. |
| 114 | HRB-VOL7-000214. |
| 115 | HRB-VOL7-000215. |
| 116 | HRB-VOL7-000216. |
| 117 | HRB-VOL7-000236 – HRB-VOL7-000238 (Def.'s Exhibit 25 to Deposition of Antonio Kenyatta). |
| 118 | HRB-VOL7-000239 – HRB-VOL7-000253 (Def.'s Exhibit 25 to Deposition of Antonio Kenyatta). |
| 119 | HRB-VOL7-000342 – HRB-VOL7-000363. |
| 120 | HRB-VOL7-000364 – HRB-VOL7-000374. |
| 121 | HRB-VOL7-000406 – HRB-VOL7-000410. |
| 122 | HRB-VOL7-000440 – HRB-VOL7-000441. |
| 123 | HRB-VOL7-000532. |
| 124 | HRB-VOL7-000601 – HRB-VOL7-000602. |
| 125 | HRB-VOL7-000631. |
| 126 | HRB-VOL7-000668 – HRB-VOL7-000671. |
| 127 | HRB-VOL7-000672 – HRB-VOL7-000674 (Def.'s Exhibit 14 to Deposition of Antonio Kenyatta). |
| 128 | HRB-VOL7-000674 (Def.'s Exhibit 14 to Deposition of Antonio Kenyatta). |
| 129 | HRB-VOL7-000675 – HRB-VOL7-000677 (Def.'s Exhibit 15 to Deposition of Antonio Kenyatta). |
| 130 | HRB-VOL7-000677 (Def.'s Exhibit 15 to Deposition of Antonio Kenyatta). |
| 131 | HRB-VOL7-000685 – HRB-VOL7-000687 (Def.'s Exhibit 17 to Deposition of Antonio Kenyatta). |
| 132 | HRB-VOL7-000687 (Def.'s Exhibit 17 to Deposition of Antonio Kenyatta). |
| 133 | HRB-VOL7-000771 – HRB-VOL7-000776 (Def.'s Exhibit 19 to Deposition of Antonio Kenyatta). |
| 134 | HRB-VOL7-000801 – HRB-VOL7-000809. |
| 135 | HRB-VOL7-000975 – HRB-VOL7-000978 (Def.'s Exhibit 26 to Deposition of Antonio Kenyatta). |
| 136 | HRB-VOL7-000977 – HRB-VOL7-000978. |
| 137 | HRB-VOL7-001258 – HRB-VOL7-001260 (Pl.'s Exhibit 1 to Deposition of Antonio Kenyatta). |
| 138 | HRB-VOL7-001260 (Pl.'s Exhibit 1 to Deposition of Antonio Kenyatta). |
| 139 | HRB-VOL7-001367 – HRB-VOL7-001371 (Def.'s Exhibit 20 to Deposition of Antonio Kenyatta). |
| 140 | HRB-VOL7-001377 – HRB-VOL7-001379 (Def.'s Exhibit 21 to Deposition of Antonio Kenyatta). |
| 141 | HRB-VOL7-001396 – HRB-VOL7-001398. |
| 142 | HRB-VOL7-001408 – HRB-VOL7-001410. |
| 143 | HRB-VOL7-001651 – HRB-VOL7-001652. |
| 144 | HRB-VOL7-001655 – HRB-VOL7-001659. |
| 145 | HRB-VOL7-001660 – HRB-VOL7-001661. |
| 146 | HRB-VOL7-001662 – HRB-VOL7-001663. |
| 147 | HRB-VOL7-001673 – HRB-VOL7-001676 (Def.'s Exhibit 39 to Deposition of Antonio Kenyatta). |
| 148 | HRB-VOL7-002520 – HRB-VOL7-002534 (withheld for privilege). |
| 149 | HRB-VOL7-002536 – HRB-VOL7-002550 (withheld for privilege). |
| 150 | HRB-VOL7-002552 – HRB-VOL7-002569 (withheld for privilege). |
| 151 | HRB-VOL7-002612 – HRB-VOL7-002711 (Def.'s Exhibit 31 to Deposition of Antonio Kenyatta). |
| 152 | HRB-VOL7-002825 – HRB-VOL7-002829 (Def.'s Exhibit 24 to Deposition of Antonio Kenyatta). |
| 153 | HRB-VOL7-002919 – HRB-VOL7-002927. |
| 154 | HRB-VOL7-002928 – HRB-VOL7-002929 (Def.'s Exhibit 18 to Deposition of Antonio Kenyatta). |

