# Exhibit 1

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| | ) **Civil Action No. 1:22-cv-05199** |
| | ) |
| | ) |
| HAMILTON RESERVE BANK LTD., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE DEMOCRATIC SOCIALIST | ) |
| REPUBLIC OF SRI LANKA, | ) |
| | ) |
| Defendant. | ) |

## EXPERT REPORT OF BENEDICT ROTH

## May 6, 2026

**CONTENTS**

I.    Assignment...............................................................................................................1

II.   Qualifications...........................................................................................................2

III.  Summary of Opinions..............................................................................................4

IV.   Background .............................................................................................................5

V.    Opinions and Basis For Opinions...........................................................................5

    A. Regulatory Constraints Applicable to HRB's Investment Activities in Nevis....................6

    B. Comparison of Nevis Banking Regulation with Basel and UK Frameworks......................9

       Basel Regulatory Standards ..............................................................................9

       United Kingdom Regulations ...........................................................................11

    C. The Non-Binding Nature of Basel and its Reliance on Domestic Implementation...........12

    D. ███████████████████████████ .......................................................14

    E. Impact of Regulation on HRB's Title to the 2022 Bonds......................................16

VI.   Conclusion .............................................................................................................17

Appendix A. Curriculum Vitae of John Benedict Roth .........................................................20

Appendix B: Materials Considered.....................................................................................24

## I.   ASSIGNMENT

1.      I, John Benedict Roth, Managing Director of SEDA Experts, LLC, ("SEDA") have been retained by Willkie Farr & Gallagher LLP to act as an expert witness in the above-captioned action on behalf of Hamilton Reserve Bank (henceforth "HRB"), the named plaintiff in this Matter.

2.      I have been asked to provide opinions in the form of an expert report and testimony regarding:

> a.   The regulatory environment surrounding HRB's purchase of Sri Lankan sovereign bonds in 2021 and 2022, ███████████████████; and
>
> b.   The relationship between this regulatory environment and HRB's title to the bonds and right to their repayment.

3.      SEDA is being compensated at a rate of $1,500 per hour for my time. This compensation is not contingent on the conclusions reached in this report or the outcome of this litigation. In formatting and verifying the references in this report, as well as drafting the report, I was assisted by SEDA professionals who worked under my direction and supervision.

4.      In this report, I set forth the independent opinions and conclusions I have reached and the basis for those opinions and conclusions, using the information currently available to me. Such opinions and conclusions are based on my experience, knowledge, and education, as described below.  I offer no legal opinions in this report. A list of documents that I considered in forming my opinions and conclusions is attached as Appendix B.

5.      I reserve the right to supplement or revise my opinions should any additional documents or other information be provided to me.

**Benedict Roth Report**                                                    **CONFIDENTIAL**

## II.    QUALIFICATIONS

6.    For this expert assignment, I am acting in my capacity as a Managing Director at SEDA, an expert witness consulting firm that provides independent advice, data analytics, and valuation services to law firms, corporations, government agencies, and regulatory bodies in the financial services industry.

7.    My academic background is in ancient languages and in mathematical modelling, while my professional training is in financial risk management. I have practiced this profession since 1990: first in asset/liability management and balance sheet risk; then in market risk and traded credit risk, such as the credit risk on Sri Lankan government bonds; and then, between 2005 and 2011, in counterparty credit risk.

8.    The time span of my risk management career parallels the time span of international regulators' use of standardized rules to assess bank capital adequacy: the first Basel Accord was published in 1988, its revision for market risk, which permitted banks to develop their own mathematical risk measurement models, was published in 1996; the second Basel Accord was published in 2004.

9.    During this period, in common with others in my profession, I became intimately involved in decisions which sat on the intersection of risk and regulation. Determining or optimizing the regulatory impact of trading and lending decisions, particularly in terms of their capital usage as measured by standardized regulatory rules or by banks' own models, was a vital part of the risk management brief.

10.    For example, while working at the London branch of a leading German bank which specialized in trading credit-risky emerging market bonds and currencies, I was responsible for the maintenance and development of one of the first mathematical models in the industry to cover these emerging market risks. I developed it and presented it, successfully, to the German regulators for their approval. Similarly, while working for an international bank whose largest global trading book was located in London, I was responsible for the operation of one of the first mathematical models in the industry to cover counterparty credit risks. The model was presented to UK regulators and approved.

2

**CONFIDENTIAL**

11.     My role encompassed risk management as well as risk modelling: I was present in the trading room during the Argentine default in December 2001 and involved in discussions about the bank's response – my employer had lent substantial sums of money to the Central Bank of Argentina, secured on Argentine government bonds, and was heavily-exposed when their value collapsed.

12.     In 2012 I left the commercial banking sector and joined the Financial Services Authority, the United Kingdom's financial services regulator, as a Technical Specialist, supervising institutions like the ones which had previously employed me.

13.     The following year, when the government of the United Kingdom (henceforth "UK") moved the Financial Services Authority's prudential supervision[1] responsibilities into the Bank of England, I moved there too. Until 2015 I was part of the department which supervised overseas banks in London; in that role I dealt with the largest and best-resourced investment banks in the world, all of whom had major trading operations in the UK, as well as advising the supervisors on their approach to the smallest overseas institutions, whose London offices numbered in the hundreds.

