# Exhibit 1

No. 1:22-cv-5199 (S.D.N.Y.)

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

*HAMILTON RESERVE BANK LTD.*

*Plaintiff,*

*v.*

*THE DEMOCRATIC SOCIALIST REPUBLIC OF SRI LANKA,*

*Defendant.*

**EXPERT REPORT OF PAUL NORING, CPA**

_____

Paul Noring, CPA

May 6, 2026

HRB v. Sri Lanka, No. 1:22-cv-5199 (S.D.N.Y.)                CONFIDENTIAL
P. Noring Expert Report

## TABLE OF CONTENTS

I.   KEY EVENTS AND ALLEGATIONS.................................................................... 3

II.  QUALIFICATIONS AND BASIS FOR OPINIONS ............................................ 5

III. ASSIGNMENT AND COMPENSATION ............................................................ 7

IV.  SUMMARY OF OPINIONS ................................................................................ 8

V.   OPINIONS............................................................................................................ 8

   A.  Opinion I: HRB's Internal Records Substantiate That it is the Beneficial Owner of

      $250,490,000 in Principal Amount of the July 2022 Bonds ............................... 8

   ████████████████████████████████████████████████████████

   ██████████████████████████████████████████████

   ████████████████████████████████████████████ ..... 9

   C.  Opinion III: The Fact That the Bonds are Held in Street Name by the Depository

      Trust Company is Normal and Customary ....................................................... 13

   D.  Opinion IV: HRB is a Bank, not an Investment Company or Trust Entity............... 16

VI.  CONCLUSION ................................................................................................... 21

APPENDIX A ............................................................................................................. 22

APPENDIX B ............................................................................................................. 25

APPENDIX C ............................................................................................................. 29

*HRB v. Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.)                                    **CONFIDENTIAL**
P. Noring Expert Report

## I.  KEY EVENTS AND ALLEGATIONS

1.  On July 25, 2012, the Government of the Democratic Socialist Republic of Sri Lanka (*hereafter "Defendant"*) entered into an Indenture Agreement with its Trustee, HSBC Bank USA, N.A. ("HSBC") to issue its $1,000,000,000 5.875% Bonds (CUSIP Nos. USY2029SAH77 / Y2029SAH7) due on July 25, 2022 (*hereafter the "July 2022 Bonds"*). Per this agreement, with respect to the July 2022 Bonds, the Defendant agreed to:

    *pay...not later than 10:00 [ET] on the Business Day prior to each interest or principal payment date or the maturity date [] of the Securities...in immediately available funds, an amount which (together with any funds then held by the Trustee and available for the purpose) shall be sufficient to pay the aggregate amount of principal (and premium, if any) and/or interest, as the case may be, becoming due in respect of such Securities by such Payment Date.[1]*

2.  Further, the agreement states that the Plaintiff has satisfied its agreement requirements when the Defendant has, at a minimum:

    ***irrevocably deposited...trust funds in trust for the purpose an amount sufficient to pay and discharge the entire indebtedness on such Securities*** not previously delivered to the Trustee or any Paying Agent for cancellation, ***for principal (and premium, if any) and interest***, if any, and Additional Amounts, if any, ***to the date of such deposit (in the case of Securities which have become due and payable) or to the Stated Maturity, as the case may be***, together with irrevocable instructions from the [Defendant] directing the Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be[.][2] (*Emphasis added.*)

3.  A timeline of key events related to Hamilton Reserve Bank Ltd.'s (*hereafter "HRB"*) purchase of fixed assets issued by the Defendant is as follows:

*   **July 25, 2012** – Indenture Agreement executed between Defendant and HSBC for July 2022 Bonds[3]

*   **Jan. 25, 2013** – July 2022 Bonds' interest becomes payable semi-annually on Jan. 25 and July 25[4]

*   **Aug. 12, 2020** – HRB purchases Certificate of Deposit from NDB Bank (*a Sri Lankan licensed entity*) with a maturity date of Aug. 12, 2021[5]

---

[1] Am Compl. Ex. B at 50, ECF No. 23-2.

[2] *Id.* at 33.

[3] *Id.* at 1.

[4] *Id.* at 16.

[5] HRB-VOL11-000112.

- **Sept. 2, 2020** – HRB begins purchasing Sri Lankan bonds with a maturity date of July 27, 2021[6]

- **Sept. 16, 2020** – HRB purchases Sri Lankan bonds with a maturity date of Jan. 18, 2022.[7]

- **Jan. 19, 2021** – HRB receives interest payment (*$28,750.00*) from Defendant for bonds maturing Jan. 18, 2022[8]

- **Jan. 27, 2021** – HRB receives interest payment (*$750,000.00*) from Defendant for bonds maturing July 27, 2021[9]

- **July 19, 2021** – HRB receives interest payment (*$28,750.00*) from Defendant for bonds maturing Jan. 18, 2022[10]

- **July 27, 2021** – July 27, 2021 bonds maturity date; HRB receives full bond coupon payment from Defendant (*$4,340,000.00*)[11]

- **Aug. 10, 2021** – HRB begins purchasing the July 2022 Bonds[12]

- **Jan. 25, 2022** – HRB receives coupon payment (*$4,969,075.00*) from Defendant for bonds maturing Jan. 18, 2022[13]

- **Apr. 12, 2022** – Defendant announces it is delaying payments on its external debt indefinitely[14]

- **May 4, 2022** – HRB issues a demand letter to Defendant regarding its pending default on the July 2022 Bonds[15]

---

[6] HRB-VOL7-00 2911-HRB-VOL7-2912.

[7] HRB-VOL7-002912, HRB-VOL7-002914.

[8] HRB-VOL7-003384.

[9] *Id.*

[10] HRB-VOL11-000086.

[11] HRB-VOL11-000103.

[12] HRB-VOL11-000053.

[13] HRB-VOL3-000529.

[14] Uditha Jayasinghe and Jorgelina Do Rosario, *Sri Lanka unilaterally suspends external debt payments, says it needs money for essentials*, Reuters (Apr. 12, 2022), https://www.reuters.com/world/asia-pacific/sri-lanka-temporarily-suspend-foreign-debt-payments-c-bank-governor-2022-04-12/.

[15] HRB_028.

HRB v. Sri Lanka, No. 1:22-cv-5199 (S.D.N.Y.)                                    **CONFIDENTIAL**
P. Noring Expert Report

- **May 12, 2022** – HRB authorizes counsel to *"pursue all legal rights permitted by law to secure full payments of its July ISB"*[16]

- **June 22, 2022** – HRB files its Complaint against Defendant[17]

- **July 25, 2022** – July 2022 Bonds Maturity Date; Defendant fails to pay bondholders

- **Sept. 23, 2022** – Cede & Co. ("Cede") issues letter to HRB's counsel stating the Participant's account held $248,183,000 for HRB, and authorizes HRB to take any and all actions that Cede is entitled as the record holder of the July 2022 Bonds[18]

- **Nov. 25, 2024** – Defendant issues a solicitation requesting consent from eligible bond holders to perform a mandatory exchange of bonds for new securities. Holders of the July 2022 Bonds were invited to exchange their Bonds for new securities; HRB received the solicitation.