Confidential

# Appendix II

## Materials Considered

| Number (1) | Item (2) |
|---|---|
| 155 | HRB-VOL7-002937 – HRB-VOL7-002940. |
| 156 | HRB-VOL7-002966 – HRB-VOL7-002970 (Def.'s Exhibit 34 to Deposition of Antonio Kenyatta). |
| 157 | HRB-VOL7-002968 – HRB-VOL7-002970. |
| 158 | HRB-VOL7-002974 – HRB-VOL7-003086. |
| 159 | HRB-VOL7-003087 – HRB-VOL7-003088 (Def.'s Exhibit 37 to Deposition of Antonio Kenyatta). |
| 160 | HRB-VOL7-003387 – HRB-VOL7-003401 (Def.'s Exhibit 3 to Deposition of Antonio Kenyatta). |
| 161 | HRB-VOL8-000079 – HRB-VOL8-000185. |
| 162 | HRB-VOL8-000243 – HRB-VOL8-000253. |
| 163 | HRB-VOL8-000287 – HRB-VOL8-000291. |
| 164 | HRB-VOL8-000344 – HRB-VOL8-000345. |
| 165 | HRB-VOL8-000348 – HRB-VOL8-000353. |
| 166 | HRB-VOL8-000354. |
| 167 | HRB-VOL8-000355. |
| 168 | HRB-VOL8-000356. |
| 169 | HRB-VOL8-000357 – HRB-VOL8-000358. |
| 170 | HRB-VOL8-000362 – HRB-VOL8-000367. |
| 171 | HRB-VOL8-000368 – HRB-VOL8-000369. |
| 172 | HRB-VOL8-000373 – HRB-VOL8-000378. |
| 173 | HRB-VOL9-000013 – HRB-VOL9-000014 (Def.'s Exhibit 9 to Deposition of Antonio Kenyatta). |
| 174 | HRB-VOL9-000015 – HRB-VOL9-000016 (Def.'s Exhibit 9 to Deposition of Antonio Kenyatta). |
| 175 | HRB-VOL10-000001 – HRB-VOL10-000035 (Def.'s Exhibit 35 to Deposition of Antonio Kenyatta). |
| 176 | HRB-VOL10-000036 – HRB-VOL10-000045 (Def.'s Exhibit 36 to Deposition of Antonio Kenyatta). |
| 177 | HRB-VOL10-000046 – HRB-VOL10-000050. |
| 178 | HRB-VOL10-000051. |
| 179 | HRB-VOL10-000052 – HRB-VOL10-000053. |
| 180 | HRB-VOL11-000027 – HRB-VOL11-000057. |
| 181 | HRB-VOL11-000058 – HRB-VOL11-000073. |
| 182 | HRB-VOL11-000074 – HRB-VOL11-000081. |
| 183 | HRB-VOL11-000100 – HRB-VOL11-000106. |
| 184 | HRB-VOL11-000107 – HRB-VOL11-000111. |
| 185 | Notice of Deposition of Plaintiff Hamilton Reserve Bank Ltd., *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka*, June 24, 2025 (Def.'s Exhibit 1 to Deposition of Antonio Kenyatta). |
| 186 | Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories., *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka*, July 30, 2025 (Def.'s Exhibit 12 to Deposition of Antonio Kenyatta). |
| 187 | Sebastion Ambrose to Phil Jones, "Re: Seeking your regulatory guidance - remitting account balances of bank-closed customer accounts (due to compliance reasons) to a third-party legal escrow account at Wells Fargo Bank," July 30, |
| 188 | "SL - Purchase Market Value of Bonds (Aug 2021 - June 2023).xlsx." |
| 189 | "The mysterious 'global financier' suing Sri Lanka," *FT Alphaville*, September 8, 2023 (Def.'s Exhibit 29 to Deposition of Antonio Kenyatta). |
| **Other** | |
| 190 | "BCP - Core Principles for Effective Banking Supervision," *Basel Committee on Banking Supervision*, effective April 25, 2024, available at https://www.bis.org/basel_framework/standard/BCP.htm?tldate=20250619. |
| 191 | Declaration of Avinash Persaud, *Hamilton Reserve Bank Ltd v. The Democratic Socialist Republic of Sri Lanka*, July 17, 2023. |
| 192 | Declaration of Avinash Persaud, *Hamilton Reserve Bank Ltd v. The Democratic Socialist Republic of Sri Lanka*, July 1, 2025. |
| 193 | Fitch Ratings, Rating Definitions. Available at https://www.bis.org/basel_framework/chapter/CRE/20.htm?inforce=20230101&published=20221208#paragraph_CRE_20_20230101_20_7. |
| 194 | FSRC - Nevis Branch. Regulated Entities, available at https://www.nevisfsrc.com/regulated-entities/#hamilton. |
| 195 | HRB official website available at https://hrbank.com/. |
| 196 | "LEX - Large Exposures," *Basel Committee on Banking Supervision,* effective January 1, 2023, available at https://www.bis.org/basel framework/standard/LEX.htm?tldate=20260506. |