14.     Subsequently, I served the Bank of England's Prudential Policy Directorate, which was responsible for negotiating the Bank of England's position with international bodies such as the Basel Committee and the European Central Bank, and which implemented these bodies' international rules in the UK rulebook.

15.     After leaving the Bank of England in 2020 I joined, as Chief Risk Officer, a startup cryptocurrency exchange based in London which was trying to offer regulated, rule-compliant cryptocurrency services to regulated institutions. I subsequently joined a Singapore cryptocurrency derivative exchange which was pursuing the same path. In addition to my banking risk practitioner and my supervisory experience, I therefore have a working understanding of the real difficulties encountered by small institutions with limited risk management resources.

---

[1] In the UK, prudential supervision refers to the supervision of financial institutions to make sure that they don't collapse, with consequential damage to the economy, while conduct supervision refers to the supervision of financial institutions to ensure that they act fairly towards consumers and in markets.

3

16.    In March 2026 I gave expert testimony at the Hong Kong International Arbitration Centre in Case Number A21015. My resume and curriculum vitae are attached as Appendix A.

## III.    SUMMARY OF OPINIONS

17.    Based on the materials that I considered when preparing this Report (which are listed in Appendix B), as well as my knowledge and experience as set forth above, I have formed the following opinions:

a.    Based on my review of the Nevis International Banking Ordinance (HRB is incorporated and regulated in Nevis), as it existed between 2020 and 2022 when HRB invested in Sri Lankan bonds (henceforth the "Relevant Period"), and assuming the accuracy of the factual record regarding HRB's investment in Sri Lanka's government bonds (as reflected in the documents listed in Appendix B), I observed no regulatory provisions then in force that prohibited or constrained the bond investment at issue.

b.    Nevis's regulatory environment, in this regard, differed from both Basel standards and the UK's regulatory framework;

c.    Basel is neither a treaty nor a legally binding regime; it relies on domestic regulators to implement its standards through their own legislative or rulemaking processes and its implementation may differ from jurisdiction to jurisdiction depending on local needs;

d.    Nonetheless, even though the Nevis regulations did not specifically address HRB's Sri Lanka investment, the exposure drew attention from local regulators, whose response was consistent to the reaction that I would have expected from a UK regulator in a similar position; and

e.    Notwithstanding the features of the Nevis regulatory regime described above, it is my understanding that nothing in the regime and none of the material outlined above in this Report has any bearing on HRB's title to the Sri Lanka bonds (defined below) or its right to repayment. If HRB had been in breach of capital, concentration or

4

liquidity regulations, or even if it had been insolvent, it or its liquidator would still be entitled to repayment.

## IV.    BACKGROUND[2]

18.    HRB, a commercial bank and long-term investor in Sri Lanka's sovereign debt, filed a breach of contract lawsuit against the Democratic Socialist Republic of Sri Lanka ("Sri Lanka"). The dispute centered on Sri Lanka's default on its $1 billion 5.875% International Sovereign Bond ("ISB") due July 25, 2022, of which HRB holds $250,490,000[3] in principal amount (henceforth "the 2022 Bonds").

19.    HRB had previously invested in other Sri Lankan bonds, which were repaid in full, and continued to acquire the 2022 Bonds starting in August 2021. By the end of 2021, HRB held over $143 million in principal amount. Throughout early 2022, Sri Lankan officials, including the Central Bank of Sri Lanka, publicly assured investors that all debt obligations would be honored. HRB representatives visited Sri Lanka in January 2022 at the Central Bank's invitation and met with senior government officials.

20.    During that same period, the Central Bank of Sri Lanka continued to assure investors that Sri Lanka would pay all of its ISB obligations in full and, by April 2022, HRB's holdings in the ISB exceeded $242 million. Despite these assurances, on April 12, 2022, Sri Lanka declared a general moratorium on principal and interest payments on its external debt, including the bonds held by HRB. Sri Lanka subsequently failed to pay both the principal and accrued interest when the bonds matured on July 25, 2022.

21.    HRB alleges that Sri Lanka is capable of paying but has chosen not to, and that the default was orchestrated by high-level officials amid allegations of corruption.

## V.    OPINIONS AND BASIS FOR OPINIONS

22.    ████████████████████████████████████████

████████████████████████████████████████████

---

[2] *See* United States District Court Southern District of New York, Amended Complaint, October 13, 2022.

[3] HRB-VOL11-000092.

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████

### A. Regulatory Constraints Applicable to HRB's Investment Activities in Nevis

23.    HRB is regulated in Nevis as an "*international bank*"[4] and is subject to the Nevis International Banking Ordinance (henceforth "the Ordinance").[5]

24.    Important restrictions on and requirements of international banks, as specified in the Ordinance, include the following:

a.  A ban on the acceptance or solicitation of deposits from local residents,[6] albeit with certain exceptions for the acceptance of deposits from locally-incorporated businesses and local trusts.

b.  A requirement for international banks to hold a license, issued by the Minister responsible for Finance in the Nevis Island Administration after an examination by the Regulator of international banking.[7]

c.  A requirement for international banks to maintain paid-up capital of at least $2 million, or such sum as the Minister may determine, and to maintain a cash reserve at a bank other than the licensee equivalent to its minimum paid-up capital. Whenever the size of the reserve fund drops below the minimum quantity of paid-up capital specified, the licensee is required to deposit 25% of its annual profits into the reserve fund to restore it to the level required.[8]

---

[4]*See* Financial Services Regulatory Commission Nevis Branch, Regulated Entities, available at https://www.nevisfsrc.com/regulated-entities/. *See also* Letter from Regulator, December 19, 2025, HRB-VOL9-000003.