- **Dec. 16, 2024** – Defendant announces solicitation results and states there is no change to the July 2022 Bonds

- **Feb. 20, 2026** – Defendant announces a Tender Offer to beneficial owners of July 2022 Bonds; HRB receives the Tender Offer

## II. QUALIFICATIONS AND BASIS FOR OPINIONS

4. I, Paul Noring, am a Managing Director at Berkeley Research Group ("BRG"). I lead BRG's Financial Institution Advisory Practice. The practice currently consists of over 50 professionals performing advisory work for more than 50 clients annually. I am a licensed Certified Public Accountant ("CPA") in the Commonwealth of Virginia and State of North Carolina and have nearly 40 years of experience with bank accounting, auditing and advisory matters.

5. I am a former Banking & Capital Markets Audit Partner with PricewaterhouseCoopers ("PwC"), where I signed independent audit opinions accompanying financial statements filed with the U.S. Securities & Exchange Commission ("SEC"). I worked at PwC from 1987 to 2005. During this period, I spent thousands of hours auding and addressing issue related to bond portfolios held on banks' financial statements.

6. After eighteen years with PwC, in 2005, I joined the Fannie Mae Corporation, where I served as Senior Vice President of Finance and was responsible for assisting with their accounting and restatement and remediating various material internal control deficiencies. While at Fannie Mae, I was responsible for the Financial Reporting function, which included all financial reporting to the SEC.

---

[16] *Id.*

[17] Compl., ECF No. 1.

[18] Am. Compl. Ex. A at 2, ECF No. 23-1; *see also infra* note 33.

7. Upon leaving Fannie Mae in 2006, I was a Managing Director at Navigant Consulting, Inc. (*subsequently Guidehouse*). While at Navigant Consulting, Inc. I was responsible for leading the Banking, Insurance and Capital Markets group, which included more than 300 professionals.

8. In September 2019, I joined BRG. I regularly work on accounting and auditing matters and routinely review banks' financial statements. Although I primarily perform advisory related services, I have served as both an expert witness and consultant in numerous high-profile matters, including two of the three largest bank failures in United States history. During this period, I spent a significant amount of time addressing matters related to the global financial crisis. I routinely work with bank regulators and have had numerous engagements where I was the named Independent Consultant related to federal or state banking regulatory enforcement orders.

9. My work throughout my career routinely involves addressing bond related accounting and risk management matters. Some examples of well-known financial institutions where I have personally addressed bond related matters include: Bank of America, Ford Credit, Freddie Mac, Fannie Mae, JPMorgan Chase, Barclays, the World Bank, Canadian Imperial Bank & Commerce, Union Bank of Switzerland, Czech National Bank (*Central Bank of the Czech Republic*), Swiss National Bank (*Central Bank of Switzerland*), Manufacturers and Traders Trust Company, Capital One Bank, and American International Group, Inc.

10. I have extensive international experience, auditing and advising banks globally. For instance, I was seconded to the Czech Republic for approximately three years where I performed numerous audits on various European banks. While at PwC, I also audited the U.S. operations of various foreign banks and oversaw the audits of the overseas operations (*both branches and subsidiaries*) of U.S. financial institutions in more than 35 individual countries. While at Navigant and BRG, I routinely address accounting, auditing, business, and litigation matters related to non-U.S. domiciled banks.

11. I have also performed significant investigative and forensic work both internally with banks and for the U.S. federal government, including the SEC, the U.S. Department of Justice ("DOJ"), and the Federal Bureau of Investigation ("FBI"). Some of these matters were criminal in nature. Most notably, I worked with the U.S. Attorney's Office for the Southern District of New York and the FBI on the criminal investigation into the collapse of FTX, which led to the 25-year conviction of FTX's founder and Chief Executive Officer, Sam Bankman-Fried.

12. Throughout my 39 years as a practicing accountant, I have worked closely with key industry leaders, including:

   - Chairman of PwC (*current*) – directly supervised for more than 10,000 hours

   - Chief Auditor of the Public Company Accounting Oversight Board ("PCAOB") (*current*) – directly supervised for more than 4,000 hours

- Chief Accountant of the SEC (*former*) – supervised ~2,000 hours on a key re-statement engagement

- Chief Accountant of the SEC Enforcement Division (*former*) – collaborated on numerous engagement matters

- Numerous former SEC Practice Accounting Fellows – significant collaboration across multiple engagements and while at Fannie Mae

## III. ASSIGNMENT AND COMPENSATION

13. I have prepared this expert report at the request of Willkie Farr & Gallagher LLP in the action titled *Hamilton Reserve Bank Ltd. v. The Democratic Socialist Republic of Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.).

14. I was asked to examine HRB's financial statements and other internal records regarding the July 2022 Bonds and to offer my opinion, as a CPA and a former bank auditor, of whether those records reflect that HRB is the registered holder and beneficial owner of $250,490,000 in principal amount of the July 2022 Bonds. In addition, I was asked to offer my expert opinion regarding:

    a.

    b. How ownership of sovereign bonds is typically recorded; and

    c. Whether HRB's records reflect that it is a bank, rather than an investment company or a trust entity.

15. I am not a lawyer and do not offer legal opinions herein.

16. My opinions are based on my education, experience, and knowledge of accounting, auditing, and finance, as well as the understandings acquired during the course of my investigation and examination of the facts and issues in this case, as discussed in further detail below, including, without limitation, my review and analysis of the materials listed in Appendix B. I reserve the right to supplement my opinions as further information becomes available.

17. BRG is being compensated for time and expenses related to this matter. My time is billed at $1,050 per hour. Neither my nor BRG's compensation depends on the outcome of this action or the content of any of my opinions.

## IV. SUMMARY OF OPINIONS

18. My four opinions are as follows:

- Opinion I: HRB's Internal Records Substantiate That it is the Beneficial Owner of $250,490,000 in Principal Amount of the July 2022 Bonds

- Opinion II:

- Opinion III: The Fact That the Bonds are Held in Street Name by the Depository Trust Company is Normal and Customary

- Opinion IV: HRB is a Bank, not an Investment Company or Trust Entity

## V. OPINIONS

### A. Opinion I: HRB's Internal Records Substantiate That it is the Beneficial Owner of $250,490,000 in Principal Amount of the July 2022 Bonds

19. CPAs routinely make judgments and determinations as to whether assets of companies exist, are in fact owned and are bona-fide. When I was an auditor, I routinely made these types of determinations.

20. In order to determine whether the assets of a company exist, and whether they are owned by the company that is subject to the audit, I would typically request and review the following types of documents:

- Monthly (*or period-end*) brokerage/counterparty statements;

- Trade confirmation detail from counterparties;

- Cash account detail showing outflows used as consideration for the purchases of the July 2022 Bonds;

- A subledger indicating the purchase date and detail of each July 2022 Bond purchase;

- Brokerage statement showing cash being received in January 2022 for the July 2022 Bonds semi-annual coupon payment; and

- Documentation received from custodians related to any potential corporate actions/ restructurings.