Confidential

# Appendix II

## Materials Considered

| Number | Item |
| --- | --- |
| **(1)** | **(2)** |
| 197 | Mark Weidemaier and Mitu Gulati, "Raise a Glass to Freedom … From Debt Restructurings," *FT Alphaville,* April 27, 2023. |
| 198 | "Nevis Financial Services, Guidelines on the Establishment of an International Bank in Nevis, pg 1 & 10. Available at https://www.nevisfsrc.com/themencode-pdf-viewer-sc/?tnc_pvfw=ZmlsZT0vd3AtY29udGVudC91cGxvYWRzLzIwMTgvMTIvbmV2aXMtaW50ZXJuYXRpb25hbC1iYW5raW5nLWd1aWRlbGluZXMtZG9jLnBkZiZzZXR0aW5ncz0xMTExMTExMTExMSZsYW5nPWVuLVVT#page=&zoom=auto&pagemode= |
| 199 | "S&P Global Ratings Definitions," *S&P Global* , December 16, 2025, available at https://www.spglobal.com/ratings/en/regulatory/article/190705-s-p-global-ratings-definitions-s504352. |
| 200 | "Supervisory framework for measuring and controlling large exposures," *Basel Committee on Banking Supervision* , April 15, 2014, available at https://www.bis.org/publ/bcbs283.htm. |
| 201 | Price and ratings data from Bloomberg L.P. |

# Appendix III

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HAMILTON RESERVE BANK LTD,

                    Plaintiff,

v.

THE DEMOCRATIC SOCIALIST REPUBLIC OF SRI LANKA,

                    Defendant.

No. 1:22-cv-5199 (DLC)

# DECLARATION OF AVINASH PERSAUD

I, Avinash Persaud, declare as follows pursuant to 28 U.S.C. § 1746:

1. I have been retained by counsel to the Democratic Socialist Republic of Sri Lanka ("**Sri Lanka**") to opine on bank regulation, bank capital requirements, Hamilton Reserve Bank's ("**HRB**") holdings of a bond issued by Sri Lanka. The bond in question was due on July 25, 2022, paid a coupon rate of 5.875%, and was denominated in US dollars (the "**2022 Bond**"). I make this declaration based on my personal knowledge, information, and belief and my review of relevant documents.

2. Through my work on bank solvency, I was one of the intellectual architects of Basel III. I currently serve as the Special Envoy to the Prime Minister of Barbados on matters involving investment and finance. I am a former chair of the Financial Services Commission of Barbados and I have also acted in roles involving financial services in St. Kitts and Nevis, such as co-chair of the CARIFORUM conference on financial services, co-chair of the US-Treasury CARICOM Committee on Finance, and Chair of the CARICOM Committee on the Economy. My Curriculum Vita is attached as Appendix 1.

## I.    Background on HRB's Holdings

3. HRB asserts that it started purchasing the 2022 Bond in August of 2021 and that it currently holds $250,490,000 in face value.[1] It purchased the 2022 Bond in over 200 transactions beginning in August 13, 2021.[2]

4. It was reported that HRB has approximately $1 billion in total assets.[3] Therefore, using the July 6, 2023 reported price from Bloomberg of $47.887, HRB's holdings of the 2022 Bond have an estimated value of $119,952,146.[4] This would be 12% of HRB's total assets.

---

[1] Declaration of Antonio Kenyatta in Further Support of Plaintiff Hamilton Reserve Bank Ltd.'s Motion for Summary Judgment. Document 52.

[2] ECF#46-7 – Ex. G, ECF#46-8 – Ex. H, ECF#46-9 – Ex. I.

[3] https://www.temenos.com/community/success-stories/hamilton-reserve-bank-success-story/. As of July 16, 2023, HRB has a tweet about this article as HRB's "pinned" tweet, see https://twitter.com/Client1stBank.

[4] Bloomberg end of day price quote 7/6/2023 was $47.887. $250,490,000 * ($47.887/$100) = $119,952,146.

## II.    What HRB says about its business model, risk appetite and clients

5.    To signal its value to potential and existing customers, HRB boasts on its website that it has a very simple business model.[5] It engages in no loans and no lending, which would be considered activities that require significant capital by bank regulators to keep depositors safe from the risks of loss.[6] Instead, HRB states that it holds customer deposits in cash and selected sovereign bonds.[7]  While it does not state which "selected" bonds, a bank portraying itself as being very conservative, not even involved in the standard bank risk of loans and lending, and, for instance, keeping cash deposits in cash, it would likely imply that they selected these bonds for their safety, and that bonds were close to cash in terms of their risk and liquidity, for example short-dated bonds US Treasury or UK Government Bonds (depending on the currency of the bulk of its deposits).

6.    As part of its characterization of itself as simple and safe, HRB cites a dominant local market position in escrow and trusts. HRB offers other services to clients such as wealth management, the international sale or purchase of securities, and services related to bankruptcies and restructurings.[8]

## III.   Brief Overview on Banks, their Assets, and Regulation

7.    HRB is an international bank headquartered in Nevis. HRB is a licensed and regulated bank based in St. Kitts and Nevis.[9]

---

[5] Hamilton Reserve Bank. Available at https://hrbank.com/. HRB states on its website that "Hamilton Reserve Bank has a simple business model" and that "[c]ustomer deposits remain in cash or government bonds."