[5] *See* St. Christopher and Nevis, Nevis International Banking Ordinance, December 31, 2017.

[6] *Ibid.*, Sections 3 (3), 21, 30.

[7] *Ibid.*, Sections 6, 13.

[8] *Ibid.*, Section 12.

d.  A requirement for every director and significant shareholder to be "*fit and proper.*"[9]

e.  A cap on the total lending, credit facilities or credit guarantees issued by the bank at 40% of the sum of its total assets and total paid-up capital,[10] and a cap on the unsecured portion of this total credit exposure at 10% of the sum of its stated capital and published reserves.[11]

f.  A cap of $40,000, or 1% of the sum of its stated capital and published reserves (whichever is greater), on the size of any unsecured loan to a connected counterparty.[12]

g.  A cap of 20% of the sum of its stated capital and published reserves on the size of any investment in the share capital of a commercial, industrial, agricultural or any other undertaking.[13]

25.     None of these restrictions apply to investments in bonds, impose significant liquidity requirements on licensees, or impose any minimum capital requirements, other than the $2 million minimum, held in cash as a bank deposit, which applies to every licensee regardless of risk and size.

26.     Finally, the Ordinance gives the Regulator the right to seize control of a licensee when the "*realizable value*" of its assets is less than the aggregate value of its liabilities and capital accounts or when its business is being conducted in an "*imprudent manner.*"[14] However, the Ordinance does not oblige the Regulator to do so.

27.     In 2024, the Ordinance was updated[15] to include further restrictions on credit concentrations, as follows:

---

[9] *Ibid.*, Sections 13 (2) (f), 80.

[10] *Ibid.*, Section 20 (1) (a) (i).

[11] *Ibid.*, Section 20 (1) (a) (ii).

[12] *Ibid.*, Section 20 (1) (b).

[13] *Ibid.*, Section 20 (1) (e) (ii).

[14] *Ibid.*, Section 42 (1) (a), (b)

[15] *See* Island of Nevis, Nevis International Banking (Amendment) Ordinance, June 19, 2024.

    a.   A cap on any investment (without specificity and therefore including a cap on investments in bonds), set at 10% of its total assets.[16]

    b.   A ban on the undertaking, without the approval of the Regulator, of any credit exposure greater than 10% of the licensee's net capital base.[17]

    c.   A ban on any investment whatsoever in sub-investment-grade bonds.[18]

28.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

29.    Separately, the Ordinance was updated in a way that required licensees to hold a variable minimum quantity of liquid assets by mandating that their cash reserve (which, as noted above, was to be placed on deposit in a banking institution other than the licensee) should be at least equivalent to 2% of the licensee's deposits.[19] This provision guaranteed that at least 2% of the deposit liabilities of licensed institutions would be backed by liquid assets.

30.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

31.    In this respect, Nevis's International Banking Ordinance differed significantly from the normative international standards prescribed by the Basel Committee on Banking Supervision and from that in place in the UK, notwithstanding the fact that Nevis is a constitutional monarchy

---

[16] *Ibid.*, Section 7 (b) (ix).

[17] *Ibid.*, Sections 3 (a), 8.

[18] *Ibid.*, Section 7 (b) (x).

[19] *Ibid.*, Section 6.

8

whose Head of State is the UK sovereign[20] and whose legal system is based on English common law.

32.     These differences are the subject of the next section of this Report.

## B.  Comparison of Nevis Banking Regulation with Basel and UK Frameworks

33.     Under normative international standards as prescribed by the Basel Committee on Banking Supervision, and under the UK banking regulatory framework, an exposure of the type and scale described in the record would ordinarily be subject to capital, concentration, and liquidity constraints that could restrict or effectively preclude such an investment. However, the provisions giving rise to those constraints in Basel standards and UK regulations were not present in the Nevis International Banking Ordinance during the Relevant Period. In this respect, Nevis's regulatory environment differed from Basel and from that of the UK.

### Basel Regulatory Standards

34.     The Basel Committee on Banking Supervision[21] is a supra-national body whose charter describes it as the "*primary global standard setter for the prudential regulation of banks*."[22] Originally formed in 1974 by the governors of the central banks of the Group of 10,[23] its members and observers now span 28 jurisdictions world-wide and include every jurisdiction with a significant financial services sector.[24]

35.     Basel's first Capital Accord, published in 1988,[25] assigned "*risk weights*" to different types of credit exposures, ranging from zero for instruments that were seen as the least

---

[20]*See* The Constitution of Saint Christopher and Nevis, Section 51 (1), June 23, 1983, available at https://www.oas.org/juridico/PDFs/mesicic5_skn_constitution_annex1.pdf.