21. I requested and reviewed these documents from HRB. Specifically, I examined documentation (*including cash account movements*) that HRB received from various counterparties related to the purchases and holdings of the July 2022 Bonds. Those

*HRB v. Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.)                                       **CONFIDENTIAL**
P. Noring Expert Report

counterparties include Interactive Brokers, Raymond James and Morgan Stanley. The July 2022 Bonds were ultimately transferred to Bank of New York Mellon ("BNY"), and I reviewed custodian statements from BNY related to their transfer and holding. This material fully substantiates that HRB purchased and holds the July 2022 Bonds.

22. I also corroborated HRB's internal records with external sources. For instance, the International Monetary Fund ("IMF")[19] recognized HRB as a holder of the July 2022 Bonds in a publicly available September 2025 Report presented to the IMF Executive Board titled, *A Stocktaking of the Current International Architecture for Resolving Sovereign Debt Involving Private Creditors.*[20] In my professional opinion, reports from the IMF, a multilateral government-sponsored institution, are strong sources of corroborating public information. As an auditor, I would also independently confirm period-end positions with counterparties; however, I did not perform that procedure as part of this engagement.

23. A full list of the documents that I have considered are provided in Appendix B of this Report.

24. HRB's internal records substantiate that it is the beneficial owner of $250,490,000 in principal amount of the July 2022 Bonds. I see no indication in the records that I have reviewed that HRB is not the beneficial owner of the July 2022 Bonds, or that HRB holds the July 2022 Bonds for the benefit of another entity.

25. In my view, as an individual who has spent tens of thousands of hours auditing, investigating, and advising on the accounting for various bond portfolios and positions, none of the internal documents that I have reviewed call into question whether HRB is the beneficial owner of the July 2022 Bonds that are listed as an asset in its financial statements. In fact, all the documents I have reviewed overwhelmingly support that HRB is the beneficial owner of the July 2022 Bonds.

**B. Opinion II:** ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████

26. ████████████████████████████████████████████████████████

---

[19] Per the IMF, it "*works to achieve sustainable growth and prosperity for all of its 191 member countries*" and does so by "*supporting economic policies that promote financial stability and monetary cooperation, which are essential to increase productivity, job creation, and economic well-being. The IMF is governed by and accountable to its member countries.*" Additionally, the IMF states that it has three critical missions: "*furthering international monetary cooperation, encouraging the expansion of trade and economic growth, and discouraging policies that would harm prosperity. To fulfill these missions, IMF member countries work collaboratively with each other and with other international bodies.*" *What is the IMF?*, IMF, https://www.imf.org/en/about/factsheets/imf-at-a-glance (accessed on May 5, 2026).

[20] IMF, *A Stocktaking of the Current International Architecture for Resolving Sovereign Debt Involving Private Sector Creditors* (Sept. 19, 2025), https://www.imf.org/-/media/files/publications/pp/2025/english/ppea2025034.pdf.



27.

28.

[22] HRB-VOL2-000450.

*HRB v. Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.)    **CONFIDENTIAL**
P. Noring Expert Report



29.

30.

_____

[23] HRB-VOL2-000457.

[24] HRB-VOL2-000450.



31.

32.

33.

34.

---

[26] HRB-VOL2-000457.

[27]

CONFIDENTIAL



### C. Opinion III: The Fact That the Bonds are Held in Street Name by the Depository Trust Company is Normal and Customary

35. I was asked how securities, such as the July 2022 Bonds, are typically held by market participants. The July 2022 Bonds are held by the Depository Trust Company ("DTC"), which is normal and customary.

36. The DTC is a subsidiary of the Depository Trust & Clearing Corporation ("DTCC"), its holding company, and was established in 1973 to *"reduce costs and provide clearing and settlement efficiencies by immobilizing securities and making 'book-entry' changes to ownership of the securities."*[29] As a member of the U.S. Federal Reserve System and an SEC-registered clearing agency, DTC retains custody of over 1.4 million active securities issues valued at $87.1 trillion (USD), including securities that are issued in the United States and over 131 countries and territories.[30]

37. Per the DTCC, DTC offers numerous benefits to bond participants, issuers, and investors throughout a security's lifecycle, by helping to increase efficiencies and reduce risk and costs.[31] For example, during the eligibility process, DTC enables electronic initial distribution of a security offering to financial institutions that are DTC participants (*and subsequently to investors*), and once a security is eligible, DTC, via its nominee Cede, becomes the registered holder of the securities.[32] DTC then routinely processes dividend and interest payments and manages the electronic book-entry transfer of interests in securities among participants.[33]

---

[28] HRB_144.

[29] *About DTCC, Businesses & Subsidiaries: The Depository Trust Company (DTC)*, DTCC, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (accessed on Apr. 27, 2026).

[30] *Id.*

[31] *Issuer Services Frequently Asked Questions (FAQs)*, DTCC (Nov. 29, 2021), https://dtcclearning.com/products-and-services/asset-services/issuer-services/8674-issuer-services-frequently-asked-questions-faqs.html.

[32] *Id.*

[33] *Id.* "*Participants*" are defined as broker-dealers and banks, holding one or more accounts through which they deposit and hold securities at DTC, and each participant is holds non-voting shares of DTC. *Demystifying DTC: The Depository Trust Company and the Municipal Bond Market*, Nat'l Ass'n of Bond Lawyers 2 (Mar. 2017), https://www.nabl.org/wp-content/uploads/2023/02/20170331-NABL-Demystifying-DTC.pdf. Participants often hold and transfer interests in the securities at the direction of their customers, which include the ultimate beneficial owners. DTCC, *Issuer Services FAQs*.

38. In sum, "*by offering a single source for the deposit and electronic transfer of interests in Securities, facilitat[ing] the distribution of public bond offerings by means of electronic delivery and settlement (footnote omitted),*" the DTC system "*reduces or eliminates costs of shipping and insurance associated with transporting certificates, risk of loss or delay in shipment, risk of theft, and associated replacement costs in the event of loss,*" and "*eliminates the risk of a missed election on a corporate action, or a missed dividend payment.*"[34]

39. DTC-eligible securities are held in three ways:

- **Street Name (Least Expensive/Lower Risk)**: Investor's name is listed on its brokerage firm's books as the beneficial owner of the shares and the brokerage firm's name is listed in DTC's ownership records. **Cede is listed as the registered owner on the records of the issuer** maintained by its transfer agent; DTC holds the legal title to the securities, and the **ultimate investor is the beneficial owner of the securities** (*emphasis added*).

- **Direct Registration (Less Expensive/Lower Risk)**: Through the direct registration system ("DRS"), an investor, as the security owner, can be the registered holder directly on the issuer's books and records, maintained by its transfer agent. Investors who use direct registration receive a statement providing evidence of ownership in lieu of a stock certificate, and the issuer or transfer agent sends all investor information, dividends, and other corporate communications directly to the investor.

- **Physical Certificate (Most Expensive/Higher Risk)**: Investors can hold shares in the form of a certificate; however, physical certificates can be lost, stolen or damaged, and replacement can be costly and take time.[35]

40. Additionally, participants do not hold the title to a specific security; participants own a securities entitlement to a pro rata interest in the interest of a security held by the DTC.[36] Customers (*which may be the beneficial owner*)[37] of a participant (*with respect to a security*) for whom the participant acts as a securities intermediary, own a securities

---

[34] *Demystifying DTC, supra* note 33, at 3; DTCC, *Issuer Services FAQs*.