[6] According to Basel Framework CRE 20.82, the risk weight for residential real estate not dependent on property cash flow ranges from 20% to 70% depending on the relevant loan to value ratio.  See Section III for a further discussion.

[7] Hamilton Reserve Bank. Available at https://hrbank.com/. HRB makes two statements on it home page regarding the use and safety of customer deposits. First, they state that "[c]ustomer deposits remain in cash or government bones: Fast, Safe, and Confidential." They go on to later state"[t]he bank maintains deposits in cash or selected foreign bonds, safeguarding customer deposits."

[8] Hamilton Reserve Bank. Available at https://hrbank.com/ .

[9] Hamilton Reserve Bank, About The Bank. Available at https://hrbank.com/about-the-bank/.

8. Because banks hold deposits of customers, lend to banks, and play a critical role in the payments system, they carry more significant "spill-over" risks than ordinary firms: one bank's failure can impact other banks and undermine confidence in the entire payment system.[10] Consequently, banks are subject to additional regulation.

9. The 2014 Nevis International Banking Ordinance ("NIBO") governs the operations of international banks in Nevis.[11] The Nevis Ministry of Finance must approve the licensing and incorporation of the international financial businesses. The approval process revolves around due diligence conducted by Financial Services Regulatory Commission (FSRC)-Nevis Branch. HRB is regulated by the FSRC-Nevis Branch[12], which states that in its regulation and supervision they are "guided by the concept of consolidated supervision contained in the *Core Principles for Effective Banking Supervision* released by the Basel Committee on Banking Supervision."[13]

   i. Principle 15 – Risk management process

   ii. Principle 16- Capital Adequacy

      1. "…Capital requirements are not less than the applicable Basel Standards."

   iii. Principle 17- Credit Risk

   iv. Principle 18 – Problem Assets, provisions, and reserves

---

[10] BIS. Risk transfers in international banking.

[11] Nevis Financial Services. Guidelines on the Establishment of an International Bank in Nevis, pg. 1. Available at https://www.nevisfsrc.com/themencode-pdf-viewer-sc/?tnc_pvfw=ZmlsZT0vd3AtY29udGVudC91cGxvYWRzLzIwMTgvMTIvbmV2aXMtaW50ZXJuYXRpb25hbC1iYW5raW5nLWd1aWRlbGluZXMtZG9jLnBkZiZzZXR0aW5ncz0xMTExMTExMTExMSZsYW5nPWVuLVVT#page=&zoom=auto&pagemode=.

[12] FSRC-Nevis Branch. Regulated Entities. Available at https://www.nevisfsrc.com/regulated-entities/#hamilton.

[13] Nevis Financial Services. Guidelines on the Establishment of an International Bank in Nevis, pg. 10. Available at https://www.nevisfsrc.com/themencode-pdf-viewer-sc/?tnc_pvfw=ZmlsZT0vd3AtY29udGVudC91cGxvYWRzLzIwMTgvMTIvbmV2aXMtaW50ZXJuYXRpb25hbC1iYW5raW5nLWd1aWRlbGluZXMtZG9jLnBkZiZzZXR0aW5ncz0xMTExMTExMTExMSZsYW5nPWVuLVVT#page=&zoom=auto&pagemode=.

4

    v.   Principle 24 – Liquidity Risk[14]

10. The framework and background to the Core Principles may be summarized as follows. Bank liabilities are their customers' deposits, and bank assets are what they have used them for, such as issuing loans to customers. Without regulation, banks are incentivized to invest their customers' deposits in more speculative, illiquid, high-yielding assets than would be safe for their customers or the financial system. Banking regulation counters this by asking banks to put aside their own funds (undistributed profits and other shareholders equity), as loss-absorbing capital in relation to the riskiness of their assets. The capital is used in part to fund these assets. There are different risks, such as liquidity, market, credit, counter-party, and operational risks, and regulators add up these risks of its assets into a sum of "risk-weighted-assets" and require banks to hold as capital and fund a percentage - approximately 8% - of their risk-weighted assets with their own funds.

11. Nevis states that its capital requirements are no less than the Basel capital standards.[15] Under the Basel capital standards, the amount of capital a bank needs to use to purchase and hold a sovereign bond is related to its credit rating.[16] The three leading credit rating agencies are commonly considered to be Standard and Poor's, Moody's and Fitch. Below, we set out the definitions of what the ratings mean, using for illustration Fitch's definitions.[17]

***Investment Grade***

    AAA: Highest credit quality

---

[14] Core Principles for Effective Banking Supervision, 2019. Available at https://www.bis.org/basel_framework/chapter/BCP/01.htm.

[15] Nevis Financial Services. Guidelines on the Establishment of an International Bank in Nevis, pg. 12. Available at https://www.nevisfsrc.com/themencode-pdf-viewer-sc/?tnc_pvfw=ZmlsZT0vd3AtY29udGVudC91cGxvYWRzLzIwMTgvMTIvbmV2aXMtaW50ZXJuYXRpb25hbC1iYW5raW5nLWd1aWRlbGluZXMtZG9jLnBkZiZzZXR0aW5ncz0xMTExMTExMTExMSZyYW5nPWVuLVVT#page=&zoom=auto&pagemode=.