[21] While the early Basel publications cited here often use the English and old French spelling, "*Basle*", the use of the American and German spelling, "*Basel*" is now universal and is employed consistently in this report.

[22] *See* BIS, Basel Committee Charter, June 5, 2018, available at https://www.bis.org/bcbs/charter.htm.

[23] *See* BIS, History of the Basel Committee, available at https://www.bis.org/bcbs/history.htm?m=84.

[24] *See* BIS, Basel Committee membership, May 14, 2024, available at https://www.bis.org/bcbs/membership.htm.

[25] *See* Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards, July 1988.

risky to 100% for riskier ones.[26] Government bonds issued by non-OECD countries in non-national currencies were given a risk weight of 100%.[27]

36.    Basel's second Capital Accord, published in June 2004,[28] made these risk weights sensitive to the credit ratings of the underlying obligor. Sovereign bonds rated BBB were weighted at only 50% of their nominal value; those rated BB+ to B- were weighted at 100%; and sovereign bonds rated below B- were weighted at 150% of their value.[29]

37.    The first Capital Accord also set a minimum "*target standard ratio of capital to weighted risk assets*" of 8%.[30]

38.



39.    However, the concept of "*risk weights*" did not exist in the Ordinance prior to its June 2024 amendment and the "*target standard ratio of capital to weighted risk assets*" does not appear at all – neither in the 2017 text which was in force at the time of HRB's investment in the 2022 Bonds nor in its 2024 amendment.

40.    In 1991, between the dates of the first and second Basel Accords, the Basel Committee published a further paper on large exposures, recognizing that the 1988 Accord had been based on the assumption that banks held a diversified portfolio of credit exposures but that a "*significant proportion of major bank failures have been due to credit risk concentration.*" The

---

[26] *Ibid.*, ¶¶ 28-43.

[27] *Ibid.*, p. 18.

[28] *See* Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards A Revised Framework, June 2004.

[29] *Ibid.*, ¶ 53.

[30] *See* Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards, July 1988, ¶ 44.

[31] *See* S&P Global, Sri Lanka Downgraded To 'CCC+/C' On Increasing External Financing Risks And Fiscal Deterioration; Outlook Stable, December 11, 2020, available at https://www.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2569227.

paper sought "*to define what levels of credit concentration should be regarded as acceptable in relation to capital as defined in the July 1988 paper.*"[32] It proposed a reporting threshold for exposures to a single non-bank counterparty or to a single, inter-connected group of non-bank counterparties to be set at 10% of a bank's capital, as well as an exposure limit to be set at 25% of a bank's capital. It made the suggestion that every bank should be alerted "*to the need to monitor carefully its sectoral and geographic exposures.*"[33]

41.

42.  Finally, Basel's reforms to regulatory standards following the financial crisis of 2008 introduced liquidity regulations in the form of the Net Stable Funding Ratio,[35] which matches longer-term or illiquid assets such as the 2022 Bonds with stable liabilities, and the Liquidity Coverage Ratio,[36] which ensures that deposit-taking institutions hold sufficient high-quality liquid assets to sustain a 30-day period of stress. However, neither of these liquidity concepts exist in the Ordinance, even after its 2024 update, and therefore they could not have had any impact on HRB's bond purchases.

### United Kingdom Regulations

43.  UK regulation generally follows the Basel regime and is implemented via the UK's Financial Services and Markets Act which outlines "*Threshold Conditions*" for banks to be

---

[32] *See* Basel Committee on Banking Supervision, Measuring and Controlling Large Credit Exposures, January 1991, ¶¶ 1, 3.

[33] *Ibid.*, ¶ 25.

[34] *See* St. Christopher and Nevis, Nevis International Banking Ordinance, December 31, 2017, Section 20 (1) (a).

[35] *See* Basel Committee on Banking Supervision, Basel III: the net stable funding ratio, October 2014.

[36] *See* Basel Committee on Banking Supervision, Basel III: The Liquidity Coverage Ratio and liquidity risk monitoring tools, January 2013.

authorized.[37] These conditions begin with a general requirement that business is "*conducted in a prudent manner*" and specify that this requirement can only be met if a bank's financial resources are appropriately liquid and its assets are appropriate given its liabilities.

44.    The Prudential Regulation Authority, the UK's banking and insurance regulator, interprets these conditions as requirements that banks must meet not only at the point of authorization but "*at all times,*"[38] commenting that "*We assess firms against the Threshold Conditions on a continual basis.*"[39]

45.    As noted above,[40] the Ordinance does give the Nevis Regulator the right to seize control of a bank without adequate financial resources or a bank whose business is being conducted in an "*imprudent manner*" at any time.[41] However, it does not place any obligation on the Regulator to do so.

### C.  The Non-Binding Nature of Basel and its Reliance on Domestic Implementation

46.    In order to explain why the Nevis regulatory regime might differ from Basel and from other banking standards, it is important to understand that the Basel Accord and its accompanying recommendations are neither a treaty nor a legally binding regime: the Basel Committee is a committee of central banks and financial market supervisors[42] which relies on domestic regulators to implement its standards through their own legislative or rulemaking processes, "*following due regulatory and legislative processes in each individual jurisdiction.*"[43]

47.    As such, its implementation may differ from jurisdiction to jurisdiction depending on local needs.

---

[37] *See* Financial Services and Markets Act 2000 (Threshold Conditions) Order 2013, March 7, 2013, Part 1E, ¶¶ 5B-5F.