[35] DTCC, *Issuer Services FAQs*.

[36] U.C.C. § 8-503(b); *see also Demystifying DTC, supra* note 33, at 4.

[37] *Demystifying DTC, supra* note 33, at 6.

entitlement to a pro rata interest (*in the security held by the participant*) which is tracked and credited to the relevant CUSIP[38] in the customer's account with the participant.[39]

41. Beneficial owners do not receive physical certificates in DTC-held transactions; they only receive written confirmation from the participant (*or intermediary*), with which the beneficial owner has an account. This confirmation provides transaction details and periodic statements of their holdings.[40]

42. While HRB is the beneficial owner of the July 2022 Bonds, HRB's purchased securities are held by Cede, DTC's nominee, using the Street Name method described above. DTC holds the July 2022 Bonds at the Defendant's request. Per the Defendant's 2012 Indenture Agreement, DTC is the Depositary of the July 2022 Bonds:

> *UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY...TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO....AND ANY PAYMENT IS MADE TO CEDE & CO....ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL BECAUSE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.*[41]

43. This is further supported by Cede's September 23, 2022 letter to HRB's counsel which states that Cede is the nominee for DTC and the record holder of the Bonds:

> *Cede & Co., as nominee of The Depository Trust Company ("DTC"), is the holder of record, as of July 15, 2022, of The Democratic Socialist Republic of Sri Lanka 5.875% Notes due July 25, 2022, CUSIP No. Y2029SAH7 (the "Notes").*
>
> *DTC is informed by its Participant, Interactive Brokers LLC (the "Participant"), that the Notes credited to the Participant's DTC account on July 15, 2022 include $248,183,000 in principal amount thereof ("Subject Notes") that the Participant held*

---

[38] "CUSIP" stands for Committee on Uniform Securities Identification Procedures; a CUSIP number identifies most financial instruments, including registered US stocks, commercial paper, and U.S. government and municipal bonds. Foreign securities are identified through the CUSIP International Numbering System which uses a nine character identifier and a letter in the first position to signify the issuer's country or geographic region. *CUSIP Number*, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/cusip-number (accessed on Apr. 27, 2026).

[39] *Demystifying DTC, supra* note 33, at 4.

[40] *Id.* at 8.

[41] ECF No. 23-2 at 15-16; *see also* the Agreement states that "*Depositary*" will "*refer to either Euroclear or Clearstream or DTC, as the case may be.*" *Id.* at 2.

as custodian for beneficial owner Nevis International Bank & Trust Ltd (the "Beneficial Owner").[42]

44. In my experience auditing bond portfolios and advising on issues related to such portfolios, the vast majority of securities registered in the U.S. are held in Street Name by DTC. Further, for the last few decades, it has been quite rare for physical certificates to be issued to beneficial owners, and direct registration is also less common.[43]

45. As such, while HRB is the beneficial owner of the July 2022 Bonds, per industry standard and the Defendant's preference, DTC (via Cede) is the record holder of the Bonds in question. The fact that DTC is the record holder does not in any way call into question whether HRB actually owns the July 2022 Bonds.

**D. Opinion IV: HRB is a Bank, not an Investment Company or Trust Entity**

46. Finally, I was asked to explain the difference between a bank and an investment company or trust entity, and to assess whether HRB is a bank, or one of the latter entities. For the reasons stated below, HRB is a bank, not an investment company or trust entity.

47. Governments have long recognized the importance of financial intermediation by offering banks special privileges and protections. These incentives – such as access to credit through a central bank (e.g., the U.S. Federal Reserve System) and the insurance of deposits – have not been similarly extended to other financial institutions like investment funds, investment companies, insurance companies, and broker-dealers. Accordingly, the benefits and responsibilities associated with their public role as financial intermediaries have brought banks significant government oversight, including extensive licensing requirements and prudential supervision.[44]

48. Broadly, one distinct characteristic of depository institutions (i.e., banks or savings associations) is their ability to collect and hold deposits.[45] Companies without banking charters may engage in other financial services (e.g., lending or servicing loans) or may receive and retain customers' funds for the purposes of certain trading or investment activities, but these funds are fundamentally different than traditional bank deposits.

---

[42] Am. Compl. Ex. A at 2, ECF No. 23-1; see also DTCC, Issuer Servs. FAQs ("As the holder of record, DTC must be notified of relevant information related to an issuer's security[.]") and Demystifying DTC, supra note 33, at 2 ("Registered Holder" is the person or entity named and recorded on the books of the issuer, trustee, or registrar as the holder of the bonds. This may be an individual, a corporation, a Participant, or, most likely, Cede & Co., the nominee of DTC in book-entry transactions.").

[43] Demystifying DTC, supra note 33, at 8 ("Evidence of Ownership Received by Beneficial Owners. In DTC-held transactions, Beneficial Owners do not receive physical certificates. They only receive written confirmation from the Participant or intermediary with which the Beneficial Owner has its account providing details of the transaction, and the periodic statements of their holdings.").

[44] AICPA 1.02.

[45] 12 U.S.C. § 1813(c)(1), (l) (hereafter the Federal Deposit Insurance Act or "FDI Act"); see also Scott G. Alvarez, "Why do we have Banks?," Univ. of N.C. Sch. of Law 9 (Mar. 26, 2025), https://cle.law.unc.edu/wp-content/uploads/2025/03/1-BanksThroughBalanceSheets.March2025-Alvarez.pdf.

HRB v. Sri Lanka, No. 1:22-cv-5199 (S.D.N.Y.)                                    **CONFIDENTIAL**
P. Noring Expert Report

49. In contrast to banks, investment companies are entities (*i.e., corporations, business trusts, partnerships, or limited liability companies*) that issue securities or partnership interests and are primarily engaged in the business of investing in securities.[46] Investment companies invest funds received from investors on a collective basis and investors share in the profits and losses in proportion to their interest in the company, as performance of company is based upon the performance of the securities and other assets the investment company owns.[47]

50. Investment companies' balance sheets also have specific features that differentiate these companies from noninvestment companies under GAAP. These include:

- *Investment companies typically report financial position under a statement of assets and liabilities format rather than presenting a conventional balance sheet.*

- *When reporting financial position, investment companies provide a schedule of investments for each statement of assets and liabilities presented.*

- *When reporting results of operations, investment companies separately report components of investment income, expenses and gain or loss from investments and foreign currency transactions.*

- *Investment companies are exempt from the requirement to provide a statement of cash flows when certain conditions are met.*[48] (*Footnotes and internal references omitted.*)

51. Additionally, customer funds received by investment companies (*i.e., deposits used for the purpose of securities investments versus deposits received or held by a depository institution as previously defined by the FDI Act*) under GAAP are reported as equity contributions.