[16] Basel Framework, CRE 20.7. Available at https://www.bis.org/basel_framework/chapter/CRE/20.htm?inforce=20230101&published=20221208#paragraph_CRE_20_20230101_20_7.

[17] Fitch Ratings, Rating Definitions. Available at https://www.fitchratings.com/products/rating-definitions.

'AAA' ratings denote the lowest expectation of default risk. They are assigned only in cases of exceptionally strong capacity for payment of financial commitments. This capacity is highly unlikely to be adversely affected by foreseeable events.

AA: Very high credit quality

'AA' ratings denote expectations of very low default risk. They indicate very strong capacity for payment of financial commitments. This capacity is not significantly vulnerable to foreseeable events.

A: High credit quality

'A' ratings denote expectations of low default risk. The capacity for payment of financial commitments is considered strong. This capacity may, nevertheless, be more vulnerable to adverse business or economic conditions than is the case for higher ratings.

BBB: Good credit quality

'BBB' ratings indicate that expectations of default risk are currently low. The capacity for payment of financial commitments is considered adequate, but adverse business or economic conditions are more likely to impair this capacity.

### ***Speculative Grade***

BB: Speculative

'BB' ratings indicate an elevated vulnerability to default risk, particularly in the event of adverse changes in business or economic conditions over time; however, business or financial flexibility exists that supports the servicing of financial commitments.

B: Highly speculative

6

'B' ratings indicate that material default risk is present, but a limited margin of safety remains. Financial commitments are currently being met; however, capacity for continued payment is vulnerable to deterioration in the business and economic environment.

CCC: Substantial credit risk.

Very low margin for safety. Default is a real possibility.

CC: Very high levels of credit risk.

Default of some kind appears probable.

12. Under the risk-weighted asset regulatory regime (Principles 16 and 17 of the Basel Core Principles and Basel Capital Standards), some assets like cash and US Treasury Bonds have a risk weight of zero, while others have higher risk weights: up to 50% in the case of some residential mortgages, 100% for some unsecured customer deposits, and 150% in the case of risky sovereign bonds. For example, if a bank puts $100m of its customer deposits into sovereign bonds issued by the government of Malaysia or Poland, both of which carry an A- or equivalent credit rating by the leading credit rating agencies, the Basel Capital Standard risk weight is 20% and if the capital requirement was the standard 8%, then the bank would need to use $1.6m of their capital to purchase the $100m asset (i.e. $100m x 20% x 8%). If, instead, they purchased a sovereign bond with a CCC+ rating, such as the Sri Lankan 2022 Bond as of August 2021, then risk weight would be 150% and the amount of capital required would be $12m ($100m x 150% x 8%) a difference of more than seven times.

13. Note that Nevis may apply a higher (more restrictive) risk-weight and Nevis may apply a higher (more restrictive) capital adequacy requirement percentage as Nevis states that they apply a regime at least as restrictive as Basel.

14. Exhibit 1 below shows the risk weightings of differently rated sovereign bonds under the Basel Framework.

7

*Exhibit 1: Risk Weights for Sovereign and Central Bank Exposures*

| External Rating of Sovereign (1) | Risk Weight (2) |
|---|---|
| AAA to AA- | 0% |
| A+ to A- | 20% |
| BBB+ to BBB- | 50% |
| BB+ to B- | 100% |
| Below B- | 150% |
| Unrated | 100% |

**Notes and Sources:**
Based on Basel Framework,
CRE 20.7.

15. The idea of this risk-to-capital mapping is to strongly disincentive banks from investing in risky assets, and if one of their holdings becomes riskier over time, to be actively managing risk, by putting aside increasing amounts of capital to absorb a future potential loss (Principles 15 and 18 of the Basel Core Principles). This is not academic; it ensures sufficient loss-absorbing capital to shield their depositors and the financial system from likely losses. Because of this risk mapping, which is highly slanted against poorly rated bonds, it is in my experience unusual to see ordinary banks, much less conservative banks, hold more than 15% of their assets in assets below investment grade (below BBB-).

16. Further, the Basel Framework takes into account the possibility that diversification can moderate risk, and so high levels of exposure in a single instrument (greater than 5%) as in the case of HRB and the 2022 Bond, would be subject to much concern by regulators and external bank auditors as well as the board's risk management committees and, hopefully, the bank's management.

17. Apart from individual credit and concentration risks, the Basel Core Principles also concern liquidity risks (Principle 24). Banks need liquidity to meet their payment

8

obligations to counterparties and customers– and to do so without needing to liquidate assets at excessive private or systemic costs. The liquidity risk of an instrument relates to the cost and time required to sell the instrument for cash. The inability to meet the withdrawal of customer deposits is a primary risk of banks and why HRB boasts that it doesn't take liquidity or credit risks with its depositors by keeping its customers' deposits in cash or selected bonds.