[38] *See* Bank of England PRA, The Prudential Regulation Authority's approach to banking supervision, July 2023, ¶ 23.

[39] *Ibid.*

[40] *See supra* ¶ 26.

[41] *See* St. Christopher and Nevis, Nevis International Banking Ordinance, December 31, 2017, Section 42 (1) (a), (b).

[42] *See* BIS, Basel Committee membership, May 14, 2024, available at https://www.bis.org/bcbs/membership.htm.

[43] *See* BIS, The Basel Process - overview, available at https://www.bis.org/about/basel_process.htm.

48.     For example, mortgage-backed bonds issued by banks in the European Union (henceforth the "the EU") may attract a risk weighting in the EU as low as 10%[44] whereas under Basel their risk floor would be set at 20%.[45] This leniency in the EU mirrors the EU's dependence on privately-issued mortgage-backed bonds to finance its housing market: in the United States of America (henceforth "USA"), these bonds are often fully-guaranteed by government agencies, with an automatic risk weighting of zero,[46] or partially-guaranteed with a risk weighting of 20%,[47] regardless of the credit quality of the issuer or the collateralisation of the bond. As such, deviation from Basel to facilitate housing market finance is not required in the USA.

49.     Similarly, loans of less than EUR 1.5 million to small and medium-sized enterprises in the EU benefit from a risk-weighting reduction-multiplier of 76.19% in order to ensure an adequate flow of bank lending to these enterprises.[48] This reduction carries no risk management rationale whatsoever; it was put in place to facilitate bank lending to small businesses.

50.     Further differences between EU and Basel standards are documented in Basel's Regulatory Consistency Assessment Programme, which assessed the EU's capital regime implementation in 2014 as "*materially non-compliant*" with the minimum standards of the Basel framework.[49] Nevertheless, the EU is and remains an important contributor to – and participant in – the Basel process. Non-compliance in some areas is an expected result – a feature rather than a bug – when "*following due regulatory and legislative processes in each individual jurisdiction.*"[50]

51.     Along the same lines, both Brazil, Japan and Switzerland have implemented Basel standards differently for different types of banks within their jurisdictions.[51] It is notable that the

---

[44] *See* Official Journal of the European Union, Regulation (EU) No 575/2013 of the European Parliament and of the Council, June 26, 2013, Article 129.

[45] *See* Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards A Revised Framework, June 2004, ¶¶ 60-64.

[46] *See* eCFR, General Risk Weights, December 17, 2020, § 1240.32 (a) (1), available at https://www.ecfr.gov/current/title-12/section-1240.32.

[47] *Ibid.*, § 1240.32 (a) (2).

[48] *See* Official Journal of the European Union, Regulation (EU) No 575/2013 of the European Parliament and of the Council, June 26, 2013, Article 501.

[49] *See* Basel Committee on Banking Supervision, Regulatory Consistency Assessment Programme (RCAP), Assessment of Basel III regulations - European Union, December 2014, Section 1.4.

[50] *See* BIS, The Basel Process - overview, available at https://www.bis.org/about/basel_process.htm.

[51] *See* Financial Stability Institute, Proportionality in banking regulation: a cross-country comparison, August 2017.

**Benedict Roth Report**                                                    CONFIDENTIAL

Nevis Ordinance, as outlined above,[52] does include capital and large exposure constraints on credit exposures related to borrowers, and on investment risks related to equity investments, but did not include bond-related credit exposures within those frameworks until 2024, indicating that such exposures were not originally treated as a risk category contemplated for licensees.

**D.**

52.

a.

b.

c.

---

[52] *See supra* Section V.

[53] *See* Response from Mr. Antonio Kenyatta to Phil Jones' Letter, April 14, 2022, HRB_227.

[54] *See* Letter from Mr. Phil Jones to Mr. Antonio Kenyatta, June 29, 2022, HRB-VOL7-000601. *See also* Letter requesting additional information from Mr. Phil Jones to Mr. Antonio Kenyatta, July 07, 2022, HRB-VOL10-000052.

[55] *See* 1st Follow-up Examination Report, December 28, 2022, HRB-VOL10-000001.

[56] *Ibid.*

[57] *Ibid..* at HRB-VOL10-000034.

**Benedict Roth Report**                                    **CONFIDENTIAL**



53.

a.

b.

c.

54.

[59]

---

[58] *See* Michael S. Barr, Risks and challenges for bank regulation and supervision, February 20, 2025.

[59] *See* Letter from Mr. Phil Jones to Sir Tony Baldry, December 19, 2025, HRB-VOL9-00003.

### E. Impact of Regulation on HRB's Title to the 2022 Bonds

55.    Most of my Report has focused on the application of Nevis regulation to HRB's investment in the 2022 Bonds, or the possible application of other regulatory regimes to its investment.