52. Trust companies draw their distinction from investment companies in that they are businesses that are authorized to act in a fiduciary capacity with respect to their customers' assets; these fiduciary-related functions include acting as the trustee, agent, custodian or investment manager of the property of another person.[49] Similar to banks, trust companies can be formed and are regulated under state or federal law; however, one significant difference is that trust companies generally cannot take deposits ("*Trust companies are not authorized to accept deposits, which not only precludes their use for*

---

[46] SEC Office of Investor Ed. And Advocacy, *Investment Companies* (July 9, 2013), https://www.sec.gov/answers/mfinvco.htm.

[47] *Id.*

[48] *Investment Companies Handbook US GAAP, Question 6.3.20 How do an investment company's financial statements differ from financial statements of other entities?*, KPMG 242-243 (May 2025), https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2025/handbook-investment-companies.pdf.

[49] Grant F. Butler and Robert M. Tammero, Jr., *The trust company — an old tool for a new age*, Reuters (July 22, 2022), https://www.reuters.com/legal/transactional/trust-company-an-old-tool-new-age-2022-07-22/.

*deposit-taking activities but also means that they do not have access to the low-cost funding provided by deposits.*").[50]

53. Further, trust companies diverge from banks in how their customers' assets are held. Trust companies are required to segregate the assets they hold in a fiduciary capacity from their own assets such that these assets are generally protected from the trust company's creditors.[51] In contrast, the cash that banks receive from its depositors is comingled not only with other depositors cash, but with the banks' own cash (*e.g., cash raised from an equity offering or cash proceeds from bank investments*). The Federal Financial Institutions Examination Council ("FFIEC"),[52] in providing financial reporting guidance to fiduciary institutions, also draws a distinction between the assets held by a trust company and bank deposits.[53]

54. In short, there are significant fundamental differences in business structure and financial reporting requirements between banks, investment companies, and trust companies:

- **Banks** – Depository institutions that receive and hold customer deposits. Deposits are reported as debt liabilities given that the deposits are monies borrowed from depositors that are owed, in whole, to the depositor. Deposits are comingled with other depositors' funds, as well as funds that originated from the bank itself. There are no specific restrictions on how the funds are used by the bank (*absent applicable banking regulation in the relevant jurisdiction*) and depositors receive a stated rate of interest (*or no interest for non-interest bearing accounts*). Depositors do not participate in any upside from investment or loan returns.

- **Investment Companies** – Companies that receive investor funds and utilize those collective funds to invest in securities. Any customer deposits are reported as assets on a specific assets and liabilities statement that differs from the conventional balance sheet. Investment companies are usually governed by a prospectus, offering memoranda or other similar governing documents that set forth permissible investment strategies. Received customer monies are reported as equity and these customers participate, generally on a pro-rata basis, in the upside or downside of the returns on those particular investments.

---

[50] *Id.*

[51] *Id.*

[52] The FFIEC is an interagency body that includes the Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation ("FDIC"), Office of the Comptroller of the Currency ("OCC"), National Credit Union Administration, Consumer Financial Protection Bureau ("CFPB"), and representation from five state financial regulators via the State Liaison Committee ("SLC") plus the SLC Chair. The FFIEC "*prescrib[es] prescribing uniform principles, standards, and report forms for the federal examination of financial institutions and making recommendations to promote uniformity in the supervision of financial institutions.*" *Mission*, Fed. Fin. Inst. Exam. Council, https://www.ffiec.gov/about/mission (accessed on Apr. 29, 2026).

[53] *FFIEC 031 and FFIEC 041 Instructions for Preparation of Consolidated Reports of Condition and Income*, FFIEC RC-T-1 – RC-T-2 (Mar. 2025), https://www.ffiec.gov/sites/default/files/data/reporting-forms/FFIEC031_FFIEC041_202503_i.pdf.

HRB v. Sri Lanka, No. 1:22-cv-5199 (S.D.N.Y.)                          CONFIDENTIAL
P. Noring Expert Report

- **Trust Companies** – Regulated fiduciaries that act as trustees, agents, custodians, or managers of individuals' property. Trust companies cannot take deposits and must report bank deposits differently than the company's fiduciary assets, as off-balance sheet items. Customer funds can be commingled (*e.g.*, *common and collective trust funds*); however, there is no comingling with funds belonging to the trust company. Monies are only used as directed by the ultimate owner or governing trust agreements. The U.S. Trust Indenture Act governs the issuance of most debt securities and requires a trustee type structure and a named trustee (*Trust Company*). The ultimate beneficial owner of the trust receives the upside and downside of any investment returns.

Each of these different types of institutions performs a different type of business activity and therefore deploys customers' funds differently. Accordingly, the financial statements of each of the entity types reflect these differences.

55. In the U.S., nonbank entities within the same corporate family cannot use the word "*Bank*" in their name; for example, Banc of America Securities (*with a "c" instead of a "k"*) is a nonbank entity. Like the U.S., most countries prevent financial institutions that are not specifically licensed as banks to be called a "*Bank*." Nevis follows the same protocol and thus, the fact that the Plaintiff is "*Hamilton Reserve Bank*" is *prima facie* evidence that it is, in fact, a bank.[54]

56. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████[55] I also reviewed HRB's Customer Account Agreement, which provides the underlying operational framework for opening, receiving, and servicing customer deposits, and defines the terms and conditions governing all activities related to "*the existence and operation of [customers'] deposit accounts with the Bank.*"[56]

57. Per Nevis' Financial Services Regulatory Commission Act ("FSRC Act"), HRB is required to submit copies of its annual financial statements within three months of the end of its fiscal year to its banking regulator, the Nevis Financial Services Regulatory Commission ("NFSRC").[57] These financial statements must be audited by an accredited accountant who:

*[E]xamine[s] the books and records in accordance with internationally accepted accounting principles and [makes] a report on the annual financial statements and*

---

[54] Nevis Int'l Banking Ordinance, Cap. 7.05 § 17(2) (2017) (St. Kitts & Nevis).

[55] HRB-VOL2-000288; HRB-VOL2-000316; HRB_149; HRB_163; HRB-VOL2-000437; HRB-VOL2-000447; HRB-VOL2-000452; HRB-VOL2-000460.

[56] Decl. of A. Kenyatta in Opp'n re: Mot. to Intervene Ex. A, ECF No. 93-1.

[57] Fin. Servs. Regulatory Comm'n Act, Cap. 21.10, § 37.4 (2020) (St. Kitts & Nevis).

*financial position, and in every such report the auditor shall state whether in the auditor's opinion the balance sheet and profit and loss account give a true and fair view of the state of affairs of the [Bank].*[58]



58. In addition to auditing requirements, Nevis banking laws require institutions engaging in international banking business activities in Nevis to be licensed as an international bank.[59] Nevis defines *"international banking"* as receiving foreign funds through:

- *[T]he **acceptance of foreign money deposits payable upon receipt demand** or after a fixed period or after notice;*

- *[T]he **sale or placement of foreign bonds**, certificates, notes or other debt obligations or other securities; or*

- *[A]ny **other similar activities involving foreign money or foreign securities;** and*

- *[E]ither in whole or in part using foreign funds so acquired for loans, advances and investments whether in Nevis or elsewhere.*[60] (*Emphasis added.*)

59. I reviewed HRB's by-laws for alignment with these requirements and HRB states its company objective and business activities are restricted to *"international banking with client beneficial owners outside Nevis,"* with activities including *"transactions, products and services involving securities, bonds, commodities and futures, investment banking, investment brokerage, and investment advisory services."*[61]

60. To receive its banking license, HRB submitted the required application documentation to NFSRC, who issues international banking licenses to eligible companies that, among other requirements, have deposited or invested two hundred thousand dollars (*$200,000.00*) in deposits with a bank licensed under the Banking Act or deposits with a financial institution approved by the Minister.[62] Companies can be refused a license (*or have their license revoked*) if NFSRC determines that the company is operating or intends to operate an international banking business under a name which can *"mislead or confuse the persons for whom it intends to provide any or all of its services"* or *"is calculated to*

---

[58] *Id.* at § 35.1(a).