18. Banks are required under Basel standards to have sufficient high-quality liquid assets, or HQLA, to meet deposit withdrawal in times of stress.[18] Recent experience in California around Silicon Valley Bank and First Republic Bank shows the consequences of having depositor cash tied up in instruments that cannot be sold quickly or without loss. Bonds that are highly speculative and where default is a high probability, such as those with a rating below BB, do not attract broad investor interest. The holder would likely have to wait or discount the instrument's price heavily to find a buyer, so they are considered illiquid. They could not be counted as part of a bank's HQLA. And if the purchase required the sale of HQLA, it could reduce it and would reduce the ratio of liquid to illiquid assets.[19]

## IV.  Credit Rating of Bonds at Issue

19. The Bonds were issued in July of 2012. At the time of the offering, Sri Lanka's Foreign Currency Long-Term Debt was reported by Fitch Ratings at BB-, S&P Global Ratings at B+, and Moody's Investor Services at B1. By the time HRB started to purchase the Bond, Sri Lanka's rating was CCC at Fitch, CCC+ at S&P, and Caa1 at Moody's. At no point after the 2022 Bonds were issued was Sri Lanka's Foreign Currency Long-Term Debt rating at an investment grade level by any of the three ratings agencies. See Exhibit 2 below.

---

[18] Basel Framework. LCR30. Available at
https://www.bis.org/basel_framework/chapter/LCR/30.htm?tldate=20191231&inforce=20191215.  HQLA are defined as assets that "can be easily and immediately converted into cash at little or no loss of value."

[19] Ibid.

*Exhibit 2: Credit Ratings for Sri Lanka's Foreign Currency Long-Term Debt*

| Date | Fitch | S&P | Moody's |
|------|-------|-----|---------|
| (1) | (2) | (3) | (4) |
| 9/14/2010 | | B+ | |
| 7/18/2011 | BB- | | |
| 7/27/2011 | | | B1 |
| 11/20/2013 | | | B2 |
| 12/4/2013 | | B | |
| 2/29/2016 | B+ | | |
| 12/3/2018 | B | | |
| 4/17/2020 | | | B2 |
| 4/24/2020 | B- | | |
| 5/20/2020 | | B- | |
| 9/28/2020 | | | Caa1 |
| 11/27/2020 | CCC | | |
| 12/11/2020 | | CCC+ | |
| 7/19/2021 | | | Caa1 |
| 10/28/2021 | | | Caa2 |
| 12/17/2021 | CC | | |
| 1/12/2022 | | CCC | |
| 4/13/2022 | C | CC | |
| 4/18/2022 | | | Ca |
| 4/25/2022 | | SD | |
| 5/19/2022 | D | | |

**Notes and Sources:**
Data are from Bloomberg L.P.
Credit ratings for the 2022 Bond follow the same trends as ratings for Sri Lanka's Foreign Currency Long Term Debt. These credit ratings start in 2010, whereas the 2022 Bond was issued in 2012.

# V.    Conclusion

20. In conclusion, my opinion is that the extremely poor credit rating of the 2022 Bond, indicating a high probability of default at purchase, and worsening over time, alongside poor liquidity of the bond and the speculative nature of the investment, sits squarely with the type of instrument HRB may offer for safe keeping, escrow or trust services to a client but is highly unlikely to be the kind of instrument HRB would

10

own for its own account in such quantity. Moreover, it would be a sophisticated investor-client who makes speculative near-equity-like investments around bankruptcies and restructurings with no requirement to set aside capital because they are using their own money and not retail depositors' cash to fund the investment. It is the type of client HRB indicates it has and wishes to attract.

21. Within this class of investors are what are sometimes called 'vulture investors' who prefer to be anonymous as they deliberately purchase distressed assets when they are cheap, expecting a default and looking to extract very high returns, often a large multiple of their original investment, by holding out against a reasonable restructuring offer in return for a better settlement even though they were not an investor before the investment became impaired. This is a fundamentally different kind of activity than what HRB states it is involved in, and, as a regulated bank, it would find it hard to be involved in. Vulture funds are almost all investment funds, not banks.

22. Buying bonds on the verge of default is a far cry from an investment by a deposit-taking bank, subject to Basel capital adequacy requirements. These requirements are designed to protect retail depositors by, in the first instance, disincentivizing banks from making such investments and, in the second, by requiring increased capital injections at every worsening of the credit to shield depositors from a coming loss. Consequently, it is highly unlikely that HRB would hold so much of the 2022 Bond for its own account.

23. To give a fair sense of proportion, without claiming precision because I am not familiar with the specifics of how HRB performed its Basel related computations, if $250m of the face value of the 2022 Bond was purchased by a regulated bank, at a CCC credit rating, a risk weighting of 150% would be applied to the asset, which at an 8% capital adequacy rate, would have required capital of approximately $30m (i.e. $250m x 150% x 8%), which is likely to be a significant part of HRB's capital given its approximately $1 billion asset base.