56.    However, notwithstanding the features of the various regulatory regimes described above, nothing in these regimes or in previous sections this Report has any bearing on HRB's title to the 2022 Bonds or its right to repayment. ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████

57.    Ownership of an international bond is normally recorded and verifiable, today, via a book-entry in a central securities depository, maintained by a registrar. For anti-money-laundering reasons, as well as for market integrity and practicality, bearer bonds without a central registrar are only issued in rare circumstances.

58.    In the specific case of the bonds purchased by HRB, the registry is the Depository Trust Company (henceforth "DTC"), the trustee is HSBC Bank USA, National Association, which also serves as transfer and paying agent, and the offering circular states that "*Beneficial interests in the Global Bonds will be shown on, and the transfer thereof will be effected only through, records maintained by DTC and its direct and indirect participants*."[60] In my professional experience in credit risk management, records of book entries at a central securities depository are unquestioned as evidence of good title.

59.    I understand that HRB received an interest payment on its 2022 bonds in January 2022, before Sri Lanka announced its moratorium on external debt service in April of the same year.[61] This coupon payment must have been produced by the paying agent in accordance with information held by the registrar. As such, it is impossible to understand how HRB could not be said to have title to its bonds and the right to repayment.

---

[60] *See* The Democratic Socialist Republic of Sri Lanka, Offering Circular US$1,000,000,000 5.875% Bonds due 2022, July 17, 2012, at SL_000194.

[61] *See* Letter from Mr. Antonio Kenyatta to Ms. Serene Antoine, November 01, 2022, HRB-VOL7-000652.

16

60.     Subsequent to Sri Lanka's default, HRB received both a proxy solicitation (in 2024)[62] relating to its ownership of the 2022 Bonds and a tender offer (in 2026)[63] for its holdings. As above, it is impossible to understand how these offers could have been extended to HRB if HRB had not been in possession of good title to the 2022 Bonds.

## VI.    CONCLUSION

61.     As explained in the Summary of Opinions for this Report, based on my review of the Nevis International Banking Ordinance as it applied during the Relevant Period, when HRB invested in Sri Lanka's ISB, and my review of the factual record, it is my opinion that no regulatory provisions then in force prohibited or constrained HRB's investment in the 2022 Bonds. The regulatory framework in Nevis differed in this respect from the Basel standards and the UK regulatory regime; however, Basel standards are not legally binding and depend on jurisdiction-specific implementation by domestic regulators.

62.     ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Finally, nothing in the Nevis regulatory regime, nor any of the matters discussed in this Report, affects HRB's title to the 2022 Bonds or its entitlement to repayment, ████████████████████████████████████ ████████

63.     I reserve the right to update the analyses and opinions in this Expert Report should additional information become available to me. I also reserve the right to prepare exhibits, examples, demonstratives, and other visual representations of the analyses and opinions described in connection with future hearings in this case. This Expert Report and any accompanying analyses or calculations discussed herein have been prepared in connection with the above-captioned matter

---

[62] *See* Democratic Socialist Republic of Sri Lanka, Indicative Results of Consent Solicitation and Invitation to Exchange (The "Invitation") in Respect of the Democratic Socialist Republic of Sri Lanka's Existing Bonds, December 13, 2024.

[63] *See* BNY, Corporate Actions Notification and Response New and Amended Events Only (Current and Prior Weekday), February 24, 2026, HRB-VOL9-000005.

**Benedict Roth Report**                                                                  CONFIDENTIAL

and cannot be used for any other purpose or in any other context without the express written authorization of the person signed below.

*Signature Page Follows*

**Benedict Roth Report**                                                    **CONFIDENTIAL**


May 6, 2026                                      Respectfully submitted,


_____
John Benedict Roth

**APPENDIX A. CURRICULUM VITAE OF JOHN BENEDICT ROTH**



# BENEDICT ROTH

SEDA EXPERTS, LLC
1185 AVENUE OF THE AMERICAS
NEW YORK, NY 10036
O. 646-626-4555
WWW.SEDAEXPERTS.COM

## WORK EXPERIENCE

**ASIANEXT (ASIA DIGITAL EXCHANGE PTE LTD)**          **2024 – 2025**
*Chief Risk Officer (interim)*
Established risk management systems, culture and controls for a start-up cryptocurrency derivative exchange in Singapore. Led the exchange's discussions about what range of collateral to accept. Re-built the exchange's perpetual futures product to bring it into line with market convention

**ZODIA MARKETS**          **2021 – 2023**
*Chief Risk Officer*
Designed and implemented the risk management framework for a start-up spot cryptocurrency exchange and brokerage with a significant financial risk, financial crime risk, cyber-security risk, and operational risk profile.
On completion and implementation of the risk framework, Zodia Markets' application for registration in the UK as a cryptoasset service provider was accepted by the Financial Conduct Authority, the UK's regulator for digital assets.

**BANK OF ENGLAND (FSA prior to April 2013)**          **2012 – 2020**
*Chief Risk Officer, Ministry of Housing, Communities and Local Government*          *2018 – 2020*
On secondment from the Bank of England, established an enterprise-wide risk function for a central government department with 4,600 staff, a £20bn secured loan portfolio, and a complex non-financial risk profile including building safety regulations, housing policy, climate, reputation and conduct.