[59] Nevis Int'l Banking Ordinance, Cap. 7.05 § 6.

[60] *Id.* at § 3(1).

[61] HRB-VOL2-000106 at 23.1.

[62] Cap. 7.05 § 11(c)(iii)-(iv).

*suggest falsely, the patronage of or connection with some person or authority whether within Nevis or not[.]"* [63]

61. HRB's original Articles of Incorporation were approved by the Nevis Registrar of Companies under its previous name, Nevis International Bank & Trust Ltd., on October 29, 2018, and HRB's name was changed to Hamilton Reserve Bank Ltd. on March 3, 2021. [64] The Bank subsequently received a Nevis international banking license that reflected its amended name, Hamilton Reserve Bank Ltd., on January 4, 2022. [65]

62. In its December 19, 2025 letter to HRB, NFSRC confirmed that HRB was licensed to perform international banking business activities and that its banking license remained valid. [66] As of the date of this report, HRB is listed as an active licensed international bank on NFSRC's *"Regulated Entities"* page. [67]

63. Lastly, NFSRC also oversees the licensing of trusts and other money services businesses, which are organized and licensed separately from international banks. [68] If HRB's activities or audited financials did not meet Nevis' statutory international banking requirements and more appropriately aligned with a different business structure, there would likely be evidence of NFSRC requesting that HRB change its operating model, clarify its audited financial statements, and/or revoke its banking license.

64. Based on my professional experience and the facts discussed above, HRB is a bank. It is not an investment company, fund or other similar investment vehicle. Likewise, it is not a trust company. Therefore, the depositors do not participate in the returns of any specific investments.

## VI. CONCLUSION

65. In conclusion, HRB's internal records substantiate that it is a bank, and that it is the beneficial owner of $250,490,000 in principal amount of the July 2022 Bonds. ███ ████████████████████████████████████████████████ Finally, the fact that the July 2022 Bonds are held in street name by DTC is normal and customary and does not in any way cast doubt that HRB is the beneficial owner.

---

[63] *Id.* at § 17(1)(a), (c).

[64] HRB-VOL7-001439; HRB-VOL7-001441.

[65] HRB-VOL7-001435.

[66] HRB-VOL9-000003.

[67] *Regulated Entities, Licensed International Banks,* NFSRC, https://www.nevisfsrc.com/regulated-entities/#hamilton (accessed Apr. 28, 2026).

[68] *Id.* at *Licensed Money Services Businesses, Licensed Trust and Corporate Service Providers.*

## APPENDIX A

### I. Curriculum Vitae of Paul Noring, CPA

Mr. Noring is a Managing Director who leads BRG's advisory practice dedicated to serving Financial Institutions. This practice specializes in providing a full suite of consulting services, including due diligence, compliance, investigations, operational enhancement, risk management and accounting solutions to the banking, consumer finance, fintech, capital markets and insurance industry. Mr. Noring has over 37 years of audit, investigations and advisory experience in the financial services industry. He is an expert in financial reporting, accounting policy and auditing matters related to banks and other companies. Throughout his career, he has routinely practiced in U.S. GAAP, International Financial Reporting Standards (IFRS) and other local GAAP. He has significant testifying experience related to accounting and auditing matters. Each year, Mr. Noring spends hundreds of hours reviewing SEC filings including 10-Ks, 10-Qs, 8-Ks and Registration Statements. He routinely reviews audit work papers in conjunction with certain matters.

Prior to joining BRG in September 2019, he spent 13 years at Navigant Consulting (*now Guidehouse*), where he led the Banking & Capital Markets practice. Mr. Noring was also an Audit Partner at PwC, where he started his career and spent 18 years in the Banking and Capital Markets Group. While there, he was responsible for auditing two of the top three U.S. banks, a government-sponsored enterprise, one of the world's largest captive finance auto lenders, various broker-dealers, the world's leading stock exchange and numerous international banks. He signed audit opinions, which were filed with the SEC and has worked closely with Internal Audit Departments. While an audit partner for PwC, he performed specific fraud investigation engagements as well as conducted numerous special projects at audit clients analyzing large unanticipated losses.

He left PwC to join Fannie Mae to spearhead the remediation of issues identified as part of their accounting scandal. He served as Senior Vice President of Finance and was responsible for financial reporting (*including all SEC filings*), tax and the business unit controller's function as well as leading key restatement and risk management remediation efforts.

During his career, Mr. Noring has conducted hundreds of audits, financial reporting related engagements, risk and control assessments, accounting policy analyses, due diligence reviews, fraud reviews, gap analyses and Sarbanes-Oxley reviews. He has deep product expertise across all aspects of lending, consumer finance, corporate banking and capital markets. His audit and accounting work also spans non-financial service entities. He also has extensive international experience in Europe, Asia and Latin America. He has spent thousands of hours interfacing with regulators and Boards of Directors and as a result is an expert in governance, risk and control. Mr. Noring also has deep experience with credit risk management, the allowance for loan losses and valuation of various financial assets, including whole loans, securities, Mortgage Servicing Rights, and hedging instruments. He has worked extensively on all phases of the lending life cycle from origination to collateral disposition. He is also an expert in financial reporting, accounting policy and auditing matters related to banks and other financial institutions.

He has far-reaching experience in addressing regulatory concerns and exam management. He is well versed in the CFPB compliance requirements/rulemaking as well as state law requirements. He has served as the *"Independent Consultant"* for Federal Banking regulators, the CFPB and State Attorneys General related to investigating various potential unlawful activities and quantifying the related harm to large numbers of consumers.

Most recently, he was the lead banking expert working for the Unsecured Creditors' Committee of SVB [*Silicon Valley Bank*] Financial Group, investigating the reasons for the bank's failure, working to maximize creditor recoveries and assisting counsel in pursuing causes of action. He is also serving as the named Independent Consultant for a major OCC enforcement matter related to the servicing of defaulted mortgages. Other recent work includes a forensic investigation and prosecution assistance for the U.S. Attorney's Office for the Southern District of New York related to a multi-billion-dollar fraud. Projects completed within the past two years include model validations, end-to-end reviews of fraud risk management practices, assessment of a bank's internal audit function, compliance management system (CMS) reviews, multi-risk stripe risk and control self-assessments, as well as assisting banks close regulatory gaps for various leading banking-as-a-service.