24. If, for some reason, HRB did own this asset, its poor and worsening credit and liquidity would have created substantial issues that would be identified by their

11

external auditors. The position would be discussed in the notes to their audited annual reports regarding: (i) instruments it holds with poor credit ratings, (ii) on concentration risks, (iii) on impaired assets, (iv) reasons for capital injections and (v) on loss provisions.

25. Given the size and concentration of this risk relative to the Bank's assets, and its capital and liquidity, I would also expect to see these holdings much discussed and recorded in the minutes of the Board, its Risk Management Committee and its Audit Committee.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Belgium on this 17th day of July, 2023, by:

_____

Avinash Persaud

12

# Appendix IV

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HAMILTON RESERVE BANK LTD,<br><br>Plaintiff,<br><br>v.<br><br>THE DEMOCRATIC SOCIALIST REPUBLIC OF SRI LANKA,<br><br>Defendant. | No. 1:22-cv-5199 (DLC) |

# DECLARATION OF AVINASH PERSAUD

I, Avinash Persaud, declare as follows pursuant to 28 U.S.C. § 1746:

1.  I have been retained by counsel to the Democratic Socialist Republic of Sri Lanka
    ("**Sri Lanka**") to opine on the principles of bank regulation, bank capital
    requirements, and in the context of those Hamilton Reserve Bank's ("**HRB**")
    holdings of a bond issued by Sri Lanka. The bond in question was due on July 25,
    2022, paid a coupon rate of 5.875%, and was denominated in US dollars (the "**2022
    Bond**"). I make this declaration based on my personal knowledge, information, and
    belief and my review of relevant documents.

2.  I have been retained at my standard hourly rate of $1050 per hour. My fee is not
    contingent on the outcome of this matter.

3.  I previously submitted a declaration in this matter in July 2023, which I incorporate
    by reference here. I understand that in May of 2025, HRB produced financial
    documentation. This declaration supplements my conclusions from that declaration
    based on this new information. This declaration and my prior declaration are a
    complete statement of my opinions in this matter. However, I reserve the right to
    revise or supplement my conclusions in light of any evidence, testimony, or other
    information which becomes known to me after the date of this declaration.

4.  Through my work on bank risks, liquidity and insolvency, I was one of the
    intellectual architects of Basel III. I currently serve as the Special Advisor on Climate
    Change to the President of the Inter-American Development Bank. I previously
    served as the Special Envoy to the Prime Minister of Barbados on matters involving
    debt, investment and finance, including on the Barbados debt restructuring of 2018-
    2020. I am a former chair of the Financial Services Commission of Barbados and I
    have also acted in international roles involving financial services in St. Kitts and
    Nevis, such as co-chair of the CARIFORUM conference on Caribbean financial
    services, co-chair of the US-Treasury CARICOM Committee on Finance, and Chair
    of the CARICOM Committee on the Economy.

2

5.  I have been an expert witness on several cases involving banks, their actions and their distressed assets, including matters relating to Lloyds Bank PLC and HBOS in the UK, Exotix, a UK broker in emerging market debt, Laiki Bank in Greece and Bank of Cyprus in Cyprus.

6.  My Curriculum Vita is attached as Appendix I.

7.  The list of materials considered in the preparation of this declaration is attached as Appendix II.

# I.    Overview of the 2022 Bond

8.  The 2022 Bond was issued in 2012, with a total issue size of $1 billion.[1] My understanding is that it was one of the older-style bonds with non-aggregated collective action clauses. In bonds with aggregated collective action clauses, a holdout or vulture investor would have to purchase 25% or more of all of the bonds in default issued by the issuer. My understanding is that the Sri Lankan Government's default covered international bonds with a face value of more than $12 billion.[2] However, in bonds with the non-aggregated clauses, a holdout would only need to own 25% of a single issue of the bond to be able to block a restructuring, which in the case of the 2022 Bond was $250 million. This feature of the 2022 Bond is considered the "main reason" why in 2021 and 2022 it was trading at a higher proportion of face value than other Sri Lankan Government Bonds.[3] See Exhibit 1 below.

---

[1] Amended Complaint, filed October 13, 2022, ¶19.

[2] HRB_207.

[3] For a discussion of these issues, see Mark Weidemaier and Mitu Gulati, "Raise a Glass to Freedom … From Debt Restructurings," *FT Alphaville*, April 27, 2023.

3

Exhibit 1. *Sri Lankan Government Bond Prices*



**Notes and Sources:**
Data are from Bloomberg L.P.

## II.    HRB's Financial Statements

9.  I have reviewed HRB's audited financial statements for 2021 and their unaudited financial statements for 2022 and 2023.[4] I am not aware of any audited financial statements after 2021. I understand that HRB has stated that it is unable to provide audited financial statements after 2021 due to the pending litigation. This explanation is nonsensical. Financial institutions are required by regulators to produce audited financial statements in reasonable time, irrespective of pending litigation and do so as a matter of routine. It is my understanding that HRB's regulator, in accordance with the international principles on banking supervision set by the Basel Accords which the regulator has committed to following, imposes a statutory duty on regulated entities to submit a copy of its annual audited financial statements within three months of the end of the financial year and that these audits should follow the

---

[4] HRB_144 – HRB_183.