*Policy Strategy and Implementation, Prudential Policy*          *2016 – 2018*
**Regulatory arbitrage**. Advised on contentious problems or transactions that tested the regulatory system – sitting within the regulation in theory but lying outside its principles in practice – such as the use of derivatives and financial engineering to disguise bank lending from the leverage ratio, the use of off-market valuation techniques for risky credit-sensitive assets, and the use of wrong-way risk to enhance portfolio returns.
**International**. Represented the Bank of England on an international repo market study group convened by a Basel sub-committee, the Committee on the Global Financial System, looking at the strains in the government bond repo market/collateralised lending market which emerged after the introduction of the leverage ratio.

*International Banks Supervision*          *2013 – 2015*

20

As a specialist supervisor, reviewed complex transactions, risk governance, counterparty credit risk management, credit-risky asset valuations and the effectiveness of the risk functions in the largest of the global investment banks located in London.

Initiated the Prudential Regulation Authority's work on investment banking risk culture (the Prudential Regulation Authority is the arm of the Bank of England responsible for bank and insurance company supervision).

*Supervisory Risk Specialists (at the FSA, prior to its merger with the Bank)*      *2012 – 2013*
Reviewed counterparty credit risk modelling and risk management in a number of global institutions and in a UK central counterparty.

**HSBC BANK PLC**                                                                 **2006 – 2011**
*Head of Global Funds Credit Risk Analytics*
Margined every hedge fund transaction traded with the bank world-wide and managed all other fund-related credit risk analytics.

*Credit Exposure Measurement and Control*
Quantified and managed all counterparty credit risk on HSBC's London trading portfolio, with over 10,000 counterparties from different sectors, hundreds of thousands of open trades, hundreds of relationship managers, and every type of traded asset and derivative.

Debated the valuation of credit-risky derivative/off-balance-sheet lending transactions with salespeople and management – transformed HSBC's approach from one that was purely model-driven to one which incorporated expert judgement and prudential reserves.

**FIMAT INTERNATIONAL BANQUE SA**                                                **2005**
*Deputy Head of Risk & Credit (head on maternity leave)*
Responsible for risk management in the London office, mainly incurred via credit risk from margined derivative, collateralised lending and prime brokerage business with hedge funds and commodity traders. Conducted on-site due diligence visits to hedge fund counterparties.

**WESTLB AG, LONDON BRANCH**                                                     **2001 – 2005**
*Deputy Head of the Market Risk Management Group in London.*
Specific responsibility for traded risk in emerging markets, based around a portfolio of credit derivatives with underlying cash and foreign exchange exposures, managed globally from London under a specialised risk architecture. This risk architecture played a key role in WestLB's application to German regulators for recognition of its traded credit and market risk models under EU capital adequacy regulations.

Led a feasibility study to transform WestLB's counterparty credit risk management from passive to active: valuing and hedging the counterparty credit risk in the trading book rather than holding risk passively to maturity or default.

**RABOBANK INTERNATIONAL, LONDON BRANCH**                                        **1998 – 2001**
Designed credit and market risk tools for a new commodity financing business, led global Treasury/interest rate risk management across emerging markets, and built risk analytics for a new equity trading operation in London and Amsterdam.

**MERRILL LYNCH**                                                                **1997 – 1998**

21

Equity derivative product controller. Implemented a new control structure for equity derivatives against the background of adverse criticism from the SFA and imminent SFA re-inspection.

**NATIONAL WESTMINSTER BANK**                                              **1984 – 1996**
Held risk and treasury roles, including developing one of the first traded value-at-risk models approved by UK regulators, mapping group-wide risk and capital deployment, and advising senior management on strategic exposures.

## EDUCATION

**Worcester College, Oxford**
BA, Oriental Studies

**Stanford University**
Studies leading to the degree of MSc in Operations Research. Mathematical programming, statistics, economic modelling, optimisation

## PUBLICATIONS

*"How risk managers can stop the FTX infection from spreading"* Risk.net, November 21 2022. Segregation and transparency can save investors from imploding crypto trading venues.

*"Risk management is not a job for compliance"* Risk.net, April 28 2021. Credit Suisse's losses show why boards require real risk management expertise.

*"Repair the leverage ratio, revive the repo market."* Risk.net, January 25 2021. A proposal to remove domestic-currency government bonds and repo from the leverage ratio.

*"Banking Sector Interconnectedness: What Is It, How Can We Measure It and Why Does It Matter?"* Bank of England Quarterly Bulletin, June 2015. A survey of traditional and non-traditional measures of financial system interconnectedness.

*"Pricing the Risk in Collateralised Lending."* Risk Magazine, January 2004. A simple pricing model for collateralised loans which uses option pricing techniques to pull together the credit risk of the borrower and the market volatility of the collateral.

*"Agribusiness and Commodity Risk – Strategies and Management."* Risk Books, September 2003. Responsible for the credit risk management chapter of an agribusiness risk manual.

*"A Future for Coffee Producers."* Financial Times, August 9 2001. Central and international banks could help farmers in poor countries by enhancing their access to commodity derivative markets.

*"Complacency Towards Catastrophe."* Financial Times, January 23 2001. Regulators are wrong to think that banks can compensate for operational risk by holding more capital.

*"Invisible Risk."* Operational Risk, January 2000. Operational risk managers can expose yesterday's losses and indicate today's weaknesses but they cannot quantify the risks of tomorrow.