He was retained by a major European Central bank during the height of the credit crisis to assist in the rescue of a major global bank – which entailed investigating the extent of losses, serving as the Independent Investment Advisor and monitoring the disposition of assets. Members of Mr. Noring's team also investigated a major mortgage fraud that led to the collapse of a large regional bank and high-profile criminal convictions. He was also personally retained to investigate management activities related to two of the three largest U.S. Bank failure in history, which involved analyzing reserving practices, risk management activities, credit underwriting, governance, asset-liability management, FDIC resolution actions, and role of various advisors. He was retained by a major European Central bank during the height of the credit crisis to assist in the rescue of a major global bank – which entailed investigating the extent of losses, serving as the Independent Investment Advisor and monitoring the disposition of assets. Members of Mr. Noring's team also investigated a major mortgage fraud that led to the collapse of a large regional bank and high-profile criminal convictions. He was also personally retained to investigate management activities related to two of the three largest U.S. Bank failure in history, which involved analyzing reserving practices, risk management activities, credit underwriting, governance, asset-liability management, FDIC resolution actions, and role of various advisors.

Mr. Noring has extensive knowledge of derivative transactions, deposit activities, structured finance, including asset back finance, CDOs and structured credit products. He has audited hundreds of highly complex transactions and structuring mechanisms, assisted clients in establishing innovative deals, valued resulting securities / retained interests, evaluated underlying collateral performance, assisted entities in establishing Day 2 accounting and risk management for de-novo vehicles, as well as evaluated the impact of major industry events on existing transactions and structures. He has significant experience addressing complex legal entity structures and cross-border activities.

Mr. Noring routinely advises clients on accounting standards, audit issues, preparing material for auditors and interfaces with auditors. During his career, he has assisted the SEC in their

investigations as well as supported and advised clients with respect to SEC investigations. He has also spent significant time working with the Division of Corporate Finance to pre-clear accounting issues.

Mr. Noring is also a recognized expert in best practice environments surrounding compliance functions and risk management operations. He has assisted dozens of top-tier banks, consumer finance entities, and mortgage companies to stand up new risk management procedures or improve existing federal, state and investor compliance operations, including outsourced periodic product level surveillance and testing. He has personally overseen the testing of over a million individual mortgage loans for various compliance attributes, including adequate loss mitigation, foreclosure and bankruptcy processes.

While serving as the Practice Leader for Navigant Consulting, Inc. Banking, Insurance and Capital Markets he grew the unit from an initial group of ten individuals to at one point over 300 hundred domestically based professionals and 150 offshore testers over a thirteen-year period. Since joining BRG, he has helped grow the Financial Institutional Advisory practice from an initial four members to over 60 professionals in five years.

## II.  Publications From the Preceding Ten Years

Paul Noring, "*As LIBOR Sunsets – 5 Things to Consider As You Prepare For A New Interest Rate Benchmark*," Navigant – Insights (May 9, 2019).

Paul Noring, "*Not So Fast, SOFR: Is It a Viable LIBOR Replacement?*," BRG – Thinkset (2020).

Paul Noring, "*Time to Test: Surveying Post-Libor Options for Banks*," American Bankers Association, ABA Banking Journal 112, No. 3 20-21 (2020).

Paul Noring, *LIBOR 101: Transition Basics for the CRE Finance Market*, Mortgage Bankers Association Webinar (July 26, 2020).

Paul Noring, *'Zombie' LIBOR for USD Contracts: Navigating the Critical Issues*, The Knowledge Group, Webinar (May 12, 2021).

Paul Noring, *How to Mitigate and Manage Third-Party Risks: Leveraging Tools and Best Practices*, The Knowledge Group Webinar (October 13, 2022).

Paul Noring, "*AMERIBOR's Resilience to COVID-19 Stress*," ValueWalk (June 9, 2023).

*HRB v. Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.)                                    **CONFIDENTIAL**
P. Noring Expert Report

## APPENDIX B

## I. List of Materials Considered

### a. LEGAL FILINGS

Compl, ECF No. 1 (June 21, 2022)

Am. Compl., ECF No. 23 (Oct. 13, 2022)

Decl. of Evan Kubota in Supp. of Mot. for Summ. J., ECF No. 46 (June 26, 2023)

Rule 56.1 Statement (1), ECF No. 47 (June 26, 2023)

Decl. of Antonio Kenyatta in Supp. of Mot. for Summ. J., ECF No. 48 (June 26,2023); ECF No. 52 (July 7, 2023); ECF No. 61 (July 31, 2023); ECF No. 138 (Jan. 24, 2025)

Decl. of Avinash Persaud, ECF No. 57 (July 17, 2023); ECF No. 152-6 (July 1, 2025)

Decl. of James Smith in Supp. of Mot. to Intervene, ECF No. 81 (Feb. 29, 2024)

Mem. of Law in Supp. of Motion to Intervene, ECF No. 82 (Feb. 29, 2024)

Mem. of Law in Opp'n of Mot. to Intervene, ECF No. 92 (Mar. 15, 2024)

Decl. of Antonio Kenyatta in Opp'n Mot. to Intervene, ECF No. 93 (Mar. 15, 2024)

Decl. of Jesse Guzman in Supp. of Mot. to Intervene, ECF No. 97 (Mar. 22, 2024)

Suppl. Decl. of Robert Houck in Opp'n Mot. for Summ. J., ECF No. 140 (July 31, 2025)

Declaration of Juan Migone [152], ECF No. 152-7 (July 1, 2025)

Pl.'s Obj. and Resp. to Def.'s First Req. for Admis. (July 30, 2025)

Pl.'s Obj. and Resp. to Def.'s First Set of Interrog. (July 30, 2025)

Dep. of Antonio Kenyatta (Apr. 16, 2026)

### b. PRODUCED MATERIALS

HRB Nevis Certificate of Incumbency (HRB_024)

HRB By-Laws (HRB-VOL2-000106)

HRB Articles of Incorporation (HRB-VOL7-001439; HRB-VOL7-001441)

HRB Nevis International Banking License (HRB-VOL7-001435)

HRB Nevis Certificate of Incumbency (HRB_024)

Sri Lanka proxy solicitation (Feb. 20, 2026) (HRB-VOL9-000008)

Sri Lanka Tender Offer Redemption July 2022 ISB (Feb. 23, 2026)

Aug. 12, 2020 Certificate of Deposit from NDB Bank (HRB-VOL11-000112)

May 4, 2022 HRB Demand Letter to Defendant (HRB_028)

June 21, 2022 Bond Investment Portfolio (HRB-VOL7-001260)

2020/2019 Audited Financial Statement (HRB-VOL2-000285)

2021 Audited Financial Statement (HRB_144)

2023/2022 Audited Financial Statement (HRB-VOL2-000433)

2024/2023 Audited Financial Statement (HRB-VOL2-000448)

Dec. 2020 IB Activity Statement (HRB-VOL3-000618)

Apr. 2021 IB Activity Statement (HRB-VOL11-000111)

July 2021 IB Activity Statement (HRB-VOL11-000106)

Aug. 2021 IB Activity Statement (HRB-VOL12-000051)

Aug. 2021 IB MTM Statement (HRB-VOL11-000057)

Sept. 2021 IB Activity Statement (HRB-VOL7-002919)