International Financial Reporting Standards (IFRS). It is a sad observation that financial institutions are almost always the subject of pending litigation, and I have never seen the existence of pending litigation as an accepted reason to not have audited financial statements.

10. My understanding is that HRB has stated that it does not have board materials discussing the 2022 Bond until May 2022, after Sri Lanka had announced a suspension of payment on its debt.[5] This is inconsistent with what I expect from a bank and inconsistent with banking regulations and best practices. I would have expected such a substantial purchase to be discussed by the risk, audit, and investment committees of HRB and for such discussions to be reflected in their minutes and those of the wider Board.

11. HRB's financial statements are presented on a consolidated basis with its subsidiary, Fintech Bank Limited ("**FBL**"), a bank in Malaysia. HRB owns 90% of FBL.[6] In my analysis below, I assume that FBL does not hold a material amount of the 2022 Bond and that HRB itself claims to hold the 2022 Bond.

## A.    HRB's Assets and Liabilities

12. HRB's statement of assets and liabilities for 2021 – 2023 is reproduced below in Exhibit 2.

---

[5] HRB_028.

[6] HRB_154 and HRB_169.

5

Exhibit 2.  *HRB's Assets and Liabilities (in USD) from 2021 to 2023 – As Reported*

| | 2021 | 2022 | 2023 |
|---|---|---|---|
| | (1) | (2) | (3) |
| ██ | | | |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ███████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ███ |
| ████ | ███ | ███ | ███ |
| ████ | ██ | ██ | ██ |
| ███████ | | | |
| ██████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ███ |
| █████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ███ |
| ██████ | ███ | ███ | ███ |

**Notes and Sources:**
Data are from Hamilton Reserve Bank's Audited Financial Statements for the year ended December 31, 2021 and Hamilton Reserve Bank's Unaudited Financial Statements for the years ended December 31, 2022 and December 31, 2023. See HRB_149 and HRB_167.

## B.    Deposits and Purchases of the 2022 Bond at HRB

13. ████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████ ████████████████████████████████

---

[7] HRB_152.

[8]  (HRB_152).



14. ███████████████████████████

15. ███████████████████████████

16. ███████████████████████████

---

[9] HRB_164.

[10] HRB_152 and 164.

[11] ████████████████████

[12] ████████████████████

[13] See Exhibit 1 and HRB_177.

[14] ████████████████████

[15] ████████████████████████



17. In 2023, HRB's holdings of the 2022 Bond increased to a face value of $250.49 million, slightly over one quarter of the issue size of the 2022 Bond.[16]

## III.   Riskiness of HRB's Asset Base

18.

19.

## A.   Update to Reserve Analysis

20. In my previous declaration filed on July 17, 2023, I discussed the capital requirements of banks under the risk-weighted asset framework as outlined in the Basel Core Principles and Basel Capital Standards. Under these standards, if $250 million of the defaulted 2022 Bond was purchased by HRB, a risk weighting of 150% would be applied to the asset which, under a minimum 8% capital adequacy rate –

---

[16] See HRB_177 and HRB_208.

[17] On HRB's balance sheets, they report the carrying value of the 2022 Bond in 2021 and the face value of the 2022 Bond in 2022 and 2023. For consistency, I use the face value of $144 million as of year-end 2021 (HRB_164). See Exhibit 2 for 2022 and 2023.

[18] "BCP – Core Principles for Effective Banking Supervision," *BIS*, effective April 25, 2024, available at https://www.bis.org/basel_framework/standard/BCP.htm?tldate=20250619

most banks run a higher capital ratio – would mean that HRB would be required to hold at least $30 million in capital for this credit risk alone. At the time I submitted my previous declaration, I was not aware of the full value of HRB's assets.

21.

22.

**B.**

23.

24.

25. Using the market price reported by Bloomberg for the 2022 Bond as of December 30, 2022, the value of the 2022 Bond would be 33% of the face value of the bond.[19] At that price the market value HRB's holding of the 2022 Bond would be approximately $80 million compared to the balance sheet valuation of $241 million. ████████

---

[19] The value of the accrued interest would be zero at this price, as the quoted price is inclusive of the accrued interest.

10

Exhibit 3. *HRB's Pro-Forma Assets and Liabilities*



**Notes and Sources:**

Price data are from Bloomberg L.P.

Financial data are from Hamilton Reserve Bank's Unaudited Financial Statements for the years ended December 31, 2022 and December 31, 2023 (see HRB_167).



26. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████

27. ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

11



## IV.  Conclusion

28.

29.

30.

---

[20] See Exhibit 3. ███████████████████████.

[21] ████████████████████████████████████████████
████████████



31. ████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████

32. ██████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████
██████████████████████████████████████████████
███████████████

13

33.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Belgium on this 1st day of July, 2025, by:

ADP1.

_____

Avinash Persaud

14