*"Risky Models for Traders."* Financial Times, March 30 1999. Inappropriate use of value-at-risk controls encourages traders to run more dangerous positions.

***"Risk Primer - Tools for Trading."*** Risk Magazine, June 1998. A rapid, cost-effective value-at-risk implementation for an emerging market equity trading book.

**APPENDIX B: MATERIALS CONSIDERED**

**Pleadings, Filings, and Other Relevant Documents**

1.  Bank of England PRA, The Prudential Regulation Authority's approach to banking supervision, July 2023

2.  Basel Committee on Banking Supervision, Basel III: The Liquidity Coverage Ratio and liquidity risk monitoring tools, January 2013

3.  Basel Committee on Banking Supervision, Basel III: the net stable funding ratio, October 2014

4.  Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards A Revised Framework, June 2004

5.  Basel Committee on Banking Supervision, International Convergence of Capital Measurement and Capital Standards, July 1988

6.  Basel Committee on Banking Supervision, Measuring and Controlling Large Credit Exposures, January 1991

7.  Basel Committee on Banking Supervision, Regulatory Consistency Assessment Programme (RCAP), Assessment of Basel III regulations - European Union, December 2014

8.  Democratic Socialist Republic of Sri Lanka, Indicative Results of Consent Solicitation and Invitation to Exchange (The "Invitation") in Respect of the Democratic Socialist Republic of Sri Lanka's Existing Bonds, December 13, 2024

9.  Financial Services and Markets Act 2000 (Threshold Conditions) Order 2013, March 7, 2013

10. Financial Stability Institute, Proportionality in banking regulation: a cross-country comparison, August 2017

11. Island of Nevis, Nevis International Banking (Amendment) Ordinance, June 19, 2024

12. Michael S. Barr, Risks and challenges for bank regulation and supervision, February 20, 2025

24

13. Official Journal of the European Union, Regulation (EU) No 575/2013 of the European Parliament and of the Council, June 26, 2013

14. St. Christopher and Nevis, Nevis International Banking Ordinance, December 31, 2017

15. ECF 23, Amended Complaint, October 13, 2022

16. *Hamilton Reserve Bank Ltd v. The Democratic Socialist Republic of Sri Lanka*, No. 1:22-cv-5199 (DLC) (S.D.N.Y.), ECF 152-6, Declaration of Avinash Persaud, July 1, 2025[64]

17. ECF 152-7, Declaration of Juan Migone, July 1, 2025

18. ECF 57, Declaration of Avinash Persaud, July 17, 2023

19. U.S. District Court, S.D.N.Y., Deposition of Antonio Kenyatta, April 16, 2026

**Bates-Numbered Documents**

20. HRB_231

21. HRB-VOL10-000001

22. HRB-VOL10-000036

23. HRB-VOL10-000046

24. HRB-VOL10-000051

25. HRB-VOL10-000052

26. HRB-VOL11-000092

27. HRB-VOL2-000106

28. HRB-VOL2-000120

29. HRB-VOL2-000122

30. HRB-VOL2-000174

---

[64] All docket numbers refer to docket entries in *Hamilton Reserve Bank Ltd v. The Democratic Socialist Republic of Sri Lanka*, No. 1:22-cv-5199 (DLC) (S.D.N.Y.).

25

31.    HRB-VOL4-000979

32.    HRB-VOL4-000981

33.    HRB-VOL4-000985

34.    HRB-VOL4-000989

35.    HRB-VOL4-001379

36.    HRB-VOL6-000002

37.    HRB-VOL7-000584

38.    HRB-VOL7-000586

39.    HRB-VOL7-000589

40.    HRB-VOL7-000592

41.    HRB-VOL7-000595

42.    HRB-VOL7-000601

43.    HRB-VOL7-000603

44.    HRB-VOL7-000604

45.    HRB-VOL7-000652

46.    HRB-VOL8-000348

47.    HRB-VOL9-000003

48.    HRB-VOL9-000005

49.    SL_000167

**Research**

50. BIS,    Basel    Committee    Charter,    June    5,    2018,    available    at
https://www.bis.org/bcbs/charter.htm

51. BIS, Basel Committee membership, May 14, 2024, available at https://www.bis.org/bcbs/membership.htm

52. BIS, History of the Basel Committee, available at https://www.bis.org/bcbs/history.htm?m=84

53. BIS, The Basel Process - overview, available at https://www.bis.org/about/basel_process.htm

54. eCFR, General Risk Weights, December 17, 2020, § 1240.32 (a) (1), available at https://www.ecfr.gov/current/title-12/section-1240.32

55. Financial Services Regulatory Commission Nevis Branch, Regulated Entities, available at https://www.nevisfsrc.com/regulated-entities/

56. S&P Global, Sri Lanka Downgraded To 'CCC+/C' On Increasing External Financing Risks And Fiscal Deterioration; Outlook Stable, December 11, 2020, available at https://www.spglobal.com/ratings/en/regulatory/article/-/view/type/HTML/id/2569227

57. The Constitution of Saint Christopher and Nevis, June 23, 1983, available at https://www.oas.org/juridico/PDFs/mesicic5_skn_constitution_annex1.pdf