Oct. 2021 IB Activity Statement (HRBVOL7-000364)

Oct. 2021 IB MTM Summary (HRB-VOL7-000048)

Nov. 2021 IB Activity Statement (HRB-VOL12-000001)

Dec. 2021 IB Activity Statement (HRB-VOL4-000968)

Jan. 2022 IB Activity Statement (HRB-VOL3-000521; HRB-VOL11-000113)

Feb. 2022 IB Activity Statement (HRB-VOL12-000012)

Mar. 2022 IB Activity Statement (HRB-VOL12-000023)

Apr. 2022 IB Activity Statement (HRB-VOL12-000035)

May 2022 IB Activity Statement (HRB-VOL8-000243)

May 2022 IB MTM Summary (HRB-VOL11-000073)

June 2022 IB Activity Statement (HRB-VOL11-000081)

July 2022 IB Activity Statement (HRB-VOL4-000018)

Dec. 2022 IB Activity Statement (HRB-VOL3-000303)

Apr. 2023 IB Activity Statement (HRB-VOL1-000033-REPROD)

July 19, 2022 Morgan Stanley Account Transfer Form (HRB-VOL4-000780)

Apr. 2023 Morgan Stanley Client Statement (HRB-VOL1-000007-REPROD)

June 2023 Morgan Stanley Client Statement (HRB-VOL11-000026)

July 2023 Morgan Stanley Client Statement (HRB-VOL12-000068)

Dec. 2020 Raymond James Account Statement (HRB-VOL7-002909)

Jan. 2021 Raymond James Account Statement (HRB-VOL7-3379)

Feb. 2021 Raymond James Account Statement (HRB-VOL7-002893)

July 2021 Raymond James Account Statement (HRB-VOL11-000089)

Sept. 2021 Raymond James Account Statement (HRB-VOL4-001276)

Oct. 2021 Raymond James Account Statement (HRB-VOL7-000375)

Jan. 2022 Raymond James Account Statement (HRB-VOL12-000064)

June - July 2023 Raymond James Account Statement (HRB-VOL12-000045)

Apr. 24, 2023 Morgan Stanley Letter to Berkowitz Pollack (HRB-VOL1-000001-REPROD)

June 20, 2023 Morgan Stanley Account Balance (HRB_137)

Jan. 2024 BNY Transaction Record (HRB-VOL2-000431)

HRB Bond Position at BNY as of Dec. 31, 2024 (HRB-VOL11-000090)

HRB Bond Position at BNY as of Dec. 31, 2025 (HRB-VOL11-000091)

HRB Bond Position at BNY as of Mar. 31, 2026 (HRB-VOL11-000092)

### c. PUBLICLY AVAILABLE DOCUMENTS

AICPA, *Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies, and Mortgage Companies.*

*AS 1105: Audit Evidence*, PCAOB, https://pcaobus.org/oversight/standards/auditing-standards/details/AS1105 (accessed on Apr. 28, 2026).

*FFIEC 031 and FFIEC 041 Instructions for Preparation of Consolidated Reports of Condition and Income*, FFIEC (Mar. 2025), https://www.ffiec.gov/sites/default/files/data/reporting-forms/FFIEC031_FFIEC041_202503_i.pdf.

*Mission*, Fed. Fin. Inst. Exam. Council, https://www.ffiec.gov/about/mission (accessed on Apr. 29, 2026).

IMF, *A Stocktaking of the Current International Architecture for Resolving Sovereign Debt Involving Private Sector Creditors* (Sept. 19, 2025), https://www.imf.org/-/media/files/publications/pp/2025/english/ppea2025034.pdf.

*Investment Companies Handbook US GAAP*, KPMG (May 2025), https://kpmg.com/kpmg-us/content/dam/kpmg/frv/pdf/2025/handbook-investment-companies.pdf.

Scott G. Alvarez, *"Why do we have Banks?,"* Univ. of N.C. Sch. of Law (Mar. 26, 2025), https://cle.law.unc.edu/wp-content/uploads/2025/03/1-BanksThroughBalanceSheets.March2025-Alvarez.pdf.

*Demystifying DTC: The Depository Trust Company and the Municipal Bond Market*, Nat'l Ass'n of Bond Lawyers (Mar. 2017), https://www.nabl.org/wp-content/uploads/2023/02/20170331-NABL-Demystifying-DTC.pdf.

Grant F. Butler and Robert M. Tammero, Jr., *The trust company — an old tool for a new age*, Reuters (July 22, 2022), https://www.reuters.com/legal/transactional/trust-company-an-old-tool-new-age-2022-07-22/.

Uditha Jayasinghe and Jorgelina Do Rosario, *Sri Lanka unilaterally suspends external debt payments, says it needs money for essentials*, Reuters (Apr. 12, 2022),

*HRB v. Sri Lanka*, No. 1:22-cv-5199 (S.D.N.Y.)                                    **CONFIDENTIAL**
P. Noring Expert Report

https://www.reuters.com/world/asia-pacific/sri-lanka-temporarily-suspend-foreign-debt-payments-c-bank-governor-2022-04-12/.

*About DTCC, Businesses & Subsidiaries: The Depository Trust Company (DTC)*, DTCC, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (accessed on Apr. 27, 2026).

*Issuer Services Frequently Asked Questions (FAQs)*, DTCC (Nov. 29, 2021), https://dtcclearning.com/products-and-services/asset-services/issuer-services/8674-issuer-services-frequently-asked-questions-faqs.html.

*What is the IMF?*, IMF, https://www.imf.org/en/about/factsheets/imf-at-a-glance (accessed on May 5, 2026).

NFSRC, https://www.nevisfsrc.com/regulated-entities/#hamilton (accessed Apr. 28, 2026)

*CUSIP Number*, SEC, https://www.investor.gov/introduction-investing/investing-basics/glossary/cusip-number (accessed on Apr. 27, 2026).

SEC Office of Investor Ed. And Advocacy, *Investment Companies* (July 9, 2013), https://www.sec.gov/answers/mfinvco.htm.

### d. STATUTES AND REGULATIONS

12 U.S.C. § 1813(c)(1), (l)

U.C.C. § 8-503(b)

Nevis Int'l Banking Ordinance, Cap. 7.05 (2017) (St. Kitts & Nevis)

Fin. Servs. Regulatory Comm'n Act, Cap. 21.10 (2020) (St. Kitts & Nevis)

## APPENDIX C

### I.  Litigation Testimony (*2022 – 2026*)

- *BitGo Holdings, Inc. v. Galaxy Dig. Holdings LP*, No. 2022-080-KSJM (Del. Ch.)

- *Prophet Mortg. Opportunities, L.P. v. Christiana Trust*, No. 22-cv-9771 (S.D.N.Y.)

- *Life Ins. Fund Elite, LLC v. Hamburg Commercial Bank AG*, No. 153200/2003 (N.Y. Sup. Ct. N.Y. Cnty.)

- *Terraform Power Parent, LLC v. Orrick, Herrington & Sutcliffe LLP*, JAMS Case No. 1425037813

- *Vivint Solar, Inc. v. Lundberg*, No. 2020-0988 (Del. Ch.)